IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCES DARCANGELO,

       Plaintiff,

    v.

VERIZON MARYLAND INC.,

       Defendant.

No. WDQ-02-816

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Karen M. Wahle, Bar No. 013658
Martha Dye, Bar No. 015057
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, D.C.  20004-1109
(202) 383-5300
(202) 383-5414 (facsimile)

Counsel for Defendant
Verizon Maryland Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... I

FACTUAL BACKGROUND ........................................................................................ 2

    I.    Plaintiff's Early Employment History (1977-1987). ............................... 2

    II.   Plaintiff's Employment History In The Maintenance Department At the Company's Hunt Valley Facility (1988-1994). ...................................... 3

    III.  Plaintiff's Employment History In the Provisioning Department, In The Years Leading Up To Her Termination (1995-1999). ............................ 6

    IV.  Plaintiff's Job Functions in the Provisioning Department. ................... 18

    V.   Plaintiff's Medical Condition. .............................................................. 21

ARGUMENT ........................................................................................................... 26

    I.    Plaintiff's Disparate Treatment-Based Claims (Counts I and II) Fail Because The Company Had Legitimate Non-Discriminatory Reasons for The Actions It Took. ............................................................................. 27

    II.   Plaintiff's "Failure To Accommodate" Claim Fails. ........................... 33

        A.    Defendant Did Not Have Notice Of Plaintiff's Claimed Disability Or Any Request Or Need For Accommodation. ...................................... 35

        B.    The Proposed Accommodations Would Not Render Plaintiff Qualified For The Position. ...................................................................... 38

            1.    The Proposed Accommodations Would Not Have Prevented Plaintiff From Engaging In Inappropriate Behavior. ...................................................................... 38

            2.    Working With Others Was An Essential Function Of The Job. .................................................................................... 40

    III.  Plaintiff's Discrimination-Based Claims Also Fail Because She Is Not A "Qualified Individual With A Disability," As If Required For Coverage Under The Act. ................................................................................... 43

        A.    Plaintiff's Misconduct Rendered Her Unqualified For Her Position. ...... 44

        B.    Plaintiff Was Not Disabled As That Term Is Defined Under The ADA. ......................................................................................... 47

            1.    Plaintiff Was Not "Actually" Disabled. ...................................... 47

            2.    Plaintiff Was Not "Regarded As" Disabled. ............................... 51

            3.    Plaintiff Did Not Have A "Record Of" Disability. ...................... 55

    IV.  The Medical Examination-Related (Count V) Is Barred By Res Judicata, And Fails In Any Event. ...................................................................... 57

**TABLE OF CONTENTS**
(continued)

**Page**

CONCLUSION.....................................................................................................................60

## TABLE OF AUTHORITIES

**Page**

### CASES

*Amir v. St. Louis Univ.*, 184 F.3d 1017 (8th Cir. 1999) ....................................................49

*Baert v. Euclid Beverage*, 149 F.3d 626 (7th Cir. 1998) ................................................34

*Baffoe v. W.H. Stewart Co.*, 2000 U.S. App. LEXIS 15134 (10th Cir. Apr. 24, 2000) ...........................................................................................................................55

*Baird v. Rose*, 192 F.3d 462 (4th Cir.1999) ..................................................................27

*Basith v. Cook County*, 241 F.3d 919 (7th Cir. 2001) ....................................................35

*Boldini v. Postmaster Gen.*, 928 F. Supp. 125 (D.N.H. 1995).....................................45

*Bratten v. SSI Servs., Inc.*, 185 F.3d 625 (6th Cir. 1999).............................................35

*Breiland v. Advance Circuits, Inc.*, 976 F. Supp. 858 (D. Minn. 1997) ......................49

*Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124 (4th Cir 2002) ...........................................33

*Bryant v. Better Business Bureau*, 923 F. Supp. 720 (D. Md. 1996) ...............34, 35, 36

*Burch v. Coca-Cola*, 119 F.3d 305 (5th Cir. 1997) ......................................................52

*Burke v. Va.*, 1997 U.S. App. LEXIS 13388 (4th Cir. June 6, 1997) ...........................41

*Carrozza v. Howard County*, 847 F. Supp. 365 (D. Md. 1994).....................................46

*Chidebe v. MCI Telecomm. Corp.*, 19 F. Supp. 2d 444 (D. Md. 1998) ...................34, 38

*Cody v. CIGNA Healthcare*, 139 F.3d 595 (8th Cir. 1998) ..........................................54

*Colwell v. Suffolk County Police Dept.*, 158 F.3d 635 (2d Cir. 1998)............53, 54, 56

*Comber v. Prologue, Inc.*, 2000 U.S. Dist. LEXIS 16331 (D. Md. Sept. 28, 2000)....................50

*Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894 (D.C. Cir. 1998) ......................46

*Daley v. Koch*, 892 F.2d 212 (2d Cir. 1989) .................................................................48

*Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998) ...............................56

*Davis v. Univ. of N.C.*, 263 F.3d 95 (4th Cir. 2001) ...............................................48, 50

*Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)................33

## TABLE OF AUTHORITIES
(continued)

**Page**

*Doyal v. Okla. Heart, Inc.*, 213 F.3d 492 (10th Cir. 2000)............................................52

*Duda v. Bd. of Educ.*, 133 F.3d 1054 (7th Cir. 1998) ..................................................48

*EEOC v. Amego, Inc.*, 110 F.3d 135 (1st Cir. 1997) ....................................................47

*EEOC v. Browning-Ferris, Inc.*, 2002 WL 32098075 (D. Md. Sept. 17, 2002)........................44

*EEOC v. Clay Printing Co.*, 955 F.2d 936 (4th Cir. 1992)............................................33

*EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001).............................................50

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55 (4th Cir. 1995) ....................27, 33

*Faulkner v. ATC Vancom of Nev. Ltd. P'ship*, 1999 U.S. App. LEXIS 31855 (9th
    Cir. 1999) ..................................................................................54

*Fenton v. Pritchard Corp.*, 926 F. Supp. 1437 (D. Kan. 1996) ....................................52

*Fitch v. Solipsys Corp.*, 94 F. Supp. 2d 670 (D. Md. 2000) ........................................53

*Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir. 1998)..............................38

*Gasper v. Perry*, 1998 U.S. App. LEXIS 14933 (4th Cir. July 2, 1998) ..........................46

*Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361 (11th Cir. 1999) ....................37

*Gaul v. AT&T, Inc.*, 955 F. Supp. 346 (D.N.J. 1997) ..............................................55

*Gilday v. Mecosta County*, 124 F.3d 760 (6th Cir. 1997)..........................................33

*Greenberg v. N.Y. State Dept. of Correctional Services*, 919 F. Supp. 637
    (E.D.N.Y. 1996) .............................................................................48

*Grenier v. Cyanamid Plastic*, 70 F.3d 667 (1st Cir. 1995)........................................44

*Gutridge v. Clure*, 153 F.3d 898 (8th Cir. 1998) ................................................56

*Hager v. First Va. Bank.*, 2002 WL 31373439 (W.D. Va. Oct. 18, 2002) ..........................34

*Halperin v. Abacus Tech. Corp.*, 128 F.3d 191 (4th Cir. 1997) ..............................44, 47

*Hamilton v. S.W. Bell Tel. Co.*, 136 F.3d 1047 (5th Cir. 1998) ..................................50

*Hardy v. Sears, Roebuck & Co.*, 1996 WL 735565 (N.D. Ga. Aug. 28, 1996)........................46

*Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530 (4th Cir. 1991) ....................58

# TABLE OF AUTHORITIES
(continued)

**Page**

*Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696 (4th Cir. 2001) ...............................44, 51, 52

*Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928 (7th Cir. 1995) ........................................37

*Hill v. Fla. Dept. of Public Health*, 58 FEP Cases 1532, 2 AD Cases 177 (M.D. Fla. 1992) ....................................................................................................42

*Hinson v. Tecumseh Prods. Co.*, 2000 U.S. App. LEXIS 26778 (6th Cir. Oct. 17, 2000)....................................................................................................37

*Holder v. City of Raleigh*, 867 F.2d 823 (4th Cir. 1989) ............................................27

*In re Tomlin*, 105 F.3d 933 (4th Cir. 1997) .............................................................58

*In re Varat Enters., Inc.*, 81 F.3d 1310 (4th Cir. 1996) ..............................................57

*Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151 (E.D.N.Y. 2002) ...............................50

*Johnson v. Boardman Petroleum, Inc.*, 923 F. Supp. 1563 (S.D. Ga. 1996) .................54

*Jones v. Am. Postal Workers Union*, 192 F.3d 417 (4th Cir. 1999) ............................46

*Kaplan v. City of N. Las Vegas*, 323 F.3d 1226 (9th Cir. 2003) .................................33

*Kelly v. Drexel Univ.*, 94 F.3d 102 (3d Cir. 1996).....................................................51

*Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876 (6th Cir. 1996) .........................................53

*Krocka v. Chgo.*, 203 F.3d 507 (7th Cir. 2000) .......................................................53

*Lane v. Wal-Mart Stores, Inc.*, 2000 WL 1481638 (D. Md. Aug. 28, 2000)..............33

*Larking v. CIBA Vision Corp.*, 3 AD Cases 715 (N.D. Ga. 1994)...............................42

*Lawson v. CSX Transp.*, 254 F.3d 916 (7th Cir. 2001) ............................................56

*Little v. FBI*, 1 F.3d 255 (4th Cir. 1993) ................................................................46

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001) .................................35

*Mack v. State Farm Mut. Automobile Ins. Co.*, 2000 U.S. App. LEXIS 1012 (7th Cir. Jan. 20, 2000).....................................................................................43

*Mancini v. Gen. Elec. Co.*, 820 F. Supp. 141 (D. Vt. 1993) ......................................45

*Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir. 1997)................................35

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Mayers v. Washington Adventist Hosp.*, 131 F. Supp. 2d 743 (D. Md. 2001) ............................53

*Mazzarella v. U.S. Postal Serv.*, 849 F. Supp. 89 (D. Mass. 1994) ............................................46

*McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999) ...........................................50

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................................27

*Mendez v. West*, 177 F. Supp. 2d 121 (D.P.R. 2001) ................................................................47

*Miles v. General Services Administration*, 5 AD Cases 351 (E.D. Pa. 1995) ...........................45

*Miller v. Champaign Cmty. Unit Sch. Dist.*, 983 F. Supp. 1201 (C.D. Ill. 1997) ......................60

*Misek-Falkoff v. IBM Corp.*, 854 F. Supp. 215 (S.D.N.Y. 1994) ........................................42, 44

*Montoya v. N. Mex.*, 2000 U.S. App. LEXIS 2687 (10th Cir. Feb. 23, 2000) ............................37

*Mont-Ros v. City*, 111 F. Supp. 2d 1338 (S.D. Fla. 2000) ........................................................53

*Mundo v. Sanus Health Plan*, 966 F. Supp. 171 (E.D.N.Y. 1997) .............................................48

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ....................................................57

*Newberry v. E. Tex. State Univ.*, 161 F.3d 276 (5th Cir. 1998)..................................................33

*Olivares v. Nat'l Aeronautics & Space Admin.*, 934 F. Supp. 698 (D. Md. 1996) .......................2

*Olson v. Dubuque Cmty. Sch. Dist.*, 137 F.3d 609 (8th Cir. 1998)............................................50

*Olson v. Gen. Elec. Astrospace*, 101 F.3d 947 (3d Cir. 1996)...................................................55

*Palmer v. Circuit Ct.*, 905 F. Supp. 499 (N.D. Ill. 1995) ....................................................45, 46

*Patterson v. Chgo. Ass'n for Retarded Citizens*, 150 F.3d 719 (7th Cir. 1998) ........................50

*Perkins v. St. Louis County Water Co.*, 160 F.3d 446 (8th Cir. 1998) ......................................50

*Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437 (6th Cir. 1991)...................................42, 44, 45

*Pittston Co. v. United States*, 199 F.3d 694 (4th Cir. 1999) .................................................57, 59

*Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462 (4th Cir. 2002) ..........................................56

*Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566 (N.D. Ala. 1996)......................................48

*Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152 (10th Cir. 2002).....................................................55

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001) ......................................38

*Rhoads v. FDIC*, 257 F.3d 373 (4th Cir. 2001) ................................................. passim

*Sanders Confectionery Products v. Heller Fin.*, 973 F.2d 474 (6th Cir. 1992) ...........58

*Saylor v. United States,* 315 F.3d 664 (6th Cir. 2003) ................................................58

*Schmidt v. Delta Airlines, Inc.*, 2001 WL 649676 (N.D. Tex. June 8, 2001) ...............33

*Seaman v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999) ..................................................38

*Serow v. Redco Foods, Inc.*, 187 F. Supp. 2d 47 (N.D.N.Y. 2002) ...............................53

*Shiflett v. GE Fanuc Automation Corp.*, 1998 U.S. App. LEXIS 13186 (4th Cir. June 19, 1998) ...........................................................................................................37

*Smith v. Universal Servs., Inc.*, 454 F.2d 154 (5th Cir. 1972) ......................................2

*Soileau v. Guilford of Me.*, 105 F.3d 12 (1st Cir. 1997) ..............................................49

*Sorenson v. Univ. of Utah Hosp.*, 194 F.3d 1084 (10th Cir. 1999) ..............................55

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) ..............................................27

*Stafne v. Unicare* Homes, 266 F.3d 771 (8th Cir. 2001) .............................................34

*Steele v. Thiokol Corp.*, 241 F.3d 1248 (10th Cir. 2001).............................................49

*Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804 (6th Cir. 1999) ..................54, 59, 60

*Sutton v. United Air Lines*, 527 U.S. 471 (1999) ........................................................51

*Tan v. Runyon*, 1996 U.S. App. LEXIS 15826 (4th Cir. 1996) .....................................36

*Taylor v. Principal Fin'l Group, Inc.*, 93 F.3d 155 (5th Cir. 1996) .............................38

*Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ......................................28

*Tice v. Centre Area Transp. Auth.*, 247 F.3d 506 (3d Cir. 2001) .................................54

*Tozzi v. Advanced Med. Mgmt.*, 2001 US Dist LEXIS 17910 (D. Md. May 24, 2001) ..............................................................................................................................50

*Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209 (4th Cir. 1994) ...........................27, 44

*Watson v. City of Miami*, 177 F.3d 932 (11th Cir. 1999) ............................................48

## TABLE OF AUTHORITIES
(continued)

Page

*Webb v. Mercy Hosp.*, 102 F.3d 958 (8th Cir. 1996)..................................................52

*Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1 (D.D.C. 2000) ...............................44

*Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30 (1st Cir.
    2001) ...................................................................................................................50

*Williams v. City of Charlotte*, 899 F. Supp. 1484 (W.D.N.C. 1995) .........................53

## STATUTES

42 U.S.C. § 12102(2)(A).............................................................................................47

42 U.S.C. § 12102(2)(B).............................................................................................47

42 U.S.C. § 12102(2)(C).........................................................................................47, 51

42 U.S.C. § 12112(a) ..............................................................................................43, 44

42 U.S.C. § 12112(b)(5)(A).........................................................................................34

42 U.S.C. § 12112(d)(4) ..............................................................................................59

42 U.S.C. § 12113(b) ..................................................................................................46

42. U.S.C. § 12102(2)(B) ............................................................................................55

## OTHER AUTHORITIES

EEOC Compliance Manual § 902................................................................... passim

Enforcement Guidance on the ADA and Psychiatric Disabilities ...............................46

## REGULATIONS

29 C.F.R. § 1630.14(c) app.........................................................................................59

29 C.F.R. § 1630.2(h) app...........................................................................................48

29 C.F.R. § 1630.2(j)(1)(ii) (2000) .............................................................................49

29 C.F.R. § 1630.2(k) (2000).......................................................................................55

29 C.F.R. § 1630.2(n)(3)..............................................................................................40

29 C.F.R. § 1630.2(o) app...........................................................................................35

**TABLE OF AUTHORITIES**
(continued)

**Page**

29 C.F.R. § 1630.9 ...................................................................................................34, 36

29 C.F.R. § 1630.9 app ...........................................................................................34

## INTRODUCTION

Defendant Verizon Maryland Inc. (the "Company")[1] respectfully submits this memorandum in support of its motion for summary judgment pursuant to Fed. R. Civ. P. 56.

In this action, plaintiff asserts four separate claims under the Americans with Disabilities Act ("ADA") arising out of her employment by defendant. Plaintiff maintains that she has suffered from Bipolar Disorder, a form of mental illness, since 1990, and that the Company discriminated against her on the basis of her disability in several actionable ways between 1997 and her termination on January 6, 1999.

Count I of the complaint alleges disparate treatment arising out of the 1999 termination of plaintiff's employment. Count II alleges disparate treatment arising out of two separate suspensions in 1998, and in other unspecified discipline. Count III, captioned "Failure to Accommodate," challenges the Company's "inappropriate disciplining of Plaintiff," apparently including the same suspension incidents. In Count V, plaintiff claims that she was improperly forced to submit to medical examinations in violation of the ADA on two different dates in 1997 and 1998, and that another examination was requested but never performed in October 1998.[2]

While plaintiff attempts to paint a picture of insensitivity and discriminatory treatment at the hands of Company superiors, the evidence demonstrates that, during her tenure, she engaged in repeated and intolerable misconduct, including violent threats against supervisors and racial harassment of co-workers. Moreover, she refused to curtail this behavior despite repeated warnings and lesser disciplinary sanctions, culminating in her dismissal. Plaintiff's behavior was

---

[1] Verizon Maryland Inc. is the successor-in-interest to plaintiff's prior employers, including Bell Atlantic Maryland, Inc. and the Chesapeake and Potomac Telephone Co. For purposes of simplicity, defendant will refer to "the Company" to mean Verizon Maryland Inc. or any of its predecessors that employed plaintiff.

[2] Count IV of the complaint, alleging a "Violation of ADA Medical Record Confidentiality," was dismissed on October 4, 2002 for failure to timely include it in the administrative charge that plaintiff filed with the Maryland Commission on Human Relations. (Memorandum Opinion, Oct. 4, 2002 (Dkt. #11).)

contemporaneously and meticulously documented by Company management, and is not disputed

by plaintiff herself. Based on the undisputed material facts, and as explained below, the

Company is entitled to summary judgment on each and every one of plaintiff's claims.

## FACTUAL BACKGROUND

### I.     PLAINTIFF'S EARLY EMPLOYMENT HISTORY (1977-1987).

Plaintiff began working at the Company in 1977 as a building attendant. (Dep. of

Frances M. Darcangelo, Dec. 23-24, 2002 ("Darcangelo Dep.") at 103-04.)[3] After a series of

position changes and a six-month break in employment, plaintiff obtained a position with the

Company as a directory assistance operator in 1982. (*Id.* at 105-13.) During her employment as

a directory assistance operator, plaintiff was suspended when she brought bullets with her to

work and told a co-worker that she "was writing her name on the bullets." (*Id.* at 135-36;

1/11/83 Employee Contact Record (Ex. 3).) The bullets were from one of several guns that

plaintiff owned and used for target practice. (Darcangelo Dep. at 138-40.) Plaintiff also carried

a knife at work during various time periods. (*Id.* at 144-46, 178-79; 4/93 Memo (Ex. 11);

4/21/93 Memo (Ex. 13).) During this same time period, plaintiff was suspended for wearing a T-

shirt to work with the words "Hitler was right" written on it, and refusing to cover it or go home

and change. (Darcangelo Dep. at 147-48; 3/16/83 Employee Contact Record (Ex. 4); 3/18/83

Employee Contact Record (Ex. 5); Commission Finding (Ex. 1)[4], at V-DAR 00807.) At her

deposition, plaintiff testified that she wore the T-shirt to intentionally aggravate her supervisor.

(Darcangelo Dep. at 149, 251.)

---

[3] All deposition transcripts, exhibits, and other materials referenced in this memorandum can be found in the
separately submitted volumes of exhibits.

[4] Administrative determinations such as the Writing Finding of the Maryland Commission on Human Relations in
this case are admissible evidence, *Olivares v. Nat'l Aeronautics & Space Admin.*, 934 F. Supp. 698, 703 n.5 (D. Md.
1996), and have been held by some courts to be "highly probative." *See, e.g., Smith v. Universal Servs., Inc.*, 454
F.2d 154, 157 (5th Cir. 1972).

II.     **PLAINTIFF'S EMPLOYMENT HISTORY IN THE MAINTENANCE
        DEPARTMENT AT THE COMPANY'S HUNT VALLEY FACILITY (1988-1994).**

Following several position changes, plaintiff became a Central Office Technician in the

Company's Hunt Valley (Cockeysville), Maryland facility in 1988.  (*Id.* at 124-28, 153.)

Through approximately 1995, plaintiff worked in the facilities maintenance area, which involved

facilitating the repair of existing telephone lines using CRT terminals.  (*Id.* at 154, 156-58.)  At

various times, she worked different time shifts, including off hours shifts.  (*Id.* at 156.)

In October 1989, plaintiff took a leave of absence from the Company to join the Air

Force.  (*Id.* at 181.)  She was sent to Lackland Air Force Base in Texas for basic training.  (*Id.* at

183-84.)  During basic training, she developed mental health problems, culminating in a manic

episode.  (*Id.* at 187, 193-94.)  Plaintiff was given an administrative separation from the Air

Force.  (*Id.* at 194.)  Following her return home, she became delusional.  She was found by the

police trespassing on the grounds of a factory, and was admitted to the hospital, where she was

placed on medication.  (*Id.* at 197-99.)  After two additional hospital stays, plaintiff returned to

work at her previous position with the Company in March 1990.  (*Id.* at 200-07.)

During her employment in the Company's maintenance area, plaintiff frequently engaged

in abusive and disruptive behavior, including regularly referring to a co-worker as a "fat pig" (*id.*

at 164-66) and calling another a "nutless wonder" (*id.* at 166, 170; 3/1/93 Memo (Ex. 9)).  In

1992, plaintiff was given warnings for the use of profanity while guests were touring the facility.

(8/24/92 Memo (Ex. 6); Commission Finding (Ex. 1) at V-DAR 00807.)  Plaintiff displayed

materials in her work area with references to violence and death, including a graph cut out from a

newspaper article regarding "murder at work" and a caption typed up by her referring to "psycho

killers here at the telephone company."  (Darcangelo Dep. at 483-85; USA Today Cartoon (Ex.

7).)  Another item she displayed was a cartoon of the "grim reaper" in front of a man behind a

desk with the caption "Can you give me a minute?  There are a few key people I want to take along with me."  (*Id.* at 486; Cartoon (Ex. 8).)

In 1993, plaintiff was sent for a medical evaluation due to her erratic behavior, including raising her voice, using profanity, and acting irrational and threatening, but was returned to work. (*Id.* at 177 & 221; Dep. of James P. Conrad, Feb. 25, 2003 ("Conrad Dep.") at 85-87; 4/22/93 Request for Medical Evaluation (Ex. 14); 5/4/93 Medical Dept. Report (Ex. 15).)  Management was informed only that she had a condition that was being medically treated and that she was responsible for her actions.  (Conrad Dep. at 87-88, 100; 5/4/93 Medical Dept. Report (Ex. 15).) In connection with the evaluation, the Company medical department received a letter from plaintiff's psychiatrist stating that her medical condition "does not preclude her from performing her work duties or in anyway impair her productivity.  She is not affected by her condition in such a way that her judgement or thought processes are affected."  (6/5/93 Letter (Ex. 16).) James Conrad, plaintiff's manager (the next level of management over her immediate supervisor) was aware only that plaintiff had some kind of medical condition, and did not tell others in the group about it.  (*Id.* at 88-90.)  A disciplinary memo was subsequently placed in her personnel file for this type of behavior.  (Darcangelo Dep. at 211-12.)

In 1994, plaintiff received a performance appraisal that indicated that she needed improvement due to a lack of respect for others and using nicknames and defaming comments when angry.  (1994 Performance Evaluation (Ex. 17); Commission Finding (Ex. 1) at V-DAR 00807)  Plaintiff referred to herself in various communications as "Fran the Terrible," the "Tasmanian Devil," and "Your Humble Goddamn Lunatic."  (Darcangelo Dep. at 223-27, Conrad Dep. at 88-89; 6/18/94 Notes (Ex. 23); 6/6/94 Letter (Ex. 18); 3/1/93 Memo (Ex. 9).) Her dress was "slovenly" and "ill-kempt," to the point that a co-worker referred to her as a "bag

lady." (Darcangelo Dep. at 250-51.) During this time period, she also called a supervisor "fat little bastard" (*id.* at 210; 6/18/94 Notes (Ex. 23); 4/16/93 Notes (Ex. 10); 4/21/93 Memo (Ex. 13); 4/93 Memo (Ex. 11), called a group of supervisors who were participating in a conference call a "bunch of losers," and used foul language in the work place. (6/18/94 Notes (Ex. 23).) Plaintiff made a comment at work that if she were to receive a quality award, "there will be blood on the floor." (6/6/94 Letter (Ex. 18).) Plaintiff's behavior was so severe and threatening that a co-worker wrote a letter to her supervisor stating that she came to work each day "not knowing if I will survive an onslaught by my coworker" and did not feel safe in the workplace (4/20-21/93 Notes (Ex. 12); *see also* 6/14/94 Note (Ex. 20).)

On June 15, 1994, after a complaint was received from a co-worker regarding threatening behavior, a meeting was held between plaintiff and the security department, which, in cooperation with management, sought to reinforce the "harassment free work environment" concept with her. (6/6/94-6/28/94 Incident Rpts. (Ex. 19).) The next day, Mr. Conrad held a meeting with plaintiff, two supervisors, and a union steward "to give her a formal warning that disciplinary action will take place if she does not change her behavior in the workplace." (6/18/94 Notes (Ex. 23); Conrad Dep. at 96-100.) Mr. Conrad reviewed a several incidents of plaintiff's inappropriate and improper behavior, which collectively created a threatening image for herself. (6/18/94 Notes (Ex. 23).) He informed her that this behavior was not acceptable and would not be tolerated. (*Id.*) He also listed situations in which other employees had been held accountable for similar behavior but, unlike herself, had changed their behavior upon being reprimanded. (*Id.*) Mr. Conrad asked plaintiff to seek help from any and all sources when and if she felt it was needed. (*Id.*) A written warning was placed in Ms. Darcangelo's personnel file at this time, to be removed on December 1, 1994. (*Id.*; 6/16/94 Memo (Ex. 22).)

Less than a week later, plaintiff appeared at the office late and in a state of confusion. (7/5/94 Notes (Ex. 24); 7/7/94 Memo (Ex. 25).) Plaintiff had begun taking a new medication, which had a toxic effect on her, causing her to experience severe visual field narrowing and to behave erratically. (Darcangelo Dep. at 216-19.) In spite of the impairment caused by the medication, plaintiff drove to work (arriving late), then was unable to complete her tasks. (*Id.* at 217; Conrad Dep. at 90, 7/5/94 Notes (Ex. 24); 7/7/94 Memo (Ex. 25).) When asked whether she wished to leave, she declined. (7/7/94 Memo (Ex. 25); 9/26/94 Notes (Ex. 27).) Management was not aware of the reason plaintiff was on medication. (Conrad Dep. at 91, 104-05.) Plaintiff was suspended for half a day for coming to work impaired and failing to complete the work rather than calling in sick, as she should have. (Darcangelo Dep. at 221, 7/14/94 Notes (Ex. 26); 9/26/94 Notes (Ex. 27).) At a subsequent grievance meeting, Mr. Conrad pointed out that "I'm not a doctor and can only judge the behavior she presents. She can be very erratic, disrupts my workplace and performs poorly. I've sat down with her at least 8 times. I can't allow my center to be disrupted." (9/26/94 Notes (Ex. 27).)

After this, plaintiff's behavior improved for a period, and the suspension was removed from her record. (Darcangelo Dep. at 232, 12/2/94 Notes (Ex. 28).) In general, as her then-manager testified, "[t]here were periods of time when Fran did well and then there were periods of time when she just didn't want to cooperate." (Conrad Dep. at 122, 124.)

## III.     PLAINTIFF'S EMPLOYMENT HISTORY IN THE PROVISIONING DEPARTMENT, IN THE YEARS LEADING UP TO HER TERMINATION (1995-1999).

In December 1994 or January 1995, plaintiff was reassigned to the provisioning department at the Hunt Valley facility, which handled "provisioning" – new service (as opposed to maintenance of existing service). (Darcangelo Dep. at 261-63.) In this new work group,

where she had agreed to work on the day shift[5] (Darcangelo Dep. at 263-64, 304; Conrad Dep. at 204-06, CORE Records (Ex. 39) at 2), plaintiff's unprofessional behavior continued. For appraisal years 1995 and 1996, plaintiff received coaching regarding her tendency to disrupt the workplace (1995 Performance Appraisal (Ex. 30); 1996 Performance Appraisal (Ex. 32); Commission Finding (Ex. 1) at V-DAR 00808). On January 20, 1995, a supervisory memo was written with a warning regarding her use of "inappropriate language." (Supervisory Memo (Ex. 29).) Other than that, no major incidents took place during 1995-96.

In 1997, plaintiff's behavior again began to become more extreme. (Conrad Dep. at 146-47.) Her supervisor, Gottlieb Fleig, "wanted to do everything to make her successful" (Dep. of Gottlieb Fleig, Jan. 21, 2003 ("Fleig Dep.") at 72), but found it "hard to get Fran to work" (*id.* at 36; *see also id.* at 57 ("Fran would go in a direction that wasn't work related or conducive to get work done . . . ."); *id.* at 66 (plaintiff "caused more problems in that area than any of the other employees [and at times] the job wasn't getting done"); *id.* at 122). When he asked her whether she might be more productive in another section, she responded, "no, if I go there I'm going to have to work." (Fleig Dep. at 72.) She also told him that "she was not going to work for 20 to 25 years with Bell Atlantic, that her game plan was to do something to get fired and then to sue the company and to take those monies and supplement her income, that she would have as a refrigeration repairman." (Fleig Dep. at 115-16; 8/14/97 Notes: F.D. File (Ex. 35)) Mr. Fleig also offered to enroll her in classes on "Interpersonal Communication Skills" or "How to Manage Conflict, Anger, & Emotion," but plaintiff refused. (Seminar Info. Sheets (Ex. 37).)

---

[5] Although plaintiff has on occasion suggested that she was improperly denied the right to work nights following her placement on the day shift, at her deposition she conceded that she did not in fact wish to go back to the night shift. (Darcangelo Dep. at 305.) In any event, management testified that she was not prohibited from working nights. (Conrad Dep. at 204-06.)

On August 14, 1997, plaintiff was confronted by Mr. Fleig for inappropriately eating food and reading a newspaper at her workstation when she should have been working. (Commission Finding (Ex. 1) at V-DAR 00808; Fleig Dep. at 70, 101-02; 8/14/97 Notes: F.D. File (Ex. 35); 8/14/97 Notes Prepared by G. Fleig (Ex. 36).)  Mr. Fleig and another supervisor also overheard her using the "N" word and other racial inappropriate terms on multiple occasions.  (Fleig Dep. at 50-51, 101-05; 8/14/97 Notes Prepared by G. Fleig (Ex. 36); 8/14/97 Notes: F.D. File (Ex. 35); Notes re 8/14/97 Incident (Ex. 34); Dep. of Marianne Moxey, Mar. 6, 2003 ("Moxey Dep.") at 17-22.)  During 1997, plaintiff also disrupted the workforce in other ways, screaming in the work area, making derogatory comments, using offensive language, and posting offensive material in her work area.  (10/13/97 Notes (Ex. 38).)  At some point during this time period she also posted a picture of an "Uzi" sub-machine gun.  (Dep. of Barbara Jean Lee, Mar. 25, 2003 ("Lee Dep.") at 56-57.)

In an attempt to curtail plaintiff's misconduct in the workplace, Mr. Conrad in late 1997 asked union representatives to participate in a meeting at which he would spell out for plaintiff that her unacceptable and offensive behavior would no longer be tolerated, and to put her on notice that henceforth she would be placed in progressive discipline if she were to engage in further improper workplace behavior.[6]  (Commission Finding (Ex. 1) at V-DAR 00808; 10/13/97 Notes (Ex. 38); 6/98-7/98 Minutes (Ex. 54) at 3-4; 1/6/99 Summary of Events (Ex. 70).)  He felt that previously he had been lenient with her in an attempt to "make a workplace where everybody could be productive and earn their money" (Conrad Dep. at 94-95, 150-51; 10/13/97 Notes (Ex. 38)), and partly due to her "special" medical condition, although he did not know

---

[6] According to a Company Labor Relations specialists deposed by plaintiff, "[i]n progressive discipline the company takes increasingly severe disciplinary action in an attempt to communicate with employees about rules, procedure, expectations."  (Dep. of Ann Sewell, Apr. 25, 2003 ("Sewell Dep."), at 9; *see also* Dep. of Charles English, February 11, 2003 ("English Dep.") at 29 (progressive discipline "means that each violation would incur a more severe penalty"); Fleig Dep. at 76-77 (describing progressive dis cipline").)

what that was. (Conrad Dep. at 152-53; 1/6/99 Summary of Events (Ex. 70).) According to one supervisor, Mr. Conrad was "very patient and understanding . . . [in] his reactions to some of these things [plaintiff did]." (Fleig Dep. at 64.)

At the meeting, held on October 13, 1997, Mr. Conrad gave examples of unacceptable conduct in which plaintiff had engaged in the recent past, including use of the terms "nigger," "fuck," "idiot," and "ass kisser," and the posting of offensive materials in her cubicle and around the office, such as posting office memos with the words "dog piss" on them, and taping off her work cubicle like a police crime scene. (Commission Finding (Ex. 1) at V-DAR 00808; 10/13/97 Notes (Ex. 38); *see also* Fleig Dep. at 202-03 (describing "dog piss" incident); 7/1/97 Policy Statement with Handwritten Notes (Ex. 33).) Plaintiff admitted at her deposition that she used the term "nigger" at work on multiple occasions, although she asserted that she did not use the term "enough." (Darcangelo Dep. at 469.) At the meeting, Mr. Conrad informed plaintiff that "she needed to understand that this behavior was no longer going to be overlooked" (10/13/97 Notes (Ex. 38)), but that "if she applied herself she could get back on the right track with the company" (*id.*).

A short time after this meeting, several of plaintiff's co-workers separately approached Company management, including plaintiff's supervisor, to report that they were fearful of plaintiff due to her behavior, and were concerned that she might engage in violence. (Darcangelo Dep. at 314-16, 352; 6/98-7/98 Minutes (Ex. 54) at 2; CORE Records (Ex. 39) at 2; Fleig Dep. at 41-45; Moxey Dep. at 93.) Management promptly contacted CORE, Inc. ("CORE") to obtain advice on handling the situation. (Darcangelo Dep. at 315-16; CORE Records (Ex. 39) at 2-3; Fleig Dep. at 45.) CORE is a medical benefits administration and services company staffed with nurses and doctors with whom the Company contracted to provide

or coordinate certain medical services. The medical staff at CORE asked plaintiff to sign a

release so that they could discuss her condition with her mental health providers, but plaintiff

refused. (*See* Dr. Anthony Russo Notes (Ex. 41).) The medical staff at CORE accordingly

instructed management to send plaintiff home from work until she could undergo a psychiatric

evaluation. (CORE Records (Ex. 39) at 3.) CORE then made arrangements for plaintiff to be

evaluated by psychiatrist Dr. Anthony Russo. (CORE Records (Ex. 39) at 5, 10/23/97 IME/FCE

Request Form, 10/27/97 Genex Letter.) Plaintiff was placed on paid leave beginning October

23, 1997 until the evaluation could be conducted and the results returned to CORE. (CORE

Records (Ex. 39) at 3; Darcangelo Dep. at 318-20; 6/98-7/98 Minutes (Ex. 54); Fleig Dep. at 96.)

The placement of plaintiff on leave was an administrative matter; it was not "a disciplinary

thing." (Fleig Dep. at 96.) Although the appointment was originally scheduled for October 31,

1997 (CORE Records (Ex. 39), 4-A-0 at 2), plaintiff "got lost" on the way to the appointment

and it was rescheduled for November 4, 1997. (*Id.*; 11/4/97 Russo IME Rpt. (Ex. 40).)

Although plaintiff's usual attire was sweatpants or camouflage clothing, a knit cap, and combat

boots (Darcangelo Dep. at 249-50; Answers to Interview Questions (Ex. 78); Lee Dep. at 57),

plaintiff appeared at the appointment with Dr. Russo "neatly dressed in a navy business suit."

(11/4/97 Russo IME Rpt. (Ex. 40) at 2.) This could have been as a result of a manipulative effort

on her part to appear "normal." (Russo Dep. at 81-84.) Dr. Russo found plaintiff to be relatively

high functioning, and returned her to work with no medical restrictions or accommodations other

than a notation with respect to "appropriate dress and behavior." (Commission Finding (Ex. 1)

at V-DAR 00808; 11/4/97 Russo IME Rpt. (Ex. 40).) Management was not given a copy of the

medical report or told of any diagnosis, but was merely told that she was cleared to work without

restrictions.  (Conrad Dep. at 84; 4/29/99 Company Response (Ex. 77); Fleig Dep. at 100; Dep.

of Barbara Kelly, Feb. 14, 2003 ("Kelly Dep.") at 76-77, 91.)

Plaintiff returned to work on December 1, 1997 (CORE Records (Ex. 39), 4-A-0 at 7),

and on January 8, 1998, Mr. Conrad transferred her to a new supervisor, Marianne Moxey, in the

hope that she would have a better rapport with Ms. Moxey than she had with Mr. Fleig.

(Darcangelo Dep. at 262; Answers to Interview Questions (Ex. 78); Fleig Dep. at 39; 1999 F.

Darcangelo Memo to CWA (Ex. 65).)  In general, Mr. Conrad "liked her and . . . he wanted to . .

. try and make things nice for her."  (Fleig Dep. at 88.)  Plaintiff nonetheless continued to disrupt

the workplace after the transfer.  Her performance appraisal for 1997 indicated that she "used

language that was offensive to others," that "[d]espite admonitions she continues to repeat such

occurrences," and that she was "frequently very curt and flippant with technicians and

supervisors and her occasional outbursts are disruptive."  (1997 Performance Appraisal (Ex. 42);

Fleig Dep. at 117-18.)

In early 1998, plaintiff's management documented that she yelled at Ms. Moxey so

loudly that it disrupted the office, and referred to another Company supervisor, Charles "Butch"

English, as a "lying sack of shit."  (Darcangelo Dep. at 410-15; 2/16/99 Notes (Ex. 76); 3/9/98

Memo (Ex. 43); 3/13/98 Memo (Ex. 45); Commission Finding (Ex. 1) at V-DAR 00808; 1/6/99

Summary of Events (Ex. 70); Moxey Dep. at 91.)[7]  Plaintiff also performed poorly and refused to

perform her duties during this period.  (CORE Records (Ex. 39), 6-A-0 at 2; Moxey Dep. at 36

("She wasn't doing barely anything."); *id.* at 52, 88 ("she didn't carry her share of the load").)

Although answering the telephone was part of her job, plaintiff "didn't like to answer the

---

[7] At that time, Mr. English was the work group's "administrative supervisor," who handled administrative issues
such as human resources paperwork, etc., on behalf of all the group's supervisors.  (*See* Moxey Dep. at 86; Fleig
Dep. at 93.)

telephone." (Moxey Dep. at 33.) On March 16, 1998, Ms. Moxey contacted CORE to determine whether plaintiff "had any restrictions which would account for her behavior, otherwise this would all be treated as a disciplinary problem." (CORE Records (Ex. 39), 6-A-0 at 3.) After conferring with plaintiff's health care providers, CORE advised Ms. Moxey and Mr. English that plaintiff was not determined to be a threat, and that she "can be held accountable for her behavior." (*Id.* at 4.)

On May 8, 1998, plaintiff placed a poster in her work area containing a picture of Mr. English in the center of a rifle target. (Commission Finding (Ex. 1) at V-DAR 00808; Darcangelo Dep. at 328-33, 342-45; Conrad Dep. at 46, 156-57; 1/6/99 Summary of Events (Ex. 70).) She also taped the target in several places around the office on co-workers' computer terminals. (6/98-7/98 Minutes (Ex. 54) at 3.)[8] This display caused havoc in the workplace when it was discovered the next morning; it was perceived as violent and threatening, and Mr. English became fearful of being harmed by plaintiff. (Darcangelo Dep. at 345-47; Conrad Dep. at 48, 58-59; 6/98-7/98 Minutes (Ex. 54) at 2-3; English Dep. at 81-83, 184; Kelly Dep. at 86; Lee Dep. at 58-59.) Although a similar, but less imposing, version of the poster had been posted several years prior to this incident, the May 1998 was perceived by Mr. English as particularly threatening on this occasion in light of the fact that (in contrast to the earlier time) he and

---

[8] In addition to the rifle target poster that plaintiff has admitted to posting, with a caption of "Put Butch on the Bus" (Darcangelo Dep. at 328-33, 342-45; "Put Butch on the Bus" Target (Ex. 48)), two other similar rifle target posters with different captions ("Brain Dead, 9 to 5," and "Butch English - Head of the T.C.C. Sharpshooters") were also found in Company files relating to plaintiff. ("T.C. Sharpshooters" Target (Ex. 49); "Brain Dead" Target (Ex. 51).) Because these events occurred five years ago, Comp any witnesses do not have a specific recollection with respect to the circumstances under which these other targets were posted (*see, e.g.*, Fleig Dep. at 193), and plaintiff denied any knowledge of the "T.C.C. Sharpshooters" poster (Darcangelo Dep. at 330). Nonetheless, the caption on the "T.C.C. Sharpshooters" poster does appear to be in plaintiff's handwriting (*compare* "T.C. Sharpshooters" Target (Ex. 49) *with* Handwriting Samples (Ex. 50)), and it was accompanied by a note from Mr. English to Mr. Conrad indicating that plaintiff had posted it in another area of the office. (*See* "T.C. Sharpshooters" Target (Ex. 49).) Accordingly, it is seems likely that these two other targets were the ones posted by plaintiff at other locations around the office at the same time as the "Put Butch on the Bus" version. In any event, it is undisputed that plaintiff posted in the office posters with a supervisor's photograph in the center of a rifle target, and any dispute regarding the origin of the "T.C.C. Sharpshooters" poster created by plaintiff's testimony is accordingly immaterial.

plaintiff "were not getting along," and in the context of plaintiff's recent bizarre behavior and the violence in the workplace concerns that had recently been raised with respect to her.  (English Dep. at 65, 67-68, 78; 5/8/98 Notes of Incident (Ex. 46).)

As a result of plaintiff's posting the rifle target poster, Company management contacted CORE yet again and was told to send plaintiff home pending a medical evaluation.  (CORE Records (Ex. 39), "Violence in the Workplace" Section at 3, 5/11/98 IME/FCE Request Form; 5/8/98 Notes Prepared by M. Moxey (Ex. 47).)  Plaintiff underwent the examination on May 29, 1998, and returned to work on June 3, 1998.  (CORE Records (Ex. 39), 7-A-0 at 4-5.)  The only restriction she was given was that she work one week of a shift of three-quarters the usual length. (CORE Records (Ex. 39), "Violence in the Workplace" Section at 3, Modification Checklist.)  In a conversation with a CORE nurse regarding the restriction, plaintiff stated that she was fine and wanted to return to work full time.  (CORE Records (Ex. 39), 7-A-0 at 4.)  Management again was not given a copy of the medical report or told of any diagnosis that plaintiff had, but was merely told that she was cleared to work without restrictions.  (Conrad Dep. at 84, 185-86; 4/29/99 Company Response (Ex. 77), CORE Records (Ex. 39), 7-A-0 at 3, 6/19/98 Letter from CORE to Marianne Moxey; 6/4/98 Minutes (Ex. 53).)

As a result of the rifle target incident, management consulted with the Company's Labor Relations department, CORE, and Company security personnel, and plaintiff was subsequently suspended for ten days.  (Commission Finding (Ex. 1) at V-DAR 00808; Conrad Dep. at 48-49, 80-81, 161-63; 6/98-7/98 Minutes (Ex. 54); 1/6/99 Summary of Events (Ex. 70); 5/8/98 Notes of Incident (Ex. 46); 5/8/98 Notes Prepared by M. Moxey (Ex. 47); CORE Records (Ex. 39), "Violence in the Workplace" Section at 3.)  Following the suspension, plaintiff was placed on paid leave until the results of the medical evaluation were returned.  (CORE Records (Ex. 39), 7-

A-0 at 3-4.)  Like her superiors, the Company personnel in Labor Relations involved in the

suspension decision were given no information about plaintiff's medical condition.  (Sewell Dep.

at 52.)  In a grievance regarding the suspension, the Company expressed a willingness at a

grievance meeting to reduce the suspension to five days.  (6/98-7/98 Minutes (Ex. 54) at 5.)

Although plaintiff and the union grieved the suspension through two steps, the union elected not

to take the issue to arbitration.  (Dep. of Maria Bury, Apr. 29, 2003 ("Bury Dep.") at 52.)

Plaintiff concedes that her posting of the rifle target violated the Company's Code of Business

Conduct, and that she violated the Code of Business Conduct on other occasions.  (Darcangelo

Dep. at 165-66, 351, 411, 416-17.)

On June 4, 1998, plaintiff was welcomed back to work with a formal meeting in which

she was again informed that she was being placed on progressive discipline and future incidents

would result in further disciplinary action, up to and including dismissal.  (Commission Finding

(Ex. 1) at V-DAR 00808; 1/6/99 Summary of Events (Ex. 70); 6/4/98 Minutes (Ex. 53).)

Plaintiff stated at the meeting that during her absence, she had "forgotten how to do many of the

tasks associated with her position."  (*Id.*)  For the first half of 1998, plaintiff received a

performance appraisal that indicated that she "has on occasion disrupted the work area with her

conduct.  Customers an co-workers have complained about her attitude and behavior."  (1998

Performance Appraisal (Ex. 55).)

Plaintiff subsequently failed to heed the warnings she had been given, and rather than

curtailing her improper behavior, escalated her level of misconduct.  On September 15, 1998,

plaintiff was rude on the telephone to a supervisor.  (Commission Finding (Ex. 1) at V-DAR

00808; Darcangelo Dep. at 412-13; 2/16/99 Notes (Ex. 76).)  Plaintiff also loudly referred to Ms.

14

Moxey as a "slut" to co-workers during this period,[9] and on September 23, 1998 caused a disruption in the workplace by refusing to accept training from a co-worker. (9/28/98 Memo (Ex. 59); Commission Finding (Ex. 1) at V-DAR 00808; Moxey Dep. at 155-56, 165; 9/30/98 Notes (Ex. 60).) A supervisor from another work group formally complained about plaintiff's loud and disruptive behavior, as did several co-workers. (Darcangelo Dep. at 413; 2/16/99 Notes (Ex. 76); Moxey Dep. at 165; 9/30/98 Notes (Ex. 60).)

In the September 23, 1998 incident, the co-worker who was attempting to train plaintiff contacted Ms. Moxey (who was out of the office) for assistance in dealing with plaintiff. (Moxey Dep. at 155.) Ms. Moxey in turn contacted Mr. English to ask him to deal with the situation in her absence. (Darcangelo Dep. at 363; English Dep. at 123-30; 9/23/98 Notes (Ex. 57); Conrad Dep. at 51, 58.) Mr. English instructed plaintiff to come into a conference room with him and to tell him what was going on. (English Dep. at 123-30; 9/23/98 Notes (Ex. 57); 9/21/98 Notes (Ex. 56); Darcangelo Dep. at 363; Conrad Dep. at 51-53; 1/6/99 Summary of Events (Ex. 70).) She refused, claiming that she wanted union representation. (Darcangelo Dep. at 363; Conrad Dep. at 51-53; English Dep. at 123-30; 9/23/98 Notes (Ex. 57); 9/21/98 Notes (Ex. 56).) Mr. English informed plaintiff that if she left the room, it would constitute insubordination, and she nonetheless walked out of the room. (Darcangelo Dep. at 363; English Dep. at 123-30; 9/23/98 Notes (Ex. 57); 9/21/98 Notes (Ex. 56); Conrad Dep. at 46, 51-53; 1/6/99 Summary of Events (Ex. 70); 9/23/98 Minutes (Ex. 58).) Plaintiff was subsequently suspended for three days for insubordination, after management consulted with Company Labor Relations personnel. (Darcangelo Dep. at 368; English Dep. at 123-30; 9/23/98 Notes (Ex. 57);

---

[9] When Ms. Moxey later asked whether she had indeed called her a "slut," plaintiff stated that "she would have to 'think about it.'" (9/30/98 Notes (Ex. 60); Commission Finding (Ex. 1) at V-DAR 00808.)

9/21/98 Notes (Ex. 56); 9/23/98 Minutes (Ex. 58).)  Again, although plaintiff grieved the suspension, the union declined to take the issue to arbitration.  (Bury Dep. at 52.)

Despite the prior warnings she had received, plaintiff again violated Company policy on October 23, 1998, by walking out on a business telephone call with another technician and a customer.  (Commission Finding (Ex. 1) at V-DAR 00808; Darcangelo Dep. at 375, 415; 2/16/99 Notes (Ex. 76); Conrad Dep. at 46, 61; 1/6/99 Summary of Events (Ex. 70); English Dep. at 136-38; 10/23/98 Notes Prepared by B. English (Ex. 62); Moxey Dep. at 166-67; 10/23/98 Notes Prepared by M. Moxey (Ex. 61); 4/11/99 Memo (Ex. 64); 10/23/98 Addendum (Ex. 63).)  When told that she was to be suspended, plaintiff ignored the supervisor who was to escort her out of the building, and instead conducted a loud and disruptive telephone call with a union representative, refusing to hang up the phone.  (10/23/98 Notes Prepared by B. English (Ex. 62).) Management later found out (after plaintiff's termination) that around this time, plaintiff had constructed a "100 days until termination" calendar at her desk and had begun crossing off the days.  (Answers to Interview Questions (Ex. 78).)  At her deposition, plaintiff admitted that she behaved inappropriately in this and the prior incident, and had violated the Company's Code of Business Conduct.  (Darcangelo Dep. at 300, 376-77.)  She also admitted that no one else had engaged in similar behavior and gotten away with it.  (*Id.* at 376-77.)

As a result of the October 23, 1998 incident of misconduct and insubordination, plaintiff was suspended for fifteen days, pursuant to a consultation between management and the Labor Relations department.  (Conrad Dep. at 61-62; Moxey Dep. at 166-71; 10/23/98 Notes Prepared by M. Moxey (Ex. 61).)  Again, although plaintiff grieved the suspension, the union declined to take the issue to arbitration.  (Bury Dep. at 52.)

During plaintiff's fifteen-day suspension, one of plaintiff's co-workers approached Company supervisor Butch English expressing fear of plaintiff's potential for violence. (English Dep. at 133-34; 11/4/98 Notes (Ex. 66).) The employee indicated that she was concerned, based on her previous interactions with plaintiff, that she might retaliate against her and possibly the group or the Company if plaintiff were to be fired. (Darcangelo Dep. at 49-51, 385-87; English Dep. at 133-34; 11/4/98 Notes (Ex. 66).)

On November 16, 1998, plaintiff was welcomed back from suspension once more, with a meeting similar to those that had been held on prior occasions, and a warning to discontinue her violations of the Company's Code of Business Conduct. (Commission Finding (Ex. 1) at V-DAR 00808, 2/16/99 Notes (Ex. 76); 1/6/99 Summary of Events (Ex. 70); Moxey Dep. at 176; 11/16/98 Notes (Ex. 67).) One month later, however, plaintiff repeated the same pattern of inappropriate behavior. On December 17, 1998, while a holiday party was underway at the office, plaintiff responded to a request from African-American co-worker Barbara Lee that she pick up a work "ticket" with the comment that "I ain't gonna do that Ole Massa," in a feigned African American accent. (Darcangelo Dep. at 388-89; 2/16/99 Notes (Ex. 76); Conrad Dep. at 46, 63; 1/6/99 Summary of Events (Ex. 70); 12/17/98 Witness Statements (Ex. 68); English Dep. at 156-59; 12/18/98 F. Darcangelo Statement (Ex. 69).)

When Ms. Lee expressed her displeasure to plaintiff over this racially-charged statement, plaintiff continued to taunt her, repeating the statement multiple times (according to plaintiff herself, possibly ten times (Darcangelo Dep. at 390)) until Ms. Lee became enraged. (*Id.* at 390-91; 1/6/99 Summary of Events (Ex. 70); 12/17/98 Witness Statements (Ex. 68).) Both employees were sent home pending an investigation of the matter. (Commission Finding (Ex. 1) at V-DAR 00809; Darcangelo Dep. at 394.) Ms. Lee, having no disciplinary history (and having

been provoked), was subsequently suspended for three days for her part in the confrontation.
(Sewell Dep. at 54-56 & Confidential Portion at 6; 2/1/99 Notes (Ex. 74); English Dep. at 168-
69.)  Plaintiff was placed on suspension and then formally terminated on January 6, 1999, due to
multiple violations of the Code of Business Conduct, as well as a history of poor performance.
(Conrad Dep. at 45-46, 72-73, 178-82, 201-02; 1/6/99 Summary of Events (Ex. 70); 1/11/99
Notes (Ex. 73); Darcangelo Dep. at 397; Sewell Dep. at 68-69; 1/6/99 Letter (Ex. 72); English
Dep. at 177; Statement of Individual Loss (Ex. 71).)  Again, plaintiff grieved the suspension and
termination, raising for the first time Americans with Disabilities Act issues.  (4/29/99 Company
Response (Ex. 77).)  The union again declined to take the case to arbitration, most likely because
it did not belief it would prevail.  (Bury Dep. at 52, 149-50.)  Plaintiff concedes that her behavior
during this incident violated the Code of Business Conduct.  (Darcangelo Dep. at 400.)

## IV.    PLAINTIFF'S JOB FUNCTIONS IN THE PROVISIONING DEPARTMENT.

The provisioning department in which plaintiff worked from 1995 until her termination in
January 1999 was responsible for remotely coordinating the installation of new service.  (*See*
Fleig Dep. at 6.)  The job involved guiding and communicating via telephone with other
employees who were installing service out in the field.  (Conrad Dep. at 8-9; Fleig Dep. at 15;
Moxey Dep. at 55; Lee Dep. at 27 ("Ninety percent of the job was on the phone talking to people
. . . .").)  Among the "most important skills that people . . . needed to have to perform
successfully" (Fleig Dep. at 180) in plaintiff's position were "interpersonal communications"
(*id.*; *see also* Moxey Dep. at 60-61 (job required "good social skills")), because of the need to
guide field technicians over the telephone (Fleig Dep. at 180; *see also* Moxey Dep. at 60-61
(employees needed to have good social skills.))  Plaintiff admitted that answering the phone was
part of her day-to-day duties in the job.  (Darcangelo Dep. at 265.)  Even plaintiff's witness,
August "Gus" Dankert, agreed that it was a key requirement of the job that one be able to

interact with other people, including co-workers.  (Dep. of August Edward Dankert, Mar. 12, 2003 ("Dankert Dep.") at 59-60.)  Similarly, plaintiff's witness Maria Bury stated at her deposition that "sending another employee over" to work with other employees "happens every day."  (Bury Dep. at 41, 61-62.)  And of course the need to interact properly with supervisors is an essential requirement of any job, including plaintiff's.  (Dep. of Martin Kranitz, Mar. 18, 2003 ("Kranitz Dep. I") at 16, 24.)  Plaintiff did not meet her supervisors' expectations or perform at a satisfactory level in this respect during her entire period of employment in this position, and this was documented in her evaluations and in other entries in her personnel file.  (*See, e.g.*, Fleig Dep. at 61, 124; 1994 Performance Evaluation (Ex. 17); 1995 Performance Appraisal (Ex. 30); 1996 Performance Appraisal (Ex. 32); 1997 Performance Appraisal (Ex. 42); 1998 Performance Appraisal (Ex. 55).)

The need for appropriate interpersonal communication skills in both the maintenance and provisioning areas was documented by Mr. Conrad as far back as 1994.  (*See* Conrad Dep. at 18; Supplemental Job Requirements (Ex. 21).)  Mr. Conrad issued a set of "supplemental job requirements" that required, *inter alia*, that employees make a verbal handoff between incoming and outgoing shifts, that a "harassment-free" work place be maintained, that all duties, including telephone contacts, be performed in a "professional courteous manner," and that no comments, jokes or sarcastic notes would be tolerated on the computer system.  (*Id.*)  Plaintiff admitted that these job requirements applied to her position.  (Darcangelo Dep. at 279.)  Another set of position requirements specific to the provisioning area was also created in 1996.  In this document, one of the listed responsibilities is "[a]ssist co-workers in ongoing effort to eliminate order backlog."  (Position Requirements (Ex. 31) at 2.)  The document also lists the need to "escalate" various problems to superiors, to "notify" others of certain events, and to "assist the

supervisor and the team" to develop certain agreements, all job functions that would also require interpersonal interaction.  (*Id.* at 2-3.)  Plaintiff also admitted that these requirements applied to her.  (Darcangelo Dep. at 274.)[10]

In addition to these specific job requirements, all employees were required to comply with the Company's Code of Business Conduct, which "describ[ed] the standards expected of employee of Bell Atlantic and their actions."  (English Dep. at 13; Code of Business Conduct (Ex. 2).)  The Code of Business Conduct "contains references to behaviors and conduct[] that [are] expected and prohibited in the workplace."  (Sewell Dep. at 12.)  Among other things, the Code of Business Conduct requires that employees be "respectful, cooperative and helpful toward customers, suppliers, [and] our co-workers" (Code of Business Conduct (Ex. 2) at V-DAR 01054), that they not "act in an abusive, threatening, discriminatory, harassing or obscene manner toward any employee or others with whom we come in contact during the course of business" (*id.*) and that they "respect the authority of . . . supervisors and other company managers, never act in an insubordinate manner" (*id.* at V-DAR 01055).  The Code of Business Conduct also prohibited acts of workplace violence, including "threats of physical harm or violence, or any other actions that are threatening or hostile in nature."  (*Id.* at V-DAR 01063.)

Plaintiff admitted at her deposition that she was not treated differently from other employees in the type or number of assignments she was given or the standards of performance to which she was held.  (Darcangelo Dep. at 310-11.)  Plaintiff's supervisors were not given instructions to treat her differently from other employees, nor did they treat her any differently. (Fleig Dep. at 80-81, 87-88; Dankert Dep. at 75-76; Moxey Dep. at 134; Answers to Interview Questions (Ex. 78).)

---

[10] Plaintiff also admitted that mental stability was an essential function of her position.  (Darcangelo Dep. at 481.)

In addition, plaintiff never asked for any accommodation that would enable her to perform the functions of the job that involved interaction with other people, or enable her to comply with the Company's conduct standards and expectations.  (English Dep. at 150; Moxey Dep. at 129-30; Bury Dep. at 116; Plaintiff's Responses to Defendant's 2nd Set of Interrogatories at 2, 4 (admitting that she did not request either (i) that she be allowed to work alone or (ii) that co-worker training be conducted); Pl.'s Responses to Def.'s 1st Set & 2nd Sets of Requests for Admission at 4 (admitting that she "never requested that [she] be allowed to work alone during 1997-98").)  The only "accommodations" that plaintiff testified to having requested were (i) having her work station moved away from a co-worker after he allegedly threw candy into her cubicle, (ii) promotion, (iii) permission to take time off for doctor appointments, and (iv) to be taken off of the night shift (the latter was granted, and in response to the former, the co-worker's cubicle was moved).  (Darcangelo Dep. at 304-07, 369, 403; Moxey Dep. at 182; Plaintiff's Responses to Defendant's 2nd Set of Interrogatories at 1-2, 4.)

## V.    PLAINTIFF'S MEDICAL CONDITION.

Defendant retained an expert witness, Dr. Jeffrey S. Janofsky, to examine plaintiff and to opine on her mental condition.  After reviewing all available records (including plaintiff's employment and medical records from 1981 to the present) and interviewing plaintiff, Dr. Janofsky diagnosed her with Bipolar Disorder, Delirium, and a Personality Disorder.  (Report of Defendant's Expert Jeffrey S. Janofsky, M.D. ("Janofsky Report") ¶ 246.)  He opined, however, that the Delirium (associated only with the June 1994 medication toxicity incident) was fully resolved, and that the Bipolar Disorder was in remission since her 1989-90 manic episode, such that plaintiff is not currently, and was not during her employment within the provisioning department from 1995 to 1999, suffering from any depressive, manic, or hypomanic episodes. (Janofsky Report ¶¶ 247-254.)

21

Although plaintiff's Personality Disorder was active during her employment with the Company, a Personality Disorder is not a psychiatric illness in the same way as Bipolar Disorder. (*Id.* ¶ 257.)  According to Dr. Janofsky, "Personality Disorders do not impair intellectual or perceptual functioning.  Personality Disorders also do not impair a person's ability to control their behaviors."  (*Id.*)[11]  For this reason, Dr. Janofsky opined that:

> Ms. Darcangelo's mental disorders did not cause her to be disabled from being able to perform her essential job functions.  Ms. Darcangelo had the technical capacity to perform her job functions and to interact appropriately with others, as she showed on numerous occasions and during numerous periods during her employment with Bell Atlantic.  At other times Ms. Darcangelo, however, made the choice not to follow company behavioral rules, and to act in a provocative and disruptive manner.  These disruptive behaviors were her choice and were volitional.  Her behaviors were an attempt to intimidate and threaten those around her, and were under her direct control.  She had the capacity to control her behaviors, but chose not to do so.

(*Id.* ¶ 268.)

The results from the Minnesota Multiphasic Personality Inventory 2 test that Dr. Janofsky administered to plaintiff were also consistent with the conclusion that plaintiff is in control of her behavior.  According to the psychologist who scored the test, "her quite good level of ego-strength predicts organized functioning and immediate practical self-sufficiency in many areas." (*Id.* ¶ 194.)

Dr. Janofsky further opined that because plaintiff "was actively seeking out attention and confrontation by choice" (*id.* ¶ 274), accommodations such as allowing her more space and a place to work away from other people, or providing more education or sensitivity training to co-workers (which were never requested, but have been proposed by plaintiff's expert, Martin

---

[11] *See also* DSM-IV TR at xxxiii ("[T]he fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder.").

Kranitz) could not "have any remedial effect" (*id.*) or have rendered her "more successful at her job" (*id.* ¶ 272).

Finally, Dr. Janofsky opined that the referrals of plaintiff for medical evaluations in November 1997 and May 1998 were reasonable, in light of her supervisors' legitimate concerns about disruptive behaviors, which were perceived as intimidating and threatening. (*Id.* at 277.)

Dr. Janofsky's conclusions regarding the calculated nature of plaintiff's workplace misconduct are consistent with the observations of plaintiff's supervisors. For example, Gottlieb Fleig stated that in his opinion, plaintiff's poor relationships with other people were "by design." (Fleig Dep. at 60-61.) Furthermore, he felt that she was capable of doing her job, "but quite often didn't want to." (Fleig Dep. at 67.)

Similarly, both the independent medical evaluation doctors and plaintiff's own mental health care providers also concluded that plaintiff had control over her actions. In 1993, plaintiff's then-psychiatrist opined that her condition "does not preclude her from performing her work duties or in anyway impair her productivity. She is not affected by her condition in such a way that her judgement or thought processes are affected." (6/5/93 Letter (Ex. 16).) In the 1997 medical evaluation report, Dr. Russo opined that plaintiff "is significantly stabilized on medication and can return to work in her full capacity and job duties." (Russo IME Rpt. (Ex. 40) at 3.) He further recommended that she "return to work with restrictions regarding appropriate dress and behavior" and that if she "presents any threats of violence at the work place," "[s]he should either be suspended or terminated as per company policy." (*Id.*) At his deposition, Dr. Russo elaborated that "patients that have this diagnosis are extremely cunning and manipulative." (Russo Dep. at 60.) He was also very skeptical about the possibility that training of plaintiff's co-workers or supervisors could be of use. (*Id.* at 69.) Although he ultimately

concluded that plaintiff did not appear to be a threat, Dr. Russo stated that given the Company's concerns about plaintiff's behavior, the decision to send her for a medical evaluation "definitely would have been warranted," and was in no way unusual. (*Id.* at 79-80.) Dr. Jerome Gottlieb, who conducted the 1998 medical evaluation following the rifle target incident, likewise opined that although plaintiff "demonstrated poor judgment and inappropriateness," she was "capable of performing her normal activities" and "should be able to return to work at this time." (Gottlieb IME Rpt. (Ex. 52) at V-DAR 00883.) Plaintiff's expert Martin Kranitz also stated that during the last part of her employment with the Company, plaintiff "had the ability to work and be productive." (Kranitz Dep. I at 59; *see also* Dep. of Martin A. Kranitz, Mar. 28, 2003 ("Kranitz Dep. II") at 105-06.)

Although plaintiff's expert (and treating psychiatrist) Dr. Gary Zimberg opined in his report that plaintiff "has difficulty maintaining consistent relationships . . . either in her personal life or at work," he stated at his deposition that her difficulties with social and occupational functioning are overwhelmingly related to her Personality Disorder and poor judgment. (Dep. of Gary Zimberg, Apr. 30, 2003 ("Zimberg Dep.") at 62.) According to Dr. Zimberg, plaintiff's Bipolar Disorder diagnosis is "a sideshow." (*Id.*) Dr. Zimberg also did not question the propriety of the independent medical evaluations, "I assume they acted in good faith. They probably thought there was some reason for concern." (*Id.* at 105.)

Plaintiff's psychologist, Ms. Julie Swope, also stated in March 1998 that plaintiff was "in control" and "does have control of her responses." (CORE Notes re Conversations with Julie Swope (Ex. 44) at V-DAR 01940.) At her deposition, she reaffirmed that plaintiff "could have reacted appropriately and have control of her responses" (Dep. of Julie D. Swope, May 28, 2003 ("Swope Dep.") at 154) and "is capable of being responsible" (*id.* at 112; *see also id.* at 24 ("Q.

She should be able to function fine at work?  A. Yeah.”); *id.* at 155 (“[S]he can control whether it’s, it’s – she can make the decision whether this is a situation that warrants me to respond in the way that I’m responding.  Q.  And she is capable of that?  A.  Yeah.”).)  Furthermore, Ms. Swope stated that even in a relatively solitary job that plaintiff recently held as a janitor, she nonetheless ran into problems with social interaction.  (Swope Dep. at 157.)  When asked about the propriety of plaintiff’s being sent by the Company for the two medical evaluations, Ms. Swope testified that “I guess they had every right to.”  (Swope Dep. at 23.)

While plaintiff clearly had and has a psychiatric diagnosis, Company management was never made directly aware of that fact by plaintiff or anyone else.  Although plaintiff occasionally made oblique references to being on medication, to her past experience in the Air Force, or to mental illness generally, management was unaware that plaintiff had a currently diagnosed medical condition or that she may have required any kind of accommodation.  (*See, e.g.*, Fleig Dep. at 208; English Dep. at 150; Moxey Dep. at 129-31.)  Indeed, there was some speculation in the workplace that plaintiff did not even have any such condition, but was faking it.  (Dankert Dep. at 60, 86.)  Moreover, as set forth above, management was repeatedly told by CORE as a result of the medical evaluations that plaintiff had no restrictions or limitations.  (*See* Answers to Interview Questions (Ex. 78) (“Could not get info from medical department, information I received stated no reason C could not work in the workplace.”).)  In addition, the Labor Relations staff, which made decisions regarding disciplinary issues such as the length of suspensions (*see, e.g.*, Moxey Dep. at 135, 170-71), had no knowledge of plaintiff’s medical condition (Sewell Dep. at 52).  Indeed, when plaintiff was asked at her deposition for the basis for her belief that Company management was aware of her medical condition, she was not able to provide any response other than speculation.  (Darcangelo Dep. at 293-95.)  Nor is there any

evidence – even aside from the question of management's knowledge, *vel non*, about that plaintiff's diagnosis – that management believed her to be or treated her as substantially limited in any major life activity.  (*See, e.g.*, Bury Dep. at 121 (no indication that management thought that her condition impacted her ability to work).)

At her deposition, plaintiff also could not point to any non-speculative basis for her belief that the motive for the alleged adverse employment actions was discriminatory.  (Darcangelo Dep. at 322-27.)  Gus Dankert, an employee who testified on plaintiff's behalf, in fact opined that any negative actions that were taken against plaintiff in the workplace were directed at her personally, rather than due to any negative animus towards disabled or mentally ill people. (Dankert Dep. at 71-72; *see also id.* at 74-80 (stating that he never observed anything suggesting that any of the supervisors or Mr. Conrad were prejudiced); *id.* at 114-15 (admitting he never observed her being treated less favorably that other employees); *see also* Bury Dep. at 112-14 (admitting that she never heard anything suggesting that Mr. Conrad, Ms. Moxey, or Mr. English were prejudiced in any way).)

## <u>ARGUMENT</u>

Plaintiff's disparate treatment-based claims (Counts I and II) fail because the undisputed facts demonstrate that the Company had legitimate non-discriminatory reasons for disciplining and terminating her due to repeated incidents of inappropriate, disruptive, and violent misconduct in the workplace, all of which were carefully documented on a contemporaneous basis in her personnel file.  Plaintiff's "failure to accommodate" claim (Count III) fails because plaintiff never suggested to her superiors that her medical condition compromised her ability to perform her job or that she required accommodation in any way, and because the accommodations she proposes would not have rendered her qualified to perform the essential functions of the position in any event.  These three claims also fail because plaintiff is not a

"qualified individual with a disability," as is required for coverage under the Act.  Plaintiff's

medical examination-related claim ("Count V") fails because on both occasions on which she

was required to undergo a medical examination, the examination was job-related and consistent

with business necessity, thus satisfying the ADA's requirements.

## I.  PLAINTIFF'S DISPARATE TREATMENT-BASED CLAIMS (COUNTS I AND II) FAIL BECAUSE THE COMPANY HAD LEGITIMATE NON-DISCRIMINATORY REASONS FOR THE ACTIONS IT TOOK.

In plaintiff's first two counts, she claims that she was treated more harshly than other

employees on the basis of disability with regard to her termination (Count I) and disciplinary

action that was taken against her (Count II).  To establish a claim for disparate treatment,

plaintiff must prove the following elements:  (1) plaintiff has a disability, (2) plaintiff is

otherwise qualified for the position, and (3) plaintiff has suffered an adverse employment action

due to discrimination solely on the basis of disability.  *Baird v. Rose*, 192 F.3d 462, 466, 470 (4th

Cir.1999); *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 212 (4th Cir. 1994).  To prove that the

action was taken on the basis of disability, the plaintiff must show not only that the reason

proffered for its conduct by the employer was false and pretextual, but also that discrimination

was in fact the real reason for the action.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519

(1993) ("It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the

plaintiff's explanation of intentional discrimination.").[12]  Although ADA claims, like other

employment discrimination claims, are subject to the burden-shifting proof scheme of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *Ennis v. Nat'l Ass'n of Bus. & Educ.*

*Radio, Inc.*, 53 F.3d 55, 57-58 (4th Cir. 1995), "[t]he ultimate burden of persuading the trier of

---

[12] *See also Holder v. City of Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989) (pointing out that even "a reason honestly described but poorly founded" need not be pretextual, because "[b]ad or mistaken reasons for a decision may yet be non-discriminatory").

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

As explained below in Part III, plaintiff cannot satisfy the first two prongs of this standard. But the most fundamental flaw in plaintiff's disparate treatment claims – which alleged two sets of "adverse employment actions" – her January 1999 termination (Count I) and "the suspensions imposed in 1998" (Count II) – is the overwhelming evidence that the Company did not take the adverse employment actions due to discrimination solely on the basis of disability. The undisputed evidence demonstrates that plaintiff was actively engaged in countless acts of misconduct, insubordination, and inappropriate and threatening behavior over the years, and that the Company finally took action to discipline and ultimately terminate plaintiff based on her intolerable workplace behavior.

For each incident in which plaintiff was disciplined, and for her termination, there is overwhelming evidence of legitimate non-discriminatory reasons for the Company's action, all of which were amply documented by her superiors with contemporaneous records including: (1) plaintiff's misconduct, (2) the collaborative process through which management and the Labor Relations department conferred as to the proper disciplinary action, (3) consultation with medical professionals concerning the appropriate response to plaintiff's behavior, and (4) the efforts that were made to directly counsel and persuade plaintiff to conduct herself properly in the workplace.

**1997 Paid Leave and Medical Evaluation.** Following reports from several employees of their concern that plaintiff might become violent, plaintiff was referred for a medical evaluation and placed on non-disciplinary paid leave pending the outcome of that evaluation. These reports occurred at a time when plaintiff's behavior in the workplace had become

increasingly offensive and bizarre, and she had been warned about the consequences of continuing her misconduct, as amply documented in Company records.  In determining to send plaintiff for a medical evaluation, plaintiff's superiors conferred with CORE, which approved the request, after plaintiff refused to permit CORE to confer with her mental health care providers.  None of the documentation relating to this incident, nor any of the deposition testimony in the case, contains any indication that plaintiff was being placed on leave or sent for a medical evaluation for any reason other than a concern for plaintiff's ability to perform her duties in the workplace and the safety of her co-workers.  (*See* Factual Background, *supra*, at 7-11, Exs. 1, 33, 38-39, 41, 54, 70.)

**May 8, 1998 Suspension, Paid Leave and Medical Evaluation.**  Plaintiff was suspended for ten days after displaying a poster of a rifle target with a supervisor's face in the center.  She was also referred for a medical evaluation and was placed on paid leave pending the outcome of the evaluation.  Plaintiff's behavior leading up to this suspension clearly violated multiple provisions of the Code of Business Conduct, including those governing "violence in the workplace."  Moreover, it occurred after plaintiff had already been repeatedly warned about improper behavior, including the posting of offensive materials in her cubicle.  Management conferred with the Company's Labor Relations department about the appropriate disciplinary sanctions, with CORE regarding the need for medical intervention, and with the Company's security personnel regarding how to ensure the safety of the workplace.  Management documented the incident and the reasons for its actions contemporaneously.  None of this documentation, nor any of the deposition testimony in the case, contains any indication that she was being disciplined or sent for a medical evaluation for any reason other than her inappropriate

workplace conduct and a concern for the safety of plaintiff's co-workers.  (*See* Factual

Background, *supra*, at 11-14, Exs. 1-2, 38-39, 46-51, 54, 70, 76.)

**September 23, 1998 Suspension.**  Plaintiff was suspended for three days after refusing

to comply with a supervisor's order to meet with him about a incident in the work area.  This

behavior constituted insubordination and violated the Code of Business Conduct.  Management

again conferred with the Labor Relations department to determine the appropriate disciplinary

sanction for this conduct.  Management also documented the incident and the decision to take

disciplinary action contemporaneously.  None of this documentation, nor any of the deposition

testimony in the case, contains any indication that plaintiff was being disciplined for any reason

other than her inappropriate workplace conduct.  (*See* Factual Background, *supra*, at 14-16,

Exs. 1, 56-60, 70, 76.)

**October 23, 1998 Suspension.**  Plaintiff was suspended for ten days after walking out on

a telephone call with a customer and another technician in which she was supposed to be

resolving a technical problem.  Once again, plaintiff's behavior constituted a violation of the

Code of Business Conduct.  Plaintiff's conduct and the basis for the decision to suspend her,

including management's discussions with Labor Relations, were contemporaneously

documented.  None of this documentation, nor any of the deposition testimony in the case,

contains any indication that plaintiff was being disciplined for any reason other than her

inappropriate workplace conduct.  (*See* Factual Background, *supra*, at 15-17, Exs. 1, 61-64, 70,

76.)

**January 6, 1999 Termination Following December 17, 1998 Incident.**  Plaintiff was

suspended and then terminated following an incident in which she repeatedly taunted an African-

American employee with a racial slur.  Plaintiff's conduct in this final incident again violated the

30

Code of Business Conduct. As the contemporaneous documentation shows, the termination was premised not only on this incident, but also on all of the other prior incidents of misconduct, including but not limited to the three previous incidents in which plaintiff had been suspended. Like the other disciplinary decisions, the decision to terminate plaintiff was arrived at in collaboration with the Labor Relations department. Plaintiff demonstrated that, despite repeated warnings and disciplinary actions, she simply would not curb her improper behavior in the workplace. Not only had plaintiff repeatedly violated Company rules, but she was engaging in behavior that was harmful to her co-workers and that, if not curtailed, could in fact subject the Company to liability for race-based harassment. Under the circumstances, the Company was clearly justified in terminating her. Moreover, none of the contemporaneous documentation, nor any of the deposition testimony in the case, contains any indication that plaintiff was terminated for any reason other than her inappropriate workplace conduct. (*See* Factual Background, *supra*, at 16-18, Exs. 1, 68-74, 76.)

        In light of these facts, the Company clearly had legitimate non-discriminatory reasons for the disciplinary action it took. Nor can plaintiff point to any evidence of preferential treatment. In fact, the record shows that plaintiff may have been treated more *leniently* than other employees. Plaintiff may attempt to compare herself to Ms. Lee, the employee at whom she directed the racial slur in the December 17, 1998 incident, and who was suspended but not terminated, but the comparison is not valid. Although Ms. Lee also engaged in misconduct in response to plaintiff's taunting, Ms. Lee had been provoked, and did not have a disciplinary record – in contrast to plaintiff's extraordinarily lengthy one. She therefore was legitimately given only a three day suspension. Moreover, although plaintiff may argue (based on her own testimony and that of Gus Dankert, a disgruntled former employee whose comments during his

deposition suggested that he may harbor some animus against Ms. Lee) that Ms. Lee frequently yelled in the workplace without management taking disciplinary action, there is simply no evidence that any behavior of Ms. Lee's rose to the level of the frequent and repeated profanity, direct violent threats, racial slurs, insubordination, and insults directed at supervisors, in the face of repeated warnings, that plaintiff indisputably engaged in. And even if plaintiff *could* show that she was unfairly treated more harshly than Ms. Lee, there is in any event no evidence that the reason for the claimed differential treatment was due to plaintiff's disability.

The Maryland Commission on Human Relations, which investigated plaintiff's administrative claim prior to her initiating the present lawsuit, came to the same conclusion in an unusually thorough and detailed Written Finding. (*See* Commission Finding (Ex. 1).) Specifically, the Commission found that "Complainant[']s work behavior and conduct did not meet Respondent's expectations after being given repeated notice. There is no evidence Respondent's reasons are [not credible,] and because there is no direct evidence of discriminatory motive, it is determined that there is no probable cause to believe that unlawful discrimination has occurred." (Commission Finding (Ex. 1) at V-DAR 00810.)

Moreover, even plaintiff's own witness, Gus Dankert opined that any negative actions that were taken against plaintiff in the workplace were directed at her personally, rather than due to any negative animus towards disabled or mentally ill people. (Dankert Dep. at 71-72.) Plaintiff herself could not point to any non-speculative basis for her believe that the motive for the alleged adverse employment actions was discriminatory. (Darcangelo Dep. at 322-27.)

Given that no evidence of discriminatory motive or treatment exists, plaintiff's bare speculation and subjective belief that the Company disciplined and terminated her because of her

disability is not sufficient to support a claim for disability discrimination.[13]  Because no evidence

exists concerning discriminatory comments made by management or other behavior suggesting

discriminatory intent on the part of management, the Company is entitled to summary

judgment.[14]

## II.    PLAINTIFF'S "FAILURE TO ACCOMMODATE" CLAIM FAILS.[15]

In plaintiff's Count III, she claims that the Company failed to accommodate her alleged

disability.  The accommodations she demands, based on the testimony of her expert, Martin

Kranitz, are the right to "work alone, or that my interactions with other people be limited," and

"counsel[ing] and educat[ing] the co-workers in my group about dealing with someone with my

condition."  (Pl.'s Responses to Def.'s 2nd Set of Interrogs. at 2.)  The Company is entitled to

summary judgment on this claim because the evidence demonstrates that plaintiff cannot prove

the elements of a "failure to accommodate" claim.

---

[13]  *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-35 (4th Cir 2002) (evidence of subjective beliefs "is insufficient to create a genuine issue of material fact as to any discriminatory conduct on Bell Atlantic's part"); *Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*) ("It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion . . . ."); *Schmidt v. Delta Airlines, Inc.*, No. Civ.A 3:99-CV-0772-G, 2001 WL 649676, at *7 (N.D. Tex. June 8, 2001) (bare speculation and subjective belief regarding defendant's motive insufficient to support ADA claim).

[14]  *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) (granting summary judgment where plaintiff lacked factual support regarding discriminatory motive); *Lane v. Wal-Mart Stores, Inc.*, No. Civ. CCB-99-763, 2000 WL 1481638, at *5-*6 (D. Md. Aug. 28, 2000); *see also EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992) (affirming summary judgment in favor of defendant when neither plaintiffs' testimony nor the statistical evidence showed any evidence of discriminatory conduct"); *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 279 (5th Cir. 1998) (affirming ruling in favor of defendant where all evidence pointed to dismissal on the basis of poor work performance and lack of collegiality, and in absence of evidence that the employer "was concerned specifically about Newberry's being mentally ill – which would be the case if they believed, for example, that mentally ill people are inherently dangerous, and they fired him to avoid the danger").

[15]  Plaintiff claims not only that she was "actually" disabled, and thus entitled to protection under the ADA, but also that she was "regarded as" or had a "record of" being disabled.  (*See* Pl.'s Responses to Def.'s 1st Set & 2nd Sets of Requests for Admissions, at 1-3.)  Should plaintiff's case be reduced to a "regarded as" or "record of" case only, her failure to accommodate claim fails because there is no requirement for accommodation in such cases.  *Newberry*, 161 F.3d at 280 ("regarded as" individuals not entitled to accommodation); *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1232 (9th Cir. 2003) (same); *Gilday v. Mecosta County*, 124 F.3d 760, 764-65 (6th Cir. 1997) (no accommodation required in "regarded as" or "record of" cases).

To establish a prima facie case for failure to accommodate, plaintiff must show that (1) she was an individual with a disability within the meaning of the ADA, (2) defendant had notice of her disability, (3) with reasonable accommodation should could perform the essential functions of the position, and (4) defendant refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001).  A reasonable accommodation does not need to be the accommodation that the employee requested or preferred, *see, e.g.*, *Baert v. Euclid Beverage*, 149 F.3d 626, 633 (7th Cir. 1998), and the employer need only accommodate disabilities of which it is aware.  42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9 app.; *Hager v. First Va. Bank.*, No. Civ.A. 7:01CV00053, 2002 WL 31373439, at *3 (W.D. Va. Oct. 18, 2002).

The burden is on the employee to request the accommodation.  *See Bryant v. Better Business Bureau*, 923 F. Supp. 720, 737 (D. Md. 1996) (ruling that it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed); *Chidebe v. MCI Telecomm. Corp.*, 19 F. Supp. 2d 444, 448 (D. Md. 1998) ("It was [plaintiff's] responsibility to inform MCI if additional accommodation was needed."); *see also* 29 C.F.R. § 1630.9 at 414 (Appendix: Interpretative Guidance).  Thus, if an employee never requested the accommodation at issue, the employer cannot be held liable for failure to accommodate.  *Rhoads v. FDIC*, 956 F. Supp. 1239, 1248-49 (D. Md. 1997) (defendant "should not be held liable for an accommodation which it was never requested to make"), *aff'd in relevant part*, 257 F.3d 373 (4th Cir. 2001).

Even if an employee requests an accommodation, the employer is only required to provide it if it is "effective for the employee."  *Bryant*, 923 F. Supp. at 735.  This means that the accommodation must be one that enables the employee to perform the essential functions of the job.  *See Stafne v. Unicare* Homes, 266 F.3d 771, 774 (8th Cir. 2001).  If the accommodation

would not have the effect of rendering the employee qualified for the job, it does not constitute a "reasonable" accommodation, as is required under the ADA. *Bryant*, 923 F. Supp. at 734-35. Moreover, removing some of the "essential functions" of the job is not a "reasonable accommodation" under the ADA. 29 C.F.R. § 1630.2(o) app ("An employer . . . is not required to reallocate essential functions" as an accommodation); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997) ("The ADA simply does not require an employer to hire an additional person to perform an essential function of a disabled employee's position.").[16]

As described in detail in Part III below, plaintiff was not an individual with a disability within the meaning of the ADA. But even if she had been, she could not meet the remaining requirements to prevail on a "failure to accommodate" claim. Plaintiff never notified her management of her claimed disability or her need for a reasonable accommodation. Furthermore, the accommodations demands would not have been effective. Accordingly, as discussed below, defendant is entitled to summary judgment on Count III.

A.    **Defendant Did Not Have Notice Of Plaintiff's Claimed Disability Or Any Request Or Need For Accommodation.**

The circumstances surrounding the events in plaintiff's workplace are a far cry from those that the drafters of the ADA had in mind when they created a cause of action for an employer's "failure to accommodate." This is not a case in which plaintiff presented her supervisor with a doctor's note explaining that she had a medical condition and required an accommodation, and management refused to provide it. To the contrary – although plaintiff occasionally alluded obliquely to mental illness in the workplace, she never informed her supervisors of a diagnosis, a condition, her treatment history, or even said, "I am mentally ill."

---

[16] *See also Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001) (employer not required to reallocate essential functions as a reasonable accommodation); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258-59 (11th Cir. 2001) (same); *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999) (same).

In fact, when plaintiff's management, stumped by her repeated misconduct in the workplace, sought to determine whether in fact she had some sort of limiting medical condition, plaintiff affirmatively thwarted those efforts. When she was sent for medical evaluations, plaintiff made an obvious effort to appear as "normal" as possible, and management accordingly was twice notified that she was fully fit for duty without any need for accommodation. Nor did plaintiff ever request the accommodations that she now claims would have rendered her qualified for her position, such that management could have "refused" to provide them. Plaintiff thus cannot state a claim for failure to accommodate.

Neither plaintiff's supervisors nor her manager, James Conrad, were aware that plaintiff had a disability that may have required accommodation. Before plaintiff was suspended for the first time in 1998, she was sent for a medical evaluation; management was notified by CORE only that she was fully capable of working without restrictions. That same conclusion was confirmed after the second psychiatric evaluation of plaintiff in May 1998. Accordingly, the best and most up-to-date information that management had on plaintiff's medical condition was that she was fully in control of her faculties and should be treated the same as any other employee. Plaintiff cannot therefore meet her burden of demonstrating that the Company was "on notice" of her disability such that it was required to provide her with an accommodation. *Rhoads*, 257 F.3d at 387 n.11; *Tan v. Runyon*, No. 95-1366, 1996 U.S. App. LEXIS 15826, at *8 (4th Cir. 1996) (unpublished) ("An employer must know about the *existing specific disability* before it can be liable for failing to accommodate the disabled person's needs." (emphasis added)).

Even if her superiors had been "on notice" of plaintiff's claimed disability, the Company cannot be held liable for failure to provide an accommodation, because plaintiff never requested one. 29 C.F.R. § 1630.9, at 414 (Appendix: Interpretive Guidance); *Bryant v. Better Business*

*Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 737 (D. Md. 1996); H.R. Rep. No. 485, pt. 2, at

65 (absent a request, "it would be inappropriate to provide an accommodation"); *Gaston v.*

*Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1364 (11th Cir. 1999) ("[T]he initial burden

of requesting an accommodation is on the employee.  Only after the employee has satisfied this

burden and the employer fails to provide that accommodation can the employee prevail on a

claim that her employer has discriminated against her."); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d

928, 934 (7th Cir. 1995) ("The ADA does not require clairvoyance.").[17]

    During the EEOC investigation, plaintiff "acknowledged that she never requested an

accommodation in response to her disability."  (Commission Finding (Ex. 1) at V-DAR 00809.)

Similarly, at her deposition, the only "accommodations" that she testified to having requested

were (i) having her work station moved away from a co-worker after he allegedly threw candy

into her cubicle, (ii) promotion, (iii) permission to take time off for doctor appointments, and (iv)

being taken off of the night shift (the latter was granted, and the co-worker's work station was

moved in response to the candy incident).  Obviously, none of these would have or could have

had the effect of rendering her capable of performing her work duties or addressing her claimed

disability.

    In any event, based on the testimony of plaintiff's vocational expert, Martin Kranitz, it

appears that the accommodations that plaintiff is now asserting that the Company should have

provided are something quite different – (i) "a place to work away from other people," in the

sense of "isolation rather than space" (Kranitz Dep. I at 31) and (ii) "training done with

---

[17] *See also Montoya v. N. Mex.*, 99-2126, 2000 U.S. App. LEXIS 2687, at *7-*8 (10th Cir. Feb. 23, 2000)
(unpublished) (employee with mental disability not entitled to accommodation where never requested); *Hinson v.*
*Tecumseh Prods. Co.*, 99-6091, 2000 U.S. App. LEXIS 26778, at *8 (6th Cir. Oct. 17, 2000) (unpublished) (same);
*Shiflett v. GE Fanuc Automation Corp.*, 97-1689, 1998 U.S. App. LEXIS 13186, at *8 (4th Cir. June 19, 1998)
(unpublished) ("where the employee will not acknowledge the need for or request an accommodation" the employer
"cannot be required to guess or read the employee's mind").

coworkers and supervisors to understand her condition" (*id.*).  It is undisputed that plaintiff never requested either of these accommodations.  In addition, the Company cannot be held responsible for failing to "guess" that these were accommodations that plaintiff required.  *See, e.g.*, *Chidebe v. MCI Telecommunications Corp.*, 19 F. Supp. 2d 444, 448 (D. Md. 1998) ("It was [plaintiff's] responsibility to inform MCI if additional accommodation was needed.").[18]  Accordingly, plaintiff's failure to accommodate claim fails because she did not request the accommodations she now claims she needed.

**B.      The Proposed Accommodations Would Not Render Plaintiff Qualified For The Position.**

Plaintiff's proposed accommodations also fail because they would not have been effective to render her capable of performing her position.  First, neither of these accommodations would have remedied plaintiff's tendency to antagonize others and engage in misconduct at work.  Second, allowing plaintiff to work away from others would have eliminated an essential function of her job, and does not therefore qualify as a "reasonable" accommodation.

**1.      The Proposed Accommodations Would Not Have Prevented Plaintiff From Engaging In Inappropriate Behavior.**

After interviewing plaintiff and reviewing all of the relevant records, defendant's expert, Dr. Janofsky, concluded that plaintiff's poor interactions with co-workers and customers on the job were the result of volitional behavior on her part to seek out confrontation.  (Janofsky Report ¶¶ 260, 274.)  As a result, he opined that accommodations such as allowing her more space and a

---

[18] *See also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir. 1998) (employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation); *Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001) (accommodation request must be "direct and specific" and "must explain how the accommodation requested is linked to some disability"); *Taylor v. Principal Fin'l Group, Inc.*, 93 F.3d 155, 165-66 (5th Cir. 1996) (employee had an obligation to identify specific reasonable accommodations); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (in mental disability cases "in which the resulting limitations are not obvious to the employer, an employee cannot remain silent and expect his employer to bear the burden of identifying the need for and suggesting appropriate accommodation").

place to work away from other people, or providing more education or sensitivity training to co-workers could not "have any remedial effect" (*id.*) or have rendered her "more successful at her job" (*id.* ¶ 272).

This conclusion is confirmed by numerous other facts relating to plaintiff's job history. With respect to "education or sensitivity training," the facts outlined previously demonstrate that both plaintiff's manager and supervisors were already very sensitive to plaintiff's needs, and attempted on numerous occasions and in numerous ways to create an environment in which she could succeed. Mr. Conrad was actually overly lenient with plaintiff. And *before* taking the step of disciplining plaintiff, management sent her for medical evaluations on two occasions to determine if there was a medical problem that needed to be addressed or accommodated, so that they wouldn't be disciplining an employee who wasn't actually accountable for her behavior. In addition, at each juncture, meetings were held with plaintiff to counsel her as to how to avoid further discipline. It is not clear how additional "sensitivity" training could have altered the situation in the workplace caused by plaintiff's misconduct. Certainly training of other employees would not have had the effect of curtailing plaintiff's own inappropriate behavior, all of which was unprovoked. Moreover, Mr. Kranitz's opinion on this subject was admittedly "largely based on what [he] got from [plaintiff.]" (Kranitz Dep. I at 31.) He did not review plaintiff's personnel file, containing any of the Company documents regarding plaintiff's misconduct or the efforts that were made to enable her to succeed, and thus cannot legitimately opine on whether this type of training would have improved the situation. (*Id.* at 29.)

With respect to the "work alone" option, again, the facts confirm that Dr. Janofsky's psychiatric opinion is correct. No matter what type of "work alone" plaintiff could propose, she would still have to interact with her supervisors, and much of her documented misconduct was

within the context of interaction with her superiors. Moreover, although she worked on the night shift during the early part of her career at the Hunt Valley facility, plaintiff clearly had numerous personality conflicts and disciplinary issues during that timeframe as well. Further, after her termination, she entered into a confrontation with a co-worker at a subsequent job even when in the relatively solitary position as a janitor. These facts point to the inevitable conclusion that the "work alone" solution, even if it were possible, would not have been effective in reducing plaintiff's tendency to engage in inappropriate conduct in the workplace.

## 2.    Working With Others Was An Essential Function Of The Job.

Plaintiff's proposed accommodation of being allowed to work alone would not qualify as a reasonable accommodation because it would have required eliminating the essential function of interacting with co-workers and customers, obviously a requirement in plaintiff's job description.

That interacting with others was an essential function of the job is apparent from consideration of the factors listed by the EEOC as relevant to the identification of essential functions: (i) the employer's judgment, (ii) written job descriptions; (iii) amount of time spent performing the function; (iv) the consequences of not performing the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3). Here, these considerations clearly point to the conclusion that the ability to properly interact with management, co-workers, and customers was essential to plaintiff's position.

As described above, the employer's judgment, as embodied in the testimony of plaintiff's management (and co-workers), is that plaintiff's job is one that requires a significant amount of interaction with co-workers and customers. Plaintiff's job involved remotely coordinating the installation of new telephone service by programming a computer and communicating with people working on the installation out in the field. In addition, due to the problem-solving nature

of the work, co-workers were continually called upon to interact with each other to train and

assist each other in resolving issues that arose.  The consequences of failing to interact with co-

workers would be that plaintiff and her co-workers would not be able to solve the technical

problems that came up using the team effort that was frequently required.  To the extent that

plaintiff seeks to avoid telephone contact as well, coordination of work with technicians out in

the field (the entire purpose of the position) could not be performed at all.

The written job descriptions for persons in plaintiff's work area (that she admits applied

to her (Darcangelo Dep. at 274, 279)) clearly emphasized the need to engage in social

interactions and have proper social skills.  (Supplemental Jobs Requirements (Ex. 21); Position

Requirements (Ex. 31).)  A document regarding "supplemental job requirements" required

employees to make a verbal handoff to employees on the next shift, and discusses proper conduct

when engaging in the frequent interactions with co-workers and customers that were required for

the job.  (Supplemental Job Requirements (Ex. 21).)  Another position requirements document

listed "[a]ssist[ing] co-workers" and other tasks involving interpersonal communication as

responsibilities for persons in plaintiff's position.  (Position Requirements (Ex. 31).)  These

written job descriptions are highly probative of the fact that the need for such interactions was an

essential function of the position.  *See Burke v. Va.*, No. 96-1709, 1997 U.S. App. LEXIS 13388,

at *4-*5 (4th Cir. June 6, 1997) (unpublished).

With respect to the amount of time spent interacting with others on the job, and the extent

to which incumbents actually engaged in those activities, plaintiff admits that her day-to-day

activities involved talking on the phone.  And it is undisputed that each incident in which

plaintiff was involved took place in the course of regular workplace interactions with co-workers

the were required to perform the job.  For example, the Barbara Lee confrontation in December

41

1998 occurred when Ms. Lee asked plaintiff to handle a work "ticket" that had come into the office.  The September 1998 suspension stemmed from a dispute between plaintiff and a co-worker regarding training.  And the October 1998 suspension stemmed from an incident that occurred while plaintiff was on the phone with a technician as part of her regular duties.  Of course all of these incidents, and all of plaintiff's job duties, also required interaction with her supervisors; contact with them is an essential function of any job, as even Mr. Kranitz acknowledges.

That a job's essential functions can encompass more than just the technical skills required to perform the basic job function is confirmed by the opinions of numerous courts around the country that have concluded that interacting with others is an essential function of a job in similar circumstances.[19]  Because plaintiff's proposed "work alone" accommodation would have eliminated an essential function of the job, it does not constitute a "reasonable accommodation" under the ADA.  *See, e.g.*, *Hill v. Fla. Dept. of Public Health*, 58 FEP Cases 1532, 2 AD Cases 177 (M.D. Fla. 1992) (employer did not have to eliminate the public-contact function of a position to accommodate an employee with a depressive disorder who could not tolerate the stress of contact with the public); *Larking v. CIBA Vision Corp.*, 3 AD Cases 715 (N.D. Ga. 1994) (employer was not obligated to eliminate the telephone-answering function from a job for an employee who was unable to field telephone calls because of panic attacks caused by posttraumatic stress).

---

[19] *See e.g.*, *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 441-42 (6th Cir. 1991) ("ability to get along with supervisors and co-workers" found to be an essential function); *Misek-Falkoff v. IBM Corp.*, 854 F. Supp. 215, 227 (S.D.N.Y. 1994) (it is "certainly a 'job-related requirement' that an employee, handicapped or not, be able to get along with co-workers and supervisors" and an employer may "require that employees, whether handicapped or not, not cause, or contribute to, undue hostility in the workplace"), *aff'd*, 60 F.3d 811 (2d Cir. 1995).  *See also Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir. 2003) (ability to handle stressful situations deemed an essential function); *Mancini v. Gen. Elec. Co.*, 820 F. Supp. 141, 147 (D. Vt. 1993) ("employees must be present and willing to obey their supervisors to perform the essential functions of their job").

Moreover, an employer cannot be required to provide an ADA plaintiff with a stress-free environment, which is essentially what plaintiff is suggesting. *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 728 (8th Cir. 1999) (employer does not need to provide "an aggravation-free environment" for an employee with depression and stress syndrome).[20] Indeed, in one analogous case, a federal appellate court concluded that an employee was not entitled to have his employer "'leave him alone' and allow him to remain at his desk without interaction with management until he reaches retirement age." *Mack v. State Farm Mut. Automobile Ins. Co.*, No. 99-2315, 2000 U.S. App. LEXIS 1012, at *15 (7th Cir. Jan. 20, 2000) (unpublished). Accordingly, plaintiff's proposed accommodations must be rejected, and defendant is entitled to summary judgment on plaintiff's "failure to accommodate" claim.

## III.   PLAINTIFF'S DISCRIMINATION-BASED CLAIMS ALSO FAIL BECAUSE SHE IS NOT A "QUALIFIED INDIVIDUAL WITH A DISABILITY," AS IF REQUIRED FOR COVERAGE UNDER THE ACT.

Each of plaintiff's first three counts – for disparate treatment in termination and employment and for failure to accommodate – fails for the reasons explained above. But even if plaintiff could surmount the legal hurdles that the other elements of each of those claims presents, she could not prevail on any of them due to lack of standing. Counts I through III of plaintiff's complaint derive from the ADA section prohibiting discrimination against "a qualified individual with a disability." 42 U.S.C. § 12112(a). In order to have standing to bring those claims, then, plaintiff must prove that she is in fact a "qualified individual with a disability." Under the ADA, a "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions

---

[20] *See also Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002) ("employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position"); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) (the employer was not required to "create a wholly isolated work space for an employee that is free from numerous possible irritants").

of the employment position that such individual holds or desires." *Id.* § 12111(8).  For the

reasons described below, plaintiff cannot meet these criteria.

### A.    Plaintiff's Misconduct Rendered Her Unqualified For Her Position.

Plaintiff bears the burden of demonstrating that she was qualified for her position.

*Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 197 (4th Cir. 1997); *Tyndall v. Nat'l Educ. Ctrs.*,

31 F.3d 209, 213 (4th Cir. 1994) (plaintiff "bears the burden of demonstrating that she could

perform the essential functions of her job with reasonable accommodation").  With respect to

termination-based claims like Count I, this factor is also sometimes referred to as a requirement

that she "was performing the job at a level that met [her] employer's legitimate expectations."

*Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001).[21]

Although the term "qualified" might suggest to the lay person the issue of whether the

employee has the appropriate technical skills and experience, like those that one might see on a

resume, this is not its legal meaning under the ADA.  *Grenier v. Cyanamid Plastic*, 70 F.3d 667,

674-75 (1st Cir. 1995).  Other aspects of the job, such as the ability to get along with co-workers,

can also be "essential functions" of the job, and the inability or unwillingness to perform them

renders an employee "unqualified."  *Id.* (ability to get along with supervisors and co-workers is

essential to most jobs).[22]

---

[21] *See also Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001); *EEOC v. Browning-Ferris, Inc.*, No. CIV.A.MJG-98-3246, 2002 WL 32098075, at *5 & *8 (D. Md. Sept. 17, 2002) (equating the requirement that the employee be "otherwise qualified" with the requirement that the employee must have been performing her job at a level that met the employer's expectations).

[22] *See also Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 14-15 (D.D.C. 2000) (observing that "technical skills and experience are not the only essential requirements of a job" and concluding that the plaintiff's "ability to interact with her co-workers and supervisors in a non-disruptive and non-abusive fashion was an essential function of her job"); *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 441-42 (6th Cir. 1991) ("ability to get along with supervisors and co-workers" found to be an essential function); *Misek-Falkoff v. IBM Corp.*, 854 F. Supp. 215, 227 (S.D.N.Y. 1994) (it is "certainly a 'job-related requirement' that an employee, handicapped or not, be able to get along with co-workers and supervisors" and an employer may "require that employees, whether handicapped or not, not cause, or contribute to, undue hostility in the workplace"), *aff'd*, 60 F.3d 811 (2d Cir. 1995); *Mancini v. Gen. Elec. Co.*, 820

44

As described above with respect to the accommodation question, interacting with co-workers, supervisors, and customers was an essential function of plaintiff's position. Moreover, the Company promulgated rules that all Company employees must engage in proper conduct in the workplace, as embodied in the Code of Business Conduct. Plaintiff's repeated demonstrations that she would not comply with those rules rendered her unqualified for her position – and thus not a "qualified individual with a disability" – and defeats her discrimination-based claims.

In numerous cases, courts have uniformly agreed that failure to comply with workplace conduct rules renders an employee unqualified for the purpose of the ADA. For example, in *Miles v. General Services Administration*, 5 AD Cases 351 (E.D. Pa. 1995), the court ruled that an employee was not qualified because, among other things, he was disruptive at meetings, harassed fellow employees and insulted his supervisors. *Id.* at 355. Similarly, in *Palmer v. Circuit Ct.*, 905 F. Supp. 499 (N.D. Ill. 1995), *aff'd*, 117 F.3 351 (7th Cir. 1997), the plaintiff was deemed not qualified (in spite of an alleged mental condition) because she continually engaged in disruptive and abusive behavior towards her co-workers. *Id.* at 509. Other courts have agreed on similar facts. *See, e.g.*, *Boldini v. Postmaster Gen.*, 928 F. Supp. 125, 128, 131 (D.N.H. 1995) (employee with "severe mental stress-related anxiety" who engaged in verbal altercations with co-workers and customers and who became loud and abusive and failed to follow instructions held unqualified under Rehabilitation Act due to her failure to "adhere to the formalities and requirements associated with her job"); *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 442 (6th Cir. 1991) (employee with mental disability that caused negative reactions to his supervisors' criticism was not qualified); *Mazzarella v. U.S. Postal Serv.*, 849 F. Supp. 89,

---

F. Supp. 141, 147 (D. Vt. 1993) ("employees must be present and willing to obey their supervisors to perform the essential functions of their job").

92-95 (D. Mass. 1994) (employee with "explosive personality disorder" who screamed

obscenities and threw office furniture held unqualified under the Rehabilitation Act); *Hardy v.*

*Sears, Roebuck & Co.*, Civ. A. No. 4:95-CV-0215-HLM, 1996 WL 735565, at *4, *7 (N.D. Ga.

Aug. 28, 1996) (employee with Bipolar Disorder who "pose[d] [an] ongoing risk of combative

exchanges with his co-workers" held not qualified due to failure to fulfill essential job function

of peacefully interacting with his supervisors, other employees, and customers").

     This conclusion is consistent with the EEOC's interpretation of the ADA as not requiring

an employer to tolerate an employee's improper workplace behavior, even if caused by the

employee's disability.  EEOC Compliance Manual § 902.2 n.11 (an employer "does not have to

excuse . . . misconduct, even if the misconduct results from an impairment that rises to the level

of a disability"); Enforcement Guidance on the ADA and Psychiatric Disabilities ¶ 30 (an

employer may discipline an individual with a disability for violating a valid workplace conduct

standard, even if the misconduct resulted from a disability); *id.* ("Nothing in the ADA prevents

an employer from maintaining a workplace free of violence or threats of violence . . . .").[23]

Plaintiff accordingly cannot maintain any discrimination-based claim under the ADA, because

her misconduct clearly rendered her unqualified, and she did not perform her job at a level that

met her employer's legitimate expectations.[24]

---

[23] *See also Little v. FBI*, 1 F.3d 255, 259 (4th Cir. 1993) (an employer must be permitted to terminate its employee on account of egregious misconduct, irrespective of whether the employee is disabled); *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999) ("The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability"); *Gasper v. Perry*, No. 97-1542, 1998 U.S. App. LEXIS 14933, at *21 (4th Cir. July 2, 1998)) (plaintiff could be disciplined for repeated misconduct even though plaintiff claimed it was caused by mental disability); *Carrozza v. Howard County*, 847 F. Supp. 365, 367-68 (D. Md. 1994) (termination of employee with Bipolar Disorder justified where employee engaged in insubordinate behavior and outbursts directed towards her supervisors), *aff'd*, 45 F.3d 425 (4th Cir. 1995); *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 898 (D.C. Cir. 1998) (employer justified in terminating employee with psychiatric disorder due to rudeness).

[24] It also bears mentioning that an employee may be deemed unqualified if she "pose[s] a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b); Palmer, 905 F. Supp. at 509, 510 (N.D. Ill. 1995) (plaintiff's use of threatening statements rendered her a "direct threat to the health and safety" of the other

**B.**     **Plaintiff Was Not Disabled As That Term Is Defined Under The ADA.**

In addition to not being "qualified," plaintiff cannot meet the requirement that she be a "qualified individual with a disability" because she is not disabled, as the ADA defines that term. An ADA plaintiff must demonstrate that she is disabled in one of three ways. First, the employee can show that she has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Second, the employee can show that she has "a record of such an impairment." *Id.* § 12102(2)(B). Third, the employee can show that she is "regarded as having such an impairment." *Id.* § 12102(2)(C). The undisputed facts of this case demonstrate that plaintiff cannot meet any of these definitions of "disability."

**1.**     **Plaintiff Was Not "Actually" Disabled.**

Plaintiff cannot demonstrate that she actually suffers from "a physical or mental impairment that substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A). To satisfy this definition, plaintiff must establish (i) that her mental condition is a "physical or mental impairment," (ii) that "engaging in social interactions" or "working" are "major life activities," as she asserts, and (iii) that her mental condition "substantially limits" her ability to engage in social interactions or to work. *See Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997). Plaintiff cannot satisfy these conditions.

As an initial matter, it is questionable whether plaintiff suffers from any impairment under the ADA. According to Dr. Janofsky, plaintiff's Bipolar Disorder is in remission, and Dr.

---

workers); *EEOC v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir. 1997) (when an individual poses a direct threat to the health and safety of others, he is not "otherwise qualified for the job"). With respect to the rifle target incident and the 1997 medical evaluation incident, management had every reason to believe that, absent medical confirmation that she was okay, plaintiff could pose a direct threat to Mr. English or to the other employees who had expressed fear. Accordingly, she cannot maintain a cause of action under the ADA based on those incidents for this additional reason. *Mendez v. West*, 177 F. Supp. 2d 121, 127 (D.P.R. 2001) ("[W]hen an individual threatens her employer, she may not maintain a cause of action under the Americans with Disabilities Act . . . .").

Zimberg agrees that it is a "sideshow" compared with plaintiff's Personality Disorder and poor

judgment.  Furthermore, although plaintiff has been diagnosed with a Personality Disorder,

Personality Disorders are not "illnesses" but merely a collection of maladaptive personality traits

that have been given a name as a psychiatric diagnosis.  (*See* Janofsky Report ¶¶ 255-57.)

"Personality traits such as poor judgment or a quick temper" are not covered by the ADA.  29

C.F.R. § 1630.2(h) app.; EEOC Compliance Manual § 902.2(c)(4); *see also Greenberg v. N.Y.*

*State Dept. of Correctional Services*, 919 F. Supp. 637, 643 (E.D.N.Y. 1996) ("poor judgment"

is a "personality character trait[]" not covered under the ADA); *Watson v. City of Miami*, 177

F.3d 932, 935 (11th Cir. 1999) (being "paranoid, disgruntled, oppositional, difficult to interact

with, unusual, suspicious, threatening, and distrustful" are behavioral characteristics, not mental

impairments); *Daley v. Koch*, 892 F.2d 212, 214 (2d Cir. 1989) (applicant who showed "poor

judgment, irresponsible behavior and poor impulse control" did not have an ADA-covered

impairment).[25]   Therefore, plaintiff's Personality Disorder ought not be considered an

"impairment" under the ADA.  Even assuming that a Personality Disorder could properly be

considered an impairment, in this instance plaintiff's Personality Disorder (her only diagnosis

during the period in question) does not substantially limit any of her major life activities.

     The ability to get along with others has not been determined in this Circuit to be a major

life activity, nor should it be.  *Davis v. Univ. of N.C.*, 263 F.3d 95, 100 n.4 (4th Cir. 2001)

(expressing doubt about whether "the ability to get along with others is a major life activity").

Several other circuits have also expressed doubt about whether the ability to get along with

---

[25] *See also Duda v. Bd. of Educ.*, 133 F.3d 1054, 1059 (7th Cir. 1998) ("mere temperament and irritability" are not covered under the ADA); *Mundo v. Sanus Health Plan*, 966 F. Supp. 171, 173 (E.D.N.Y. 1997) ("an inability to tolerate stressful situations is not an impairment" under the ADA; the ADA "was not intended to categorize people with common personality traits as disabled"); *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1580 (N.D. Ala. 1996) (poor judgment, irresponsible behavior, and poor impulse control do not amount to mental condition that Congress intended to be considered impairment that substantially limits major life activity).

others as a major life activity, because while it is "a skill to be prized, it is different in kind from breathing or walking." *Soileau v. Guilford of Me.*, 105 F.3d 12, 15 (1st Cir. 1997).[26]

In any event, plaintiff cannot prove that she is substantially limited in either the ability to get along with others or the major life activity of working. To be "substantially limited" means to be "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (2000); *Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001). As Dr. Janofsky explains in his report, a person with plaintiff's behavior and experiences is categorized by psychiatrists diagnostically as having a Personality Disorder. Her Bipolar Disorder is in remission. Plaintiff's personality order diagnosis means nothing with respect to how well she is able to control her actions compared to the average person in the general population. According to Dr. Janofsky, and as corroborated by the independent medical evaluators and her own health care providers, plaintiff was fully in control of her interactions with others during the final years of her employment at the Company. When she disrupted the workplace or entered into confrontations with co-workers, it was intentional and a decision that she consciously made. Plaintiff herself does not dispute this. As described in Dr. Janofsky's report, plaintiff admitted that she did things, such as using racial slurs towards Barbara Lee, on purpose to aggravate people. Given that plaintiff was strategically deciding when she wanted to

---

[26] *See also Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999) (stating that it is "questionable" whether the "ability to get along with others" constitutes a major life activity); *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254-55 (10th Cir. 2001) (difficulty interacting with co-workers is not a disability); *Breiland v. Advance Circuits, Inc.*, 976 F. Supp. 858, 863 (D. Minn. 1997).

get along with others and when she did not, it cannot be said that she was substantially limited in interacting with others, even if it *were* a major life activity.[27]

To show that she was substantially limited in working, plaintiff would need to present evidence that she was precluded from working in a broad class of jobs. *Davis v. Univ. of N.C.*, 263 F.3d 95, 99 (4th Cir. 2001). But because her inappropriate workplace behavior was fully under her control, she cannot even demonstrate that she was disabled from performing her *own* job, let alone a broad class of jobs. *Perkins v. St. Louis County Water Co.*, 160 F.3d 446, 448 (8th Cir. 1998) (plaintiff not substantially limited in working where he could not even demonstrate that he was disabled from performing his own job). In addition, the fact that plaintiff did hold her job at the Company for a substantial period of time, and during some time periods without significant behavioral irregularities, tends to confirm that plaintiff was not disabled from working. *See Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 34 (1st Cir. 2001); *Hamilton v. S.W. Bell Tel. Co.*, 136 F.3d 1047, 1051 (5th Cir. 1998); *Olson v. Dubuque Cmty. Sch. Dist.*, 137 F.3d 609, 611 (8th Cir. 1998); *Patterson v. Chgo. Ass'n for Retarded Citizens*, 150 F.3d 719, 726 (7th Cir. 1998); *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001) (finding that a plaintiff who "perform[ed] her job effectively" before being replaced was not disabled under the ADA).

In summary, although plaintiff does have a psychiatric diagnosis, nothing about that diagnosis or any other facts in this case suggest or indicate that plaintiff was substantially limited in either ability to interact with others or in her ability to work.[28]

---

[27] *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999) ("mere trouble getting along with co-workers is not a substantial limitation in the major life activity of getting along with others"); *Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 160-61 (E.D.N.Y. 2002) (citing *McAlindin*); *Tozzi v. Advanced Med. Mgmt.*, No. S00-2363, 2001 US Dist LEXIS 17910, at *31 n.9 (D. Md. May 24, 2001) (finding no substantial limitation on a life activity when plaintiff had difficulty socializing in certain contexts); *Comber v. Prologue, Inc.*, SFM-99-2637, 2000 U.S. Dist. LEXIS 16331, at *9-10 (D. Md. Sept. 28, 2000) (a personality conflict does not establish a substantial limit on a life activity, even when plaintiff's mental illness may have contributed to the conflict).

## 2.    Plaintiff Was Not "Regarded As" Disabled.

Plaintiff also claims that she was "regarded as" being disabled, *see* 42 U.S.C.

§ 12102(2)(C).  In order to demonstrate that she was regarded as disabled, plaintiff is "required

to show that: (1) her employer 'mistakenly believe[d] that [she] has a physical impairment that

substantially limits one or more major life activities,' or (2) her employer 'mistakenly believed

that an actual, nonlimiting impairment substantially limits one or more major life activities.'"

*Rhoads v. FDIC*, 257 F.3d at 390 (quoting *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696,

703 (4th Cir. 2001)).  This aspect of the ADA's definition of disability is "designed to protect

against myths, fears, stereotypes, and other attitudinal barriers about disability," EEOC

Compliance Manual § 902.8(a), and is intended to protect those individuals who are subjected to

employer misconceptions that "result from stereotypic assumptions not truly indicative of . . .

individual ability." *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999).

Where the evidence merely demonstrates management "uncertainty about [plaintiff's]

condition," *Haulbrook*, 252 F.3d at 704, it is not sufficient to establish a "regarded as" claim.  *Id.*

Moreover, even if the employer clearly is aware of an employee's impairment this fact, "without

more, is 'insufficient to demonstrate either that the employer regarded the employee as disabled

or that perception caused the adverse employment action.'"  *Id.* at 703 (quoting *Kelly v. Drexel*

*Univ.*, 94 F.3d 102, 109 (3d Cir. 1996)); EEOC Compliance Manual § 902.8(a) ("To determine

whether an employer regards an individual as having an impairment that substantially limits

major life activities, one must examine the employer's perception *and treatment* of the charging

party.") (emphasis added).  As explained in the EEOC Compliance Manual:

---

[28] Moreover, even if plaintiff were not able to control her behavior due to a mental illness of some type, the inevitable conclusion would be that she was not qualified for her job at Bell Atlantic, which required the ability to interact with others.  And as set forth above, plaintiff's proposed accommodations would do not be effective to render her qualified.

> An employer regards an individual as substantially limited in the
> ability to work if, as the result of myths, fears, stereotypes, or other
> attitudinal barriers commonly associated with disability, it treats
> the individual as having an impairment that disqualifies or
> significantly restricts him or her from working in a class of jobs or
> in a broad range of jobs in various classes. . . . This means that one
> must determine what the employer thinks about the impairment
> and how the employer believes the impairment affects the
> individual's ability to work. *That is, one must identify the work
> limitations that the employer believes result from the impairment*.

*id.* § 902.8(f) (emphasis added).[29]

Here it cannot be said that the Company possessed anything more than "uncertainty"

regarding plaintiff's condition. Although some members of the management team had heard that

plaintiff was on medication, they never knew whether she had a medical diagnosis or identifiable

psychiatric condition. Indeed, they were repeatedly told by trained medical professional

following the medical evaluations that plaintiff was fully capable of working and did not have

any condition that would affect her work. Thus, as in *Haulbrook*, "the record demonstrates that

[the Company] did not know the extent of [plaintiff's] illness and sought further information

regarding the nature of [her] impairment." *Haulbrook*, 252 F.3d at 703. This is not sufficient to

state a "regarded as" claim. *Id.*[30]

---

[29] *See also Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144 (2d Cir. 1998) (rejecting "regarded as" claim despite employer's knowledge of plaintiff's panic disorder, where plaintiff could not demonstrate that the employer regarded the employee as substantially limited in a major life activity); *Schwartz v. Comex*, No. 96 CIV. 3386 LAP, 1997 WL 187353, at *2 (S.D.N.Y. Apr. 15, 1997) (employee must be treated as unable to perform major life activities at the same level as an average person to state a "regarded as" claim).

[30] *See also Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 499 (10th Cir. 2000) (perceiving someone as "unmotivated, forgetful, and irremediably unhappy in her job" is not the same as regarding him or her as substantially limited in a major life activity); *Burch v. Coca-Cola*, 119 F.3d 305, 322 (5th Cir. 1997) (although company may have been concerned about the employee's inappropriate behavior and short temper, this did not mean that the company regarded the employee as substantially limited in his ability to work or in his other major life activities); *Fenton v. Pritchard Corp.*, 926 F. Supp. 1437, 1444-45 (D. Kan. 1996) (perceiving of employee as a violent person due to his misconduct was not equivalent to regarding him as suffering from an impairment that substantially limited him in a major life activity); *Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir. 1996) (rejecting regarded as claim because although employer may have believed the employee was difficult and insubordinate, there was no evidence that "she was considered mentally impaired").

Even if the limited information that management had about plaintiff's condition were sufficient to suggest that they "knew" of her disability, there is no evidence whatsoever that they believed her to be substantially limited in a major life activity, or treated her as such. Even plaintiff admitted that she was treated the same as other employees with respect to work assignments and was not precluded from engaging in any particular job activities. The fact that the Company allowed plaintiff to continue to work without restrictions on the types of duties she could perform demonstrates that it did not "regard her" as substantially limited in working.[31] *Mayers v. Washington Adventist Hosp.*, 131 F. Supp. 2d 743, 750 (D. Md. 2001) (rejecting "regarded as" claim because plaintiff "returned to the same position without any alteration in her duties or responsibilities"); *Fitch v. Solipsys Corp.*, 94 F. Supp. 2d 670, 676 (D. Md. 2000) (rejecting "regarded as" claim because plaintiff was "never on limited duty of any kind").[32]

---

[31] In her interrogatory responses, plaintiff contends that she was regarded as substantially limited in the major life activity of "working alone." (Pl.'s Responses to Defendant's 2nd Set of Interrogatories at 3.) This contradicts her responses to requests for admissions, in which she admits that the only major life activities at issue are "interacting with others, working, and working an out-of-hours shift," suggesting that the interrogatory response may be a typographical error. (*See* Pl.'s Responses to Def.'s 1st Set & 2nd Sets of Requests for Admission, at 3.) In any event, this contention should be rejected because there is no precedent for the concept that "working alone" is a major life activity. In addition, it appears that plaintiff may make this contention on the basis that she was moved from night to day work in the months following the 1994 medication toxicity incident. Plaintiff has specifically testified that she did not *want* to work nights (Darcangelo Dep. at 305), and it therefore makes no sense for her now to be contesting the decision to put her on the day shift (which in any event occurred long before the allegedly discriminatory employment actions at issue in the case). But even leaving that aside (and even assuming she could show that she was regarded as unable to work the night shift), the inability to work a particular shift does not constitute a substantial limitation on a major life activity, and plaintiff's contention must therefore be rejected. *See, e.g.*, *Serow v. Redco Foods, Inc.*, 187 F. Supp. 2d 47, 51 (N.D.N.Y. 2002) (inability to work night shift not substantial limitation on major life activity); *Mont-Ros v. City*, 111 F. Supp. 2d 1338, 1353 (S.D. Fla. 2000) ("The inability to work a certain shift, without more, is insufficient to constitute a disability."); *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 644-45 (2d Cir. 1998) (that police officer's doctor imposed certain restrictions on his work schedule following his cerebral hemorrhage, including that he work days only and only indoors, that his overtime be limited to certain hours, that he not work late tours or rotating shifts, and that he avoid stress and confrontation, was insufficient to establish that he was significantly restricted in his ability to work at a class or broad range of jobs and thus was "substantially limited" in major life activity of working and disabled under ADA); *Williams v. City of Charlotte*, 899 F. Supp. 1484, 1488 (W.D.N.C. 1995) (rejecting plaintiff's claim that her "shift work sleep disorder" substantially interfered with her major life activity of working since the sleep disorder did not impose a "significant barrier to employment" at numerous non-night shift jobs).

[32] *See also Krocka v. Chgo.*, 203 F.3d 507, 514 (7th Cir. 2000); *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 884 (6th Cir. 1996) (rejecting "regarded as" claim where supervisor merely noted that employee could probably function

Plaintiff is likely to assert that Mr. Conrad's reference to having treated her leniently due to her "special consideration" evidences that she was "regarded as" disabled. However, it is a fundamental principle of ADA law that efforts to assist or otherwise find ways to help a disabled employee cannot be used against an employer in this manner. *See Johnson v. Boardman Petroleum, Inc.*, 923 F. Supp. 1563, 1568 (S.D. Ga. 1996) (humanitarian gestures in asking employee to seek professional help for grief and offering time off for treatment should not be punished). "[A]cced[ing] to minor and potentially debatable accommodations (a sensible way to avoid litigation, liability, and confrontation), does not thereby stipulate to the employee's record of a chronic and endless disability." *Colwell v. Suffolk County Police Dept.*, 158 F.3d at 646; *see also Faulkner v. ATC Vancom of Nev. Ltd. P'ship*, No. 98-16467, 1999 U.S. App. LEXIS 31855, at *12 (9th Cir. 1999) (unpublished) (granting employee with knee complaints an exemption from driving certain types of vehicles did not "regard" him as being disabled).

Nor does the fact that the Company sent plaintiff to be medically evaluated constitute evidence that she was "regarded as" disabled. *See, e.g.*, *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 515 (3d Cir. 2001) (referring an individual for a medical examination does not regard the individual as disabled, but "only establishes that the employer [has] doubts (not certainties) with respect to an employee's ability to perform a particular job. Doubts alone do not demonstrate that the employee was held in any particular regard"); *Cody v. CIGNA Healthcare*, 139 F.3d 595, 599 (8th Cir. 1998) (employers "need to be able to use reasonable means to ascertain the cause of troubling behavior" in the workplace "without exposing themselves to ADA claims"); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999) (medical

---

better on a less demanding shift, because plaintiff offered no evidence that the employer perceived her as being unable to perform the functions of her position).

referral does not demonstrate employee was "regarded as" disabled; "an employer needs to be able to determine the cause of an employee's aberrant behavior").

### 3. Plaintiff Did Not Have A "Record Of" Disability.

Plaintiff also asserts that she had a "record of disability."  42. U.S.C. § 12102(2)(B).  In order to prove this, plaintiff would have to establish that "she had 'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'"  *Rhoads*, 257 F.3d at 391 (quoting 29 C.F.R. § 1630.2(k) (2000)).  If the individual has a record of an impairment that was *not* substantially limiting (for example, a brief hospitalization), he or she is not covered under the "record of" prong.  EEOC Compliance Manual § 902.7 at 40-41; *Sorenson v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1086-87 (10th Cir. 1999) (plaintiff must prove not only a record of impairment, but also that the impairment as to which she has a record substantially limits a major life activity).  Furthermore, if the alleged impairment did not prevent the employee from working, the employee cannot be said to have had a record of disability, if the major life activity in question is that of working.  *Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152 (10th Cir. 2002) (no record of substantial limitation in working where employee remained employed); *Gaul v. AT&T, Inc.*, 955 F. Supp. 346, 351 (D.N.J. 1997) (same), *aff'd*, 134 F.3d 576 (3d Cir. 1998); *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947 (3d Cir. 1996) ("record of" case rejected despite employer's knowledge of hospitalization for mental illness where the evidence revealed that plaintiff was able to function normally despite her condition).  Moreover, medical records alone are not sufficient because there must be evidence that the impairment was substantially limiting.  *See Baffoe v. W.H. Stewart Co.*, 99-6199, 2000 U.S. App. LEXIS 15134, *13 (10th Cir. Apr. 24, 2000).

Plaintiff's "record as" claim fails for the same reasons as her claims that she was "actually" disabled and that she was "regarded as" disabled.  As with a "regarded as" claim,

plaintiff must demonstrate that the employer was aware of her "record of" disability. *Lawson v. CSX Transp.*, 254 F.3d 916, 927 n.10 (7th Cir. 2001) (plaintiff "must demonstrate that the employer knew of that record"); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n.8 (7th Cir. 1998) (record of claim "requires proof that the employer was aware of the record in question"). For the same reasons described above, plaintiff cannot satisfy this standard.

In addition, plaintiff simply cannot establish that she ever suffered from, or was classified as suffering from, an impairment that substantially limited a major life activity. With respect to her Personality Disorder, there is no evidence that her ability to control her actions was limited at any time. As for plaintiff's Bipolar Disorder, the only times when she has been incapacitated were during her single manic episode in 1989-90, and the one night during which she experienced medication toxicity in 1994. At all other times, plaintiff was able to work. Neither of these incidents can establish a record of disability because both episodes were temporary and of short duration and thus do not meet the criteria for a disability. *See* 29 C.F.R. pt. 1630, app. (noting that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"); *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 468 (4th Cir. 2002) ("Temporary impairments usually do not fall within the ADA's definition of 'disability'."); *Gutridge v. Clure*, 153 F.3d 898, 901 (8th Cir. 1998) (mere fact that someone has been hospitalized does *not* necessarily meant that he or she has a record of a disability); *Colwell v. Suffolk County Policy Dept.*, 158 F.3d 635, 645 (2d Cir. 1998) (same).

IV.    **THE MEDICAL EXAMINATION-RELATED (COUNT V) IS BARRED BY RES JUDICATA, AND FAILS IN ANY EVENT.**[33]

In her last claim, plaintiff contends that the Company violated the ADA by referring her for the two medical evaluations in 1997 and 1998. As a threshold matter, Count V is barred by res judicata. That doctrine bars any claim that "arises out of the same transaction or series of transactions as the claim resolved by [a] prior judgment," *Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999). *See also In re Varat Enters., Inc.*, 81 F.3d 1310, 1316 (4th Cir. 1996) (doctrine bars subsequent claims arising out of a common "core of operative facts"). When claim preclusion applies, "the judgment in the first case acts as an absolute bar to the subsequent action with regard to every claim which was actually made or and those which might have been presented" in the earlier action. *Id.* at 1315. Claim preclusion occurs when: 1) the prior judgment was final and on the merits; 2) the parties are identical, or in privity, in the two actions; and 3) the claims in the second matter are based upon the same cause of action involved in the earlier proceeding. *Id.*

On December 4, 2000, Darcangelo filed a complaint against Verizon Communications Inc. (the parent corporation of defendant here) in the Circuit Court for Baltimore County, which was later removed to this Court (Action S-01-CV-45). Her 2000 complaint alleged, as does the complaint here, that the defendant (alleged to be her employer) requested and forced her to

---

[33] Bell Atlantic also renews the argument it made at the motion to dismiss stage that this claim is not timely because the Administrative Charge in the case was filed more than 300 days after the medical evaluations (and the May 1998 suspension), and the continuing violation doctrine does not apply. At that time, this Court ruled that "absent the benefit of discovery, it cannot say, as a matter of law, that the continuing violation doctrine does not apply to Plaintiff's allegations," (Mem. Opinion & Order, dated Oct. 4, 2002, at 12) (Dkt. #11), and denied the motion "with leave to renew the motion at the close of discovery." (*Id.*) Discovery has now amply demonstrated, as set forth in the facts described above, that each of the events in question was a discrete act occurring on a "particular day," such that these incidents cannot support a continuing violations theory. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). The same applies to plaintiff's other claims, to the extent that they are premised on events occurring prior to September 11, 1998 (300 days prior to the filing of plaintiff's administrative charge). Defendant hereby incorporates by reference its briefing on the timeliness issue associated with its earlier partial motion to dismiss.

undergo independent medical examinations in November 1997 and May 1998, and requested another IME in October 1998. (*See* 2000 Compl. ¶¶ 18-22, Ex. 79.) She alleged that defendant's conduct violated state confidentiality and privacy laws, along with several common law torts such as invasion of privacy. (*See id.* ¶¶ 23-26.) On July 30, 2002, this Court dismissed Darcangelo's 2000 complaint with prejudice. (*See* Stipulation for Dismissal (entered on July 30, 2002) (Dkt. #39), Ex. 80.).

All three requirements for claim preclusion are met here to bar Count V of plaintiff's complaint. First, "dismissal of an action with prejudice is a complete adjudication" of the matters litigated, and is considered final and on the merits. *In re Tomlin*, 105 F.3d 933, 936-37 (4th Cir. 1997) (quoting *Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 534 (4th Cir. 1991)). Second, the parties in the two actions are in privity with each other. In the res judicata context, privity means a "successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." *Sanders Confectionery Products v. Heller Fin.*, 973 F.2d 474, 481 (6th Cir. 1992). In her earlier action, Darcangelo named Verizon Communications Inc. as the successor-in-interest to Bell Atlantic, plaintiff's employer. (*See* 2000 Compl. ¶¶ 6, 7.) Darcangelo now names Verizon Maryland, Inc. as the successor-in-interest to Bell Atlantic. (*See* 2002 Compl. ¶ 2.) Moreover, Verizon Communications Inc. adequately represented the interests of Verizon Maryland Inc. in the prior litigation. *See Saylor v. United States,* 315 F.3d 664, 669 (6th Cir. 2003) ("Because all the [successors'] interests are identical, all were adequately represented by the four [successors] present before the court in the prior proceeding."). Finally, Count V arises out of the precise events – the demand for IME's by Darcangelo's employer – resolved by the District Court's prior dismissal, and Count V is therefore barred by the doctrine of claim preclusion. *See*

*Pittston*, 199 F.3d at 704 (finding that claim preclusion applies when "the facts of the current and prior clams are so woven together that they constitute a single claim") (internal quotations omitted).

In any event, plaintiff's Count IV is subject to the dismissal on the merits.  42 U.S.C. § 12112(d)(4).  Employers are not barred from conducting inquiries or medical examinations "when there is a need to determine whether an employee is still able to perform the essential functions of his or her job."  29 C.F.R. § 1630.14(c) app.  Here it is clear that in both instances of the Company's requesting plaintiff to undergo a medical examination, the circumstances of plaintiff's outrageous behavior in the workplace – including behavior that was threatening to co-workers and supervisors – justified an inquiry into her mental state.  Ensuring the safety of the workplace by requesting that an employee who is making threats against her supervisor is clearly a "job-related" purpose that is "consistent with business necessity."  42 U.S.C. § 12112(d)(4).  Dr. Janofsky has also opined that given the erratic and threatening nature of plaintiff's behavior, the medical evaluation requests were reasonable as a matter of his medical judgment.  Neither Dr. Zimberg nor plaintiff's psychologist, Ms. Swope, disagreed.  Nor were the examinations unduly intrusive, and both were conducted by appropriately licensed psychiatrists.  Moreover, the requests for medical evaluations were approved by CORE, an independent medical services company, and only after plaintiff refused to sign a release for CORE staff to speak with her mental health care providers.  CORE's staff members applied their medical judgment in determining whether a medical evaluation was the proper course of action.

That the Company's requests for medical evaluations were valid under the AMA standard is confirmed by similar cases in which the employer's right to order an independent medical evaluation was upheld.  For example, in *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804 (6th

Cir. 1999), the court affirmed a ruling that an employer was permitted to order a medical examination where, like here, an employee engaged in bizarre and threatening behavior. *Id.* at 813; *see also Miller v. Champaign Cmty. Unit Sch. Dist.*, 983 F. Supp. 1201, 1206-07 (C.D. Ill. 1997) (medical examination appropriate where employee exhibited paranoid behavior).

Accordingly, the Company is entitled to summary judgment on Count V.[34]

## CONCLUSION

For the above reasons, Verizon Maryland Inc. is entitled to summary judgment on each of plaintiff's claims.

Dated: June 20, 2003

Respectfully submitted,

_____/s/_____
Karen M. Wahle, Bar No. 013658
Martha Dye, Bar No. 015057
O'MELVENY & MYERS LLP
555 13th Street, N.W.
Washington, D.C. 20004-1109
(202) 383-5300
(202) 383-5414 (facsimile)

Counsel for Defendant
Verizon Maryland Inc.

DC1:552896.3

---

[34] In addition, given that the ADA affirmatively permits employers to require medical evaluations under these circumstances, any contention that referring her for a medical evaluation constituted an "adverse employment action" under her disparate treatment claims must also be rejected. *See Miller v. Champaign Cmty. Unit Sch. Dist.*, 983 F. Supp. 1201, 1206 (C.D. Ill. 1997) ("In this case the 'job-related or business necessity' language of § 12112(d)(4)(A) exonerates the school district from all forms of ADA liability. Since the psychiatric examination was job-related, it necessarily cannot be the result of either direct discrimination or discrimination based on improper assessment or "regarding" Miller as having a disability.").