In the United States District Court for the
District of Maryland


**Frances Darcangelo**,                    *

      Plaintiff,                    *

-v-                    *

**Verizon Maryland Inc.,**                    *          Case No. Civ. 02-816-WDQ

      Defendant                    *


*          *I          *          *          *          *          *

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**


Edwin R. Burkhardt
502 Washington Ave #906
Towson, MD 21204
(410) 493-5547
#23626

I.    **Introduction**

Plaintiff Frances Darcangelo, by and through her attorney, Edwin R. Burkhardt of Towson, Maryland, hereby submits this Opposition and Supporting Memorandum to Defendant's Motion for Summary Judgment under Fed. R. Civ. P. 56.

Plaintiff has pled four counts, all pursuant to the  Americans with Disabilities Act, arising out her employment relationship with Defendant Verizon Maryland Inc. [1](previously, Bell Atlantic of Maryland, Inc.). Plaintiff has been diagnosed with mental illness since a severe psychotic episode which first occurred during basic training in the Air Force at Lackland Air Force base in Texas.

Count I arises out of  disparate treatment as a result of Plaintiff's unlawful discharge by Bell Atlantic in January 1999. Count II stems arises out of  disparate treatment resulting from several unjustified suspensions which occurred during 1998, including a ten-day suspension in May, a three-day suspension in September, and a 15-day suspension in October. The failure-to-accommodate claim pled in Count III encompasses the Defendant's inappropriate disciplining of Plaintiff in the termination and suspension incidents complained-of in the first two counts, and the Defendant's failure to make any effort whatsoever to engage in the interactive process with Plaintiff once it was put on notice that Plaintiff was in need of accommodation.

Starting on October 13, 1997 and continuing up through her termination[2] on January 6,

_____

[1]For clarity's sake, Plaintiff will adopt Defendant's practice (in its summary judgment motion) of referring to  Bell Atlantic of  Maryland, Inc. and its successor, Verizon Maryland Inc. as the Company.

[2]Plaintiff is abandoning Count V (IME Referral Count), since Count II already challenges the suspension she received starting in May 1998, and she will not pursue the IME referral from

1999, Plaintiff was subjected by Bell Atlantic management to a concerted campaign to ostracize

and persecute her, which ultimately resulted in Plaintiff's unlawful termination, and unleashed a

downward spiral in her life which continues to this day.

## II.    Factual Background

Plaintiff Fran Darcangelo started working for The Company as a janitor in 1977.

(December 23-24 Deposition of Fran Darcangelo, pp. 103-104. After a few job and location

changes, and a brief break in employment[3], Ms. Darcangelo was promoted to the position of

Central Office Technician in Hunt Valley, Maryland during 1988. (Darcangelo Dep. at 153).

Plaintiff took a leave of absence from the Company so she could report for basic training

at Lackland Air Force Base in Texas (Id. at 184). Plaintiff did not adjust well to the stresses of

basic training (Id. at 187), and eventually cracked under the stress of basic training, and suffered

a full-blown psychotic episode. (Id. at 193-194, 197-203), Def. Ex. #75 (Feb. 12, 1999 Report of

Dr. John Siebert[4] pp. 2-6). Plaintiff returned to work with the company in March 1990.

(Darcangelo Dep. at 207). Before returning to work, Plaintiff advised her supervisor, George

Sullivan, of her condition. (Plaintiff's exhibit #'s 9, 15 "Progress" Notes and "Medical Record"

received from CORE records sent to Plaintiff, Darcangelo Dep. at 291).

---

October 1997, which may be time-barred anyways.

[3]Plaintiff's employment history with The Company (S.J. Motion, p. 2) prior to her severe psychotic break in 1989 is totally irrelevant to the issues in this case, and it can only be presumed that the discussion of anything which may have occurred prior to the 1989 break is included only to prejudice. Plaintiff could choose to, but will not dispute the events described on S.J. Motion p. 2 only because they are totally irrelevant, and very likely, inadmissible in the trial of this case.

[4]Dr. Siebert concluded that Plaintiff was more than 70% disabled as a result of her mental health diagnosis.

Plaintiff was implicated in behavior that could be characterized as bizarre but totally non-malignant during her time in Hunt Valley, as described in Defendant's summary judgment motion pp. 3-5. Plaintiff's co-workers, stoked by their own prejudices about mental illness and the mentally ill, conjured up fears having no basis in reality. One of Ms. Darcangelo's co-workers called her a "goddamn lunatic" (Darcangelo Dep. at 223). and was reprimanded for it. (Def. Ex. 23, p. 2). The company's collections of petty insults and off-the-wall remarks was an attempt to build a case to have her declared a "direct threat" in the workplace so they could  fire Fran without fear of repercussion (Darcangelo Dep. at 229-231).

In 1994, Plaintiff was having increasing difficulty in getting the appropriate medication to manage her mood swings, and acted increasingly erratically, resulting in counseling from her second-level supervisor, Jim Conrad. (Def. Ex. 23. On the graveyard shift of June 23-24, Plaintiff had a severe reaction to a dosage of Depakote, a new medication being tried by her treating physician Dr. Mira (Darcangelo Dep. P. 287, Def Ex's # 24, 25, 26, 27). The incident resulted in Plaintiff wandering around aimlessly during her shift, sitting at work desk staring into space, losing control of her bowels and losing her underwear, and generally acting like a zombie. Instead of sympathy, Ms. Darcangelo was suspended by the company for the incident.

Ms. Darcangelo grieved the suspension (Def. Ex.'s 27, 28). Present at the Second Step Grievance Meeting on September 26, 1999 were, among others Plaintiff, Maria Bury, and Plaintiff's second-level supervisor at the company, Jim Conrad, who held the final say in whether to discipline her for the incident.

The Second Step Grievance Committee notes typed up by the Company (Def's Ex. 27) reveal that Maria Bury repeatedly told Jim Conrad that Fran's conduct that night was due to Fran

being improperly medicated with her mental health medications. (Def. Ex. 27, Maria Bury

Deposition of April 29, 2003 at 64-65, 92, 139-140, February 25, 2003 Deposition of James

Conrad at 103). That note stated in relevant part:

JIM CONRAD:     I think warning and suspension must stand. She must be accountable for her long chain of offensive behavior.

MARIA:          Fran couldn't put her thoughts together and couldn't make a decision the night in question

JIM CONRAD:     I'm not a doctor and can only judge the behavior she presents. She can be very erratic, disrupts my workplace and performs poorly. I've sat down with her at least 8 times. I can't allow my center to be disrupted.

FRAN:           I haven't changed my medication since 1990.

JIM CONRAD:     One year ago your medicine was changed. Fran, you have to make us aware of changes in your life. She views us (management) as a bunch of idiots. We'll hold our position and won't rescind the letter of warning or suspension. Fran, you need to understand you are in jeopardy here - you won't work with us. When you to to Security, file grievances, all EEO, etc., it takes the manager out of the loop.

FRAN:           About the warning letter in June, I went to my doctor and had my medicine changed since my surrounding co-workers thought I was acting erratic. I didn't think I would have a problem with changing medicines. After a week on Depakote, I had a toxic reaction and became non-functional.

JIM CONRAD:     I deal with behaviors and performance.

MARIA:          Mental illness is rugged and we all can't be held accountable all the time if we are mentally ill. Maybe the company needs to be actively involved in making her aware of her problems when they arise.

(Excerpt omitted)

FRAN:           I am not ignoring warnings. I try to meet the requirements and keep my job. I am trying daily to do better. I am not 100%. The drugs screwed me up in June and I wasn't aware of the changes in my behavior. I'll try again, but I shouldn't be penalized for a toxic reaction to my medicines.

MARIA:                  We would like her reimbursed for 4 hours lost pay and removal of warning
                        letter.

JIM CONRAD:             I can't. She needs the wake up call. We will remove letter of warning on
                        12-1-94 if there are no further incidents.

Conrad, however, full well knowing that Fran's behavior had been caused by the

problems with her Depakote medication, imposed a penalty of suspension (later rescinded) and

also docked Fran four hours pay for the incident. (Darcangelo Dep. 307-308, James Conrad

deposition of February 25, 2003 pp. 103, 106, 206). The four hours Ms. Darcangelo lost as a

result of this incident was never made up.

## II.     A. Plaintiff's "Special" Medical Condition

Jim Conrad denied in his deposition that he knew what medical problem Fran was

receiving medical treatment for (James Conrad Dep. at 91, 101-105). Conrad admitted he knew

Fran had a condition and assumed from Fran's own comments it was mental (Conrad Dep. at 88)

In his deposition, Jim Conrad did tell the EEOC investigator, Frieda Morgan, that he knew that

Fran had manic depression. (Conrad Dep. at 119).

Maria Bury[5], who was the President of the Communication Workers of America local at

the time of the deposition, (Bury Dep. p. 17), testified that it was procedure for the medical file to

be released to the supervisor before the grievance meeting (Bury Dep. p. 167-169, 173-174).

Thus, James Conrad would have been provided a folder with all the information in Fran's

medical file before the grievance meeting.

Apparently, Jim Conrad's denials to the contrary, he was apparently about the only person

_____

[5]Ms. Bury confirmed that she was the Union Rep talking on behalf of Ms. Darcangelo
during the 1994 2nd step grievance. (Bury Dep. at 18).

in the workplace  who didn't know what Fran was taking medication for (though he considered her "special"). Gus Dankert (employed mid-1998) testified that Marianne Moxey told him about Fran's mental problems (Dankert Dep. at 61), though Moxey denied this in her deposition (Moxey at 76-77), and that the group ostracized Ms. Darcangelo (Dankert Dep. at 45). Maria Bury said that Fran pulled out her mental health papers in a meeting and said she was certifiable (Bury at 65), that everyone in the workgroup knew she had a mental problem (Bury at 118), and that she was called "Dark Angel" by others in the workgroup, including Barbara Lee  (Bury Dep. at 89). Plaintiff testified that Gary Tolliver (co-worker in group) told Marianne Moxey on the day that resulted in the October 23, 1998 suspension that Fran was having "one of those days." (Plaintiff Dep. at 363). Gottleib Fleig testified Fran had pictures up of famous people with mental problems (Fleig Dep. at 85).

And then there's Barbara Lee, a co-worker in Fran's workgroup. Barbara Lee filed a grievance over an incident[6] that occurred in December 1998 with Fran Darcangelo, in which she referred to Fran as "The Devil's Child" (Plaintiff's Ex. 4, Jan. 20 Grievance of Barbara Lee, Bates-numbered 4102-4105). In that grievance, Barbara Lee said:

"The Devil's Child (Ms. Darcangelo) was standing there smirking. I feel the whole incident to be fault of Conrad because Fran has been allowed to terrorize the whole group for many years...I feel Fran needs a Doctor.–not a dismissal"

(Plaintiff's Ex. 4, discussed in Barbara Lee Dep. (Confidential portion at 8-18).

## II.    B. The Campaign against Ms. Darcangelo

Plaintiff continued to experience the same type of minor problems in the workplace after 1994, making flippant, ill-advised and inappropriate remarks, and never threatening any person

---

[6]That incident will be discussed in greater detail later in this opposition.

with harm of any type. However, management became tired of her getting herself into trouble

with her co-workers and said clearly that it was adopting a heavy-handed, no tolerance policy for

Fran, and James Conrad (Def. Ex. 38 (JC  Deposition Ex. #3) said he wasn't going to tolerate it

anymore. (Conrad Dep. At 146-148). On October 13, 1997, James Conrad created three

documents (Def. Ex. 38, Conrad Dep. #14). On the 1st, was stationary saying "Eliminate the Root

Cause", on the 2nd (dated Oct. 13, 1997) Subject: the work place behavior of Ms. Fran

D'Archangelo, and on the 3rd, titled DISCUSSION WITH FRAN DARCANGELO 10/13/97.

      That 3rd page stated in part:

The purpose of this meeting was to inform Fran that I had gone too far in trying to create a
workplace where she could be productive. In fact, I had allowed her to disrupt the workforce, use
offensive language, and hang all manner of material in her cube. I told that I had done this
because I felt I needed to do all that I could for her because of her "special" medical condition. I
continued by re-stating that I had gone too far and that the rules were changing. From this date
forward she would have to conform to the environment because I had the responsibility to create
a proper environment for the rest of my team.

      On that day, October 13, 1997,  The Company began its full-fledged campaign to

persecute and "get rid[7] of" Fran Darcangelo. Ms. Darcangelo was also told on that day that she

would no longer be paid for going to her counseling sessions (Plaintiff's Ex. 15, Fran Darcangelo

Affidavit, Darcangelo Dep. at 307).

      It started out near the end of October, when Butch English, a supervisor charged with

administrative tasks like handling leave requests and special issues, called in to CORE (The

Company's medical administrator) to report The Company's concerns with Ms. Darcangelo. (See

---

[7]Marianne Moxey, who would become Ms. Darcangelo's supervisor in January 1998, said
Fran would get loud on occasion, but not enough "to get rid of her". (Deposition of Marianne
Moxey March 6, 2003, at 89). Two of Ms. Darcangelo's co-workers, Maria Bury (Bury Dep. at
56, 60-61), and Mr. August Dankert (March 12, 2003 Deposition of August Dankert (Dep. at 34)
said it was no secret that the company wanted to get rid of Ms. Darcangelo.

Pl. Ex. 8, CORE records, VIOLENCE IN THE WORKPLACE and "Workability" records,

Deposition of Barbara Kelly pp. 19-24 (regular business entries). Among the concerns cited by a

Butch English were a throng of incidents, virtually all of which predated 1997–most by <u>at least</u>

<u>four years</u>  (Def. Ex. 3, 5,  7, 8, 12, 13). Based on the misleading information provided by

English, CORE referred Fran out for an independent medical examination (IME), and she was

taken off of work for three weeks. Also around that time, her medical examination was

performed by Dr. Anthony Russo on November 4, 1997 (Def. Ex. 40-41). Dr. Russo concluded

that Ms. Darcangelo did not present a threat of violence, although he noted that she engaged in a

multitude of bizarre behavior[8] and instructed Bell Atlantic that although she was not thought to

be a legitimate threat for violence, "it is recommended that if the patient presents any threats of

violence[9] at the work place she should be either suspended or terminated as per company policy."

(Russo report, Def. Ex. 40 p. 3).

Ms. Darcangelo was transferred to the supervision of Ms. Moxey in January 1998,

purportedly because the thinking was she'd do better under a female supervisor. However, the

same type of minor problems (inappropriate language[10], inappropriate conduct) continued  in the

---

[8]Dr. Gary Zimberg, Plaintiff's treating physician since 1997 and an expert for the Plaintiff in this case, noted that Dr. Russo's report (that Ms. Darcangelo was high-functioning and accountable for her behavior) was not consistent with Russo's own observations about her behavior and demeanor in the interview. (Zimberg Dep. at 114-116).

[9]This supports Ms. Darcangelo's understanding that the company kept sending her out for IME's so she could be declared a "direct threat" under the ADA and fired. Of course, The Company has maintained that it didn't know that Ms. Darcangelo was disabled.

[10]There is no evidence in this record that Ms. Darcangelo ever directed a racial slur at any minority (See Fleig, Lee, Moxey Deps.). In any event, rough language and swearing was commonplace (Moxey and Dankert Deps.)

spring of 1998, and once again, The Company was angling for another medical exam for Ms.

Darcangelo, so she could be declared a direct threat and fired. Plaintiff's Ex. 8, CORE records,

(6-A-0 and 7-A-0).  On May 6, 1998, the company discovered a poster which she had posted for

many months previously (though not in the immediately preceding months) with a picture of her

ex-supervisor on an image which some observers[11] could tell was a rifle target. Contrary to

company practice (Maria Bury Dep. at 107) Ms. Darcangelo was not given an opportunity to take

the poster down. Rather, she was immediately suspended[12], and put out on leave, contrary to the

company's normal procedure when an employee is asked to take down objectionable material[13]

from their cubicle (Maria Bury Dep. at 107). Once against she was sent out on leave for an IME

(Def. Ex. 39), and once again, the examining physician, Dr. Jerome Gottleib, determined that she

posed no threat of violence. (Def. Ex. 52, Gottleib report of May 9, 1998).

---

[11]Other individuals, like Maria Bury, knew that the poster was a joke (Bury Dep. at 38, 97). In fact, previously there had been a collection cup put out for the campaign to "Put Butch on the Bus" to Pocomoke, and Jim Conrad even contributed a dollar to the campaign. (Conrad Dep. at 158-159, English DEP at 79).

[12]Butch English testified that this incident was considered "very serious" because she had been removed from the workplace for threat of violence once before. Remember, Ms. Darcangelo was pulled from the workplace in October 1997 because Butch English had dredged up every complaint and incident that had occurred with Ms. Darcangelo dating back from the early 1980's and insinuated that these incidents were all occurring contemporaneously. When asked in his deposition why he should be fearful of Ms. Darcangelo, English said he was not concerned about the poster (English Dep. at 80-81), and wasn't concerned about the poster which had been put up previously (English Dep. at 78).  English was not able to explain why and how his relationship ha deteriorated, although he maintained it had deteriorated (English Dep. at 142).

[13]Defendant's S.J. Motion p. 12, n. 8, in which it is suggested that Ms. Darcangelo's handwriting exemplars, bears resemblance to that on the T.C.C. sharpshooters poster (Def. 49) apparently fails to note that the distinct lower-left to upper-right slant on the post bears no resemblance to any of Ms. Darcangelo's handwriting in any documents in this case (for example, Plaintiff's exhibits 7 (signatures) and 15 (affidavit).

Dr. William Wright, CORE's Medical Director who oversaw the operations of CORE, recommended to Butch English that the co-workers in Ms. Darcangelo's workgroup be given counseling and educated about working with a person with her mental health condition. (Def. Ex. 39, 7-A-0 6-2-98 notation, Deposition of Dr. William Wright, pp. 39-40.) Undeniably, this accommodation was never provided, and this counseling was never done. (Wright Dep. at 39-40).

After returning from her 10-day suspension in June 1998, Ms. Darcangelo continued to face unwarranted write-ups and persecution. She was singled out for a totally unwarranted suspension for an incident that occurred on September 23, 1998. Ms. Darcangelo was asked to go into a room by Butch English, then once in the room, when English failed to tell her the purpose of the meeting, insisted on exercising her right to union representation.[14].

Approximately one-month later, Fran Darcangelo was suspended, this time for 15-days, for walking out while she was on the phone with a customer, which was a situation which was never supposed to occur for Central Office Technicians, who "at least 90% of the time" (Barbara Lee Dep. at 27-28) time interfaced exclusively with The Company's co-workers in remote locations. Ms. Darcangelo said she thought Ms. Moxey was trying to "provoke her" into a physical confrontation (Darcangelo Dep. at 299). Ms. Moxey wrote a letter to Jim Conrad

---

[14]Maria Bury, who was president of the local union from 1997 until earlier this year (2003), stated that once an employee states he wants union representation, under Weingarten the meeting should stop (Bury Dep. at 24-25), and that Fran should not have been suspended for insubordination. Ms. Darcangelo (Darcangelo Dep. at 298) testified she just wanted her right to representation. Ms. Barbara Lee (formerly a Union Steward) also acknowledged Fran's right to representation. (Barbara Lee Deposition of March 25, 2003 at 102). Amazingly, Jim Conrad who imposed the suspension, never asked Fran Darcangelo or Butch English why Fran left the room, or why Butch wanted her in the room. (Conrad Dep. at 52). English admitted he didn't tell Fran why he wanted to talk to her (English Dep. at 131).

reporting that she was afraid Fran was going to hit her (Def. Ex. 64), but then at her deposition,

(Marianne Moxey Dep. at 173) Moxey was unable to explain why she said that.

On December 17, 2003, an incident occurred which resulted in Fran Darcangelo's

termination, and Barbara Lee's 3-day suspension. (Def. 68, 69). Barbara Lee ordered Fran to

pick-up a work order, and the Plaintiff refused to do so, acknowledging, properly, that Ms. Lee

was not her supervisor, and taunting Ms. Lee in a manner which Ms. Lee found offensive. Ms.

Lee then totally lost control of her emotions and herself, and proceeded to attempt to attack Ms.

Darcangelo, to the point that a huge crowd formed around the two, and Ms. Lee was  physically

restrained from attacking Ms. Darcangelo after threatening to kill her (Def. 68-69, Marianne

Moxey deposition at 192) only by a supervisor, Tim Mace, who prevented an assault from taking

place (January 21, 2003 Deposition of Gottleib Fleig at 150-153).

Fran Darcangelo was terminated as a result of this incident[15] while Barbara Lee received a

_____

[15]The Company has made a somewhat amusing effort to maintain that Fran Darcangelo's job performance (other than misconduct) was an ongoing legitimate concern, another basis for firing her. The company has clearly stated that she was fired for misconduct (Def. Ex. 71, 72, Conrad Dep. at 45). However, after the fact Moxey and Conrad attempted to claim that her job performance was substandard (Conrad Dep. at 201-202, Moxey Dep. at 14, 36), yet Moxey's midyear appraisal of Ms. Darcangelo does note reflect such concerns (Def. 55). Conversely, Fleig's 1997 appraisal of Ms. Darcangelo came out very late (July 1998) and reflected performance concerns (Def. 42), although at their depositions, neither Fleig (Dep. at 73) nor English Dep. at 62 (Fran's job performance wasn't an issue) noted concerns. Conrad testified that all aspects of an employee's performance are to be reflected in the annual evaluation (Conrad Dep. at 23).

Perhaps more importantly, Ms. Darcangelo continued to apply for and receive approval for promotions, and she was even offered a promotion to an engineering assistant job in Richmond, Virginia in January 1998. She was not eligible to apply for, much less receive, promotions if her performance was substandard. (Darcangelo dep. at 52, 54, Plaintiff's Ex. 6, 14, 15).

Note that post-hoc rationalizations of the type described above can establish pretext. EEOC v. Sears Roebuck & Co., 243 F.3d 846 (4th Cir. 2001); Thurman v. Yellow Freight, 90 F.3d 1160 (6th Cir. 1996).

three day suspension. (Deposition of Ann Sewell, April 25, 2003, pp. 53-56, Def. Ex. 72).

Barbara Lee had quite a history of conflicts with her co-workers, although she apparently benefitted from having a supervisor who kept her "official" record clean. Id. Gus Dankert testified that he had complained repeatedly to Marianne Moxey about Barbara Lee's threats and screaming (Dankert Dep. 31-32, 101-103, 107-109, Plaintiff's Ex. 4), and Barbara Lee herself admitted she had been written up and counseled repeatedly (Barbara Lee Dep. at 83-86, although after she grieved the incident with Gus Dankert, it was taken out of her personnel file). Marianne Moxey said that she had written up Barbara Lee many times (Moxey Dep at 37-39), and said that Barbara Lee, like Plaintiff, frequently cursed and swore (Moxey Dep. at 95-96) but denied that anyone had complained about Lee (Moxey Dep. at 39-41). Maria Bury said Barbara Lee had a hot temper, and repeatedly challenged others to go to the parking lot (Bury Dep at 44, 160-161). Jim Conrad noted professionalism and conduct issues with Barbara Lee in her evaluations (Conrad Dep. At 196-198)

**DISCUSSION: " DISABLED" UNDER THE  ADA**

There are three ways to meet the definition of disabled under the ADA, all three of which have been pled by Plaintiff in the instant case. An individual is disabled if: 1) she has a qualifying physical or mental impairment that substantially limits a major life activity; 2) she has a record of such an impairment; or 3) she is regarded as having such an impairment. 42 U.S.C. sec. 12102(2).

The Supreme Court has established a three-step inquiry for determining whether an impairment substantially limits a major life activity:

First, we consider whether respondent's [condition] was a physical impairment.

-13-

Second, we identify the life activity upon which respondent relies . . .

and determine whether it constitutes a major life activity under the ADA. Third,

tying the two statutory phrases together, we ask whether the impairment substantially

limited the major life activity.

Bragdon v. Abbott, 524 U.S. 624, 631 (1998).


I.    **PLAINTIFF'S DIAGNOSED BIPOLAR DISORDER IS AN ADA-QUALIFYING IMPAIRMENT**

There is no question that Plaintiff has been diagnosed by each and every physician

(including Defendant's expert, Dr. Janofski) who has examined her since her manic psychotic

episode in 1989 - 1990 with bipolar disorder. Bipolar disorder has been universally

acknowledged by the courts as an ADA-qualifying impairment[16]. See Duda v. Bd. of Education,

133 F.3d 1054, 1059 N. 10 (7th Cir. 1998)(collecting cases recognizing bipolar and other mental

health conditions as ADA-qualifying impairments); Den Hartog v. Wasatch Academy, 129 F.3d

1076, 1081 (10th Cir. 1997)(recognizing bipolar as qualifying impairment); EEOC v. Voss

Electric, CIV-02-92-C (W.D. Okl. April 7, 2003)(LOISLAW)(same).


---

[16]"(h) Physical or mental impairment means:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of following body systems: (listings omitted); or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."

29 C.F.R. sec. 1630.2 (h) (1999).

## II.    PLAINTIFF IS DISABLED IN THE MAJOR LIFE ACTIVITIES OF INTERACTING WITH OTHERS AND WORKING

Proceeding to the second step of the three-step inquiry, Plaintiff must demonstrate that she is impaired in a major life activity. citing Bragdon, 524 U.S. 624, 641 (1998). The plain meaning of the word "major" denotes comparative importance, and suggests that the touchstone for determining an activity's inclusion under the ADA  is its significance. Bragdon v. Abbott, 524 U.S. 624, 638 (1998). Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 29 C.F.R. sec. 1630.2(i) (1999). Plaintiff has identified the major life activities of interacting with others and working as major life activities in which she has been substantially impaired by her condition.

### A. INTERACTING WITH OTHERS HAS BEEN RECOGNIZED BY THE COURTS AS AN ADA-QUALIFYING MAJOR LIFE ACTIVITY

Several courts around the country have held that interacting with others is a major life activity. McAlindin v. County of San Diego, 192 F.3d 1226, 1234  as amended by 201 F.3d 1211 (9th Cir. 2000), cert. denied, 530 U.S. 1243 (2000)("[b]ecause interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of major life activity"; Lemire v. Silva, 104 F. Supp. 2d 90 (D. Mass. 2000)(same); Voss, at pp. 4-5. The 4th Circuit has assumed, without explicitly deciding, that social interaction is a major life activity under the ADA. Davis v. UNC, 263 F.3d 95, n. 4 (4th Cir. 2001).

### B. WORKING HAS BEEN RECOGNIZED BY THE COURTS (AND EXPRESSLY BY THE EEOC) AS AN ADA-QUALIFYING MAJOR LIFE ACTIVITY

-15-

Working is expressly included in the EEOC's list of major life activities. 29 C.F.R. sec. 1630.2(i).  Individuals whose impairments hinder their ability to work are protected by the ADA. 29 C.F.R. sec. 1630.2(i). This Circuit has so held. Id. at 100; Moysis v. DTG Datanet, 278 F.3d 819, 825 (8th Cir. 2002)(employee with permanent cognitive impairments found disabled in major life activity of working); Wilson v. Lemington Home for the Aged, 159 F. Supp.2d 186 (W.D. Pa.)(employee diagnosed with depression found disabled in the ability to work).

## III.    PLAINTIFF IS SUBSTANTIALLY LIMITED IN THE MAJOR LIFE ACTIVITIES OF INTERACTING WITH OTHERS AND WORKING

### A. INTERACTING WITH OTHERS

An impairment "substantially limits" one's ability to carry out a major life activity if, because of the impairment, the individual is significantly restricted as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. sec. 1630.2 (j). The ADA addresses substantial limitations[17] on major life activities, not utter inabilities. Humphrey v. Memorial Hospitals Association, 239 F.3d 1128, 1135 (9th Cir. 2001), citing Bragdon, 524 U.S. 624, 641 (1998).  The statutory requirement that disability determinations be made with respect to the individual

---

[17]In a recent discussion of "substantially limits" as applied to a major life activity not implicated here (performing manual tasks), the court stated that the impairment must prevent or severely restrict the individual from doing activities that are of central importance to most peoples' daily lives. Toyota Motor Mfg. Ky, Inc. v. Williams, 534 U.S. 184, 122 S. Ct. 681 (2002). The activities claim here certainly meet this definition.

contemplates an individualized and case-by-case determination of whether an impairment substantially limits a major life activity of the individual. Sutton v. United Air Lines, Inc., 130 F.3d 893, 897 (10th Cir. 1997), aff'd, 527 U.S. 471 (1999).

A recently released case from the District Court in Okahoma has found that an employee diagnosed with bipolar (even without a prior history) was substantially limited in the major life activity of interacting. EEOC v. Voss Electric, April 7, 2003 (LOISLAW) at 4-5. See also Jacques v. DiMarzio, Inc., 200 F. Supp. 151, 162 (E.D.N.Y. 2002)(clear plaintiff had established that he was "regarded as" substantially limited in major life activity of interacting).

The evidence in this case is powerful that Fran Darcangelo has been unable to maintain successful interpersonal relationships, or successfully interact with other people on any type of consistent basis, inside or outside the workplace. The testimony of her co-workers and supervisors, along with her own testimony, have clearly established that she has had a long-term history of poor relationships and interactive strife. (Darcangelo Dep. 282-284, Conrad Dep. 134-135, English Dep. 143-147, Moxey Dep. 63, Fleig Dep. at 124-25). Every medical examination done since her psychotic episode in 1989, including the MMPI-II done on behalf of Dr. Janofsky[18], Defendant's expert, has either noted or anticipated difficulties in her interpersonal relationships. Most importantly, her own treating physician and expert witness, Dr. Gary Zimberg, testified in his deposition that Ms. Darcangelo, his long-term patient for over five years, was impaired even under the influence and with the benefit of her medication (ZIMBERG DEP

---

[18]Dr. Janofsky cited as examples of Plaintiff's ability to control her behaviors her relationships with her medical treatment providers, and her past personal relationships. The record demonstrates just how far Dr. Janofsky had to "stretch" to conjure up these examples of Ms. Darcangelo's ability to successfully interact.

at 103), and, that her conduct was an  involuntary manifestation of her mental health disorders,

notwithstanding any appearances to the contrary.

Q.     What extent do you think Ms. Darcangelo's behavior I guess particularly associated with her personality disorder is volitional? For example, if she gets in an altercation with somebody or has a personality conflict with somebody, is it something that she can turn on and off?

A.     Volitional as in willful?

Q.     Yeah,

A.     No. It may appear to a layperson that she has control over it, but like many other psychiatric or psychological conditions, there is no fun, it doesn't produce any benefit for her. If it was willful, she wouldn't choose to embroil herself in events that would get her fired or events that would be as time consuming and distressful as this. They are not willful behaviors.

Q.     So you're saying that even if she does something that appears to be intentionally for the purpose of provoking someone, that you wouldn't construe that as a volitional act?

A.     Not in her case. She is not looking for fights and there is no positive outcome, there is no benefit to her from that, only trouble. There is only bad sequalae (sic). So it wouldn't be logical to do anything like that willfully.

Q.     So she's not able to control?

A.     Exactly.

(ZIMBERG DEP at 105-106).

### B.     WORKING

When the major life activity under consideration is that of working, the term substantially

limits means significantly restricted in the ability to perform either a class of jobs or a broad

range of jobs in various classes as compared to the average person having comparable training,

skills and abilities. Davis, 263 F.2d at 100, citing 29 C.F.R. sec. 1630.2(j)(3)(i). The inability to

-18-

perform a single, particular job does not constitute a substantial limitation in the major life

activity of working. Id.

The EEOC recommends that courts consider four  factors in determining whether an

individual is substantially limited in the major life activity of working:

1. The type of job from which the individual has been disqualified because of the impairment;
2.  The number of jobs in the geographic area from which he is disqualified because of his impairment;
3. The number and types of jobs using similar training, knowledge, skill, or abilities from which the individual is disqualified within the geographic area; and
4. The number of jobs in the geographic area not involving similar training, knowledge, skill, or abilities from which the individual is also disqualified.

EEOC Technical Assistance Manual at II-2(ii).

Plaintiff's Vocational Expert, Martin Kranitz, reported that Plaintiff would have difficulty

maintaining employment without an accommodation. He did give the opinion that Plaintiff was

employable, but would need support to have a decent prospect for success (Deposition of Martin

Krantiz of March 18, 2003, pp. 34, 110, 152-153). Given her functional limitations, he identified

jobs like inspector, janitorial, and claim processing clerk, as the types of jobs for which she

would be best suited, and that she had limited prospects for successfully maintaining other

employment in most other positions in the workplace. (Plaintiff's Ex. 10, Report of Martin

Krantiz).

When an employee's limitations resulting from his (mental health condition) translate

across a broad spectrum of jobs, the jury could reasonably find that the employee's impairments

were long-term and substantially limited his "real work opportunities."  Moysis,  278 F. 3d at

825, (employee with brain injury substantially limited in working), citing Webb v. Garelick Mfg.

Co., 94 F.3d 484, 488 (8th Cir. 1996)(employee unable to write or type because of focal dystonia in both hands found substantially limited in major life activity of working, because he was precluded from performing a significant percentage of jobs available to those with his experience and education); Benson v. E.I. Dup Pont de Nemours & Co., Civ. No. 5:00CV00095 (W.D. Va. Jan. 25, 2002)(LOISLAW)(employee suffering from effects of stroke found substantially limited in working); Anderson v. Independent School District No. 281, Civ. No. 01-560 (D. Minn. Oct. 4, 2002)(LOISLAW)(employee with mixed psych. disorders found substantially limited in working); see also Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667 (7th Cir. 1998)(assembly-line worker with carpal tunnel substantially limited in working); Leslie v. St. Vincent New Hope, Inc., 916 F. Supp. 879, 885 (S.D. Ind. 1996)(nurse with back problems found substantially limited in working because lifting limitations, limited educations, and lack of a transferable skills substantially limited her opportunities for many other kinds of jobs she might be able to perform); Burns v. Coca-Cola Enterpreises, Inc., 222 F.3d 247 (6th Cir. 2000)(worker restricted to lifting no more than 23 pounds found substantially limited in working because his injury precluded him from performing at least 50% of the jobs he was qualified to perform given his educational backgrounds and experience); Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 784-85 (3d Cir. 1998)(meat packer with back problems which prevented him from lifting more than fifty pounds substantially limited in working, even though lack of marketability due in part to lack of education, training, and marketable skills; Smith v. Kitterman, Inc., 897 F. Supp. 423 (W.D. Mo. 1995)(employee with carpal tunnel substantially limited in working because had lack of marketable training and skills).

Here, Plaintiff has been found by her vocational expert to be ill-suited for the great

majority of jobs available to her due to her difficulties interacting with others. Therefore, she

meets the requirement of being substantially limited in the major life activity of working because

her limitations preclude her from successfully maintaining employment in the great majority of

jobs in the workplace. See Anderson, LOISLAW p. 6, citing Snow v. Ridgeview Med. Ctrl,

128 F.3d 1201, 1207 (8th Cir. 1997).

## IV. PLAINTIFF WAS A QUALIFIED INDIVIDUAL WITH A DISABILITY, ABLE TO PERFORM ALL ESSENTIAL FUNCTIONS OF HER POSITION

A qualified individual is an individual is an individual who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such

individual holds of desires. 42 U.S.C. 12111(8). Plaintiff has the burden of demonstrating that

she was performing at a level that met her employer's legitimate expectations. Rhoads v. FDIC,

257 F.3d 373, 387 (4th Cir. 2001).

A job's "essential functions" are defined in 29 C.F.R. sec. 1630.2(n)(1) as those that are

"fundamental, not marginal." The regulations enumerate a number of factors which distinguish

fundamental from marginal in this context, including:

1. whether performance of the function is the reason the (employee's) position exists;
2. Whether there are a limited number of employees available among whom the performance of that job function can be distributed; and
3. Whether the function is highly specialized so that the incumbent in the position is hired for his or her expertise.

29 C.F.R. sec. 1630.2(n)(2). See generally Skerski v. Time Warner Cable Co., 257 F.3d 273, 279

(3rd Cir. 2001)(thorough discussion of the EEOC regs. on essential functions). The regs (29

C.F.R. sec. 1630.2(n)(3)) contain a non-exhaustive list of seven examples of evidence designed

to assist a court in identifying essential functions, including:

(i).   The employer's judgment as to which functions are essential;
(ii).  Written job descriptions prepared before advertising or interviewing applicants
         for the job;
(iii). The amount of time spent on the job performing the function;
(iv).  The consequences of not requiring the incumbent to perform the function;
(v).   The terms of a collective bargaining agreement;
(vi).  The work experience of past incumbents in the job; and/or
(vii). The current work experience of incumbents in similar jobs.

Skerski, 257 F.3d at 279 (citing regs).

Whether a particular function is essential is a factual determination that must be made

ono a case by case basis. EEOC Interpretive Guidance on Title I of the Americans with

Disabilities Act, 29 C.F.R. pt. 1630, App. 1630.2(n)(2000)(hereinafter Interpretive Guidance).

None of the identified factors or examples provided in the regs are necessarily dispositive on

their own. Skerski, 257 F.3d at 279.

Defendant Verizon attempt to circumvent (and conveniently, avoid) the type of detailed

analysis of "essential function" suggested by the regs (and thoroughly discussed in Skerski) by

simply citing to a number of cases (Defendant's Motion for Summary Judgment, pp. 44-46)

which it represents stand for the proposition that interacting with co-workers, supervisors, and

customers is necessarily an essential function of virtually any position. The type of conduct of

which Defendant complains does not rise anywhere near the level of behavior implicated in the

other cases[19], such as Misek-Falkoff v. IBM Corp., 854 F. Supp. 215, 227 (S.D.N.Y. 1994)(fits of

---

[19]The cases cited in Defendant's Motion (p. 46, n. 23) implicate misconduct which either far surpasses any of Plaintiff's conduct, or are dissimilar. See Little v. FBI, 1 F.3d 255, 259 (4th Cir. 1993)(FBI agent who admitted egregious misconduct of being intoxicated on duty, in violation of department rules); Jones v. Am Postal Workers Union, 192 F.3d 417, 429 (4th Cir. 1999)(postal worker directly threatened to kill supervisor and left suicide note); Carozza v. Howard County, 847 F. Supp. 365, 367-68 (D. Md. 1994)(plaintiff admitted emotional outbursts and repeated insubordination). In the case of Crandall v. Paralyzed Veterans of Am., 146 F.3d 894, 898 (D.C Cir. 1998), the employee was never ADA-qualified in the first place since his

-22-

rage, emotional outbursts, altercation with co-worker); Mazzarella v. U.S. Postal Serv., 849 F.

Supp. 89, 92-95 (D. Mass. 1994)(employee who damaged property, threw equipment and had

violent outbursts). Likewise, Plaintiff's conduct doe not approach the threshhold required to

establish a "direct threat..[20]

## V. INTERACTING WITH OTHERS WAS NOT AN ESSENTIAL FUNCTION OF THE CENTRAL OFFICE TECHNICIAN POSITION, AS APPLIED TO PLAINTIFF AND THE CO-WORKERS IN HER GROUP

The regs, as applied in Skerski, mitigate in favor of a determination that interacting[21] was

not an essential function of the Central Office Technician (COT) position. Applying the regs

---

employer never had notice that he had bipolar disorder.

[20]It is true that an employee may be deemed unqualified for the purposes of the ADA if she poses a direct threat to the health or safety of other individuals in the workplace. 42 U.S.C. sec. 12113(b). That is why Defendant kept sending Plaintiff for IME's, practically begging the examiners to declare her a direct threat so they could fire her without repercussion. However, Plaintiff's conduct, which is more aptly characterized as bizarre, rather than violent, does not come close to approximating that described in Palmer v. Circuit Ct, 905 F. Supp. 499, 509, aff'd, 117 F.3d 351 (7th Cir. 1997) (employee threatened to kill supervisor), or in EEOC v. Amego, Inc., 110 F.3d 135, 143 (1st Cir. 1997)(suicidal and severely-depressed employee was direct threat to patients to whom she was charged with medicating). Direct threat analysis, including the exacting requirements of objective evidence giving reasonable basis for specific threat of harm is thoroughly discussed in Bragdon. Good discussions of direct threat analysis are contained in EEOC v. Texas Bus Lines, 923 F. Supp. 965, 979-81 (S.D. Tex. 1996)(unjustified fears about the morbidly obese driver), and EEOC v. Chrysler Corp., 917 F. Supp. 1164, 1170-72 (E.D. Mich. 1996).

[21]Plaintiff recognizes that a minimal level of interaction is required in any job in the sense that an employee must at least have the desire to be responsive to their supervisors and accept their supervision. Some of the cases cited by Defendants, for example, Boldini v. Postmaster Gen., 928 F. Supp. 125 (D.N.H. 1995), and Mancini v. Gen. Electric Co., 820 F. Supp. 141, 147 (D. Vt. 1993) involve situations where the employees were so insubordinate or hostile to the idea that their supervisor had any authority over them that they were probable not qualified for any position. Plaintiff's case is much different, in the sense that she did want to do a good job (note she made repeated requests for additional training) but was still not always able to control her behavior.

-23-

applicable determining whether a function is marginal or fundamental, it is important to remember that Plaintiff is asserting that interacting in this context should be evaluated in the proper context. Plaintiff was involved in basically two types of regular interactions in the COT position: 1) interacting with fellow Bell Atlantic employees in remote installations to execute the provisioning function, which was a central purpose of her job; and 2) interacting with her co-workers in the immediate workgroup. Plaintiff recognizes the former as an essential function of her position, and the undisputed evidence will bear out that there were few reports of complaints about her performance from these remotely-sited co-workers. In fact, Plaintiff is aware of few complaints in the record of complaints from the remotely-situated Bell Atlantic co-employees about her work performance. Plaintiff's problems stemmed almost exclusively with flippant, ill-advised, involuntary remarks she made which got her into trouble with the co-workers on the Hunt Valley Floor with whom she worked on the provisioning orders.

The workplace requirements are discussed in Def. Ex. 31 "Transport Provisioning Technician". The job requirements make no mention of interacting with co-workers as a particular requirement, (Plaintiff's Ex. 18), although Moxey and Conrad tried to make it seem like interaction with team co-workers was important. Moxey Dep. at 61, Conrad Dep. at 10-19. Other workers familiar with the job, including Barbara Lee, (Lee Dep. at 27-28), and Maria Bury said the Union had even tried to get Fran moved so she wouldn't have to have much contact with co-employees (Bury Dep. at 69, 179-180, 55-56).

Applying the regs to the COT position as it functioned in Plaintiff's workgroup in Hunt Valley under Marianne Moxey.

1. whether performance of the function is the reason the (employee's) position

exists;

    A. Interacting as it related to the remote provisioning was essential, interacting as it related to the COT co-workers on the floor was marginal;

    2. Whether there are a limited number of employees available among whom the performance of that job function can be distributed;

    A. There were 7 employees in Moxey's workgroup, and all were expected to perform the job functions of generalists;

    3. Whether the function is highly specialized so that the incumbent in the position is hired for his or her expertise.

    A. COT's are hired for their skills as applied in remote provisioning, not for the skills in getting along with their co-workers on the floor.

29 C.F.R. sec. 1630.2(n)(2). Reviewing the regs contained in 29 C.F.R. sec. 1630.2(n)(3) which list of seven (nonexhaustive list) examples of the types of evidence designed to assist a court in identifying essential functions, including:

    (i). The employer's judgment as to which functions are essential;

    A. Getting along with co-workers in the workgroup not identified by employer as essential, except in depositions for this case

    (ii). Written job descriptions prepared before advertising or interviewing applicants for the job;

    A. The written job description does not list interacting as a job skill, as noted in Marianne Moxey's deposition

    (iii). The amount of time spent on the job performing the function;

    A. Deposition testimony established time interacting with co-workers was minimal;

    (iv). The consequences of not requiring the incumbent to perform the function;

    A. As Plaintiff was never considered for an accommodation, Defendant never examined possibility of restructuring Plaintiff's job to reduce her need to

interact with her co-workers;

(v).   The terms of a collective bargaining agreement;

A.  The CBA does not address this;

(vi).  The work experience of past incumbents in the job; and
(vii). The current work experience of incumbents in similar jobs.

A. No evidence that the job requirements have been changed to accommodate another worker with Ms. Darcangelo's disability.

Interacting with others, with the caveat noted in Note 6, was not an essential function of the COT position held by Ms. Darcangelo. Therefore, in light of the lack of Plaintiff's satisfactory performance in the other aspects of her job, Plaintiff was a qualified person with a disability.

## VI: (COUNTS)

## COUNT I:    DISPARATE TREATMENT IN TERMINATION

McDonnell Douglas Corp.v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973) and subsequent decisions have established an allocation of the burden of production and on order to the presentation of proof in discriminatory-treatment cases. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, (2000)(applying McDonnell Douglas). First, the plaintiff must establish a prima facie case of discrimination. She must show that: 1) she was in the protected class (disabled); 2) she was discharged; 3) at the time of discharge, she was performing the job at a level that met his employer's legitimate expectations; and 4) the

discharge occurred under circumstances[22] that raise a reasonable inference of unlawful

discrimination. <u>EEOC v. Town & Country Toyota, Inc.</u>, 7 Fed. Appx. 226, 229 (4th Cir. 2001),

<u>citing</u> <u>Ennis v. National Ass'n of Business and Educ. Radio, Inc</u>., 53 F.3d 55, 58 (4th Cir. 1995).

Plaintiff claims that she was treated more harshly than her co-worker, Barbara Lee, for

the December 17, 1998 incident which resulted in her termination and Barbara Lee's suspension.

Maria Bury testified that in her experience, Fran should have at worst received the same

disciplinary action as Barbara Lee, whose culpability in the incident was undeniably greater.

Remember, in this incident, the undisputed facts show:

i) Barbara Lee had said she was going to "Fuck you up" to Fran, which all involved took to
  be a serious threat of bodily harm;
ii) Barbara Lee assaulted Fran, and had to be physically prevented from attacking her;
iii) Barbara Lee's actions were a terminable offense, and a violation of every policy [23]and
guideline of the Company (Plaintiff Ex. No. 12, Ann Sewell Dep. at  18, 57-61).
iv) Despite her threat to Fran Darcangelo, Barbara Lee was not referred for an IME (Barbara Lee
Dep. at 32), or  assessed for a threat of violence, contrary to Company policy (Sewell Dep.).

Also, remember that just 14 months previously, The Company had announced a "get

tough" policy with Ms. Darcangelo, which resulted in her extremely dubious referrals for an IME

in October 1997 based on allegations and complaints spanning from the 1980's and early 1990's,

and a dubious referral and 10-day suspension in May 1998 at a time when it was common

knowledge the company was trying to get rid of Fran. On top of that, on September 23, 1998, Ms.

Darcangelo was suspended for three days for exercising her union rights to be represented, and

---

[22]Defendant's erroneously suggest in their brief that  the causation standard on the
motivation element that Plaintiff is required to satisfy is "solely because of," <u>citing</u> <u>Baird v. Rose</u>,
192 F.3d 462, 468-70 (4th Cir. 1999). In fact, it is "by reason of." The error is somewhat
understandable, because several of the district courts in this district have made the same error.

[23]As to the "Code of Conduct" being a bona fide policy or guideline, the Company's
managers have a great difference of opinion. In their depositions, Butch English said

English and Conrad pretty much established that they had violated the law on.

Remember also that the company had made a concerted effort to deny that it knew about Ms. Darcangelo's disability, despite overwhelming evidence to the contrary. James Conrad's imposition of discipline on Ms. Darcangelo during the Depakote incident in 1994, when he knew her conduct was caused by a medication intoxication, and was squarely confronted with that in the grievance meeting, constitutes Direct Evidence of intent to discriminate. Although it is too late for Ms. Darcangelo to pursue ADA redress for the 1994 Depakote incident, she is entitled to use that incident (she lost a half-day pay) to prove motive in this discrimination case. See UAL v. Evans, 431 U.S. 553, 558 (1977)(pre-charge discrimination may constitute relevant background evidence); Taylor v. Western & Southern Life Insurance Co., 966 F.2d 1188, 1196 (7th Cir. 1992)(employee pursuing race claim allowed to introduce evidence of employer's race discrimination against him four years earlier at a different job site and location); Grant v. Murphy & Miller, 149 F. Supp. 2d 957, 967 (N.D. Ill. 2001)(sex discrimination plaintiff allowed to introduce harassing supervisor's pre-charge conduct); Atencio v. City of Albuquerque, 911 F. Supp. 1433, 1438 (D. N.M. 1995)(plaintiff allowed to testify as to other conduct and remarks of supervisor to explain why she slept with him).

Once the plaintiff establishes a prima facie case of disability discrimination under the McDonnell Douglas proof scheme, the burden shifts to the employer to offer evidence that the plaintiff was rejected for a legitimate, non-discriminatory reason. See Reeves, 530 U.S. at 142. This is a burden of production, not of persuasion. If and when the defendant satisfies this burden of production, the presumption created by the prima facie case drops out and the plaintiff bears the ultimate burden of convincing the trier of fact that he has been the victim of intentional

discrimination. Id.; Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct.

1089 (1981). In attempting to satisfy this burden, a plaintiff must be allowed the opportunity to

prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

were not the true reasons, but were a pretext for discrimination. Reeves, 530 U.S. at 143.  Proof

that the defendant's explanation is unworthy of credence (i.e. is "false") can permit the trier of

fact to reasonably infer that the employer is lying to cover up discrimination. Id. at 147.

Permitting such an inference comports with the bedrock principle of evidence law that the

factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative

evidence of guilt." Id. Thus, a prima facie case and sufficient evidence to reject the employer's

explanation may well permit the factfinder to impose liability. Id. at 149.

       Such evidence is present here.

**COUNT II:   DISPARATE TREATMENT IN SUSPENSION ISSUED IN
MAY 1998 (POSTER INCIDENT, TEN DAYS), SEPTEMBER 1998
(INSUBORDINATION FOR WALKING OUT OF MEETING, THREE DAYS), AND
OCTOBER 1998 (WALKOFF FROM CUSTOMER, FIFTEEN DAYS)**

       Plaintiff has raised sufficient doubt about the reason offered for these respective adverse
actions to deny summary judgment to the Defendant. Remember that:

i) Jim Conrad had refused to withdraw a loss-of-hours against Fran for her 1994 Depakote
incident, despite knowing she was sickened by a reaction to the medication;
ii) Jim Conrad had announced a get tough, no tolerance policy with Fran on October 13, 1997;
iii) Jim Conrad had withdrawn the accommodation of allowing her to be paid for attending
her counseling sessions with her counselor and doctor.
iv) just weeks after announcing the new policy, Fran was put on involuntary FMLA (she was not
formally "suspended" but was stigmatized for being out of work five weeks in 1997 without
explanation;
v) In May 1998, Fran was suspended for10-days for putting up the same poster which had been
up for months or years before without causing anyone undue concern, and was not permitted or
asked to remove the poster before being suspended; when asked to explain why and how his
relationship with Fran had deteriorated, English was at a loss for words;
v) In September 1998, Fran was suspended for three days for seeking to protect her right to

Union representation. The testimony on English and Conrad on this suspension (English: didn't tell her what the meeting is about; Conrad: didn't ask either Plaintiff or English why she walked out) is illuminating.

vii) In October 1998, Fran was suspended for 15-days for leaving a customer on the phone. Marianne Moxey couldn't explain why she wrote to Conrad she was afraid of being struck when she recounted the incident.

viii) Management continued to deny knowing about Fran's condition, despite ample evidence to the contrary, although Conrad knew she had a "special" medical condition.

When there is ample evidence for a factfinder to conclude a defendant's explanation is false and it is reasonable to infer[24] that prohibited discrimination is a contributing factor, pretext is established. Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 259 (4th Cir. 2001)(race discrimination in accommodations). As recited above, there is ample reason to question the reasons offered for the three respective suspensions, especially in light of the other questionable employment actions taken by the company during the 1997-1998 time period, and its continued claims that it didn't know about Plaintiff's disability. The employee established his case when after announcing his disability and requesting accommodation, evaluations of his work declined and his supervisors increased their criticism of his work in Butler v. Prairie Village, Kansas, 9 AD Cases 1269 (10th Cir. 1999). See also Mayer v. Univ. of Minn., 7 AD Cases 1551 (D.C. Minn. 10-96)(failure to explain differential treatment created fact issue).

**COUNT III: FAILURE TO ACCOMMODATE IN IMPOSING DISCIPLINE (UP TO AND INCLUDING PLAINTIFF'S TERMINATION), AND FAILURE TO ACCOMMODATE SINCE DEFENDANT WAS ON NOTICE THAT PLAINTIFF WAS IN NEED OF TWO POSSIBLE REASONABLE ACCOMMODATIONS: 1) LIMITING HER INTERACTION WITH HER CO-WORKERS; 2) COUNSELING HER CO-WORKERS ON HOW TO DEAL WITH A PERSON WITH HER MENTAL HEALTH CONDITION, AND BY REFUSING TO ENGAGE IN THE INTERACTIVE PROCESS AND DENYING THESE ACCOMMODATIONS, VIOLATED THE ADA**

---

[24]A comment to the effect of "If you're too sick to work on Mondays, you can't work at all" was construed as Direct Evidence of intent in a discharge case. EEOC v. Mid-Continent Security Agency, Inc., 11 AD Cases 448 (D.C. N. Ill. 2000).

Courts have increasingly rejected employer's attempts to abrogate their obligations under the ADA by painting all misconduct with the same broad brush, as Defendant attempts to do here. The language of the ADA, its statutory structure, and case law, suggest that an employer should normally consider whether a mentally disabled employee's purported misconduct could be remedied through a reasonable accommodation. If so, then the employer should attempt the accommodation. If not, the employer may discipline the disabled employee only if one of the affirmative defenses articulated in 42 U.S.C. sec. 12113, 12114 (1994) applies. Otherwise the employer must tolerate eccentric or unusual conduct[25] caused by the employee's mental disability so long as the employee can satisfactorily perform the essential functions of the position. Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1088 (10th Cir. 1997). Although it is clear that an employer may discipline an employee who poses a significant risk to the health or safety of others under the "Direct Threat" principle (discussed, supra), the fact that an employer may discipline an employee whose "disability-caused misconduct" threatens the safety of others in the workplace, however, does not mean that the employer may discipline an employee whose "disability-caused misconduct" does not pose such a "direct threat" (and does not otherwise violate reasonable job-related qualifications consistent with business necessity or fall within another ADA exception to protection). Id. n. 10.

Regardless of whether the court agrees with the Den Hartog's interpretation of the ADA's

---

[25]Den Hartog points out that the EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans With Disabilities Act, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 28 par. 30 (Mar. 25, 1997) states by way of example that an employer must make an exception to a general policy requiring employees to be neat and courteous in order to accommodate a mentally disabled employee whose job does not involve interaction with customers or co-workers.

anti-discrimination provisions, employers cannot simply discard their obligations by flatly

terminating the mentally-disabled based on any type of disability-caused misconduct. In <u>Benson</u>,

an employer attempted to argue that the plaintiff was not a qualified individual with a disability

based on misconduct in the workplace including excessive profanity and an alleged threat to kill a

co-worker, misconduct that was attributable to her disability. The court analyzed the situation this

way:

> In arguing that Benson was unqualified and not meeting legitimate expectations, the
> defendant focuses almost entirely on Benson's alleged incidences of misconduct in
> the workplace. The defendant makes no reference to performance issues related
> specifically to Benson's quality assurance position...[T]hus, the crux of the defendant's
> argument appears to be that the ability to interact appropriately with her co-workers
> was an essential function of Benson's job, and that Benson had exhibit an inability to
> do so. However, even if it is assumed that an ability to interact with co-workers is an
> essential function of the quality assurance technician position, and that Benson was
> unqualified to perform that function, it may be that the defendant could have provided a
> reasonable accommodation that would address its concerns and yet allow Benson to
> keep her job.

<u>Benson</u>, LOISLAW at 8. The court also noted that plaintiff was able to perform the functions of

the job, just not able to execute them in groups of people <u>Id</u>. at 6. See <u>also</u> <u>EEOC v. Voss</u>,

LOISLAW at 6. (rejecting defendant's argument that employee disabled by bipolar disorder was

not a qualified individual able to perform all essential functions because the employee was

irrational, delusional, unable to communicate effectively, and unable to attend work at the time of

his termination and determining these issues were for the jury).

　　　Because Plaintiff's physician has testified that Plaintiff's misconduct is involuntary (even

Jim Conrad said Fran couldn't keep herself under control (Conrad Dep. at 164), it is

improper for the Company to discipline her for conduct attributable to her disability.

-32-

Also, although Plaintiff did not specifically request herself a specific accommodation for her disability. it is not always necessary that the employee initiate the request. <u>Baucom v. Potter</u>, WMN-98-2625 (2002 U.S. Dist. LEXIS 21067 September 17, 2002) at 6. Courts have also accepted communications from an employee's family, <u>see</u> <u>EEOC v. VOSS</u>, W.D. Okla. LOISLAW at 6 (whether defendant had obligation to accommodate when it denied knowing even that employee was disabled question for jury when defendant's wife testified she gave defendant information which put it on notice that employee husband was disabled and in need of accommodation); <u>Baucom</u>, 2002 U.S. Dist. LEXIS 21067 at 6 (communication from a physician may suffice to put defendant on notice of disability and need for accommodation); <u>Bultermeyer v. Fort Wayne Community Schools</u>, 100 F.3d 1281, 1285 (7th Cir. 1996), <u>Criado v. IBM Corp.</u>, 145 F.3d 437, 444 (1st Cir. 1998). <u>See also</u> <u>Raddatz v. City of Chicago</u>, 11 AD Cases 829 (N.D. Ill. 2000).

Once an employer is put on notice of the need for an accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. <u>Humphrey v. Memorial Hospitals Ass'n</u>, 239 F.3d 1128, 1137 (9th Cir. 2001)(concluding that <u>as a matter of law</u> defendant had affirmative duty to explore possible accommodation when put on notice that employee might need accommodation.)  <u>See also</u> <u>Perez v. Procter & Gamble Manufacturing Co</u>., No. Civil S-99-2000 FCD/DAD (E.D. Cal. August 24, 2001)(LOISLAW)(defendant has obligation to continue to engage in the interactive process, even if plaintiff originally refused offered  accommodation).

An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position. <u>Humphrey</u>, 239 F.3d at 1137. The interactive process requires

communication and good-faith exploration of possible accommodations between employers and employees. In fact, employers who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. Id. At 1137-38.

Here, The Company was put on notice that Plaintiff needed an accommodation in being moved so that she would not be required to interact with other people. (MARIA BURY Dep. 55-56, 69). Also, Dr. William Wright, the Medical Director for CORE, the health care administrator with whom Bell Atlantic contracted, told Bell Atlantic supervisor Butch English that Fran's co-employees in her workgroup should be counseled about working with someone with a mental disability. (DR. William Wright Dep., pp. 38-39). This was not done. Actually, the Company has simply denied that it knew about Fran Darcangelo's need for accommodation.

As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform the job, the employer is liable for failing to attempt that accomodation. Humphrey, 239 F.3d at 1136. The ADA does not require an employee to show that a proposed acccommodation (in this case, leave of absence) is certain or even likely to be successful to prove that it is a reasonable accommodation. Id.

Plaintiff's co-worker (Maria Bury), treating physician (Dr. Gary Zimberg Dep. at 97-98) and Vocational Expert (Martin Krantiz Dep. 32-33) have all noted that Ms. Darcangelo's best prospects for succeeding at her job are with limited social contacts. Dr. Wright ordered counseling of her co-workers. Despite this, the Company made no effort to accommodate[26] Ms. Darcangelo.

---

[26]The company has argued that it in fact made an effort to give extra special treatment to Ms. Darcangelo (Conrad Dep. at 164, 203, Moxey Dep. at 128), but Maria Bury certainly didn't agree. If accepted, the company's attempts at leniency certainly undercut its claims that it didn't

**VII: IF IT IS DETERMINED THAT PLAINTIFF WAS NOT ACTUALLY DISABLED, PLAINTIFF HAS ESTABLISHED THAT SHE WAS "REGARDED AS" DISABLED UNDER THE ADA**

Jim Conrad's statement that Plaintiff's "special" medical condition, the company's attempts to restrict Fran from working nights (Darc. Dep. at 304-306, Plaintiff Ex. 8 CORE Records), and his statements that Ms. Darcangelo's "job was changed several times" (Conrad Dep. at 203), support a finding that the Company regarded Plaintiff as disabled in the major life activities of interaction and working.  See Julia v. Jansen, 92 F. Supp. 2d 25 (P.R. 2000).

**CONCLUSION:**

For the reasons stated above, Plaintiff has put forth sufficient evidence to proceed on all three counts, and the Defendant's Motion for Summary Judgment should be denied.


Dated this 12th day of July, 2003


_____

Edwin R. Burkhardt
502 Washington Ave #906
Towson, MD 21204
Bar #23626
(410) 493-5547