IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCES DARCANGELO,

     Plaintiff,

v.

VERIZON MARYLAND INC.,

     Defendant.

No. WDQ-02-816 (Civ.)

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Karen M. Wahle, Bar No. 013658
Martha Dye, Bar No. 015057
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006-4001
(202) 383-5300
(202) 383-5414 (facsimile)
Counsel for Defendant
Verizon Maryland Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.  PLAINTIFF WAS NOT A "QUALIFIED INDIVIDUAL" UNDER THE ADA ................. 2

    A.  Plaintiff Was Not Qualified Without An Accommodation ....................................... 2

    B.  The Proposed Accommodations Would Not Have Rendered Her Qualified ............ 4

        1.  The "Work Alone" Accommodation Would Have Eliminated An
Essential Function Of Plaintiff's Position ...................................................... 5

        2.  Neither Accommodation Would Be Effective For Other Reasons ................ 7

II.  PLAINTIFF WAS NOT DISABLED UNDER THE ADA .................................................. 9

    A.  Plaintiff Was Not "Actually" Disabled ......................................................... 9

    B.  Plaintiff Was Not "Regarded As" Disabled ............................................... 11

III.  PLAINTIFF'S "FAILURE TO ACCOMMODATE" CLAIM (COUNT III) FAILS
FOR THE ADDITIONAL REASON THAT THE COMPANY HAD NO NOTICE
OF PLAINTIFF'S CLAIMED DISABILITY OR NEED FOR ACCOMMODATION ..... 13

IV.  PLAINTIFF'S DISPARATE TREATMENT-BASED CLAIMS (COUNTS I AND
II) FAIL FOR THE ADDITIONAL REASON THAT THE COMPANY HAD
LEGITIMATE NON-DISCRIMINATORY REASONS FOR ITS ACTIONS ................... 15

    A.  There Was No Discriminatory Motive For The May 8, 1998 Suspension ............... 16

    B.  There Was No Discriminatory Motive For The September 23, 1998
Suspension ............................................................................................. 19

    C.  There Was No Discriminatory Motive For The October 23, 1998 Suspension ....... 20

    D.  Plaintiff Cannot Show Any Discriminatory Motive For Her Termination .............. 21

CONCLUSION ....................................................................................................... 25

## <u>INTRODUCTION</u>

The motion for summary judgment filed by defendant Verizon Maryland Inc. (the "Company") should be granted on all of the counts in plaintiff's complaint, because there is no genuine issue as to any material fact, and the Company is entitled to judgment as a matter of law. Although plaintiff bears the burden of proof, she has not made a showing to establish the existence of several of the essential elements of her causes of action, and summary judgment should be granted on behalf of the Company. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999) (summary judgment for ADA defendant is appropriate when plaintiff fails to make a showing sufficient to establish the existence of an element essential to the case and on which the plaintiff will bear the burden of proof at trial).

In her opposition to the Company's summary judgment motion, plaintiff abandons Count V of the complaint, and identifies no material disputes of fact with respect to the remaining counts (Counts I-III). While plaintiff's brief does contain a factual background section setting forth her interpretation of the facts, she admits to engaging in all of the misconduct identified by the Company, and any minor differences between plaintiff's version of the facts and the Company's are wholly attributable to a difference in interpretation and emphasis. Furthermore, plaintiff's interpretation of the law must be rejected. Throughout the brief, plaintiff attempts to portray herself as helpless and "out of control," such that she was simply unable to comply with the Company's workplace conduct standards due to her alleged disability. This argument fails to recognize the well-established law providing that regardless of the cause of plaintiff's workplace misconduct, the Company (and, for that matter, plaintiff's co-workers) cannot be required to tolerate such behavior. The Company simply cannot be held liable for disciplining and ultimately terminating plaintiff for failure to comply with its legitimate expectations, regardless of the reason for her failure to comply.

## ARGUMENT

I.    **PLAINTIFF WAS NOT A "QUALIFIED INDIVIDUAL" UNDER THE ADA.**

A threshold determination under the ADA is whether plaintiff was "qualified" to perform the essential functions of her position.  42 U.S.C. § 12111(8).  If plaintiff is not qualified – with or without an accommodation – the ADA provides no protection and her employer cannot be held liable for taking adverse employment action against her or failing to accommodate her.  *Id.*  If an employee is incapable of complying or unwilling to comply with basic rules of proper workplace conduct, with or without an accommodation, she is not qualified for her position and can be disciplined or terminated as a result, without running afoul of the ADA.  (*See* Def.'s Br. at 45-46 (summarizing caselaw).)  Because the Company has shown conclusively that plaintiff did not comply with the its basic workplace conduct rules, and that the accommodations she proposes would not have changed her behavior or made it tolerable, the Company is entitled to summary judgment on all three of the remaining counts of plaintiff's complaint.[1]

A.    **Plaintiff Was Not Qualified Without An Accommodation.**

In her opposition to the Company's motion for summary judgment, plaintiff does not dispute that she engaged in repeated misconduct and insubordination in the workplace, in violation of the Company's Code of Conduct.  Indeed, plaintiff concedes that she engaged in each and every instance of improper behavior on which her discipline and termination were based, but claims that she could not control it.  (*See* Pl.'s Br. at 16-20, 22-23 & n.21, 30-32.)  If true, this would render plaintiff unqualified for her position, and the Court need not detain itself further with the other legal questions at issue here, absent the availability of an effective reasonable accommodation.

Even if – as defendant's expert concluded – plaintiff's misconduct is volitional, however, the uncontested facts regarding her workplace behavior demonstrate that she was unqualified and

---

[1] Plaintiff has abandoned Count V of her complaint, claiming improper medical examinations.  (Pl.'s Br. at 1 n.2.)

thus outside the protection of the ADA.  Plaintiff argues that the "employer must tolerate eccentric or unusual conduct caused by the employee's mental disability" (Pl.'s Br. at 30), but acknowledges that an employee may be disciplined and terminated if he or she cannot perform the essential functions of the job or violates reasonable job-related qualifications consistent with business necessity (*id.* at 31).  The fact is that plaintiff's repeated misconduct, whether caused by her alleged disability or not, *did* violate such reasonable job-related qualifications and did not meet the Company's legitimate workplace expectations.  Plaintiff does not dispute or otherwise respond to the Company's detailed presentation of the evidence, including plaintiff's performance appraisals and numerous contemporaneous memoranda, documenting plaintiff's improper behavior and poor work performance.  Instead, she merely attempts to minimize the severity of her conduct, claiming that it "does not rise anywhere near the level of behavior" implicated in the cases in the Company's opening brief.  (Pl.'s Br. at 21-22.)  In fact, plaintiff's behavior is quite similar to that set forth in many of these cases.[2]  But even if it were not, the fact that plaintiff's behavior and work performance did not meet legitimate workplace expectations is sufficient to require summary judgment on behalf of the Company.  *See Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (employee must perform "at a level that met [] employer's legitimate expectations").

Despite her acknowledgement that there are circumstances in which disabled employees may be disciplined, plaintiff argues that the Company was not entitled to discipline and terminate her for her misconduct.  (*See* Pl.'s Br. at 30-31.)  Plaintiff's citations to authority do not support her position, however.  In *Benson v. E.I. du Pont de Nemours & Co.*, 182 F. Supp. 2d 527 (W.D. Va. 2002) (*cited in* Pl.'s Br. at 31), summary judgment was rejected on the qualification issue only

---

[2] *See, e.g.*, *Miles v. Gen. Servs. Admin.*, 5 AD Cases 351, 355 (E.D. Pa. 1995) (employee disruptive at meetings, harassed fellow employees, and insulted his supervisors); *Boldini v. Postmaster Gen.*, 928 F. Supp. 125, 128, 131 (D.N.H. 1995) (employee engaged in loud, abusive, verbal altercations with co-workers); *Hardy v. Sears, Roebuck & Co.*, Civ. A. No. 4:95-CV-0215-HLM, 1996 WL 735565, at *21 (N.D. Ga. Aug. 28, 1996) (employee "pose[d] [an] ongoing risk of combative exchanges with his co-workers").

because the defendant was on notice that plaintiff required accommodation, and an accommodation could have made it possible for plaintiff to perform the essential functions of her position, including the essential function of interacting appropriately with her co-workers. *Id.* at 535-36. The *Benson* case at no point suggested that defendant should be forced to tolerate misconduct merely because it was caused by the plaintiff's disability, absent an appropriate accommodation.

The result in *EEOC v. Voss Elec. Co.,* 257 F. Supp. 2d 1354 (W.D. Okla. 2003) (*cited in* Pl.'s Br. at 32) also turns on the availability of an accommodation, and in no way suggests that an employer should be forced to tolerate misconduct if no accommodation is requested or the requested accommodation would be ineffective. *See id.* at 1361. Similarly, in *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076 (10th Cir. 1997) (*cited in* Pl.'s Br. at 30-31), the court makes the point that "an employer would not be required to rescind discipline for misconduct. Therefore, it appears that this employer could terminate the employee for bringing a loaded gun onto company property, assuming it would impose such discipline on [an] employee without disabilities." *Id.* at 1088 n.10. Furthermore, the court acknowledges that an employer may discipline an employee for "disability-caused misconduct" where it "violate[s] reasonable job-related qualifications consistent with business necessity." *Id.* That is exactly what happened in plaintiff's case.

### B.    The Proposed Accommodations Would Not Have Rendered Her Qualified.

Plaintiff claims that the Company should have accommodated her in two ways, purportedly to render her capable of behaving properly and thus "qualified" to perform the essential functions of her position. Plaintiff claims that the Company should have modified her position to limit her interaction with co-workers, and that the Company should have provided counseling to her co-workers "on how to deal with a person with her mental health condition." (Pl.'s Br. at 30-34.)

The undisputed evidence demonstrates that neither of the proposed accommodations (which plaintiff did not request while employed) would have been effective. Plaintiff instead argues, based

on *Humphrey v. Mem'l Hosps. Assn.*, 239 F.3d 1128 (9th Cir. 2001), that "[a]s long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform [the] job, [the] employer is liable for failing to attempt that accommodation." (Pl.'s Br. at 33 (citing *Humphrey*, 239 F.3d at 1136).)  However, as the Ninth Circuit itself has pointed out, *Humphrey* was limited to situations where the employer "had been apprised of the employee's need for an accommodation, and had already unsuccessfully attempted to provide an accommodation." *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1188 n.3 (9th Cir. 2001).  In addition, another appellate court has recognized that the standards set forth in *Humphrey* represent the most "rigorous version" of any court's construction of an employer's obligation to engage in an interactive process to accommodate a disabled employee, and has declined to follow them.  *See Kvorjak v. Maine*, 259 F.3d 48, 52 (1st Cir. 2001).  Nor has the Fourth Circuit adopted the overbroad language from *Humphrey*.  In any event, even the *Humphrey* court did not question that an accommodation must be "'effective in enabling the employee to perform the duties of the position'" in order to be appropriate and reasonable.  *Humphrey*, 239 F.3d at 1137 (citation omitted).  As explained below, plaintiff's proposed accommodations do not meet that standard.

### 1.    The "Work Alone" Accommodation Would Have Eliminated An Essential Function Of Plaintiff's Position.

In its opening brief, the Company showed that the "work alone" accommodation plaintiff demands is inappropriate because it would result in eliminating an essential function of her position – interacting with other employees.  (*See* Def.'s Br. at 40-43.)  In response, plaintiff argues that interaction with her Hunt Valley co-workers was not an essential function and that she could have performed her essential job functions without such interaction.  (*See* Pl.'s Br. at 22-25.)[3]  But even

---

[3] Plaintiff insists on a mechanical application of factors promulgated by the Equal Employment Opportunity Commission for consideration in determining whether a job function is "essential" or not, but her application of those factors is conclusory and lacking in evidentiary citations.  Whether analyzed via use of the various factors or viewed as

assuming such an accommodation could eliminate plaintiff's misconduct, the evidence shows that interacting with her Hunt Valley co-workers was in fact an essential function of plaintiff's job.

Although plaintiff references a Company-wide generic description for her job classification (*see* Fleig Dep.[4] at 178; Darcangelo Dep. at 268-73), she cannot dispute that the job descriptions that applied to her specific work area included tasks requiring interaction with co-workers, including assisting co-workers, notifying others of various issues, and making a "verbal handoff" to the next shift.  (*See* Supplemental Job Requirements (Ex. 21); Position Requirements (Ex. 31).) Furthermore, the testimony of all witnesses for both sides supports the conclusion that it was a job necessity for co-workers to interact with each other and train each other on a regular basis.  (*See* Def.'s Br. at 18-19; *see also* Fleig Dep. at 12, 180; Moxey Dep. at 60-61; Conrad Dep. at 10-19; Dankert Dep. at 59-60, Bury Dep. at 41, 61-62.)  And while Ms. Bury testified that the union attempted to have plaintiff moved to a position that would require *less* contact with co-workers, her proposal was *not* that plaintiff's current position be adapted (as she must have known this was impossible), but rather that an entirely different position be found for her.  (Bury Dep. at 55 & 69.)[5]

That interaction with co-workers was vital to ensuring the functioning of the work group is further evidenced by the events surrounding the termination of plaintiff's witness Gus Dankert.  Mr. Dankert was terminated as a direct result of failure to communicate an important problem in the computer system to co-worker Barbara Lee.  (Conrad Dep. at 41; Dankert Incident Reports (Def.'s Reply Ex. 2).)  In that instance, the failure to communicate with a co-worker actually impacted customer telephone service, because it took co-workers a lengthy period to reconstruct the situation on their own.  (*Id.*; Conrad Dep. at 41, 43-44.)  The fact that failure to communicate with a co-

a whole, the evidence, as set forth here and in the Company's opening brief, demonstrates that interacting with co-workers was an essential function of plaintiff's position.

[4] A number of pages were inadvertently omitted from Mr. Fleig's deposition transcript submitted with the Company's opening brief.  Accordingly, a replacement copy is being submitted herewith as Defendant's Reply Exhibit 1.

[5] Plaintiff asserts without citation that "[d]eposition testimony established time interacting with co-workers was minimal."  (Pl.'s Br. at 25.)  Defendant is unaware of any such testimony.

worker was deemed so serious as to require termination in that instance contradicts plaintiff's

interpretation of the necessity for intra-office communications as a "marginal" function of the

position.  Undeniably, the same customer service disruption that took place in the Dankert

termination incident could easily have occurred if the Company had allowed plaintiff to perform her

job without communicating with co-workers.  Accordingly, plaintiff's proposed accommodations

would not have rendered her capable of performing the essential functions of her position.

### 2.    <u>Neither Accommodation Would Be Effective For Other Reasons.</u>

Plaintiff fails to respond to the Company's showing that neither of the proposed

accommodations would have prevented her from engaging in inappropriate behavior at work,

whether it was voluntary or involuntary (as she now asserts).  With respect to the proposed

workplace counseling accommodation, the conclusion of defendant's expert Dr. Janofsky –that it

would not be effective – remains unrebutted.  Dr. Russo, a third-party witness and independent

psychiatrist who examined plaintiff, also opined that educating supervisors would be ineffective,

because it would be impossible for a layperson to fully understand and be trained in how to handle a

person like plaintiff.  (*See* Russo Dep. at 69-70.)

Nor would the proposed "work alone" accommodation be effective, even if interaction with

co-workers were not an essential function of the job.  Plaintiff concedes that "a minimal level of

interaction is required in any job in the sense that an employee must at least have the desire to be

responsive to their supervisors and accept their supervision."  (Pl.'s Br. at 22 n.21.)  She does not

explain, however, how her repeated offensive behavior in the workplace – which went beyond the

few incidents that actually resulted in suspensions (*see* Def.'s Br. at 7-18 (detailing frequent

incidents of misconduct)) – is consistent even with this "minimal level of interaction."  Contrary to

plaintiff's unsupported assertion that she "did want to do a good job" (Pl.'s Br. at 22 n.21), her

record indicates that she was not willing or able to interact properly with anyone, even at a

"minimal" level.[6]  And if, as she claims, she was "not always able to control her behavior" (Pl.'s Br. at 22 n.21), then she was not qualified, and could not be rendered qualified by an accommodation that would still require interaction with superiors and field technicians.[7]

Plaintiff admits that interacting with field technicians in remote locations via telephone was "a central purpose of her job," and does not propose that her "work alone" solution would eliminate this interaction.  (Pl.'s Br. at 23.)  Contrary to her assertion, however, plaintiff's interactions with field technicians were not free from the contentious attitude that she displayed towards her Hunt Valley co-workers.  It is undisputed that the September 1998 incident leading to her suspension involved improper behavior with a field technician on the phone.  Furthermore, plaintiff had previously been reprimanded for being "frequently very curt and flippant with [field] technicians . . . ."  (1997 Performance Appraisal (Ex. 42).)  Both "[c]ustomers and co-workers . . . complained about her attitude and behavior."  (1998 Performance Appraisal (Ex. 55).)  And part of the problem with plaintiff's performance was that she "didn't like to answer the telephone."  (Moxey Dep. at 33.)  Thus the evidence (as confirmed by defendant's expert, as set forth in the opening brief (*see* Def.'s Br. at 22-23)) demonstrates that any proposed accommodation that did not eliminate this essential job function would not be effective in curtailing her improper behavior.

Because the undisputed facts demonstrate that neither of plaintiff's proposed accommodations would be effective in rendering her capable of performing the essential functions of her position, she cannot be deemed a "qualified individual" under the ADA, and the Company is entitled to summary judgment on all of her claims.

---

[6] Plaintiff suggests that her repeated requests for training demonstrate a desire to perform well on the job.  To the contrary, plaintiff demanded training on subjects that she already knew well as just another disruptive tactic.  (*See, e.g.*, 6/4/98 Minutes (Ex. 53) (claiming that during her four week absence, she had "forgotten how to do many of the tasks associated with her position").)

[7] While plaintiff contends that her problems with interpersonal communications were primarily with co-workers, she cannot deny that the majority of the incidents for which she was disciplined in the months leading up to her termination involved confrontations with supervisors, rather than co-workers.  She does not explain how her proposed "work alone" accommodation could eliminate her problematic interactions with supervisors.

## II.    PLAINTIFF WAS NOT DISABLED UNDER THE ADA.

All of plaintiff's claims must also be rejected for failure to satisfy the other threshold requirement for her to be covered by the ADA: she cannot establish that she was "disabled" as that term is defined under the Act, *i.e.*, that she suffered from "a physical or mental impairment that substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A).[8]

### A.    Plaintiff Was Not "Actually" Disabled.

Despite the undisputed evidence that plaintiff's Bipolar Disorder has been in remission since 1990 due to medication (*see* Janofsky Report ¶¶ 247-54; Zimberg Dep. at 62), plaintiff continues to assert that she suffers from an ADA-covered disability based on her diagnosis of Bipolar Disorder. (*See* Pl.'s Br. at 13.)  This argument is wholly inconsistent with the fundamental principal established by the United States Supreme Court in *Sutton v. United Air Lines*, 527 U.S. 471 (1999) that mitigating measures must be taken into account in determining disability status. *Id.* at 482. Furthermore, plaintiff does not (and indeed cannot) contend that her Personality Disorder constitutes an "impairment" under the ADA.  Because plaintiff's claim of disability is premised solely on a disorder from which she suffers no current effect, plaintiff's claims must be rejected.

Even if plaintiff's outrageous workplace behavior *were* associated with a legally cognizable impairment, she still could not prove that she was substantially limited in any major life activity. Whether the major life activity in question is interacting with others or working,[9] plaintiff cannot show that she is "substantially limited" with respect to either, because the great weight of the evidence indicates that she was able to control her behavior and intentionally caused the

---

[8] In her opposition brief, plaintiff no longer asserts that she is eligible for ADA protection because she has a "record of" disability, and must be deemed to have conceded that.  Plaintiff's claim is thus limited to her argument that she was a) "actually" disabled or b) "regarded as" disabled.

[9] Plaintiff misconstrues *Davis v. Univ. of N.C.*, 263 F.3d 95 (4th Cir. 2001) when she claims that the Fourth Circuit "has assumed, without explicitly deciding, that social interaction is a major life activity under the ADA." (Pl.'s Br. at 14.)  In fact, the Fourth Circuit explicitly stated in *Davis* that it had "some doubt" about whether social interaction would qualify as a major life activity. 263 F.3d at 100 n.4. This can hardly be seen as an endorsement of plaintiff's position.

confrontations for which she was disciplined.  Plaintiff's only response to the evidence in support of

this conclusion from all of the health care providers who have evaluated her, including emphatic

statements from her own psychotherapist, is a single passage from the deposition of her medical

expert, Dr. Zimberg, who opined that she is not in fact able to control her misconduct.  (*See* Pl.'s Br.

at 16-17.)  This testimony is at odds with all other evidence in the case.  Furthermore, it appears to

be based more on his view that plaintiff's behavior would be logically counterproductive – and

therefore "must" be involuntarily – rather than an evaluation of her mental state.  (*See* Zimberg

Dep. at 106 ("[T]here is no benefit to her from that, only trouble. . . . So it wouldn't be logical to do

anything like that willfully.").)  Dr. Zimberg's testimony fails to appreciate that plaintiff prefers

solitude, and therefore logically desires to distance herself from others, as Dr. Janofsky has

explained.[10]  Moreover, Dr. Zimberg was not privy to any documents or information whatsoever

concerning plaintiff's employment other than her own skewed reports (*see* Zimberg Dep. at 73,

110), and therefore did not realize that plaintiff's "game plan was to do something to get fired and

then to sue the company . . . ."  (Fleig Dep. at 115.)[11]  With that game plan in mind, it is easy to see

how plaintiff's actions in provoking her co-workers and then blaming it on her "disability" could

easily provide a "benefit to her" and "be logical" such that she might do so willfully.

Given Dr. Zimberg's limited access to information, and the fact that his conclusory

testimony on this issue is contrary to the other evidence in the case – including from plaintiff's other

mental health care provider – his opinion should be disregarded and the Court should conclude that

---

[10] *See, e.g.*, Janofsky Report ¶ 266 (concluding that plaintiff "chooses to keep others at a distance through sarcasm and verbally inappropriate behavior.  Ms. Darcangelo uses fear and intimidation to separate herself from others.  She is capable of controlling her behavior but at times chooses not to in order to distance herself from others.").

[11] Dr. Zimberg's limited understanding of the level of plaintiff's misconduct at work is exemplified by the fact that even by the time of his deposition he had never heard that she had posted a rifle target at work with her supervisor's face in the center.  (*See* Zimberg Dep. at 178-79.)  When he heard this for the first time at the deposition, Dr. Zimberg indicated that he would have concerns about her posing a threat of violence under those circumstances.  (*Id.* at 180.)

plaintiff's behavior was willful and cannot support a finding that her condition (whether Bipolar Disorder or something else) rendered her "substantially limited" in any major life activity.[12]

### B.    Plaintiff Was Not "Regarded As" Disabled.

Plaintiff cites three pieces of evidence to counter the Company's showing that she was not "regarded as" disabled.  None of these in fact demonstrates that the Company "regarded her" as substantially limited in any major life activity, however.

Plaintiff first asserts that Mr. Conrad's reference to her "special" medical condition shows that she was "regarded as" disabled.  (Pl.'s Br. at 34.)  This argument is invalid for several reasons.  First, it demonstrates nothing more than uncertainty about the nature of plaintiff's condition, and thus does not rise to the level of knowledge that must be proven to support a "regarded as" claim. *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 704 (4th Cir. 2001) ("uncertainty about [plaintiff's] condition" insufficient to establish "regarded as" claim).  Second, this statement was made prior to the discipline at issue in this lawsuit and prior to the two independent medical evaluations that resulted in reports that plaintiff was fully capable of working regardless of any medical condition she may have.  (*See* 10/13/97 Notes (Ex. 38).)  Thus, even if Mr. Conrad had thought that plaintiff suffered from a disability at that time, the subsequent medical evaluations caused him to conclude that plaintiff was fully capable of working.  (*See* Answers to Interview Questions (Ex. 78) ("[I]nformation I received [from medical evaluations] stated no reason [plaintiff] could not work in the workplace.").)  Finally, the "special medical condition" reference says nothing about whether Mr. Conrad regarded plaintiff as substantially limited in any major life activity.  As such, it does not support the theory that she was "regarded as" disabled.

---

[12] The findings of Mr. Kranitz, who admittedly is not qualified to evaluate plaintiff's psychiatric state (Kranitz Dep. at 230), should also be disregarded because they are similarly based on the assumption that plaintiff's failure to maintain employment is due to some involuntary mental condition rather than the willful desire to distance herself from others. (*See* Kranitz Report at 10-11 (citing the "difficulty" plaintiff has in getting along with other people).)  Moreover, like Dr. Zimberg, Mr. Kranitz was not given access to plaintiff's employment records in preparing his report, and based his conclusions solely on plaintiff's self-report.  (Kranitz Dep. at 29-31, 41-42.)

Plaintiff next claims that the Company's purported attempts "to restrict Fran from working nights" support a "regarded as" claim. (Pl.'s Br. at 34.) This assertion also fails for several reasons. First, it is far from clear that the Company actually restricted plaintiff from working nights. Although plaintiff did shift from the night to the day shift, plaintiff testified that she did not want to go back to the night shift (Darcangelo Dep. at 305), and Mr. Conrad testified that she was not prohibited from working nights (Conrad Dep. at 204-06). But even if plaintiff had been restricted to days, she could not show that she was "regarded as" disabled because, as set forth in the Company's opening brief, working nights is not a major life activity. (*See* Def.'s Br. at 53 n.31.)

For the same reason, Mr. Conrad's testimony that plaintiff's job "was changed several times" (Conrad Dep. at 203 (*cited in* Pl.'s Br. at 34)) does not meet the standard for a "regarded as" claim. It simply says nothing about whether she was "regarded as" being substantially limited in a major life activity. *See, e.g.*, *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144 (2d Cir. 1998) (rejecting "regarded as" claim where plaintiff could not demonstrate that the employer regarded him as substantially limited in a major life activity). Moreover, because these job changes were intended to "enhance the ability of Fran to do that job" (Conrad Dep. at 203), they cannot be used against the employer as evidence that it regarded her as disabled. *See, e.g.*, *Johnson v. Boardman Petroleum, Inc.*, 923 F. Supp. 1563, 1568 (S.D. Ga. 1996) (humanitarian gestures should not be punished); *see also Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (provision of accommodation should not be considered stipulation of disability).[13]

In summary, plaintiff cannot prove that the Company regarded her as suffering from an impairment that substantially limited her in a major life activity. The Company is accordingly entitled to summary judgment on the "regarded as" aspect of her claims.

---

[13] Plaintiff relies on *Julia v. Janssen, Inc.*, 92 F. Supp. 2d 25 (D.P.R. 2000), but in that case, the employer questioned the plaintiff's "ability to work at all." *Id.* at 37. Plaintiff has presented no evidence that this was the case in her situation.

**III.    PLAINTIFF'S "FAILURE TO ACCOMMODATE" CLAIM (COUNT III) FAILS FOR THE ADDITIONAL REASON THAT THE COMPANY HAD NO NOTICE OF PLAINTIFF'S CLAIMED DISABILITY OR NEED FOR ACCOMMODATION.**

As demonstrated in Part I.B, neither of the accommodations plaintiff now demands would have been effective in rendering her qualified for her position, and her claim that the Company improperly failed to accommodate her alleged disability thus fails on that ground alone.  *See, e.g.*, *Bryant v. Better Business Bureau*, 923 F. Supp. 720, 734-35 (D. Md. 1996).  But even if an effective accommodation had been available, plaintiff's "failure to accommodate" claim would nonetheless fail because she never requested the accommodations she now claims should have been provided to her.  Plaintiff concedes that she never requested these accommodations, and does not dispute that all of the information that management was given as a result of her medical evaluations indicated that she was fully capable of working without any accommodation.  (Pl.'s Br. at 32.)[14]  Plaintiff nevertheless claims that the Company should have known that she required an accommodation.

In the face of the extensive caselaw referenced in the Company's opening brief establishing the unmistakable rule that the employee is responsible for requesting an accommodation (even in the case of mental illness), and that a defendant cannot be held liable for failure to accommodate without being placed on notice of both the specific disability suffered and the specific accommodation required (*see* Def.'s Br. at 36-38), plaintiff cites a handful of easily distinguishable cases where an explicit request was not required.  (*See* Pl.'s Br. at 32.)  The circumstances of each of those cases were a far cry from plaintiff's own situation, however.  In plaintiff's lead case of *Baucom v. Potter*, 225 F. Supp. 2d 585 (D. Md. 2002), the defendant was placed on notice by a psychiatric evaluator that plaintiff had a medical problem that rendered him "not fit for duty."  *Id.* at

---

[14] Plaintiff asserts, based on the testimony of Ms. Bury, that Mr. Conrad knew about her diagnosis because the usual procedure in 1994 was for management to receive a copy of her medical file before the grievance meeting.  (Pl.'s Br. at 6.)  However, Mr. Conrad testified that he was never given any detailed medical information and did not have access to plaintiff's medical records.  (Conrad Dep. at 84, 184-85.)  In any event, any information provided in 1994 would have been superseded by the later information that was provided to management, which was that plaintiff was fully responsible and accountable for her behavior.  (*See* Def.'s Br. at 25-26 (summarizing evidence).)

589.  In addition, the defendant in that case did not even raise the issue of the plaintiff's failure to

request accommodation.  Similarly, in *EEOC v. Voss Elec. Co.,* 257 F. Supp. 2d 1354 (W.D. Okla.

2003), defendant was made aware that plaintiff had a medical problem that was preventing him

from coming to work, *id.* at 1356, and the facts suggested that defendant may have been told by

plaintiff's wife that he required a definite period of medical leave (the accommodation at issue), *id.*

at 1361.  *See also Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1282 (7th Cir. 1996)

(defendant was aware that plaintiff had been on disability leave and had previously been granted

accommodations due to his psychiatric condition, and plaintiff delivered a note to defendant from

his psychiatrist requesting accommodation).  None of these cases therefore is relevant to plaintiff's

situation, in which she affirmatively concealed her alleged disability and in which the Company was

repeatedly informed by medical providers that she was capable of working without restrictions.[15]

     Although plaintiff herself clearly never requested accommodation, she claims that two other

sources of information were sufficient to place the Company on notice of her need for

accommodation.  First, she asserts that Dr. William Wright of CORE notified the Company that

plaintiff's "workgroup should be counseled about working with someone with a mental disability."

(Pl.'s Br. at 33.)  In fact, the only evidence regarding Dr. Wright's recommendation is that on June

2, 1998, he instructed a nurse to recommend to a supervisor "that he ask for intervention on site

from [Bell Atlantic Company Employee Assistance Program] for support of his work group that is

receiving this [employee] back to work."  (CORE Records (Ex. 39) at 7-A-0 at 4; Wright Dep. at

38-39.)  There is no evidence that the nurse actually passed this suggestion along to any Company

supervisor.  (*See* Conrad Dep. at 165 (no recollection of any discussion about work group

counseling); Moxey Dep. at 131 (same).)  Moreover, there is no evidence to suggest that Dr. Wright

---

[15] Moreover, in two of plaintiff's cases, the employee actually did request accommodation.  *See Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir. 1998) (employee requested leave, and "IBM was on notice that Criado was suffering from a mental impairment and that she needed time to adjust to her exacerbated condition"); *Raddatz v. City of Chi.*, No. 98 C 5323, 2000 WL 968823, at *2 (N.D. Ill. July 12, 2000) (plaintiff filed "reasonable accommodation" form).

intended this recommendation as an accommodation for *plaintiff*. Rather, the text of the CORE records and Dr. Wright's testimony suggest that Dr. Wright was concerned for the well being of the members of the work group (who had recently expressed fear of harm from plaintiff). (CORE Records, 7-A-0 at 4; Wright Dep. at 38-39.) None of the evidence indicates that the Company was on notice that it should provide, as an accommodation to plaintiff, co-worker "counsel[ing] about working with someone with a mental disability." (Pl.'s Br. at 33.)

Plaintiff next claims that the Company was on notice of her need for an accommodation based on the testimony of Ms. Bury. (Pl.'s Br. at 33.) Ms. Bury testified that she vaguely remembered that the union attempted at a grievance hearing to get plaintiff moved into a different job in another part of the Company where she had less direct contact with other employees. (Bury Dep. at 55, 69.) This testimony is not corroborated anywhere in the contemporaneous grievance records, and there is no indication that plaintiff at any time desired to be moved into another job. Indeed, the accommodation she is now demanding is not transfer to another position, but rather modification of the position that she already held. Thus, any supposed request by the union to have the plaintiff moved to another position (in which plaintiff herself was apparently uninterested) cannot be said to have placed the Company on notice of plaintiff's need for accommodation.

Because plaintiff never requested an accommodation, and the Company was not on notice of the need for such an accommodation, it is entitled to summary judgment on plaintiff's Count III.

**IV.    PLAINTIFF'S DISPARATE TREATMENT-BASED CLAIMS (COUNTS I AND II) FAIL FOR THE ADDITIONAL REASON THAT THE COMPANY HAD LEGITIMATE NON-DISCRIMINATORY REASONS FOR ITS ACTIONS.**

Plaintiff's Counts I and II alleged that she was treated more harshly than other employees on the basis of disability with regard to her termination (Count I) and other disciplinary actions taken against her (Count II). The Company's opening brief presented voluminous compelling evidence of plaintiff's misconduct and insubordination, and of the numerous instances of inappropriate and

threatening behavior upon which her termination and discipline were based, demonstrating that the Company had legitimate, non-discriminatory reasons for taking these actions. (Def.'s Br. at 28-33.) Plaintiff does not dispute this evidence – indeed, she concedes that she engaged in the conduct and behavior for which she was disciplined in each incident. (*See* Pl.'s Br. at 3-12.)

Rather than presenting evidence demonstrating a discriminatory motive for the Company's actions, as she must, *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993), plaintiff instead relies on hyperbole, unsupported suppositions, and innuendo in the hope that the Court will allow her case to proceed to trial. When the facts – rather than plaintiff's rhetoric – are examined, however, it is clear that the Company is entitled to summary judgment on plaintiff's disparate treatment claims. As described below, each scrap of evidence that plaintiff has seized upon in various places throughout her brief relating to the incidents at issue is inadequate to controvert the Company's showing that it had legitimate non-discriminatory reasons for its actions.

### A.    There Was No Discriminatory Motive For The May 8, 1998 Suspension.

It is undisputed that in May 1998 plaintiff was suspended after displaying a poster of a rifle target with a supervisor's face in the center, following a warning not to post offensive materials in her cubicle. (Def.'s Br. at 29-30.) Although no evidence exists supporting plaintiff's claim that the discipline was imposed on her due to her alleged disability, plaintiff attempts to avoid summary judgment by alluding to several pieces of evidence which she believes cast doubt on defendant's stated reasons for suspending her. As discussed in detail below, none of plaintiff's evidence demonstrates or even suggests that the Company's reasons for suspending her in this incident were pretextual or that the Company's true reasons were discriminatory.

**Prior Posting of Rifle Target.** Plaintiff first points out that the rifle target had been posted previously, and was treated as a joke. (Pl.'s Br. at 9 & n.12, 28.) What plaintiff fails to mention is that the evidence clearly shows that the Company had good reason to be more concerned about the

rifle target the second time it was posted. Plaintiff's conduct at the time had become more extreme and necessitated repeated warnings. (*See* Def.'s Br. at 7-12.) In addition, several co-workers had, in the months leading up to the incident, approached management to report that they were fearful of her, lending credence to the possibility that plaintiff had a potential for violence. (*See id.* at 9.) Finally, Mr. English, whose face was in the center of the rifle target, was not at the time "getting along" with the plaintiff, in contrast to the prior year in which a similar poster had been displayed. (English Dep. at 65.)[16] And contrary to plaintiff's assertion, Mr. English was very concerned about the poster and became fearful of being harmed by plaintiff as a result of the rifle-target display. (*See* Conrad Dep. at 58-59; English Dep. at 82-83, 184; Kelly Dep. at 86; Lee Dep. at 58-59.)[17]

    **Testimony of Maria Bury.** Plaintiff next emphasizes that union official Maria Bury "knew that the poster was a joke" (Pl.'s Br. at 9 n.11) and asserts, based on Ms. Bury's testimony, that according to "company practice," plaintiff should have been permitted to simply remove the offending poster (*id.* at 9, 28-29.) However, Ms. Bury never worked with plaintiff, or even at the Hunt Valley facility. (*See* Bury Dep. at 32, 48-49, 57-58.) She was not therefore subject or privy to the continuous verbal abuse and other bizarre behavior that plaintiff engaged in during this period, and is not a reliable witness on the subject of whether the poster was threatening. In fact, she did not witness any of the events in question. Ms. Bury's role is to act as an advocate for grieving employees (like plaintiff) on behalf of the union. (*See, e.g.*, Bury Dep. at 86 (describing her role in

---

[16] Plaintiff places great emphasis on the fact that Mr. English's testimony did not articulate what led to the deterioration of the relationship between himself and plaintiff. The following is the entire exchange on this subject: "Q: Okay. Do you know what incidents caused [the relationship between you and plaintiff] to not be good anymore? A: No." (English Dep. at 142.) No significance can be read into this other than Mr. English understandably did not have a perfect recollection of the events in question, given that they occurred nearly five years ago, and prior to his retirement.

[17] In claiming that Mr. English "was not concerned about the poster," (Pl.'s Br. at 9 n.12), plaintiff misinterprets the deposition testimony. The question that Mr. English was asked was "Were you the person that initially had the concern over [the poster]?" (English Dep. at 80-81.) The subsequent testimony makes clear that Mr. English was not the first person to *discover* the poster and that his "no" response to the question merely meant that others discovered and were concerned about it *first*. (*See* English Dep. at 81 (testifying that other central office technicians were the persons that initially had the concern and that they "came and got me and said, Look at this"); *id.* at 82 ("Q: And when you saw it you were concerned? A: They were concerned too.").

grievances).)  She cannot therefore be considered a witness (much less a credible and unbiased one) on such subjects.  In any event, Ms. Bury did *not* in fact testify that it was "company practice" for individuals to be allowed to remove offensive posters to avoid discipline (*see* Bury Dep. at 107 (*cited in* Pl.'s Br. at 9)), and plaintiff herself testified that she was not even at work (so as to be able to remove the poster) when it was discovered (Darcangelo Dep. at 347).  The Bury testimony thus fails to raise any legitimate doubts about the Company's motivations in disciplining plaintiff.

**Preceding Events.**  Plaintiff's final attempt to show that the stated motives for her May 1998 suspension were pretextual is simply a recitation of the prior events that had occurred in the workplace, including previous warnings to plaintiff that any further misconduct would result in discipline, as well as her prior medical examination.  (*See* Pl.'s Br. at 28.)  But far from proving that there was some sort of "campaign" to harass plaintiff, these events have the contrary effect of demonstrating that plaintiff did in fact engage in a course of misconduct that the Company properly addressed by suspending her.[18]  Plaintiff accordingly cannot demonstrate that the Company's reasons for suspending her were in any way invalid, let alone a pretext for discrimination.

---

[18] In her brief, plaintiff repeatedly makes the unsupported assertion that the Company's decisions to send plaintiff for a medical evaluation on this and the prior occasion in 1997 were motivated by a desire to have her declared a "direct threat" so that she could be dismissed without legal repercussions under the ADA.  (*See, e.g.*, Pl.'s Br. at 9, 22 n.20.) This theory is inherently incredible because it assumes a level of understanding of the ADA legal regime by lower level management that is implausible and unsupported.  Moreover, it ignores the undisputed fact that plaintiff's co-workers were fearful of her, a circumstance that cannot be attributed to management's purportedly plotting against plaintiff. Plaintiff's theory also ignores the undisputed fact that plaintiff was only asked to attend an independent examination after she refused to sign a release allowing CORE to speak with her own medical providers.  (*See* Def.'s Br. at 10.)  In any event, the recorded communications between management and CORE demonstrate not an unjustified desire by management to "get rid of" plaintiff, but rather a genuine concern about whether there might be a medical – rather than a disciplinary – solution to plaintiff's repeated and intolerable misconduct.  (*See, e.g.*, CORE Records (Ex. 39) at 2-3 (1997 call from English reporting bizarre behavior); *id.*, 6-A-0 at 3 (1998 call from Ms. Moxey stating that "she was concerned or questioned if [employ]ee had any restrictions which would account for her behavior, otherwise this would all be treated as a disciplinary problem")).  Indeed, CORE was in both instances the source of the suggestion to send plaintiff for evaluation, not management.  (*Id.* at 3 (CORE nurse Barbara Kelly "[a]dvised" Mr. English that "IME will be scheduled"); *id.*, 7-A-0 at 2 (again "[a]dvis[ing]" management that "IME will be obtained prior to [employee] return to work").)  These facts cannot be reconciled with plaintiff's conspiracy theory about a campaign by management to have her declared a direct threat, and her suppositions in this respect must therefore be rejected.

**B.**    **There Was No Discriminatory Motive For The September 23, 1998 Suspension.**

Plaintiff's attempt to plant a seed of doubt with respect to the September 23, 1998 suspension should similarly be disregarded.  Plaintiff does not dispute that she disobeyed her supervisor by leaving a conference room in contravention of his direct order for her to stay and explain an incident on the work floor after she had created a scene following a dispute with a co-worker on a training issue.  Plaintiff attempts to justify her action by claiming that she was not told the subject of the meeting, and that, because she believed at the time that it would result in disciplinary action, she was entitled to union representation under *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975).  (*See* Pl.'s Br. at 10 & n.14.) [19]

Plaintiff's analysis of this incident is faulty.  As an initial matter, plaintiff was in fact informed of the "subject" of the meeting.  Mr. English specifically asked her to explain, "[w]hat's the problem out there?  Tell me."  (English Dep. at 127.)  Far from "admitt[ing]" that he did not tell her why he wanted to talk to her (Pl.'s Br. at 10), Mr. English responded to the deposition question, "Did you let her know when you went into that conference room what the topic or the subject of conversation was going to be" (English Dep. at 131) as follows:  "Yes.  Well, I asked her what's going on out there.  What's the problem?" *id.*  Moreover, Mr. English explicitly informed plaintiff that she did not need union representation (because no disciplinary action was contemplated).  (9/23/98 Notes (Ex. 57).).  Given that the entire purpose of the meeting was simply to hear from plaintiff what was "going on," plaintiff could not have reasonably believed that the meeting would result in disciplinary action, as is required for an employee's *Weingarten* rights to be triggered.  *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975).  In any event, even if Mr. English's actions or

---

[19] Plaintiff also claims that it is significant that Mr. Conrad "never asked Fran Darcangelo or Butch English why Fran left the room, or why Butch wanted her in the room."  (Pl.'s Br. at 10 n.14; *id.* at 29.)  In fact, Mr. Conrad was fully aware of the circumstances of the incident, and testified that Mr. English "asked her in the room to talk about the training issue.  He wanted to find out what the issue was."  (Conrad Dep. at 52.)  Plaintiff's counsel never asked Mr. Conrad whether he was aware of plaintiff's request for union representation.  (*See* Conrad Dep. at 52-54.)

the discipline ultimately imposed on plaintiff could be seen as unjustified, there is no evidence supporting plaintiff's theory that the "true" motive for the discipline was discriminatory.

### C.    There Was No Discriminatory Motive For The October 23, 1998 Suspension.

Plaintiff also does not dispute that she walked out on a business telephone call with another technician and an outside customer, leading to a fifteen-day suspension on October 23, 1998. (Pl.'s Br. at 10.)   Rather, she claims that telephone calls with customers were "never supposed to occur," since Central Office Technicians spend "'at least 90% of the time'" interfacing exclusively with Company co-workers rather than outside customers. (Pl.'s Br. at 10.)  It is unclear how this fact justifies plaintiff's conduct, and ignores the fact that plaintiff herself admitted at her deposition that she had behaved inappropriately during this incident. (Darcangelo Dep. at 300, 376-77.)  Moreover, "co-workers in remote locations" were referred to internally in plaintiff's department as "customers" (*see, e.g.,* Moxey Dep. at 55 ("they had to work with customers on the telephone, meaning phone company employees, not outside customers); Bury Dep. at 181 (referring to plaintiff's job as requiring extensive dealings with "customers" on the phone)), and it is undisputed that dealing with internal "customers" on the telephone was one of the essential functions of plaintiff's position.  There is no indication that plaintiff was disciplined strictly (or more harshly) because an outside customer was involved.  Nor is there any reason why plaintiff's admittedly inappropriate conduct in dealing with an outside customer should be treated differently (much less more leniently) than had she been dealing solely with an inside customer.

Plaintiff next argues that she "thought Ms. Moxey was trying to 'provoke her' into a physical confrontation" (Pl.'s Br. at 10) during the incident.  She assigns significance to Ms. Moxey's testimony that she could not remember why she had written a note regarding the incident stating that, "I didn't know if she was sick or going to hit one of us" (Ex. 64). (*See* Pl.'s Br. at 10 &

29.)[20]  Nothing about this testimony or plaintiff's subjective belief about Ms. Moxey's motives contradicts the otherwise clear record that plaintiff was disciplined in this incident for her misconduct, and not for any improper reason.  (*See* Def.'s Br. at 30.)

      **D.**    **Plaintiff Cannot Show Any Discriminatory Motive For Her Termination.**

Plaintiff's argument regarding her termination following a December 17, 1998 dispute with co-worker Barbara Lee focuses on a comparison of plaintiff's behavior with that of Ms. Lee, asserting that plaintiff was treated more harshly than Ms. Lee for the same incident.  (Pl.'s Br. at 11-12.)  Again, plaintiff's analysis is flawed.

**The December 1998 Incident.**  The flaws in plaintiff's analysis first surface in her factual description of the incident, in which she conveniently omits the racial slur that she admitted to uttering at her deposition (Darcangelo Dep. at 388-39).  (*See* Pl.'s Br. at 11.)  Plaintiff also incorrectly states that Ms. Lee "threaten[ed] to kill" her, an assertion for which there is no support in either plaintiff's testimony or the documents that she cites for that proposition.  (*See id.* (citing Def.'s Exs. 68-69, Moxey Dep. at 192).)  Similarly, plaintiff incorrectly states, without citation, that Ms. Lee "proceeded to attempt to attack Ms. Darcangelo, to the point that a huge crowd formed around the two" (Pl.'s Br. at 11) and "assaulted Fran, and had to be physically prevented from attacking her."  (Pl.'s Br. at 26.)[21]  There is no evidence – not even in plaintiff's testimony - that supports these statements.  Finally, plaintiff argues (citing to an entire deposition transcript without specifying any particular page) that Company policy was not followed because Ms. Lee should have been referred for an IME and assessed for a threat of violence as a result of the incident.  (Pl.'s Br.

---

[20] Ms. Moxey testified that she did not remember the specifics of what she meant:  "If you are standing in a cubicle, there is two people in a cubicle and if somebody goes to run out, you don't actually know what they're going to do. . . . [The note] means it was an element of surprise.  We did not know what was going to happen."  (Moxey Dep. at 173-75.)
[21] Plaintiff also states that supervisor Tim Mace "prevented an assault from taking place," citing the deposition of supervisor Gottlieb Fleig.  In fact, Mr. Fleig's testimony merely shows that Mr. Mace prevented Ms. Lee from following plaintiff to continue the dispute (which was at all times verbal), not that he prevented her from assaulting plaintiff.  (*See* Fleig Dep. at 150-53.)  This is consistent with Mr. Mace's contemporaneous statement, in which he reported that he "had to somewhat physically hold [Ms. Lee] from going down the hall."  (Witness Statements (Ex. 68).)

at 26.)  Again, there is no support for these statements.  Disputes of fact precluding summary

judgment cannot be created from bare assertions, even if these alleged facts were material.

  **Plaintiff's Comparison With Ms. Lee.**  Even apart from plaintiff's errors in the

interpretation of the evidence, her argument challenging the Company's motive for her termination

suffers from additional fundamental flaws.  As a threshold matter, Ms. Lee's behavior in the

incident, while sanctionable, was properly considered less culpable than plaintiff's because Ms. Lee

had been provoked.  (*See* Sewell Dep. at 54-56.)  Indeed, it would be hard to envision a situation in

which any person would not become enraged when confronted with a racially-charged statements

like "Ole Massa," which plaintiff repeatedly fired at Ms. Lee.

  Even if Ms. Lee's behavior in the specific incident had been equally culpable, the

comparison would nonetheless fail because of the vast difference in the two employees' disciplinary

histories.  Unlike plaintiff's many repeated recent transgressions and suspensions, Ms. Lee had *no*

disciplinary history at the time of the incident.  (Sewell Dep. at 54-56 & Confidential Portion at 6;

2/1/99 Notes (Ex. 74); English Dep. at 168-69.)  Plaintiff's statements that Ms. Lee's had "quite a

history of conflicts with her co-workers," was "written up and counseled repeatedly," was written

up "many times" (Pl.'s Br. at 12), and "repeatedly challenged others to go to the parking lot" (Pl.'s

Br. at 12), vastly overstate Ms. Lee's disciplinary history.  The facts, as demonstrated by the very

deposition testimony that plaintiff cites, are that Ms. Lee was involved in only two official

disciplinary incidents – the December 1998 altercation with plaintiff, and a prior incident in which

Ms. Lee was "written up" for yelling at co-worker Gus Dankert.  (Lee Dep. at 85-86.)  Ms. Moxey

testified that she documented Ms. Lee's "being loud" on at least three occasions, but testified to

only one "official write-up."  (Moxey Dep. at 37-39.)  This is consistent with the documentary

record of Ms. Lee's disciplinary history.  (*See* Pl.'s Exs. 3-4 (showing only the two aforementioned

recorded disciplinary incidents).)  Further, Ms. Bury testified to only one other occasion in which

Ms. Lee "had words with somebody and invited them outside."  (Bury Dep. at 160.) [22]

Plaintiff correctly states that Ms. Lee was counseled for professionalism and conduct issues,

and management acknowledged that she could be "loud" at times.  But unlike plaintiff, Ms. Lee

never engaged in conduct that rose to the level of requiring suspension (prior to the December 1998

incident), and never entered progressive discipline.  Ms. Lee responded to the informal counseling

that she was given, rather than escalating her improper conduct in the manner that plaintiff did in

the months preceding her termination.  In addition, while former employee Gus Dankert (who was

terminated for withholding work-related information from Ms. Lee) complained about Ms. Lee's

conduct, no employee ever expressed fear of Ms. Lee, again distinguishing her from plaintiff.

Although plaintiff attempts to attribute Ms. Lee's clean disciplinary record to favorable

treatment, there is no support for this claim.  Over the course of 30 years, Ms. Lee held many

different positions in different departments and locations, and worked for many different

supervisors.  (Lee Dep. at 15-23.)  As described above, Ms. Lee was never suspended by any of

these supervisors, nor was any formal disciplinary action taken against her, until the incidents with

plaintiff and Mr. Dankert just three years before her retirement.  In contrast, plaintiff had a

disciplinary record reaching back 20 years, in different departments and under different supervisors.

In addition, she was written up, suspended, and warned at least 20 times before the incident that led

to her termination.  No analogy can be drawn between the two.  Moreover, even if the analogy were

apt, no basis exists to ascribe any supposed differential treatment to plaintiff's alleged disability.

**The 1994 Incident.**  Plaintiff also claims that Mr. Conrad's imposition of discipline on

plaintiff in 1994 following an incident of erratic behavior at work (described in Def.'s Br. at 6)

---

[22] Contrary to plaintiff's insinuation (*see* Pl.'s Br. at 12), there was nothing unusual about Ms. Lee's "official" record being clean despite one past incident in which she had been "written up" in a formal disciplinary action.  Indeed, plaintiff herself benefited on several prior occasions from the Company practice of removing disciplinary memos from her file after a period of good behavior.  (*See* 6/18/94 Notes (Ex. 23); 6/16/94 Memo (Ex. 22); 12/2/94 Notes (Ex. 28).)

constitutes "direct evidence" of the Company's intent to discriminate at the time of her 1999

termination. (Pl.'s Br. at 27.) But the events of 1994 do not even show an intent to discriminate at

that time, much less an intent to discriminate with respect to the incidents over four years later

leading to plaintiff's termination. The record is clear that plaintiff's suspension in 1994 was due to

her coming to work impaired and failing to complete her work, rather than calling in sick as she

should have. (7/14/94 Notes (Ex. 26); 9/26/94 Notes (Ex. 27).) The 1994 disciplinary action was

taken in the wake of her repeated disruptions in the workplace and poor performance, having been

"sat down" with her manager "at least 8 times." (9/26/94 Notes (Ex. 27).) Although plaintiff's

failure to complete her work may have been caused by a toxic reaction to medication, there is no

indication that the Company disciplined her for discriminatory reasons.

Plaintiff appears to be arguing that the mere imposition of discipline in those circumstances

was in and of itself evidence of discrimination. (*See* Pl.'s Br. at 27 ("Conrad's imposition of

discipline on Ms. Darcangelo . . . when he knew her conduct was caused by a medication

intoxication . . . constitutes Direct Evidence of intent to discriminate.").) But it is beyond question

that employees may be disciplined for misconduct, even if the improper behavior is caused by a

disability. EEOC Compliance Manual § 902.2 n.11 (an employer "does not have to excuse . . .

misconduct, even if the misconduct results from an impairment that rises to the level of a

disability"); Enforcement Guidance on the ADA and Psychiatric Disabilities ¶ 30 (an employer may

discipline an individual with a disability for violating a valid workplace conduct standard, even if

the misconduct resulted from a disability). This argument thus should also be rejected.

*     *     *     *     *

As explained above, plaintiff's attempts to cast doubt on the obvious and documented

legitimate reasons for each of the adverse employment actions the Company took against her are

unavailing. But even if the facts upon which plaintiff relies did suggest that the Company's stated

-24-

motives for each of these actions were false, that would not be sufficient for her to defeat summary judgment against her.  Beyond simply raising questions about the Company's stated reasons for its actions, plaintiff must ultimately prove that intentional discrimination was the *real* reason for the adverse employment action in order to prevail.  According to the United States Supreme Court, "[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993); *see also Holder v. Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989) ("Bad or mistaken reasons for a decision may yet be non-discriminatory.").  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The evidence that the Company has presented in support of its motion for summary judgment shows that plaintiff cannot meet these standards and would not be able to do so even if allowed to proceed to trial.

Notwithstanding the extensive discovery that plaintiff conducted in the case (eleven depositions and over 5,000 pages of documents), plaintiff's argument is nothing more than an unsuccessful attempt to poke microscopic "holes" in the Company's "story."  Plaintiff has simply presented no evidence whatsoever that refutes the Company's demonstration that each of the adverse employment actions at issue was taken against her for legitimate non-discriminatory reasons, or is in any way consistent with intentional discrimination.  Summary judgment must therefore be granted to the Company on both of plaintiff's disparate treatment claims.[23]

## CONCLUSION

For the above reasons, Verizon Maryland Inc. is entitled to summary judgment.

---

[23]  "[S]ummary judgment for a defendant is appropriate when [a] plaintiff fails to make a showing sufficient to establish the existence of an element essential...on which [she has] the burden of proof at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999); *see also Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156 (4th Cir. 1997) (following defendant's motion for summary judgment on ADA claim, plaintiff bore burden of producing competent evidence on each element of his claim).

Dated:  August 8, 2003

Respectfully submitted,

_____/s/_____
Karen M. Wahle, Bar No. 013658
Martha Dye, Bar No. 015057
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006-4001
(202) 383-5300
(202) 383-5414 (facsimile)

Counsel for Defendant
Verizon Maryland Inc.

TC1:472975.5