1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2
    FRANCES DARCANGELO
 3
                 Plaintiff
 4
        vs.                      CIVIL ACTION NO:
 5                               02 CV 816
    BELL ATLANTIC
 6
                 Defendant
 7  _____/


 8


 9            The deposition of GOTTLIEB JOHN FLEIG was

10  held on Tuesday, January 21, 2003, commencing at 10:45

11  A.M., at the Law Offices of Edwin R. Burkhardt, 401

12  Washington Avenue, Suite 303, Towson, Maryland, 21204,

13  before Ronda J. Thomas, Notary Public.


14


15  APPEARANCES:

16            EDWIN R. BURKHARDT, ESQUIRE
                    On behalf of Plaintiff
17
              MARTHA DYE, ESQUIRE
18                  On behalf of Defendant

19  ALSO PRESENT:

20            FRANCES DARCANGELO

21  REPORTED BY:  Ronda J. Thomas, RPR
```

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

2

```
 1                    STIPULATION

 2            It is stipulated and agreed that the filing

 3   of this deposition with the Clerk of Court be and the

 4   same is hereby waived.

 5                 - - - - - - -

 6   Whereupon,

 7                 GOTTLIEB JOHN FLEIG,

 8   called as a witness, having been first duly sworn

 9   to tell the truth, the whole truth, and nothing but the

10   truth, was examined and testified as follows:

11            MS. DYE:  We'd like to say on the record

12   that we want to have the record to read and sign and

13   the transcript.

14            EXAMINATION BY MR. BURKHARDT:

15       Q    Good morning Mr. Fleig, my name is Ed

16   Burkhardt.  I'm an attorney representing Fran

17   Darcangelo in a lawsuit that she's pursuing against

18   Bell Atlantic, I guess which has changed its name now

19   to Verizon.

20            I'm going to ask you some questions, you're

21   under oath here.  I'm wondering have you testified
```

3

1   under oath before in any other type of proceeding,

2   either court or deposition?

3        A    Yes.

4        Q    Can you tell me what the proceeding was?

5        A    My brother was trying to prove his property

6   and it was a zoning thing and they asked me to talk

7   about it and I did, that was it.

8        Q    What year was that?

9        A    That was last year.

10       Q    What was the locale, do you know?

11       A    Yes, White Marsh.

12       Q    So we're under oath here today.  What we're

13   doing is just like you're in court, you're testifying

14   under oath.  You're sworn to testify to the best of

15   your knowledge in your possession so if you can please

16   try to do that, I'd appreciate that.  I'm going to ask

17   you just some basic background information concerning

18   your name for example.  What is your full name?

19       A    It is unusual, my name is Gottlieb John

20   Fleig.

21       Q    Gottlieb is spelled out?

4

1       A       G-O-T-T-L-I-E-B, of course John and my last

2   name is F-L-E-I-G.

3       Q       What's your address?

4       A       11236 Bird River Grove Road in White Marsh.

5       Q       What's the zip code?

6       A       21162.

7       Q       What's your residential phone number?

8       A       (410)335-6354.

9       Q       Can you give me the name and phone number

10  of a close relative that does not reside with you, an

11  emergency contact number?

12      A       Yes, Irene Fleig, same last name.

13  (410)342-9013.

14      Q       Can you provide your Social Security

15  number?

16      A       Sure.  ███████████.

17      Q       Are you presently employed?

18      A       No.

19      Q       Are you retired?

20      A       Yes.

21      Q       What year did you retire?

1  A  Probably two years ago or so.  Kind of not

2 a clear cut date.

3  Q  Did you work for a business entity called

4 Bell Atlantic?

5  A  Yes.

6  Q  Do you know what time period you worked for

7 that business entity?

8  A  I believe it was the eighth month of '97 to

9 I believe the year 2000, first quarter of 2000.

10  Q  What was the job site at Bell Atlantic that

11 you worked at?

12  A  Hunt Valley.

13  Q  Do you know what department you worked in?

14  A  I don't remember the name of the

15 department.

16  Q  Were you in the same department during your

17 entire tenure with Bell Atlantic?

18  A  Yes.

19  Q  Do you know what the department did or what

20 it was charged with doing?

21  A  We put in -- we, like, oversaw the

6

1    establishment of fiber optic cable and we -- there's

2    this automatic system that puts -- hooks new service up

3    for people and it's run by software and occasionally

4    the software would have a glitch or there would be a

5    problem and the group of people that I had would go in

6    and take care of that.  That was the primary things

7    that we did.

8        Q    Did your department have any kind of

9    repair, equipment repair function?

10       A    No.

11       Q    So it's safe to say it was equipment

12   installation?

13       A    It was installation of the lines, not the

14   hardware itself but the conduits, if you will, that

15   hooked up between them and we would turn up service for

16   people remotely.  In other words, they would have the

17   central offices where the equipment was located and the

18   line would go through a bunch of offices.  We would

19   program this machine to take that line and switch it,

20   send it over to this one and all the way around the

21   ring like that.

7

```
1      Q      Did your department deal with service

2  issues as far as lines that were installed?

3      A      Yes.

4      Q      Incorrectly installed?

5      A      Incorrectly installed?

6      Q      Service problems?

7      A      We were doing -- no.  We were installing

8  primarily new lines.

9      Q      Do you know what your job title was?

10     A      When I was hired it was as a supervisor.

11 Later on they called it a group leader.

12     Q      Did you have a supervisor?

13     A      I had a manager above me.

14     Q      Who was your manager?

15     A      James Conrad.

16     Q      Was he your manager during the entire time

17 that you were at Bell Atlantic?

18     A      Yes.

19     Q      Did you have another manager above you

20 besides James Conrad?

21     A      Only that was above him but I didn't report
```

8

1   directly to that manager, I reported directly to James

2   Conrad.

3          Q     Were there other individuals that you're

4   aware of that also reported directly to James Conrad at

5   your supervisory level?

6          A     Yes.

7          Q     Do you know who those individuals were,

8   names?

9          A     Yes.

10         Q     Tell me, please.

11         A     You know there's about 50 people and --

12         Q     Fifty supervisors under Conrad?

13         A     I'm sorry.  Supervisors themselves there

14  was probably about 12 or 15.  I don't remember all of

15  their names but I could give you some of their names.

16         Q     Can you provide me with the names that you

17  do remember?

18         A     Sure.  Would you like me to do that?

19         Q     Yes, please.

20         A     Tim Mace, M-A-C-E, Marianne Moxey, Mike

21  Polek, Shantel SaKay, Kathy Keeney, Brian Belbott, Mike

9

1    Ports, Charles English.  They're the only ones I can

2    remember at this stage.

3        Q    The individuals that you named just now,

4    did you all have essentially the same supervisory

5    position and job functions?

6        A    Yes.  We all had different jobs, you know,

7    different segments, different type of work but we all

8    had the same responsibility to our people and to our

9    jobs, our specific jobs.

10        Q    Now, I'm talking about supervisors in your

11    position generally, did you have a set number of

12    individuals generally that you supervised; like a

13    dozen?

14        A    Yes.

15        Q    What was that number?

16        A    I think it was about seven.  I had two

17    groups of people that I supervised.  Initially it was

18    about -- it was one group of about seven and then it

19    was another group that I took that -- I took the work

20    that I had with the first group and that was given to

21    another supervisor and then I took over some other

10

1    supervisor's job.  And that was a group of about seven.

2         Q    So all of the supervisors that you named in

3    this type of position supervised essentially about

4    seven people?

5         A    No.

6         Q    No?

7         A    Different jobs require different amount of

8    people.

9         Q    So you said you had two different

10   positions?

11        A    Two different sets of people at different

12   times.  I never supervised them both at the same time.

13        Q    Do you remember who was in the first set of

14   people under your supervision?

15        A    Yes.

16        Q    Can you please identify their names for me?

17        A    Sure.  Dwight Allen, Aaron Moore, Theresa

18   Rogers, Salina Gries, Sean Hogan, Dane Wescott.

19        Q    Anybody else?

20        A    I can't recall anyone else.

21        Q    Was Fran Darcangelo?

1      A      And Fran, of course, yes I'm sorry.

2      Q      Do you know what month, you said you

3  started with Bell Atlantic August of '97, do you know

4  how many months you had that group?

5      A      Most of the time at my time there I had

6  that group.  I would say all the way up until about six

7  months before I left I had that group.

8      Q      This group that you just identified, can

9  you describe the group, was it called a certain name or

10  department?

11      A      Yes, I think it was transport support.  I

12  don't recall specifically what it was called.

13      Q      Do you know what the job functions were of

14  the individuals in that group?

15      A      Yes, they were the ones that turned up this

16  new service and looked in to supervising or overseeing

17  the fiber optics installations with new equipment.

18      Q      Did all the individuals in this group have

19  essentially the same jobs?

20      A      No.

21      Q      Can you tell me how the jobs differed among

12

1  those individuals you just identified?

2        A      We would have training and we couldn't send

3  everybody to the same training so we would try and

4  cross train people; but a lot of times I was

5  shorthanded so I couldn't send somebody to learn

6  someone else's job so people were kind of, you know,

7  tied to one area for the most part.

8        Q      Did Fran Darcangelo's job differ from the

9  job of the other individuals in this group of people

10  that you identified?

11        A      Yes, since they all didn't do the same

12  work, work that she did was different.

13        Q      Can you tell me how it was different?

14        A      Initially when I first took the group over

15  she told me that she was doing scheduling for the

16  supervisor, Marianne Moxey, of work that came in, so

17  for me being the new supervisor for a short period of

18  time she was continuing on doing that.  I spoke with

19  Marianne about that and she said that it was more

20  automated and that it wasn't really necessary and

21  didn't realize that Fran was doing this.

1              So since I needed -- had a lot of work and

2    only had a few people I tried to get Fran away from

3    doing that and into helping with the turning up of

4    systems, and Fran had been there longer than some of

5    the other employees and had experience on lower level

6    technology and so she was trying to work with that type

7    of technology and most of the other people were working

8    with more modern equipment.

9         Q    Are you talking about the time period when

10   you first started supervising this group?

11        A    Yes.

12        Q    So after this initial -- you said Fran was

13   doing more the scheduling type function when you first

14   took over this group and then did her job duties change

15   after that?

16        A    Well, the only exception I have to your

17   question is that I don't even know if it was her job

18   duties because once again when I asked a supervisor why

19   is she doing this and she didn't seem to be aware that

20   this was a large part of Fran's work day.

21        Q    So whatever she was doing -- okay, but that

14

1  changed, correct?

2      A    Yes.

3      Q    And she started doing more of what type of

4  work?

5      A    I tried to get her to do some of the work

6  that some of the other people were doing.

7      Q    Did you describe that previously, the work

8  that the people in the group were doing?

9      A    Yes.

10     Q    Did she start doing more of that type of

11 work?

12     A    Yes.

13     Q    Were all the people under your supervision

14 on the same shift?

15     A    No.

16     Q    So you had people on the three different

17 shifts?

18     A    Yes.

19     Q    Were there differences in the

20 responsibilities that people under your supervision had

21 on the three shifts?

1       A       By nature of the work we sat there as

2   coordinators and had other groups out in the field over

3   the telephone hooking lines up and it had to be

4   coordinated.  We felt a responsibility with that

5   position to complete the job, particularly if it was

6   close to completion of the job didn't feel like you

7   should just get up and go home or leave or whatever, in

8   terms of responsibility I think that that was there and

9   the employees for the most part shared in that

10  responsibility, in that feeling of responsibility.

11      Q       Did people have a choice of shift to work

12  on?

13      A       Yes.

14      Q       When a position came up, was it up for a

15  job posting or a bid or what?

16      A       Basically we were assigned these various

17  types of work to do and we were assigned these people

18  to do the work, and the way it worked at Bell Atlantic

19  at that time was that according to seniority you got to

20  choose, you know, what shift you wanted to work on and

21  I think that there was some reasonableness with that

16

1    too.  Like, in other words, if you were not trained to

2    do the specific job and it took place during the

3    specific time, well we might go ahead and try and get

4    you that training but if you didn't have it today you

5    couldn't, and let's say it was a shift tonight, you

6    couldn't go in there and perform that job because you

7    didn't have the tools to do it with.

8        Q    Were you aware of instances where people

9    under your supervision were denied the ability to work

10   on a shift that they wanted for reasons other than what

11   you just described?

12       A    No.

13       Q    Were you aware of any instances where a

14   medical restriction was a reason why an individual

15   couldn't work on a particular shift?

16            MS. DYE:  Objection, vague.

17       A    Let's see.

18            (Pause.)

19       A    I don't know if that was the reality of

20   what was going on there.

21       Q    Can you talk more specifically what you're

1  referring to?

2      A    One time Fran told me that she was not

3  allowed to work second shift.  It didn't appear she

4  wanted to work second shift or night shift I should

5  say.  She didn't want to work it.  She just wanted to

6  apprise me of the fact that she thought she was not

7  allowed to do that and that -- and the reason or the

8  person that, to her way of thinking, that said that was

9  my boss.  I went to my boss and said --

10     Q    That individual was?

11     A    Jim Conrad.  And I said is that the

12  situation.  He said he did not recall ever saying that.

13  So, you know, if he says it didn't happen then the only

14  way you can answer the question is it wasn't the

15  situation.

16     Q    Did Bell Atlantic perform any type of

17  performance assessments on the individuals that, for

18  example, you supervised?

19     A    I did performance appraisals.

20     Q    Was that pursuant to the -- were you

21  expected to do performance appraisals?

1       A      Yes.

2       Q      About how frequently were you expected to

3   do that?

4       A      I guess annually.

5       Q      Was this some type of written policy of the

6   company?

7       A      I never saw written policy about that.

8       Q      But to the best of your knowledge you're

9   supposed to do an annual evaluation?

10      A      Yeah, your boss would say hey it's time for

11  evaluations of your people.

12      Q      Aside from the annual evaluation, was there

13  any type of system in place where you had a performance

14  concern that you were to make like some kind of note of

15  it or could you address performance issue, any type of

16  way short of the evaluation?

17      A      Oh, of course, if someone were having a

18  problem you could call them in and try to get them on

19  the right track but that wasn't in the official type

20  evaluation.  That was just part of the normal

21  supervisory duties.

19

 1      Q      Did you do that?  Did you call people in

 2  and try to get them on the right track?

 3      A      I can't recall an instance when I did that.

 4      Q      Okay.  But if there was a performance issue

 5  you would have done that, is that a fair statement?

 6             MS. DYE:  Objection, mischaracterizes his

 7  testimony.

 8      Q      It's a question.

 9      A      I wouldn't have a problem doing that.

10      Q      Just to clarify is it your testimony that

11  you have not done that?

12      A      No, that wasn't my testimony.

13      Q      Your testimony is you can't recall having

14  done that.

15      A      I don't recall a specific time that I like

16  pulled someone in and said hey you're going in the

17  wrong direction or something like that.  I'm sure that

18  that is a normal supervisory thing to do but I can't

19  recall an instance when I pulled someone in; and the

20  other thing is that it's not like an official thing.

21  It would be just, I mean, if someone was having a

1  problem with something and they were heading in the

2  wrong direction.  You know when I say call them in, it

3  sounds so official and you're in a board room with them

4  or somebody.  It was more, you know, hey what's

5  happening with that and why, you're only getting four

6  widgets out when normally you're getting eight.  Just a

7  normal supervisory thing.

8            (There was a break at 11:15 a.m and

9  testimony resumed at 11:22 a.m.)

10      Q    I think we were talking about performance

11  issues previously and you said if you had a concern you

12  would take people aside and have a talk with them?

13      A    Yeah, I'd talk to them if there was a

14  problem.

15      Q    Would you note that in the file at all or

16  no?

17      A    Depends.

18      Q    Do you know, can you recall an instance

19  when you have noted it in the file?

20      A    Yes.

21      Q    Can you tell me what the incident was or

21

1   instance was?

2       A    One time I came in and looked like an

3   employee was sleeping and I noted that in the file.

4       Q    Do you know who that was?

5       A    Yes.

6       Q    Identify?

7       A    That was Dwight Allen.

8       Q    You said you did an annual evaluation; is

9   that correct?

10      A    I said we were supposed to do an annual

11  evaluation.

12      Q    When you did an annual evaluation and you

13  did not supervise an individual for the entire

14  evaluation period, how did the company want you to

15  treat that?

16      A    Usually if the old supervisor's input would

17  be utilized as well as whatever -- if you were

18  supervising that person let's say for two months and

19  they had supervised them for ten and, you know, you

20  would take their input or they would wind up doing it

21  rather than you.

22

1    Q    So you were expected to consult with the

2  prior supervisor in doing that annual performance

3  evaluation?

4    A    Only if during that period of time they had

5  worked for that supervisor substantial period of time.

6  As I just said.

7    Q    Would half the year or more meet the

8  substantial period?

9    A    Of course this is me, this isn't a

10  guideline from Bell Atlantic.

11    Q    Okay.

12    A    I would think that it would be reasonable

13  for me if a person had worked six months for the other

14  one to, if the period of time for the evaluation

15  included this other supervisor, six months.

16    Q    So you were expected to consult with the

17  other supervisor?

18    A    No, I didn't say that.  I said this was me,

19  not any expectations from Bell Atlantic.

20    Q    So they didn't have any expectations or

21  policies as far as consulting with the prior

1   supervisor?

2         A      I didn't see any.

3         Q      Were you aware of any?

4         A      I wasn't aware of any.

5         Q      Was there any instance in which you are

6   aware in which you did an evaluation and you did not

7   consult with the prior supervisor given the caveat you

8   just mentioned.  Any time there was a substantial

9   period they were under the supervision of another

10  person you would consult?

11        A      Yes.

12        Q      Can you tell me what instance that was?

13        A      I believe that the supervisor was no longer

14  available.

15        Q      Who was the individual involved?

16        A      I don't recall.

17        Q      Was it Fran Darcangelo?

18        A      No.

19        Q      Was there any type of third-party input,

20  aside from talking to the prior supervisor when you did

21  your evaluations, did you consult with any other people

24

1   in determining that annual performance evaluation?

2       A    If the individual was working for a period

3   of time for somebody else let's say like temporarily

4   then I would.  And I would get guidance also as to how

5   to do a performance appraisal.

6       Q    By guidance can you tell me what you mean

7   by that and from whom?

8       A    I was a new supervisor to Bell Atlantic

9   period.  So I had never done a performance appraisal at

10  Bell Atlantic so I would ask other supervisors how it

11  was handled and my manager.

12      Q    Did your manager sometimes give you input

13  on performance evaluation?

14      A    Yes.

15      Q    Can you recall an instance in which that

16  occurred?

17      A    No, just a generality.

18      Q    Just in general?

19      A    Yes.

20      Q    So James Conrad, would he look at your

21  evaluations, like, did you submit them to him before

25

1   you printed them out?

2       A    Yes.

3       Q    That was regularly?  That was the regular

4   procedure?

5       A    Yes.

6       Q    If he had an issue or comment would he make

7   a notation or would he discuss it with you verbally or

8   what?

9       A    I think it was more verbal, I don't recall

10  him marking anything up.

11      Q    Are there any individuals where you can

12  identify where that occurred?

13      A    No, just in general.  Once again, I was a

14  new supervisor and he was helping me in understanding

15  how to do this thing that is to be done by supervisors

16  there.

17      Q    In your department was there ever any

18  question who an individual's supervisor was?  Like did

19  you have a roster where you were definitely assigned

20  individuals?

21      A    Yes.

1       Q     So in your experience every individual

2   underneath -- at the level underneath you always was

3   assigned to a particular supervisor; is that correct?

4       A     I believe, I can't remember an instance

5   when that wasn't the case.

6       Q     How would that be reflected in the company

7   records, do you know?

8       A     No, I don't.

9       Q     Would you say that it definitely was

10  reflected in the company's records?

11      A     No.

12      Q     How did you know who you supervised?  How

13  were you told who you supervised?

14      A     When I got there, he introduced me to these

15  people, my boss did, and I believe he might have had a

16  piece of paper that said hey this supervisor, here's

17  the people and here's the name of the group, what they

18  do in general.  I think that there's something like

19  that.

20      Q     When the people under your supervision

21  changed, was there some type of notice that reflected

27

1  that you were bringing a new person into your group or

2  leaving your group?

3       A    No, no notice went around.  They might take

4  the person around and introduce them.

5       Q    I want to finish up on your own history

6  before I forget.  You left the company you said in what

7  month of what year?

8       A    To be truthful with you, I don't recall.  I

9  know that before I left I was doing some work on Y2K

10  and I know that that went off without a hitch.  So I

11  think it was in the first quarter of 2000 that I left.

12      Q    Why did you leave Bell Atlantic?

13      A    Just didn't want to work there anymore.

14      Q    Can you be more specific?

15      A    I had other things that I wanted to do

16  outside that were more important to me than working

17  there.

18      Q    Did you enjoy working there?

19      A    Sometimes.

20      Q    Did you enjoy working there when you left?

21      A    You mean like the day I left or?

28

1     Q    Just in general, preceding month or two?

2     A    Sometimes.

3     Q    You said sometimes you enjoyed working

4  there and I guess the implication is that sometimes you

5  did not enjoy working there; is that correct?

6     A    Correct.

7     Q    Can you tell me what you did not enjoy

8  about working there?

9     A    I came from a company that had a different

10  product lines.  I was a defense contractor and this was

11  a telephone company and it was different completely

12  work-wise, people-wise, product-wise, customer-wise.

13     Q    Was dealing with the personnel aspect of

14  the job something that you did not enjoy?

15     A    Sometimes.

16     Q    Can you tell me what you did not enjoy

17  about it?

18     A    I think that the union there was very

19  strong and I hadn't been involved with a job where the

20  union was that strong before and that sometimes was not

21  comfortable.

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

29

1       Q       Did you enjoy working with Jim Conrad?

2       A       Sometimes.

3       Q       Again, the implication being there were

4    times that you did not enjoy working with Jim Conrad,

5    is that a fair statement or it's a question?  Were

6    there times that you did not enjoy working with Jim

7    Conrad?

8       A       Let me think.  No more than anybody else

9    that has a boss.

10      Q       How would you describe the nature of your

11   relationship with Jim Conrad; excellent, good, fair?

12      A       All of the above at different times.

13      Q       Do you know what he thought of you as an

14   employee?

15              MS. DYE:  Objection, lack of foundation.

16      A       Different things at different times.  Some

17   things I did he really liked, some things I did as a

18   new supervisor he felt that he needed to discuss with

19   me.

20      Q       What didn't he like?

21      A       Let's see, what didn't he like?

 1            MS. DYE:  Objection, lack of foundation.

 2      A     I don't know if like is the word.  I think

 3  he realized that there was some learning curve or

 4  whatever coming from the outside and coming in as a

 5  supervisor completely new to Bell Atlantic.  The

 6  majority of supervisors came up through the ranks.

 7      Q     Okay.  Did he perform your evaluations?

 8      A     Yes.

 9      Q     Did you receive excellent evaluations from

10  him?

11      A     No, I did not.

12      Q     Was that one of the issues between you and

13  him?

14      A     Yes.  That was an issue of contention

15  between him and I.

16      Q     Do you know what are the specific areas in

17  which he thought you could be better?

18            MS. DYE:  Objection, lack of foundation.

19      A     Yeah, one specific one was that I needed to

20  get up on that learning curve to fit in as a supervisor

21  at Bell Atlantic.

1    Q    Was he unhappy with your dealing with

2    personnel issues?

3         MS. DYE:  I'm just going to have a running

4    objection of lack of foundation of these questions that

5    are asking what Mr. Conrad thinks or how he feels or

6    all of that.  There's no way the witness could know any

7    of that.

8    Q    Go ahead and answer, sir.  She has a

9    running objection but you still go ahead and answer.

10        MS. DYE:  Can you read back the question?

11        (The reporter read back as requested.)

12    A    No.

13    Q    Was Jim Conrad one of the reasons why you

14    left the company?

15    A    Yes.

16    Q    Aside from what you previously identified

17    he thought you needed to get up to the learning curve

18    as a supervisor --

19    A    Yes.

20    Q    -- in the area of personnel issues, did you

21    have a level of dissatisfaction with his handling of

1   personnel issues in general?

2       A     We had two different management styles.

3       Q     Do you want to describe those to me?

4       A     His management style was one that was from

5   him having 30 some years or whatever with Bell Atlantic

6   and not really working anywhere else.  Where mine was

7   from working somewhere else and not having a management

8   style that grew up in the environment that I was now

9   supposed to be in.

10      Q     Did he sometimes seek to influence your

11  handling of personnel issues?

12      A     Yes.

13      Q     How did he do that?

14      A     He would discuss them with me.

15      Q     Can you recall instances of any individuals

16  where he discussed such issues with you?

17      A     I think at one time or another he had

18  discussed everyone that worked for me with me.

19      Q     Was there a particular reason why he would

20  have cause to be concerned with how you handled

21  personnel issues with the people under your

33

1  supervision?

2       A    Yes.

3       Q    What was that?

4       A    I was a new supervisor to Bell Atlantic and

5  he had grown up in Bell Atlantic.

6       Q    Was he critical of your handling of

7  personnel issues?

8            MS. DYE:  Asked and answered.

9       A    Do I answer that?

10      Q    Go ahead.  Unless she tells you not to

11 answer you should answer.

12      A    Okay.  Yes.

13      Q    Can you tell me how, what he thought --

14 areas he thought you fell short in?

15           MS. DYE:  Objection, lack of foundation.

16      A    Let's see.  Well, just in general the way

17 things were done there I was new to it and he would say

18 hey, you know, you don't do it that way here, you do it

19 this way here.  Sort of like that.

20      Q    He have an issue with you improperly

21 documenting things in the files?

1       A       No.

2       Q       Are there any individuals in particular
3   where you can recall where he was dissatisfied with
4   your handling of a personnel issue?

5       A       No.

6       Q       Going back to the evaluations, is there an
7   instance in which you can recall where you said the
8   procedure was that he would review an evaluation before
9   you actually issued it?

10      A       Yes.

11      Q       Can you recall an instance where that was
12  done like the particular individual and the type of
13  input that he did?

14      A       It was done for every one of my people.

15      Q       Did you do an evaluation for Fran
16  Darcangelo?

17      A       Yes.

18      Q       Did Conrad review that before you issued
19  it?

20      A       I don't recall it specifically but in
21  general he reviewed all of them.

1      Q      Do you recall if he had any input in the

2  creating of that evaluation?

3      A      He gave me guidance on every evaluation of

4  everybody that I did an evaluation on.

5      Q      Do you recall the Fran Darcangelo

6  evaluation if he gave you any particular guidance?

7             MS. DYE:  Objection, asked and answered.

8      A      No, just in general that, you know, he

9  would go over everyone that I had and help me write an

10  evaluation as he perceived Bell Atlantic evaluations

11  should be written or were written.

12      Q      Did he have to approve every evaluation

13  that you issued?

14      A      I don't know the answer to that.  I don't

15  know if officially that's the way it was.  I mean he

16  didn't sign them.

17      Q      Do you recall an instance where you and him

18  had a -- kind of an insoluble or unresolvable

19  difference of opinion on an aspect of an evaluation?

20      A      No, I think we -- everything was resolved

21  between him and I.  Every instance.  There was never

1 anything that just hung there with him and I.  We had

2 work to do and it was either one way or the other way.

3       Q      Did you have any performance issues with

4 Fran Darcangelo?

5       A      Yes.

6       Q      Can you tell me what they were?

7       A      It was hard to get Fran to work.

8       Q      Did you tell her that?

9       A      Yeah.

10      Q      Was this reflected in the evaluation you

11 did of her?

12      A      In some part, yes.

13      Q      Do you know who Fran's previous supervisor

14 was before you took over her supervision?

15      A      I believe it was Mike Polek or Marianne

16 Moxey.  It was a group that I had and I don't know what

17 happened in between Polek and me.

18      Q      At some point you said you identified an

19 initial set of individuals that you supervised and that

20 the group changed at some point in your tenure?

21      A      (Nodding, yes.)

1    Q    Can you tell me why it changed?

2    A    I believe that the supervisor in that other

3  group moved on to another position so he had a hole to

4  fill, he Jim Conrad.

5    Q    Do you know who the supervisor was?

6    A    Marianne Moxey.

7    Q    So you went and took over Marianne Moxey's

8  group?

9    A    Yes.

10    Q    Do you remember when that was?

11    A    No, I don't.  It was towards the latter

12  part of my tenure there.

13    Q    Did the people in that group have the same

14  job responsibilities that your people in the first

15  group you supervised had?

16    A    No.

17    Q    How were they different?

18    A    They were the people that I talked about

19  earlier that if this automatic system would have an

20  error, they would go in and manually hook the service

21  up for the customer and other things; but that was a

38

 1  primary focus on that job.

 2        Q     Fran Darcangelo was in the first set of

 3  people that you initially supervised at Bell Atlantic,

 4  correct?

 5        A     Correct.

 6        Q     At some point she transferred to another

 7  group?

 8        A     Yes.

 9        Q     Do you know why she transferred to another

10  group?

11        A     I believe it was Jim Conrad's decision to

12  put her in another group.

13        Q     Do you know did she ask to be put in

14  another group?

15        A     I don't think so but I don't recall.

16        Q     Did you ask to put her in another group?

17        A     No.

18        Q     Did Jim Conrad ask you before reassigning

19  her to the second group?

20        A     Ask me what?

21        Q     Did he consult you?

1       A      Consult me, he consulted me.

2       Q      What did he talk about when you consulted

3  with him?

4       A      He basically said hey I really -- I want to

5  put Fran over with Marianne Moxey and do you have any

6  objections or whatever and I said no, not really.

7       Q      Did he say why he wanted to put Fran over

8  with Marianne?

9       A      I think that there was some -- he had

10 thought from some of Fran's actions that perhaps she

11 was more comfortable with a female supervisor rather

12 than a male.

13      Q      The people in this first group that you

14 identified that you supervised along with Fran, did any

15 of them have, what do you call it, personality conflict

16 or were there problems that she had working with any of

17 the individuals in the group?

18             MS. DYE:  Objection, compound.

19      Q      I'll break it down.  Did she have a

20 personality conflict or ongoing issue with any of the

21 individuals in the first group?

40

1      A      In the first group.  I'm trying to think of

2  a specific one so if you'll bear with me for a moment.

3              (Pause.)

4      A      I can't think of a specific issue.

5      Q      Are you aware that she did have an issue

6  working with any of the individuals in that group?

7      A      I can't think of a specific one.

8      Q      Did she ever express to you that she had a

9  problem working with any of the individuals in that

10  first group?

11      A      I can't recall her ever expressing that.

12      Q      On follow-up, did any of those individuals

13  express to you they had a problem working with her?

14      A      Oh, oh yes that there was, I just recalled.

15      Q      Who was it?

16              MS. DYE:  Did you say who was it?

17      Q      Yes.

18      A      I'd rather not say because it was -- I'd

19  just rather not say.

20      Q      Okay.  I'd like to ask you to identify the

21  person.  We can designate this as a confidential

41

1  material which will not be used outside of the course

2  of the proceeding but if you recall it I'd like you to

3  identify the individual?

4          MS. DYE:  We'd also like to ask

5  Ms. Darcangelo to leave the room, just for the answer

6  of this question.

7          (Ms. Darcangelo exited the room.)

8          MR. BURKHARDT:  Go ahead.

9          MS. DYE:  So from this point --

10          MR. BURKHARDT:  It's my question.

11          MS. DYE:  Just for the record from this

12  point until I make a note of it again, we'd like the

13  transcript designated confidential subject to the

14  protective order in this case.

15          (Page 41 line 15 through page 49 line 13

16  are sealed confidential.  No testimony was omitted.)

17

18

19

20

21

42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

44

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

45

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

46

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15            (Ms. Darcangelo re-entered the room.)

16            (There was a break at 12:07 p.m and

17   testimony resumed at 12:20 p.m.)

18      Q    We were talking about the first set of

19   people that you supervised and you said there was a

20   general feeling that Fran was difficult to work with or

21   deal with?

50

1       A       I think it was, yeah, there was comments

2   that Fran would make that would be as I said earlier

3   comments that would not endear her to the other people.

4       Q       Now, the comments that you're referring to,

5   did you hear them yourself or were they passed on to

6   you by these other individuals?

7       A       Both.

8       Q       Did you make any notations or take note of

9   these comments in the file?

10      A       I believe I did on at least one occasion.

11      Q       Do you remember the specific comment?

12      A       I think she used the "N" word in a group

13  where there were people of African American ancestry.

14      Q       Did you hear her use the "N" word?

15      A       Yeah.

16      Q       Do you recall any specific circumstances of

17  that conversation?

18      A       Nope.

19      Q       Do you know who she was directing it to?

20      A       I don't recall the specifics of it at this

21  time.

51

1    Q    Is it possible that she was using that word

2  in a -- not directing it to any particular individual?

3    A    Since I don't recall I can't say honestly.

4    Q    Could she have been referring to herself?

5    A    No.

6    Q    How do you know that?

7    A    I just don't recall that it was in that

8  direction.

9    Q    Do you recall any other instance where she

10  used the "N" word?

11    A    I think she used it more than once.

12    Q    Did you make a notation of the other times

13  that she used it?

14    A    I don't believe so.

15    Q    Did the company instruct you or have any

16  kind of training as to how you were supposed to respond

17  when you heard comments of that nature?

18    A    No.

19    Q    Did you always make a note of I guess a

20  comment that could be construed as inappropriate, did

21  you always make a note in the file?

1     A    No.

2     Q    Did you regularly make a note in the file

3  about that kind of comment?

4         MS. DYE:  I'm going to object as to vague

5  as to what you mean by the file.

6     Q    We can back -- we can get into that.  I

7  just wanted to do -- there's no harm in doing that.

8  The employees under your supervision, we're just going

9  to go with this for a while, did you keep a file on

10  them individually?

11     A    Yes.

12     Q    Was that your own doing or was that

13  pursuant to a company policy?

14     A    My own doing.

15     Q    So you kept a file on all of the

16  individuals under your supervision; is that correct?

17     A    Yes.

18     Q    What would you refer to that file as?

19     A    Supervisory file for the individuals.

20     Q    And what type of information would you put

21  in that file?

1      A      Well, I remember that one of the employees

2  had graduated with an Associates Degree and I put that

3  in there.  If somebody said that an employee did

4  something outstanding like another group that we were

5  providing a service for, I would put that in there.

6  If, consequently, they said that the person was -- did

7  something wrong, I might put that in there and it might

8  not stay in there.

9      Q      By it might not stay in there, is that your

10  doing?

11      A      Yes.

12      Q      Did the other supervisors keep files of the

13  type you're describing to me?

14          MS. DYE:  Objection, lack of foundation.

15      A      I don't know.

16      Q      Aside from what you put in there, like the

17  evaluation, that was kept in the file?

18          MS. DYE:  Are you talking again about the

19  supervisory file?

20          MR. BURKHARDT:  The file that he was just

21  talking about.

54

1        A       A copy was put in there.

2        Q       All performance related issues which you

3   noted in writing, would they be put in that file?

4        A       No.

5        Q       Where would they be put?

6        A       They could be given into a personnel file

7   on the individual or they could be in this supervisory

8   file.

9        Q       You mentioned a personnel file, can you

10  describe to me what that is?

11       A       Only by describing what my file was versus

12  a personnel file.

13       Q       Okay, please do that to the best of your

14  ability.

15       A       My file was for doing evaluations in some

16  instances.  Notes that I would have that would help me

17  knowing that I would sooner or later have to do an

18  evaluation, that wouldn't go into a file that was

19  perhaps like a company file or a corporate file or an

20  official file.  This would just be a place where I

21  would put things rather than running to wherever that

1  other place was for the official file or put them in

2  there every day if the occasion arose.

3        Q       Now the official file, can you describe

4  that to me?

5        A       Actually, no.

6        Q       Who kept the official file?

7        A       Don't even know for sure.

8        Q       Did you have access to the official files

9  of the people under your supervision?

10       A       If I wanted it I'm sure I could have.

11       Q       Did you look at those -- we're talking --

12  they're called personnel files, is that what we're

13  talking about?

14       A       Yeah, I guess.

15       Q       Have you looked at those, people under your

16  supervision?

17       A       I don't recall looking at that.

18       Q       Do you know where they were kept?

19       A       Nope.

20       Q       If you wanted to look at one how would you

21  go about obtaining it?

56

1     A    I'd probably go to the administrative

2  supervisor and ask him how, Butch English, and say I

3  have a need to look at that where is that, can you get

4  that for me.

5     Q    Do you know did you ever look at that file

6  in relation to Fran?

7     A    I don't recall that I did.

8     Q    I forget, did you testify that you had

9  accessed one of those files for one of the people in

10  your supervision, I don't recall what your answer was?

11     A    No, I don't recall ever looking at a

12  personnel file, company personnel file, on anybody.

13     Q    Do you know what was kept in those files?

14     A    Since I didn't look in there, I can't say

15  that I do.

16     Q    Is your testimony that you haven't looked

17  at any of those personnel files?

18     A    My testimony was and still is that I don't

19  recall ever looking in there of any individual.

20     Q    This general feeling you said the people in

21  your group expressed to you about Fran being difficult

1  to work with, did that impact their ability to perform

2  their jobs?

3        A     At times.

4        Q     Can you describe how?

5        A     Let's see.  Fran would go in a direction

6  that wasn't work related or conducive to get work done

7  and continue in that direction until I would go around

8  and say hey how about knocking that off.

9        Q     Do you recall any specific instance?

10       A     No, not specifically.

11       Q     Do you think Fran had a problem dealing

12  with other people?

13       A     Yes.

14       Q     Do you think she lacked social interaction

15  skills?

16       A     I don't know.

17       Q     Do you think she had a greater than normal

18  amount of difficulty dealing with other people?

19       A     Yes, I do.

20       Q     Do you think she had difficulty accepting

21  criticism?

58

1       A       No.

2       Q       Do you think her difficulties dealing with

3  other people affected her job performance?

4       A       Yes.

5       Q       How did they affect her job performance?

6       A       I remember one occasion where, as I had

7  talked earlier, we would be the focal point for turning

8  up this ring which is basically this fiber cable and

9  going through this myriad of machinery and switching

10 and being formulated and what have you.  Sometimes that

11 could take a week, sometimes three days of work, what

12 have you.

13            We had time constraints with this where

14 these customers needed this service put in and our job

15 was to get it in.  It was a normal quitting time and

16 with all of these, you know, maybe five or six people

17 on the phone doing all of this and her coordinating it

18 she just said I'm out of here because it was time for

19 the shift to end.

20            I went over and said can't you -- can you

21 stay, I mean, we really need to do this.  It's like

59

1  running a race and you're one foot from the finish and

2  now you're going to stop the race.  She wouldn't, by

3  design, she would not communicate with me what was the

4  rationale.

5          In other words, I was saying to her do you

6  have somewhere you have to go or is it you have some

7  obligation and by design she wasn't going to say

8  anything but I'm out of here.

9      Q    Was that just one occasion this happened

10 on?

11     A    I do recall that occasion.  I don't

12 remember that happening on another occasion, that

13 specific type of thing.  But that was the answer to

14 your question.

15     Q    Was it out of the ordinary for jobs to be

16 unfinished when shifts ended?

17     A    No.

18     Q    It was actually quite common place,

19 correct?

20     A    No, it's just that it happened

21 occasionally.

60

1    Q    When it did happen on these occasions, was

2  there a set procedure for dealing with it?

3    A    No.

4    Q    How was it typically dealt with when these

5  occasions did arise?

6    A    All my other employees that were faced with

7  similar situations, which almost all of them had been,

8  they felt the sense of obligation getting this job done

9  and, you know, one of them might say to me my child is

10 waiting at this place and I can't call there and we

11 would understand and we would do whatever we had to do

12 to rectify the situation.

13         But there was this feeling among the other

14 employees to get that job done and I didn't have that

15 with Fran.  It was just the opposite.

16    Q    Now, you testified previously that you

17 thought Fran had greater than average difficulties in

18 dealing with other people, is that a fair way to

19 describe your testimony?

20         MS. DYE:  Objection, lack of foundation.

21    A    Would you repeat that, please.

61

1              (The reporter read back as requested.)

2        A     She displayed that.  I don't know if it was

3    a difficulty.

4        Q     Would you describe it as a difficulty?

5        A     I don't know if it was a difficulty.

6        Q     In your opinion as a supervisor was it a

7    deficiency on her part?

8        A     What I'm saying is I'm not so sure that it

9    wasn't by design.

10       Q     Did she meet your expectations as a

11   supervisor, what you expect out of your employees as

12   far as their ability to deal with their co-employees?

13   Did Fran meet your expectation level in her ability to

14   deal with her co-employees?

15       A     No.

16       Q     So in your opinion she fell short in that

17   area?

18       A     Yes.

19       Q     Did other people aside from the individuals

20   you supervised share the opinion that Fran fell short

21   in that area?

62

```
 1        A      In other groups.  Outside --

 2        Q      Other supervisors or people in management?

 3        A      She had been managed by other supervisors

 4   and they knew that this was not ideal.

 5        Q      Did they discuss this issue with you?

 6        A      I think I might have with them initiated

 7   discussion.

 8        Q      Do you know who you talked to about it?

 9        A      I believe I talked with Marianne Moxey,

10   administrative supervisor.

11        Q      Charles English?

12        A      Yes.

13        Q      Did either of them express opinions as to

14   this subject?

15        A      Mostly, rather than opinions, mostly

16   observations that they had.

17        Q      Can you describe the observations?

18        A      Only that they were consistent with what --

19        Q      Your experience was?

20        A      My experiences were.

21        Q      Was this discussed with Conrad at all?
```

63

1     A     I believe so.

2     Q     Do you recall the circumstances of the

3 discussion?

4     A     That's why I said I believe so.  Really I

5 know that they were but I don't recall sitting down and

6 saying hey there's this, that and the other.

7     Q     Did Conrad ever approach you to talk about

8 this issue?

9          MS. DYE:  Objection, vague.

10    Q     Talking about Fran's difficulty dealing

11 with other people?

12         MS. DYE:  Objection, mischaracterizes his

13 testimony.

14    A     Did he initiate an approach to me?  No.

15    Q     Did he discuss it with you?

16    A     I discussed it with him.

17    Q     What did you talk about?

18    A     Just the things that she would do that were

19 out of the ordinary.

20    Q     What did he say about this?

21    A     Actually -- my opinion?

64

1     Q     Yes.

2     A     Is that he was very patient and

3  understanding was my opinion of his reactions to some

4  of these things.

5     Q     Did he think you should document the

6  problems with Fran more than you did?

7     A     I don't recall.  I think I gave prior

8  testimony that he was unhappy with the amount of

9  documenting I was doing.

10    Q     Did Fran's difficulty interacting with her

11 co-employees, in your opinion, did that prevent her

12 from doing her job?

13          MS. DYE:  Objection, it calls for a legal

14 conclusion.

15    Q     Go ahead and answer it.  It's not asked in

16 the legal sense but go ahead.

17          MS. DYE:  Can you read it back.

18          (Reporter read back as requested.)

19          MS. DYE:  I'm also going to object to the

20 use of the term difficulty which he previously

21 testified he wouldn't necessarily use to characterize

1    what we're talking about here so I would suggest you

2    use another term.

3         Q      We can back up and go over the ground

4    again.

5              MS. DYE:  You asked him before about

6    whether you would say she had difficulty and he said

7    no.  Now you're assuming that she has a difficulty

8    which he already testified he didn't necessarily agree

9    with so you're going to have to use another term.

10        Q      Did you recognize that Fran had a problem

11   dealing with other people?

12        A      I recognize that there were times that she

13   had problems dealing -- that in dealing with other

14   people it created a problem.

15        Q      Was this an ongoing shortcoming of Fran's,

16   in your opinion?

17        A      It never -- there wasn't a period of time

18   where it stopped.

19        Q      Of the people under your supervision in

20   that first group, was she the individual that had the

21   most difficulty in this area?

1          MS. DYE:  I'm going to object again to the

2   use of that term.

3      Q     I don't want to use difficulty.  Did she

4   have a greater problem dealing with people than any of

5   the other people under your supervision?

6          MS. DYE:  I'm going to object again as to

7   vague because he previously testified that he thought

8   that it was intentional not that it was something that,

9   you know, when you say she had a problem it suggests

10  that she was unable to control it or something and he

11  reported it.  He testified that it was possibly

12  intentional.

13     Q     I understand.  Do you understand the

14  question?  She can read it back if you want.

15     A     She caused more problems in that area than

16  any of the other employees.

17     Q     And you recognize this as a deficiency in

18  her job performance; is that correct?

19     A     The times that she was doing this the job

20  wasn't getting done.

21     Q     Did her problem with this keep her from

1  doing her job?

2          MS. DYE:  I'm going to object again on the

3  same grounds.

4      Q      Did it keep her from doing her job?

5      A      When she would act up it wasn't the

6  direction of her completing whatever her task was and

7  quite often if it involved someone else they weren't

8  going in the direction of completing what they were

9  assigned to do.

10          It wasn't part of her job to act up.

11     Q      Okay.  If I posit the question as a yes or

12  no question, how would you respond?

13     A      Could you give me the question?

14          (The reporter read back as requested.)

15     A      Yes.

16     Q      In your opinion was she able to do her job?

17          MS. DYE:  Objection to the extent that it

18  calls for a legal conclusion.

19     A      I personally felt she could do it but quite

20  often didn't want to.

21     Q      When you did your evaluation of Fran, did

68

1  you make note of this in the evaluation?

2      A     Of her being disruptive?

3      Q     However you want to characterize?

4      A     I guess that's what I was saying there is

5  that she would act up and it would sometimes involve

6  the other people so it would disrupt the work flow,

7  yes.

8      Q     Did you make note of it, do you know?

9      A     Oh, I believe I did but I, you know, it's

10 been awhile since I've seen --

11     Q     Yeah, it has been no doubt about it.  Were

12 there other areas in Fran's job performance that gave

13 you concern in addition to the area to which you just

14 testified?

15          MS. DYE:  Objection, asked and answered.

16     A     What did you get out of my answer so that I

17 know what I'm responding to.  Can you capsulize it?

18     Q     This is my understanding what you testified

19 to, that you had identified that Fran had some type of

20 issue, a problem, a difficulty and I guess you used the

21 word disruptive which if I understand your use of the

69

1   word disruptive, does that necessarily mean disruptive

2   in terms of affecting her co-employees?

3           MS. DYE:  Affecting her what employees?

4       Q   Co-employees.  Is that the sense you're

5   using it in?

6       A   On occasion but what you synopsized there

7   differentiates as to the attorney here, Martha, in that

8   I didn't say she had difficulties.  I said that I was

9   not certain that it wasn't by design.

10          MS. DYE:  Is this a good time for a lunch

11  break?

12          MR. BURKHARDT:  I guess I want to knock off

13  this thing with the evaluation and then we can, yeah,

14  we can do that if that's what the general sense is.

15      Q   Let me finish with the evaluation then.

16  Basically what I was trying to ask was aside from we

17  have used different words that describe what you're

18  talking about and every time I try to characterize it I

19  get an objection but aside from that, what you've

20  identified as an issue with Fran, were there other

21  performance concerns that you had with her?

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

70

1     A    Yes.

2     Q    Can you tell me what they were?

3     A    She had a habit of taking off and walking

4  around and doing things that had nothing, you know,

5  just walking around the plant chitchatting with people

6  and one occasion I came back and in the middle of the

7  work day, her with lots of work to do, she had her feet

8  up on the desk, was eating a plate full of chipped beef

9  and reading the Wall Street Journal that was on her

10  lap.  When, like the other employees, she was expected

11  to be doing what her work assignments were, which were

12  obviously not what I observed.

13        Once again, she had to get up from her work

14  area, not say anything to me, go down to the cafeteria,

15  stand in line, purchase this and come back.  So that

16  was one that I recall that has nothing to do with her

17  being disruptive or --

18     Q    Okay.  You said she would chitchat with

19  other people.  Is that what you said?

20     A    Yes.

21     Q    In the context of the normal amount of

1  chitchat that occurred in the workplace of the people

2  that you supervised, did she do that an average amount,

3  greater than average or less than average?

4      A    What was more bothersome than the frequency

5  was that I didn't mind somebody sitting there and doing

6  their work and talking, you know, how like that.  But

7  she would get up and go to the other end of the

8  building and talk with somebody over there and not be

9  at her assigned place, not let me know she's going.  I

10 didn't know what was going on.

11     Q    I guess getting back to the issue of

12 frequency, was she chitchatting more than the other

13 people in the group?

14     A    Outside of the group, yes.

15     Q    Outside, yes.  Okay.  Did she have any

16 friends in the workplace?

17     A    I'm sure.

18     Q    Do you know who any of them are?

19     A    My wife was one.

20     Q    What was her name?

21     A    Linda Fleig.

1     Q     Do you know if there are any other friends

2  that she had in the workplace that you can identify?

3     A     I know she had other friends, I couldn't

4  necessarily identify them by name.

5     Q     Aside from the issues to which you just

6  testified, were there other issues with Fran's

7  performance that you had a concern with?

8     A     Right now I'm not recalling specific

9  instance.

10    Q     What about in a more general sense?

11    A     I do recall one conversation I had with her

12  where there was an opening in another section and

13  thinking that maybe she could be more productive

14  somewhere else, maybe there's something in our section

15  that wasn't conducive to her.  I wanted to do

16  everything to make her successful.  I said would you

17  like to go over in that other section and her answer

18  was no, if I go there I'm going to have to work.

19  Meaning that if she stays here she's not going to have

20  to work.  So that to me goes towards her productivity

21  and her attitude towards productivity.

73

1     Q     When you do the evaluation is there any way

2  that, like, the work quantity can be -- the quantity or

3  amount of work that an employee does, does that

4  quantify it or evaluate it in any way?

5     A     If I can I will but since it was such a

6  diverse amount of work effort, you know, different

7  people were doing different jobs, it was real hard to

8  do that.  But where I could I would.  Like, if we got

9  so many done on time or something like that.

10     Q     Did you make a note of that in the

11  evaluations you did?

12     A     Where I could, I would.

13     Q     Do you know if you did that in Fran's

14  evaluation.

15     A     No, I did not do that in her evaluation

16  that I recall.

17          (There was a lunch taken at 12:56 p.m and

18  testimony resumed at 1:55 p.m.)

19     Q     We're back on the record here in the

20  afternoon after a lunch break.

21          Did you have any particular training as to

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

74

1   the code of conduct at Bell Atlantic?

2       A    Not that I can recall.

3       Q    Do you know what the code of conduct was?

4       A    No, I don't.

5       Q    Do you remember any references to this code

6   of conduct?

7       A    It's vague.

8       Q    Was it a written document?

9       A    I believe so.  Yes, it wasn't oral.

10      Q    Do you remember having received a copy of

11  it?

12      A    I don't remember who it was in relationship

13  but I think there was an incident and it was an

14  incident that was countered a code of conduct so I saw

15  that, and then I think there might have even been

16  displayed around the place, you know, most places will

17  have that up there so I say it's vague.

18      Q    Did you as a supervisor have occasion to be

19  involved in any type of employee discipline?

20      A    I handled a lot of grievances, could that

21  be considered that?

1      Q      Yes, that would fall.  Now, by handled a

2  lot of grievances, do you mean you initiated some type

3  of disciplinary action that resulted in a grievance?

4      A      A lot of the grievance meetings you would

5  have the supervisor, the employee, the union rep and

6  then you would have someone taking notes and the union

7  would have someone.  Sometimes I was a note taker,

8  sometimes I was a supervisor that was involved with

9  that, what have you.

10      Q      Did you have any instructions from Conrad

11  about applying this code of conduct to the people under

12  your supervision?

13      A      I'm sure it was expected.  But nothing

14  specific, you know, like a --

15      Q      Did he talk to you about it?

16      A      I don't recall a time when we sat down and

17  discussed the code of conduct together.

18      Q      Did he ever mention to you that there was a

19  particular incident occurring with one of the people

20  under your supervision that was a violation of the code

21  of conduct?

76

1     A     I don't remember that.

2     Q     Did he ever suggest that you write

3  something up or make a note of an incident that

4  occurred for the people under your supervision?

5     A     Yes.

6     Q     Can you tell me what instance?

7     A     No, I can't.  I just know that in general

8  if something happened he might say, well make sure you

9  make a note of that.

10     Q     Do you know what progressive discipline is?

11     A     Yes.

12     Q     Can you describe it to me?

13     A     It's a situation where you start out at the

14  lower level of discipline like give a person a day off

15  if they did something that they weren't supposed to do

16  and it wasn't something that was necessarily like a

17  firable thing but more of a less than a firable thing

18  then you would do that.  If they repeated that then

19  maybe the next time you need to give them three days

20  off from work without pay.  Then up to, if it continues

21  and it's a firable thing then you have to terminate.

1      Q     So who made the decision on who to put into

2 progressive discipline?

3           MS. DYE:  Objection, vague.  Are you

4 talking about a specific incident?

5           MR. BURKHARDT:  No, general policy.

6           MS. DYE:  Policy.

7      A     For me it would be myself, the supervisor.

8      Q     Could you make that decision on your own

9 level?

10     A     Yes.

11     Q     To put someone in progressive discipline?

12     A     Yes.

13     Q     Do you know if you ever did that?

14     A     Almost everything I did I discussed with

15 other people since I was a supervisor new to Bell

16 Atlantic.

17     Q     Was there any individual that you're aware

18 that you -- that was placed in progressive discipline

19 based on your recommendation, that you placed in

20 progressive discipline?

21     A     I don't recall.

78

1     Q     Did Jim Conrad ever place any individuals

2 in progressive discipline?

3          MS. DYE:  Objection, lack of foundation.

4     A     I don't know.

5     Q     Was the progressive discipline policy, was

6 that a written policy?

7     A     I never saw a written policy.

8     Q     How did you become aware that there was

9 such a policy?

10     A     From my background.

11     Q     Can you elaborate?

12     A     I worked at places other than Bell Atlantic

13 prior to working for them and I knew that the thing to

14 do would be to progressively discipline somebody if

15 they were doing something that was incorrect.

16     Q     Were individuals other than the immediate

17 supervisors empowered to put an employee in progressive

18 discipline?

19     A     The manager, Jim Conrad, could do those

20 kind of things.

21     Q     Do you know how, by what authority he could

1   do those kind of things, could do that?

2        A     That he was over the supervisors.

3        Q     So he did have that authority to place an

4   individual in progressive discipline?

5        A     Well, I don't know if he would himself do

6   that but he could direct his supervisor working for him

7   after hearing what the situation is to say hey, I think

8   the person needs to go into progressive, some sort of

9   progressive discipline.

10        Q     Did he ever tell you to put a person in

11  progressive discipline?

12        A     Not that I can recall.

13        Q     Did he ever direct you to place a person in

14  progressive discipline?

15        A     Not that I can recall.

16        Q     Was Fran Darcangelo ever placed in

17  progressive discipline?

18        A     I don't recall.  I do know she was

19  terminated.  I mean, that's a step in it and it wasn't

20  under my supervision.

21        Q     Was progressive discipline, was that

1    mandated by the code of conduct?

2        A    Not that I can remember anything being like

3    that.

4        Q    Is it fair to say it was elective, either

5    supervisor or manager could elect to place a person in

6    progressive discipline?

7        A    If they were related, yes.  In other words,

8    it couldn't be a supervisor in another group

9    necessarily.  Even though if someone did something that

10    they should leave the plant for, like right now,

11    another supervisor could perhaps say I want you to

12    leave the plant right now but it would have to be

13    something that merited it.

14        Q    When you began supervising Fran, did you

15    have any type of instructions as far as treating her

16    differently than other people?

17        A    No.

18        Q    Did you have any discussions with Conrad

19    about how to treat her?

20            MS. DYE:  I'm going to object to vague.

21        A    Ever?

81

1      Q      Yes.

2      A      Not just in the beginning like your

3  previous question?

4      Q      No, any time period.

5      A      Well, yes.

6      Q      Can you tell me what they were?

7      A      No, I don't remember but I know that if I

8  had good or bad situations with employees I would share

9  them with my boss and we would discuss them.

10      Q      Did Jim Conrad tell you to treat her the

11  same as anybody else under your supervision?

12      A      He did not tell me to treat her any

13  differently nor did he go out of his way to tell me to

14  make sure I treated her like everybody else.

15      Q      Okay.  Did you form an opinion as to what

16  Jim Conrad thought of Fran Darcangelo?

17      A      I think with Fran's history and whether at

18  that time current actions it would be hard not to

19  evaluate them and come away with some sense about them.

20      Q      What was your opinion of what Jim Conrad

21  thought of her?

1      A     She did things that were not what you would

2 expect other people to do.

3      Q     Did he dislike her?

4      A     Actually, no.

5      Q     Did he ever mention any medical limitations

6 or condition that she had?

7      A     Medical?  I think during a discussion that

8 we had about what had happened the time when Fran

9 maintained and he said he couldn't recall saying, that

10 she not go on the nightshift.  That she had gone on

11 night shift and had taken some medication so I guess

12 that's about some physical problem, I don't know.  That

13 was discussed.

14      Q     Did he mention anything about the nature of

15 the medications?

16      A     No.  Or I don't recall.

17      Q     Did he talk about the nature of the

18 physical problem?

19      A     I don't think he did to me.

20      Q     Did anybody else talk you to about the

21 nature of the physical problem?

83

1       A       I think the supervisor, Mike Ports, who was

2   there that night described somewhat the situation.

3       Q       Can you be more specific, describe the

4   situation?

5       A       I was hoping you weren't going to say that.

6   I think she had problems with the bathroom for one

7   thing.

8       Q       By the bathroom, do you mean a loss of

9   control?

10      A       Control, yes.

11      Q       So there was some type of incident that

12  occurred where she experienced a loss of control?

13      A       Yeah.  She was kind of out of it.  Groggy

14  perhaps is the term that's coming to my mind.

15      Q       Was there any discussion about the

16  circumstances in which that incident occurred?

17      A       Any discussion about the circumstances?

18      Q       Was she ill at the time, do you know, was

19  that talked about?

20      A       I don't recall.

21      Q       Was she do you know if there was a

84

1  reference to her taking medication?

2      A    Yes.

3      Q    What was the reference to her taking

4  medication?

5      A    That when they asked what's wrong, she

6  obviously wasn't herself and when they asked her what

7  is wrong she said that it was a result of her taking

8  medication, of the medication that she was taking at

9  that time.

10     Q    Do you know what the medication was being

11 taken for?

12     A    No, I don't really.

13     Q    Was there any discussion of her physical

14 condition that caused her to have to take the

15 medication?

16     A    No.

17     Q    Were you aware of any physical condition

18 that required her to take any medication?

19     A    I wasn't aware of anything physically wrong

20 with her during that period of time.

21     Q    What about any period of time were you ever

1  aware that there was something physically wrong with

2  her?

3       A    No, not physically.

4       Q    Were you ever made aware that she had any

5  type of mental health issue?

6       A    Yes.

7       Q    Can you tell me how you were made aware of

8  that?

9       A    Well, the word aware there is strange.  You

10  know, she told me -- she had posters up in her cubicle

11  of I guess famous people in history who had mental

12  problems.  I remember Abraham Lincoln was one of them.

13  I asked her why she had that up there and she indicated

14  that she was perhaps in the same category as those

15  people.

16       Q    Do you remember what words she used?

17       A    No, I don't.  It's been quite awhile ago.

18  Then the other issue with that is that when we decided

19  to send her out to be evaluated it was obviously that

20  it wasn't -- I mean for a physical evaluation.  It was

21  more a mental evaluation.

1    Q    Were you supervising her at this time?

2    A    The valuation time and the time that I --

3    Q    The time she told you about the --

4    A    Yes.

5    Q    That would have been 1997?

6    A    I think it was a little later.

7    Q    Do you remember what period of time you

8 were supervising her?

9    A    No, I don't.  I'm really vague on that, bad

10 with dates.

11    Q    Did Conrad ever discuss her medical

12 condition with you?

13    A    Yes.

14    Q    Can you tell me what he talked with you

15 about?

16    A    Well, I told you that I went in and talked

17 to him about, and it was at my initiative, about having

18 her evaluated because of some of the things I shared

19 with you earlier.

20    Q    What did Conrad say about that?

21    A    After hearing what I -- after me bringing

87

1   this up and talking about it and he said yeah that

2   would probably be a good thing to do.

3        Q    Before that did Conrad ever use the word

4   special in describing Fran Darcangelo?

5        A    Special?  No, I don't remember her being

6   characterized as being special in anything.

7        Q    Did Conrad treat her differently than other

8   people?

9        A    No, he treated her just like everybody

10  else.  There was nothing pinpointed to her.

11       Q    Did he treat her more harshly than other

12  people?

13       A    Definitely not.

14       Q    You mentioned earlier that you thought

15  Conrad was, it was either extremely patient or very

16  patient in the dealings with Fran Darcangelo?

17       A    That's kind of part of my last answer.  He

18  was at times more patient than what I would have

19  expected other people to be in his position.

20       Q    Do you know why he was more patient with

21  her?

1      A      You asked me earlier if he liked her and he

2   did and he wanted to, you know, try and make things

3   nice for her I guess.   Happy.

4      Q      Are you aware of any instance where an

5   employee was fired for a type of, I guess, offense or

6   activity that Fran was engaged in?

7      A      I can't recall any.

8      Q      Do you think Jim Conrad treated her better

9   than the other people he treated under his supervision?

10      A      No.

11      Q      Did you talk with Butch English about Fran?

12      A      Oh yes.

13      Q      What did you talk to Butch English about?

14      A      Well, first of all, Butch being the

15   administrative supervisor if I had a question I could

16   go to Butch and ask him, you know, how is that handled

17   and then also as I told you I had a discussion with

18   Conrad about having Fran evaluated and Butch was the

19   guy to turn that over to once Conrad agreed that that

20   was the thing to do.

21      Q      Was there any incident in particular that

89

1    prompted you to go to Conrad and talk to him about

2    having Fran evaluated?

3         A    Yes.

4         Q    What was it?

5         A    It was one I shared with you earlier.

6         Q    And can you just refresh my memory, what

7    was it again?

8         A    The employee complaint.

9         Q    Do you remember when that occurred?

10        A    No.  Just before her leaving, not too long

11   before that.

12        Q    Did Bell Atlantic have a policy regarding

13   the referral of individuals for this medical

14   evaluation?

15        A    Not that I was aware of.  That was kind of

16   Butch's balliwick to delve into that.

17        Q    So they never made you aware of what type

18   of factual circumstances in which it would be

19   appropriate to seek that type of evaluation?

20        A    No, I had no guidelines.

21        Q    Were there any guidelines on an assessment

90

1   of a potential for violence in the workplace.

2        A    We used to go to seminars and I think that

3   that was in some part discussed at maybe one of the

4   in-house seminars but I don't even know when that was.

5   That might have been after this.

6        Q    Was there any written policy that you're

7   aware of that addressed violence in the workplace

8   issues?

9        A    Well, I just know that that probably would

10  be against the code of conduct there and any other

11  place.

12       Q    Were you aware of any I guess standards in

13  place as far as objectively assessing the risk of a

14  person being in potential for violence in the

15  workplace?

16       A    No.

17       Q    Was there any requirement that an

18  allegation, for example, be verified or the person

19  interviewed?

20       A    No.

21       Q    Do you know if there was any type of

1   interview process that took place in relation of this

2   referral of Fran for the medical evaluation?

3        A    Of Fran?

4        Q    Of individuals in relation to that

5   suggestion that she be referred for a medical

6   evaluation?

7        A    No.  You asked me a question before about

8   what kind of led up to that and I gave you the -- I

9   told you that this one employee --

10       Q    Yes.

11       A    More employees -- there was another thing

12  that in her cubicle she had a bull's eye put up on the

13  wall with the target being a picture of the supervisor

14  Butch English, which was taken as perhaps an indication

15  that there was a problem.

16       Q    Was this the same incident, this target,

17  was that posted at the time that the other individual

18  complained about his concern, his or her concern?

19       A    Close to the same timeframe.  You know, I

20  can't tell you it was two days apart, two months apart.

21       Q    Was this poster -- you said it was a poster

1  with Butch English's image on it?

2        A       It was a target.

3        Q       A target.

4        A       Yes, and like a rifle or range type target

5  and the person -- the bull's eye on the target was

6  Butch English.

7        Q       Is there any kind of threat printed out or

8  mentioned on the target?

9        A       I don't recall that part.

10       Q       Do you know if this target, was that a

11  factor considered in the decision to refer Fran for a

12  medical evaluation?

13              MS. DYE:  I'm going to object as vague.  Do

14  you have a timeframe?

15       Q       No.  Do you know if that target was

16  considered?

17       A       By whom?

18       Q       Whoever made the decision?

19       A       Well, I was part of the decision making

20  process and yes I considered that.

21       Q       Target?

93

1      A      Yes.

2      Q      Did you have the authority yourself to

3  refer her to a medical evaluation?

4      A      I don't believe I did.

5      Q      Who did?

6      A      I took this information and approached my

7  boss with it.

8      Q      Jim Conrad?

9      A      Yep.  Then Butch got involved and I don't

10  know who else.  In other words, they might have called

11  someone above them that I wasn't privy to.

12      Q      Okay.  Did you, yourself, mention this

13  target as one of the reasons you had this concern about

14  Fran?

15      A      I believe so.

16      Q      How was it that Butch became involved?  Did

17  you ask him to become involved?

18      A      Butch was the administrative supervisor.

19  This was done for efficiency that the supervisors of

20  the individuals could go ahead and crack, you know,

21  stay focused on productivity or whatever these

1  administrative things kind of went through him.

2       Q    Did Conrad ask that Butch become involved?

3       A    Ask who?

4       Q    Do you know if Butch's involvement, did

5  that come from Conrad?

6       A    Yes.

7       Q    Did Conrad tell you that Butch would be

8  handling it?

9       A    I don't know if it was words to that effect

10  but give this to Butch and let him run with it.

11       Q    Were you ever a party to communications

12  with any of Fran's medical treatment people?

13       A    I think only one time and that was -- she

14  was out for quite a long time and during that time I

15  believe somebody called in from -- I think the company

16  subcontracted to this guy.  I don't think he was a Bell

17  Atlantic employee, whoever he was.  So there was an

18  organization within the company that kind of handled

19  that in personnel and I don't remember the name of that

20  organization.  They called like with the results after,

21  off the top of my head, several month period of time

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

95

1    and said hey, you know, here's this, that and the other

2    and she's ready to go back.

3        Q    So that was after the evaluation was

4    performed?

5        A    Yes.

6        Q    Did they attempt to interview you or

7    solicit information from you before or in the process

8    of the evaluation?

9        A    I don't recall them doing that.

10       Q    Do you ever recall talking with an

11   individual named Barbara Kelly?

12       A    The name is not familiar to me.

13       Q    Did you ever talk with a nurse over at

14   CORE?

15       A    Now, CORE was the organization I was trying

16   to think of.  I remember it was someone there but I

17   don't remember the person's name.  I don't even

18   remember their gender.

19       Q    Were they asking you questions?

20       A    I don't recall.  I think it was -- the only

21   thing I vaguely remember about it was I think they were

96

1    trying to get ahold of Butch because Butch had like a

2    call in saying hey, you know, this is taking months,

3    you know, how long is this going to take or whatever.

4    And he said we're just about done here, here it is.

5              I don't know if Butch was there to answer

6    that and they said where is her supervisor and might

7    have gotten a phone call like that.

8         Q    Do you know when she was put on leave at

9    that time, why she was put on the leave?

10        A    For the evaluation.

11        Q    Was it because she was medically disabled?

12        A    No, I explained earlier what prompted us to

13   do that.

14        Q    Okay.  Was she placed on some type of

15   administrative leave?

16        A    I think she was paid while she was out, I'm

17   quite sure of that so I guess that's kind of like an

18   administrative leave.  It wasn't a disciplinary thing.

19        Q    It wasn't disciplinary.  Was it because she

20   was medically disabled from working, the reason --

21        A    No.

97

1    Q    The reason for her leave was not because

2  she was medically disabled; is that correct?

3    A    Medically?

4    Q    Yes, she was unable to work?

5    A    No, she was -- she left and we needed an

6  evaluation and they had, until they produced the

7  evaluation, the results of the evaluation, we would

8  know what to do from that point.

9    Q    Do you know did she ask to go on that

10  leave?

11    A    I don't recall her asking.

12    Q    Do you think she was placed on that leave?

13    A    Yes, for the evaluation.

14    Q    Who placed her on the leave?

15    A    Once again I think that with Butch

16  English's conversations with CORE and personnel or

17  whatever, that was the thing to do.  You know, that's

18  how they envisioned it happening.

19    Q    So, she was under your supervision at this

20  time, correct?

21    A    That's correct.

98

1          Q      Did they tell you why she was out on this

2    leave?

3                 MS. DYE:  Objection, vague.  Who is they?

4          Q      Did you ever find out why she was out on

5    this leave?

6          A      Yeah, she was out on the leave to be

7    evaluated and the evaluation took the term of the

8    leave.

9          Q      Are you familiar with another instance

10   where any person at Bell Atlantic, not just confined to

11   your supervision, but anyone that you know of was

12   placed on a leave of this type?

13         A      I was a new supervisor, I wasn't there that

14   long but during my short time I don't recall anybody

15   being put on a leave for an evaluation.  There's people

16   that had physical problems that were on leave.

17         Q      Did they tell you at any point when she was

18   on this leave how long she would be out on the leave?

19         A      No.

20         Q      Did they tell you when the evaluation was

21   done were they going to look at anything in particular?

99

1            MS. DYE:  Objection, vague.

2      Q      Did they say what kind of evaluation was

3  going to be done?

4            MS. DYE:  Objection, vague.  Who is they?

5      A      No, they never discussed with me.

6      Q      Any individual at Bell Atlantic?  Was it

7  discussed with you, the type of evaluation that would

8  be done?

9      A      No.  I mean, I knew -- I mean I was the guy

10  that was initiating her going so I mean I know why she

11  was going but no one ever called me back and said oh

12  you initiated her going and you had the reasons that

13  you said and now they're going to tell them back to me.

14  That didn't happen.

15      Q      So, is it fair to say the reason for her

16  going was that there was a concern that she was

17  potentially violent?

18      A      That she could -- yes.

19      Q      Do you know if she was -- was she referred

20  for any other reason in addition to that?

21      A      No.  No, that was it.

1    Q    Did anyone ask your opinion about whether

2  she was potentially violent?

3    A    No.  No.

4    Q    At any time?

5    A    Not that I can recall.  I just knew what

6  the circumstances were and it all equated to going in

7  that direction.

8    Q    When she returned from that leave, did you

9  get any type of report or status?

10    A    I don't recall a report.  I think that the

11  only thing that happened was that we were told that she

12  could return to -- in their opinion she could return to

13  the workplace.

14    Q    When they had the opinion that she could

15  return to the workplace, were there any type of

16  limitations or restrictions mentioned?

17    A    I don't recall.

18    Q    Were you asked to treat her differently

19  when she returned to the workplace after that leave?

20    A    No, I felt like it's kind of like getting a

21  clean bill of health or whatever.

1     Q    Did you treat her differently after she

2  returned from that leave?

3     A    No.

4     Q    We can get into the documents here.

5          I'm going to hand you some documents, I

6  want you to look at them.  Tell me when you've had a

7  chance to look at the document.  This is Deposition

8  Exhibit No. 1.  It's a letter with a typed Gottlieb

9  Fleig on the bottom and the upper left-hand corner the

10  letter is on 14 August 1997.

11         (Fleig Deposition Exhibit No. 1 was marked

12  for purposes of identification.)

13         (Pause.)

14     Q    Have you seen this document before?

15     A    It's jogging my memory.  I'm done.

16     Q    Did you create this document?

17     A    Yes.

18     Q    Did you create it with the input or

19  distance of any other person?

20     A    Nope, with just me.

21     Q    Is there anything in the recitation of the

1   events in the document that you know now to be

2   inaccurate?

3         A     No, I do not know that now.

4         Q     Do you know Barbara Lee?

5         A     Sure do.

6         Q     Did she work for you?

7         A     At one time.  She was part of the second

8   group.

9         Q     The second group of people you supervised.

10  Is Ms. Lee, would you describe her as a vocal person?

11        A     Yes.

12        Q     Opinionated?

13        A     Yes.

14        Q     This reference to Fran using the "N" word,

15  did Ms. Lee hear that?

16        A     Yes.

17        Q     Did she respond to it?

18        A     No.

19        Q     Did that surprise you?

20        A     Yes.

21        Q     Do you know how much after the events

1 occurred that you -- how much later in time you created

2 the document?

3      A      I think it was so startling for me, I'm a

4 new supervisor, that I was self-urged to create that

5 document.

6             MS. DYE:  Why don't you listen carefully to

7 his question.  His question was about when it was

8 created.  Answer only what he's asking for.

9      A      Immediately after it.

10     Q      Have you heard that "N" word spoken in

11 Barbara Lee's presence in other occasions?

12     A      I don't recall.

13     Q      Was Ms. Lee sensitive about racial issues?

14            MS. DYE:  Objection, lack of foundation.

15     Q      I can rephrase it.  Did she take objection

16 to any -- to comments of a type that could be construed

17 as racist?

18     A      Did you keep the word any in there?

19     Q      Any, in your experience, did she respond to

20 comments that she construed as racist?

21     A      In here it says she did.

1      Q      That she did respond?

2      A      She responded that she didn't think it was

3   racist, this thing with the other employee who is

4   black.   Right?

5      Q      So the way you understand this is that

6   Ms. Lee believed this was not a racist comment?

7      A      No, not that.   You asked me about any type

8   of comment or perhaps situation.

9      Q      Yes.

10     A      See in here about the fellow reading the

11  newspaper, she says, Mrs. Lee told Mrs. Darcangelo that

12  she did not think the matter was discriminatory which

13  to me means race in nature and that her advice to

14  Ms. Darcangelo was to further discuss the matter with

15  me, her supervisor.

16            So you asked me did she comment anything

17  about racism or whatever and there's her comment,

18  there's one of them anyways.

19     Q      Did you understand that Barbara Lee took

20  offense to this comment?

21     A      Did I understand?   Did I have a sense of

1  understanding?

2       Q    Yes, did she take offense?

3       A    I think she just thought it was, you know,

4  not the right thing to say and before she could comment

5  in saying that, Marianne Moxey immediately as a

6  supervisor felt a responsibility to tell her don't talk

7  like that before Barbara could get it out.

8       Q    So Barbara didn't respond to this comment

9  that Fran made?

10      A    The "N" word part, not Dwight reading the

11  newspaper?

12      Q    Yes, did she respond to the "N" word

13  reference?

14      A    Not that I can recall.

15      Q    Is that consistent with what you know about

16  Barbara Lee or not responding?

17      A    I would have expected her to respond.

18      Q    Because in your experience with her she

19  regularly did respond when she heard comments that she

20  viewed as racially inappropriate?

21           MS. DYE:  I'm going to object to

1  mischaracterizing testimony.

2      Q    It's a question.  Go ahead.  I mean, that's

3  my question to you?

4      A    She wasn't introverted.

5      Q    So I guess to answer the question, would

6  you say it was -- she regularly did respond when she

7  heard a remark of that nature?

8           MS. DYE:  I'm going to object to the lack

9  of foundation.  You haven't shown that there were any

10 remarks of that nature.  I mean for her to regularly be

11 responding to.

12     A    The operative word there is regular.  That

13 I would say the answer is no because of the word

14 regular, you know.  Every day, every two days did she

15 have a retort for a racist comment, the answer is no.

16 I don't know what you mean by regularly.

17     Q    We can back up, are you aware of instances

18 where Barbara Lee heard a comment of a racial nature?

19     A    Other than this one, no, I can't remember.

20     Q    There's no other instance in which you're

21 familiar that she heard a comment of a racially

1  offensive nature?

2       A    Not that I can remember.

3       Q    We can label this as Fleig Deposition

4  Exhibit No. 2.

5            (Fleig Deposition Exhibit No. 2 was marked

6  for purposes of identification.)

7       Q    There is no signature or identification of

8  the individual creating the document.  It does have in

9  the upper right-hand corner on August 14, '97.  It's

10  labeled DAR01783 in the Bates stamping system in the

11  lower right-hand corner of the page.

12           (Pause.)

13       Q    Have you seen this document before?

14       A    I'm trying to think whether I did.  Let me

15  read it again.

16       Q    You can read it.  I don't know if you ever

17  saw it before.  If you haven't tell me that.  If you

18  have I'd like to know about it.

19           (Pause.)

20       A    I don't recall the incident.

21           MS. DYE:  The question is have you seen the

1  document before?

2      A    I don't recall the document.

3      Q    Do you recall the incident referred to in

4  the document?

5      A    No.

6      Q    Is the incident referred to in this

7  document the same incident in the exhibit we looked at

8  previously?

9          MS. DYE:  Objection, lack of foundation.

10  He just testified he doesn't recall the incident.

11          MR. BURKHARDT:  I just wanted to ask.

12      Q    Answer if you can.

13      A    I don't recall this one.  I don't recall

14  this document or incident.

15      Q    So in response to my question -- can you

16  read the question back?

17          (The reporter read back as requested.)

18          MS. DYE:  Objection, asked and answered.

19      Q    What's your response?

20      A    I don't know.

21          (Fleig Deposition Exhibit No. 3 was marked

109

1  for purposes of identification.)

2      Q     Next Exhibit is going to be Deposition

3  Exhibit No. 3.  It's Bates labeled 00770 through 772

4  summary of events leading to termination Frances

5  Darcangelo.  It's a three-page exhibit.  Please take a

6  look at this and let me know if you've seen it before.

7           (Pause.)

8      Q     Have you seen this document?

9      A     It's not familiar.

10           MS. DYE:  You can say that.  You weren't

11  done looking through it.

12     Q     Is that a yes, no, or I don't recall?

13     A     I don't recall that document before.

14     Q     I'd like to ask you one question about a

15  meeting referenced in the document.  I understand you

16  say you don't recall but the very first, you know, the

17  very top 10/13/97 notation, there's a reference to a

18  meeting and I wonder, number one, at that time 10/13/97

19  was Fran under your direct supervision?

20           MS. DYE:  Go ahead and read that first

21  paragraph real carefully.

110

1       A     I did read it.  I don't know for sure.  I

2   don't remember as I stated earlier when she worked for

3   me, when she didn't.  I'm having a hard time even

4   remembering when I left Bell Atlantic.

5       Q     What's your belief?  Do you believe she was

6   working for you?

7       A     If I were to make a guess, is that what

8   you're saying?  My guess would be she probably did

9   during this period of time.

10      Q     Do you recall any such meeting, the meeting

11  referenced in that first paragraph?

12      A     I think I do recall that.

13      Q     Is there anything in the language in the

14  first paragraph that you believe to be inaccurate?

15            MS. DYE:  I'm going to object to lack of

16  foundation.  He hasn't testified that she was there at

17  the meeting so to be able to testify about what

18  occurred during it or what was said.

19      Q     We can back up.  Do you recall if you were

20  at this meeting that's referenced in the first

21  paragraph?

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1        A     I believe I was.  But it's vague.

2        Q     I guess the question would still stand and

3    that is:  The information in that first paragraph,

4    anything in there that you believe to be inaccurate?

5        A     I don't understand the one sentence.

6        Q     Which sentence is that?

7        A     He also stated that he had gone too far,

8    this is the part I don't understand the next part, and

9    that he now needed to ensure that he was creating an

10   environment for his entire team.  I don't know what he

11   means by what type of environment.  Obviously there's

12   an environment there if he does nothing.

13       Q     Is that the only thing in that statement

14   you believe to be inaccurate?

15       A     Well, I don't think that that's inaccurate,

16   I just don't understand it.

17       Q     Okay.

18       A     I have no real opinion of the accuracy of

19   what this fellow wrote and I vaguely remember the

20   meeting so I can't say that that's a synopsis or

21   whatever.

112

1    Q    Okay.

2         MS. DYE:  Let me just counsel the witness

3    that we don't know who wrote this and there hasn't been

4    any testimony about it.

5    A    Okay.

6         MS. DYE:  To the extent that something --

7    Q    Is there anything in there that varies with

8    your recollection of this meeting?

9    A    I think that in general in the meeting Jim

10   Conrad had felt that he had dealt gingerly with Fran

11   and her antics and that he was putting her on notice

12   that this was now going to be dealt with more

13   stringently in the future.

14        Also in that thing I must say that his

15   hopes was that she would get on track.

16   Q    Is there anything in this paragraph that

17   you didn't know about before?

18   A    I don't know what the notes are.  So I

19   can't speak to that, the last sentence in parens, so I

20   can't speak to that.  But I think -- I don't have a

21   glaring objection to anything that's in there I guess.

1      Q      There's nothing in there that you believe

2  to be at variance with your recollection of this

3  meeting; is that correct?

4      A      Yeah, as vague as my recollection honestly

5  is I think that was the gist, to come in and say hey,

6  here's a new day.

7      Q      Let's label this next one Deposition

8  Exhibit No. 4.

9             (Fleig Deposition Exhibit No. 4 was marked

10  for purposes of identification.)

11      Q      There's two pages to it circled one and two

12  upper right-hand corner date, upper right-hand corner

13  of the first page is 14 August '97.  First page upper

14  left-hand corner F abbreviated file, looks like two

15  pages of handwritten notes.  Take this as an exhibit.

16  I'm going to hand this to you Mr. Fleig.  I want you to

17  take a look at it and tell me if you have seen it

18  before.

19             (Pause.)

20      A      Yes, I've seen it before.

21      Q      Where have you seen it before?

1        A        I wrote it.

2        Q        Do you remember when you wrote it?

3        A        I don't remember but it's dated.

4        Q        Do you remember if you wrote it immediately

5   after the date or in very close in time to the date

6   referenced in it?

7        A        I'd say at least close in time to the date

8   referenced if not that day.

9        Q        Within a day?

10       A        Yes.

11       Q        What prompted you to write this up?

12       A        As far as I was concerned outlandishness of

13  the actions of Fran during this period.

14       Q        Did you write this up entirely on your own?

15       A        Yes.

16       Q        There's a reference to a union rep at the

17  bottom half of that first page of the exhibit, do you

18  know who that is referring to?

19       A        Yeah, it seems back in that other document

20  it's Barbara Lee.

21       Q        Do you know how long after you started

1  supervising Fran that you wrote this up?

2      A    No, but it looks pretty close to the

3  beginning.  It says there that the 13th of August is

4  about the sixth day at work, that means me, my day

5  there.

6      Q    Where is that at?

7      A    The first, the third line down from the

8  top.

9      Q    Oh, okay.

10      A    First day, third day, sixth day and then we

11  see August there probably like the sixth day or so or

12  close to it.

13      Q    There's a reference that looks right below

14  that, did you not work here 20, 25 years?

15      A    Yeah.

16      Q    What is that about?

17      A    I'm surprised you asked that one.  That was

18  a -- I couldn't believe the candidacy of Fran with

19  this.  Basically she told me that she was not going to

20  work for 20 to 25 years with Bell Atlantic, that her

21  game plan was to do something to get fired and then to

116

1   sue the company and to take those monies and supplement

2   her income, that she would have as a refrigeration

3   repairman.

4       Q      How did you end up talking about this?

5       A      You work with Fran for a while now and you

6   know that she will blurt something out there, just let

7   something go.  It just came out.

8       Q      There's a reference to lawyer to the right

9   of that?

10      A      Yeah.

11      Q      Do you know what that's about?

12      A      Yeah, that's part of it.  This is kind of

13  cryptic because I'm not going to take all day and

14  document everything that Ms. Darcangelo --

15      Q      I didn't expect to ask you about it, I just

16  was curious?

17      A      What that means that was part of it to jog

18  my memory that she was going to get a lawyer and I

19  think at this point she had even discussed it with a

20  lawyer.  That was her game plan to do that kind of

21  thing.  And she's telling this to me, her supervisor.

1          (Fleig Deposition Exhibit No. 5 was marked

2    for purposes of identification.)

3        Q    Deposition Exhibit No. 5 associate

4    appraisal and development plan, six pages.  Fran

5    Darcangelo central office technician, January '97-31

6    December '97.  If you can take a look at this and let

7    me know when you've had a chance to look at it.

8          (Pause.)

9          MS. DYE:  This one isn't Bates labeled.

10          MR. BURKHARDT:  That's what I was going to

11    do.  We do have one Bates labeled.  I think it's a

12    little different.  I think the only difference I'm

13    aware of is that I think Mr. Fleig's name is on the

14    Bates labeled.

15          MS. DYE:  Actually the previous one isn't

16    Bates labeled either.  Are these documents that you did

17    produce -- you produced to us and that's why they're

18    not Bates labeled; is that right?

19          MR. BURKHARDT:  Yes.  I don't think we did

20    the labeling for the documents we gave you.

21          MS. DYE:  No, you didn't.  But this one we

1  certainly produced to you.

2            MR. BURKHARDT:  Yours has a stamp on it.

3            MS. DYE:  So this you produced to us?

4            MS. DARCANGELO:  I got that in 1998.

5            MS. DYE:  Okay, your copy of the appraisal.

6  When did you get this?

7            MS. DARCANGELO:  1998 at the grievance.

8            MS. DYE:  Oh.

9            (There was a discussion held off the

10  record.)

11     Q     This document is also Bates labeled 00125

12  through 00130 in the lower right corner.  We're I guess

13  using an unlabeled version but it's the same document.

14            Mr. Fleig, have you seen this document

15  before?

16     A     Yes, I believe I have.

17     Q     What context have you seen it before?

18     A     I think I am the person who wrote this.

19     Q     Do you remember when you wrote it?

20     A     No, I don't.  I think it was late in terms

21  of the appraisal period is here and normally we do it

1  right after that or whatever.  Me being a new

2  supervisor I had problems in understanding or knowing

3  how this was to take place on here and what you were

4  supposed to write and it took me awhile to get that

5  right.

6       Q    Do you know in drafting this document, did

7  you consult with any other individual?

8       A    Yes.

9       Q    Who?

10      A    Jim Conrad was instrumental in showing me

11  how to do this.

12      Q    Did you consult with Fran's previous

13  supervisor?

14      A    I believe I did.

15      Q    Do you know who that was?

16      A    Marianne.  No.  No, I guess I didn't

17  because Mike was her -- sometimes it's confusing

18  because she kind of worked for Mike, then she worked

19  for Marianne for a little while I think there and was

20  doing work for Marianne and then it came to me and it

21  went back to Marianne.  It's kind of hard to know

120

1  without a script who's up to bat here.

2      Q    You didn't consult with any of the

3  individuals with whom you just mentioned; is that

4  correct?

5      A    I don't recall.  I can't honestly say yes

6  or no.  You know, I just can't recall.

7      Q    After looking at this evaluation, is there

8  anything in it that you believe to be inaccurate?

9      A    No.  I don't see anything in here that

10  looks inaccurate to me.

11      Q    Did any individual urge you to put anything

12  in this evaluation that you didn't initially include?

13      A    Yes.

14      Q    Who was that?

15      A    Jim Conrad.

16      Q    What did he urge you to put in the

17  evaluation?

18      A    I don't know if it was -- I don't think it

19  was anything specifically.  Once again, I had never

20  done a Bell Atlantic evaluation and he was the guy to

21  show me how to do it.

1    Q    Was there any individual that urged you to

2  change or modify anything that you originally put in

3  the evaluation?

4         MS. DYE:  Objection, asked and answered.

5    A    Yes.

6    Q    Who was that?

7    A    James Conrad as he was instructing me how

8  to fill out an evaluation at Bell Atlantic.

9    Q    Do you know what he urged you to change or

10  modify?

11    A    No, I don't.  I think it was just general.

12    Q    And the fourth page of the evaluation

13  there's a reference to special accomplishments,

14  projects, Ms. Darcangelo taught a brief T3

15  familiarization course to her group.  Can you describe

16  what that is to me?

17    A    I think we started getting T3 work into our

18  group and wasn't originally assigned to it.  According

19  to another supervisor, and I don't recall which one it

20  was, they indicated that Fran had had quite a bit of

21  familiarization with these T3's and she had actually

1   written a small paper on it.

2            In my quest as her supervisor to try to get

3   her positive about work and participating with work I

4   asked that she, from her knowledge and from this paper

5   that she wrote, give a small course to the other

6   employees in the group that would be handling T3s.

7        Q    I believe you had testified previously that

8   you had had some concerns about Fran not, what, working

9   productively?

10       A    Yeah.

11       Q    Is it fair to say about the quantity of

12  work that she did or do you want to elaborate what

13  meant by that?

14       A    She did not do as much work or was

15  interested in doing as much work as I or probably any

16  other supervisor of hers would have had.

17       Q    Is that concern, is that addressed in this

18  evaluation?

19       A    I see one thing here just as soon as I pick

20  it up.

21       Q    Where is that?

1     A     It's on the third page from the end.  It

2     says Ms. Darcangelo does not use -- does not make good

3     use of non-demand time and then it goes on and she

4     would either, you know, be away from work area or at

5     her work area but not working for productive in between

6     job orders.  Her supervisor being me gave her busy work

7     to fill in these lulls.  She informed me, her

8     supervisor, that by her design or definition she would

9     have no such lulls and thus wouldn't be completing any

10    such busy work then she had set a quota up for herself

11    whether she could complete 100 T3s in a day.  She was

12    going to do two.  This was a self-established quota.

13     Q     The two things you just mentioned, do you

14    view them as examples of -- we had heard some testimony

15    about her having difficulty working with people.  Do

16    you view these as examples of that?

17          MS. DYE:  I'm going to object on the same

18    basis we were objecting before.  There was no testimony

19    of her having any difficulty for completing her work.

20     A     Would you repeat your question to me.

21     Q     Would you like it read back?  I'm not sure

124

1  I said it the way I really meant to.

2          Do you think Fran could have been better at

3  working with other people?

4      A    Well, I think she wanted to, yes.

5      Q    Do you think that she was average in

6  dealing with other people or below average?

7      A    Seems unacceptable on occasions.

8      Q    Was she unacceptable more than any other

9  person that you supervised?

10     A    Yes.

11     Q    Would you identify this as a shortcoming of

12  hers?

13     A    No.

14     Q    Did she meet your expectation level in this

15  regard?

16     A    No.

17     Q    Did she appreciably improve in this area

18  during the time you supervised her?

19          MS. DYE:  Objection, vague.  Are we talking

20  about the exhibit?

21          MR. BURKHARDT:  No.

1          MS. DYE:  What's this area?

2          MR. BURKHARDT:  Her dealing with other

3  people.

4     Q    Did she get better?

5     A    No.  Not that I noticed.

6     Q    The two paragraphs that you just testified

7  to --

8     A    Yes.

9     Q    -- would you say those are examples of this

10  issue?

11     A    I think they're more examples of lack of

12  productivity than her getting along with other people.

13     Q    This copy is not signed, do you know if you

14  did end up signing a copy of this?

15     A    That was an odd thing.  I don't recall if I

16  did sign or didn't.

17     Q    What was odd about it?

18     A    Fran refused to sign it and the way it was

19  supposed to work is you go and sit down and discuss

20  this and then she signs it, like, that she had received

21  it, not that she has to agree with everything but she

1  received it and then I sign it.

2          She didn't sign it.  I was a new

3  supervisor, I didn't know what to do.  I'm supposed to

4  sign after her I thought.  I don't know if later on I

5  was told she didn't have to sign it, you just sign it.

6  Just sign it, it doesn't have to be an order of

7  precedence there.  So I can't say whether it was or

8  wasn't.

9      Q    Signed?

10     A    Yes.

11          (Fleig Deposition Exhibit No. 6 was marked

12  for purposes of identification.)

13     Q    Fleig Deposition Exhibit No. 6, there are

14  three pages in the exhibit, one is handwritten and two

15  are typed with a combination -- first is entirely

16  handwritten.  It's got Eliminate The Root Cause on the

17  top in bold large type.  Second is primarily typed with

18  some handwritten comments.  Third is entirely

19  typewritten except with the signature J.P. Conrad at

20  the bottom.  Take a look at this and let me know when

21  you've had a chance to review it.

1              (Pause.)

2      Q      Have you had a chance to look at this

3  document?

4      A      Yes.

5      Q      Have you seen it before today?

6      A      I don't recall.

7      Q      Did you write this document?

8      A      No.  Or at least I didn't write it all.

9      Q      Do you remember writing any of it?

10      A      No, I don't.

11      Q      The time period -- the date on the top of

12  page two, 13 October 1997?

13      A      Yes.

14      Q      Is it your belief that Fran was under your

15  supervision at this time?

16      A      Since that's so close to this other thing I

17  think that she probably was but I can't say for sure.

18      Q      Do you have a recollection of having a

19  discussion with Conrad, I think there's a reference in

20  here that there would be a regular accounting with the

21  supervisor?  Where did I see that?

1        A       I did see that in here.  A monthly thing or

2   something?

3        Q       Yes, on monthly review.  Page two, first

4   approach, monthly review of progress of a one-on-one

5   basis between -- did Conrad ever talk to you about

6   that?

7        A       I don't believe so.  I don't believe it

8   happened.

9        Q       You don't believe he ever --

10       A       I don't remember him talking about that and

11  I don't believe she was still my -- if I was still her

12  supervisor, that I brought her in every month and

13  talked about her with her.

14       Q       Did it surprise you to see the information

15  in the documents I just handed to you?

16       A       No, because I realize that a lot of this

17  involved me.

18       Q       But the type of one-on-one monthly review

19  that's referenced on that second page never happened?

20       A       I don't recall it being a monthly thing

21  that she was pulled in.  It might have been because she

129

1  was out or, you know, was out on evaluation after this

2  or something, I don't know.  That's why it didn't

3  happen but I don't recall having a month-to-month sit

4  down with Fran.

5      Q      Did you ever recall Conrad talking to you

6  about putting Fran on progressive discipline?

7      A      I don't know if there was ever a flag

8  waived to say okay you're in progressive -- I don't

9  remember that terminology oops, like, time out in the

10  corner, hey you're on progressive discipline.  I don't

11  think that that ever was an official thing that had

12  happened or took place at Bell Atlantic.

13     Q      Is it fair to say you were never made aware

14  by Conrad that Fran had been put on progressive

15  discipline?

16     A      Only in the context of this.  In other

17  words, she had done some things in the past and we kind

18  of let it go.  And just let it go.  Then he would say

19  hey, we have been putting up with that too much.  From

20  now on we're going to have a disciplinary thing with

21  this and, of course, that would be a progressive

1  disciplinary thing.  We're not going to fire her for

2  the next incident.  We're going to start afresh and

3  we're going to give her a chance to start afresh with

4  this but we're going to put her on notice where it's

5  not going to be like it was in the past where we're

6  just going to let it go.

7      Q    Now, did that occur in the meeting

8  referenced in these documents or did it occur at

9  another time, what you just testified to?

10     A    I think that that was discussions that led

11  up to this meeting where he calls her in and lays the

12  cards on the table.

13     Q    I forget, did you say you think you were at

14  this meeting or you weren't?

15     A    I think I recall being at that meeting but

16  in here it says Butch English and himself, James Conrad

17  were at that; but I think I recall being in there and

18  it was kind of short and sweet.

19     Q    This type of meeting, would it be

20  exceptional for the immediate supervisor to not be in

21  the meeting?

1       A       That's another reason why I think I was

2    there.  But I think I vaguely recall being at the

3    meeting with the union person being there.

4       Q       Because it would have been exceptional if

5    you were not there at this type of meeting; is that

6    correct?

7               MS. DYE:  Objection, lack of foundation.

8       A       Yes I think that he would have had me

9    there.

10              (Fleig Deposition Exhibit No. 7 was marked

11   for purposes of identification.)

12      Q       Next is Deposition Exhibit No. 7 dated 15

13   October 1997.  One-page to Aaron and Theresa, CC Fran

14   from Gottlieb.  Just a one-page document.  Hopefully we

15   won't be long with this.

16              (Pause.)

17      A       Yes.

18      Q       Have you seen this document before?

19      A       I believe so.

20      Q       Do you recall when you saw it before?

21      A       When I wrote it.

132

1       Q      There's a reference to Fran putting a

2  familiarization crash course on T3s?

3       A      Right.

4       Q      Is that the same reference to the teaching

5  that we talked about previously?

6       A      Yes.

7       Q      Did she teach -- was it a one shot deal or

8  multiple?

9       A      It was a one shot deal.

10             (Fleig Deposition Exhibit No. 8 was marked

11  for purposes of identification.)

12      Q      Next Exhibit is going to be Fleig

13  Deposition Exhibit No. 8.  Fax cover sheet from CORE to

14  Gottlieb Fleig date 10/21/97 is the first page.  Second

15  page is a CORE release of medical information for Bell

16  Atlantic employee from the CORE I guess medical release

17  form.  Third page is the CORE medical release form, the

18  main headings are employee information, supervisor

19  information large bold type in the center and below

20  that healthcare provider information apparently

21  undated.  Bottom attention please be specific on

1  providing restrictions handwritten at the bottom.

2              Page four CORE sickness and accident

3  disability benefit plan, no date on it.  It is from

4  CORE.  It looks like a standard instruction sheet.

5  Sixth page is sickness and accident disability benefit

6  plan, SABP the plan, CORE large bold in the center,

7  plan administration.  Seventh page CORE copy, another

8  medical release.  Eighth page is the postcard to mail

9  the information back.  Ninth page is the outside of the

10 envelope mailing the information back.

11             Please take a look at this and tell me if

12 you've ever seen it before.

13             (Pause.)

14             MS. DYE:  I don't remember seeing this

15 document before.

16             MS. DARCANGELO:  I lost it but I found it.

17             MS. DYE:  So this is the first time this

18 document is being produced here at the deposition?

19             MR. BURKHARDT:  Yeah, I didn't label

20 everything I produced to you.  It's not a document that

21 I've spent a lot of time with.

```
 1              MS. DYE:  We'd ask, I've asked a couple of

 2    times for any remaining CORE documents because you've

 3    indicated that there are some so we want to make sure

 4    that all of those are produced.  This one clearly

 5    wasn't produced until today.

 6              MS. DARCANGELO:  Sorry, bad filing.

 7              (Pause.)

 8       A    I've looked at it.

 9       Q    Have you seen any of the documents in here

10    before?

11       A    Parts of it look familiar and parts of it

12    don't.

13       Q    Do you remember getting this fax from

14    Ms. Nancy in occupational health?

15              MS. DYE:  Are you referring to the first

16    page?

17              MR. BURKHARDT:  Yes, the first page dated

18    10/21/97.

19       A    No, I don't.

20       Q    You don't remember getting that?

21       A    I don't remember getting it.
```

1       Q       Do you remember talking to this individual

2  about Fran?

3       A       No.  I don't even remember this lady's name

4  to be truthful with you.

5       Q       Okay.

6               (Fleig Deposition Exhibit No. 9 was marked

7  for purposes of identification.)

8       Q       Let's introduce the next one, Fleig

9  Deposition Exhibit No. 9.  Undated, Statement of

10  Occurrence, CWA Local 2101 District 6.  Number one,

11  applied for FMLA.  There's no signature identification

12  on it.  Just take a look at this briefly and tell me if

13  you have seen it before.

14              (Pause.)

15      A       I don't remember seeing this.

16      Q       Did you ever have any talk with Fran about

17  family medical leave?

18      A       I don't recall any.

19      Q       Do you know if she ever asked to take

20  family medical leave?

21      A       You know, that sounds familiar but I can't

1  be any more specific than the fact that she might have

2  asked for that.

3       Q    Did she ever talk to you about being placed

4  on family medical leave without her asking?

5       A    I don't recall that at all.

6            MS. DYE:  I'd like to take a break at this

7  point.

8            MR. BURKHARDT:  That's fine.

9            (There was a break at 3:41 p.m and

10 testimony resumed at 4:05 p.m.)

11      Q    There are two subject areas that we talked

12 about briefly that I just want to take a different

13 angle on slightly.  I don't want to spend much time

14 with them.

15           With Fran doing the training of the

16 individuals on the T3 course that you described

17 previously, do you know why she was asked to do that

18 training?

19      A    I said and maybe I didn't say it correctly,

20 she had had experience with that and have actually, I

21 believe, written a paper about it and so since no one

137

1   else in my group had those qualifications and once

2   again the fact that I wanted to get her involved in

3   trying -- make her feel good about the job and what she

4   was doing and give her an area she could get her teeth

5   into and all of that, shine.  That was the reasons why

6   she was teaching the course, which was as you said a

7   one shot, a matter of hours or if it was even that.

8        Q     Did she just train the two individuals

9   referenced in that memo or were there more than that?

10        A     I don't recall.

11        Q     Was she training new hires or people that

12   had been in the group, do you know?

13        A     People that had been in the group.

14        Q     Did she do any other training aside from

15   that in the memo?

16        A     No.

17        Q     We had talked about a incident with Barbara

18   Lee where Fran mentioned the "N" word, remember we

19   talked about that a little bit earlier?

20        A     I think it's written up here, too.

21        Q     With that incident, did you talk to Conrad

1   about it?

2          A      Yes.

3          Q      What was the result of that conversation?

4          A      I don't remember.  I just know that to me

5   it was kind of a startling thing to have in the

6   workplace so I talked to my boss about it.

7          Q      Did you write her up for saying that?

8                 MS. DYE:  I'm going to object to vague as

9   to the definition of write her up.

10         Q      I can rephrase it.  Did you seek any type

11  of disciplinary action against her as a result of that

12  comment she made?

13         A      I don't believe so.

14         Q      Did you talk to Conrad about disciplining

15  her for that comment she made?

16         A      I don't recall if that was part of the

17  conversation or not.

18         Q      You have disciplined other people under

19  your supervision for making racially offensive remarks?

20         A      I don't think I have.

21         Q      Did you discipline Fran on other occasions

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1   for making racially inappropriate remarks?

2        A     By discipline you mean chastise or?

3        Q     Initiate any type of disciplinary action?

4        A     Give her a day off or something like that I

5   don't recall that.

6        Q     Have you heard her make comments of that

7   type on other occasions besides the one referenced?

8        A     On colorful comments about other people or

9   just a racial?

10       Q     Racial aspect?

11       A     I don't recall at this stage.

12       Q     Take a look at, I guess we're at Exhibit

13  No. 10 dated 23 September 1998.  Gottlieb Fleig printed

14  and signature on the bottom of one page exhibit.

15  Please take a look at this and tell me if you have seen

16  it before today.

17             (Fleig Deposition Exhibit No. 10 was marked

18  for purposes of identification.)

19       Q     Have you seen this before today?

20       A     Must have signed it but it's not familiar

21  to me.

1    Q    Do you recall being in the meeting

2   referenced in this exhibit?

3    A    With the union person there?

4    Q    Yes.

5    A    I believe so.

6    Q    Do you recall anything about the facts

7   underlying the suspension?

8    A    No, all I remember was that like I told you

9   it was standard procedure to have someone in there take

10   the notes so that the other person could do the talking

11   and Butch just grabbed me and said I need you in there

12   to do that.

13    Q    Take the notes?

14    A    Yeah.  And I really didn't have anything to

15   do with it other than I was a note taker.

16    Q    Do you recall the incident that was basis

17   of this meeting?

18    A    No, I don't think I was involved with it.

19    Q    Do you recall any discussion of it or the

20   circumstances?

21    A    No.

1           (Fleig Deposition Exhibit No. 11 was marked

2    for purposes of identification.)

3        Q    This is Fleig Deposition Exhibit No. 11,

4    request for special medical evaluation dated 4/22/93

5    with a Bates stamp number 01716.  Please take a look at

6    this document and tell me if you have seen it before.

7           (Pause.)

8        A    I'm done.

9        Q    Have you seen this document before today?

10       A    I don't recall.

11       Q    You don't recall?

12       A    I don't recall ever seeing this.

13       Q    The type of document, request for special

14   medical evaluation.  Are you familiar with this form?

15       A    No, to the best of my knowledge I don't

16   recall seeing a form like that at this point.

17       Q    When you requested the medical evaluation

18   for Fran that you testified about previously, did you

19   fill out some kind of form?

20       A    I don't believe I did.  Once again I

21   thought that was the administrative supervisor doing

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1  that and running with it.

2       Q       That being?

3       A       Charles English.

4               (Fleig Deposition Exhibit No. 12 was marked

5  for purposes of identification.)

6       Q       This will be Deposition Exhibit No. 12.

7  Review of personally identifiable information on the

8  morning of Monday January 5th, 1998 is the top line.

9  It is not signed.  It's got a heading grievance

10 attachment 13 and attachment 18, 12 signatories below.

11 Take a note, take a look at that and see if you

12 recognize the document, if you've seen it before.

13              (Pause.)

14      Q       Have you seen this before today?

15      A       I haven't seen this particular document.

16      Q       There's a reference in the document to a

17 knife, have you ever heard of any reference associated

18 with Fran and a knife?

19      A       Yes.

20      Q       Can you tell what circumstances you heard

21 such a reference?

1      A      By heard you mean have I read anything?

2      Q      Read or any kind of communication.  Where

3   did you become aware of?

4      A      In her folder that was there before I got

5   there, there was a reference of Fran with a knife at

6   work.  Is the word brandishing the knife, at work.

7      Q      It was a writing?

8      A      It was something written.  I don't know who

9   wrote it at this point; but I just remember reading

10  that someone had made a note and the only reason why I

11  recalled is obviously that's kind of an extreme thing

12  that somebody brings a knife to work and pulls it out,

13  brandishes it.  So it stuck in my mind that I had seen

14  something that made reference to that.

15     Q      Okay.  Now, you just said about this folder

16  that was there when I got there?

17     A      I don't know where it actually came from or

18  who did it or what.  I don't remember all of the ins

19  and outs.  All I remember is reading that and that's

20  fixed in my mind that hey this is something that's way

21  out over the top.

1     Q     Where did you get the folder from?

2     A     I don't recall.

3     Q     Did you go and get the folder or did

4 somebody give it to you?

5     A     I don't recall going seeking the folder on

6 her.

7     Q     Now, you had identified you said previously

8 you kept a file on individuals under your supervision

9 and you identified that as your supervisory file?

10     A     Yes.

11     Q     Now, you also testified I think about a

12 personnel file previously; is that correct?

13     A     I know that everybody has a personnel file.

14     Q     What is your understanding about the

15 contents of the personnel file?

16     A     I don't know because I've never really and

17 I think I gave previous testimony, I've never really

18 looked at a personnel file from personnel.

19     Q     Did you know where they were kept, the

20 personnel file?

21     MS. DYE:  Objection, asked and answered.

1        A        No.

2        Q        Because you testified that you had never

3    gone and looked at a personnel folder?

4        A        Right.

5        Q        Now, the folder that you just did testify

6    to that had the reference to the brandishing of the

7    knife, do you remember what else was in that folder?

8        A        No, I remember this because it sticks out

9    in my mind but I don't remember what else was in the

10    folder.

11        Q        Were there other documents in the folder

12    besides the reference to the knife?

13        A        Yes.

14        Q        Do you remember the nature of any of the

15    documents in the folder?

16        A        No, it wasn't anything like this.  That's

17    why this stuck out in my mind.

18        Q        This was the most dramatic reference of the

19    items in the folder?

20        A        Yes.

21        Q        Did the items in the folder relate to

146

1    violence or potential for violence?

2         A    I don't recall that or anything else that

3    was in the folder.  I only remember this.

4         Q    Were there any medical references in the

5    folder?

6         A    I don't recall anything else in the folder

7    except this.

8         Q    Except this thing with the brandishing a

9    knife?

10        A    Yes.

11        Q    Do you know anyone else who obtained the

12   folder that contained the reference to the brandishing

13   of the knife?

14        A    No.

15        Q    Do you recall how it came into your

16   possession initially?

17        A    No, I don't.

18        Q    Do you recall what you did with it after

19   you looked at it?

20        A    I just know that the document floated by

21   and it had this reference in it and the document was in

1   a folder.  Like this, a manila folder.

2        Q      The folder had Fran's name on it?

3        A      I don't recall that.  I just remember that

4   this incident was in that folder.

5        Q      Did you talk about the brandishing a knife

6   incident with anybody else?

7        A      No.  I didn't have a conversation or

8   anything, just this thing floated past me and I opened

9   it up and looked at it and it stuck in my mind.

10       Q      So after you looked at it where did you

11  place it?

12       A      I don't recall.

13              (Fleig Deposition Exhibit No. 13 was marked

14  for purposes of identification.)

15       Q      Take a look at Deposition Exhibit No. 13

16  date 17 December 1998.  There is a printed, two

17  paragraphs printed name Gottlieb Fleig at the bottom

18  printed underneath the second paragraph.  It is not

19  signed.  Take a look at this and tell me if you have

20  seen the document before today.

21              (Pause.)

```
 1              MS. DYE:  The copy that you've given us

 2  appears to have, that you've marked as Exhibit, has

 3  hole punches in the top or something.

 4              MR. BURKHARDT:  Okay.

 5              MS. DYE:  It blocks out the date.  But I'm

 6  willing to stipulate for the record that I think that

 7  it says 1998.

 8              MR. BURKHARDT:  Okay.

 9              MS. DYE:  Is that all right.

10              MR. BURKHARDT:  Yes.  I think it's pretty

11  clear that it is.

12              MS. DYE:  Yes.

13      A       I'm done.

14      Q       Have you seen this document before today?

15      A       Yes.

16      Q       Under what circumstances did you see it?

17      A       There was an incident that this document

18  refers to and after the incident someone and I don't

19  remember who walked around and kind of made up a

20  document like this or asked me and whoever else that

21  was there to witness this to say hey what happened,
```

1  here's from your perspective here's what happened.

2      Q    So you didn't type this in your computer?

3      A    Now I might have.  In other words, they

4  might have said would you just sit there for a minute

5  and say what happened.  I might have typed that.  But

6  they might have, they might have listened to what I

7  said and they typed it.

8      Q    By they, do you know who it was?

9      A    I don't recall.

10     Q    Was it male or female?

11     A    I don't recall.

12     Q    Were they in the security department, do

13  you know?

14     A    No, it was not.  There was another employee

15  on a supervisory level.

16     Q    An incident of this type, would that

17  normally be investigated by the security department?

18     A    Investigated.

19          MS. DYE:  Objection, lack of foundation.

20     A    She's right.  I wouldn't know what the

21  security department does in terms of investigations.

150

1     Q     I mean, backing up.  Are you familiar with

2  any type of incident where the security department came

3  to interview people in your department or yourself?

4     A     I don't recall.

5     Q     But you do recall that it was not a

6  individual with security that took the statement from

7  you; is that correct?

8     A     To be quite frank, I'm very vague on who it

9  was.  I just know it wasn't a person on her level, in

10  other words, a peer of hers.  It could have been

11  personnel, it could have been another supervisor.

12     Q     Did you see the incident referenced in

13  here?

14     A     I did not see it other than what it says

15  there where I see somebody flailing arms and what have

16  you.  I heard it, I was sitting in my cubicle.

17     Q     Did you see the arms flailing?

18     A     Yeah, I think I did as I was going to the

19  bathroom.

20     Q     Did you see Fran's arms flailing?

21     A     No.

1        Q        You saw Barbara Lee's?

2        A        Correct.

3        Q        Did Barbara Lee want to strike Fran?

4                 MS. DYE:  Objection, lack of foundation.

5        A        I don't know.

6        Q        Were the arms -- from your observation the

7   arm flailing, were they flailing in a threatening type

8   manner?

9        A        They weren't a gesture of good will, you

10  know.

11       Q        From your observation, did it look like

12  Barbara was going to strike Fran?

13                MS. DYE:  If you know.

14       A        She was physically excited.

15       Q        Was she in control of her emotions?

16       A        Who?

17       Q        Barbara?

18       A        I think she was out of control.

19       Q        Was she appearing threatening?

20                MS. DYE:  Objection, asked and answered.

21       A        The gestures were of a threatening nature.

1     Q    Did Barbara Lee make comments to Fran?

2     A    As referenced in this statement she kept

3 asking Fran so what is that supposed to mean.

4     Q    Did anyone intercede as between Fran and

5 Barbara?

6     A    Yes.

7     Q    Who did?

8     A    Initially Marianne Moxey who was her

9 current supervisor, someone who actually went and got

10 her.

11     Q    Okay.

12     A    Then I think then Marianne went and got Tim

13 Mace.

14     Q    Did Marianne have to restrain Barbara Lee?

15     A    No, as it says in this statement Marianne

16 tried to nicely lead Barbara Lee by the elbow we'll say

17 back to her cubicle and Barbara Lee was not doing that,

18 wasn't going along with that.

19     Q    So that -- then what did Marianne do after

20 that?

21     A    She went back to the break room and asked

1    Tim Mace to come out and help with the situation.

2        Q    Now, when Marianne went out to the break

3    room to get Tim Mace, what was happened at that time

4    between Barbara Lee and Fran?

5        A    It was a continuation of Barbara Lee

6    shouting that statement to Fran, so what is that

7    supposed to mean, and without any stop on her part.

8        Q    Was she still flailing her arms about?

9        A    At this point I wasn't standing up and

10   watching this, I was getting back to working on my

11   computer.  So now I'm only an ear witness.

12       Q    So at the point at which Marianne left the

13   room to get Tim Mace you could no longer visually see

14   the incident?

15       A    Yes.

16       Q    But you could still hear it?

17       A    I could still hear what was going on.

18       Q    Because you were how far away were you?

19       A    I was probably 20 feet.

20       Q    Was Barbara shouting at Fran?

21       A    Yes.

154

1     Q     How was Fran speaking to Barbara?

2     A     Fran wasn't backing down.  When Barbara

3  would ask her that, repeat that question, she would

4  repeat her answer.

5     Q     Did Fran raise her voice?

6     A     No.

7     Q     Now, at this later point in this

8  confrontation, did Barbara say anything else to Fran?

9     A     I believe she said other things but I don't

10  remember what they were.

11     Q     Were the things of a threatening nature?

12     A     They were in context with her actions in

13  general with this.

14     Q     Just going back to the question then, is

15  that a yes or a no?

16     A     I don't recall Barbara Lee ever saying I'm

17  going to do you physical harm as if you and I were to

18  have a threatening thing right here.  So, if that's

19  your definition of a threatening her, then it would be

20  no.  But was the whole thing threatening, yes.

21     Q     And it was threatening in the sense that

1 Barbara Lee was a threat to harm Fran?

2     A    By observers or be it earshot or whatever,

3 one could conclude that the next step would be physical

4 violence.

5     Q    Is that what you concluded?

6     A    It didn't happen so I didn't come to that

7 conclusion.

8     Q    Is Barbara Lee a large woman?

9     A    No.

10     Q    Is she tall?

11     A    No.

12     Q    Does she have trouble controlling her

13 emotions when she's excited?

14     A    Yes.

15     Q    Was that the case here, she had lost

16 control of her emotions?

17     A    She was bordering, borderline out of

18 control.

19     Q    At some point in the later part, is there

20 anything else you can tell me about the incident before

21 Marianne came back with Tim Mace that you recall about

1  it?

2      A    No, not really.

3      Q    Now, do you know that Marianne did come

4  back with Tim Mace?

5      A    I know that Marianne went into the room to

6  get Tim who was in the room and I know that he and her

7  came out of the room and I know that Barbara Lee was --

8  that Tim went over to Barbara Lee and attempted to

9  quiet the issue.

10     Q    Do you know if he succeeded?

11     A    Eventually.

12     Q    Did he ask her to leave the area?

13     A    Eventually.

14     Q    Well, did Tim Mace get there before

15  Marianne or did they both arrive simultaneously or

16  what?

17     A    Well, initially someone got Marianne out of

18  the break room to handle the situation and she felt as

19  though it was -- I'm sure she felt as though it was she

20  needed help and she turned around and went back to the

21  room to get Tim and brought him out and since I didn't

157

1   see that point I don't know who was a step ahead of

2   whom.

3        Q    Do you recall either one of them talking to

4   Barbara Lee upon their return -- upon their entry to

5   the cubicle?

6        A    Sure.

7        Q    What do you recall?

8        A    Well, I recall that Tim Mace was saying,

9   you know, calm down and go sit down and Barbara Lee

10  just continued, she just kept it up.

11       Q    By kept it up, what do you mean?

12       A    She was still in this frenzied stage and

13  and when Fran moved from one part to another Barbara

14  Lee wanted to move with her so that Fran would be

15  hearing whatever Barbara had to say.

16       Q    You said Barbara Lee wanted to move with

17  her.  Did she, in fact, move with her?

18       A    Yes.  Up to the point where Tim Mace

19  constrained her.

20       Q    How did he constrain her?

21       A    Well, as it says in this statement she had

1   said to Marianne, don't touch me, don't put your hands

2   on me or something to that effect.  I believe at that

3   point that was still going on and so Tim put one arm on

4   one side of her on the wall and then she started going

5   in another direction and he put that arm over there and

6   she was like in the middle and I do recall that she was

7   saying to Tim don't you touch me.

8        Q    Did she say that in a threatening way?

9        A    You have to describe threatening in this

10  context as you mean it.

11       Q    She was still in this excited frantic state

12  at this point?

13       A    Yes.

14       Q    Did she raise her voice when she said that

15  to him?

16       A    Yes.

17       Q    Did you perceive what she said to him as a

18  threat of some type?

19       A    Threat that she was going to do physical

20  harm to Tim Mace?

21       Q    No, it's not that narrow.  I mean, did she

1  say it in a sense, don't you touch, you know, change

2  the voice?

3       A     No, it was still in this frenzied?

4       Q     Raised voice state?

5       A     Shrill or whatever you want to call it.

6       Q     Did she repeat it or say it once?

7       A     Repeated it.

8       Q     How long did this go on for, her repeating

9  statement to Tim Mace?

10      A     Don't touch me?

11      Q     Yes.

12      A     Until he said to her I'm not touching you

13  and he wasn't.  Hand on both side, he was careful not

14  to touch her.  So then she stopped saying that.

15      Q     The duration of this where he had her

16  physically pinned in between the wall without touching

17  her, how long did that go on for?

18      A     Seemed like a long time but I'm sure it was

19  seconds but it really went on quite awhile.

20      Q     How did it end up resolving?

21      A     Well, the supervisors obviously wanted to

1  have this thing deflate so I believe they asked Fran to

2  leave and then someone -- and keep Barbara Lee there.

3       Q    Okay.

4       A    Because they wouldn't want her to go follow

5  Fran out to the parking lot and continue with this.

6       Q    Did you believe that they wouldn't want her

7  to follow Fran to the parking lot and continue, did you

8  believe that was a reasonable possibility?

9       A    Yes.

10      Q    Did you think it likely?

11      A    If they wouldn't have constrained her?

12      Q    Yes.

13      A    Yeah.

14      Q    So again, going back to Barbara Lee being

15  pinned against the wall by Tim Mace without any

16  physical content and that persisted for some period of

17  time.  At what point did he stop doing that?

18      A    When she stopped trying to left or right

19  or, you know, to continue in the direction of Fran

20  wherever Fran was.

21      Q    So he put his arms down?

161

1     A     So then he eventually realized that she had

2  calmed down a level or so and he felt it was no longer

3  necessary for him to physically constrain her.  She

4  wasn't going anywhere.

5     Q     When he stopped physically constraining

6  her, what happened after that?

7     A     I don't know what happened immediately.

8  All I know is that someone was standing at the window

9  and saw that Fran had departed the parking lot and was

10  on her way home, we guess.  So they then said to

11  Barbara Lee, it's your turn to go home now.  You go,

12  you leave the building too.  We'll call you, let you

13  know about when to come back or whatever.

14     Q     The second paragraph here, I heard her

15  shout to the supervisors that it was their fault for

16  not firing Fran a long time ago?

17     A     Yep.

18     Q     At what point did you hear -- is that an

19  exact quote?

20     A     Yep.

21     Q     Did Barbara say anything more specific than

162

1  that?  Was there more to it than what is reflected in

2  there?

3      A    No, no.

4      Q    Did she say it one time or several times?

5      A    I think she said it a couple times.

6      Q    Who did she say it to?

7      A    She shouted it out for everybody to hear.

8      Q    Could everybody on the floor hear it?

9      A    Everybody that was on the floor, not -- the

10  thing is petitioned off, but everybody in that section

11  could hear it.

12      Q    She shouted this out with a raised voice?

13      A    Yes.

14      Q    After she shouted this out do you recall

15  anything else that happened?

16      A    Nope.

17      Q    Was she allowed to leave the floor on her

18  own or was she escorted?

19      A    I think somebody walked down with her.

20      Q    Do you know who it was?

21      A    No, I don't.

1       Q       Was it a supervisor?

2       A       I believe so.

3       Q       Do you know if Barbara Lee had been in any

4   previous incidents involving a loss of control of her

5   temper?

6       A       Yes.

7       Q       What do you know about?

8       A       One incident.

9       Q       Can you tell me about it?

10      A       Yes.  Me being a new supervisor, myself and

11  a couple of the hourly employees had attended a class,

12  like an OJT class at nighttime at the same facility.

13  One of the fellows, Aaron Moore who worked for me, I

14  mean this was going on until 3:00 in the morning,

15  wasn't used to being there at that time and had worked

16  the previous day and he felt faint.  He felt like he

17  wanted to sit down, you know, like somebody that was

18  really tired.

19          So the class was halfway through we'll say

20  for sake of discussion and he and I said okay, well I'm

21  going to go home.  This fellow is telling me that he is

164

1   tired and all and I said well why don't you go home too

2   then, what are you going to do.  He wasn't going to do

3   any work.  I said to him go ahead on home.  So another

4   fellow that was there, it was his normal shift so he

5   stayed, he had work to do.

6           So the next day I come in and I didn't

7   realize that when you put somebody on a tour or a shift

8   you had to keep one there for the whole eight hours.

9   To me, this guy couldn't stand up, he was going to fall

10   down and hit his head on the desk or something, go

11   home.  You're not going to work, you're not going to do

12   anything, go ahead on home.

13           It wasn't the right thing to do because --

14   and I was told that it was by another supervisor but it

15   turned out that it wasn't.  I should have had them on a

16   tour and he should stay there.

17           So the next -- and the other fellow that

18   was on that night said to him don't go home, stay.  He

19   stayed.  So I come in and I said well did you go home,

20   did you get rest, no, I stayed.  I don't know what he

21   did.  He didn't do any work.  So the guy says -- he

1  goes in and talks to Barbara Lee who was supposedly the

2  lower union rep in that area and Barbara Lee asked to

3  talk to me as a union rep.

4          I went in the room and I talked with her.

5  I said I'm new here but I talked to this other

6  supervisor and he told me, hey you had every right to

7  tell the guy to go home.  And she's saying well I think

8  you owe the guy an apology telling him to go home and

9  that wasn't the right thing to do.  I go out, I said I

10 don't know what to say, but that's what I've been told.

11 I'll look into it further or whatever and we went out

12 of the room.

13         As we go out of the room, she's shouting,

14 you don't know what you're doing.  New supervisor --

15 and wouldn't shut up and kept it up.  I said to her,

16 would you please be quiet and I'm her supervisor.  I

17 might not have been at that point.  It might have been

18 Marianne but I'm a supervisor and I'm given her a

19 direct -- she wouldn't shut up and kept it up until it

20 finally died after ad nauseam and for everyone to hear

21 and what have you.  That was the other incident.

166

1     Q    Did you make any kind of record or note of

2  this incident you just described?

3     A    Why I didn't was because she was right.  I

4  went back to that supervisor and I talked to some other

5  ones and he said she was right, that's why she was

6  angry.  So I made a judgment call that hey, you know,

7  perhaps I provoked this even though it would have been

8  nice if she would have stopped this and listened but

9  she didn't.  But I was close to, you know, doing that

10  but I didn't do it.

11     Q    Did you talk to anybody else about this

12  incident?

13     A    Not that I recall.  Other than the

14  supervisor that I said hey, she's saying --

15     Q    Who was that supervisor?

16     A    That was Butch English.

17     Q    Other than that, did you talk to anybody

18  else about it?

19     A    I don't recall if I talked to anyone else.

20  I don't remember anybody else that I talked to about

21  it.

1           (Fleig Deposition Exhibit No. 14 was marked

2    for purposes of identification.)

3        Q    Deposition Exhibit No. 14 dated

4    December 18, 1998.  There's a handwritten mark on the

5    top of this exhibit.

6           MS. DYE:  December 8th.

7        Q    December 8th I'm sorry, 1998.  Typed out,

8    it has Marianne on the bottom, one-page exhibit.  Take

9    a look at this and tell me if you've seen it before,

10   Mr. Fleig.

11          MS. DYE:  I don't think we have seen this

12   one before either.

13          MS. DARCANGELO:  That's evidently not in

14   company records.

15          MS. DYE:  It should be in our records.  It

16   should have been produced in the last one.  While we're

17   on the record here, Mr. Burkhardt, I just want to

18   register a concern that it appears that the document

19   production process in this case is being left to the

20   plaintiff and it is not being properly or she's not

21   being properly instructed as to what needs to be

1   produced here because this is a document that should

2   have been produced a long time ago as was the other one

3   that we had.

4            So I would ask that rather than just

5   leaving it up to the plaintiff to produce whatever she

6   wants here that you take it as your responsibility as

7   the attorney to produce the documents that are

8   responsive to our document request.

9            MS. DARCANGELO:  But I tried so hard.

10    Q    Have you seen this before today?

11    A    I recall it some time ago.

12    Q    Do you know in what context you recall

13   seeing it in?

14            MS. DYE:  Let me stop you for a minute.

15   There's two portions to the document here.  There's a

16   typed portion and there's some handwritten language at

17   the top.

18            MS. DARCANGELO:  That's true.

19    A    I'm responding to the typed portion.

20            MS. DYE:  So you've seen the typed portion

21   before?

1      A     Yes.

2      Q     Do you remember the circumstances under

3  which you saw the typed portion before?

4      A     No.

5      Q     But you testified you have seen it before?

6      A     Yes.  I don't know if there's a specific

7  incident that prompted Marianne to write this.  I think

8  that when she did write it I saw it and it was okay

9  with me too.

10           (Fleig Deposition Exhibit No. 15 was marked

11  for purposes of identification.)

12      Q     We can introduce this as Deposition Exhibit

13  No. 15.  Family and Medical Leave Act Screening Form

14  Bell Atlantic 10/14/97 is the one-page exhibit.

15           MS. DYE:  Again, this is a document I don't

16  think we have seen before.

17           MS. DARCANGELO:  That came out of the

18  production.

19           MS. DYE:  This has been produced?

20           MS. DARCANGELO:  Yes.

21           (Pause.)

1      Q      Have you seen this document before?

2      A      Doesn't look familiar to me.

3      Q      Is that a no, is that I don't know?

4      A      That's a I don't recall seeing this.

5      Q      There's a check under the section do you

6  have a serious health condition and there's a box do

7  you have a permanent or long-term health condition, the

8  lower half of the page?

9      A      Yes.

10     Q      Do you have any idea what that's in

11  reference to?

12            MS. DYE:  Objection, lack of foundation.

13  He's not the one who checked the box or he hasn't

14  testified to it, so.

15     A      I don't know who filled this out.  I

16  didn't.

17     Q      Okay.

18            (Fleig Deposition Exhibit No. 16 was marked

19  for purposes of identification.)

20     Q      Labor Relations Information System,

21  Grievance No. 1998-00020.  Forced to go on night work

1  as on the top of the first page.  This is Bates labeled

2  965 and 966, Fleig deposition Exhibit No. 16.  Please

3  take a look at this and tell me if you've seen it

4  before.

5          (Pause.)

6      A    I'm done.

7      Q    Have you seen that before today?

8      A    Yes.

9      Q    Can you tell me the circumstances under

10  which you had seen that document previously?

11      A    I was involved with this, this grievance

12  and this is basically about a grievance.

13          MS. DYE:  Be careful though, have you seen

14  the document is, you know, you may have been involved

15  with the grievance but have you seen this document

16  before.  Actually typing up the grievance and all of

17  that.

18      A    I don't know.  It could be typed by me.

19      Q    Are you familiar with the incident

20  referenced in the document?

21      A    Yes.

1      Q      What do you recall about it?

2      A      This fellow Dwight worked for me and he was

3  Jamaican, he was going back to Jamaica.  He needed --

4  he would like to have some extra time to be with his

5  family, he had been up here for quite a while.  As a

6  nicety we said okay, you can have some extra time.  He

7  didn't know at that point whether he was going the next

8  day or whatever, you know, a week from then.  He was

9  trying to get an airplane ticket.  He got the ticket,

10  he was all lined up to go and we didn't have anybody to

11  cover the work that he had done -- he was doing at

12  night with the exception of Fran and she was -- had

13  knowledge about this type of work and it appears in

14  here and so we said, you know, we don't have anybody to

15  go on night shift.

16          Now, remember that it's a seniority basis

17  thing but if you're not trained in that then we can't

18  put somebody there that doesn't have the tools to do

19  the job.  She had the tools to do the job in our

20  estimation, as brought out in this, we said we need you

21  to cover that shift.  She took objection, a grievance

173

1  to doing that.

2       Q     Okay.  Do you know how it was resolved?

3       A     I think she wound up working it.  I don't

4  know.  I don't recall is my answer.

5             (Fleig Deposition Exhibit No. 17 was marked

6  for purposes of identification.)

7       Q     Next Exhibit is Fleig number 17.  It's been

8  Bates labeled 1872 to 1873 statement of individual loss

9  relating to Fran Darcangelo.  I don't know if there's a

10  date on it but anyway please take a look at this and

11  let me know if you've seen it before.

12            (Pause.)

13      A     I'm finished.

14      Q     Have you seen that document before today?

15      A     I don't recall it but my signature is on

16  it, the second page of it.

17      Q     Are you familiar with that type of

18  document?

19      A     No.

20      Q     You're not familiar with it?

21      A     No, I'm not.

1      Q      But you do recognize your signature on the

2  second page?

3      A      Yeah.

4      Q      Have you seen that type of document before?

5      A      No.

6      Q      Okay.  Is that your signature on the second

7  page?

8      A      Yes.

9      Q      Do you recall discussing any of the items

10  contained in the body of the document with anybody?

11      A      I don't even know what this document is

12  about.

13      Q      You just know that your signature is on the

14  second page?

15      A      Yes.

16      Q      Have you ever been consulted in relation to

17  a document of this type for any other individual?

18            MS. DYE:  Objection, asked and answered.

19  He just testified he doesn't even know what this kind

20  of document is.  It's after 5:00 o'clock, why don't we

21  just move on.

1        A     I don't.

2              MS. DYE:  Can I take a quick break?

3              (There was a break at 5:04 p.m and

4    testimony resumed at 5:11 p.m.)

5              (Fleig Deposition Exhibit No. 18 was marked

6    for purposes of identification.)

7        Q     We're going to introduce as Exhibit 18 a

8    job description, Job Briefs, central office technician.

9    Bates numbered 01160 through 01162, a three-page

10   exhibit.  I'm going to give this to Mr. Fleig.  I want

11   you to take a look at it and tell me when you've had a

12   chance to review it.

13             (Pause.)

14       A     I think I've scanned it enough.

15       Q     Have you seen this document before?

16       A     I don't recall.

17       Q     Are you familiar with the job title central

18   office technician?

19       A     Yes.

20       Q     Is that the job title of the individuals

21   that you supervised at Bell Atlantic?

176

1         A      Yes.

2         Q      Do you believe the contents of this exhibit

3    to be an accurate reflection of the duties,

4    requirements, et cetera associated with the job

5    position?

6         A      I think that they have -- I know that they

7    have central office technicians doing different things

8    and not everything is in this document.

9         Q      Can you tell me what things they have

10   central office technicians doing that may not appear in

11   this document?

12        A      As I was telling you earlier, I had groups,

13   you know, two fellows doing this, two fellows doing

14   that.  There are things that they were doing that don't

15   require safety glasses, don't require somebody going up

16   a pole but they require somebody to have the ability to

17   learn this piece of equipment that they're going to

18   work on.  And there are central office technicians who

19   might work there all their career and never work on

20   that piece of equipment.

21             In my, you know, in here they're basically

1  talking about somebody going out to a central office.

2  We were located in a more of a workplace type building

3  rather than the traditional sense of a central office.

4  Even though at Hunt Valley they have a central office

5  down on the basement, we were working kind of like in

6  this building.

7       Q    Now, by a central office, just to clarify

8  what you mean by that, do you mean a switching area or

9  what?

10       A    Yes.  Throughout Bell Atlantic's realm

11  you'll -- we all see them when we drive around we'll

12  see a building that looks like it has no cars outside

13  of it and it's got a Bell Atlantic logo on it.  Well,

14  that's basically a central office and there's all that

15  switching gear inside there and what have you.  And

16  they used to have a technician or technicians plural

17  assigned to it.

18            Now, a lot of that equipment is able -- is

19  smart equipment so that you can from a central location

20  tell this equipment what to do so you don't necessarily

21  have to have as many people in there doing some of the

1  things that are in here.

2     Q    So, is it fair to say that many of the

3  things that are in here were, in fact, not duties or

4  responsibilities that the people you supervised had to

5  deal with?

6     A    Well, let's look under duties.  I guess in

7  general, the general duties are probably okay with this

8  document.

9     Q    Is it fair to say that some of the

10  individuals you supervise never had to perform some of

11  the documents described in the document?

12     A    General duties?

13     Q    Yes.

14     A    Yes.

15     Q    Is it fair to say that this document and

16  the job descriptions in it may have been somewhat dated

17  as of the time that you were doing your supervising?

18     A    It could be, it could be but I think that

19  beyond it being dated there were like specialized

20  things that were being done that this generic document

21  might not all encompass.

1      Q      Can you be specific?

2      A      Once again I take you back to that scenario

3   where this guy pulls up in a truck and comes out with a

4   meter and has a list and goes in there and does what

5   he's supposed to do, switch this to that.

6             Now we have got somebody that's got to be

7   computer literate or be able to be trained with a

8   computer to do those things and be able to understand

9   all the ins and outs of that equipment so that they can

10  manipulate this equipment remotely and this does not

11  necessarily take that into account.  That was

12  specifically in my area.  Now, that same person could

13  be told to go out there and do that.

14     Q      Okay.  In the area of skills or abilities,

15  was there something that maybe was required of the

16  people you supervised that is not reflected in the

17  document?

18     A      What I just said, you know, that it doesn't

19  say it here.  I mean, if I hired you and you came and

20  you had a problem with computers, a lot of people do.

21  Well, I couldn't use you.  In here I don't know if it

180

1    necessarily says that, that you have to have the

2    ability to learn this equipment in and out and be able

3    to remotely program this and pass a school that we

4    would send you to on this.

5          Q     What were the most important skills that

6    people that worked under you needed to have to perform

7    successfully?

8          A     What I just said, that and interpersonal

9    communications because you would have all of these

10   people on a line and you -- now remember they're

11   central office technicians out there and they're

12   sitting there maybe with this equipment or splicing in

13   a line or whatever and now you're going to coordinate

14   all of this.  If this guy does his job before the other

15   one it won't work.  So you have to coordinate these

16   throes.  Maybe if they don't do it together that

17   they'll be off line, the customer will be off line for

18   a period of time and things like that.

19         Q     Anything else?

20         A     That's it.  Also that they would have to

21   be, since they were the focal point, they were the one

1  leading this and they had to, you know, rise to that

2  occasion to lead this job and it might take two weeks

3  to do this whole thing and can't get up in the middle

4  of it and just walk away.

5         Q     Anything else?

6         A     I think that's it.

7              (Fleig Deposition Exhibit No. 19 was marked

8  for purposes of identification.)

9         Q     Let's introduce this next exhibit as

10  Deposition Exhibit No. 19.  We only have one of the

11  color picture so I guess we have got to share that.

12             Just to describe, it is a photograph of a

13  individual, there's two photographs and this is a laser

14  copy.  Photograph of an individual on a target with a

15  sign underneath it:  Put Butch On The Bus One Way To

16  Pocomoke.  And then the picture that's on the left side

17  of the picture -- the right side of the picture is a

18  larger photo of the same picture identified in the left

19  side but in the context of additional documents two

20  below and one above.

21             The four documents total depict in the

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1  picture on the right side.  The top document in there,

2  to those of you who supported the previous campaign:

3  Put Butch On A Bus One Way To Pocomoke.  Above that:

4  Now There Is A New Worthy Cause.  Lib To Lab.  Help Buy

5  Gottlieb A Light Rail Pass.

6          Below that is the same picture of Butch

7  English with the same notation beneath him on the

8  target referencing him on the left side of the photo.

9  Beneath that is a depiction of:  We Will Not Be Road

10 Kill On The Information Super Highway.  On a fellow

11 sticker with CWA logo on the right-hand corner.  Below

12 that is a sticker:  Mental Illness Awareness Week.

13         We can enter this in as Fleig Deposition

14 Exhibit No. 19.  Can you take a look at this and maybe

15 if we can hold it in a way that we can all look at it.

16         MS. DYE:  There's other pages to this,

17 right.  Did you mean for the whole thing to be an

18 exhibit?

19         MR. BURKHARDT:  Yes, go ahead.  I'm not

20 sure if you have the other pages but we can certainly.

21 In fact, you've seen that one.

1          MS. DYE:  I haven't sent it to you.  It

2  must be in the mail still.

3          MR. BURKHARDT:  The poster.

4          MS. DYE:  The picture of the poster I

5  didn't receive before coming here today.

6          MR. BURKHARDT:  You never received the

7  laser copy I sent you last week?

8          MS. DYE:  No, I got your fax cover sheet

9  referencing that you were sending it.

10          MR. BURKHARDT:  That was a long time ago.

11  A week ago.

12          MS. DYE:  No, maybe Thursday.

13          MR. BURKHARDT:  Let me at least copy the

14  documents underneath it and I'll bring that back.  I

15  guess I can try to copy that, it's not going to be

16  good.  It's going to be dark.

17          MS. DYE:  I didn't get a color copy of this

18  yet.

19          MR. BURKHARDT:  I sent it to you.

20          MS. DYE:  No --

21          MR. BURKHARDT:  Because I sent the fax

1  cover sheet the same.  Let me go copy that and I'll

2  copy the documents beneath it also.  So what I sent you

3  was it didn't have the writing on the back but I laser

4  copied over at Kinko's and sent you the color of the

5  top one.

6            (Off the record.)

7      Q    Exhibit 19 is going to be three pages.  The

8  poster I just described, a second page Mental Health

9  Awareness Week, it looks like a paper relating to that.

10 Then there's a couple of dates near the bottom of that

11 second page, April 15th,'94, October 2nd, 1994.  And

12 then the third page is a cut out of the article

13 relating to Bell Atlantic roadkill t-shirts and the

14 sticker:  We Will Not Be Roadkill On The Information

15 Super Highway.  So there are three pages.

16           MS. DYE:  The exhibit has two of the pages

17 flipped though from what you described.  The article is

18 page two and the one with mental health aware.

19           MR. BURKHARDT:  Mental Health Awareness

20 will be the third page; the newspaper article will be

21 the second page.

1       Q       Have you seen the poster depictions on the

2   first page of the exhibit which we did identify as 19.

3               MS. DYE:  Let me just say for the record

4   also that again I haven't seen any of these pages that

5   are part of Fleig 19 have not been produced yet.  It's

6   my understanding that the first page has been sent in

7   the mail although I haven't received it but the other

8   two this is the first time they're being produced.

9               MR. BURKHARDT:  Okay.

10      Q       Does this look familiar to you at all?

11      A       Yes.

12      Q       Can you tell me the circumstances under

13  which you have seen this previously?

14      A       Walked by Fran's cubicle and I seem to

15  recall this being on there.

16      Q       Do you recall when this was?

17      A       No, I don't.

18      Q       Did you view this prior to referring her to

19  the medical evaluation?

20      A       I don't recall.  I don't recall if it was

21  prior to or not.

1       Q       This depiction on the -- I guess it's the

2    left side of page one:  Put Butch On The Bus One Way To

3    Pocomoke?

4       A       Yes.

5       Q       Do you have any understanding of what that

6    means?

7       A       Not currently.  I don't know if I did back

8    then or not.

9       Q       Do you have a recollection?

10       A       No.

11       Q       Now, it might be easier to look at -- are

12    you looking at the original, you have the best copy?

13       A       Yes.

14       Q       Maybe looking at the right side of the

15    first page of the exhibit, the poster on the top, to

16    those of you who supported the previous campaign Put

17    Butch On The Bus.  Lib to Lab:  Help Buy Gottlieb A

18    Light Rail Pass.  Have you seen that before?

19       A       I think I have.

20       Q       Does that help refresh your memory about

21    the Put Butch On A Bus?

1          A      I think that both of these, I know the one,

2     that's me, Lib is me, referring to me.  Basically this

3     was, since it was in her cubicle I assume it was her

4     way of saying how to get rid of the two supervisors.

5          Q      Lib To Lab, do you know what that refers

6     to?

7          A      Yeah.

8          Q      What?

9          A      Well, it's misspelled and all that but the

10    last part of my first name is L-E-I-B and she shortened

11    that to L-I-B and lab means in Light Rail in downtown

12    Baltimore there's a training place called the lab and

13    she's saying put me on the Light Rail to go down there

14    and work at the lab, at this training place to get rid

15    of me.

16         Q      Did you ever mention doing that to her,

17    going to work at this training place?

18         A      No, no.

19         Q      Do you know where she got that idea into

20    her head?

21         A      I don't understand this whole thing.

188

1      Q      Is the poster depiction with Butch English

2  in the Put Butch On The Bus One Way To Pocomoke, do you

3  understand that?

4             MS. DYE:  Objection, asked and answered.

5      A      Nope.

6      Q      To the best of your knowledge is this

7  poster accurate reflection of how that appeared in her

8  cubicle at the time you took notice of it?

9      A      I don't remember what it was on.  In other

10  words, was this all in one big thing or were they

11  separately.  I only remember them individually.  There

12  was this writing thing, there was this target thing.

13  The other two things -- you've asked me about the whole

14  thing, right?

15     Q      Yes.

16     A      I don't recall them.  It's been quite

17  awhile ago.

18     Q      Is there anything in the -- do you know if

19  it was a wall or a poster board?

20     A      No, I said I can't do that.  I just said

21  that.  I don't know if it was on a poster board, if it

189

1  was sticking on a cubicle wall.  I just know that those

2  two things were in Fran's cubicle.

3        Q     You're talking about the Lib To Lab poster

4  on top and the target?

5        A     I don't call that a poster, I think it's a

6  piece of paper.

7        Q     The printout with the Butch On A Bus and

8  Lib To Lab comments?

9        A     Yeah.

10        Q     You remember that?

11        A     Yes.

12        Q     You remember the target?

13        A     I recall the target.

14        Q     With the Butch picture and the little

15  saying?

16        A     Yes.

17        Q     Do you remember was there anything else on

18  that target that's not there now?

19        A     I don't recall.  I recall Butch being the

20  center of the target and that was about it.

21        Q     Do you recall Fran taking up any kind of

190

1  collection relating to putting Butch on a bus?

2        A    No.

3        Q    Did you ever hear about anything like that?

4        A    I don't recall.

5        Q    Pages two and three of this exhibit.  I

6  wanted to ask you if you have seen either of these

7  documents before?

8        A    I don't recall either one of them.

9        Q    This:  We Will Not Be Roadkill On The

10  Information Super Highway.  That little sticker that's

11  referenced actually on the first page of the exhibit

12  underneath the poster target and on the second page of

13  the exhibit, are you familiar with that sticker?

14        A    No.

15             (Fleig Deposition Exhibit Number 20 was

16  marked for purposes of identification.)

17        Q    Let's enter as Exhibit No. 20, we have got

18  a little post-it note addressed to Jim.  I cannot

19  decipher the signature below it.  A Bates stamp number

20  is 01840.  This exhibit also I believe has four -- it

21  has the poster pages but split up into four copies

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1   because I could we couldn't fit the original on a

2   regular copying sheet.  I want to give these documents

3   to you and I want you to take a look at them briefly.

4        A     All right.

5        Q     The other pages of this Exhibit 20 were

6   provided to us by Bell Atlantic.  I guess they are

7   Bates stamped numbered it looks like 01841 through at

8   least 843 and it may be 844.  Oh, 845.  Consisting of

9   1841, 1842, 1843, 1844, 1845 with a Bates stamp.  It

10  looks like one of the copies are missing here.  This is

11  what we'll do.  We'll set this all out in the middle of

12  the table so we can look at it.

13            MS. DYE:  So just so I understand Exhibit

14  No. 20 is the pages 1840 to 1845.

15            MR. BURKHARDT:  I think it's 40 -- yes,

16  that's correct.  It looks like a couple of the copies

17  didn't have -- a couple copies didn't have 44 on it,

18  that's what's creating the problem here.

19        Q     First about the post-it note, do you

20  recognize that post-it note?

21        A     No.

192

```
 1        Q      Have you ever seen it before?

 2        A      I don't recall.  It's not mine.

 3        Q      All right.  So this exhibit, is it

 4   essentially a reflection of the previous exhibit, the

 5   picture in Exhibit 19?

 6        A      Well, the problem is it doesn't have the

 7   tag down the bottom of it.  It's just got, I assume

 8   that's his picture?

 9        Q      Yes.

10        A      But there's no send Butch to Pocomoke.

11        Q      On it, correct?

12        A      Right.

13        Q      Now, is there some handwriting on this

14   exhibit that is not on the other exhibit?

15        A      Yeah.

16        Q      Do you recognize the handwriting?

17        A      Nope.

18        Q      Have you ever seen it before?

19        A      The handwriting?

20        Q      Yes.  On the poster?

21        A      The poster itself?
```

1     Q    No, the handwriting on the poster?

2     A    I don't recognize whose that is.

3     Q    My question was:  When you saw the poster

4  originally did you see it with the handwriting which

5  looks like it's on the side that's got Butch English

6  and on the top head of the TC sharp shooters, did it

7  have that handwriting on it when you saw it?

8     A    I don't recall.  My recollection was a

9  picture of him on a target and I don't remember

10  anything else.

11     Q    So you don't remember seeing a picture with

12  the handwriting on it like we see in Exhibit 20?

13     A    I don't remember seeing it or not seeing

14  it.  Once again I focused in on this, the center part.

15     Q    Is this the poster that triggered your

16  concerns about the safety issue that you were

17  testifying to previously?

18     A    I had concerns about this and certainly

19  there's a safety concern about this.  I don't know when

20  this picture was displayed with the target on it with

21  reference to when my concerns culminated in Fran being

194

1   sent out for an evaluation.

2        Q    When you saw the target that is the subject

3   of Exhibit 19 and 20 did you immediately raise your

4   concerns with somebody?

5        A    I don't know about immediately but it

6   bothered me and I know I told Jim Conrad about it.

7   Describe an investigation?

8        Q    Did security come to investigate?

9        A    I don't recall.

10       Q    The poster itself, do you know what

11  actually happened to it?

12       A    One of the documents that you gave me, I

13  thought, either that or it's my memory.  There was at

14  one point and I don't remember if this was part of it

15  concern about a lot of things that were in

16  Ms. Darcangelo's cubicle and the union was brought

17  around and showed it and because there were personal

18  things that people had on their desk and all but

19  this -- targets with pictures and other things that

20  were in there seemed to be over the top.

21            So brought the union around and the union

195

1  said that's got to go.  Take it, you know, get that

2  out.  Have her remove that.  So I think that's what

3  happened to it eventually.

4           I do recall a situation like that involving

5  stuff that was on her wall that was like this.  Whether

6  it was a specific target at one point in time, I don't

7  know.  She had yellow hazard tape, biohazard or

8  something like that around where you couldn't walk into

9  the cubicle.

10    Q    So the last you saw of the poster it was

11  sitting in her cubicle?

12    A    The last I think I saw of a poster, whether

13  it be that one or not was her removing it at the

14  direction of management and the union.  I believe

15  that's my recollection.

16    Q    So this particular -- and you don't know if

17  that was this poster or another poster?

18    A    I mean, looking at this thing and this

19  happened quite awhile ago and this is four Xerox pieces

20  together and I just know there was one in there with

21  his picture on it.  It was orange and that's all I can

1  tell you.

2           (Fleig Deposition Exhibit No. 21 was marked

3  for purposes of identification.)

4       Q    This is Fleig Deposition Exhibit No. 21.

5  It's Bates stamped 0167 dated 05898.  Fran Darcangelo

6  was removed, this is the top line of the exhibit.  It's

7  a one-page exhibit.  Can you just take a look at it and

8  tell me if you've seen it before.

9           (Pause.)

10      A    I don't remember seeing this.

11      Q    Have you seen it before?

12      A    I don't remember seeing this.

13      Q    The incident that's referred to in the

14 exhibit, are you familiar with that incident?

15      A    Not that -- I only know that there was --

16 what does it say here?  A poster.  I don't know what

17 poster they're -- it looks like this is typed Marianne

18 Moxey.  I don't know what poster they're referring to.

19 It could be the one you just showed me or another one.

20 I don't know.

21           (Fleig Deposition Exhibit No. 22 was marked

1    for purposes of identification.)

2        Q    The next one is going to be Fleig

3    Deposition Exhibit No. 22 Bates stamped 1755 on the

4    top, Fran Darcangelo incident 5/8/98.  Please take a

5    look at this and let me know if you've seen it before.

6            (Pause.)

7        A    I don't recall seeing this either.

8        Q    You did not create this document, correct?

9        A    I think it says my picture is in it.  The

10   person that wrote it says my picture is in it and it's

11   Butch's picture in the thing so I would deduce that

12   perhaps it's Butch that wrote this.

13       Q    I just want to ask you briefly.  There is a

14   reference in here in the middle of that first

15   paragraph, this matter was considered very serious

16   since Fran had been removed from the job because of

17   circumstances involving possible violence in the

18   workplace once before.  Because of that incident a

19   medical evaluation have been performed to determine her

20   ability to remain in the workplace.

21       A    Uh-huh.

198

1    Q    Do you have any idea what that is in

2    reference to, two lines I just read to you?

3    A    I didn't write this so I don't know.  But I

4    know that that document that preceded this, it refers

5    to a reevaluation here that Marianne wrote.  I mean,

6    I'm just -- it's a reevaluation which to me means that

7    she was evaluated once and this thing that Marianne

8    wrote has got the same date on it as this thing here

9    that looks like Butch wrote so I guess this had

10   occurred after she had been out and evaluated and was

11   felt that she could come back into the workplace, that

12   this happened.

13   Q    There's a reference on I guess both of

14   these documents to a 10-day suspension in May of 1998.

15   Do you have any familiarity with that?

16   A    No.  You know, I really don't remember all

17   of the times that she was suspended and what it was

18   for.  As you can see there's a lot of different people

19   involved with all of those things.

20   Q    Have you seen any documents that have

21   referred to Fran's medical treatment?

1      A     Medical treatment?  I don't recall seeing

2  anything that I guess her doctor would have written.

3      Q     Okay.  Do you recall talking to any other

4  people at Bell Atlantic about her medical treatment?

5      A     About her medical treatment?  The only

6  person I might have and I don't know would be like the

7  people at CORE, that nurse whose name is on there who I

8  don't even remember talking to her.  So I don't

9  remember specific conversation but I could understand

10  if I would have said when is she coming back, does

11  there seem to be a problem with her, if so what is the

12  problem and so on.  But I don't recall any specifics of

13  anything like that.

14      Q     Do you recall discussing her taking any

15  medication with anybody else at Bell Atlantic?

16      A     Me discussing it with somebody else?  I

17  might have but I don't remember in what context.

18      Q     Do you remember anything about the

19  conversation?

20      A     Well, I know that there was the situation

21  once again that I testified earlier about where she was

1  on night shift, lost control, was under medication.

2  Ports and I discussed that I think.  Any other ones

3  like, I don't recall.

4            (Fleig Deposition Exhibit No. 23 was marked

5  for purposes of identification.)

6      Q    Take a look at what we're going to enter as

7  Fleig Deposition Exhibit No. 23.  Maryland/Delaware

8  Network Operation Center Policy Statement 7/1/97.  It's

9  a one-page exhibit.  There are some handwriting on the

10  exhibit also.  Please take a look at it and tell me

11  when you've had a chance to review it.

12            MS. DYE:  How much more do you have here?

13  It's almost 6:00 o'clock.

14            MR. BURKHARDT:  Just one after this.  I

15  would think maybe five minutes.  Depending on how much

16  he has to say about the documents.

17      A    What would you like to know?

18      Q    Have you seen this document before?

19      A    Yes.

20      Q    Do you know what it is?

21            MS. DYE:  I just want to caution the

1  witness.  The document obviously has a bunch of

2  typewritten stuff and some handwritten stuff and stuff

3  that's edited and things like that.  When he asks have

4  you seen this document, he's talking about everything

5  that's on there so with that caveat.

6      A     Yeah, as I'm reading it I understand what

7  it's about.  Basically I believe that in a prior

8  exhibit there's a line in there where I'm telling Fran

9  not to read the newspaper and not to eat during working

10  hours and let me know when you're going somewhere and

11  all of that.  She's telling me that she's got to eat

12  and what have you and I'm trying to come up with other

13  ways of working around this.  Then she hands me this

14  piece of paper that says that she shouldn't be doing

15  what she's doing according to this work policy thing

16  that Jim Conrad had put out in '97.  So she handed me

17  this.

18          In the discussion she was indicating that

19  she was being singled out by me saying hey don't read

20  the paper, don't do that and all.  So to negate that

21  because certainly I wasn't singling her out.

1          I then wrote up at the top to these people

2   and I think there was more to this, this was the bottom

3   part of this that, you know, adhere to this thing that

4   came out a long time ago and if you got any questions

5   please see me.  Thank you.  Go ahead.

6          MS. DYE:  Just have to clarify, when you

7   passed it around, did it have this circled portion on

8   it.

9      A    I'm getting on that part.  So like it says

10  Dwight, Teresa, Salina, well, there was more to this in

11  terms of there was more people that worked for me, one

12  of them being Fran.  So I give it back to Fran showing

13  that all of these people are being made aware that

14  they're not supposed to do what I just told her not to

15  do.  So she doesn't feel picked on or whatever.

16          So when I give it back to her she then goes

17  and puts this notation on here that she got out of

18  something, clipped out of something and that's why it

19  says added by Fran Darcangelo and as you can see that's

20  not in my handwriting, that's probably somebody else's.

21          So we had people come through from other

1  centers and what have you and we were trying to feel

2  proud about our center and what we were doing there and

3  the work we were doing and they're walking by and

4  they're seeing this and I guess I need to tell you what

5  she added says:  As If Dog Piss Is The Problem.

6           We just thought that that's not normal to

7  hang something up like that and here we have got all of

8  these people coming through and we're trying to show

9  what a nice place we have got and we have got that

10 hanging up in her cubicle or she's got that hanging up

11 in her cubicle.  So this was just yet another thing

12 that just seemed over the top.

13           (Fleig Deposition Exhibit No. 24 was marked

14 for purposes of identification.)

15      Q    This is going to be the last exhibit.  This

16 is my intent at this time.  It's an excerpt from a CORE

17 record, which is the medical record provider.  It's

18 designated 3A, I think it's index by Social Security

19 number, is that your Social Security number up there?

20           MS. DARCANGELO:  The case number is that

21 last 3A0.

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

204

1      Q    3A0 is the case and the identifying is your

2   social.  Five pages in this exhibit.  We can designate

3   this as a confidential document within the meaning of

4   our protective order.  What that means is I don't want

5   us to talk about the contents of the document I'm going

6   to show you beyond the room here today.

7      A    Okay.

8           (Page 204 line 8 through page 207 line 18

9   is sealed confidential.  No testimony was omitted.)

10

11

12

13

14

15

16

17

18

19

20

21

205

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

206

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19        Q    All right.  I want to thank you for coming

20  by here today and spending the day with us to assist us

21  in doing this lawsuit.  I just had one question extra,

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1  that is, if I did want to talk to you further would you

2  be willing to talk to me?

3      A    I don't see why not.

4          MR. BURKHARDT:  That's all I have.

5          MS. DYE:  Let us just take a couple of

6  minutes, I may have a couple of follow-up things.

7          (There was a break at 6:12 p.m and

8  testimony resumed at 6:17 p.m.)

9          EXAMINATION BY MS. DYE:

10     Q    Mr. Fleig, I just had one follow-up

11 question to kind of clarify some of the testimony that

12 went before and that is that other than

13 Ms. Darcangelo's own representations and the things she

14 hung in her cubicle et cetera, did you have any reason

15 to believe that she was actually diagnosed with any

16 kind of mental illness or other medical condition?

17     A    No.

18         MS. DYE:  All right.  I don't have anything

19 further.

20         (Deposition was concluded at 6:17 p.m.)

21

209

1                    CERTIFICATE OF DEPONENT

2

3              I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7              Any additions or corrections that I feel

8    are necessary, I will attach on a separate sheet of

9    paper to the original transcript.

10

11

12            _____

               Gottlieb John Fleig
13

14

15

16

17

18

19

20

21

                        GORE BROTHERS
                  Reporting & Video Co., Inc.
                       410-837-3027

1  State of Maryland

2  County of Baltimore, to wit:

3          I, RONDA J. THOMAS, a Notary Public of the

4  State of Maryland, Baltimore County, do hereby certify

5  that the within-named witness personally appeared

6  before me at the time and place herein set out, and

7  after having been duly sworn by me, according to law,

8  was examined by counsel.

9          I further certify that the examination was

10  recorded stenographically by me and this transcript is

11  a true record of the proceedings.

12          I further certify that I am not of counsel

13  to any of the parties, nor in any way interested in the

14  outcome of this action.

15          As witness my hand and notarial seal this

16  7th day of February, 2003.

17                    _____

18                    RONDA J. THOMAS, RPR

19                         Notary Public

20  My Commission Expires:

21  October 1, 2005

211

```
1                         INDEX

2              Deposition of Gottlieb John Fleig

3                     January 21, 2003

4

5    Examination by:                        Page

6        Mr. Burkhardt                       2

7        Ms. Dye                           208

8

9    Exhibit No.                          Marked

10   1     Letter dated 8/14/97            101

11   2     Document DAR01783 8/14/97       107

12   3     Summary of termination events  108

13   4     Document dated 8/14/97          113

14   5     Associate appraisal  & plan    117

15   6     Three-page document            126

16   7     Document dated 10/15/97        131

17   8     Three-page fax document        132

18   9     Statement of occurrence        135

19   10    Document 9/23/98               139

20   11    Request for medical evaluation 141

21   12    Grievance document             142
```

| 1 | 13 | Document dated 12/17/98 | 147 |
| 2 | 14 | Document dated 12/8/98 | 167 |
| 3 | 15 | Family Medical Leave Act form | 169 |
| 4 | 16 | Grievance no. 1998-00020 | 170 |
| 5 | 17 | Statement of individual loss | 173 |
| 6 | 18 | Job description document | 175 |
| 7 | 19 | Photographs | 181 |
| 8 | 20 | Poster pages | 190 |
| 9 | 21 | Bates 0167 dated 5/8/98 | 196 |
| 10 | 22 | Bates 1755 dated 5/8/98 | 196 |
| 11 | 23 | Network operation policy statement | 200 |

12

13

14

15

16

17

18

19

20

21

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

1

CONFIDENTIAL

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MARYLAND

2

FRANCES DARCANGELO

3         Plaintiff

4

    vs.               CIVIL ACTION NO:

5                     02 CV 816

BELL ATLANTIC

6

        Defendant

7  _____/

8

9

10        The following excerpts were taken at the

11  deposition of GOTTLIEB JOHN FLEIG on Tuesday, January

12  21, 2003.

13

14  APPEARANCES:

15         EDWIN R. BURKHARDT, ESQUIRE
          On behalf of Plaintiff

16
         MARTHA DYE, ESQUIRE

17          On behalf of Defendant

18

19

20

21  REPORTED BY:  Ronda J. Thomas, RPR

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

41

CONFIDENTIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15        Q     Go ahead.

16        A     An individual Aaron Moore had came to me

17   and expressed feelings of being fearful of physical

18   harm to himself by Fran Darcangelo.  He expressed this

19   to me in confidence.  He didn't do it in front of

20   everybody and that's why we're doing this here like

21   this.

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

42

CONFIDENTIAL

1      Q      Was there an incident that in particular

2  that he identified that gave him cause for concern?

3      A      I think it was some discussions he had had

4  with her and to where he felt that she could -- perhaps

5  doing something like that.

6      Q      Can you be more specific?

7      A      No, I honestly can't.  I mean, I don't

8  remember what the conversation that he related to me

9  was about.  I just know that as a supervisor he came --

10  an employee of mine comes to me and says hey, I'm

11  feared that somebody there would do physical harm to

12  myself and perhaps others.

13      Q      Did he get more specific than that?  You

14  know, I fear that she's going to do physical harm?

15      A      No.

16      Q      Did he say why she made a threat.  Did he

17  say that she made a threat?

18      A      No, as I stated, I believe it was as a

19  result of from her actions at work and conversation he

20  either overheard or he had with her.

21      Q      Did he identify anything in particular that

43

CONFIDENTIAL

1   gave him cause for concern?

2          MS. DYE:  Objection, asked and answered.

3     A    I don't know what her objection is but I

4   think it would be that I already answered that, right.

5   He didn't say anything specific.

6     Q    Nothing specific.  Okay.  Did you pass this

7   on to Conrad?

8     A    Yes.

9     Q    Did Conrad have any kind of response?

10    A    He and I discussed it.

11    Q    Okay.

12    A    I believe there was another letter that

13  came from another employee that I don't recall her

14  working for me at that point in time where she had some

15  reservations of having Fran Darcangelo work there with

16  these other people.

17    Q    Do you know who that employee was?

18    A    No, I don't really.  I really can't say.  I

19  can only guess and I don't think that would be fair.

20    Q    Don't need you to guess.  Did you see the

21  letter?

44

CONFIDENTIAL

1          A      I believe I read the letter.

2          Q      What do you remember about the letter?

3          A      Well, the only thing I do remember is I

4    don't know how the letter got to me.  I don't recall

5    quite honestly if the letter was addressed to me and I

6    go over and look and there's a letter or if it went to

7    someone else and they handed me the letter as her -- as

8    Fran's supervisor.

9               I don't recall who that person was.  I

10   don't believe it was anybody that worked for me.  I'm

11   quite sure of that.  But it was someone who had worked

12   with her and talked with her before.

13         Q      Was this concern you had with this

14   initiated by this Moore, was that reflected, did you

15   memorialize that or make any kind of notation in a

16   document?

17         A      I don't recall that I did that but it

18   sounds like something I would have done.

19         Q      Do you know did Conrad take any actions as

20   a result of this concern you raised with him?

21         A      Yes.

45

CONFIDENTIAL

1     Q     What did he do?

2     A     This is when we decided having the

3   fiduciary responsibility for the safety of the

4   employees there that maybe we ought to have a

5   professional, a doctor, look into this and make a

6   determination whether there was a real safety concern

7   there.

8     Q     Do you know when that occurred?

9     A     No, not specifically.

10     Q     Was this the only thing that influenced the

11   decision to have a doctor look at this and decide if it

12   was a safety issue?

13           MS. DYE:  Objection.

14     A     No.

15           MS. DYE:  Objection, lack of foundation and

16   vague.  Would you read back the question?

17           (The reporter read back as requested.)

18     A     No.

19     Q     I guess we can back up.  Do you know did a

20   doctor end up looking into this?

21     A     Yes.

CONFIDENTIAL

1       Q       Do you know who took the steps to initiate

2    the process of having to look into this?

3       A       Yeah, that's why I kind of grimaced when I

4    made that answer was because it was not me.  Working

5    for Jim Conrad was Charles English who was an

6    administrative supervisor, so it was turned over to him

7    to set this evaluation up or see if it was even needed

8    first.

9       Q       Who turned it over to him?

10       A       Jim Conrad who was his manager.

11       Q       Did Charles English have his own group of

12    people to supervise?

13       A       He had one person.

14       Q       Do you know who that was?

15       A       Frances Parr.

16       Q       Why was Charles English -- why did he get

17    involved with this?  Fran was under your supervision at

18    the time, is that accurate?

19       A       Yes  because there were administrative

20    issues that that was this guy's job to handle rather

21    than the individual supervisors.

CONFIDENTIAL

1           MS. DYE:  Are we done with the individuals,

2   with the individuals that complained?

3       Q   Was that the only individual in the group

4   that gave you that concern?

5       A   Yes.  Can I say something off the record?

6           MS. DYE:  No.  If you want to take a break

7   and we need to talk about something that's fine.  Why

8   don't we take a break.

9           THE WITNESS:  Actually, I want to talk to

10  him.

11          MS. DYE:  You can't talk to him unless he

12  asks you a question.

13          MR. BURKHARDT:  Well, if he wants to talk

14  to me he can but we can get into that later.

15          MS. DYE:  Let's take a break since there's

16  some confusion.

17          MR. BURKHARDT:  I mean, he can.

18          MS. DYE:  Is there something about your

19  answer that you want to clarify?

20      A   Basically I just want to talk about Aaron

21  Moore and my concern for his safety.

48

CONFIDENTIAL

1          MS. DYE:  All right.  Go ahead.

2     A    The reason why we're talking with her out

3  of the room is because this fellow comes to me in

4  confidence and says I've done this, you know, I got

5  this fear.

6          I don't feel as though Fran should know

7  that even at this stage because if there is a problem,

8  if there is any foundation to this she could seek

9  reprisals and I don't mean legally.  If this guy has

10 got a concern for his safety, I'd like to honor that.

11 So you as her lawyer I'm giving you that name but my

12 whole thing with that is that I want to make sure no

13 harm comes to him physically.

14    Q    Well, okay.

15    A    You understand?

16    Q    Yeah, I do.  Although we don't need to get

17 into it further.  I will respect, you know, to the

18 utmost degree or the concern that I have certain legal

19 obligations and ethical obligations which I intend to

20 honor.

21    A    And so do I.


GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

49

CONFIDENTIAL

1  Q  Just to finish with the group.  Anybody

2 else in the group that had a -- that they had a

3 personality conflict with Fran?

4  A  I just think in general there was that

5 feeling.

6  Q  You said in general there was that feeling.

7 How did you become aware that in general there was that

8 feeling?

9  A  Fran would make comments that would be

10 unappropriate throughout, you know, periods of time and

11 certainly didn't endear her to the other people.

12  Q  If we're done with that, we should --

13   MS. DYE:  Yes, I was just going to say this

14 is where the confidential designation should stop.

15

16

17

18

19

20

21

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

CONFIDENTIAL

1

2

3

4

5

6

7

8      Q      Take a look at that and let me know when

9  you've had a chance to look through it.

10           (Pause.)

11     A      Is this a copy of the same thing.

12           MS. DYE:  I think some of this is

13  repetitive.

14     A      Page two is duplicated in my package.

15     Q      It's essentially a copy.  One of them has

16  got a little date on it see and the other doesn't but I

17  think they're --

18     A      But for our purposes here.

19     Q      I think they're the same.  One page of the

20  exhibit is OBO case number and the other one is case

21  number 5OA.  I guess the unifying link is the time

CONFIDENTIAL

1   period where we were looking at a time period where you

2   may have supervised Fran so that's why I'm presenting

3   this to you.

4           (Pause.)

5       A    Done.

6       Q    First question:  Have you seen any of these

7   papers in this exhibit before?

8       A    I don't recognize anything that's in here.

9       Q    I just want to ask you about two references

10  that are in these documents.  The second page which, of

11  the exhibit, which has got the social in the upper left

12  with the 3AO, see this page here and there's a notation

13  10/21/97?

14      A    Okay.

15      Q    Faxed medical release and EE demo forms to

16  supervisor Gottlieb Fleig?

17      A    Yes.

18      Q    Does that trigger anything in your memory

19  about a fax?

20      A    The only thing I can think is you remember

21  that fax that you showed me earlier?

CONFIDENTIAL

1          Q     Yes.

2          A     Does that coordinate with that date then

3     that was probably the fax.  Go ahead.

4          Q     Do you recall anything else about that,

5     about the fax?

6          A     No.

7          Q     The second question I believe it's the

8     final page of the exhibit social in the upper left-hand

9     corner.  4AO is the apparently the case designation,

10    the top date on it is 11/26/97, that's the date that's

11    closest to the top of the page?

12         A     Okay.

13         Q     You see that page there?

14         A     Yep.

15         Q     And then if you go slightly more than

16    halfway down there is a date on the left-hand side,

17    12/5/97?

18         A     Yes.

19         Q     1626B Kelly R.N..  There's a reference to

20    Fleig and then a phone number after that?

21         A     Right.  Yes.

207

CONFIDENTIAL

1    Q    Discussed and -- number one, that phone

2    number was that a phone number associated with you?

3    A    Yes.

4    Q    After seeing that reference on this page,

5    does that trigger any recollection of a discussion with

6    this Barbara Kelly?

7    A    I don't recall anything that was discussed

8    with her.  Like I said, I don't even recognize her

9    name.  My role in this was a minor role and, you know,

10   Butch might not have been there.  Mr. English might not

11   have been in there and he faxed it to me and when I got

12   it I might have called her back and said yeah, I got

13   the fax and how is she doing and evidently they --

14   their conclusion was that she was okay to come back to

15   work and that might have been the extent of it.

16         But Butch was the one that was

17   communicating back and forth, that's why the name is

18   very unfamiliar to me or a conversation with them.

19         (Confidential testimony concluded.)

20

21

GORE BROTHERS
Reporting & Video Co., Inc.
410-837-3027

208

CONFIDENTIAL

1  State of Maryland

2  County of Baltimore, to wit:

3          I, RONDA J. THOMAS, a Notary Public of

4  the State of Maryland, Baltimore County, do hereby

5  certify that the within-named proceedings took place

6  before me at the time and place herein set out.

7          I further certify that the proceedings were

8  recorded stenographically by me and this transcript is

9  a true record of the proceedings.

10         I further certify that I am not of counsel

11 to any of the parties, nor an employee of counsel,

12 nor related to any of the parties, nor in any way

13 interested in the outcome of this action.

14         As witnessed my hand and notarial seal this

15 7th day of February, 2003.

16

17                     _____
                            RONDA J. THOMAS, RPR
18                             Notary Public

19

20 My commission expires:

21 October 1, 2005


                    GORE BROTHERS
              Reporting & Video Co., Inc.
                    410-837-3027