IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCES DARCANGELO,

      Plaintiff,

    v.

VERIZON MARYLAND INC.,

      Defendant.

No. WDQ-02-816

## JOINT PRETRIAL ORDER

Morris E. Fischer, Bar No. 26286
Snider & Fischer, LLC
104 Church Lane
Baltimore, Maryland 21209
410-653-9060 phone
410-653-9061 fax


Attorneys for Plaintiff

Ira H. Raphaelson, Bar No. 012849
Martha Dye, Bar No. 015057
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006
202-383-5300 phone
202-383-5414 fax


Attorneys for Defendant

A.    **Brief Statement Of Facts That Plaintiff Proposes To Prove In Support Of Her Claims, Together With A Listing Of The Separate Legal Theories Relied Upon In Support Of Each Claim**

Plaintiff will present *prima facie* cases of disability discrimination, failure to accommodate, and disparate treatment.  Plaintiff will also present evidence that as a result of discrimination she was terminated from her employment with the Defendant.

Plaintiff proposes to prove the following facts to make her *prima facie* case and to show that her managers' explanations for their actions are pretextual.

1.    As early as January 1990, Plaintiff, Fran Darcangelo was diagnosed with bi-polar disorder.  As part of her condition, she is periodically unable to control her behavior.

2.    As a result of Plaintiff's disability, bi-polar and/or personality disorder, she was substantially limited in the major life activities of working and social interactions.

3.    Plaintiff Fran Darcangelo started working for defendant as a janitor in 1977.

4.    Ms. Darcangelo was promoted to the position of Central Office Technician in Hunt Valley, Maryland during 1988.

5.    Plaintiff's job as a central office technician did not require significant social interaction.

6.    Plaintiff took a leave of absence from the Company and reported for basic training at Lackland Air Force Base in Texas.

7.    During training, Plaintiff suffered a full-blown psychotic episode.

8.    Upon returning to work in March 1990, Plaintiff advised her supervisor, George Sullivan, of her condition.

9.    At some point, Plaintiff asked that her seat be moved away from her group.

10.    During her time at the Hunt Valley facility, Plaintiff was implicated in behavior that could be characterized as bizarre but totally nonmalignant.

11.    Management made no attempt to accommodate the Plaintiff by allowing her to be placed in a working environment in which the effects of her behavior would be minimized.

12.    In 1994, Plaintiff was having increasing difficulty in getting the appropriate medication to manage her mood swings, and acted increasingly erratically, resulting in counseling from her second-level supervisor, Jim Conrad.

13.    On the graveyard shift of June 23-24, 1994, Plaintiff had a severe reaction to a dosage of Depakote, a new medication being tried by her treating physician Dr. Mira.

14.    The incident resulted in Plaintiff wandering around aimlessly during her shift, sitting at work desk staring into space, losing control of her bowels and losing her underwear, and generally acting like a zombie.

15.    Ms. Darcangelo was suspended by the company for the incident.

16.    Mr. James Conrad, Plaintiff's second line supervisor, knew that Plaintiff had a mental condition, during the 1994 incident.

17.    Plaintiff's work group knew of Plaintiff's mental condition, ostracized, and ridiculed her because of it.

18.    In October 1997, management became tired of dealing with Plaintiff's mental condition and led by James Conrad, adopted a heavy-handed, no tolerance policy for Plaintiff, as recorded by several documents in defendant's possession

19.    On October 13, 1997, Ms. Darcangelo was also told on that day that she would no longer be paid for going to her counseling sessions.

20.    Near the end of October 1997, Butch English, an administrative manager, called in to CORE (The Company's medical department) to report concerns regarding Ms. Darcangelo.

21.    CORE referred Ms. Darcangelo for an independent medical examination (IME) and this evaluation was reviewed by different individuals in the core management department.

22.    It was concluded by CORE that Ms. Darcangelo did not pose threat of violence. Dr. Anthony Russo, one of the examining physicians wrote Ms. Darcangelo engaged in a multitude of bizarre behaviors and stated that "it is recommended that if the patient presents any threats of violence at the workplace she should be either suspended or terminated as per company policy."

23.    In May 1998, the company discovered a poster which had been posted previously for a number of months (though not in the immediately preceding months) with a picture of Ms. Darcangelo's ex-supervisor on an image which some observed was a rifle target.

24.    Contrary to company practice, Ms. Darcangelo was not given an opportunity to take the poster down. Rather, she was immediately suspended, and put out on leave.

25.    Once again, she was sent for an IME, and again, the examining physician, Dr. Jerome Gottleib, determined that she posed no threat of violence.

26.    Dr. William Wright, CORE's Medical Director who oversaw the operations of CORE, recommended to Butch English that the co-workers in Ms. Darcangelo's workgroup be given counseling and educated about working with a person with her mental health condition.

27.    This accommodation was never provided, and this counseling was never done.

28.    In September 1998, Ms. Darcangelo was suspended for insisting on Union representation to which she was lawfully entitled during a meeting with Butch English.

29.    Approximately one-month later, Fran Darcangelo was suspended, this time for 15-days, for allegedly walking out on a phone conversation with a customer.  In fact, Plaintiff was refused help by the other members of her work group and could not assist the customer.

30.     December 17, 2003, an incident occurred which resulted in Fran Darcangelo's termination, and Barbara Lee's 3-day suspension.  Barbara Lee, a co-worker and non-supervisor ordered Ms. Darcangelo to pick up a work order and Plaintiff refused to do so. Plaintiff then taunted Ms. Lee in a manner which Ms. Lee found offensive.

31.     Ms. Lee then totally lost control of her emotions and herself, and proceeded to attempt to attack Ms. Darcangelo, to the point that a huge crowd formed around the two, and Ms. Lee was physically restrained from attacking Ms. Darcangelo after threatening to kill her.

32.     Fran Darcangelo was terminated as a result of this incident while Barbara Lee received a three day suspension.

33.     Plaintiff suffered damages as a result of the suspensions, intrusive medical examinations and terminations, in that she suffered sleeplessness, anxiety, thought disturbances and fatigue.


**Plaintiff relies on the following legal theories:**

**Discrimination under the American Disabilities Act ("ADA"),** *42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4*, which provides that "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

a)  **Failure to Accommodate,** under *42 U.S.C. § 12112*(b)(5)()-(B)

Plaintiff will demonstrate that she suffers from a disability recognized by the ADA as one which substantially impacts the major life activities of working and social

interactions.   In the alternative, she will then establish that she had a record of such disability or that the Defendant regarded her as disabled.   Since Plaintiff was able to perform the essential elements of the COT position she met the definition of "qualified" under the statute.   Defendant was aware of the mental disability and the problems that Plaintiff had in both working and social relationships.   However, Defendant failed to provide sensitivity training to the employees in Plaintiff's work group or restructure Plaintiff's position to deal with these issues. As a result, Plaintiff was suspended eventually terminated and suffered damages.

b)  **Disparate Treatment,** under *42 U.S.C. § 12112*(b)

Plaintiff will demonstrate that other employees, including but not limited to Barbara Lee, did similar actions as she, but were not disciplined in a similar manner. The actions that Plaintiff took which generated the suspensions commencing in 1994-1998 were not threatening in nature and were used as opportunities by management and co-workers to eventually remove her from her position.   Plaintiff also contends that as part of the disparate treatment, she was subjected to extraneous and intrusive independent medical examinations.

**B.**    **Brief Statement Of Facts That Defendant Proposes To Prove Or Rely Upon As A Defense Thereto, Together With A Listing Of The Separate Legal Theories Relied Upon In Support Of Each Affirmative Defense**

During plaintiff's employment, she engaged in repeated and intolerable misconduct, including violent threats against supervisors and racial harassment of co-workers.  She refused to curtail this behavior despite repeated warnings and lesser disciplinary sanctions, culminating in her dismissal.  Although plaintiff is under psychiatric treatment, she is not "disabled" as defined by the Americans with Disabilities Act.  Indeed, she is in full control of her behavior and nothing about her mental condition causes or excuses her misconduct.

Even if she were disabled, the nature and severity of plaintiff's misconduct was such that it could not be reasonably accommodated in the workplace.  Moreover, plaintiff never notified anyone at the company that she claimed to be disabled or requested any accommodation that would have enabled her to perform the essential functions of her position.  Under the circumstances, the company acted reasonably in suspending and ultimately terminating her for non-discriminatory reasons.  Defendant relies on the following legal theories and affirmative defenses, supported by the listed facts:

**1.**    **Plaintiff's inappropriate workplace behavior rendered her unqualified and therefore not covered by the Americans with Disabilities Act.**

1.    Plaintiff's job as a Central Office Technician in the provisioning department involved frequently communicating via telephone with other employees who were installing telephone service out in the field.  Answering calls from technicians and interacting with co-workers and supervisors were also part of plaintiff's day-to-day duties.

2.    Among the most important skills required of plaintiff's position was the ability to engage in appropriate interpersonal communications.  The need for interpersonal communication

skills for employees in plaintiff's position was documented as far back as 1994, in several sets of written job descriptions.

3.     In addition to these specific job requirements, all employees were required to comply with the company's Code of Business Conduct, which described the standards of conduct expected of employees.  Among other things, the Code of Business Conduct required that employees be respectful, cooperative, and helpful toward customers, suppliers, and their co-workers, that they not act in an abusive, threatening, discriminatory, harassing, or obscene manner toward any employee or others with whom they came in contact during the course of business, and that they respect the authority of supervisors and other company managers, and never act in an insubordinate manner.  The Code of Business Conduct also prohibited acts of workplace violence, including threats of physical harm or violence, or any other actions that are threatening or hostile in nature.

4.     Plaintiff did not meet her supervisors' expectations or perform at a satisfactory level with respect to the essential job functions of her position.

5.     To the contrary, plaintiff engaged in numerous instances of misconduct in which she demonstrated that she was not qualified to perform these essential functions of her job.

6.     As far back as the early 1980s, when she was a directory assistance operator, plaintiff was suspended when she brought bullets with her to work and told a co-worker that she was writing the co-worker's name on the bullets.  Plaintiff also routinely carried a knife at work.

7.     During her employment as a directory assistance operator, plaintiff wore a T-shirt to work with the words "Hitler was right" written on it, and refused to cover it or change.  She admitted that she did this in order to aggravate her supervisor, and was suspended for this incident.

8.    During plaintiff's employment in the maintenance department at the Hunt Valley facility in 1988-94, plaintiff frequently engaged in abusive and disruptive behavior, including regularly referring to a co-worker as a "fat pig" and calling another a "nutless wonder."

9.    In 1992, plaintiff was given warnings for the use of profanity while guests were touring her facility.  During this same time period, she displayed materials in her work area with references to violence and death, including a graph cut out from a newspaper article regarding murder at work and a caption typed up by her referring to "psycho killers here at the telephone company."  Another item she displayed was a cartoon of the grim reaper in front of a man behind a desk with the caption, "Can you give me a minute?  There are a few key people I want to take along with me."

10.    In 1993, plaintiff was disciplined for raising her voice, using profanity, and acting irrational and threatening.  Her 1994 performance appraisal indicated that she needed improvement due to a lack of respect for others and her practice of using nicknames and defaming comments when angry.  Plaintiff also referred to herself in various communications as "Fran the Terrible," the "Tasmanian Devil," and "Your Humble Goddamn Lunatic."  During this same time period, she called a supervisor "fat little bastard," called a group of supervisors who were participating in a conference call "a bunch of losers," and used foul language, such as the work "fuck," in the workplace.  She also made a comment at work that if she were to receive a quality award, "there would be blood on the floor."

11.    In December 1994 or January 1995, plaintiff was reassigned to the provisioning department at the Hunt Valley facility.  In this new work group plaintiff's unprofessional behavior continued, and during 1995 and 1996, she received coaching regarding her tendency to

disrupt the workplace.  On January 20, 1995, plaintiff received a written warning regarding her use of inappropriate language.

12.    In 1997, plaintiff's supervisor observed that she was not being productive, and asked her whether she might be more productive in another section.  Plaintiff responded, "No, if I go there I'm going to have to work."  Plaintiff also told him that she was not going to work for 20 to 25 years; that her game plan was to do something to get fired and then to sue the company and to take those monies and supplement the income that she would have repairing refrigerators.

13.    During 1997, plaintiff used the word "nigger" and other racially inappropriate terms on multiple occasions.  She also disrupted the workforce in other ways, screaming in the work area, making derogatory comments, using offensive language, and posting offensive material in her work area.  At one point during this time period plaintiff posted a picture of an "Uzi" sub-machine gun in her work area.

14.    In an attempt to curtail plaintiff's misconduct in the workplace, plaintiff's management conducted a meeting on October 13, 1997 at which plaintiff was notified that her unacceptable and offensive behavior would no longer be tolerated, and that henceforth she would be placed in "progressive discipline" if she were to engage in further improper workplace behavior.  In "progressive discipline," management takes increasingly severe disciplinary action in an attempt to communicate with employees about rules, procedure, and expectations. Progressive discipline means that each violation would incur a more severe penalty.

15.    At the meeting, the manager of plaintiff's work group gave examples of unacceptable conduct in which plaintiff had engaged in the recent past, including use of the terms "nigger," "fuck," "idiot," and "ass kisser," posting offensive materials in her cubicle and

around the office, such as office memos with the words "dog piss" on them, and taping off her work cubicle like a police crime scene.

16.    Plaintiff subsequently continued to use language that was offensive to others, and despite admonitions she continued to repeat such occurrences.  Furthermore, she was frequently very curt and flippant with co-workers and supervisors and her occasional outbursts were disruptive.  For example, in early 1998, plaintiff yelled at her supervisor so loudly that it disrupted the office, and she referred to another supervisor as a "lying sack of shit."

17.    On May 8, 1998, plaintiff placed a poster in her work area containing a picture of a supervisor in the center of a rifle target.  Plaintiff also taped the target in several places around the office on co-workers' computer terminals.  This display caused havoc in the workplace when it was discovered the next morning; it was perceived as violent and threatening, and the pictured supervisor became fearful of being harmed by plaintiff.  As a result of this incident, plaintiff was suspended for ten days.

18.    On September 15, 1998, plaintiff was rude on the telephone to a supervisor.  Plaintiff also loudly referred to her supervisor as a "slut" to co-workers during this period, and on September 23, 1998 caused a disruption in the workplace by refusing to accept training from a co-worker and refusing to follow the direction of a supervisor.  She was suspended as a result.

19.    Despite prior warnings she had received, plaintiff again violated company policy on October 23, 1998, by walking out on a business telephone call with another technician and a customer.  She was suspended for fifteen days as a result of this incident.

20.    One month later, plaintiff repeated the same pattern of inappropriate behavior.  On December 17, 1998, plaintiff responded to a request from African-American co-worker Barbara Lee that she pick up a work "ticket" with the comment that "I ain't gonna do that Ole

Massa," in a feigned African American accent.  When Ms. Lee expressed her displeasure to plaintiff over this racially charged statement, plaintiff continued to taunt her, repeating the statement at least ten times until Ms. Lee became enraged.

21.     Taken together, all of these incidents demonstrate that plaintiff was not fulfilling the workplace requirements of her position, and as such was not a qualified individual entitled to protection under the Americans with Disabilities Act.

### 2.     Plaintiff was not "disabled" under the terms of the Americans with Disabilities Act.

1.     Plaintiff suffers from Bipolar Disorder and a Personality Disorder.

2.     Plaintiff's Bipolar Disorder is in remission due to medication.  Her Personality Disorder is not an illness, but merely a collection of maladaptive personality traits.

3.     Plaintiff's psychiatric diagnoses do not substantially limit any of her major life activities or limit her ability to control her behavior.  Indeed, the DSM-IV, the authoritative psychiatric diagnostic manual, provides that "the fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder."

4.     Plaintiff was fully in control of her interactions with others during the final years of her employment.  When she disrupted the workplace or entered into confrontations with co-workers, it was intentional and a decision that she consciously made.

5.     Because nothing about plaintiff's psychiatric diagnoses substantially limited her ability to engage in any of her major life activities, she does not meet the definition of "disabled" under the Americans with Disabilities Act.

### 3.    Plaintiff's conduct could not be reasonably accommodated.

1.      Plaintiff never notified management that she considered herself disabled or that she required an accommodation due to her mental condition.  Although plaintiff occasionally alluded obliquely to mental illness in the workplace, she never informed her supervisors of a diagnosis, a condition, her treatment history, or even said "I am mentally ill."

2.      When plaintiff's management, stumped by her repeated misconduct in the workplace, sought to determine whether in fact she had some sort of limiting medical condition, plaintiff affirmatively thwarted those efforts.  When she was sent for medical evaluations, plaintiff made an obvious effort to appear as "normal" as possible, and management accordingly was twice notified that she was fully fit for duty without any need for accommodation.

3.      Moreover, because plaintiff was actively seeking out attention and confrontation by choice, accommodations such as allowing her more space and a place to work away from other people, or providing more education or sensitivity training to co-workers (which were never requested, but have been proposed by plaintiff's expert, Martin Kranitz), could not have had any remedial effect or made it possible for her to succeed in performing the essential functions of her job, including the essential functions of interacting appropriately with co-workers and supervisors.

4.      Accordingly, plaintiff was not entitled to any accommodation, and there is in any event no accommodation that reasonably could have been provided to her in light of her repeated unmitigated misconduct.

### 4.    Defendant had legitimate non-discriminatory reasons for suspending and ultimately terminating plaintiff.

1.      As to each incident in which plaintiff claims she was treated in a discriminatory manner, defendant had a legitimate non-discriminatory reason for its actions.

2.    **1997 Paid Leave and Medical Evaluation.**  Following reports from several employees of their concern that plaintiff might become violent, plaintiff was referred for a medical evaluation and placed on non-disciplinary paid leave pending the outcome of that evaluation.  These reports occurred at a time when plaintiff's behavior in the workplace had become increasingly offensive and bizarre, and she had been warned about the consequences of continuing her misconduct, as amply documented in defendant's records.  In determining to send plaintiff for a medical evaluation, plaintiff's superiors conferred with CORE (the company's medical vendor), which approved the request, after plaintiff refused to permit CORE to confer with her mental health care providers.  None of the evidence indicates that plaintiff was placed on leave or sent for a medical evaluation for any reason other than a concern for plaintiff's ability to perform her duties in the workplace and the safety of her co-workers.

3.    **May 8, 1998 Suspension, Paid Leave and Medical Evaluation.**  Plaintiff was suspended for ten days after displaying a poster of a rifle target with a supervisor's face in the center.  She was also referred for a medical evaluation and was placed on paid leave pending the outcome of the evaluation.  Plaintiff's behavior leading up to this suspension clearly violated multiple provisions of the Code of Business Conduct, including those governing "violence in the workplace."  Moreover, it occurred after plaintiff had already been repeatedly warned about improper behavior, including the posting of offensive materials in her cubicle.  Management conferred with the Labor Relations department about the appropriate disciplinary sanctions, with CORE regarding the need for medical intervention, and with security personnel regarding how to ensure the safety of the workplace.  Management documented the incident and the reasons for its actions contemporaneously.  None of the evidence indicates that plaintiff was disciplined or sent

for a medical evaluation for any reason other than her inappropriate workplace conduct and a concern for the safety of plaintiff and her co-workers.

4.      **September 23, 1998 Suspension.**  Plaintiff was suspended for three days after refusing to comply with a supervisor's order to meet with him about an incident in the work area. This behavior constituted insubordination and violated the Code of Business Conduct. Management again conferred with the Labor Relations department to determine the appropriate disciplinary sanction for this conduct.  Management also documented the incident and the decision to take disciplinary action contemporaneously.  None of the evidence indicates that plaintiff was being disciplined for any reason other than her inappropriate workplace conduct.

5.      **October 23, 1998 Suspension.**  Plaintiff was suspended for ten days after walking out on a telephone call with a customer and another technician, in which she was supposed to be resolving a technical problem.  Once again, plaintiff's behavior constituted a violation of the Code of Business Conduct.  Plaintiff's conduct and the basis for the decision to suspend her, including management's discussions with Labor Relations, were contemporaneously documented.  None of the evidence contains any indication that plaintiff was being disciplined for any reason other than her inappropriate workplace conduct.

6.      **January 6, 1999 Termination Following December 17, 1998 Incident.** Plaintiff was suspended and then terminated following an incident in which she repeatedly taunted an African-American employee with a racial slur.  Plaintiff's conduct in this final incident again violated the Code of Business Conduct.  As the contemporaneous documentation shows, the termination was premised not only on this incident, but also on all of the other prior incidents of misconduct, including but not limited to the three previous incidents in which plaintiff had been suspended that same year.  Like the other disciplinary decisions, the decision

to terminate plaintiff was arrived at in collaboration with the Labor Relations department. Plaintiff demonstrated that, despite repeated warnings and disciplinary actions, she simply would not curb her improper behavior in the workplace.  Not only had plaintiff repeatedly violated workplace rules, but she was engaging in behavior that was harmful to her co-workers and that, if not curtailed, could in fact subject the company to liability for race-based harassment.  Under the circumstances, defendant was clearly justified in terminating her.  Moreover, none of the evidence contains any indication that plaintiff was terminated for any reason other than her inappropriate workplace conduct.

       7.      In light of these facts, defendant clearly had legitimate non-discriminatory reasons for the disciplinary action it took.

### 5.        Plaintiff is not entitled to the relief she seeks.

       1.      Plaintiff failed to mitigate her damages by seeking and holding alternate comparable employment.  Instead, she spent significant periods of time without seeking employment.  At other times she obtained employment but quit or caused herself to be fired. Even when she sought employment, she sought only part time employment in low level jobs not comparable to her position with defendant.

       2.      Plaintiff further failed to mitigate her damages by failing to apply for Social Security disability benefits.

       3.      Any back pay plaintiff seeks must be reduced by the amount of her wages since her termination, plus unemployment compensation and veterans' benefits she received.

       4.      Plaintiff further failed to mitigate her damages by seeking health care and medication from sources other than the Veterans' Administration, which provides her with free health care and medication.

5.      Plaintiff is not entitled to compensatory damages because her emotional state actually improved following her termination.

6.      Plaintiff is not entitled to punitive damages because defendant's conduct did not rise to the extreme level of impropriety required for such an award.

### 6.      Res Judicata

1.      Plaintiff previously filed a lawsuit alleging that defendant mishandled her medical records and improperly forced her to undergo medical examinations.  *See* Amended Compl., *Darcangelo v. Verizon Communications, Inc., et al.*, No. 1:01-cv-00045-FNS, dated Dec. 4, 2000.

2.      Plaintiff voluntarily dismissed her prior lawsuit as against defendant.  *See* Stipulation of Dismissal With Prejudice As To Verizon, No. 1:01-cv-00045-FNS, dated July 30, 2002 [Dkt. #47].

3.      To the extent that plaintiff premises her claims on the same factual allegations or legal theories covered by the prior lawsuit, they are barred by the doctrine of res judicata.

**C.**    **<u>Similar Statements As To Any Counterclaim, Crossclaim, Or Third-Party Claim</u>**

[not applicable]

**D.**  **Any Amendments Required Of The Pleadings**

The complaint in this action should be amended to delete Counts IV and V. Count IV was previously dismissed (*see* Order dated Oct. 4, 2002 [Dkt. #11]) and Count V was abandoned by plaintiff in her opposition to defendant's motion for summary judgment (*see* Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Corrected Version) dated July 15, 2003 [Dkt. #41] at 1 n.2). Furthermore, defendant argued at the summary judgment stage that plaintiff could not demonstrate a "record of" disability under Americans with Disabilities Act § 12102(2)(B), and plaintiff did not respond. Accordingly, the complaint should be amended to delete any reference to plaintiff's having a "record of" disability. Finally, the complaint should be amended to indicate the substitution of Verizon Maryland Inc. as the sole defendant, per this Court's Order dated June 23, 2003 [Dkt. #37].

**E.**    <u>**Any Issue In The Pleadings That Is To Be Abandoned**</u>

**Defendant's Statement:**  Count V was abandoned by plaintiff in her opposition to defendant's motion for summary judgment (*see* Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Corrected Version) dated July 15, 2003 [Dkt. #41] at 1 n.2).  Furthermore, defendant argued at the summary judgment stage that plaintiff could not demonstrate a "record of" disability under the Americans with Disabilities Act, and plaintiff did not respond.  Accordingly, any argument that plaintiff is a "qualified individual with a disability" under the Act by virtue of a "record of" disability should be deemed abandoned.

**Plaintiff's Statement:**  Plaintiff concedes that Count V of the Complaint should not be a count onto itself, but should be an issue developed at trial as part of the remaining counts.  With respect to Failure to Accommodate, the issue bears on whether Plaintiff was truly a "direct threat" and the Defendant's overreaction to the events that Plaintiff allegedly committed.  With regard to the  Disparate Treatment counts, it serves as a further example of the disparate treatment rendered against Plaintiff due to her disability.

F.    **Stipulations Of Fact**

Defendant's proposed stipulations of fact are set forth below.  Plaintiff agrees to numbers 1,2,6, 9- with the following language: "During basic training, Plaintiff suffered a severe psychotic episode., 10,17, 40, 68, 72, 73, 83- with the following language:  "Plaintiff suffers from bi-polar disorder."  and 95.

1.    **Plaintiff's Early Employment History (1977-1987)**

1.    Plaintiff began working at a predecessor company to defendant Verizon Maryland Inc. in 1977 as a building attendant.

2.    After a series of position changes and a six-month break in employment, plaintiff obtained a position as a directory assistance operator in 1982.

3.    During her employment as a directory assistance operator, plaintiff was suspended when she brought bullets to work and told a co-worker that she was writing the co-worker's name on the bullets.  The bullets were from one of several guns that plaintiff owned and used for target practice.  Management documented this incident in plaintiff's personnel records.

4.    Plaintiff also carried a knife at work during various time periods.

5.    During her employment as a directory assistance operator, plaintiff was suspended for wearing a T-shirt to work with the words "Hitler was right" written on it, and refusing to cover it or change the shirt.  Management documented this incident in plaintiff's personnel records.  Plaintiff has admitted that she wore the T-shirt to intentionally aggravate her supervisor.

      2.      **Plaintiff's Employment History In The Maintenance Department At The Hunt Valley Facility (1988-1994)**

6.      Following several position changes, plaintiff became a Central Office Technician in the Hunt Valley (Cockeysville), Maryland facility in 1988.

7.      Through approximately 1995, plaintiff worked in the facilities maintenance area, which involved facilitating the repair of existing telephone lines using CRT terminals.

8.      At various times, plaintiff worked different time shifts, including off hours shifts.

9.      In October 1989, plaintiff took a leave of absence to join the Air Force and was sent to Lackland Air Force Base in Texas for basic training.  During basic training, plaintiff developed mental health problems, culminating in a manic episode.

10.      Plaintiff was given an administrative separation from the Air Force.  Following her return home, she became delusional.  Plaintiff was found by the police trespassing on the grounds of a factory, and was admitted to the hospital, where she was placed on medication. After two additional hospital stays, plaintiff returned to work at her previous position in March 1990.

11.      During her employment in the maintenance area, plaintiff frequently engaged in abusive and disruptive behavior, including regularly referring to a co-worker as a "fat pig" and calling another a "nutless wonder".

12.      In 1992, plaintiff was given warnings for the use of profanity while guests were touring the facility.

13.      During her employment in the maintenance area, plaintiff displayed materials in her work area with references to violence and death, including a graph cut out from a newspaper article regarding murder at work and a caption typed up by her referring to "psycho killers here at the telephone company."  Another item she displayed was a cartoon of the grim reaper in front

of a man behind a desk with the caption, "Can you give me a minute?  There are a few key people I want to take along with me."

14.     In 1993, management sent plaintiff for a medical evaluation due to her erratic behavior, including raising her voice, using profanity, and acting irrational and threatening.  A disciplinary memo was also placed in her personnel file for this behavior.

15.     In connection with the 1993 medical evaluation, the medical department received a letter from plaintiff's psychiatrist stating that her medical condition did not preclude her from performing her work duties or in any way impair her productivity.  It also stated that plaintiff was not affected by her condition in such a way that her judgment or thought processes were affected.  Management was informed only that plaintiff had a condition that was being medically treated and that she was responsible for her actions.  In particular, James Conrad, plaintiff's manager (the next level of management over her immediate supervisor) was aware only that plaintiff had some kind of medical condition, and did not tell others in the group about it.

16.     During 1994, plaintiff's performance was documented as needing improvement due to a lack of respect for others and using nicknames and defaming comments when angry.

17.     Plaintiff referred to herself in various communications as "Fran the Terrible," the "Tasmanian Devil," and "Your Humble Goddamn Lunatic."

18.     Throughout her employment, plaintiff's dress was routinely slovenly and ill-kempt, to the point that co-workers occasionally referred to her as a "bag lady."

19.     During her employment in the maintenance area, plaintiff also called a supervisor "fat little bastard," called a group of supervisors who were participating in a conference call "a bunch of losers," and used foul language in the workplace.

20.     In June of 1994, plaintiff made a comment at work that if she were to receive a quality award, "there would be blood on the floor." This was contemporaneously documented by management.

21.     During her tenure in the maintenance department, plaintiff's behavior was so severe and threatening that a co-worker wrote a letter to her supervisor stating that she came to work each day "not knowing if she would survive an onslaught by my coworker" and did not feel safe in the workplace.

22.     On June 15, 1994, after a complaint was received from a co-worker regarding threatening behavior, a meeting was held between plaintiff and the security department, which, in cooperation with management, sought to reinforce the "harassment free work environment" concept with her.

23.     On June 16, 1994, Mr. Conrad held a meeting with plaintiff, two supervisors, and a union steward "to give her a formal warning that disciplinary action will take place if she does not change her behavior in the workplace." Mr. Conrad reviewed several incidents of plaintiff's inappropriate and improper behavior, which collectively created a threatening image for her. Mr. Conrad informed plaintiff that this behavior was not acceptable and would not be tolerated. Mr. Conrad also listed situations in which other employees had been held accountable for similar behavior but, unlike plaintiff, had changed their behavior upon being reprimanded. Mr. Conrad asked plaintiff to seek help from any and all sources when and if she felt it was needed. A written warning was placed in plaintiff's personnel file at this time, to be removed on December 1, 1994.

24.     Less than a week after Mr. Conrad's meeting with plaintiff, on June 24, 1994, plaintiff appeared at the office late and in a state of confusion. She had begun taking a new

medication, which had a toxic effect on her, causing her to experience severe visual field narrowing and to behave erratically.  In spite of the impairment caused by the medication, plaintiff drove to work (arriving late), then was unable to complete her tasks.  When asked whether she wished to leave, plaintiff declined.  Management was not aware of the reason plaintiff was on medication.  Plaintiff was suspended for half a day for coming to work impaired and failing to complete the work rather than calling in sick, as she should have.

25.    At a subsequent grievance meeting on June 26, 2004, Mr. Conrad pointed out that he is not a doctor and can only judge the behavior plaintiff presents.  Mr. Conrad stated that plaintiff can be very erratic, that she disrupts his workplace and performs poorly.  He also stated that he sat down with her at least eight times and could not allow his center to be disrupted.

26.    After the 1994 suspension, plaintiff's behavior improved for a period, and the suspension was removed from her record.

27.    In general, there were periods of time when plaintiff did well and then there were periods of time when she just didn't want to cooperate.

### 3.    Plaintiff's Employment History In The Provisioning Department, In The Years Leading Up To Her Termination (1995-1999)

28.    In December 1994 or January 1995, plaintiff was reassigned to the provisioning department at the Hunt Valley facility, which handled "provisioning" new service (as opposed to maintenance of existing service).  In this new work group, where plaintiff had agreed to work on the day shift, plaintiff's unprofessional behavior continued.

29.    During 1995 and 1996, plaintiff received coaching regarding her tendency to disrupt the workplace.  This is documented in her personnel records.

30.     On January 20, 1995, a supervisory memo was written with a warning regarding plaintiff's use of inappropriate language.  Other than that, no major incidents took place during 1995-96.

31.     In 1997, plaintiff's behavior again began to become more extreme.  Although her supervisor, Gottlieb Fleig, wanted to do everything to make her successful, he found it hard to get plaintiff to work.  Plaintiff tended to go in a direction that wasn't work-related or conducive to getting work done.  In fact, plaintiff caused more problems in her work area than any of the other employees and at times the job wasn't getting done.

32.     When Mr. Fleig asked plaintiff in 1997 whether she might be more productive in another section, plaintiff responded, "No, if I go there I'm going to have to work."  Plaintiff also told Mr. Fleig that she was not going to work for 20 to 25 years with Bell Atlantic; that her game plan was to do something to get fired and then to sue the company and to take those monies and supplement the income that she would have repairing refrigerators.

33.     During 1997, Mr. Fleig offered to enroll plaintiff in classes on "Interpersonal Communication Skills" or "How to Manage Conflict, Anger, & Emotion," but plaintiff refused.

34.     On August 14, 1997, plaintiff was confronted by Mr. Fleig for inappropriately eating food and reading a newspaper at her workstation when she should have been working.  Management contemporaneously documented this incident.

35.     Plaintiff used the word "nigger" and other racially inappropriate terms on multiple occasions during her employment in the provisioning area.

36.     During 1997, plaintiff also disrupted the workforce in other ways, screaming in the work area, making derogatory comments, using offensive language, and posting offensive material in her work area, including a picture of an "Uzi" sub-machine gun.

37.    In an attempt to curtail plaintiff's misconduct in the workplace, Mr. Conrad in late 1997 asked union representatives to participate in a meeting at which he would spell out for plaintiff that her unacceptable and offensive behavior would no longer be tolerated, and to put her on notice that henceforth she would be placed in "progressive discipline" if she were to engage in further improper workplace behavior.  In "progressive discipline," the company takes increasingly severe disciplinary action in an attempt to communicate with employees about rules, procedure, and expectations.  Progressive discipline means that each violation would incur a more severe penalty.

38.    Mr. Conrad had previously been lenient with plaintiff in an attempt to make a workplace where everybody could be productive and earn their money and partly due to her "special" medical condition, although he did not know what that was.  In general, Mr. Conrad was very patient and understanding in his reactions to some of these things plaintiff did.

39.    At the meeting, held on October 13, 1997, Mr. Conrad gave examples of unacceptable conduct in which plaintiff had engaged in the recent past, including use of the terms "nigger," "fuck," "idiot," and "ass kisser," and the posting of offensive materials in her cubicle and around the office, such as posting office memos with the words "dog piss" on them, and taping off her work cubicle like a police crime scene.

40.    At the October 13, 1997 meeting, Mr. Conrad informed plaintiff that she needed to understand that this behavior was no longer going to be overlooked but that if she applied herself she could get back on the right track with the company.  This was documented contemporaneously.

41.    A short time after the October 13, 1997 meeting, several of plaintiff's co-workers separately approached management, including plaintiff's supervisor, to report that they were

fearful of plaintiff due to her behavior, and were concerned that she might engage in violence. Management promptly contacted CORE, Inc. ("CORE") to obtain advice on handling the situation.

42.     CORE is a medical benefits administration and services company staffed with nurses and doctors with whom defendant contracted to provide or coordinate certain medical services.

43.     When they were contacted by management due to the fears of plaintiff's co-workers, the medical staff at CORE asked plaintiff to sign a release so that they could discuss her condition with her mental health providers, but plaintiff refused. The medical staff at CORE accordingly instructed management to send plaintiff home from work until she could undergo a psychiatric evaluation. CORE then made arrangements for plaintiff to be evaluated by psychiatrist Dr. Anthony Russo.

44.     Plaintiff was placed on paid leave beginning October 23, 1997 until the psychiatric evaluation by Mr. Russo could be conducted and the results returned to CORE. The placement of plaintiff on leave was an administrative matter; it was not disciplinary.

45.     Although plaintiff's psychiatric evaluation appointment with Dr. Russo was originally scheduled for October 31, 1997, plaintiff got lost on the way to the appointment and it was rescheduled for November 4, 1997.

46.     For plaintiff's psychiatric evaluation appointment with Dr. Russo, she wore a navy business suit, although plaintiff's usual attire was sweatpants or camouflage clothing, a knit cap, and combat boots. This may have been as a result of a manipulative effort on her part to appear normal.

47.     At the November 4, 1997 evaluation, Dr. Russo found plaintiff to be relatively high functioning, and stated that she could return to work with no medical restrictions or accommodations other than a notation with respect to appropriate dress and behavior. Management was not given a copy of Dr. Russo's report or told of any diagnosis, but was merely told that she was cleared to work without restrictions.

48.     Plaintiff returned to work after the medical evaluation by Dr. Russo on December 1, 1997, and on January 8, 1998, Mr. Conrad transferred her to a new supervisor, Marianne Moxey, in the hope that she would have a better rapport with Ms. Moxey than she had with Mr. Fleig.  In general, Mr. Conrad liked plaintiff and wanted to try and make things nice for her. Plaintiff nonetheless continued to disrupt the workplace after the transfer.

49.     Plaintiff's performance appraisal for 1997 documents that she used language that was offensive to others, and despite admonitions she continued to repeat such occurrences. Furthermore, she was frequently very curt and flippant with technicians and supervisors and her occasional outbursts were disruptive.

50.     In early 1998, plaintiff yelled at Ms. Moxey so loudly that it disrupted the office, and referred to another supervisor, Charles "Butch" English, as a "lying sack of shit."  This incident was documented by management.

51.     Plaintiff also performed poorly and refused to perform her duties during 1998. For example, although answering the telephone was part of her job, plaintiff didn't like to answer the telephone.  On March 16, 1998, Ms. Moxey contacted CORE to determine whether plaintiff had any restrictions that would account for her behavior.  Otherwise, she planned to treat it as a disciplinary problem.  After conferring with plaintiff's health care providers, CORE advised Ms.

Moxey and Mr. English that plaintiff was not determined to be a threat, and that she could be held accountable for her behavior.

52.     On May 8, 1998, plaintiff placed a poster in her work area containing a picture of Mr. English in the center of a rifle target.  Plaintiff also taped the target in several places around the office on co-workers' computer terminals.  This display caused havoc in the workplace when it was discovered the next morning; it was perceived as violent and threatening, and Mr. English became fearful of being harmed by plaintiff.

53.     Although a similar, but less imposing, version of the poster had been posted several years prior to this incident, the May 1998 rifle target poster was perceived by Mr. English as particularly threatening on this occasion in light of the fact that (in contrast to the earlier time) he and plaintiff were not getting along, and in the context of plaintiff's recent bizarre behavior and the violence in the workplace concerns that had recently been raised with respect to her.

54.     As a result of plaintiff's posting the rifle target poster on May 8, 1998, management contacted CORE and was told to send plaintiff home pending a medical evaluation. Plaintiff underwent the examination on May 29, 1998, and returned to work on June 3, 1998. The only restriction plaintiff was given was that for one week she work a shift of three-quarters the usual length.  In a conversation with a CORE nurse regarding the restriction, plaintiff stated that she was fine and wanted to return to work full time.  Management again was not given a copy of the medical report or told of any diagnosis that plaintiff had, but was merely told that she was cleared to work without restrictions.

55.     As a result of the rifle target incident, management consulted with the Labor Relations department, CORE, and security personnel, and plaintiff was subsequently suspended for ten days.  Following the suspension, plaintiff was placed on paid leave until the results of the

medical evaluation were returned.  Like plaintiff's superiors, the Labor Relations personnel involved in the suspension decision were given no information about plaintiff's medical condition.

56.    In a grievance meeting regarding the suspension associated with the rifle target incident, management expressed a willingness to reduce the suspension to five days.  Although plaintiff and the union grieved the suspension through two steps, the union elected not to take the issue to arbitration.

57.    Plaintiff's posting of the rifle target violated the Code of Business Conduct, and plaintiff also violated the Code of Business Conduct on other occasions.

58.    On June 4, 1998, plaintiff was welcomed back to work following her suspension with a formal meeting in which she was again informed that she was being placed on progressive discipline and future incidents would result in further disciplinary action, up to and including dismissal.  This meeting was documented by management.  Plaintiff stated at the meeting that during her absence, she had forgotten how to do many of the tasks associated with her position.

59.    Plaintiff's performance appraisal for the first half of 1998 documents that plaintiff on occasion disrupted the work area with her conduct.  Customers and co-workers complained about her attitude and behavior.  Plaintiff also failed to heed the warnings she had been given, and rather than curtailing her improper behavior, escalated her level of misconduct.

60.    On September 15, 1998, plaintiff was rude on the telephone to a supervisor.  This incident was documented by management.

61.    Plaintiff loudly referred to Ms. Moxey as a "slut" to co-workers during 1998, and on September 23, 1998 caused a disruption in the workplace by refusing to accept training from

a co-worker. A supervisor from another work group formally complained about plaintiff's loud and disruptive behavior, as did several co-workers.

62. In the September 23, 1998 incident, the co-worker who was attempting to train plaintiff contacted Ms. Moxey (who was out of the office) for assistance in dealing with plaintiff. Ms. Moxey in turn contacted Mr. English to ask him to deal with the situation in her absence. Mr. English instructed plaintiff to come into a conference room with him and to tell him what was going on. Plaintiff refused, claiming that she wanted union representation. Mr. English informed plaintiff that if she left the room, it would constitute insubordination, and she nonetheless walked out of the room.

63. Following the September 23, 1998 incident, plaintiff was suspended for three days for insubordination, after management consulted with Labor Relations personnel.

64. Despite the prior warnings she had received, plaintiff again violated company policy on October 23, 1998, by walking out on a business telephone call with another technician and a customer. When told that she was to be suspended, plaintiff ignored the supervisor who was to escort her out of the building, and instead conducted a loud and disruptive telephone call with a union representative, refusing to hang up the phone.

65. Plaintiff admits that she behaved inappropriately in both the September 23, 1998 and October 23, 1998 incidents and violated the Code of Business Conduct. Furthermore, no one else had engaged in similar behavior and gotten away with it.

66. During the fall of 1998, plaintiff constructed a "100 days until termination" calendar at her desk and began crossing off the days.

67. As a result of the October 23, 1998 incident of misconduct and insubordination, plaintiff was suspended for fifteen days, pursuant to a consultation between management and the

Labor Relations department.  During plaintiff's fifteen-day suspension, one of plaintiff's co-workers approached supervisor Butch English expressing fear of plaintiff's potential for violence.  The employee indicated that she was concerned, based on her previous interactions with plaintiff, that she might retaliate against her and possibly the group or the company if plaintiff were to be fired.

68.     On November 16, 1998, plaintiff was welcomed back from her most recent suspension, with a meeting discussing the incident and warning her to discontinue her violations of the Code of Business Conduct.  This meeting was documented by management.

69.     One month after the November 16, 1998 "welcome back" meeting, plaintiff repeated the same pattern of inappropriate behavior.  On December 17, 1998, while a holiday party was underway at the office, plaintiff responded to a request from African-American co-worker Barbara Lee that she pick up a work "ticket" with the comment that "I ain't gonna do that Ole Massa," in a feigned African American accent.  When Ms. Lee expressed her displeasure to plaintiff over this racially charged statement, plaintiff continued to taunt her, repeating the statement at least ten times until Ms. Lee became enraged.  Both employees were sent home pending an investigation of the matter.

70.     Ms. Lee, having no disciplinary history (and having been provoked), was subsequently suspended for three days for her part in the December 17, 1998 confrontation.  Plaintiff was placed on suspension and then formally terminated on January 6, 1999, due to multiple violations of the Code of Business Conduct, as well as a history of poor performance.

71.     Plaintiff grieved the suspension and termination following the December 17, 1998 incident, raising for the first time Americans with Disabilities Act issues.

72.     Plaintiff subsequently filed an administrative complaint with the Maryland Commission on Human Relations.  The Commission conducted an investigation and concluded that there was no probable cause to believe that plaintiff had been the victim of discrimination.

### 4.      Plaintiff's Job Functions in the Provisioning Department

73.     The provisioning department in which plaintiff worked from 1995 until her termination in January 1999 was responsible for remotely coordinating the installation of new service.

74.     The job involved guiding and communicating via telephone with other employees who were installing service out in the field.  Among the most important skills needed for plaintiff's position were interpersonal communications, because of the need to guide field technicians over the telephone.  Answering the phone was part of plaintiff's day-to-day duties in the job.

75.     The need to interact properly with supervisors is an essential requirement of any job, including plaintiff's.  Mental stability was also an essential function of her position.

76.     Plaintiff did not meet her supervisors' expectations or perform the essential functions of her job at a satisfactory level.

77.     The need for appropriate interpersonal communication skills in both the maintenance and provisioning areas was documented by Mr. Conrad as far back as 1994.  Mr. Conrad issued a set of supplemental job requirements that required, *inter alia*, that employees make a verbal handoff between incoming and outgoing shifts, that a harassment-free workplace be maintained, that all duties, including telephone contacts, be performed in a professional courteous manner, and that no comments, jokes, or sarcastic notes would be tolerated on the computer system.  These job requirements applied to plaintiff's position.

78.    Another set of position requirements specific to the provisioning area was also created in 1996.  In this document, one of the listed responsibilities is to assist co-workers in ongoing effort to eliminate order backlog.  The document also lists the need to escalate various problems to superiors, to notify others of certain events, and to assist the supervisor and the team to develop certain agreements, all job functions that would also require interpersonal interaction. These requirements applied to plaintiff.

79.    In addition to the specific job requirements associated with plaintiff's position, all employees were required to comply with the Code of Business Conduct, which described the conduct standards expected of all employees.  The Code of Business Conduct contained references to behaviors and conduct that were expected and prohibited in the workplace.

80.    Among other things, the Code of Business Conduct required that employees be respectful, cooperative, and helpful toward customers, suppliers, and their co-workers, that they not act in an abusive, threatening, discriminatory, harassing, or obscene manner toward any employee or others with whom they came in contact during the course of business, and that they respect the authority of supervisors and other company managers, and never act in an insubordinate manner.  The Code of Business Conduct also prohibited acts of workplace violence, including threats of physical harm or violence, or any other actions that are threatening or hostile in nature.

81.    Plaintiff was not treated differently from other employees in the type or number of assignments she was given or the standards of performance to which she was held.  Nor were plaintiff's supervisors given instructions to treat her differently from other employees.

82.   Plaintiff never asked for any accommodation that would enable her to perform the functions of the job that involved interaction with other people, or enable her to comply with workplace conduct standards and expectations.

### 5.   Plaintiff's Medical Condition

83.   Plaintiff suffers from Bipolar Disorder, Delirium, and a Personality Disorder.

84.   Plaintiff's Delirium (associated only with the June 1994 medication toxicity incident) is fully resolved, and her Bipolar Disorder has been in remission since her 1989-90 manic episode, such that plaintiff is not currently, and was not during her employment within the provisioning department from 1995 to 1999, suffering from any depressive, manic, or hypomanic episodes.

85.   Although plaintiff's Personality Disorder was active during her employment, a Personality Disorder is not a psychiatric illness in the same way as Bipolar Disorder.  Personality Disorders do not impair intellectual or perceptual functioning.  Personality Disorders also do not impair a person's ability to control their behaviors.  Indeed, the DSM-IV, the authoritative psychiatric diagnostic manual, provides that "the fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder."

86.   Plaintiff's mental disorders did not cause her to be disabled from being able to perform her essential job functions.  Plaintiff had the technical capacity to perform her job functions and to interact appropriately with others, as she showed on numerous occasions and during numerous periods during her employment.  At other times plaintiff, however, made the choice not to follow company behavioral rules, and to act in a provocative and disruptive manner.  These disruptive behaviors were plaintiff's choice and were volitional.  Plaintiff's

behaviors were an attempt to intimidate and threaten those around her, and were under her direct control.

87.    The results from the Minnesota Multiphasic Personality Inventory 2 test that defendant's expert Dr. Janofsky administered to plaintiff were consistent with the conclusion that plaintiff is in control of her behavior.  Plaintiff's quite good level of ego-strength predicts organized functioning and immediate practical self-sufficiency in many areas.

88.    Because plaintiff was actively seeking out attention and confrontation by choice, accommodations such as allowing her more space and a place to work away from other people, or providing more education or sensitivity training to co-workers (which were never requested, but have been proposed by plaintiff's expert, Martin Kranitz) could not have any remedial effect or have rendered her more successful at her job.

89.    Referrals of plaintiff for medical evaluations in November 1997 and May 1998 were reasonable, in light of her supervisors' legitimate concerns about disruptive behaviors, which were perceived as intimidating and threatening.  Management's concerns about plaintiff's behavior and the decision to send her for a medical evaluation were warranted and in no way unusual.

90.    Plaintiff's poor relationships with other people were by design.  Plaintiff was capable of doing her job, but quite often didn't want to.  Plaintiff had control over her actions. Plaintiff's condition did not preclude her from performing her work duties or in anyway impair her productivity.  Plaintiff was not affected by her condition in such a way that her judgment or thought processes were affected.

91.    At the time of plaintiff's examination by Dr. Russo, she was significantly stabilized on medication and was able to return to work in her full capacity and job duties.  Dr.

Russo recommended that plaintiff return to work with restrictions regarding appropriate dress and behavior and stated that if she presents any threats of violence at the workplace, she should either be suspended or terminated as per company policy.

92.    Patients that have plaintiff's diagnosis are extremely cunning and manipulative. It would be nearly impossible to effectively train plaintiff's co-workers or supervisors to deal with her behavior.

93.    Although as of her 1998 medical evaluation, plaintiff demonstrated poor judgment and inappropriateness, she was capable of performing her normal activities and was able to return to work.

94.    Although plaintiff has difficulty maintaining consistent relationships either in her personal life or at work, her difficulties with social and occupational functioning are overwhelmingly related to her Personality Disorder and poor judgment. Plaintiff's Bipolar Disorder diagnosis is a sideshow. Plaintiff was in control and did have control of her responses. Plaintiff could have reacted appropriately, and could have control of her responses and is capable of being responsible.

95.    Even in a relatively solitary job that plaintiff recently held as a janitor, she nonetheless ran into problems with social interaction.

96.    While plaintiff clearly had and has a psychiatric diagnosis, management was never made directly aware of that fact by plaintiff or anyone else. Although plaintiff occasionally made oblique references to being on medication, to her past experience in the Air Force, or to mental illness generally, management was unaware that plaintiff had a currently diagnosed medical condition or that she may have required any kind of accommodation. Indeed,

there was some speculation in the workplace that plaintiff did not even have any such condition, but was faking it.

97.    Management was repeatedly told by CORE as a result of the medical evaluations that plaintiff had no restrictions or limitations. The Labor Relations staff, which made decisions regarding disciplinary issues such as the length of suspensions, had no knowledge of plaintiff's medical condition. Management did not believe plaintiff to be, nor did they treat her as, substantially limited in any major life activity.

### 6.    Plaintiff's Alleged Damages

98.    Plaintiff failed to mitigate her damages by seeking and holding alternate comparable employment. Instead, she spent significant periods of time without seeking employment. At other times she obtained employment but quit or caused herself to be fired. Even when she sought employment, she sought only part time employment in low level jobs not comparable to her position with defendant.

99.    Plaintiff further failed to mitigate her damages by failing to apply for Social Security disability benefits.

100.    Any back pay plaintiff seeks must be reduced by the amount of her wages since her termination, plus unemployment compensation and veterans' benefits she received.

101.    Plaintiff further failed to mitigate her damages by seeking health care and medication from sources other than the Veterans' Administration, which provides her with free health care and medication.

102.    Plaintiff is not entitled to compensatory damages because her emotional state actually improved following her termination.

103.    Plaintiff is not entitled to punitive damages because defendant's conduct did not rise to the extreme level of impropriety required for such an award.

F-19

G.   **The Details Of The Damages Claimed Or Any Other Relief Sought As Of The Date Of The Pretrial Conference**

   1.   **Plaintiff's Statement**

      a.   **Back Pay/Front Pay**

Pursuant to 42 U.S.C. § 2000e, which applies both to Title VII and the ADA, back pay and front pay should be classified as equitable remedies. The Court, therefore, should determine back pay and front pay after the jury trial. Therefore, Plaintiff proposes that no evidence of pay records or other similar records be introduced to the jury during the trial or that any expert witness testify as to back pay or front pay awards at trial. Plaintiff has requested from Defendant to stipulate, but Defendant has not consented.

As such, Plaintiff will be moving for a partial bifurcation on the issue of back-pay and front pay. Should the Court rule that back-pay is a matter for the jury to determine, then Plaintiff's back-pay calculation is as follows:

**Fran Darcangelo-Damages Outline**

Lost Wages

   Past Lost Wages
                     Date of Final Suspension: 12/18/98
                     Date of Termination:        1/6/99

Jan/99:      Plaintiff. Making $960.00 per week (gross)= $49,920.00 per year
             Estimated Medical Benefits ($300.00), vision, dental, long term and short term
                disability.

                           =  $3,600.00 per year in benefits
                              $53,520.00 per year

   Per the union contract, Plaintiff would have received a 3 % increase per year. As such back-pay for the following years:

| Year | Salary | Salary + Estimated Benefits |
|------|--------|------------------------------|
| 1999 | $49,920 | $53,520.00 |
| 2000 | $51,417.60 | $55,017.60 |

| 2001 | $52,960.13 | $56,560.13 |
| 2002 | $54,548.93 | $58,148.93 |
| 2003 | $56,185.39 | $59,785.39 |
| 2004 | $57,870.96 | $61,470.96 |

Total Salary and Estimated
Benefits in Back-pay          $344,503.01

Pension: Plaintiff was credited with 21.25 years towards her 30 year pension and was paid $35,000.00 for the 21.25 years. According to the Union Contract, had Plaintiff stayed with Verizon for an additional 8.75 years, she would have received $54.30 x 360 (months) x life time benefit (20 years) = $390,960.00.

### b.    **Compensatory Damages.**

Plaintiff seeks compensatory damages. Plaintiff suffered damages as a result of the suspensions, intrusive medical examinations and terminations, in that she suffered sleeplessness, anxiety, thought disturbances, fatigue and overall loss of enjoyment in life. She received medical treatment for these injuries from both Julie Swope, M.A. and her Psychiatrist, Dr. Gary Zimberg.

The statutory cap on such damages is $300,000. 42 U.S.C. § 1981a. The jury will not be informed of the cap. Plaintiff will request a specific amount and will leave it to the jury to set an appropriate amount.

### c.    **Punitive Damages**

Plaintiff seeks a punitive damage award and will leave it to the jury to set an appropriate amount. Plaintiff acknowledges that the $300,00.00 cap is on both compensatory and punitive damages.

### 2.    **Defendant's Statement**

Defendant disputes that plaintiff is entitled to back pay, front pay, compensatory, or punitive damages of any kind. Defendant further disputes the particular back pay calculation set forth by plaintiff. Moreover, defendant notes that the $300,000 statutory cap plaintiff references

is a cap on compensatory and punitive damages combined, not just on compensatory damages. Regarding plaintiff's bifurcation proposal, it is defendant's position that back pay is an appropriate issue for the jury and as a result defendant will not stipulate to having back pay determined by the judge after trial.

H.     **Exhibit Lists**

1.     **Plaintiff's Documents Or Exhibits That Will Be Presented At Trial**

| EXHIBIT NUMBER | DESCRIPTION | AUTHENTICITY STIPULATED? |
|---|---|---|
| 1. | Martin Kranitz Expert Report 1/7/03 (Kranitz Dep. Ex. 1) | Y |
| 2. | Notes from Meeting With Fran Darcangelo 6/16/94 (Conrad Dep. Ex. 4) | Y |
| 3. | Test Items and Abbreviated Instructions (Kranitz Dep. Ex. 2) | Y |
| 4. | Summary Score Sheet for Fran Darcangelo (Kranitz Dep. Ex. 3) | Y |
| 5. | Career Decision Making System Summary (Kranitz Dep. Ex. 4) | Y |
| 6. | Materials Labeled Ex. 5 Kranitz Depo. (Kranitz Dep. Ex. 5) | N |
| 7. | Employment Statistics Quarterly (Kranitz Dep. Ex. 6) | Y |
| 8. | Employment Statistics Quarterly (State) (Kranitz Dep. Ex. 7) | Y |
| 9. | Myers-Briggs Test (Kranitz Dep. Ex. 8) | N |
| 10. | Dr. Gary Zimberg Report 10/15/97 (Zimberg Dep. Ex. 3) | Y |
| 11. | Chart/Treatment Notes by Dr. Zimberg (Zimberg Dep. Ex. 6) | Y |
| 12. | Dr. Gary Zimberg Expert Report 1/17/03 (Zimberg Dep. Ex. 7) | Y |
| 13. | Curriculum Vitae for Dr. Gary Zimberg, M.D. (Zimberg Dep. Ex. 7) | Y |
| 14. | Note from Dr. Zimberg and Three Pages Following It (Zimberg Dep. Ex. 17) | Y |

| EXHIBIT NUMBER | DESCRIPTION | AUTHENTICITY STIPULATED? |
|---|---|---|
| 15. | Julie Swope Patient File for Fran Darcangelo (Swope Dep. Exs. 5, 7, 8, 9, 11, 12, 16, 17, 19, 21-23) | N |
| 16. | Second Step Grievance Notes and Warning of Suspension 9/26/94 (Conrad Dep. Ex. 5) | Y |
| 17. | Barbara Lee's Grievance 1998 (V-DAR-3688, 4093-7) | Y |
| 18. | Memo by James Conrad 10/13/97 (Conrad Dep. Ex. 14) | Y |
| 19. | E-Mail from Marianne Moxey to James Conrad 4/11/99 (Def. SJ Ex. 64) | Y |
| 20. | Statement of Individual Loss from Bell Atlantic 1/6/99 (V-DAR 00511-12, Conrad Dep. Ex. 25) | Y |
| 21. | Associate Appraisal and Development Plan for 1997 (Def. SJ Ex. 42) | Y |
| 22. | Fran Darcangelo's Test Results for Promotions and Regional Associate Mobility Plan (V-DAR 4868-9, 3002-8, 3218-22) | Y |
| 23. | Job Description for Central Office Technician for Bell Atlantic (Pl.'s SJ Ex. 18) | Y |
| 24. | Baltimore Transport Control Center Position Requirement Description (V-DAR 0121-4) | Y |
| 25. | Bell Atlantic Human Resource Guidelines, Workplace Violence, Disciplinary Process and Disability Etiquette (V-DAR 2026-9, 2052-55, 2047-51, 2070-71, 2161-76, 2129-31, 2155-60) | Y |
| 26. | Notes of Meeting with Marianne Moxey, Chantal Sakay, Fran Darcangelo and Eleanor McCollough Welcoming Fran Darcangelo Back to Work (Moxey Dep. Ex. 9) | Y |
| 27. | Notes from Charles English re: 9/3/98 Incident With Fran Darcangelo (English Dep. Ex. 13) | Y |

| EXHIBIT NUMBER | DESCRIPTION | AUTHENTICITY STIPULATED? |
|---|---|---|
| 28. | Questions and Answers to Interview Questions by Marianne Moxey to the MHRC (Moxey Dep. Ex. 5) | Y |
| 29. | Bell Atlantic Health Fit, Mental Health Awareness Week October 1-7 Poster (Lee Dep. Ex. 3) | N |
| 30. | Picture of Charles English in Crossword Puzzle Square With Caption, "Put Butch on the Bus One Way to Pocomoke" and "Lib to Lab" Document Over Picture (Conrad Dep. Ex. 15) | Y |
| 31. | Interview Questions From MHRC and Answers Given by James Conrad (Conrad Dep. Ex. 10) | Y |
| 32. | Bell Atlantic Labor Relations Common Guidelines (V-DAR 1875-81, 2019-29, 2318, 3352, 2321-22) | Y |
| 33. | Memo from Marianne Moxey 12/9/98 re: Loudness of Crew (Fleig Dep. Ex. 14) | Y |
| 34. | Official FMLA Report 10/14/97 (Fleig Dep. Ex. 15) | Y |
| C. | CORE Records As Follows: 1. Exhibits 1-6 Anthony Russo 2. Report of Dr. Gottlieb (Zimberg Ex. 9) 3. Report of Dr. Seibert (Zimberg Ex. 10) 4. Kelly Exhibits 1-2 5. Wright Exhibits 1-2 | Y |
| D. | Records on Damages: i.  Tax Returns from 1997-2004 (V-PLA 338-344, 326-337, 316, 325, 304-315, 295-303) ii.  Union Contract (V-DAR 1451-678) iii. Darcangelo Ex. 5 (V-PLA 00141, 00143-00148) | Y as to exhibit ii only, N as to the others |

2.    **Plaintiff's Documents Or Exhibits That May Be Presented At Trial**

| EXHIBIT NUMBER | DESCRIPTION | AUTHENTICITY STIPULATED? |
|---|---|---|
| 1. | Second Martin Kranitz Expert Report 1/20/03 (Kranitz Dep. Ex. 9, includes report and all materials referred to) | N |
| 2. | DSM-IV Criteria for Hypomanic Episode (Zimberg Dep. Ex. 11) | Y |
| 3. | DSM-IV-TR Report (Zimberg Dep. Exs. 4-5) | Y |
| 4. | Cartoon: "Big Blizzard Did Bring Out the Best and the Worst" (Darcangelo Dep. Ex. 22) | Y |
| 5. | Dr. Anthony Russo's Notes of 11/4/97 (Zimberg Dep. Ex. 8) | Y |
| 6. | Witness Statements re:  12/17/98 Incident (Conrad Dep. Ex. 20) | Y |
| 7. | Summary Appraisals-Fran Darcangelo (V-DAR 522-99) | Y |
| 8. | Associate Appraisal Plan- Barbara Lee (V-DAR 3657-8, 3666-9) | Y |
| 9. | Barbara Lee's Grievance Notes (V-DAR 3690-5) | Y |
| 10. | Information sheets regarding seminars on communication skills (V-DAR 01774-5) | Y |
| 11. | Memo from English to Darcangelo (V-DAR 1835) | Y |
| 12. | Security file on Plaintiff (V-DAR 1875-1900) | Y |
| 13. | Rifle target poster (Dankert Ex. 4) | Y |
| 14. | Rifle target poster (Dankert Ex. 3) | Y |
| 15. | CORE File (V-DAR 273-463) | Y |
| 16. | Plaintiff's personnel file (V-DAR 0001-0223) | Y |

### 3.     Defendant's Documents Or Exhibits That May Be Offered If The Need Arises

| EXHIBIT NUMBER | DATE | DOCUMENT DESCRIPTION | BATES NOS./EXHIBIT REFERENCE | AUTHENTICITY STIPULATED? |
|---|---|---|---|---|
| 1. | 01/11/83 | Handwritten Employee Contact Record re Incident Involving F. Darcangelo and R. Lacey | V-DAR 00137-8 | Y |
| 2. | 03/16/83 | Handwritten Employee Contact Record re F. Darcangelo's Work Attire and Suspension Warning | V-DAR 00136 | Y |
| 3. | 03/18/83 | Handwritten Employee Contact Record re F. Darcangelo's Work Attire on 3/16/83 and Reiteration of Suspension Warning | V-DAR 00131 | Y |
| 4. | 03/24/92 | Memo Prepared by Mike Ports, re F. Darcangelo's Inappropriate Language During Customer Tour; Memo Prepared by M. Ports, re F. Darcangelo's Comments on Prior Memo of 3/24 | V-DAR 00172; V-DAR 00171 | Y |
| 5. | 03/31/93 | Memo from M. Ports re "Unprofessional" Work Requests, with Typed Note from "Fran TT" | V-DAR 01839 | Y |
| 6. | 04/93 | Memo from Carl E. Broyles, with copies to R. Libertini and M. Ports, re Incident Involving F. Darcangelo and Allegations of Sexual Harassment | V-DAR 01797 | Y |
| 7. | 04/16/93 | Notes Prepared by R. Libertini, re Incident Involving F. Darcangelo's Allegations of Sexual Harassment (Confidential) | V-DAR 01819 | Y |
| 8. | 04/20/93-04/21/93 | Handwritten Note to Mike Ports from Shirley J. Scott re Working Conditions Dangerous to Her Health and Well Being; Handwritten Memo re Shirley Scott's Letter dated 4/20/93 (Confidential) | V-DAR 01798-9 | Y |

| 9. | 04/21/93 | Memo, with 12 Signatures, to Jim Conrad re Letter Written by F. Darcangelo Concerning Conduct on Night Shift (Confidential) | V-DAR 01800-1 | Y |
|---|---|---|---|---|
| 10. | 04/22/93 | Request for Special Medical Evaluation of F. Darcangelo | Dep. of J. Conrad, Ex. 2 | Y |
| 11. | 05/04/93 | C&P Medical Department Report, Signed by Carmen A. Fratto, M.D., re 4/27/93 Medical Examination of F. Darcangelo | V-DAR 00414 | Y |
| 12. | 06/05/93 | Letter to Carmen A. Fratto, M.D. from John F. Mira, M.D. | Dep. of J. Conrad, Ex. 3; V-DAR 01719 | Y |
| 13. | 1993 | USA Today Cartoon re Murder at Work with Caption re Psycho Killers and Kleptomania | Dep. of F. Darcangelo, Ex. 21; V-DAR 01796 | Y |
| 14. | 1993 | Cartoon Depicting the Grim Reaper | Dep. of F. Darcangelo, Ex. 22; V-DAR 01795 | Y |
| 15. | 03/01/94 | Associate Performance Evaluation of F. Darcangelo for the period 9/1/92-3/1/94 | V-DAR 00098-113 | Y |
| 16. | 06/06/94 | Certified Letter to Mary Belcastro re Quality Improvement Award of 3/25/93 | V-DAR 00139 | Y |
| 17. | 06/06/94-06/28/94 | Incident Reports, Prepared by Bell Atlantic Security, re Employee Harassment by F. Darcangelo | Dep. of J. Conrad, Ex. 8; V-DAR 01898-900; V-DAR 01895-7 | Y |
| 18. | 06/14/94 | Note to John re Events That Led to the "Problem" | V-DAR 01794 | Y |
| 19. | 06/14/94 | Supplemental Job Requirements FMAC Associates | V-DAR 01792-3 | Y |

| 20. | 06/16/94 | Memo to F. Darcangelo from J.P. Conrad re Formal Warning, with Handwritten Note | V-DAR 003750 | Y |
| 21. | 06/18/94 | Notes Prepared by J. Conrad and Mike Ports, of 6/16/94 Interview with F. Darcangelo re Formal Warning | Dep. of J. Conrad, Ex. 4 | Y |
| 22. | 07/05/94 | Notes re Failure of F. Darcangelo to Complete Work on 6/24/94 | Dep. of J. Conrad, Ex. 9; V-DAR 00181 | Y |
| 23. | 07/07/94 | Memo to M. Ports from Ralph Libertini re 6/24/94 Interview with F. Darcangelo | Dep. of J. Conrad, Ex. 6; V-DAR 00178-9 | Y |
| 24. | 07/14/94 | Notes Prepared by M. Ports, re F. Darcangelo's 4-Hour Suspension | V-DAR 00182 | Y |
| 25. | 09/26/94 | Notes of Second Step Grievance Meeting re Warning and Suspension | Dep. of J. Conrad, Ex. 5 | Y |
| 26. | 12/02/94 | Handwritten Notes of Third Step Grievance Meeting re Removal of 1994 Warning from F. Darcangelo's Records | Dep. of J. Conrad, Ex. 7 | Y |
| 27. | 01/20/95 | Supervisory Memo for F. Darcangelo, from Evonne M. Jackson, re Complaints Concerning Inappropriate Language | V-DAR 01786 | Y |
| 28. | 03/18/96 | Bell Atlantic Network Operations Associate Performance Appraisal for the Period 1/95-12/95 | V-DAR 00114-7 | Y |
| 29. | 1996 | Baltimore Transport Control Center Position Requirements Transport Provisioning Technician | V-DAR 00121-4, Dep. of F. Darcangelo, Ex. 12 | Y |
| 30. | 01/97–12/31/97 | Associate Appraisal and Development Plan for F. Darcangelo | Dep. of G. Fleig, Ex. 5 | Y |
| 31. | 01/13/97 | Bell Atlantic Network Operations Associate Performance Appraisal for the Period 1/96-12/96 | V-DAR 00118-9 | Y |

| 32. | 07/01/97 | Maryland/Delaware Network Operations Center Policy Statement re Professional Environment, with Handwritten Notes | V-DAR 01785, Dep. of G. Fleig, Ex. 23 | Y |
|---|---|---|---|---|
| 33. | 08/14/97 | Notes re 8/14/97 Incident Between F. Darcangelo and B. Lee | Dep. of M. Moxey, Ex. 24; V-DAR 01783 | Y |
| 34. | 08/14/97 | Notes: F.D. File | Dep. of G. Fleig, Ex. 4 | Y |
| 35. | 08/14/97 | Notes Prepared by G. Fleig, re F. Darcangelo's Conduct in the Workplace | Dep. of F. Fleig Ex. 1; V-DAR 00135 | Y |
| 36. | 08/15/97 | Information Sheets re Seminars on Interpersonal Communications Skills and "How to Manage Conflict, Anger & Emotion," with Handwritten Notes | V-DAR 01774-5 | Y |
| 37. | 10/13/97 | Notes Prepared by J. Conrad, re Discussion with F. Darcangelo re Behavior in the Workplace, with Handwritten Notes Attached | Dep. of J. Conrad, Ex. 14 | Y |
| 38. | 10/23/97-04/27/99 | CORE Records re F. Darcangelo | Dep. of C. English, Ex. 8 (excerpts attached to Defendant's Motion for Summary Judgment) | Y |
| 39. | 11/04/97 | Independent Medical Examination Report by Anthony Russo, M.D. | Dep. of A. Russo, Ex. 6 | Y |
| 40. | 11/04/97 | Dr. Anthony Russo Notes of Interview with F. Darcangelo | Dep. of A. Russo, Ex. 8 (excerpts attached to Defendant's Motion for Summary Judgment) | Y |

| 41. | 1997 | Bell Atlantic Code of Business Conduct | V-DAR 01044-104, Dep. of F. Darcangelo, Ex. 15 | Y |
|---|---|---|---|---|
| 42. | 03/09/98 | Memo to F. Darcangelo re Inappropriate Behavior Toward Employee | V-DAR 00163 | Y |
| 43. | 03/11/98-05/11/98 | CORE Notes re Conversations with Julie Swope | Dep. of J. Swope Ex. 23; V-DAR 01939-41 | Y |
| 44. | 03/13/98 | Memo re F. Darcangelo's Use of Inappropriate Language on 3/6/98 | V-DAR 00164 | Y |
| 45. | 05/08/98 | Notes of Incident Involving F. Darcangelo | Dep. of C. English, Ex. 7 | Y |
| 46. | 05/08/98 | Notes Prepared by M. Moxey, re Fran Darcangelo's Removal from the Workplace | Dep. of M. Moxey, Ex. 7 | Y |
| 47. | 05/08/98 | Rifle Target Poster with Caption: "Put Butch on the Bus" | Dep. of A. Dankert, Ex. 5; Dep. of C. English, Ex. 6 | Y |
| 48. | 05/09/98 | Rifle Target Poster with Caption: "Head of the T.C.C. Sharpshooters," with Post-It | V-DAR 01840; Dep. of A. Dankert, Ex. 4; Dep. of G. Fleig, Ex. 18 | Y |
| 49. | 05/09/98 | Rifle Target Poster with Caption: "Brain Dead 9AM-5 PM Mon-Fri" | Dep. of A. Dankert, Ex. 3; V-DAR 04607 | Y |
| 50. | 05/29/98 | Independent Medical Examination Report by Jerome Gottlieb, M.D. | Dep. of G. Zimberg Ex. 9; V-DAR 00881-3 | Y |
| 51. | 06/04/98 | Minutes of Meeting with M. Moxey, C. Sakay, F. Darcangelo, and E. McCollough Welcoming F. Darcangelo Back to Work | Dep. of M. Moxey, Ex. 9 | Y |

| 52. | 06/15/98 & 07/20/98 | Minutes of Grievance Meetings re F. Darcangelo's 10-day Suspension | Dep. of J. Conrad, Ex. 16; V-DAR 00969-73 | Y |
|---|---|---|---|---|
| 53. | 06/30/98 | Associate Appraisal and Development Plan for F. Darcangelo for the Period 1/1/98-6/30/98, prepared by M. Moxey | V-DAR 01870 | Y |
| 54. | 09/21/98 | Notes on Fran Incident | Dep. of M. Moxey, Ex. 11 | Y |
| 55. | 09/23/98 | Notes re FD Incident | Dep. of C. English, Ex. 13 | Y |
| 56. | 09/23/98 | Minutes of Meeting Prepared by G. Fleig, re F. Darcangelo's 3-day Suspension | Dep. of G. Fleig, Ex. 10 | Y |
| 57. | 09/28/98 | Memo from S. Townsend re F. Darcangelo's "Disruptive" Telephone Conversation, with Handwritten Notes by M. Moxey | V-DAR 00157 | Y |
| 58. | 09/30/98 | Notes on Discussion with F. Darcangelo in Presence of E. McCullough (Union Steward) re Workplace Behavior | Dep. of M. Moxey, Ex. 13 | Y |
| 59. | 10/23/98 | Notes Prepared by M. Moxey, re Incident Involving F. Darcangelo's Behavior in the Workplace | Dep. of M. Moxey, Ex. 14 | Y |
| 60. | 10/23/98 | Notes Prepared by B. English, re Incident Involving F. Darcangelo's Behavior in the Workplace | Dep. of C. English, Ex. 18 | Y |
| 61. | 10/23/98 | Addendum Prepared by M. Moxey, re 15-day Suspension of F. Darcangelo for Misconduct and Insubordination | V-DAR 00162 | Y |
| 62. | 11/04/98 | Notes Prepared by B. English, re Discussions with Associate re F. Darcangelo's Potential for Retaliation | Dep. of C. English, Ex. 16; V-DAR 00221 | Y |

| 63. | 11/16/98 | Minutes of Meeting with C. Sakay, M. Moxey, F. Darcangelo and E. McCullough re Welcome Back from Suspension | Dep. of M. Moxey, Ex. 16 | Y |
|---|---|---|---|---|
| 64. | 12/17/98 | F. Darcangelo Termination: Witness Statements re Incident with B. Lee | V-DAR 01743-9; Dep. of J. Conrad, Ex. 20 | Y |
| 65. | 12/18/98 | F. Darcangelo Statement re 17 December 1998 Incident | Dep. of C. English, Ex. 21 | Y |
| 66. | 1998 | F. Darcangelo Memo to Communications Workers of America Local 2101 Titled "A Year to End All Years" | V-DAR 04009 | Y |
| 67. | 01/06/99 | Summary of Events Leading to Termination of F. Darcangelo | Dep. of J. Conrad, Ex. 19; V-DAR 00770-2 | Y |
| 68. | 01/06/99 | Bell Atlantic Statement of Individual Loss for F. Darcangelo | Dep. of J. Conrad, Ex. 25 | Y |
| 69. | 01/06/99 | Letter to F. Darcangelo from J. Conrad re Termination | V-DAR 04064, Dep. of A. Sewell, Ex. 6 | Y |
| 70. | 01/11/99 | Notes re "Violations Code of Conduct Fran Darcangelo Incident 17 December 1998" | V-DAR 00169 | Y |
| 71. | 02/01/99 | Notes of Grievance Meeting re Union Request to Lift B. Lee's Suspension (Confidential) | V-DAR 01707-8, Dep. of A. Sewell, Ex. 4 | Y |
| 72. | 02/12/99 | Psychiatric Evaluation of F. Darcangelo, Signed by Stephen W. Seibert, M.D. | Dep. of G. Zimberg, Ex. 10; V-PLA 00262-7 | Y |
| 73. | 02/16/99 | Notes Prepared by J. Conrad, re F. Darcangelo's Termination Meeting | Dep. of F. Darcangelo, Ex. 25; V-DAR 00153-5 | Y |

| 74. | 04/11/99 | Memo to J. Conrad from M. Moxey re Customer Dropping Incident Involving F. Darcangelo | Dep. of M. Moxey, Ex. 15 | Y |
|---|---|---|---|---|
| 75. | 04/29/99 | F. Darcangelo Second Step Grievance: Company Response to Union Concerns | Dep. of J. Conrad, Ex. 22; V-DAR 01038; V-DAR 00973 | Y |
| 76. | 10/25/01 | Written Finding of the Maryland Commission on Human Relations | Dep. of F. Darcangelo, Ex. 6; V-DAR 00806-11 | Y |
| 77. | 12/24/02 | Handwriting Samples of "Head of the T. C. Sharpshooters" and "Butch English" | Dep. of F. Darcangelo, Ex. 30; Dep. of F. Darcangelo Ex. 29 | Y |
| 78. | Undated | Answers to Interview Questions by M. Moxey and J. Conrad, with Interview Questions Attached | Dep. of M. Moxey, Ex. 5; Dep. of J. Conrad, Ex. 10 | Y |
| 79. | Undated | F. Darcangelo's 1997 U.S. Individual Income Tax Return, Form 1040 | V-PLA 338-44 | N |
| 80. | Undated | F. Darcangelo's 1998 U.S. Individual Income Tax Return, Form 1040 | V-PLA 00326-37 | N |
| 81. | Undated | F. Darcangelo's 1999 U.S. Individual Income Tax Return, Form 1040 | V-PLA 00316-25 | N |
| 82. | Undated | F. Darcangelo's 2000 U.S. Individual Income Tax Return, Form 1040 | V-PLA 00304-15 | N |
| 83. | Undated | F. Darcangelo's 2001 U.S. Individual Income Tax Return, Form 1040 | V-PLA 00295-303 | N |
| 84. | Undated | F. Darcangelo's List of Employers | V-PLA 00141 | N |
| 85. | Undated | F. Darcangelo's Source and amount of income since Jan. 6, 1999 | V-PLA 00143-8 | N |

| 86. | 04/23/98 | Maryland Office of Unemployment Insurance- Denial Notice for F. Darcangelo | V-PLA 00249-51 | Y |
|---|---|---|---|---|
| 87. | 04/28/01 | F. Darcangelo's Veteran's Application for Compensation or Pension;<br><br>Rating Decision by the Dept. of Veteran's Affairs | V-PLA 00283-94 | Y |
| 88. | 06/09/03 | Expert Report of Jeffery S. Janofsky | Dep. of J. Janofsky, Ex. 8 | Y |
| 89. | 02/14/03 | Plaintiff's Responses to Defendant's 1st Set and 2nd Sets of Requests for Admission | | Y |
| 90. | 03/17/03 | Plaintiff's Responses to Defendant's 2nd Set of Interrogatories | | Y |
| 91. | Various | Gus Dankert Incident Reports | Dep. of A. Dankert, Exs. 8-9 | Y |
| 92. | 12/23-24/02 | Videotapes of Deposition of Plaintiff Frances Darcangelo | | Y |
| 93. | 01/03/03 | Videotapes of Expert Examination of Plaintiff | | Y |
| 94. | Undated | Handwritten Notes regarding grievance | Dep. of M. Bury, Ex. 1, V-DAR 03730-3 | Y |
| 95. | 08/26/98 | Labor Relations Information System Grievance Meeting Minutes | Dep. of M. Bury, Ex. 4, V-DAR 00944-56 | Y |
| 96. | Undated | Gloria Pack's Handwritten Notes from the grievance relating to the September '98 insubordination incident and the October 23rd fifteen-day suspension | Dep. of M. Bury, Ex. 5, V-PLA 00454-63 | Y |

| 97. | 11/19/02 | Labor Relations Information System Meeting Minutes | Dep. of M. Bury, Ex. 6, V-DAR 00980-1; V-PLA 00442-7 | Y |
|---|---|---|---|---|
| 98. | 01/11/99 | Letter to R. Wahl from M. Bury re: F. Darcangelo Evaluation | Dep. of M. Bury, Ex. 7, V-DAR 00922 | Y |
| 99. | 07/27/99 | Letter to F. Darcangelo from J. Buttiglieri re:  file requested in 6/10/99 letter | Dep. of M. Bury, Ex. 8, V-DAR 04010 | Y |
| 100. | 10/02/98 | Request to Review/Authorization to Release Medical Records | Dep. of M. Bury, Ex. 9, V-DAR 02049 | Y |
| 101. | 02/05/02 | Fax to J. Buttiglieri and M. Wilson from M. Bury with document titled Eradicate All Evildoers | Dep. of M. Bury, Ex. 10, V-DAR 04290-1 | Y |
| 102. | 09/13/94 | Release Form | Dep. of M. Bury, Ex. 11 | Y |
| 103. | Undated | Affidavit of G. Dankert | Dep. of G. Dankert, Ex. 6 | Y |
| 104. | 02/19/03 | Labor Relations Information System Grievance Report, Employee Discharged | Dep. of G. Dankert, Ex. 7 | Y |
| 105. | 12/02 | Plaintiff's Responses to Defendant's 1st Set of Interrogatories | Dep. of F. Darcangelo, Ex. 1 | Y |
| 106. | 12/16/02 | E-mail of Plaintiff's Responses to Defendant's 1st Set of Requests for Production | Dep. of F. Darcangelo, Ex. 2 | Y |
| 107. | 11/06/01 | Letter to N. Bell from F. Darcangelo applying for reconsideration of findings | Dep. of F. Darcangelo, Ex. 7; V-PLA 00248 | Y |

| 108. | 11/25/02 | Memorandum of Understanding to E. Burkhardt from M. Kranitz | Dep. of M. Kranitz, Ex. 11 | Y |
|------|----------|----------------------------------------------------------|----------------------------|---|
| 109. | 03/08/01 | Resume of M. Kranitz | Dep. of M. Kranitz, Ex. 12 | Y |
| 110. | Undated | Background information on Vocational Consultants | Dep. of M. Kranitz, Ex. 13 | Y |
| 111. | Undated | Biographical Sketch of M. Kranitz | Dep. of M. Kranitz, Ex. 14 | Y |
| 112. | Undated | Information re: Mediation Services of Annapolis | Dep. of M. Kranitz, Ex. 15 | Y |
| 113. | Undated | Information re: Mediation Services of Annapolis | Dep. of M. Kranitz, Ex. 16 | Y |
| 114. | Undated | Information re: National Institute for Conflict Resolution | Dep. of M. Kranitz, Ex. 17 | Y |
| 115. | 10/27/97 | Letter to T. Russo from D. Crossman re: Exam of F. Darcangelo | Dep. of A. Russo, Ex. 2 | Y |
| 116. | 04/27/93 | Handwritten Notes of Doctor | Dep. of A. Russo, Ex. 4 | Y |
| 117. | 10/15/97 | York Health System Psychiatric Evaluation | Dep. of A. Russo, Ex. 7; V-DAR 02241-3 | Y |
| 118. | Undated | Resume of J. Swope | Dep. of J. Swope, Ex. 1 | Y |
| 119. | Undated | Pennsylvania Bureau of Professional and Occupational Affairs License for J. Swope | Dep. of J. Swope, Ex. 2 | Y |
| 120. | Undated | Letter from J. Mira reporting F. Darcangelo's illness and additional medical records | Dep. of J. Swope, Ex. 6; V-DAR 04356-80 | N |
| 121. | Various Dates | File material from J. Swope | Dep. of J. Swope, Ex. 7; V-DAR 5206-451 | N |

| 122. | Various Dates | Yorktowne Psychological Services Progress Notes | Dep. of J. Swope, Ex. 8; V-DAR 5420-8 | N |
|------|------|------|------|---|
| 123. | 09/23/94 | Summary Evaluation forms | Dep. of J. Swope, Ex. 9; V-DAR 5229-32, 5345-6 | N |
| 124. | 04/01/02 | Letter to H. Son from J. Swope indicating dates F. Darcangelo was in her office | Dep. of J. Swope, Ex. 11; V-DAR 5453-6 | Y |
| 125. | Undated | Encounter Form from J. Swope | Dep. of J. Swope, Ex. 12; V-DAR 5366 | Y |
| 126. | 07/05/94 | Yorktowne Psychological Services Intake Evaluation form | Dep. of J. Swope, Ex. 16; V-DAR 5298-9, 5270, 5272 | Y |
| 127. | 11/02/01 | Veterans Affairs Statement in Support of Claim | Dep. of J. Swope, Ex. 17; V-DAR 5337 | Y |
| 128. | Undated | TAO, Inc. Monthly Outpatient Activity Form | Dep. of J. Swope, Ex. 19; V-DAR 5401 | Y |
| 129. | Various Dates | Concurrent Treatment Updates-Psychiatry forms | Dep. of J. Swope, Ex. 20; V-DAR 02291-3 | Y |
| 130. | 10/20/94 | Family and Medical Leave Act Questionnaire | Dep. of J. Swope, Ex. 21; V-DAR 01725-30 | Y |
| 131. | Undated | Diagnostic Criteria for 301.0 Paranoid Personality Disorder | Dep. of G. Zimberg, Ex. 4 | Y |
| 132. | Undated | Criteria for Hypomanic Episode | Dep. of G. Zimberg, Ex. 5 | Y |

| 133. | Various Dates | Concurrent Treatment Updated-Psychiatry | Dep. of G. Zimberg, Ex. 6; V-DAR 02244-310 | Y |
|---|---|---|---|---|
| 134. | Undated | Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR | Dep. of G. Zimberg, Ex. 11 | Y |
| 135. | 01/03/03 | Letter to G. Zimberg from E. Burkhardt requesting preparation of a report on F. Darcangelo | Dep. of G. Zimberg, Ex. 13 | Y |
| 136. | 04/30/02 | Letter to K. Knapp from G. Zimberg attaching Multiphasic Screen Test Results | Dep. of G. Zimberg, Ex. 16; V-DAR 02218-9 | Y |
| 137. | Various Dates | Notes relating to G. Zimberg contact with CORE | Dep. of G. Zimberg, Ex. 17; V-DAR 02309, 01937, 01939, V-PLA 00017 | Y |
| 138. | Undated | Family and Medical Leave Act Verification Form for F. Darcangelo | Dep. of G. Zimberg, Ex. 18; V-PLA 00117 | Y |
| 139. | 07/08/99 | Charge of Discrimination Form and Attachment | Exhibit A of Memorandum in Support of Defendant's Partial Motion to Dismiss | Y |
| 140. | 06/25/01 | Charge of Discrimination Form and Attachment | Exhibit B of Memorandum in Support of Defendant's Partial Motion to Dismiss | Y |
| 141. | 02/28/01 | Amended Compl., *Darcangelo v. Verizon Communications, Inc., et al.*, No. 1:01-cv-00045-FNS, dated Dec. 4, 2000 | | Y |
| 142. | 07/30/02 | Stipulation of Dismissal With Prejudice As To Verizon, *Darcangelo v. Verizon Communications, Inc., et al.*, No. 1:01-cv-00045-FNS, dated July 30, 2002 | Docket #47 | Y |

H-17

| 143. | 01/08/03 | Bell Atlantic Service/Employee Records | V-DAR 02314-9 | Y |
| 144. | 01/01/99 | BDR Inquiry (History) | V-DAR 03696-8 | Y |
| 145. | 06/01/98 | CORE Modification Checklist for F. Darcangelo | V-PLA 00056 | Y |
| 146. | 06/19/98 | Letter to M. Moxey from CORE re: Sickness and Accident Disability Benefit Plan | V-PLA 00057 | Y |
| 147. | 01/12/90 | Request for Special Medical Evaluation | V-PLA 00066-72 | Y |
| 148. | 10/15/97 | Memo to Aaron & Theresa from Gottlieb re: presentation on T3's | V-PLA 00089 | Y |
| 149. | 02/16/90 | Attending Physician's Report | V-PLA 00110 | Y |
| 150. | 11/25/98 | Bell Atlantic Office of Ethics and Corporate Compliance Complaint | V-PLA 00125 | N |
| 151. | 10/23/98 | Statement of Occurrence | V-PLA 00132-5 | N |
| 152. | 05/11/98 | Statement of Occurrence | V-PLA 00184 | N |
| 153. | 02/14/02 | Compensation Examination of F. Darcangelo | Dep. of F. Darcangelo, Ex. 13; V-PLA 00257-8 | Y |
| 154. | 09/10/99 | Examination Findings | V-PLA 00259-61 | Y |
| 155. | 01/19/98 | Handwritten Notes | V-PLA 00414-8 | N |
| 156. | 01/19/98 | Grievance Report | V-PLA 00419 | N |
| 157. | 09/23 | Handwritten Notes | V-PLA 00420-5 | N |
| 158. | 12/03/98 | Handwritten Notes titled 1st Step | V-PLA 00429-32 | N |
| 159. | 12/10/98 | Letter to M. Bury from J. Buttiglieri re: Grievance Schedule – New Date & Time | V-PLA 00433-5 | N |

| 160. | 10/06/98 | Handwritten Notes | V-PLA 00437-41 | N |
|---|---|---|---|---|
| 161. | 04/26/99 | Handwritten Notes | V-PLA 00442-7 | N |
| 162. | 01/06/99 | Handwritten Notes | V-PLA 00448-53 | N |
| 163. | 04/09/99 | Handwritten Notes | V-PLA 00454-63 | N |
| 164. | 10/21/97 | Fax with attached Forms to be completed by F. Darcangelo | V-PLA 000484-6 | Y |
| 165. | 06/15/98 | Handwritten Notes | V-PLA 00590-4 | N |
| 166. | 08/05/98 | Handwritten Notes | V-PLA 00595-601 | N |
| 167. | 10/06/98 | Handwritten Notes titled First Step Insubordination Suspension | V-PLA 00602-5 | N |
| 168. | 12/03/98 | Handwritten Notes | V-PLA 00606-10 | N |
| 169. | 02/16/99 | Handwritten Notes | V-PLA 00611-6 | N |
| 170. | 04/09/99 | Handwritten Notes | V-PLA 00617-27 | N |
| 171. | 04/29/99 | Handwritten Notes | V-PLA 00628-31 | N |
| 172. | 10/28/97 | Letter to F. Darcangelo from D. Crossman re: Scheduled Independent Medical Examination | V-PLA 00718 | Y |
| 173. | 10/31/97 | Letter to F. Darcangelo from D. Crossman re: Scheduled Independent Medical Examination | V-PLA 00721 | Y |
| 174. | 05/15/98 | Letter to F. Darcangelo from A. Albanese re: Examination Appointment | V-PLA 00722 | Y |
| 175. | 09/16/98 | E-mail to M. Moxey from C. English re: Time Card | V-DAR 00743 | Y |

| 176. | 11/16/98 | F. Darcangelo Return to Work Memo | V-DAR 00757-8 | Y |
|---|---|---|---|---|
| 177. | 08/15/01 | E-mail to F. Morgan from G. Miles re: F. Darcangelo v. Verizon Maryland, Inc. | V-DAR 01107-8 | Y |
| 178. | 08/14/01 | E-mail to F. Morgan from G. Miles re: F. Darcangelo v. Verizon Maryland, Inc. | V-DAR 01116-8 | Y |
| 179. | 07/30/01 | E-mail to G. Miles from F. Morgan re: F. Darcangelo v. Verizon Maryland, Inc. | V-DAR 01122 | Y |
| 180. | 12/14/01 | Equal Employment Opportunity Commission Dismissal and Notice of Rights, with Information Related to Filing Suit Under the Laws Enforced by the EEOC | V-DAR 01134-5 | Y |
| 181. | 11/09/91 | Letter to G. Miles from J. Bell re: Darcangelo v. Bell Atlantic | V-DAR 01136 | Y |
| 182. | 07/18/01 | Letter to F. Morgan from G. Miles re: Darcangelo v. Bell Atlantic | V-DAR 01143-4 | Y |
| 183. | 07/09/01 | Letter to G. Miles from F. Morgan re: Darcangelo v. Bell Atlantic | V-DAR 01145 | Y |
| 184. | 11/22/99 | Letter to L. Mason from G. Miles re: Darcangelo v. Bell Atlantic with attached Request for Information Response | V-DAR 01149-58 | Y |
| 185. | 09/26/99 | Letter to J. Williams from L. Mason re: Darcangelo v. Bell Atlantic with attached copy of Complaint | V-DAR 01254-60 | Y |
| 186. | 08/12/99 | Final Company Position Memo | V-DAR 01709 | Y |
| 187. | Undated | Second Step Notes Barbara Lee Grievance | V-DAR 01710 | Y |
| 188. | 04/27/93 | Medical Department Record for F. Darcangelo | V-DAR 01717 | Y |
| 189. | Undated | Fran Complaint | V-DAR 01752 | Y |

| 190. | Undated | M. Moxey Notes | V-DAR 01765 | Y |
| 191. | 04/05/93 | Memo to All FMAC Personnel from J. Conrad re: Professionalism in the FMAC Center | V-DAR 01803 | Y |
| 192. | Undated | Notes titled My Two Days In The Bell Atlantic Way | V-DAR 01808 | Y |
| 193. | 03/16/93 | Memo to J. Conrad from M. Ports re: Blizzard "93" | V-DAR 01809-10 | Y |
| 194. | 04/01/93 | Memo to J. Conrad from F. Darcangelo | V-DAR 01813-6 | Y |
| 195. | 04/16/93 | Memo to P. Bogdan from F. Darcangelo | V-DAR 01817 | Y |
| 196. | 06/16/93 | Memo from A. Levi | V-DAR 01818 | Y |
| 197. | 04/16/93 | Memo from R. Libertini | V-DAR 01819 | Y |
| 198. | 04/17/93 | Memo to M. Ports from F. Darcangelo | V-DAR 01820 | Y |
| 199. | 04/19/93 | Memo to R. Libertini from F. Darcangelo | V-DAR 01821-2 | Y |
| 200. | 04/19/93 | Memo to J. Conrad from F. Darcangelo | V-DAR 01823 | Y |
| 201. | 04/20/93 | Memo To Whom It May Concern from F. T.T. | V-DAR 01824 | Y |
| 202. | 04/27/93 | Memo to M. Ports from F. Darcangelo | V-DAR 01826 | Y |
| 203. | 04/28/93 | Memo to M. Ports from F.T.T. | V-DAR 01827 | Y |
| 204. | 07/26/93 | Memo from M. Ports re: F. Darcangelo | V-DAR 01829-30 | Y |
| 205. | 01/24/94 | Memo to M. Ports from F. Darcangelo | V-DAR 01831-2 | Y |
| 206. | 06/06/94 | Memo to Quality Improvement Committee Bell Atlantic from F. Darcangelo | V-DAR 01833 | Y |
| 207. | 06/06/94 | Memo to M. Belcastro from F. Darcangelo | V-DAR 01834 | Y |
| 208. | 06/07/94 | Memo to C. English from F. Darcangelo | V-DAR 01835 | Y |

H-21

| 209. | 07/06/94 | Record of Status Interview | V-DAR 01836 | Y |
|---|---|---|---|---|
| 210. | 07/07/94 | Letter to M. Ports from R. Libertini re: Interview with Ms. Darcangelo on 6/24/94 | V-DAR 01837-8 | Y |
| 211. | 09/14/98 | Seniority by Service Date chart | V-DAR 01858 | Y |
| 212. | 04/23/98 | Grievance Notes | V-DAR 01859 | Y |
| 213. | Undated | Fran Gram | V-DAR 01864 | Y |
| 214. | 07/14/94 | Report of Suspension | V-DAR 01867-8 | Y |
| 215. | | Plaintiff's Personnel File | V-DAR 00001-223 | Y |
| 216. | | CORE File | V-DAR 00273-463 | Y |
| 217. | | Maryland Commission on Human Relations File | V-DAR 00798-920 | Y |
| 218. | | Defendant's File re/Plaintiff's Grievances | V-DAR 00921-90 | Y |
| 219. | | EEOC File | V-DAR 00991-1013 | Y |
| 220. | | Security Department File re/Plaintiff | V-DAR 1875-1900 | Y |
| 221. | | Barbara Lee Personnel File and Grievance Information | V-DAR 3643-95 | Y |
| 222. | | Dr. Gary Zimberg Files | V-DAR 2241-310, 4870-5205 | N |
| 223. | | Endoscopy USA Files | V-DAR 3699-719 | Y |
| 224. | | CWA Files | V-DAR 3720-4174 | N |
| 225. | | Dennis Bronis Personnel File and Grievance Information | V-DAR 4292-355, 4388-434, 4453-4 | Y |

| 226. | | Julie Swope Files | V-DAR 4356-80, 5206-452 | N |
|---|---|---|---|---|
| 227. | | Memorial Hospital File | V-DAR 4436-54 | Y |
| 228. | | Dr. Knapp Files | V-DAR 2211-38, 4455-564 | Y |
| 229. | | Dr. VonRago File | V-DAR 4566-77 | Y |
| 230. | | Dr. Illfelder File | V-DAR 4608-11 | Y |
| 231. | | Dr. Siebert File | V-DAR 4653-820 | Y |
| 232. | | Dr. Mira File | V-DAR 4861-7 | Y |
| 233. | | Various Demonstrative Exhibits To Be Determined | | Y |

Defendant may offer additional exhibits as rebuttal evidence.

I.    **Witness List**

    1.    **Plaintiff's Witnesses That Will Be Called At Trial**

Augustus E. Dankert
6203 West Hemlock Drive
Sykesville, MD 21784
(410) 549-1412

Maria Bury
1112 Rosedale Avenue
Baltimore, MD 21237
410-780-3990

Julie Swope
220 E. King Street
York, PA 17403
(717) 843-4857

Dr. William E. Wright
6801 Wemberly Way
McLean, VA 22101
(703) 556-0092

James P. Conrad, c/o Verizon Maryland Inc.

Charles English, c/o Verizon Maryland Inc.

Marianne Moxey, c/o Verizon Maryland Inc.

Barbara Jean Lee, c/o Verizon Maryland Inc.

Barbara Kelly
22 Mapledale Ave.
Glen Burnie, MD 21061
(410) 224-0854

    2.    **Plaintiff's Witnesses That May Be Called If The Need Arises**

Eleanor McCullough
8242 Church Lane
Windsor Mill, MD 21244
Union Steward- (Retired this year)
410-922-1118

Virginia Glinderman
1404 Jeffers Road
Towson, MD 21204
(410) 823-7345

Tim Mace, c/o Verizon Maryland Inc.

John L. Russo
608 Yankee Doodle Drive
Bel Air, MD
410-893-6778

Anthony F. Russo, M.D.
2300 East Market Street
York, PA 17402
717-849-5744

**Note:  Defendant objects to the presentation of Ms. McCullough, Ms. Glinderman, Mr. Mace, and Mr. Russo.  The depositions of these witnesses were not taken based on an understanding with prior counsel that they would not be used at trial.**

### 3.    Defendant's Witnesses That Will Be Called At Trial

1.    Frances Darcangelo, c/o Morris E. Fischer, Esq.

2.    James P. Conrad, c/o Verizon Maryland Inc.

3.    Charles English, c/o Verizon Maryland Inc.

4.    Marianne Moxey, c/o Verizon Maryland Inc.

### 4.    Defendant's Witnesses That May Be Called If The Need Arises

1.    Gottlieb J. Fleig, c/o Verizon Maryland Inc.

2.    Barbara Kelly
      22 Mapledale Ave.
      Glen Burnie, MD 21061
      (410) 224-0854

3.    Barbara Jean Lee, c/o Verizon Maryland Inc.

4.      Anthony F. Russo, M.D.
        2300 East Market Street
        York, PA 17402
        717-849-5744

5.      Ann Sewell, c/o Verizon Maryland Inc.

6.      Julie D. Swope
        220 E. King Street
        York, PA 17403
        717-843-4857

J.    **A List For Each Party Of The Name And Specialties Of Experts The Party Proposes To Call As Witnesses Including Hybrid Fact/Expert Witnesses Such As Treating Physicians**

    1.    **Plaintiff's Experts**

Dr. Gary Zimberg
1600 S. George Street
York, PA 17403
(717) 848-3615

Specialty:  Psychiatry

Dr. Martin Kranitz
1160 Spa Road, Ste. 1B
Annapolis MD 21403
(410) 280-8888

Specialty:  Vocational expert

    2.    **Defendant's Experts**

Jeffrey Janofsky, PhD, Specialty:  Psychiatry

**K.** **A List Of The Pages And/Or Lines Of Any Portion Of A Deposition To Be Offered In A Party's Case In Chief Or Any Counter-Designations Under Fed. R. Civ. P. 32(A)(4)**

**1.** **Plaintiff's Deposition Excerpts**

| Plaintiff's Designations | | | Defendant's Counter-Designations | |
|---|---|---|---|---|
| Witness | From Pg:Ln | To Pg:Ln | From Pg:Ln | To Pg:Ln |
| English | 16:3 | 18:8 | | |
| English | 21:7 | 22:6 | | |
| English | 29:5 | 30:8 | | |
| English | 40:4 | 40:25 | | |
| English | 50:19 | 51:21 | | |
| English | 52:4 | 52:9 | | |
| English | 59:18 | 62:6 | | |
| English | 63:1 | 63:13 | | |
| English | 65:22 | 68:9 | | |
| English | 69:9 | 72:25 | | |
| English | 73:6 | 75:4 | | |
| English | 78:12 | 79:11 | | |
| English | 80:6 | 80:15 | | |
| English | 80:25 | 82:17 | | |
| English | 86:3 | 87:5 | | |
| English | 92:12 | 93:2 | | |
| English | 98:1 | 98:19 | | |
| English | 103:2 | 105:3 | | |
| English | 108:14 | 109:16 | | |
| English | 124:18 | 127:21 | | |
| English | 130:6 | 132:13 | | |
| English | 143:1 | 143:4 | | |
| English | 143:23 | 144:1 | | |
| English | 148:7 | 148:25 | | |
| English | 150:15 | 150:24 | | |
| Dankert | 4:16 | 4:21 | | |
| Dankert | 34:5 | 34:25 | | |
| Dankert | 41:9 | 41:15 | | |
| Dankert | 45:9 | 45:25 | | |

| | | | | |
|---|---|---|---|---|
| Dankert | 48:12 | 48:13 | | |
| Dankert | 53:15 | 53:25 | | |
| Dankert | 61:5 | 61:13 | | |
| Dankert | 61:20 | 61:25 | | |
| Dankert | 72:17 | 72:20 | | |
| Dankert | 80:7 | 80:11 | | |
| Dankert | 82:3 | 82:4 | | |
| Dankert | 83:3 | 83:10 | | |
| Dankert | 84:16 | 84:21 | | |
| Dankert | 87:8 | 87:10 | | |
| Dankert | 88:21 | 89:12 | | |
| Dankert | 100:11 | 100:15 | | |
| Dankert | 101:12 | 101:17 | | |
| Dankert | 108:7 | 108:13 | | |
| Dankert | 111:1 | 111:5 | | |
| Dankert | 112:1 | 112:12 | | |
| Dankert | 112:24 | 113:1 | | |
| Dankert | 114:10 | 114:12 | | |
| Conrad | 24:20 | 25:10 | | |
| Conrad | 39:19 | 40:19 | | |
| Conrad | 49:18 | 51:3 | | |
| Conrad | 58:2 | 59:14 | | |
| Conrad | 84:21 | 86:4 | | |
| Conrad | 88:4 | 88:7 | | |
| Conrad | 99:15 | 99:21 | | |
| Conrad | 100:1 | 100:17 | | |
| Conrad | 102:4 | 102:20 | | |
| Conrad | 103:19 | 105:17 | | |
| Conrad | 120:11 | 121:11 | | |
| Conrad | 124:2 | 124:13 | | |
| Conrad | 142:20 | 145:4 | | |
| Conrad | 146:11 | 147:12 | | |
| Conrad | 150:12 | 160:13 | | |
| Conrad | 163:3 | 166:21 | | |
| Conrad | 175:7 | 181:6 | | |
| Conrad | 198:20 | 199:13 | | |
| Conrad | 5:15 | 5:21 | | |

| | | | | |
|---|---|---|---|---|
| Conrad | 12:2 | 14:21 | | |
| Conrad | 24:1 | 25:29 | | |
| Conrad | 32:15 | 33:7 | | |
| Conrad | 37:6 | 38:5 | | |
| Conrad | 47:13 | 48:7 | | |
| Conrad | 49:2 | 50:8 | | |
| Conrad | 52:7 | 53:7 | | |
| Conrad | 56:1 | 56:10 | | |
| Conrad | 66:6 | 66:11 | | |
| Conrad | 70:19 | 71:21 | | |
| Conrad | 77:9 | 79:15 | | |
| Conrad | 81:2 | 83:1 | | |
| Conrad | 83:21 | 84:21 | | |
| Conrad | 87:13 | 88:11 | | |
| Conrad | 89:15 | 93:19 | | |
| Conrad | 102:18 | 105:5 | | |
| Conrad | 119:4 | 121:25 | | |
| Conrad | 135:3 | 135:14 | | |
| Conrad | 139:4 | 139:15 | | |
| Conrad | 142:8 | 142:15 | | |
| Conrad | 149:19 | 150:11 | | |
| Conrad | 151:18 | 152:11 | | |
| Conrad | 159:18 | 160:19 | | |
| Conrad | 170:7 | 170:9 | | |
| Conrad | 181:10 | 181:21 | | |
| Conrad | 183:4 | 184:6 | | |
| Lee | 29:6 | 31:2 | | |
| Lee | 33:3 | 35:12 | | |
| Lee | 39:16 | 40:1 | | |
| Lee | 41:10 | 43:10 | | |
| Lee | 47:9 | 47:21 | | |
| Lee | 55:5 | 58:4 | | |
| Lee | 63:16 | 65:1 | | |
| Lee | 72:7 | 80:18 | | |
| Lee | 106:13 | 106:19 | | |
| Lee | 111:52 | 111:19 | | |
| Lee | 113:16 | 114:15 | | |

| Moxey | 9:18 | 9:20 | | |
|---|---|---|---|---|
| Moxey | 10:1 | 10:3 | | |
| Moxey | 37:16 | 37:21 | | |
| Moxey | 39:1 | 39:21 | | |
| Moxey | 56:8 | 56:17 | | |
| Moxey | 69:9 | 69:21 | | |
| Moxey | 70:20 | 70:21 | | |
| Moxey | 116:5 | 116:11 | | |
| Moxey | 192:6 | 193:10 | | |
| Bury | 21:7 | 22:17 | | |
| Bury | 24:7 | 24:18 | | |
| Bury | 25:11 | 25:16 | | |
| Bury | 38:9 | 38:11 | | |
| Bury | 38:20 | 38:21 | | |
| Bury | 44:5 | 44:9 | | |
| Bury | 45:7 | 45:16 | | |
| Bury | 54:12 | 54:25 | | |
| Bury | 60:19 | 60:20 | | |
| Bury | 64:17 | 65:10 | | |
| Bury | 89:3 | 89:6 | | |
| Bury | 92:2 | 92:6 | | |
| Bury | 97:4 | 97:14 | | |
| Bury | 99:3 | 99:14 | | |
| Bury | 113:7 | 113:12 | | |
| Bury | 115:9 | 115:10 | | |
| Bury | 118:20 | 118:24 | | |
| Bury | 119:2 | 119:6 | | |
| Bury | 168:14 | 168:15 | | |
| Bury | 179:20 | 179:25 | | |
| Bury | 180:1 | 180:5 | | |
| Wright | 4:21 | 8:22 | | |
| Wright | 10:4 | 12:14 | | |
| Wright | 15:2 | 17:17 | | |
| Wright | 18:7 | 21:8 | | |
| Wright | 22:14 | 23:22 | | |
| Wright | 25:10 | 25:22 | | |
| Wright | 28:16 | 43:19 | | |

| Kelly | 3:12 | 3:17 | | |
|-------|------|------|--|--|
| Kelly | 7:1 | 7:7 | | |
| Kelly | 19:1 | 24:18 | | |
| Kelly | 26:1 | 30:20 | | |

**Defendant's Statement:**  For the reasons explained below, defendant objects to the inclusion of plaintiff's deposition designations in the pretrial order and has not provided line-by-line counter-designations.  Instead, as a placeholder and in an abundance of caution, defendant counter-designates the entire deposition transcripts for those witnesses and reserves the right to challenge the admissibility of portions of those transcripts.

Plaintiff did not indicate that she intended to include her designations in the pretrial order until September 14, one day before the pre-trial order was due.  These designations were also in breach of an agreement between the parties that plaintiff would not propose designations for these witnesses.[1]  Because of their late inclusion, defendant could not – despite best efforts – complete the counter-designations to these witnesses in the limited time available (less than a full work day) before the order must be submitted.

In addition, the deposition designations are inadmissible and should be stricken.  It is defendant's position that the local rules do not require the parties to list non-party deposition excerpts until and if the witness becomes unavailable and the deposition excerpt thereby is rendered admissible.

_____

[1]     Plaintiff included certain deposition designations in her draft pretrial order, served on defendant on August 31, 2004.  When defendant's counsel pointed out shortly thereafter that the depositions of these witnesses would not be admissible because all of the witnesses in question would be appearing in person or were within the Court's subpoena power and could be compelled to appear in person, plaintiff agreed to remove the deposition designations from the draft pretrial order.  However, at 4 pm on the day prior to the filing of the pretrial order, plaintiff's counsel changed his mind, for the first time taking the position that Local Rule 106.2(k) requires the parties to now list all deposition excerpts for all witnesses regardless of their availability currently, in the event that a witness subsequently becomes unavailable.  Plaintiff provided additional deposition designations at 10:30 pm the night before the deadline for filing this order.

The parties ask the Court to provide an interpretation of Local Rule 106.2(k) at the pretrial conference.  Should the Court agree with plaintiff's position that some or all of the deposition designations are required at this time, plaintiff has stipulated that she will not object to defendant's subsequently providing counter-designations or to the designation of additional deposition excerpts for witnesses who are not now, but hypothetically could later become, unavailable.  Should the Court agree with defendant's position that plaintiff's deposition designations are not now required by the local rule, defendant asks that they be stricken from the pretrial order, without prejudice to the parties having an opportunity to subsequently designate and counter-designate deposition excerpts should particular witnesses later become unavailable.

**Plaintiff's Statement:**  Plaintiff's counsel had an apparent misunderstanding with defense counsel as to what was stipulated to.  Plaintiff throughout the negotiation assured defendant that she did not intend to jeopardize defendant's rights to file counter-designations and agreed that defendant would have two weeks following a ruling at the pretrial conference to submit its counter-designations.  It should be noted that all of plaintiff's designations were submitted to defense counsel by September 15, 2004, with the exception of one person, which was the result of defendant not stipulating to certain medial records being offered into evidence.

## 2.    Defendant's Deposition Excerpts

Defendant designates the following deposition excerpts, including the excerpts from the deposition videotape corresponding to the page/line numbers listed below.  Defendant reserves the right to designate excerpts from the depositions of additional witnesses listed on either party's witness list should they subsequently become unavailable to testify in person, if the introduction of such excerpts is otherwise appropriate pursuant to Fed. R. Civ. P. 32(a)(3) and the Federal Rules of Evidence.

| Defendant's Designations | | | Plaintiff's Counter-Designations | |
|---|---|---|---|---|
| Witness | From Pg:Ln | To Pg:Ln | From Pg:Ln | To Pg:Ln |
| Darcangelo | 29:6 | 30:5 | | |
| Darcangelo | 30:19 | 31:3 | | |
| Darcangelo | 35:14 | 35:21 | 35:22 | 36:19 |
| Darcangelo | 36:20 | 37:2 | 37:11 | 37:23 |
| Darcangelo | 38:5 | 38:10 | | |
| Darcangelo | 39:4 | 39:20 | | |
| Darcangelo | 40:3 | 40:10 | | |
| Darcangelo | 42:4 | 42:6 | | |
| Darcangelo | 49:20 | 51:3 | 51:4 | 51:19 |
| Darcangelo | 59:21 | 60:20 | | |
| Darcangelo | 103:15 | 113:17 | | |
| Darcangelo | 124:17 | 128:20 | | |
| Darcangelo | 135:6 | 137:1 | | |
| Darcangelo | 138:20 | 140:4 | 140:5 | 141:16 |
| Darcangelo | 144:24 | 146:1 | 146:17 | 147:11 |
| Darcangelo | 147:12 | 148:25 | | |
| Darcangelo | 153:2 | 153:18 | | |
| Darcangelo | 153:22 | 154:19 | | |
| Darcangelo | 156:3 | 158:16 | | |
| Darcangelo | 164:21 | 166:23 | | |
| Darcangelo | 178:11 | 179:14 | 180:1 | 180:3 |
| Darcangelo | 181:8 | 181:24 | | |
| Darcangelo | 183:3 | 184:2 | | |
| Darcangelo | 186:10 | 187:10 | | |
| Darcangelo | 193:3 | 194:11 | | |
| Darcangelo | 197:4 | 207:17 | | |
| Darcangelo | 210:7 | 212:14 | | |
| Darcangelo | 216:20 | 221:19 | | |
| Darcangelo | 223:4 | 227:7 | | |
| Darcangelo | 232:2 | 232:16 | | |
| Darcangelo | 249:11 | 251:25 | | |
| Darcangelo | 261:2 | 265:15 | | |
| Darcangelo | 272:18 | 274:23 | | |
| Darcangelo | 298:16 | 300:12 | | |

| Defendant's Designations | | | Plaintiff's Counter-Designations | |
|---|---|---|---|---|
| Witness | From Pg:Ln | To Pg:Ln | From Pg:Ln | To Pg:Ln |
| Darcangelo | 304:14 | 307:18 | | |
| Darcangelo | 310:12 | 311:8 | | |
| Darcangelo | 312:7 | 312:13 | 312:14 | 313:14 |
| Darcangelo | 314:12 | 316:11 | | |
| Darcangelo | 318:6 | 320:2 | | |
| Darcangelo | 328:5 | 333:25 | | |
| Darcangelo | 342:10 | 347:18 | | |
| Darcangelo | 351:8 | 352:10 | | |
| Darcangelo | 362:2 | 365:7 | | |
| Darcangelo | 368:5 | 369:20 | | |
| Darcangelo | 371:16 | 376:22 | | |
| Darcangelo | 380:5 | 380:9 | | |
| Darcangelo | 381:20 | 383:14 | | |
| Darcangelo | 383:15 | 391:18 | | |
| Darcangelo | 397:11 | 397:11 | | |
| Darcangelo | 400:2 | 400:12 | | |
| Darcangelo | 403:6 | 403:15 | | |
| Darcangelo | 403:24 | 404:7 | | |
| Darcangelo | 409:7 | 417:25 | | |
| Darcangelo | 427:20 | 427:25 | | |
| Darcangelo | 431:13 | 431:17 | | |
| Darcangelo | 432:10 | 432:23 | | |
| Darcangelo | 433:3 | 435:22 | | |
| Darcangelo | 436:15 | 436:16 | | |
| Darcangelo | 437:9 | 437:13 | | |
| Darcangelo | 437:23 | 440:25 | | |
| Darcangelo | 444:1 | 444:8 | | |
| Darcangelo | 469:6 | 469:13 | | |
| Darcangelo | 481:8 | 481:19 | | |
| Darcangelo | 483:19 | 485:10 | | |
| Darcangelo | 486:4 | 486:22 | | |

**L.    Any Other Pretrial Relief, Including A Reference To Pending Motions, Which Is Requested**

Plaintiff has filed a motion with respect to establishing the value of front-pay, upon a Plaintiff's verdict and a judicial determination that front pay be awarded.  Contemporaneous to the Pre-Trial conference, Plaintiff will move that the issue of back-pay should not be addressed by the jury as per see:  *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F. 3d 495, 500-01 (7th Cir. 2000).

Defendant has opposed plaintiff's motion regarding front pay, and intends to oppose any motion filed by plaintiff seeking to bifurcate back pay, as *Pals* is not controlling, and back pay is an appropriate issue for the jury.  *See Rhoads v. Federal Deposit Ins. Corp.*, 286 F. Supp. 2d 532 (D. Md. 2003).

DC1:571938.14