Gary Bryant Zimberg                                         April 30, 2003
                         Towson, MD

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MARYLAND

3

4    FRANCES DARCANGELO,        )

5              Plaintiff,       )

6         vs.                   ) Case No.

7    BELL ATLANTIC,             ) S02-816

8              Defendant.       )

9                   -   -   -   -   -

10        The deposition of GARY BRYANT ZIMBERG was

11   taken on Wednesday, April 30, 2003, commencing at

12   10:20 a.m., at 401 Washington Avenue, Suite 303,

13   Towson, Maryland, before Donna M. Hall, Notary

14   Public.

15

16                  -   -   -   -   -

**CERTIFIED COPY**

Gary Bryant Zimberg                                                 April 30, 2003
                          Towson, MD

Page 7

1    psychiatrist for several years and as such didn't
2    initially feel that it would be appropriate for me
3    to serve as an expert.  In addition, I have no
4    desire to be an expert.
5             However, I understand the nature of the
6    case and after speaking to a hospital attorney for
7    WellSpan, the group I work for, they felt that it
8    would probably be fine to serve as an expert if I'm
9    qualified as an expert.
10        Q.  Now why did you initially feel it wasn't
11   appropriate?
12        A.  I felt that experts typically are people
13   that make a living of doing it in my field in
14   psychiatry and they're professional witnesses, they
15   often come from academic circles and this is a
16   significant part of their income.
17            And I'm more of a clinician so I have no
18   particular interest or desire to be doing it.  It's
19   adversarial, it isn't necessarily clinical and it
20   has nothing to do with the reality of the patient's
21   condition much of the time.
22            I'm the treating psychiatrist and I
23   really didn't want to muddy the waters particularly
24   in this case because Ms. Darcangelo has such a
25   difficult time forming relationships.  To do

Gary Bryant Zimberg                                             April 30, 2003
                              Towson, MD

                                                                        Page 8

1   something that would impede or in any way harm that
2   relationship seemed more destructive to the
3   patient.
4            So I try to do my best to not serve in
5   that role and hopefully everybody concerned will
6   recognize that I am the treating psychiatrist and
7   she doesn't have much of a network beyond me and I
8   don't really want to jeopardize the relationship,
9   if possible.
10      Q.   Now why would your appearing as an expert
11  have the risk of jeopardizing the relationship or
12  being destructive in that relationship?
13      A.   Because expert testimony often has
14  nothing to do with the case at hand.  Things get
15  said or implied that may be cursory to the
16  treatment of the patient or may be taken out of
17  context.  If there is a transcript and Ms.
18  Darcangelo has access to it, she may look at it and
19  say what did you say that for, what do you mean and
20  jeopardize the relationship.  It's adversarial.
21           Just by nature expert testimony is
22  adversarial.  People that do it recognize that
23  they're working for one side or the other and they
24  couch their comments in terms that will be
25  supportive.  So it just doesn't appeal to me and

Gary Bryant Zimberg

Towson, MD

April 30, 2003

Page 19

1    that all psychiatrists go through with respect to
2    forensic psychiatry?
3        A.    It's part of a psychiatry residency
4    program.  There is a course in forensic psychiatry
5    and different institutions provide more or less
6    training in that.  In that course they talk about
7    expert testimony and they talk about issues that
8    relate to psychiatry frequently and the legal arena
9    areas that you may be asked to testify and how to
10   do with subpoenas, things along those lines.
11       Q.    And you took that course?
12       A.    Yes.
13       Q.    So when did you actually agree to become
14   an expert or to act as an expert in the case, this
15   case?
16       A.    It got formally agreed until about two
17   days ago until after WellSpan's attorney -- not
18   one of WellSpan's attorneys -- Maggie Finkelstein,
19   I guess spoke to you or maybe to you and felt that
20   that would be a reasonable thing to do.  Otherwise
21   I was trying to maintain a position as simply a
22   fact witness.
23       Q.    So when Mr. Burkhardt designated you as
24   an expert witness back in November 2002, it was
25   without your knowledge or your consent?

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Gary Bryant Zimberg                                           April 30, 2003
                          Towson, MD

                                                              Page 20

1            MR. BURKHARDT:  Objection to the
2    characterization.  That is not what he said and
3    that is not what any of the documents are going to
4    indicate.
5            THE WITNESS:  Would you like me to
6    clarify?
7    BY MS. DYE:
8       Q.   Let me say that whenever he objects, he
9    just preserves that for the record, he wants to get
10   that on the transcript.
11      A.   Sure.
12      Q.   But other than that you have to answer,
13   just answer the question.  So you usually read the
14   question back.  You can always ask to have it read
15   back if you forget what it is between objections.
16      A.   Sure.
17           THE WITNESS:  What was the question?
18           (The record was read as requested.)
19           MS. DYE:  Or consent.
20           THE WITNESS:  No, that is not true.  He
21   indicated that he wanted to use me as an expert and
22   indicated what his rationale was and explained it
23   and I understood that he was trying to protect his
24   client.
25           At the same time I said I'm not

Gary Bryant Zimberg                                                April 30, 2003
                              Towson, MD

Page 21

1   particularly comfortable with this, I would prefer
2   not to be an expert and suggested that he hire an
3   expert. But for various legal reasons or reasons
4   that pertain to the best case he could make for his
5   client, he felt it was more important that he use
6   me as an expert. I understood his position, but I
7   tried to maintain my position as well.
8        Q.   There is a formal court paper that gets
9   filled out that's designation of experts in which
10  both sides say these are my experts and you know
11  Mr. Burkhardt did one in November 2002. At that
12  time did you know he was going to do that? Did you
13  know he was going to formally designate you?
14       A.   I did not know ahead of time, no.
15       Q.   Did you consent for him to formally
16  designate you as an expert at that time?
17       A.   I don't know that I ever consented. I
18  don't know that I ever refused, but I don't know
19  that I ever consented.
20       Q.   Were you retained by him or Ms.
21  Darcangelo to act in this capacity, to act in any
22  capacity other than just your regular treating
23  relationship with her?
24       A.   Not that I'm aware of. He offered to pay
25  me for services rendered, but I didn't charge for

Gary Bryant Zimberg  
Towson, MD  
April 30, 2003

Page 22

1  anything because from what I could see I was just
2  providing services that would be customary for a
3  treating psychiatrist.  He asked some background
4  information, I provided that.
5       Q.   When I spoke to you at one point I think
6  it was last week, before you had worked things out
7  with the WellSpan attorney, you indicated that you
8  did not in fact intend to act as an expert, right,
9  at that time?
10          MR. BURKHARDT:  You have to say yes.
11          THE WITNESS:  Yes, yes.
12  BY MS. DYE:
13       Q.   One of the reasons I believe you
14  mentioned to me is that your knowledge on Ms.
15  Darcangelo's condition was fairly limited because
16  your function is primarily to manage her medication
17  in contrast to her therapist who you don't talk to
18  her all the time, right?
19       A.   That's one reason, yeah, among others,
20  yes.
21       Q.   And at the time you characterized
22  yourself as a hostile witness to both parties in
23  the lawsuit?
24       A.   At that point, yes.
25       Q.   And you said a few days ago you did in

Gary Bryant Zimberg                                                April 30, 2003
Towson, MD

Page 23

1  fact consent to be an expert witness in the case.
2  And so what are the terms of your retention as an
3  expert witness?
4      A.   That Mr. Burkhardt agreed to pay me usual
5  and customary fees for preparation time and I
6  understand that I would bill your office for
7  deposition time.
8      Q.   And what is the fee that you will be
9  charging?
10     A.   $250 an hour which is a standard fee for
11 this type of work for WellSpan.
12     Q.   And that's the same for me as for Mr.
13 Burkhardt?
14     A.   Yes.
15     Q.   And it's the same for the deposition
16 testimony as for preparing any documents or other
17 kind of consulting type work?
18     A.   Or forensic work, yes.  I have to say I
19 don't typically do forensic work, but we do have
20 forensic psychiatrists that do this, it's not me.
21 So I don't have a whole lot of experience with it.
22     Q.   And but when or if any of the WellSpan
23 psychiatrists do this kind of work it's always $250
24 an hour?
25     A.   As far as I know, yes.

Page 62

1   hospitalization and I don't think it's psychotic.
2   Social or occupational functioning, hard to say
3   because you see her social occupational functioning
4   is so much more affected by her schizoid
5   personality, the bipolar is a sideshow there.
6       And occupational functioning, again, the
7   schizoid personality, poor judgement, they're such
8   overwhelming factors it's hard to say what the
9   bipolar effect has.
10      Q.   So you don't really know?
11      A.   No.
12      Q.   Okay.  Other than what we discussed with
13  respect to your conversations with Ms. Swope, have
14  you ever spoken to any of Ms. Darcangelo's other
15  health care providers?
16      A.   Only one.  I mean maybe others, I just
17  can't recall.  I guess I did speak to her.  She had
18  a primary care physician, Dr. Altland, at one time
19  and I tried to coordinate the care with her.
20      And then Frances was having difficulty
21  working the VA system so eventually I did call one
22  of my friends, a woman who had trained with me who
23  is a VA physician now in Baltimore and asked if she
24  could help and she has been nice enough to help get
25  Frances' medications.

```
 1   herself in events that would get her fired or
 2   events that would be as time consuming and
 3   distressful as this.  They are not willful
 4   behaviors.
 5        Q.   So you're saying that even if she does
 6   something that appears to be intentionally for the
 7   purpose of provoking someone, that you wouldn't
 8   construe that as a volitional act?
 9        A.   Not in her case.  She is not looking for
10   fights and there is no positive outcome, there is
11   no benefit to her from that, only trouble.  There
12   is only bad sequelae.  So it wouldn't be logical to
13   do anything like that willfully.
14        Q.   So she's not able to control?
15        A.   Exactly.
16             MS. DYE:  I'm going to mark this as
17   exhibit, the next exhibit.
18             (Zimberg Deposition Exhibit Number 7 was
19   marked for identification.)
20   BY MS. DYE:
21        Q.   Do you recognize these documents?
22        A.   Looks like letters that I have sent to
23   Mr. Burkhardt at one time or another.
24        Q.   Would it be correct to say that together
25   they represent your expert report in this action?
```

Page 107

```
 1      A.    I'm not sure what you mean by my expert
 2   report.
 3      Q.    Well, you are here as an expert, right?
 4      A.    Yes.
 5      Q.    Is this your report?
 6      A.    These are letters. I wouldn't call them
 7   a report, but you can. These are letters and if
 8   this fits the definition of report, sure.
 9      Q.    Are these the letters --
10      A.    I wouldn't call this a report, I would
11   call this a letter.
12      Q.    Are these the documents that contain your
13   opinions that you are presenting here as an expert
14   in the lawsuit?
15      A.    Some of my opinions. These are, I
16   believe these are answers to specific questions
17   raised by Mr. Burkhardt.
18      Q.    Okay. Is there something else that has
19   your opinions in it that are being presented as an
20   expert in the lawsuit as far as you know?
21      A.    Only the content of our conversations,
22   nothing else written, no.
23      Q.    Let's take a look at the second page of
24   the January 17 letter from you to Mr. Burkhardt.
25   In it you express certain opinions about Ms.
```

Gary Bryant Zimberg
Towson, MD
April 30, 2003

Page 108

1  Darcangelo and her condition and etc.  What kind of
2  investigation did you conduct in order to prepare
3  this, I'm going to call it a report?
4      A.  Just review of my record.
5      Q.  So you sat down, you got a letter from
6  Mr. Burkhardt that asked you to address certain
7  issues and in response to that you took the chart
8  and sat down with it and did what?
9      A.  Well, actually I didn't do that.
10     Q.  What did you do?
11     A.  I believe I checked with Ms. Darcangelo
12 and said do you want me to do this.  I really don't
13 want to be involved.  And then her response was I
14 would like you to be involved, blah, blah, blah.  I
15 think I may have called Mr. Burkhardt.  I don't
16 recall, I think I asked is this really necessary.
17         And then after that I'm getting the
18 feeling my patient wanted me to participate in
19 this, I jotted down my initial thoughts, then I
20 went to the record to see if there was anything
21 generally that I had missed, and after about maybe
22 a 30 minute review I dictated this and off it went.
23     Q.  So how much total time did you spend
24 preparing the January 17th letter?
25     A.  This report, less than an hour.

Gary Bryant Zimberg
Towson, MD
April 30, 2003

Page 133

1    Q.   Okay.  So this January 17th letter,
2    comparing it with the January 3rd letter from Mr.
3    Burkhardt which includes a request of what he wants
4    you to address, right?
5    A.   Yes.
6    Q.   Tell me what things you left out that he
7    requested and why.
8    A.   Diagnosis of her condition looks like I
9    addressed that.  Number one was addressed,
10   medication history is addressed.  Number two,
11   number three, functional limitations, looks like I
12   addressed that.  Number four, looks like I've
13   addressed that.  And then a copy of the Federal
14   Rules of Civil Procedure, I don't have that, but
15   the questions that he asked I addressed.
16   Q.   Let's look at number three, the
17   functional limitations that you are aware impair
18   her ability to conduct day-to-day life activities.
19   So all of the day-to-day life activities and
20   functional limitations that you thought she had are
21   contained in the January 17th, 2003, letter?
22        MR. BURKHARDT:  I object on the
23   characterization.  He hasn't answered that question
24   yet.
25        THE WITNESS:  Every single limitation,

Gary Bryant Zimberg

Towson, MD

April 30, 2003

Page 134

1  no, I didn't address every single limitation.
2  BY MS. DYE:
3       Q.   Okay.
4       A.   And I didn't feel particularly compelled
5  to.
6       Q.   And why?
7       A.   I was doing this as a service to the
8  patient and at that point I was not considering
9  myself an expert and just had no interest in doing
10 it.  Didn't think it served the patient.  I was
11 trying to be cooperative with her counsel, but
12 certainly didn't have the time or interest to
13 pursue this in great detail.
14      Q.   Let's take them one by one the ones that
15 Mr. Burkhardt addresses.  He wants you to
16 specifically address the affect her condition had
17 on her ability to socially interact with others.
18 What's your opinion on that?
19           MR. BURKHARDT:  I'm going to object in
20 that you have asked this question before, but go
21 ahead and answer.
22           THE WITNESS:  I think it's pretty similar
23 to what I said before, between her schizoid
24 personality, poor judgment, and bipolarity, she has
25 a difficult time maintaining relationships with