Frances M. Darcangelo                                          December 24, 2002
Towson, MD

Page 257

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF MARYLAND
3    - - - - - - - - - - - - - - - x
4    FRANCES DARCANGELO,              :    **ORIGINAL**
5              Plaintiff,             :
6         vs.                         :  Case No. 02 CV 816
7    BELL ATLANTIC,                   :
8              Defendant.             :
9    - - - - - - - - - - - - - - - x
10                        Towson, Maryland
11                        December 24, 2002
12                        VOLUME II
13        Deposition of FRANCES M. DARCANGELO, a
14   witness herein, called for examination by counsel for
15   Defendant in the above-entitled matter, pursuant to
16   notice, the witness being duly sworn by Robert M.
17   Jakupciak, a Notary Public in and for the District of
18   Columbia, taken at the offices of Edwin R. Burkhardt,
19   Esquire, 401 Washington Avenue, Suite 303, Towson,
20   Maryland  21204, at 9:42 a.m., on Tuesday, December
21   24, 2002, and the proceedings being taken down by
22   Stenotype by Robert M. Jakupciak, and transcribed
23   under his direction.
24
25

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

```
 1      A.      (Nodding head indicating yes.)
 2      Q.      Okay. And how -- is she the only person
 3  that had children's pictures? How did you know that
 4  it was her?
 5      A.      I couldn't say that she was the only
 6  person, because I didn't do a survey. But it
 7  certainly was her aspiration in life, stay home and
 8  squeeze those pups out. That's what she would have
 9  liked to have done with her life.
10      Q.      Why do you call it a puppy reference?
11  What's the reference to puppies about?
12              MR. BURKHARDT: I'm going to object to this
13  as being irrelevant. Go ahead and answer the
14  question.
15      A.      Well, as a matter of fact, Linda used to
16  refer to them as puppies.
17      Q.      Refer to her children as puppies?
18      A.      Yes.
19      Q.      Okay. All right. Why don't you tell me
20  your version of the incident that led to your
21  termination.
22      A.      I was working on a system in Easton that
23  was pretty badly bungled, and Moxey told me not to
24  stop working on it until it was resolved. I just
25  happened to take a phone call from another technician
```

Frances M. Darcangelo                                December 24, 2002
                              Towson, MD

                                                              Page 388

1   in Annapolis about working on another order. And I
2   told her to put a ticket into the system.
3           I went over and asked Jim Bullington about
4   it to see if he knew anything about it, and Barbara
5   Lee interjected herself into the situation and told me
6   that I had better pick the ticket up when it came in.
7   And I pointed out to her that although she was
8   management's best friend, she was not in fact
9   management.
10          So I went back to doing what I was doing.
11  The ticket came in on the computer and John Russo
12  picked it up and Barbara Lee went over and told him to
13  drop the ticket and that I should pick it up. And she
14  persisted in this improper behavior in violation of
15  the code of conduct. And since I was in a hostile
16  workplace and couldn't expect management to intervene
17  and deal with the situation, I decided that I would
18  tell her to stop acting like an overseer and that's
19  what I did.
20      Q.   What was the actual term that you used?
21      A.   I said, no, ole massa.
22      Q.   Can you spell that?
23      A.   I would spell that M-A-S-S-A.
24      Q.   How about the word prior to that?
25      A.   Ole? O-L-E.

Frances M. Darcangelo  
Towson, MD  
December 24, 2002

Page 389

1  Q.  And what kind of body language was
2  associated with what you said?
3  A.  With what Barbara Lee said or what I said?
4  Q.  With what you said.
5  A.  I was just standing still.
6  Q.  Straight up or bending over or?
7  A.  I was just standing still, straight up.
8  Q.  All right.  Say it again for me.
9  A.  I ain't going to do that ole massa.
10  Q.  And you used that sort of intonation as
11  well?
12  A.  Ebonics, yes.
13  Q.  And what was your intent by saying it,
14  saying that?
15  A.  I intended to impress upon her that she
16  should stop her improper behavior because I was
17  already working on something else and I wasn't going
18  to stop and do what she told me to do.
19  Q.  Now, why did you use the particular term
20  ole massa and say it in that, with that accent, if you
21  will?
22  A.  Because she was not going to desist in her
23  behavior.
24  Q.  I mean there is a hundred things you could
25  have said, right?  So why did you choose that in

Page 392

1  African-American.
2      Q.    So you think if it had been a similar
3  situation with a white person you might have used the
4  same?
5      A.    If they were persisting in having that kind
6  of behavior toward me, then they would be behaving
7  like an overseer also.
8      Q.    And so you could have maybe used the same
9  thing?
10     A.    Yes.
11     Q.    Now, we talked about what your feelings
12 were at the time. Now, sitting here today can you see
13 why a person might interpret that as a racial slur?
14     A.    Yes.
15     Q.    All right. What happened after you said
16 that?
17     A.    She confronted me physically. She came
18 into my cubicle and stood very close to me and was
19 yelling at me and telling me that we needed to go
20 outside so that we could settle this. And Moxey
21 intervened and chased Ms. Lee back to her cubicle.
22 And Moxey left to get assistance and I don't know how
23 many management people descended on the scene after
24 that.
25     Q.    And did somebody say something to you or?

Frances M. Darcangelo                                                December 24, 2002
Towson, MD

Page 393

1    A.    I was still being confronted by Ms. Lee to
2  leave the building, so I decided to leave the
3  building.
4    Q.    Did anybody say anything to you?
5    A.    The other management people?
6    Q.    Uh-huh.
7    A.    No. I don't think I gave them the
8  opportunity.
9    Q.    Okay. So then you just left the building?
10   A.    Barbara Lee chased me down the hall until
11 Tim Mace and somebody else stopped her from coming
12 after me.
13   Q.    She chased you down the hall? She wasn't
14 actually running was she?
15   A.    I don't know how fast she was moving
16 because she was behind me.
17   Q.    Were you running?
18   A.    No.
19   Q.    So you were walking out of the building and
20 she was behind you, following you?
21   A.    Yelling.
22   Q.    Yelling. And so then what?
23   A.    I was down standing in front of the
24 building and --
25   Q.    Did she follow you all the way out of the

Frances M. Darcangelo
Towson, MD
December 24, 2002

Page 394

1  building?
2     A.   They stopped her.
3     Q.   You guys were up on the third floor?
4  Fourth floor?
5     A.   Third floor.
6     Q.   Third floor?
7     A.   Fourth floor? Where were we? Third floor.
8     Q.   So she followed you to the elevator?
9     A.   No. She didn't get that far. They
10 intercepted her before she got that far.
11    Q.   And you took the elevator down?
12    A.   Yes.
13    Q.   And left the building?
14    A.   Yes.
15    Q.   And went where?
16    A.   I was standing immediately in front of the
17 building.
18    Q.   Then what happened?
19    A.   Charles English and Tim Mace came out and
20 told me I was evicted again.
21    Q.   Is that what they actually said, you are
22 evicted again? What did they say?
23    A.   I don't think they used the term evicted.
24 I was told to go home.
25    Q.   Okay.