August E. Dankert                    CONFIDENTIAL                    March 12, 2003
                                      Towson, MD

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3   - - - - - - - - - - - - - - - - x

 4   FRANCES DARCANGELO,              :    Certified Copy

 5              Plaintiff,            :

 6         vs.                        :  Case No. 02 CV 816

 7   BELL ATLANTIC,                   :

 8              Defendant.            :

 9   - - - - - - - - - - - - - - - - x

10                        Towson, Maryland

11                        March 12, 2003

12                            - - -

13            CONTAINS CONFIDENTIAL INFORMATION

14                            - - -

15         Deposition of AUGUST EDWARD DANKERT, a

16   witness herein, called for examination by counsel for

17   Defendant in the above-entitled matter, pursuant to

18   notice, the witness being duly sworn by Robert M.

19   Jakupciak, a Notary Public in and for the District of

20   Columbia, taken at the offices of Edwin R. Burkhardt,

21   Esquire, 401 Washington Avenue, Suite 303, Towson,

22   Maryland 21204, at 11:00 a.m., on Wednesday, March

23   12, 2003, and the proceedings being taken down by

24   Stenotype by Robert M. Jakupciak, and transcribed

25   under his direction.
```

Page 2

1  APPEARANCES:
2      On behalf of the Plaintiff:
3          EDWIN R. BURKHARDT, ESQUIRE
4          401 Washington Avenue, Suite 303
5          Towson, Maryland   21204
6          (410) 583-0338
7
8      On behalf of the Defendant:
9          MARTHA DYE, ESQUIRE
10         O'MELVENY & MYERS, LLP.
11         1650 Tysons Boulevard, Suite 1150
12         McLean, Virginia   22102
13         (703) 918-2700
14
15                 Also Present
16              Frances Darcangelo
17
18
19
20
21
22
23
24
25

August E. Dankert                CONFIDENTIAL                March 12, 2003
                                   Towson, MD

Page 5

```
 1   here?
 2       A.   Yes.
 3       Q.   And are you going to do it again when it's
 4   time for trial?
 5       A.   Yes.
 6       Q.   Ms. Darcangelo is a former co-worker of
 7   yours, right?
 8       A.   Yes.
 9       Q.   How long did you work for Bell Atlantic?
10       A.   To tell you the truth, I'm not really sure.
11   A short period of time.
12       Q.   Do you know approximately when?
13       A.   I would have to look back in my records.
14   I'm horrible with dates and time as far as years.  I
15   really couldn't tell you.
16       Q.   What records would you have to look at if
17   you had to look?
18       A.   I would have to look back at my IRS records
19   as to when I claimed that on my IRS, my statements.
20       Q.   Your taxes?
21       A.   Yes.
22       Q.   How did you come to work for Bell Atlantic?
23       A.   The -- I went and took a test and I got a
24   phone call to show up a certain date and begin work.
25       Q.   Did it coincide with any sort of events in
```

August E. Dankert | CONFIDENTIAL Towson, MD | March 12, 2003

Page 6

1  your personal life that you could peg it to date-wise?
2      A.   Yeah. Actually, a good friend of mine
3  passed away while I was working there from cancer.
4      Q.   You don't remember when that date was?
5      A.   I can't even remember the date my father
6  died. I'm sorry.
7      Q.   That's all right. You got fired, didn't
8  you?
9      A.   I was let go, yes.
10     Q.   And it was because you sabotaged the
11 company?
12     A.   No.
13     Q.   Could you describe, explain for me what
14 your --
15     A.   I accidentally did not tell someone about a
16 certain incident that occurred earlier in the day, due
17 to the fact someone had been yelling at me, which was
18 Barbara Lee. She yelled at me to get the hell out of
19 my chair. She then yelled, get my fat ass out of my
20 chair. At that point I was so upset, I had just been
21 in an automobile accident a couple weeks before also,
22 and basically I got up and left, neglecting to tell
23 her about the incident.
24          They read this to be some kind of willful,
25 something that I did willfully on my part, which is

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 11

1 relatives with mental health issues or people you
2 know?
3    A.   Yeah. There are some people that I know,
4 yes, that have some mental health issues, yes.
5    Q.   Anyone at Bell Atlantic?
6    A.   Fran, I know she had something due to the
7 fact that that was shared to me from other employees
8 in the area.
9    Q.   Anybody else?
10   A.   Not that I know at Bell Atlantic, no.
11   Q.   When you were fired, did you grieve the
12 firing?
13   A.   Yes.
14   Q.   And what happened?
15   A.   They just wouldn't listen to my side of the
16 story at all.
17   Q.   And so what was the result?
18   A.   They said I couldn't come back basically.
19   Q.   Did you take it to the second step?
20   A.   No.
21   Q.   Why not?
22   A.   It wasn't worth it.
23   Q.   Were you fired while you were, had been
24 working there for less than six months?
25   A.   Yeah.

Page 12

1  Q. It was more like three or four months?

2  A. I was still within the parameters of I
3  guess whatever the -- I don't know what they call the
4  period. You should know what they call the period.
5  What do they call the period?

6  Q. I don't know, but it's something like a
7  probationary period?

8  A. Yeah. That's it.

9  Q. You were fired while you were still in the
10 probation period?

11 A. They let me go, yeah.

12 Q. Why do you say they let you go? What's the
13 difference?

14 A. I just like to say they let me go because
15 they didn't know the whole story, they didn't care to
16 hear the whole story.

17 Q. But you were weren't fired for any kind of
18 discriminatory reason?

19 A. I'm not really sure about that.

20 Q. Can you explain what you mean by that?

21 A. I think a lot of it had to do with Barbara
22 Lee.

23 Q. Okay. Keep going.

24 A. She seemed to basically run that group even
25 though Marianne Moxey was the so-called head of the

August E. Dankert | CONFIDENTIAL
Towson, MD | March 12, 2003

Page 53

1  they were all doing.
2      Q.   That's not what I'm asking for. I'm trying
3  to get your knowledge. That's why you are here today,
4  is to testify about what you know.
5      A.   Right.
6      Q.   So whatever you know is fine. So as far as
7  you know then, she wasn't one of these high end
8  people, right?
9      A.   I can't say that.
10     Q.   Okay. You don't know. All right. But you
11 and her worked off the same que at least at times?
12     A.   Yes.
13     Q.   Were there any changes to your job while
14 you were working there?
15     A.   After my training period they made me come
16 in a while for the night shift. I pulled a double
17 shift one time and that's one of the times when
18 Barbara Lee got really indignant, asking how in the
19 world could I make overtime when the other people in
20 the group who had been there longer weren't getting
21 overtime.
22     Q.   She said this to you?
23     A.   Yes.
24     Q.   What was your response?
25     A.   I said I have no control over that. How am

August E. Dankert | CONFIDENTIAL Towson, MD | March 12, 2003

Page 61

```
 1  problem that she said she had, yahdee, yahdee. You
 2  know. That's about all the conversation that I pretty
 3  much remember at this point.
 4      Q.   Anything else?
 5      A.   You know, just comments about like she is
 6  having one of her days type of things.
 7      Q.   Who would say that?
 8      A.   Barbara Lee would say that on occasion.
 9  Barbara Lee would come over and be so mad at Fran for
10  whatever. I have no idea why she would be mad, but
11  she would just get boiling irritated, you know, and
12  basically -- she would make threatening comments and
13  things of that nature.
14      Q.   Now, did Ms. Darcangelo and Barbara Lee
15  both work days?
16      A.   They sat next to each other in cubicles,
17  yeah.
18      Q.   Did they work days though?
19      A.   Yeah.
20      Q.   And any other comments that anyone made
21  about Ms. Darcangelo other than Barbara Lee and John
22  Russo?
23      A.   Marianne Moxey told me that, you know, that
24  she had some kind of a mental problem.
25      Q.   Tell me about that conversation.
```

August E. Dankert   CONFIDENTIAL   March 12, 2003
Towson, MD

Page 83

1    in a position to know?
2        A.    I don't recall her making any.
3        Q.    Did you ever observed Ms. Darcangelo having
4    any conflicts with her co-workers?
5        A.    I think I remember on a couple times that
6    Barbara Lee was yelling, that they were yelling back
7    and forth or whatever.  I'm not positive what was
8    going on.  Generally, when that kind of stuff goes on
9    I try to get out of the area.  So I would end up, I
10   guess it's time for me to go to the bathroom.
11       Q.    On more than one occasion you saw this?
12       A.    I'm trying to recall.  It was more than
13   once, yeah.
14       Q.    And what -- can you tell me anything more
15   about those things other than they were yelling?
16       A.    That's basically all.  All I know is that,
17   you know.
18       Q.    What were they saying to each other?
19       A.    Like I said, when those incidents happened,
20   I vacated the area.  So what the conversation was
21   about I don't know.
22       Q.    Did you ever observed Ms. Darcangelo having
23   any conflicts with anybody else besides Barbara Lee?
24       A.    No.
25       Q.    How about with supervisors or management?

1  details of that or you could just sit here and tell me
2  and then we would be done with it.
3      A.   One of the co-workers came in, he was going
4  to be sitting at my position.  Why he had to sit at my
5  position I have no idea.
6      Q.   Was this on shift change?
7      A.   Yes.
8      Q.   Were you on night shift at the time?
9      A.   I was on day shift.  She was on day shift.
10     Q.   Okay.
11     A.   He came in to sit down where I was because
12 I was sharing cubicles.  I was working on a particular
13 thing at the time.  She yelled at me to get the hell
14 out of the seat now.
15          I basically turned to her, I said I was
16 busy doing something, as soon as I get a chance I will
17 get up.  She then waited a few more seconds and came
18 down to me and yelled at me to get my fat ass out of
19 the chair.
20          The incident that occurred earlier in the
21 day, that totally slipped my mind.  I was kind of
22 upset that somebody was yelling at me.  I was kind of
23 perturbed that, you know, she could talk to me like
24 that.  I had brought issues up before about her
25 yelling at me and telling me to do things.  So that's

1  basically what happened that evening.  I got in my car
2  and went home, neglecting to tell her about the one
3  incident that I had earlier in the day, which caused
4  them a problem in the evening.
5       Q.    So this is the same incident as the
6  incident when you got fired?
7       A.    Yes.
8       Q.    On the same day you -- okay.  And then you
9  complained to --
10      A.    Marianne.
11      Q.    When did you complain to her?
12      A.    I had complained to her about a week
13 before. And the time before that -- I probably on
14 three separate occasions complained to her that she
15 was abrasive to me, hostile, and, you know, I'm
16 sitting there singing to the radio and she is telling
17 me to shut up.
18      Q.    And did you complain specifically about
19 this instance?
20      A.    Yes.
21      Q.    When?
22      A.    After it occurred.  But --
23      Q.    The same day?
24      A.    There was so much to do about the situation
25 that they didn't want to hear my side of it.  They

Page 108

1   singing very lightly in my own cubicle and she was
2   four cubicles away. It wasn't like I was belting out
3   an opera.
4       Q.   Okay. In paragraph five you say Barbara
5   Lee used to threaten people all the time. Can you
6   tell me the specifics of that?
7       A.   She would just come back -- sometimes she
8   would go away from her desk and come back and then
9   when she would make disturb -- comments about whoever
10  it was that she just had to deal with and she was
11  going to get back at them or she was going to, you
12  know, tear their head off or, you know, comments to
13  that nature.
14      Q.   Was it -- did you ever hear her saying
15  anything like that to anybody's face?
16      A.   I can't recall. I know that she used to
17  yell at Marianne Moxey on a regular basis. If
18  Marianne asked her to do something out of the
19  ordinary, she would get up in arms. I think she asked
20  her to take a shift change for a couple days or
21  something and they got into a heated discussion.
22      Q.   Did she make any threats against Ms. Moxey?
23      A.   Just her stature and the way she was
24  standing was, seemed to me to be very threatening.
25      Q.   Is she big and tall?

Page 114

1   interested in proving these things in her lawsuit?
2        A.    Oh, I think that maybe some of it might be
3   damaging to Bell Atlantic.  I don't know.
4        Q.    Uh-huh.
5        A.    Or whatever they are calling themselves
6   this week.
7        Q.    Other than what you -- what I'm going to
8   summarize is her being sort of shunned by, socially,
9   did you see anything, any --
10       A.    She wasn't just shunned socially.  She was
11  shunned when she was working.  If she asked someone
12  for help, no one came to her aid.
13       Q.    Okay.  Let's --
14       A.    They would, they would hem and haw and try
15  to get out of dealing with her for anything.
16       Q.    What about management?  You are just
17  talking about co-workers?
18       A.    I'm talking about co-workers.  I didn't
19  know much -- I didn't have that much experience with
20  the management.
21       Q.    Right.  Did you ever see anybody in
22  management treat her less favorably than other
23  employees?
24       A.    I can't say because I didn't see it.  I
25  didn't see the management around that much.