IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCES DARCANGELO,

          Plaintiff,

     v.

VERIZON MARYLAND INC.,

          Defendant.

No. WDQ-02-816 (Civ.)

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF MARTIN KRANITZ

Defendant Verizon Maryland Inc. ("Verizon"), by and through its undersigned counsel, respectfully submits this Memorandum in Support of its Motion in Limine to Exclude Expert Testimony of Martin Kranitz and states as follows.

## INTRODUCTION

Plaintiff Frances Darcangelo has stated her intention to present testimony at trial by a purported vocational expert, Martin Kranitz, whose opinions is based on information from doctors who have themselves testified that the information is not reliable for Kranitz's purposes. Further, although the opinions expressed in Kranitz's report are relatively narrow in scope, plaintiff has previously attempted to rely on Kranitz to establish assertions which are outside of, and indeed inconsistent with, the substance of his report. Accordingly, Verizon respectfully asks this Court to enter an Order excluding or, in the alternative, substantially limiting Kranitz's testimony at trial.

## BACKGROUND

Plaintiff has asserted that Verizon violated the Americans with Disabilities Act (the "ADA") by disciplining and ultimately terminating her in a manner different than other, non-

disabled Verizon employees and by failing to provide her reasonable accommodations to address her alleged psychiatric disability.  As a prerequisite for these ADA claims, plaintiff must show that she is disabled within the meaning of the ADA.  Section 12102 of the ADA further defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Plaintiff has alleged that she meets this definition of disability in that her mental condition allegedly substantially limits her in the life activities of working and interacting with others.

In support of her case, plaintiff has proffered expert testimony by Martin Kranitz. Kranitz is a self-described "vocational expert", who spends half of his time on vocational consulting and the other half in the unrelated field of mediation services.  (Ex. 1; Ex. 2, Deposition of Martin Kranitz ("Kranitz Dep."), at 270.)  Kranitz is not a psychologist and is not authorized to diagnose or treat mental illness. (Kranitz Dep., at 40, 230.)

According to his January 7, 2003 report, Kranitz met with plaintiff for the purpose of evaluating her past and present vocational potential.  (Ex. 3, at 1.)  During that meeting, Kranitz discussed plaintiff's educational background, work history, and current health and had plaintiff complete certain aptitude tests.  (*Id.*, at 1-5.)  In addition, Kranitz reviewed medical reports by various doctors as well as the office notes of plaintiff's treating psychiatrist.  (*Id.,* at 5-8.) Kranitz placed particular importance on the "global assessment of functioning" or "GAF" scores assigned to plaintiff by the various doctors.  (*Id.*, at 10.)  The GAF is a subjective scale used by clinician's to describe an individual's overall level of functioning.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) (DSM-IV-TR), at 32.  However, two of those doctors--indeed, the only two that were deposed in

this case--both testified that they did not believe that the GAF scores that they assigned plaintiff were highly subjective, that the scores were not intended to reflect plaintiff's ability to work, and that the scores would not be reliable for that purpose. (Ex. 4, Deposition of Gary Zimberg ("Zimberg Dep."), at 65-66; Ex. 5, Deposition of Anthony Russo ("Russo Dep."), at 85.)

In the "Conclusions" section of his report, Kranitz expresses two key opinions. First, Kranitz opines that, "Given an individual with a GAF of 50 I do not believe that such an individual would be able to maintain employment for any extended/significant period of time." (Ex. 3, at 11.) Second, Kranitz states, "If one looks at the medical reports generated while Ms. Darcangelo was employed, it appears that she was capable of maintaining that employment (from a work standpoint) at that point in time." (*Id.,* at 12)

Despite Kranitz's clear distinction between plaintiff's ability to work at the time of her employment and her inability to work at the time of his report, plaintiff has already erroneously attempted to use Kranitz's opinions to suggest that plaintiff was substantially limited in the major life activity working at the time of Verizon's alleged discrimination and is thus able to maintain a claim under the Americans with Disabilities Act (the "ADA"). (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Dkt #38, at 15, 18-19.)

For the reasons described below, Kranitz's opinions are not supported by reliable information, do not support the proposition for which plaintiff has attempted to use them, and serve no other legitimate relevant purpose in this case. Accordingly, his testimony should be excluded at trial.

## ARGUMENT

I.      **Standard for the admissibility of expert testimony.**

Federal Rule of Evidence 702 sets forth two separate sets of conditions that must be met for the admission of expert testimony. First, the specialized knowledge provided must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Second, the proffered testimony may only be admitted if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* In other words, a district court has a responsibility to ensure that any and all expert testimony admitted is both factually relevant and reliable, as required by Rule 702. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590-91 (1993); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). This two-step test for admissibility applies to "technical, or other specialized knowledge" as well as scientific evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999). Moreover, the proponent of the purported expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *Daubert,* 509 U.S. at 592 (citing Fed. R. Evid. 104(a)).

In addition to the limitations on expert testimony set forth in the Federal Rules of Evidence, Federal Rule of Civil Procedure 26(a)(2)(B) requires that a party provide, for each testifying expert, a report containing, *inter alia,* "a complete statement of all opinions to be expressed and the basis and reasons therefore." Rule 37(c)(1), in turn, provides that a party that fails to comply with that requirement "is not, unless such failure is harmless, permitted to use as evidence at trail, at a hearing, or on a motion any . . . information not so disclosed."

**II.    Kranitz's opinions were not based on reliable information.**

As stated, Kranitz expresses two key opinions in his report—(1)that he did not believe that plaintiff could maintain employment at the time of Kranitz's report but (2) that it appears she

was capable of maintaining employment at the time she was employed by Bell Atlantic (later Verizon). (Ex. 3, at 11-12.) While Kranitz interviewed plaintiff before preparing his report, his report makes clear that these opinions were significantly based on psychiatric reports from five doctors—Dr. Anthony Russo, Dr. Jerome Gottlieb, Dr. Steven Seibert, Dr James Beshai, and Dr. Lawrence Vonrogo—and the office notes of Dr. Gary Zimberg, who was at the time plaintiff's treating psychiatrist. (*Id.*, at 5-8.) Specifically, Kranitz placed considerable weight on the GAF scores that these doctors assigned plaintiff at the time of their respective examinations.[1] (*Id.,* at 10.) Indeed, in two separate parts of his report, Kranitz expressly based his opinion that plaintiff cannot currently maintain employment on the most recent GAF score she received. (*Id.*, at 10 ("At this point, given a GAF - 50 (or even 55 - 50) I do not believe that Ms. Darcangelo would be successful in maintaining employment."), 11 ("Given an individual with a GAF of 50 I do not believe that such an individual would be able to maintain employment . . .").)

"The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" *Langley v. Barnhart,* 373 F.3d 1116, 1123 (10th Cir. 2004) (quoting DSM-IV-TR, at 32.) The measurement does not focus on an individual's ability to carry out any particular life activity, but rather measures a person's general ability to function in all activities. For example, a GAF score of 41-50 is intended to reflect "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job)." *See,* DSM-IV-TR, at 34. In particular, because a GAF score is not limited to occupational functioning, even a relatively low score does not necessarily mean that that an individual is impaired in his or her ability to work. *See Crawford v. Massanari,* No. 00-CV-

---

[1] Dr. Siebert did not assign plaintiff a GAF score in his February 12, 1999 psychiatric evaluation. (Ex. 6.)

792-M, 2001 WL 1943879, *3 (N.D. Okla. Aug. 24, 2001) (upholding denial of social security

benefits despite assigned GAF score of 45).

In light of the subjective nature of the measurement and the various possible meanings of

a given score, the meaningfulness of a GAF rating is wholly dependent on the psychiatrist or

psychologist making the assessment.  Of the doctors on whose GAF ratings Kranitz relied, two,

Dr. Zimberg and Dr. Russo, were deposed in this case, and both made clear that the GAF scores

that they assigned plaintiff are not reliable for the purpose that Kranitz used them.  Indeed, Dr.

Zimberg, whom plaintiff designated as an expert in this case, expressed his skepticism of GAF

generally, calling the GAF system an "incredibly subjective scale" and specifically stating that

"there has never been great reliability on that scale."  (Ex. 4, Zimberg Dep., at 65-66.)  Dr.

Zimberg explained that doctors reasonably disagree on GAF scores "all the time," that a score

depends on how a person presents herself on a given day, and that it can be influenced by factors

such as what a person wears to their evaluation.  (Zimberg Dep., at 66.)

Dr. Zimberg repeatedly contradicted the import that Kranitz placed on the GAF scores

assigned by Dr. Zimberg and the other doctors.  While Kranitz relied on a single GAF score from

each doctor, Dr. Zimberg testified that,

> The only time [the GAF scale is] really of value is when the same rater rates it.  If
> two different people have rated you, you come into a hospital with one score from
> one rater and you leave with a different rater, it's meaningless.  So unless the
> same rater rated you on the same subject and criteria, it's not a terribly helpful
> scale.

(Zimberg Dep., at 66.)  Likewise, where Kranitz placed considerable weight on his

understanding that "the GAF scores have decreased consistently" (Ex. 3, at 10), Dr. Zimberg

testified that, "I think it goes up and down . . . [It] changes from week to week, I'm sure."

(Zimberg Dep., at 67.)  Most importantly, when asked if a GAF score could be used to measure

how well a person can perform a job, Dr. Zimberg responded, "I don't think, no, I wouldn't use it for that purpose." (Zimberg Dep., at 68-69.)

Dr. Russo likewise testified that he did not believe that his GAF rating could be used in the manner that Kranitz used them. When specifically asked whether plaintiff's GAF score could be used as an indicator of whether she was qualified to do her job, Dr. Russo responded, "No, not at all." (Ex. 5, Russo Dep., at 85.) Dr. Russo also stated that he may have been "overly generous" in the GAF score he assigned plaintiff, explaining, "I had to make some judgment at that particular time. I mean, I had no way of validating everything that was being said based on those reports and I gave her the benefit of the doubt that what she was telling me was honest and truthful." (Russo Dep., at 81-82.) He also acknowledged that the score he assigned could have been influenced by efforts by plaintiff to manipulate him. (Russo Dep., at 83-84.)

Thus, the problem with Kranitz's reliance on the GAF scores is not that such scores are generally unreliable for all purposes. Rather, it is that the very doctors who have assigned the particular GAF ratings on which Kranitz relies have themselves testified that those ratings cannot carry the weight that Kranitz assigns them. Kranitz is not a psychologist and is not authorized to diagnose or treat mental illness. (Kranitz Dep., at 40, 230.) He admitted, "I'm not qualified to make any type of opinion on emotional disability that carries any weight." (Kranitz Dep., at 40.) As a result, Kranitz is completely dependent on the diagnoses provided by the evaluating doctors, including their GAF ratings. Where, as here, those evaluating doctors have testified that their diagnoses are not reliable or intended for the purpose Kranitz uses them, Kranitz's opinions based on those diagnoses are themselves unreliable. *See McPherson v. Barnhart,* No. 4:04-CV-90190, 2005 WL 357667, at *9-10 (S.D. Iowa Feb. 9, 2005) (reversing administrative law

judge's denial of social securities benefits where ALJ assigned import to GAF ratings that rating psychiatrist did not intend).

III.    **Kranitz cannot provide competent testimony on any issue relevant to plaintiff's claims.**

Even if Kranitz had a reliable basis for his stated conclusions regarding plaintiff's ability to work, Kranitz's testimony should be excluded from trial on the grounds that those conclusions, even if true, have no apparent relevance to plaintiff's claims.  In fact, the only purpose for which plaintiff has attempted to use Kranitz's opinions thus far in the litigation was to argue that plaintiff was substantially limited in her ability to work at the time of her employment, a position which is not only unsupported by Kranitz's report but also inconsistent with Kranitz's express opinions.  While there is a great potential that plaintiff may similarly misuse references in Kranitz's report as an excuse to pursue various lines of questioning at trial, each of those lines of examination are outside the scope of Kranitz's report, beyond Kranitz's reasonable qualifications, or both.  Because Kranitz's report does not support any relevant trial testimony, Kranitz should be precluded from serving as an expert witness at trial.  In the alternative, in the event Kranitz is permitted to testify in any capacity at trial, Verizon asks that the Court prohibit any attempt to use Kranitz's testimony to establish (1) plaintiff's alleged disability; (2) Verizon's alleged failure to provide reasonable accommodations; or (3) a causal connection between Verizon's conduct and plaintiff's alleged current inability to maintain employment.

A.    **Kranitz cannot provide testimony in support of plaintiff's assertion that she was disabled at the time of her employment with Bell Atlantic.**

Plaintiff alleges in her complaint that Bell Atlantic (later Verizon) discriminated against plaintiff on the basis of her alleged disability and failed to make reasonable accommodations for

that disability in violation of the ADA.  In order to state a claim under the ADA, plaintiff must establish that she a "disability", which is defined under the ADA to mean "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual"; being regarded as having such an impairment; or having a record of such an impairment.  42 U.S.C. § 12102(2).   In order to meet this requirement, plaintiff contends that she is disabled for the purposes of the ADA in that she was substantially impaired in the major life activities of (1) interacting with others and (2) working.

Plaintiff has primarily tried to use Kranitz's opinions to establish that she is seriously impaired in the activity of working.  Plaintiff's current condition, however, is, in and of itself, irrelevant to the validity of plaintiffs' ADA claims.  Common sense dictates that Verizon could not have discriminated against plaintiff on the basis of a disability that plaintiff did not yet have and could not fail to accommodate a disability that did not yet exist.  *See, Cortes v. McDonald's Corp.,* 955 F. Supp. 541, 547 (E.D.N.C. 1996) (holding that the relevant time for assessing a disability for ADA purposes "is while the employee is still employed" and rejecting effort to base disability on plaintiff's condition nearly a year after termination).  Accordingly, the relevant issue will be whether plaintiff was disabled at that time of the alleged discrimination, i.e., at the time of her employment.

Kranitz's report contains no opinions or even suggestions that plaintiff was substantially impaired in her ability to work at the time of her employment.  To the contrary, Kranitz opined that while he did not believe plaintiff could maintain employment at the time of his report, "it appears that she was capable of maintaining that employment (from a work standpoint) at that point in time [while she was employed]."  (Ex. 3, at 11-12.)  Moreover, in his report, Kranitz repeatedly suggests that plaintiff's current inability to maintain employment is the result of a

deterioration in her condition in recent years. (*See, e.g.,* Ex. 3, at 10 ("As time has progressed from 1997 to 2001 the GAF scores have decreased consistently."); 11 ("She has great difficulty in doing this. More so now than in the past.").)[2]

Because Kranitz's report fails to provide any opinions which directly or indirectly support a finding that plaintiff was disabled at the time of her employment or, for that matter, that her alleged disability caused her to engage in the actions which led to her suspension and termination, Kranitz should be precluded from providing testimony in support of those assertions at trial.

**B.      Kranitz cannot testify as to the reasonableness or effectiveness of accommodations.**

As stated, one of plaintiff's claims is that Verizon failed to provide reasonable accommodations for her alleged disability. As this Court has recognized, the burden is on the employee to request the accommodation. *See, e.g., Chidebe v. MCI Telecomms. Corp.,* 19 F. Supp. 2d 444, 448 (D. Md. 1998) ("It was [plaintiff's] responsibility to inform MCI if additional accommodation was needed."); *Rhoads v. FDIC,* 956 F. Supp. 1239, 1248-49 (D. Md. 1997) (defendant "should not be held liable for an accommodation which it was never requested to make"), *aff'd in relevant part,* 257 F.3d 373 (4th Cir. 2001). Even if a particular accommodation is requested, the employer is still not required to provide the accommodation if the suggested accommodation would not be effective in resolving the job-related difficulties created by the individual's disability or if the accommodation would be an unduly hardship for the employer. *Brant v. Better Business Bureau,* 923 F. Supp. 720, 735-37 (D. Md. 1996).

---

[2] Kranitz also suggests in his report that plaintiff's supposed inability to work is an impermanent condition. (*See* Ex. 3, at 12 ("It is my hope that given time and the resolution of this litigation . . . the Ms. Darcangelo may become re-stabilized, and better able to re-enter the workforce and maintain employment.").)

In his report, Kranitz does not directly address the issues of whether Verizon failed to provide reasonable accommodations for plaintiff's alleged disability or whether any hypothetical accommodations would have been effective in correcting plaintiff's behavior. However, Kranitz does include a passage in his report that:

> A great deal of external support is required from employers, family, rehabilitation facilities and psychiatric centers. Support often comes in the form of educating those people around the individual with the psychiatric disorder, what to expect and how to deal with it. It does not appear that this support was provided to Ms. Darcangelo within her employment situation.

(Ex. 3, at 11.) Verizon anticipates that plaintiff may attempt to use this generalized suggestion that Verizon could have provided plaintiff more support as a basis for having Kranitz testify as to the effectiveness of specific hypothetical accommodations.

As an initial matter, any testimony by Kranitz as to the viability or effectiveness of any specific accommodations would be beyond the scope of his report and should therefore be excluded under Federal Rule of Civil Procedure 37(c)(1). The closest Kranitz's report comes to suggesting any particular accommodation is his statement that "[s]upport often comes in the form of educating the people around the individual with the psychiatric disorder." However, his report does not address any particular form or extent of education, whether that form or degree of education was feasible in this case or whether such education of plaintiff's coworkers would have prevent plaintiff's repeated inappropriate misbehavior that led to her suspensions and termination. Beyond his statement that support sometimes includes education, Kranitz identifies no other accommodation which Verizon could or should have made. Rather, after acknowledging that Verizon moved the desk of a coworker at plaintiff's request, Kranitz states, "While this does sound like an attempt at an accommodation there are many more things that can be done in a work situation to increase an individuals ability to maintain successful

employment." (Ex. 3, at 11.)  He does not identify what those other "things" might be, let alone

whether they would be possible or effective in plaintiff's case.

More importantly, Kranitz is not qualified to testify as to the feasibility or effectiveness

of any hypothetical accommodations in this case.  During his deposition, Kranitz acknowledged

that he has very little experience in assessing possible accommodations.  When asked if has

conducted any ADA-type consulting outside on accommodations outside the litigation context,

Kranitz testified, "Certainly not as a regular part of my practice; on rare occasions, I have talked

with employers about accommodations, but not as an expert on accommodations."  (Kranitz

Dep., at 184-85.)  Further, when asked to identify the types of situations in which he has

provided such input, Kranitz mentioned only situations involving "people in wheelchairs" and

"people with bad backs."  (Kranitz Dep., at 186.)  He did not identify any situations in which he

has previously assessed possible accommodations for psychiatric disabilities, which is what

plaintiff is claiming to have had in the present case.

Moreover, Kranitz makes clear in his report that he conducted virtually no investigation

into plaintiff's actual work environment, what steps Verizon took in dealing with plaintiff's

behavior and mental condition, or what particular accommodations would have been feasible and

effective under the circumstances.  Immediately after stating that it did not appear plaintiff

received support "within her employment situation", Kranitz clarifies:

> I do not state this factually because I have seen no reports from the employer.  I
> make this statement, only by inference.  Since there are no reports or mention
> made in any of the psychiatric histories concerning employers support I infer that
> there were none. . . . Should my interpretation of the lack of employers support be
> inaccurate, I would like to know, so that I can adjust my conclusions as necessary.

(Ex. 3, at 11.)  In outlining the bases for his expressed opinions, as required under Rule

26(a)(2)(B), Kranitz gives no indication of having reviewed plaintiffs' employment records,

interviewing or reviewing the deposition transcripts of plaintiffs' supervisors, or interviewing

plaintiff's former coworkers to determine their attitudes towards plaintiff or people with

psychiatric disorders. Kranitz admitted in his deposition that he knew nothing about the physical

environment in which plaintiff worked or how frequently she interacted with her coworkers and

supervisors. (Kranitz Dep., at 26.) Indeed, when asked whether plaintiff's job situation at Bell

Atlantic was one in which difficulty getting along with coworkers and customers could cause

problems in maintaining employment, Kranitz responded, "I don't think I know enough about

the case to answer that." (Kranitz Dep., at 23.) Kranitz also admitted that he had no knowledge

of plaintiff's workplace conduct beyond what plaintiff herself told him and what he gleaned from

medical records[3]. (Kranitz Dep., at 29-30, 96-97, 131-32.)

Without any of this basic information regarding plaintiff's work experience or

environment, Kranitz has no reasonable basis for opining on what accommodations were

possible in that environment or whether they would be at all effective. For example, without

investigating the attitudes of plaintiff's supervisors and coworkers towards people with

psychiatric disorders, Kranitz can provide no credible testimony as to whether education or

sensitivity training was necessary or how plaintiff's coworkers or supervisors would have

responded to such education. Likewise, without knowing what conduct led to plaintiff's

suspensions and termination, Kranitz is in no position to meaningfully comment on what

accommodations, if any, would have prevented that conduct.

Indeed, in his deposition, Kranitz appeared to recognize the speculative nature of his

opinions regarding accommodations, continually couching his comments in equivocal terms.

---

[3] During his deposition, Kranitz admitted that if he learned that plaintiff had a history of misconduct, it could the conclusions in his report. (Kranitz Dep., at 97-98.)

When asked in his deposition what his opinions were regarding accommodation in the

workplace, Kranitz answered:

> That based on her disability as I understand it, if there had been some
> accommodations made and parenthetically, I don't know that there weren't, since
> I don't have access to those records, that she *might* have been more successful on
> the job had those accommodations—had accommodations been made, if they
> were not.

(Kranitz Dep., at 30-31.) Likewise, when asked to whether a particular accommodation would

have made plaintiff more successful in the workplace, Kranitz conceded, "I can't answer that in

an absolute sense. I think she would have had a better chance at being successful. I don't know

that it's what would have absolutely happened had she been given the opportunity." (Kranitz

Dep., at 32-33.)

Asked why he believed the change would have given plaintiff a better chance of

succeeding, Kranitz could only provide the vague explanation:

> From dealing with other people in other work situations, from talking with other
> employers and employees that have gone through this and understanding that if
> someone is not working out well in a given situation and keeping them in that
> situation is not going to improve things and making changes might, it won't
> absolutely, if you keep doing the same thing over and over again you're going to
> get the same response, if you change it you might get another response.

(Kranitz Dep., at 33.) In other words, if something does not seem to be working, a change may

or may not improve matters.

Of course, here, Kranitz did not investigate what situation already existed, or what

approaches to plaintiff's behavior were tried. Accordingly, he cannot competently testify as to

what further changes or accommodations, if any, could have been made, much less whether

those accommodations would have been feasible or effective under the circumstances.

**C.    Kranitz cannot testimony to the effect that the disciplinary actions against
plaintiff on plaintiff's mental condition.**

The only clear conclusions in Kranitz's report are that plaintiff was able to maintain employment when she was employed by Bell Atlantic but could no longer maintain employment roughly four years later when Kranitz drafted his report. As discussed above, evidence that plaintiff recently became unable to maintain employment is irrelevant to the issue of liability since the key questions at trial will be whether plaintiff was disabled or believed to be disabled *at the time of the alleged discrimination*, in other words, before she was terminated. Verizon anticipates that plaintiff may attempt to use Kranitz's opinions to establish damages by suggesting that the disciplinary actions taken against plaintiff, including her termination, somehow caused her mental condition to deteriorate.

Kranitz, however, directly testified that he does not have an opinion as to whether the manner or fact of plaintiff's termination had a negative effect on her medical condition and that he lacks sufficient information about the circumstances of her termination to express such an opinion. (Kranitz Dep., at 54-55, 57-58.) Likewise, Kranitz testified that he has no opinion as to the cause of any change in plaintiff's condition during the time of her employment. (Kranitz Dep., at 64.) Thus, Kranitz has not and cannot testify as to the existence of a causal link between Verizon's allegedly discriminatory conduct and any cognizable harm to plaintiff.

In sum, although there are multiple foreseeable ways in which Kranitz's testimony could be misused at trial, the opinions actually expressed in Kranitz's report have no clear relevance to any triable issue. Accordingly, Kranitz should not be permitted to testify at trial.

<u>CONCLUSION</u>

For the reasons set forth above, Verizon respectfully requests that the Court enter an Order barring the testimony of Martin Kranitz. In the alternative, Verizon requests that the Court enter an Order expressly prohibiting Kranitz from providing testimony regarding (1) plaintiff's alleged disability; (2) Verizon's alleged failure to provide reasonable accommodations; or (3) a

causal connection between Verizon's conduct and plaintiff's alleged current inability to maintain

employment.

Dated:  March 14, 2005

_____/s/_____
Karen M. Wahle, Bar No. 013658
Ira H. Raphaelson, Bar No. 012849
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
(202) 383-5414 (facsimile)

Counsel for Defendant
Verizon Maryland Inc.