Martin Kranitz
McLean, VA
March 18, 2003

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3     - - - - - - - - - - - - - - - X

4     FRANCES DARCANGELO,              :        **Certified Copy**

5              Plaintiff,             :

6        v.                          :   No. 02 CV 816

7     BELL ATLANTIC,                  :

8              Defendant.             :

9     - - - - - - - - - - - - - - - X

10                        McLean, Virginia

11                        Tuesday, March 18, 2003

12              Deposition of MARTIN KRANITZ, a witness

13    herein, called for examination by counsel for

14    Defendant in the above-entitled matter, pursuant to

15    notice, the witness being duly sworn by PENNY M.

16    DEAN, a Notary Public in and for the Commonwealth of

17    Virginia, taken at the offices of O'Melveny & Myers,

18    LLP, 1650 Tysons Boulevard, Suite 1150, McLean

19    Virginia, at 11:53 a.m., Tuesday, March 18, 2003, and

20    the proceedings being taken down by Stenotype by

21    PENNY M. DEAN, RPR, and transcribed under her

22    direction.

23

24

25

Martin Kranitz                                                March 18, 2003
                        McLean, VA

Page 23

1  don't think getting along with coworkers or employ --

2  or --

3      Q.    Customers.

4      A.    Customers, thank you, is necessarily a

5  requirement, is necessary, is necessary.

6      Q.    Okay.  And what about with respect to

7  being able to maintain employment?

8      A.    In terms of being able to maintain

9  employment, if the people around you, your supervisor

10  or your coworkers are unhappy with your interactional

11  relationships, that may precipitate in either

12  direction from the employer or the employees'

13  standpoint, a problem of maintaining employment.

14      Q.    And in Ms. Darcangelo's situation, the job

15  that she was in, would you say that would be a

16  situation just like you just discussed in which a

17  difficulty in getting along with coworkers and

18  customers could cause problems with respect to

19  maintaining employment?

20      A.    I don't think I know enough about the case

21  to answer that.

22      Q.    So you don't have an opinion on that in

23  Ms. Darcangelo's case?

24      A.    No.

25      Q.    All right.  You did indicate that you had

Martin Kranitz                                                          March 18, 2003
McLean, VA

Page 26

1       Q.     The questions really are a lot easier than
2    you think they are.
3              Do you have any understanding of what her
4    work hours were?
5       A.     You know, there is nothing in my mind, I
6    may have something in my notes.  I truly don't
7    remember.
8       Q.     Okay.  How about what do you know about
9    the physical environment that she worked in?
10      A.     Nothing, other than there was a reference
11   to at one point working at a desk and have some
12   coworker's desk moved, beyond that, nothing.
13      Q.     You never observed her in her job?
14      A.     No.
15      Q.     Do you have any understanding as to what
16   her job duties were as they compared with the other
17   people that she worked with, whether they were the
18   same or different?
19      A.     Only from her in that they were the same.
20      Q.     Do you have any sense for how frequent her
21   interaction was with coworkers or supervisors in the
22   job?
23      A.     No, I don't.
24      Q.     Do you have an opinion as to whether she
25   was qualified to perform her job?

1   course, but sure, absolutely.

2        Q.    So other than just this inference that she

3   must have been qualified since she worked there for a

4   while, could you also draw the inference that since

5   she was terminated, she wasn't qualified at the end?

6              MR. BURKHARDT:  Objection.

7              THE WITNESS:  You could infer there was

8   something about something that was going on that the

9   employer didn't care for, sure.  I don't know if it

10  was a relationship issue or production issue, I don't

11  have that knowledge.

12             BY MS. DYE:

13       Q.    Okay.  Were you provided any information

14  other than what your interview of Ms. Darcangelo

15  was -- let me try that again.

16             Would you be provided with any information

17  other than job, what Ms. Darcangelo had told you in

18  her interview in this one certificate that we talked

19  about that related to her conduct or performance in

20  the workplace?

21       A.    There was reference to it in some of the

22  medical reports that I read, not in any great detail.

23       Q.    Anything else?

24       A.    I don't believe so no.

25       Q.    You weren't given access to her personnel

Martin Kranitz                                                    March 18, 2003
                        McLean, VA

1    file?

2         A.    No.

3         Q.    Grievance reports?

4         A.    No.

5         Q.    Do you have an opinion as to whether she

6    required some sort of accommodation to be qualified

7    to perform the essential function of her job?

8         A.    That she required or was --

9         Q.    Ask it again.  Was she required?

10            MR. BURKHARDT:  Objection, a couple of

11    legalistic terms in there and he is not qualified to

12    voice an opinion on again the legal significance.  To

13    the extent you can answer the question in your

14    layman's understanding of the term, go ahead and

15    answer it.

16            THE WITNESS:  I don't think I understand

17    the term required in the context of the question.  I

18    don't know who would require it.

19            BY MS. DYE:

20         Q.    Do you have any opinions on accommodations

21    in the workplace with respect to Ms. Darcangelo at

22    all?

23         A.    Yes.

24         Q.    What opinions do you have?

25         A.    That based on her disability as I

Martin Kranitz                                                      March 18, 2003
                              McLean, VA

Page 31

1    understand it, if there had been some accommodations

2    made and parenthetically, I don't know that there

3    weren't, since I don't have any access to those

4    records, that she might have been more successful on

5    the job had those accommodations -- had

6    accommodations been made, if they were not made.

7         Q.    Okay.  What accommodations do you think

8    could have assisted her in being more successful on

9    the job?

10        A.    Well, this is largely based on what I got

11   from her.

12        Q.    Okay.

13        A.    That if she had been allowed more space, a

14   place to work away from other people then she would

15   have felt more comfortable.  In my own opinion, if

16   there had been some more education and sensitivity

17   training done with coworkers and supervisors to

18   understand her condition, again it may be that she

19   would have been more successful.

20        Q.    Anything else?

21        A.    Nothing that comes to mind.

22        Q.    All right.  So she told you that she would

23   have felt more comfortable and maybe done better if

24   she had more space physically; is that --

25        A.    More isolation rather than space, I don't

Page 32

1    think she needed a larger work area, she needed to be

2    away from coworkers more.

3        Q.    Okay.  And did you take that at face value

4    or have you analyzed that in some way in order to

5    come to your conclusion that that would have been an

6    accommodation that would have helped her?

7        A.    Well, to the extent that there was some

8    type of administrative activity that indeed removed a

9    particular, if this is accurate, a particular

10   employee's desk from the near location of her own, I

11   mean listing at that level, the other part -- the

12   opinion is based on working in this field for a

13   number of years and dealing with other people with

14   similar disorders and understanding that a large part

15   of the population general quote normal population

16   doesn't always understand people with emotional

17   disabilities and doesn't always give them the

18   flexibility that they need in order to perform

19   adequately.  It is a generic response, not a specific

20   response to this situation.

21       Q.    So you're talking the area of sensitivity

22   training at this point?

23       A.    Yes.

24       Q.    Let's go back to this, her requiring more

25   isolation.  Is it your opinion that she would have

Martin Kranitz                                                    March 18, 2003
                          McLean, VA

Page 33

1    been more successful in the job if she had been able

2    to work in a more isolated environment?

3         A.    I can't answer that in an absolute sense.

4    I think she would have had a better chance at being

5    successful.  I don't know that it's what would have

6    absolutely happened had she been given that

7    opportunity.

8         Q.    That's fine, we don't have to work in

9    absolutes here.

10              So she would have had a better chance.

11   How did you come to that conclusion?

12        A.    From dealing with other people in other

13   work situations, from talking with other employers

14   and employees that have gone through this and

15   understanding that if someone is not working out well

16   in a given situation and keeping them in that

17   situation is not going to improve things and making

18   changes might, it won't absolutely, if you keep doing

19   the same thing over and over again you're going to

20   get the same response, if you change it you might get

21   another response.

22        Q.    It is sort of anecdotal experience just

23   from your past work that you've done; is that what

24   you're drawing on here --

25        A.    Yeah.

Martin Kranitz                                                                    March 18, 2003
McLean, VA

1   documents that were provided to you by Mr. Burkhardt

2   or by Ms. Darcangelo, do you, yourself, have you,

3   yourself, done any analysis or drawn any conclusions

4   about whether she suffers from an impairment that

5   substantially limits a major life activity?

6           MR. BURKHARDT:  Continuing objection, go

7   ahead and answer.

8           THE WITNESS:  I'm not a psychologist, I'm

9   not qualified to make any type of opinion on

10  emotional disability that carries any weight.  Having

11  said that, I had a brief couple-hour interview with

12  her and there were some behaviors that I noted that

13  while appearing minimal at first to the untrained

14  eye, if one looked at them closely, they were

15  indicative of some difficulties that might interfere

16  with life activities over time.

17          BY MS. DYE:

18      Q.   So in addition to looking at the medical

19  materials and things you've provided you were able to

20  observe her yourself in this interview and draw some

21  conclusions based on the intersection of those

22  things?

23      A.   Yes, understanding my interview was a

24  snapshot in time, it was a one-time interaction with

25  her so it is not done over time.

Martin Kranitz                                                March 18, 2003
                        McLean, VA

Page 54

1    A.    Intermittent with a lot of breaks.

2    Q.    Do you have an opinion as to whether she

3 should have been able to find a position or should

4 have been able to have continuous employment during

5 that time period?

6    A.    I have a problem with the word should.  I

7 do have an opinion nonetheless.

8    Q.    Okay, what's your opinion?

9    A.    My opinion is that as her condition

10 continued to get worse, her ability to maintain

11 consistent long term employment decreased.

12    Q.    Do you attribute that at all to Bell

13 Atlantic?

14    A.    I think it is at least conceivable as

15 possible, yes.

16    Q.    Okay, well, can you explain what you mean

17 by that?

18    A.    From what I understand of the situation

19 and I'm not suggesting that I have all the data, she

20 was not provided the accommodation that might have

21 been helpful in maintaining the employment or at

22 least mitigating the continued downward progression.

23    Q.    Okay, but don't let's say after she was

24 released from Bell Atlantic, the fact that she wasn't

25 able to maintain continuous employment, is that Bell

Martin Kranitz                                                          March 18, 2003
                              McLean, VA

Page 55

1    Atlantic's fault in your opinion?

2          A.     If her situation was exacerbated because

3    of the way she was released from Bell Atlantic, at

4    least there is some potential connection there.

5          Q.     Is it your opinion that that's in fact the

6    case that her situation was exacerbated --

7          A.     I don't know enough about how the release

8    took place to answer that.

9          Q.     You don't have an opinion on that?

10         A.     That's correct.

11         Q.     What is the -- do you have an

12   understanding as to her educational and employment

13   history in general?

14         A.     Yes, I think I do.

15         Q.     And what's the basis for your

16   understanding?

17         A.     What I gathered from her.

18         Q.     Anything else?

19         A.     No.

20         Q.     Let's take a look at Exhibit 1, your

21   report for a moment, on to the top of page 1 it says,

22   I have at your request met with your client, Frances

23   Darcangelo, for the purpose of evaluating vocational

24   potential, both past and present." And this is a

25   letter from you to Mr. Burkhardt, that's the format

Martin Kranitz                                                      March 18, 2003
                            McLean, VA

                                                              Page 57

1        Q.    Okay.

2        A.    Up until the time I saw her.

3        Q.    And ability to work, is that another way

4   to say vocational potential?

5        A.    Yeah.

6        Q.    And you mentioned this issue about the

7   accommodation, what I'll call the accommodation,

8   while she was still working there, but what's the

9   issue about her ability to work subsequent to her

10  employment with Bell Atlantic, what's the legal

11  significance of your opinion on that?

12            MR. BURKHARDT:  Same objection, go ahead.

13            THE WITNESS:  If her work experience, this

14  is just layman's understanding.

15            BY MS. DYE:

16       Q.    Fine.

17       A.    I have to qualify it that way.  If her

18  work experience or release experience exacerbated her

19  condition and further limited her ability to work,

20  then Bell Atlantic might have some responsibility in

21  that regard.

22       Q.    But you don't know anything about the

23  actual circumstances of her termination?

24       A.    I do not.

25       Q.    So you can't really have an opinion on

Martin Kranitz                                                        March 18, 2003
                              McLean, VA

                                                              Page 58

1    whether it in fact did lead to her further limited

2    ability to work, right?

3         A.    Correct, that's why I've qualified it when

4    I've answered the question.

5         Q.    But what you are opining on, I just want

6    to understand, what you are opining on is her,

7    whether or not she had limited ability to work

8    following her release from Bell Atlantic?

9         A.    Yes, I have an opinion about that and so

10   reported.

11        Q.    All right, okay.  Let's talk about

12   following her release from Bell Atlantic for a

13   moment.

14        Determining her ability to work, it seems

15   to me there are sort of two pieces to that, what her

16   capabilities are and what jobs available to a person

17   with those capabilities are, right, there is kind of

18   two -- first you have to determine what she can do,

19   you know, can or can't do and then determine what

20   potential jobs she could --

21        A.    Okay.

22        Q.    -- work?

23        A.    That's okay.

24        Q.    Are you -- you're opining on both of

25   those; is that right?  You're not just opining on

Page 64

1    A.    Could, yes.

2    Q.    Do you have anything specific that you

3  base your conclusions in this area on, other than

4  just your generalized, you know, experience and your

5  review of the medical records and your interviews

6  with Ms. Darcangelo?

7    A.    No.

8    Q.    No professional literature on this narrow

9  subject, nothing like that?

10    A.    No.

11    Q.    Do you have any conclusion at all about

12  the cause for the change in her mental status during

13  her employment, versus after she was released or you

14  just don't know --

15    A.    No, no.

16    Q.    Okay.  All right, in the --

17          MR. BURKHARDT:  Are we changing subjects

18  here?

19          MS. DYE:  Well?

20          MR. BURKHARDT:  Could we take a brief

21  break?

22          MS. DYE:  We can take a break, if you

23  want.

24          MR. BURKHARDT:  Off the record.

25          (Discussion off the record.)

Martin Kranitz                                                March 18, 2003
McLean, VA

1    have, I would have to look through all of my notes

2    and I can't do it in a minute.  If you want to reask

3    me that I'll try to be prepared for it next time.  I

4    just can't do it now.

5         Q.    All right.  Were you given any information

6    about actual or accused misconduct in the workplace

7    by Ms. Darcangelo?

8              MR. BURKHARDT:  Objection, asked and

9    answered.

10             THE WITNESS:  I didn't understand the

11   question.

12             BY MS. DYE:

13        Q.    Were you given any information about

14   misconduct by Ms. Darcangelo in the workplace,

15   whether, you know, actual having been --

16        A.    From whom, from Ms. Darcangelo?

17        Q.    From anyone.  Presumably from her or

18   Mr. Burkhardt.

19        A.    No specific reports of any misbehavior.

20   By reference at least one, possibly two of the

21   medical reports mentioned something about posters in

22   or about the cubicle, with nothing specific about

23   what they were, what they said, why they were

24   objectionable.  I have no -- no knowledge of that.

25        Q.    That's from the medical reports?

Martin Kranitz

March 18, 2003

McLean, VA

Page 97

1    A.    I'm pretty sure that's where I got it

2    from.

3    Q.    Nothing else, no other information about

4    that that you're aware of?

5    A.    Not that I'm aware of, no.

6    Q.    If you learned that she had a history of

7    misconduct, would that affect your opinions or

8    conclusions?

9         MR. BURKHARDT:  Object, go ahead and

10   answer.

11        THE WITNESS:  I would have to say it is

12   certainly a possibility, I would have to consider

13   that.  I would have to look at it in light of what

14   the misconduct was, in light of what the psychiatric

15   issues are.

16        BY MS. DYE:

17   Q.    Would that -- could it affect your

18   conclusion, for example, as to whether she was

19   qualified for her position?

20        MR. BURKHARDT:  Objection, go ahead.

21        THE WITNESS:  Anything's possible.

22        BY MS. DYE:

23   Q.    What do you think, I'm asking for your --

24   A.    I don't know, give me an example.

25   Q.    Okay.  Say you find out she's, you know,

Martin Kranitz                                                    March 18, 2003
McLean, VA

 1   using all kinds of bad language and threatening

 2   people in workplace would that affect your opinion as

 3   to whether she was, you know, able to maintain

 4   employment in your language, at her --

 5        A.    It certainly might, it certainly might.

 6   Again, it would have to be within the context of a

 7   disability, one example and I really have to run

 8   because we're after 2 o'clock.  If I found out that

 9   she had really bad language and she was -- I'm not

10   saying this is the case, I'm not trying to be

11   misleading -- if she had torticollis, which is a

12   disorder which leads people to have really bad

13   language but doesn't change their ability to work,

14   I'd have to put it all in perspective.

15        Q.    All right, we can come back to that?

16        A.    I am very antsy, you would want this back

17   as your original exhibit.  I have my copy.

18        MS. DYE:  We're going to go off the record

19   for today, but we're going to reconvene at 9 o'clock

20   on the 28th to continue the deposition.  Anything

21   you want to add.

22

23

24

25

Martin A. Kranitz                                                    March 28, 2003

McLean, VA

Page 131

1   for sure that she handed me all of these

2   computer-code things at the time that I saw her.

3        Q.   Okay.

4        A.   I'm not sure if she handed me or sent

5   me the letter of commendation.

6             It's my belief that she did send me

7   this Post Office scoring sheet.

8        Q.   After?

9        A.   Subsequent to my testing.

10       Q.   All right.

11       A.   Because it was, it's I guess similar

12   to the kind of evaluating that I was doing.  She

13   thought, possibly maybe thought it would be

14   useful to me.

15       Q.   All right.  Now when -- just set that

16   one aside.

17       A.   Sorry.

18       Q.   Okay.  When we talked previously, you

19   had indicated that you had been given no

20   information other than what was in the medical

21   reports and what Ms. Darcangelo herself reported

22   about her conduct in the workplace, correct?

23       A.   Ask the question again.

24            MR. BURKHARDT:  Objection.

25            THE WITNESS:  Ask the question again,

Martin A. Kranitz                                              March 28, 2003
McLean, VA

Page 132

 1  please.

 2              THE REPORTER:  Question:  "When we

 3  talked previously, you had indicated that you

 4  had been given no information other than what

 5  was in the medical reports and what Ms.

 6  Darcangelo herself reported about her conduct in

 7  the workplace, correct?"

 8              THE WITNESS:  Yeah.  I mean that's

 9  what I said.

10              BY MS. DYE:

11      Q.     Okay.  And if she, if you learned that

12  she continuously insulted and threatened her

13  supervisors and co-workers and posted

14  inappropriate and threatening materials around

15  the workplace, would that affect your conclusion

16  that she was qualified to work there at least

17  until around the time she was terminated?

18              MR. BURKHARDT:  Objection to asking

19  the witness for a legal conclusion.

20              Once again, go ahead and answer.

21              THE WITNESS:  I think as long as we're

22  talking about it from a behavioral standpoint, I

23  think I made the discrimination, the distinction

24  before.

25              BY MR. DYE:

Martin A. Kranitz                                                    March 28, 2003
McLean, VA

Page 184

1   you say vocational rehabilitation expert?

2        A.    Rehabilitation, vocational counseling,

3   vocational consultant are the three phrases that

4   I have heard connected to my level of expertise.

5        Q.    Do you remember what cases you were

6   accepted in?

7        A.    All of the cases that I have gone to

8   court.

9        Q.    Okay.  So you're not aware of any

10  situation in which you were determined not to be

11  qualified as an expert?

12       A.    Correct.

13       Q.    Have you ever been involved in other

14  employment discrimination cases?

15       A.    Litigations you're talking about?

16       Q.    As opposed to what?

17       A.    Mediations.

18       Q.    Okay.  Yeah.  Let me say employment

19  discrimination cases in which you acted as an

20  expert for a party, yes.

21       A.    I don't remember.

22       Q.    Do you perform or have you ever

23  performed any sort of ADA-type consulting on

24  accommodations outside of the litigation

25  context?

Martin A. Kranitz                                          March 28, 2003
McLean, VA

Page 185

1      A.    Certainly not as a regular part of my
2 practice; on rare occasion, I have talked with
3 employers about accommodations, but not as an
4 expert on accommodations.
5           (There was a pause in the
6 proceedings.)
7           BY MS. DYE:
8      Q.    Okay, but in this case, you are
9 opining about accommodations, right?
10     A.    I'm opining about an individual's
11 ability to work and what I understand, to the
12 limit of what I have, the information I have
13 read, about apparent lack of accommodations of
14 any sort except the desk removal thing that we
15 talked about last time.
16     Q.    But you're suggesting some
17 accommodations that would be helpful to her,
18 right, in this case?
19     A.    Yes, I am indeed.
20     Q.    And is that something you typically do
21 in your work in any way, or is this the first
22 time you've done that?
23     A.    Oh, not at all.  In, in other
24 situations, I might be called upon to make
25 suggestions about how work environment might be

Martin A. Kranitz                                                March 28, 2003
                              McLean, VA

1    improved.

2         Q.    What kinds of situations?

3         A.    Situations where I'm being asked to

4    provide such suggestions; there have been a few

5    times, certainly not many, where I'm asked if

6    there is something that could be done that would

7    allow an individual to maintain employment.

8              This may not necessarily be within a

9    legal suit, but certainly within the context of

10   my vocational practice and doing some vocational

11   consulting, and what are some things that could

12   be done to help an individual maintain

13   employment, what kind of accommodations.

14        Q.    Right.  Well, what I'm asking is what

15   kind of situations have you been asked to do

16   that in?

17        A.    People in wheelchairs, people with

18   back backs are the two that come to mind most

19   quickly.

20        Q.    Is this people that have hired you

21   themselves to -- or what?

22              I mean like is it a lawsuit?  Is it in

23   a Social Security hearing?

24        A.    Not Social Security.

25        Q.    Okay.

Martin A. Kranitz                                                    March 28, 2003
                          McLean, VA

Page 230

1    under structure, that they have various limiting

2    conditions that interfere with their activities

3    of daily living and/or their ability to function

4    in a work environment.

5        Q.    Have you ever participated in a

6    diagnosis or treatment of anyone for mental

7    illness?

8        A.    I'm not allowed to.

9              MR. BURKHARDT:  Objection.

10             BY MS. DYE:

11       Q.    That's a no?

12       A.    No.  I'm not allowed to diagnose.

13       Q.    Have you ever prescribed medication?

14       A.    No.

15       Q.    So you do not have the current ability

16   to diagnose or treat mental illness?

17       A.    Correct.

18       Q.    Are you familiar with the AMA "Guides

19   to the Evaluation of Permanent Impairment"?

20       A.    Yes.

21       Q.    What is it?

22       A.    It's a book which tries to standardize

23   limitations in terms of percents of body

24   function limitations which is often used by

25   physicians to render opinions used in, I'm most

Martin A. Kranitz                                      March 28, 2003
McLean, VA

Page 270

1    familiar with DEAD.

2         Q.    What percentage of your time do you

3    currently spend doing work under the name

4    Vocational Consultants?

5         A.    It's about 50 percent of my time.

6         Q.    And the other 50 percent is mediation

7    work?

8         A.    Correct.

9         Q.    Okay.

10        A.    That would be under the name Mediation

11   Services of Annapolis primarily.

12             MS. DYE:  Okay.  Let's put this as

13   Exhibit 14.

14                  (Kranitz Exhibit No. 14

15                  was marked for

16                  identification.)

17             THE WITNESS:  Can I close this for

18   now?

19             MS. DYE:  Yeah.

20             BY MS. DYE:

21        Q.    Okay.  What's this one?

22        A.    It's a wonderful full picture, smiling

23   face, the face of Martin Kranitz, MA.

24        Q.    And what's the --

25             MR. BURKHARDT:  Are your eyes open in