# Vocational Consultants
1160 Spa Rd. 1-B
Annapolis, Md., 21403

800 781-7500
(410) 974 8888    Fx (410) 295-9190
e mail makranitz @ aol.com

January 7, 2003

To: Ed Burkhardt, Esq

From: Martin Kranitz, MA.

Re: Frances Darcangelo

Dear Mr. Burkhardt,

I have, at your request, met with your client Frances Darcangelo, for the purpose of evaluating vocational potential (both past and present). As you know, I have requested additional information which I have not yet received. This report will be based on the information that I have so far. I will prepare an addendum report after I review the requested material.

I met with Ms. Darcangelo on 12/2/02 in my office in Annapolis, MD. She arrived on time, was casually dressed and appeared her stated age. It was noticed immediately and throughout the interview that she laughed and giggled nervously and often inappropriately (based on what she was describing at the time).

I obtained the following information, much of which was verified from the materials that were presented to me and which I reviewed subsequent to my interview with her. The interview and testing lasted 2 3/4 hours which is about average.

Ms. Darcangelo reported that she is a 46-year-old (DOB 1/1/56) high school and college graduate. She has obtained a Bachelor of Arts degree in Individual Studies from the University of Maryland College Park. She reported her GPA as approximately 3.5. Additionally she reported taking a number of computer courses at PG Community College as a way of increasing her knowledge and skills base in dealing with computers at work. She reports that she has taken approximately 12 courses over a three-year period of time. There was no goal of a degree in mind with these courses, they were taken to improve work skills.



3/18/03 PMD
EXHIBIT
Kranitz 1

Darcangelo  
Page 2

January 7, 2003

Work history

Ms. Darcangelo reports that she began working for the C&P telephone company in 1977. The work was full-time and began as a janitor. This work lasted approximately seven months. She was then promoted to "frame attendant", a position at which she worked for approximately nine years on and off. She learned this work on-the-job. It was her job duty to maintain the electrical equipment used in making telephone calls. She used test equipment and was required to repair or replace faulty equipment in the frame. It was during this time that she began to attend college on a part-time basis (it took her approximately eight years to obtain her degree). Reports that she worked for the telephone company for 21 years in all. After approximately nine years she was promoted to "central office technician"*, a position in which she remained for approximately 10 – 12 years. In this position she worked in a control center using remote sensors and remote control equipment to help the telephone company run smoothly. It was her job to monitor equipment and write code (instructions in computer language that told the equipment how to perform). Here, as in her previous worked she learned on-the-job.

---

\* DOT Code: 822.281-014 Test, analyze, and repair telephone or telegraph circuits and equipment at a central office location using test meters and hand tools. Analyze and repair defects in communications equipment on customers' premises using circuit diagrams, polarity probes, meters, and a telephone test set. May install equipment.

1. Tests circuits and components of malfunctioning telecommunication equipment to isolate source of malfunction, using test instruments and circuit diagrams.

2. Analyzes test readings, computer printouts, and trouble reports to determine method of repair.

3. Repairs or replaces defective components, such as switches, relays, amplifiers, and circuit boards, using hand tools and soldering iron.

4. Tests and adjusts installed equipment to ensure circuit continuity and operational performance, using test instruments.

5. Removes and remakes connections on wire distributing frame to change circuit layout, following diagrams.

6. Routes cables and trunk lines from entry points to specified equipment, following diagrams.

7. Enters codes to correct programming of electronic switching systems.

8. Connects wires to equipment, using hand tools, soldering iron, or wire wrap gun.

Darcangelo  
Page 3

January 7, 2003

9. Installs preassembled or partially assembled switching equipment, switchboards, wiring frames, and power apparatus according to floor plans.

10. Retests repaired equipment to ensure that malfunction has been corrected.)

---

Ms. Darcangelo reports that she was fired Jan. 6th, 1999. She stayed on unemployment for approximately 26 weeks then obtained employment at H & R Block, preparing tax returns during the busy season. In order to perform this work she first took the H&R Block, 66 hour training course. This employment lasted six – eight weeks. She reports multiple problems on the job in dealing with co-workers (they were very critical of her work) and she ended up quitting that employment. She reports that she earned $6.50 an hour in this work activity.

Ms. Darcangelo, then obtained work as a survey taker for the 2000 Census. It was her job to go to various households and fill in information on a form as she asked questions of the people living in the household. She was paid approximately $11 an hour and worked for 6 – 8 weeks before leaving that employment.

In 2001 Ms. Darcangelo obtained employment at a Wal-Mart were she worked the night shift stocking shelves and cleaning the store. She lasted approximately three weeks. She labeled that as a "bad job", because oftentimes employees did not show up and she was called upon to work extra time and extra hard. She felt it was a very lopsided work load and that even when certain other employees were there, they goofed off and did not do their share of the work. Additionally, she reports that the store air-conditioning was turned off at night (she was working during the summer) and it became unbearably hot in the store. She reports that initially she got along alright with other employees, then, became involved in a discussion about how Wal-Mart employees were involved in a profit sharing plan. She pointed out to other employees that they were not really getting to share in the profits. She quit when she was told she "was not welcome" by one of the supervisory staff.

Subsequent to Wal-Mart, Ms. Darcangelo took a job as a janitor at a Rest Stop in Shrewsbury, Pa. She reports that the boss's daughter was also employed at the Rest Stop. She reports that the boss's daughter came and went on an unscheduled basis and that Frances was required to change her schedule to fit the daughters coming and going. She labeled her supervisor as a "toxic boss". She quit this job after three weeks. She was earning $6 dollars an hour and indicated that she like the job she just did not like the constant schedule change.

Ms. Darcangelo then went to work for a temporary labor agency were she worked for three days sorting packages for a shipping company. She was sent back and told that she was "not fast enough." Ms. Darcangelo disagrees saying that she is "not sorting material". She then went to work for Stouffer's cookies, operating a machine that made

Darcangelo  
Page 4

January 7, 2003

dough, baked the cookies and put them in containers (plastic bears). Part of her job was to place lids on these plastic cookie containers. She reports that the machine put the wrong number of cookies in each container and that when the containers were weighed, they came up light and she was required to re-pack the bears while continuing to operate the machine and assembly line. She reports that she was unable to handle the speed of the assembly line and quit.

Ms. Darcangelo reports that 2002 was "wildly successful". She worked first for approximately three months, full-time, doing inventory in a retail store. She quit after three months. She then became employed by the York, County school district as a custodian, part-time, from March until August approximately five months. She had general cleanup duties in a public school. She reports that she was the only part-time person there (with other full-time employees). She reports that her supervisor was the best supervisor she had ever had. She also reports that she was expected to work and produce as much as full-time employees. When she realized that she was being asked to produce as much as full-time people she spoke to her supervisor. It was then that she noticed that other workers were complaining about her performance, calling her "a poor worker", and so she quit.

When asked about all of these employment situations, all the times that she has quit or been asked to leave, she responded in essence, that she is tired of being in a "hostile workplace" and will not do that again. She will continue to look for work and take employment but if she finds herself in a similar situation she won't stay. She "wants to be treated with fairness or the illusion of fairness - not going to submit to unfairness anymore", "not willing to take any crap anymore". She recognizes that she "needs to look for a job not dealing with people... machines are okay, ... (she) can be productive."

She has, in fact applied for a job with the Post Office. It is a "building equipment machine" job where she will have to install and maintain equipment for the post office. She feels that she is able to work, with "serious limitations", because the post office is large enough to handle accommodations. She believes that a small company will not hire her with her psychiatric disability. She went on to say that she "wants to work – wants a good job – won't take a crappy job." Currently, she is doing a job search with approximately one contact a week on average. I suggested she increase her outreach to 5 – 7 contacts per week.

Health issues

Ms. Darcangelo's physical health seems to be reasonably good. She reports the ability to lift 40 pounds, stand all day, sit all day, climb two flights of stairs, walk without difficulty, bend and stoop. She reports her hearing and vision are okay. She does reports she was diagnosed with anemia in 1999 but that the anemia is under control at this point in time. She has had no hospitalizations for medical reasons. She is going through menopause at this point in time.

Darcangelo  January 7, 2003
Page 5

From a psychiatric standpoint Ms. Darcangelo reports a "psychotic break" in 1989 at age 33 when she was in "basic training" for the Air Force reserve. She was hospitalized briefly then released from the hospital and separated from the Air Force (unsuitable for military service). Then was hospitalized in York, Pennsylvania but left AMA shortly afterwards. (The details she described of this time are similar to those found in several of the medical/psychiatric reports and IME's and need not be repeated here in detail).

Ms. Darcangelo summarizes her psychiatric treatment by saying she sought treatment in 1979 for depression, left therapy in 1982 (stop taking her medications) and was out of treatment until the Air Force incident in 1989. She returned to work with the telephone company, in March of 1990. She is currently in treatment with Dr. Gary Zimburg, and Julie Swope, Ph.D. in York, Pennsylvania. She reports no other psychiatric hospitalizations. She does use the services of the Veterans Administration, under category one. Ms. Darcangelo reports a bipolar disorder currently in a hypomanic phase. She is currently on several medications to help control her symptoms. To reports in the past she has been delusional, feeling that she was receiving messages from radio and television.

When asked to rate herself along a continuum (from one – ten where 5 is an average rating for her manic phase) she rated herself between two and three currently.

Test results and discussion

It is clear just from talking with Ms. Darcangelo that she is very bright. Test results show an above average intelligence (possibly above 120). Aptitude test scores were highest in the area of skilled science, technology and arts. Interest inventory results showed high scores in the career clusters: skilled crafts, arts and technical, providing a fair amount of internal consistency with the aptitude measurements. Specific occupations which are found in these career cluster categories include: building maintenance repair, air-conditioning/heating mechanic, floral designer, and cost estimator. The majority of these jobs can be learned O.J. T.

Records Review

I reviewed a number of psychiatric reports concerning Ms. Darcangelo the most important of which, I believe, are the following:

Dr. Anthony Russo (11/4/97) – The Forest Hills IPA Inc, who reports of 41-year-old white female with previous psychiatric history. The report summarizes the history and then notes from the psychiatric examination which include, "the patient's facial expressions are inappropriate with smiling at times ... behavior and mannerisms are variably cooperative with guarding, and seemingly interested as per own agenda. The patient affect his inappropriate with lability as per laughter. The patient's mood is indeed elevated and euphoric." Notes go on to discuss Ms. Darcangelo's orientation X3

and provides a final diagnosis of: Axis I- Bipolar disorder - Type 1, post tramatic stress disorder, sexual dysfunction; Axis II- Schizoid personality disorder, Borderline Personality disorder; Axis V - GAF – 80.

The doctor recommends the patient returned to work with "... restrictions regarding appropriate dress and behavior, that is, she does not use any vulgar language or make any threatening remarks to co-workers or supervisors." "It appears that the patient is significantly stabilized on medication and can return to work in her full capacity and job duties."

Dr. Jerome Gottlieb, (5/29/98) – Lancaster Behavioral Health Network, reports a 42-year-old employee of Bell Atlantic who has been with the company for 20 ½ years who was sent home from work Friday, May 8th, 1998 and was told that she would be suspended without pay for two weeks beginning May 11th. Dr. Gottlieb made issue of "posters" that were displayed in her work cubicle. No mention was made in the report of why these posters were offensive to someone. After summarizing her history the doctor noted in his mental status exam that Ms. Darcangelo, "... was somewhat guarded but largely cooperative, her thought content revealed no evidence of hallucinations, delusions, suicidal or homicidal ideas. Her affect was appropriate for the most part. There were a couple of instances where she seemed to laugh at inappropriate times. Her mood was very slightly elevated." The doctor provided a diagnosis of Axis I – Bipolar disorder, currently slightly hypomanic; Axis II deferred; Axis V - GAF 70.

The doctor summarizes by saying that, "As best I can tell... Ms. Darcangelo is receiving appropriate treatment for her illness." "...it is extremely difficult to predict violence. The best indicator is previous history of violent activity. Given that Ms. Darcangelo has had no such activity there is nothing at all to suggest that she poses an active threat to anyone." "It is my opinion that she is capable of performing her normal activities. I am unaware of any specific activities that should be avoided. She should be able to return to work at this time."

Dr. Steven Seibert (2/12/99), reports a 43-year-old single female not currently employed. Dr. Seibert reports a large number of medical records which were reviewed by him and provides a history covering developmental, educational, social/marital and occupational background. After reviewing the records in detail, he reports on his psychiatric examination (present mental status) and reports that Ms. Darcangelo was "... neatly groomed and casually dressed.... Cooperative and had a positive attitude.... She was noted to laugh intermittently during the interview... there was no evidence of unusual behavior or mannerisms during the interview or examination." He reported that ".. She was fully oriented and able to sustain attention... there was no evidence for any significant defect in attention, concentration, short-term or remote memory. She appeared euthymic and had an average range of affect." During the interview she described herself as,"... too judgemental, and it puts me into conflict with other people...

overreacting to sexual harassment... obsessive-compulsive symptoms such as checking multiple times to see at the door is locked or refrigerator door is closed... phobia of water and being underwater... feeling paranoid in the past – to the point of paralysis ." There was no other evidence of unusual preoccupation, obsession or delusional thinking. The doctor's diagnosis was: Axis I Bipolar disorder, manic in partial remission; Axis II, Personality disorder.

Under summary and opinions, the doctor mentions that Ms. Darcangelo's psychiatric history is notable for schizoid personality traits and chronic depression since childhood... there is no history for mania, paranoid symptoms, hallucinations or psychiatric hospitalizations prior to Ms. Darcangelo entering military... she became acutely psychotic on active-duty.. It is clear that the identifiable stressor was the demands placed on Ms. Darcangelo during basic training... Ms. Darcangelo was hospitalized for an episode of an acute psychotic illness... she has been under continuous mental health treatment since her hospitalizations... she has done relatively better after she was stabilized on lithium... she was able to maintain full-time employment from 3/90 – 1/99.

The doctor found that "her psychiatric condition has had an adverse effect on her capacity to maintain full-time employment... her report of harassment and personality conflict is consistent with paranoid stance and observation of talking loudly, shouting and insubordination is consistent with hypomanic or manic symptoms. He concludes "Ms. Darcangelo presented this time with significant mental and behavioral impairment. She is appropriately rated as having a psychotic disorder with lesser symptomatology, with substantial impairment in her overall functioning as manifest by social and adaptability and unemployability.'

Dr. James Beshai, Ph.D. (9/10/99) found a 43-year-old single white Air Force veteran and again repeats and reports the detail of the work and psychiatric history of Ms. Darcangelo. He reports that from 1989 until 1992 she had a few hypomanic episodes. "She was under pressure to keep her job with Bell Atlantic but she proceeded in a self-defeating manner which exacerbated her erratic and hypomanic episodes. She was at the time taking care of her mother who was in a nursing home with senile amnesia."

The doctor diagnosed Ms. Darcangelo with: Axis I - Bipolar disorder, hypomanic impartial remission; Axis II - Personality disorder; Axis V - 50 – 55.

Dr. Lawrence Vonrogo, (11/7/2001 )- reports on a 45-year-old, never married female currently living in New Freedom, Pennsylvania. She is presently unemployed. He provides a brief occupational, medical and psychiatric history and describes an individual who was "... casually dressed and groomed... felt to be fairly reliable... gave no indication that she was exaggerating or feigning symptoms... hypomanic presentation... no gross disorganization of thoughts... fairly well organized with no real

evidence of circumstantiality or tangentiality ... and no evidence of any psychotic thoughts or processes... affect is happy and silly at times.. She made jokes and was very talkative... thought processes were clear, coherent and goal directed... free of any obsessions, compulsions, delusions or hallucinations... was alert and oriented." He provides a diagnosis of: Axis I -probable Bipolar Disorder type II; GAF – 50."

I also reviewed the office notes of Dr. Gary Zimberg, M.D. the psychiatrist who has been treating Ms. Darcangelo since 1997. (I think that seeing the notes from Julie Swope, Phd., would be helpful as well.) The information provided in Dr. Zimberg's office notes is helpful in that it confirms several issues for me.

According to Dr. Zimberg, Ms. Darcangelo did not appear to be depressed, manic or hypomanic in the vast majority of visits. She did appear somewhat distracted on several occasions and as the time progressed was clearly seen as preoccupied with litigation and pre-litigation issues.

It would be useful to have Dr. Zimberg, provide a current GAF rating to see how that compares with the GAF of 60 which he assigned in October 1997. (significantly lower than the other GAF ratings provided in the same time frame).

It was also interesting to see how Ms. Darcangelo perceived her ability to work on an ongoing basis, as reported to Dr. Zimberg, and recorded in his office notes. Over time it can be seen that Ms. Darcangelo seems to have less confidence in her ability to maintain employment overtime. She sees that working by herself will be to her benefit. I can see that she appears to have less energy to seek employment the closer we get to the present time. In September of 2002 the doctor reports that, "the patient was not surprised to have lost her job, and was actually pleased that she was able to hold on for five months. She believes she could have lasted longer if she were allowed to work alone."

I also saw in these reports that Dr. Zimberg, consistently made note of Ms. Darcangelo's humor in his sessions. It makes me wonder if this was part of the difficulty she had with her various employers. As was noted in Dr. Zimberg's case notes and as I saw in several of the other reports, Ms. Darcangelo seems to laugh inappropriately, frequently. I wonder if this inappropriate laughter isn't part of what upsets other people when they have to deal with her. Since I have seen no notes from the employer it is really hard to gauge this. As I indicated to you on the phone, I think it would be useful to see how the employer views / viewed Ms. Darcangelo prior to releasing her from work. Any notes, reports or evaluations that you have, would be useful.

Summary and conclusions

Francis Darcangelo is a 46-year-old single female who has completed her college undergraduate degree, has taken numerous courses to increase her work skills. She has worked for Verizon telephone Company (C&P, Bell Atlantic) for over 20 years having been released (fired?) January 6th, 1999.

After speaking with Ms. Darcangelo, doing some basic vocational testing, and reviewing a number of psychiatric reports (mentioned above) I have a number of concerns regarding this case. It is quite clear that Ms. Darcangelo has a long history of psychiatric difficulties. Ms. Darcangelo worked for the telephone Company for approximately 10 years before entering the Air Force reserve. During those years she worked her way up from "janitor" to "frame attendant" were she was responsible for maintaining, testing and replacing telephone switching equipment. It appears from the information which I and a number of medical professionals gathered that during AF basic training Ms. Darcangelo had a psychotic episode which resulted in her discharge (for the good of the service) and hospitalizations in Maryland and Pennsylvania. Subsequent to her hospitalizations she came under the treatment of a physician who prescribed medications which helped to stabilize her condition.

She returned to work for the telephone Company and worked approximately another 10 or 11 years as a "central office technician" ( DOT Code: 822.281-014, L-7). She reported that she received several commendations for her work.

In November of '97 and May of '98 she was required to undergo psychiatric evaluations to be assessed for "violence in the workplace". I can find in none of the records I reviewed, any reference to past violence in the workplace or threats of violence in the workplace. In both reports, the assessment was that she should be allowed to return to work, that she did not pose a threat to herself or others (as far as the evaluators could tell).

Apparently, in spite of these reports, Ms. Darcangelo was released from work in January of 1999. She reports that she was earning approximately $46,000 annually which is commensurate with estimated annual wages for 1999 (see attached documents). At that point in time there were approximately 4500 people employed in that type of position in Maryland and approximately 166,000 nationally. Employment in Maryland represents about 2.7 percent of the national employment for this particular type of occupation.

In February of 1999 she was again given a psychiatric assessment and was found to have a significant mental and behavioral impairments. Unfortunately, no Axis V was given in this diagnosis.

Darcangelo                                                           January 7, 2003
Page 10

However, in September of 1999 yet another psychiatric assessment was performed in which she received a GAF of 50 – 55* (see attached GAF rating scale). The last exam from November 2001 provides a GAF of 50.

**GAF Ratings (partial)**
**\*60 - 51     Moderate Symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).**

**50 - 41     Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).**

With regard to the GAF scores, several things become apparent. As time has progressed from 1997 until 2001 the GAF scores have decreased consistently. As can be seen from the definition of these GAF scores (above) drawn from the Diagnostic and Statistical Manual of the American Psychiatric Association, DSM-V. Someone functioning at this level would have conflicts with peers or co-workers and have difficulty in keeping a job.

It would appear that Ms. Darcangelo does not react well to stress. The stress of instructors yelling at her during basic training caused her to have a psychotic episode. It is not surprising that she should decompensate as the stress in her personal life (taking care of her mother who was in a nursing home with senile amnesia) and work life (supervisors unhappy with her behavior and requiring psychiatric evaluations for "violence in the workplace"), increased.

At this point, given a GAF – 50 (or even 55 – 50) I do not believe that Ms. Darcangelo would be successful in maintaining employment. Notice that I said maintaining employment. Maintaining employment is the key to successful work. She reported in her history that she has been able, even over the last few years to obtain employment. She presents reasonably well (if one overlooks the inappropriate laughing and giggling) and was able to obtain several jobs at, theoretically, a lower level of stress and responsibility. Yet, even here she was unable to maintain employment.

I have no doubt that if Ms. Darcangelo applied herself (it may be more difficult now for Ms. Darcangelo to apply herself because she is continuing to decompensate, as I understand the record), she would be able to obtain employment. However, as can be seen from the recent work history, she has been unable to maintain employment even in some basic, entry-level jobs.

The problem, as I see it, lies not with her ability to concentrate, maintain attention or to understand the job requirements. The problem is her ability to get along with other

people. She has great difficulty in doing this. More so now than in the past.
It is a given, in all work, that the lower you go on the totem pole, the more people you have above you to supervise you, criticized and critique what you are doing. Sadly, this is what Ms. Darcangelo is facing. There are few jobs that require little interaction and no jobs that require no interaction with co-workers or supervisors. All jobs, at all levels, have someone looking over your shoulder and making comments. This is true for assemblers, janitor's and presidents of companies and the nation.

Another factor to consider is the following: it is a given that people with Bipolar disorders often have changes in mood. These can be extreme or moderate but generally fall into a greater range of change in the average person. They are often not able to see nor understand this change in themselves until after they have changed to another level. It is a given that people with psychiatric disorders, especially bipolar disorders, that are not well-controlled will have difficulty in maintaining employment.

A great deal of external support is required from employers, family, rehabilitation facilities and psychiatric centers. Support often comes in the form of educating those people around the individual with the psychiatric disorder, what to expect and how to deal with it. It does not appear that this support was provided to Ms. Darcangelo within her employment situation. I do not state this factually because I have seen no reports from the employer. I make this statement, only by inference. Since there are no reports or mention made in any of the psychiatric histories concerning employers support I infer that there was none. The exception to this is a report by Ms. Darcangelo and mention in one of the medical reports that a co-worker's desk was moved away from the area in which Ms. Darcangelo was working because of a request that she made. While this does sound like an attempt at an accommodation there are many more things that can be done in a work situation to increase an individuals ability to maintain successful employment. Should my interpretation of the lack of employers support be inaccurate, I would like to know, so that I can adjust my conclusions as necessary.

Conclusions

Given an individual with a GAF of 50 I do not believe that such an individual would be able to maintain employment for any extended/significant period of time. I do believe that such an individual will be capable of obtaining employment again and again but will in all likelihood not be successful over the long haul.

It is clear to me that the level of job search (by Ms. Darcangelo) over the last several years is less than optimal. Given an individual who's level of depression is increasing as a function of the stress of continued lost employment I believe that such an individual will have a greater and greater difficulty in reaching out and seeking employment.

If one looks at the medical reports generated while Ms. Darcangelo was employed, it appears that she was capable of maintaining that employment (from a work standpoint) at that point in time. There are other jobs which she could have performed. These are listed below.

Occupations that I would recommend would include "mechanical maintenance", "janitorial" and certain types of "clerical inspection jobs" which can be done with little or no contact with co-workers. It must be kept in mind, as stated above, few jobs are co-worker or supervisor free. Inspection jobs are often good for people with obsessive compulsive traits as long as those traits are not in the extreme. These jobs can also be done without much interaction with co-workers or supervisors. Janitorial jobs can also be done in relative isolation and are generally low stress. Mechanical maintenance jobs often require somewhat higher levels of interaction but are more intellectually challenging. A concerned that I have for Ms. Darcangelo is that we are dealing with a person with an above average intelligence. At some level, these entry-level, repetitive, low stress jobs may become boring to Ms. Darcangelo over time. The incidence of and incomes of examples of these jobs are as follows:

| Occupation | National | Wages | Maryland | Wages | Penn. | Wages |
|---|---|---|---|---|---|---|
| Janitor | 2,090,500 | $18,220 | 45,580 | $16,480 | 91,600 | $18,380 |
| Inspection - clerical | 83,800 | $25,670 | 690 | $19,230 | 2400 | $24,220 |
| Voucher Clerk | 551,410 | $23,880 | 10,900 | $25,020 | 25,470 | $24,010 |
| Maintenance | 176,000 | $36,210 | 1400 | $36,630 | 9,000 | $34,530 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

If one looks at the medical reports generated subsequent to her release from work, there seems to be a consistent assessment that work is now not a possibility. (To reiterated, when I talk of work in this context I am referring to the ability to maintain employment not just to obtain employment.) Based on my interview with Ms. Darcangelo I would concur. She appears to me to be in a situation where no work will be suitable. I believe that she will continue to seek work, obtain work, continue to be unhappy, find fault and quit or be fired.

It is my hope that given time and the resolution of this litigation, which is certain to have negative psychiatric and vocational effects on the client, that Ms. Darcangelo may become re-stabilized, and better able to re-enter the workforce and maintain employment.

Darcangelo  January 7, 2003
Page 13

The above, represents my view of Ms. Darcangelo and her ability to work at this point in time. If I receive the request the medical I will be glad to write an addendum report factoring in any information that has vocational significance.

If you have any questions, please do not hesitate to contact me.

Sincerely,


Martin Kranitz, MA, CRC, CVE, CPC