Maria M. Bury                                                    April 29, 2003
McLean, VA

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MARYLAND

 3    - - - - - - - - - - - - - - x

 4   FRANCES DARCANGELO,          :

 5            Plaintiff,          :

 6            vs.                 : Case No. 02 CV 816

 7   BELL ATLANTIC,              :

 8            Defendant.          :   CERTIFIED COPY

 9    - - - - - - - - - - - - - - x

10                      Mclean, Virginia

11                      Tuesday, April 29, 2003

12            Deposition of MARIA M. BURY, a witness

13   herein, called for examination by counsel for

14   Defendant in the above-entitled matter, pursuant

15   to notice, the witness being duly sworn by

16   CATHERINE S. BOYD, a Notary Public in and for

17   the Commonwealth of Virginia, taken at the

18   offices of O'Melveny & Myers, LLP, 1650 Tysons

19   Boulevard, Suite 1150, McLean, Virginia  22102,

20   at 9:28 a.m., Tuesday, April 29, 2003, and the

21   proceedings being taken down by Stenotype by

22   CATHERINE S. BOYD and transcribed under her

23   direction.

24

25
```

Page 16

1    union hall.

2            You know, he came in.  What happened

3    next?

4        A.    I think I offered him coffee or

5    something to drink, and then we have a small

6    board room, so we met in there, and he was

7    asking me questions primarily about a grievance

8    that I handled in 1994 I believe when I was the

9    vice president of the local.

10       Q.    What kind of questions?

11       A.    You know what?  To be honest with you,

12   I don't remember exactly what he was asking me.

13           It was all related to the grievance.

14       Q.    Just that one grievance?

15       A.    Just that one grievance.

16       Q.    He didn't ask you about anything

17   during any other time period?

18       A.    He asked me if I knew of some other

19   things.

20           There were other grievances that I was

21   asked, but I did not personally handle.

22           I was there as a -- do you understand

23   our grievance procedure?

24       Q.    A little bit, but maybe you can

25   explain it to me?

Maria M. Bury                                                    April 29, 2003

McLean, VA

Page 17

1        A.    Okay.  At the time -- well, let me

2   give you some dates.

3             From '91 to '96, I was a vice

4   president, so I was responsible for handling

5   first step grievances for suspensions and

6   terminations and various other things.

7             In '97, I became president of the

8   local, and my responsibilities then changed, so

9   I would go to second step grievances, but our

10  CWA rep out of our district office would

11  actually be the person that was charged with

12  handling the grievance.

13       Q.    Okay.

14       A.    I was there as a, the local president,

15  and as back-up to add anything to it, but it

16  wasn't my primary responsibility to handle the

17  grievance.

18            That was done by our staff rep, so I

19  was at other grievances by virtue of my

20  position.

21       Q.    Now when you mean the CWA rep, would

22  that have been Jann Buttiglieri?

23       A.    Yes.

24            (A discussion was held off the

25  record.)

Maria M. Bury                                                    April 29, 2003

McLean, VA

1          BY MS. DYE:

2          Q.   All right.  And what could you, tell

3     me what you mean by somebody who handles the

4     grievance.

5               What does that mean to handle a

6     grievance?

7          A.   It's their primary responsibility to

8     deal with management.  Other people who are

9     there as, I'm there as the local president.

10              We take a, a regular steward in as a

11    notetaker.  We take the aggrieved in, but they

12    do most of the talking.

13         Q.   Okay.  So they do the talking, and so

14    that's what you were doing at this 1994

15    grievance?

16         A.   No.  At the '94 grievance, yes, I was

17    doing the talking.

18         Q.   And then the ones that occurred after

19    you became president in 1997, although you may

20    have been president, present in your role as the

21    president, you weren't the one doing most of the

22    talking?

23         A.   Correct.

24         Q.   And you also weren't the notetaker?

25         A.   No.

Maria M. Bury                                                    April 29, 2003
                              McLean, VA

                                                              Page 19

1         Q.    Were there any grievances that Fran

2    was involved in that you were the notetaker?

3         A.    No.   I haven't taken notes in years.

4         Q.    That's just, just a, the shop stewards

5    basically that would do the notetaking?

6         A.    Right.

7         Q.    Okay.   And so he asked you about these

8    ones in which you were present as the president.

9              What did he, what did you tell him

10   about those?

11        A.    He asked me if I remember some of the

12   things I believe, and what I did remember, I

13   told him I did, and what I didn't, I mean I

14   didn't.

15             You know, if I didn't remember it, I

16   didn't remember it.

17        Q.    Right.   What were some of the things

18   that you remembered from those grievances?

19        A.    Suspensions, I knew they were

20   suspension grievances, and it all dealt with Jim

21   Conrad because he was her manager for many

22   years.

23             The reason for the suspensions, I mean

24   because I was involved in the cases, was the

25   so-called target picture that she had up, the

Maria M. Bury                                                     April 29, 2003

McLean, VA

Page 20

1    supervisor's picture.

2         Q.   Okay.

3         A.   I don't even remember if I was at

4    Fran's termination.

5              I believe I was, but I'm not sure.

6         Q.   Well, anything else you remember about

7    those grievances?

8         A.   No, just some -- it's different for me

9    because they're normal grievances.

10        Q.   What do you mean by that?

11        A.   It's, when anybody gets fired, it's a

12   standard -- I mean we ask general questions.

13   You know, you try to get to the facts of the

14   grievance, so one grievance is not necessarily a

15   lot different from another grievance because

16   anybody being terminated or suspended, the

17   company has claimed has done something wrong, so

18   it's, the grievance is to me a fact finding.

19        Q.   Did you have an opinion on any of

20   those grievances as to whether they were

21   justified or not?

22        A.   Well, sure, I did.

23        Q.   Okay.  Can you tell me what your

24   opinions were?

25        A.   Which one do you want to start with?

Maria M. Bury                                          April 29, 2003
                        McLean, VA

Page 24

1    a room --

2         A.    Okay.

3         Q.    You remember this situation?

4         A.    Vaguely.

5         Q.    Okay.

6         A.    I vaguely remember that.  If I

7    remember correctly, she had been instructed when

8    she got upset to leave the room, and she did so

9    at that time, because she felt -- this is my

10   recollection -- she felt -- I don't know what

11   the right word -- I don't want to say threatened

12   because that's not it, but Fran knew that she

13   was in discipline, that she was entitled to

14   union representation, and she also knew any time

15   she was called into a room with management, it

16   generally led to some type of investigation.

17            So I don't think she should have been

18   suspended for insubordination.

19            I would have rather seen her walk out

20   of the room, which we instruct people to do many

21   times, rather than to get into a confrontation

22   with especially a supervisor.

23        Q.    Are employees required to comply with

24   direct orders, though?

25            I mean if they don't do it, isn't it

Maria M. Bury                                                April 29, 2003
McLean, VA

Page 25

1    insubordination?

2              Are you just saying that she

3    shouldn't, shouldn't have gotten suspension?

4         A.    I think it depends on what the direct

5    order is.

6              If somebody says to me come in the

7    room, and then they say well, I want union

8    representation, and they say well, you're not

9    going to get it and sit down, they don't have to

10   comply because that's violating the law.

11             If they come, I go into the room and

12   we're having a civil conversation, and at some

13   point, I determine that I feel like I need union

14   representation, I have the right to say I want

15   union representation, and the meeting should

16   stop until I get somebody.

17        Q.    Well, what if the meeting -- I mean my

18   understanding of it is a little different, and

19   if you have a different understanding, that's

20   fine, but I just want to clarify.

21             My understanding of it is that the

22   union representation requirement means that if

23   the person is, you know, required to talk to the

24   management in an investigation or whatever it

25   may be, without the union there, and the person

Maria M. Bury                                                          April 29, 2003
                              McLean, VA

Page 27

1    until a steward is available, and this is the

2    long-standing practice the the company has

3    followed for many years.

4        Q.   Now --

5        A.   Because they call us and say, you

6    know, we're going to be disciplining somebody,

7    we need a union steward to be out here --

8        Q.   Right.

9        A.   In advance when there's not, generally

10   that happens if there's no steward present in

11   that work location, and they know somebody has

12   to come in from another building.

13       Q.   Now your knowledge about what happened

14   in the, in these two instances that we just

15   talked about, the poster incident and the

16   insubordination incident, what does that derive

17   from?

18            I mean you weren't there obviously

19   when this thing happened, right?

20       A.   No.  I was at the second step

21   grievances I believe.

22       Q.   Okay.  So did you learn about them for

23   the first time when you walked into the room, of

24   the grievances?

25       A.   No.  I always -- part of the

Maria M. Bury                                                                   April 29, 2003
McLean, VA

Page 38

 1        Q.    Was there any other arguments that you
 2   were able to make based on the medical records
 3   that you reviewed?
 4        A.    I remember '94 a little bit better
 5   than the '97 because I directly handled that.
 6        Q.    Right?
 7        A.    So that sticks in my --
 8        Q.    Yeah, we're going to get to that?
 9        A.    And these two, no, other than the fact
10   that I thought the suspension was off the wall
11   because there was no threat there.
12              There was nothing -- if you didn't
13   know what that was, if you didn't know it was a
14   target sign, and I've never owned a gun and
15   never been, shot a gun, never went to target
16   practice.  I had never seen anything like this.
17              I mean to me, it was just a poster.
18   Doesn't mean anything.
19        Q.    Yeah.
20        A.    It was a joke, so other than that, you
21   know, it wasn't threatening in any way.
22        Q.    Were there any other arguments you got
23   out of the medical information?
24        A.    Again, I don't remember which
25   grievance, okay.  They all kind of run together.

Maria M. Bury                                                April 29, 2003
                        McLean, VA

Page 39

1       Q.    No, I understand.

2       A.    I remember that they, they would, they

3   returned Fran to work saying she wasn't a threat

4   to anybody or herself because generally they do

5   both.

6             They usually indicate whether the

7   employee is a threat to themselves and others.

8       Q.    Yes.

9       A.    And so said she was fine to go back to

10  work, but that's about the extent of it.

11      Q.    All right.  Do you remember anything

12  about -- well, actually let me just follow up.

13            So your information about these

14  incidents was based on the records that the shop

15  steward gathered which in these cases included

16  the -- well, the shop steward didn't get the

17  medicals you said, but included medicals, the

18  records the shop steward had gathered in the one

19  case included a picture of the poster, and, and

20  speaking to Ms. Darcangelo, was there any other

21  source of information prior to going into the

22  grievance that you had?

23      A.    No.  You mean did I talk to the other

24  employees?

25      Q.    Right.

Maria M. Bury                                                        April 29, 2003
McLean, VA

Page 44

1    parking lot.

2            I think Fran chose not to go at that

3    point, and that's what led to her discipline,

4    because the company perceived that as violence.

5        Q.    Do you have an opinion about whether

6    her disciplining associated with that incident

7    was justified or not?

8        A.    I don't think termination was

9    justified.

10        Q.    Do you have any other situations in

11    which you're aware that Fran was disciplined or

12    written up that you think that were justified?

13        A.    I have to say no.  I know Barbara Lee.

14    Barbara Lee was a steward in a local for many

15    years, and Barbara Lee has a hot temper.

16        Q.    Yes.

17        A.    And Barbara Lee invited more than Fran

18    to go out in the parking lot at certain times

19    with her.

20            She just had -- that's just Barbara

21    Lee.  That's the way she was.  She was like that

22    with everybody, and she could get rather short

23    at times.

24            So if -- and I believe Barbara Lee

25    invited her out on the parking lot, so where was

Maria M. Bury

McLean, VA

April 29, 2003

Page 48

1    involvement in this lawsuit with Ms. Darcangelo?

2         A.   No.

3         Q.   Since Ms. Darcangelo was terminated,

4    were you ever in contact with her prior to her

5    calling you and asking you if you would be

6    willing to talk about what you knew?

7         A.   Maybe once a year, Fran would call and

8    send me an article or just, you know, she would

9    call and say she was going to send me an

10   article, and I have a couple of X members that

11   do this on occasion, but other than that, no.

12        Q.   What kind of articles would she send

13   you?

14        A.   One was about a court case, something

15   to do with benefits, and she sent me that.

16             And sometimes she would just call and

17   say how're you doing?  You know, just checking

18   in.

19        Q.   So were you friendly with her?

20        A.   Outside of work, no.

21        Q.   Yeah.

22        A.   I had no relationship.

23        Q.   Did you ever work with her in the

24   sense of, you know, company, doing company work

25   together?

Page 49

1      A.    No.   I'm in a totally different

2   atmosphere, totally different department.

3           I'm in customer service, so --

4      Q.    So the way that you know her is

5   through the grievances that you were involved in

6   with her?

7      A.    Yes.   If I wasn't a union steward, I

8   would have never met Fran.

9           I've never worked at the same work

10  location or anything.

11     Q.    Now back with the 1994 grievance that

12  you talked to them about, were you -- you said

13  you were vice president at that time, right?

14     A.    Yes.   Yes.

15     Q.    And did you know Fran prior to the

16  grievance arising?

17     A.    No.

18     Q.    So basically you met her for the

19  purposes of the first, first step grievance in

20  that case?

21     A.    (Indicated "yes.")

22     Q.    That was the first time you were in

23  contact with her?

24     A.    The best I can recall, I think that

25  was the very first time.

Maria M. Bury                                                   ＿ April 29, 2003
McLean, VA

Page 50

1      Q.   Did you have any contact with her in

2    between that grievance and these things that

3    started occurring in 1998 with the grievances

4    that went to second step?

5      A.   Other than if I do a work site visit

6    and I see Fran at the building because as an

7    officer, we go out and visit the members, and

8    you go into the different buildings, other than

9    asking her how she was and, you know, saying hi

10   to people, that would have been the only

11   contact.

12     Q.   Do you remember any instances in which

13   you actually did a work site visit and ran into

14   Fran and spoke with her?

15     A.   Probably did that a couple of times.

16   Do I remember when it was?  No.

17     Q.   Just can you replay that tape for me

18   of what you said, what she said, tell me about

19   the circumstances?

20     A.   Well, generally, because when you're

21   on a work site, you don't -- you're out there to

22   talk to as many people as possible, so you don't

23   spend a lot of time.

24          The best of my recollection would be

25   I'd walk by her desk if she was there, you know,

Maria M. Bury                                                    April 29, 2003
McLean, VA

Page 54

1   you know, justified, but do you have any reason

2   to believe that they were actually motivated by

3   discrimination?

4          A.    Do I believe that?  I would -- no, I

5   can't comment on that either way.

6          Q.    Did you ever hear of anybody treating

7   her differently because of her medical condition

8   or her disability or whatever you want to

9   characterize it as?

10         A.    Anybody meaning who?

11         Q.    Management.

12         A.    I think they were not as tolerant of

13  Fran because of her condition.

14         Q.    Was she as -- okay.  What did you,

15  what do you base that on?

16         A.    I have to think of a way to explain

17  this to you.

18                My dealings with this case and Jim

19  Conrad and Fran are they were aware that she had

20  a disability.

21                They were aware that he had certified

22  under ADA, and they got to a point where they

23  just were not going to work with her any longer,

24  and they were looking for a reason to get rid of

25  her is the best way to put it.

Maria M. Bury                                                          April 29, 2003
McLean, VA

Page 57

1    the wall that would hurt somebody else's

2    feelings, and she didn't think anything of it.

3            There were a lot of other people like

4    that at work also.

5        Q.    And you think she was --

6        A.    I mean that would make comments to

7    hurt somebody else's feelings, and it wouldn't

8    bother them that they did that is what I'm

9    saying.

10       Q.    It wouldn't bother who?

11       A.    The other -- Barbara Lee was a, I use

12   Barbara Lee as an example.

13           Barbara Lee said things that would

14   hurt other people's feelings a lot of times, and

15   she didn't care.

16           I'm talking about the, that type of

17   behavior.

18       Q.    Who didn't care?

19       A.    Barbara Lee.

20       Q.    Yeah.  And what other kinds of things

21   that Fran would do that would render her, you

22   know, a problem employee?

23       A.    The only thing I know about is what I

24   heard through the grievances because again, I

25   never worked with Fran, so my only contact with

Maria M. Bury
McLean, VA
April 29, 2003

Page 58

1    Fran in all those years was through grievances,
2    so the only thing I know about is when she got
3    into trouble for something, so if there was
4    something that didn't get up to a grievance
5    level, I probably never heard about it.
6         Q.    Now the things that she did, I know
7    you disagree with some of the discipline that
8    was given, but do you agree that they might have
9    been something that she should have gotten in
10   trouble for any of the things she did that you
11   knew about?
12        A.    Do I think that -- probably not in
13   trouble, but maybe some type of discipline,
14   maybe not as severe as what it was, okay,
15   whether it be a write-up in the file, a
16   discussion, or even a warning.
17        Q.    You mentioned that Fran was loud and
18   boisterous at times.
19             What do you know about that?
20        A.    Again, just what management would say
21   in the grievances; they would talk about her
22   being loud, you know, that she talked loud, that
23   she could be heard far away, that she would make
24   comments that were not acceptable to the
25   company, and I heard this mostly from

Page 60

1   was already asked.

2               She has answered.

3               THE WITNESS:  Does that mean I answer?

4               BY MS. DYE:

5       Q.    Yeah, you can go ahead and answer.  He

6   has to put his objection on the record.

7       A.    Ask me the question again.

8       Q.    Do you have any sense for, you know,

9   what happened with that?

10      A.    With her medical condition?

11      Q.    With, you know, whether -- I mean you

12  said the company's not always consistent.  Some

13  people they disciplined for certain, for things

14  and some people they're don't.

15              I mean do you have any reason to

16  believe that Fran was disciplined because of

17  anything relating to her medical condition, or

18  you know, just --

19      A.    Oh, I think it was all related to her

20  medical condition.

21      Q.    A-huh.

22      A.    I think management took a position

23  that they weren't able to change her behavior,

24  and they were going to do what they needed to to

25  get her off the payroll if she didn't change her

Page 62

1    her job.

2            You know, in her function, if she got

3    something, a call that she didn't know how to

4    handle, she would go to another employee or

5    supervisor, whoever was available, and ask them

6    what she should do with it, and if management is

7    there, a lot of times they will send another

8    employee over who is trained in that function,

9    who has more knowledge of it, to help another

10   employee.

11       Q.   So the job she was in, she needed to

12   be able to work with her co-workers and her

13   supervisors on a cooperative basis and interact

14   with them?

15       A.   However, I don't -- yeah, to some

16   extent, yes, but because I don't, I didn't do, I

17   have never done that job, I don't know how much

18   interaction is required.

19           I have -- other than what I hear about

20   a COT job, it's totally different than my job --

21       Q.   Yes.

22       A.   So I have no concept, and there are

23   different COTs, so I don't know how much

24   interaction there is in that job versus mine.

25       Q.   You never worked as a COT?

Maria M. Bury                                                    April 29, 2003
McLean, VA

Page 71

1    have been there ever since.

2         Q.    Have you ever had any other employment

3    other than the phone company?

4         A.    I worked, when I got out of high

5    school in '67 until August, I worked in a small

6    retail clothing store, and that's it.

7         Q.    And you're still with the company

8    today?

9         A.    Yes.

10        Q.    What is your current job title?

11        A.    Communications representative.

12        Q.    And that's at Pratt Street?

13        A.    Yes.

14        Q.    How long have you held that position?

15        A.    Almost it's either four or five years.

16        Q.    And prior to that, what was your job

17    title?

18        A.    Service rep.

19        Q.    And where were you located?

20        A.    One East Pratt, and I worked at, I

21    think I went to One East Pratt in 1978, either

22    '78 or '79.

23             Prior to that, I worked at 11350

24    McCormick Road out in Hunt Valley.

25        Q.    What were you, how long were you a

Maria M. Bury                                                    April 29, 2003
McLean, VA

Page 72

1    service rep?

2        A.    The rest of my career other than one

3    year -- about 28 years.

4        Q.    So what does a service rep do?

5        A.    Talks to customers.  If you call in

6    about an order you want to place on your phone

7    or a bill, you talk to a service rep.

8        Q.    So you did that up until four or five

9    years ago?

10       A.    A-huh.

11       Q.    And four or five years ago, you said

12   you became a, I've forgotten --

13       A.    Communications.

14       Q.    Communication, and what's the job

15   responsibility there?

16       A.    I have no idea.  I've never done it.

17       Q.    You just do union stuff?

18       A.    Yeah.  I'm never there long enough to

19   get any training, so I've never actually done

20   the communications rep job.

21            Basically it's a glorified service

22   rep.  They just do more complex work.

23            You still talk to customers.  You take

24   orders.  You visit customers on the premises,

25   and you do the complex, the teeth raise, you

Maria M. Bury                                                    April 29, 2003
McLean, VA

Page 73

1    know, the data services, the more complex work.

2         Q.    But you haven't actually done that

3    work --

4         A.    No.

5         Q.    Because of your union duties, is that

6    right?

7         A.    Yes.

8         Q.    All right.  Who is your supervisor?

9         A.    Wait a minute.  I just totally lost

10   the name.

11        Q.    All right.

12        A.    It will come back to me.

13             MR. BURKHARDT:  That's not a true

14   question.

15             BY MS. DYE:

16        Q.    Who is the second level?

17        A.    Jane Payne, P-a-y-n-e I believe it is.

18        Q.    And who is her supervisor?

19        A.    Fred Trego, T-r-e-g-o.

20        Q.    And do you remember your immediate

21   superviser?

22        A.    Judith Buford, B-u-f-o-r-d; I'm sorry.

23        Q.    Okay.  Why don't you give me the

24   history of your involvement in the union?

25        A.    I became a steward I believe in either

Maria M. Bury                                                    April 29, 2003
                            McLean, VA

1    '74 or '75.

2           Around 1980, I became a chief steward,

3    which is an elected position.  It's an executive

4    board position at One East Pratt Street.

5           I held that office until through '90

6    except for one term.

7           I went to, in the middle of all that,

8    I went to AT&T also with divestiture.  I forgot

9    to tell you that.  In 1/1/84, I went over to

10   AT&T.

11        Q.   Yes.

12        A.   And came back to the telephone company

13   in I think July of '86.

14        Q.   Okay.

15        A.   So there was two years in there where

16   I didn't hold an officer position.

17           And then I got elected, the term

18   started in '91, as a vice president, and held

19   that for two terms, which is six years.

20           Then became president in '97.

21        Q.   Are you currently the president?

22        A.   Yes, through a fluke.

23        Q.   What do you mean by that?

24        A.   Well, I lost my last election, which

25   our elections are always held in the fall, but I

Maria M. Bury

April 29, 2003

McLean, VA

Page 89

1          I don't think Bill Morley ever did.

2     Q.   Why would they have called her that?

3     A.   Barbara Lee I believe called her that.

4     Q.   Why would they have called her that?

5     A.   Because they thought she was crazy, to

6  be honest with you.

7     Q.   Anything else?  Any comments you heard

8  from anybody about Fran?

9     A.   No.  That was it.  That's the one,

10  that's the only one I can remember.

11     Q.   Right.  Any other information you had

12  going into the grievance?

13     A.   No.

14     Q.   Did you ever discuss, prior to this,

15  did you ever discuss Fran with Jann?

16     A.   I may have.  I don't remember.

17     Q.   Okay.  What is your understanding of

18  why Ms. Darcangelo wanted you to testify about

19  this 1994 grievance?

20     A.   When she asked me if I testify for

21  her, I don't think we talked about any

22  particular grievance.

23          Just she asked me if I would testify,

24  and I said yes, I would, but all I could do was

25  tell the truth.

Maria M. Bury                                                April 29, 2003

McLean, VA

Page 96

1    correct?

2        A.    Yeah.

3              MS. DYE:  All right.  We can take a

4    break.

5              Let's go off the record.

6              MR. BURKHARDT:  Thank you.

7              (A recess was taken.)

8              MS. DYE:  Back on the record.

9              BY MS. DYE:

10       Q.    You said before that maybe some of the

11   behavior that Ms. Darcangelo engaged in would

12   have been justified, some sort of disability but

13   perhaps not as severe as what she was actually

14   given, right?

15       A.    Correct.

16       Q.    What about the poster situation?  I

17   understand that you personally didn't recognize

18   it as a target, but if it was recognized by the

19   people in the workplace as a shooting target,

20   what amount of discipline do you think would

21   have been proper?

22       A.    If it was recognized, first of all, I

23   don't know that it was recognized.

24       Q.    Okay.

25       A.    By others, but --

Maria M. Bury                                          April 29, 2003
McLean, VA

Page 97

1      Q.    With that assumption.

2      A.    None.

3      Q.    None?

4      A.    None, because she, from everything I

5  remember, there was nothing to indicate a

6  threat.

7            It was a joke.  It had been used, the

8  same poster had been used three years before or

9  several years before.  I don't want to be -- may

10 not have been three.  Three is what sticks in my

11 mind.

12     Q.    Yes.

13     A.    We'll say several, several years

14 before.

15           Management participated in the joke at

16 that point, so how can anyone perceive -- and

17 it's basically the same work groups -- how can

18 it now be perceived as some sort of violent

19 overture?

20           I just don't understand that.

21     Q.    Well, what about, you know,

22 intervening events?

23           Could that affect things?

24     A.    No.  And I don't see, I don't see

25 where they would only because Fran's behavior

Maria M. Bury                                            April 29, 2003
                        McLean, VA

1       A.   Okay.  My personal opinion is it still

2   wouldn't have been threatening to me.

3       Q.   Okay, but let's say it was threatening

4   just the same.

5            Wasn't that inappropriate?

6       A.   I, again, I would have to say no.  It

7   would not have been considered inappropriate

8   because it had been used before, and everybody

9   thought it was a joke then, so I wouldn't

10  perceive that, if I had been in the workforce,

11  and I had seen that three years before, and then

12  it comes back out three years later, I wouldn't

13  think that was inappropriate because three years

14  earlier, it was not inappropriate.

15      Q.   What about if she had been

16  specifically warned not to put up, you know,

17  offensive things in her cubicle?

18           Would that affect your view of this

19  incident?

20      A.   If it was something that was viewed as

21  offensive by me, yeah, that would affect how I

22  perceived it.

23           If she had been told not to put up

24  anything offensive, and then she turned around

25  and put up something that was offensive, I would

Maria M. Bury                                                    April 29, 2003
McLean, VA

Page 112

1      A.    Yes.

2      Q.    Tell me about Jim Conrad.  What do you

3   know about him as a manager?

4      A.    Very little.  My only dealings with

5   Jim are in the grievance procedure.

6           I never worked directly for him.  I

7   mean I know him to say hi because you build a, a

8   rapport with management in our, in our jobs, but

9   I've never worked directly with him, so my only

10  contact with him has been in the grievance

11  process.

12     Q.    In the grievance possess, or you know,

13  from hearing anything from anybody else, did you

14  ever hear anything that suggested that he was

15  prejudiced against any particular group of

16  individuals?

17     A.    No.

18     Q.    Nothing he ever said suggested that to

19  you?

20     A.    No.

21     Q.    How about do you know an individual

22  named Marianne Moxey?

23     A.    Um-hm.

24     Q.    What do you know about her?

25     A.    Again, not a lot; I've only met

Maria M. Bury                                                     April 29, 2003
                            McLean, VA

```
 1    Marianne a couple of times, and again, my
 2    dealings with her are through the grievance
 3    process.
 4         Q.   Anything that you ever heard about her
 5    or from her that you think suggested that she
 6    harbored any kind of prejudices?
 7         A.   I don't know about prejudices.  I know
 8    Marianne, one of the things that I hear the most
 9    about her is that she has certain people that
10    she favors, and if you're one of her favorites,
11    you can't do any wrong, but if you're not, you
12    very seldom can do anything right.
13         Q.   But you've never heard that that had
14    anything to do with, you know, race or
15    disability or anything like that?
16         A.   No.
17         Q.   What about a fellow named Gottlieb
18    Fleig?
19              Is that a name you're familiar with?
20         A.   I know the name.  I think I met him
21    one time.  Know nothing about him.
22         Q.   How about Butch English?
23         A.   I know Butch.
24         Q.   Okay.  Tell me.
25         A.   Again, it's through the grievance
```

Maria M. Bury                                              April 29, 2003

McLean, VA

Page 114

1    procedure.

2            I proably have more grievances with

3    Butch than with Conrad because Butch was a first

4    level, so we dealt more with him.

5            Butch always seemed like a reasonable

6    guy.  He's easy-going.  He was good to deal

7    with, but personal history or anything like

8    that, I don't know anything.

9       Q.   Do you think he basically treated the

10   employees well?

11      A.   Didn't hear many complaints about him,

12   so I would have to say yeah.

13      Q.   From in the grievance procedure, did

14   you get the sense that he was actually somebody

15   that wanted to help the employee and, you know,

16   whether through discipline or otherwise, help

17   the employee succeed?

18      A.   Sometimes.  Sometimes.  Sometimes he

19   really did want to help people, and other times,

20   he didn't.

21      Q.   And did you ever hear anything about

22   him or from him that suggested that he harbored

23   any kind of prejudices?

24      A.   No.

25      Q.   Sometimes if there's an issue with

Page 115

1    race in the workplace or disability or

2    discrimination or anything like that, some kind

3    of sensitivity training can be held to try and

4    improve the environment.

5              Do you think that some kind of

6    training for Ms. Darcangelo's co-workers would

7    have helped, or do you think she's just kind of

8    a special case?

9        A.    No.  I think training probably would

10   have helped, and I can give you a for-instance.

11             It's not related to her case, but we

12   had a girl in the local with HIV, and was it was

13   very early when HIV first came out, and she was

14   harassed so bad by her co-workers, I mean really

15   bad, that we had to step in, and the company

16   just absolutely refused to do anything to the

17   point where her co-workers -- she worked in the

18   central office, like Fran used to, and she

19   worked as a frame attendant, and they climb up

20   and down ladders to do their job.

21             And her co-workers went to management

22   at one point to say if she falls, we want to be

23   able to help her, but we're afraid to touch her

24   with HIV, so can you get masks and gloves in

25   here, and the company absolutely refused.  The

Maria M. Bury

McLean, VA

April 29, 2003

Page 118

1        I mean they could have instructed them
2    to, but what you get out of something like that
3    is up to you as an individual.
4        Q.   Why do you think it would have been
5    appropriate?
6        A.   It would have been appropriate?
7        Q.   Yes.
8        A.   Because Fran was different, and Fran
9    did have issues, and everybody was aware of
10   those issues.
11       I mean people in the work group knew
12   that Fran was different than the rest of them,
13   and her behaviors were different, and I think if
14   they had brought somebody in to talk about
15   different behaviors, and they sent us through
16   all kind of training over these different
17   things, and we talk about diversity all the time
18   trying to understand different people, different
19   cultures, you know, people are different.
20       So I think bringing somebody in to
21   talk about maybe mental illness and how some
22   people are affected and the differences in
23   behavior might have helped some people
24   understand better.
25       Q.   What do you know about Fran's medical