1    A.   You know, I can't ignore the input I have
2  from these independent medical exams and other
3  sources of information that come through. I look
4  at them, so they inform me to some extent.
5    Q.   That's all the stuff that would be in her
6  chart. Is there any other source of information
7  other than her self-report and what's in her chart
8  and your clinical experiences?
9    A.   No.
10   Q.   Okay. We've discussed her diagnoses, are
11 those what you would construe to be her impairment?
12   A.   Well, her diagnoses and beyond her
13 diagnoses, you can be an impaired individual
14 without a psychiatric diagnosis. And through early
15 life experiences, parenting, whatever, this is even
16 if she didn't have psychiatric disorders like
17 schizoid and bipolar, she has poor problem solving
18 skills, poor social skills and they're going to
19 impair her no matter what. They're not psychiatric
20 per se, but they are impairing.
21   Q.   What other impairments?
22   A.   That's about all I can think of right
23 now.
24   Q.   And what major life activities would you
25 say were limited by her impairments?

1  her own and that's another story, but she has made
2  attempts to get jobs on her own and they'll work
3  for a while and she gets into personality clashes.
4      Q. Do you have an opinion about whether Ms.
5  Darcangelo suffered from an impairment that
6  substantially limits a major life activity, as you
7  understand those terms, during the 1997 and 1999
8  time frame?
9          MR. BURKHARDT: Object, again asking him
10 for legal conclusions. To the extent he
11 understands the question in a layperson's sense, go
12 ahead.
13         THE WITNESS: Could you read the question
14 again, please.
15         (The record was read as requested.)
16         THE WITNESS: Yes.
17 BY MS. DYE:
18     Q. What's your opinion?
19     A. That she does have a variety of
20 psychiatric diagnoses that limit her ability to
21 perform in several areas.
22     Q. And what do you base that on?
23     A. My clinical experience and her
24 self-reports.
25     Q. Anything else?

 1    A.  I wouldn't use it in itself. I don't
 2 think, no, I wouldn't use it for that purpose.
 3 It's more of internal distress and when the score
 4 gets low enough it's external distress. That's
 5 what a person reports internally.
 6    Q.  After this initial meeting with Ms.
 7 Darcangelo, what was the nature of your subsequent
 8 visits that she's had with you?
 9    A.  This person has been seen for medication
10 management and for supportive psychotherapy. It's
11 been an unusual case in that regard.
12    Q.  Why, because you don't usually provide
13 the support of psychotherapy?
14    A.  Right, for this length of time I would
15 typically not be seeing somebody monthly for this
16 length of time. For most bipolar patients I would
17 have gone to a quarterly schedule or even have the
18 primary doctor write it for that time. But in her
19 case it was extenuating circumstances and her
20 desire to see me. It kept it going.
21    Q.  Describe what you do on a regular
22 clinical visit with her.
23    A.  I usually escort her into the office and
24 let her talk about what's happened since the last
25 time I saw her.

```
 1   could look at it. I don't have the scale
 2   memorized, so I don't have it memorized. I'd have
 3   to look at the scale and pick a number is what I
 4   usually do.
 5        Q.  Was there any specific point in which you
 6   think her GAF score dropped? I mean you said
 7   downward trend or is it a gradual thing or what?
 8        A.  No, I think it's been gradual.
 9        Q.  So in let's say the time frame of when
10   you first saw her through when she was terminated
11   which is the beginning of 1999, you think it was a
12   continuing gradual trend, downward trend even in
13   that time period?
14        A.  I do.
15        Q.  And would a person with a score lower
16   than 60 be qualified to perform a job that requires
17   significant interaction with other people?
18        A.  Yeah. I think that the GAF score
19   wouldn't be the primary impediment, it would be
20   your social skills. And so the GAF wouldn't, I
21   mean you would notice it if somebody had a much
22   lower score, they would look impaired to you, but
23   that wouldn't keep you from performing in itself.
24        Q.  So the GAF score in itself can't serve as
25   a measure of how well a person can perform a job?
```

1  maybe, I never gotten into that with her. That
2  hasn't been a treatment issue. Schizoid borderline
3  seems pretty consistent with everybody else. He
4  gives her a real high GAF score of 80 suggesting
5  that she was in pretty good shape the day she saw
6  him.
7          As far as his recommendations, supported
8  the treatment that was being offered and gave his
9  thoughts on what might be worthwhile. Is there
10 something specific?
11     Q. Is there anything you see in there other
12 than what you already identified you agree with or
13 inconsistent with your understanding of her case?
14     A. Well, I mean there is a comment here: It
15 would be highly recommended the patient handle
16 herself in a appropriate manner with all
17 proprieties and in conformance with Bell Atlantic
18 expectations. I'm not sure what that means.
19         If she, if she felt that she was being
20 harassed or demeaned or somehow mistreated there,
21 then just to present that in a one-sided fashion
22 would be counterproductive and probably just piss
23 her off. I'm not sure I agree with that.
24     Q. Anything else?
25     A. I'm not sure I would recommend that she

```
 1   one time, it would require multiple meetings.
 2         I think most psychiatrists would agree
 3   that a bipolar patient is virtually impossible to
 4   diagnose one session. It takes a long time, a year
 5   to get a feel for what's going on with somebody,
 6   and these are mostly one-shot deals.
 7         Sometimes in Dr. Siebert's case it's a
 8   review of literature, it's a review of her history
 9   and probably maybe a little bit more valid.
10      Q. On the second page of Exhibit 8 the Russo
11   report describes the patient is neatly dressed in a
12   dark navy suit, etc.
13      A. Yeah.
14      Q. You mentioned before that dress --
15      A. That's interesting because she's never
16   worn a suit, she's worn stretch pants. I've never
17   seen her in a suit, so you are right she may have
18   tried to appear more intact on the day she saw him.
19      Q. What does she usually wear?
20      A. Very casual clothes, looks like somebody,
21   it's not bizarre but sometimes that's disjointed,
22   things don't match and it doesn't look like a
23   working person certainly. It looks like a person
24   that's down and out. She looks like she's sort of
25   pieced together and not very well coordinated.
```

1  return to work right then. I think I would have
2  asked for some sort of conference. I was never
3  clear what the issues were at work and had I been
4  involved in this I think I would have asked for a
5  for a formal meeting with her supervisor and just
6  try to figure out what are the real issues and are
7  there any psychiatric impediments, are there any
8  real psychiatric or psychologic issues here. With
9  this information I think I would have tried to get
10 the parties together. I would also question the
11 GAF score. Again, it seems awfully high for this
12 person. That's all that stands out there.
13     Q.  You think that high GAF score could have
14 been explained by Ms. Darcangelo's affirmative
15 attempts to appear as quote unquote normal as
16 possible so as to preserve her employment if she
17 perceived this as a threat to her employment?
18     A.  I don't know that she could. She may
19 have tried, but I don't know that a person with
20 this many disorders can make themselves look this
21 good.
22         Also, he's got a litany of symptoms here
23 which, gosh, I won't reread all these, but it's a
24 paragraph of symptoms that he lists here that just
25 are not consistent with a GAF of 80, and 80 is a

1  pretty high score.
2       He's got dysphoric moods, unstable,
3  euphoric, anxiety, anger, frustration,
4  irritability, agitation, dyscontrol, yelling, sleep
5  disturbance. I mean it goes on and on and on.
6  That's just not consistent with a GAF of 80 -- just
7  not.
8       Q. Okay. Is that everything?
9       A. I think so.
10      Q. So you've reviewed Exhibit 8 previously?
11      A. Yes, yes, yes.
12      Q. And 9 and 10?
13      A. Yes.
14      Q. And these are things that she brought and
15  gave to you as you described?
16      A. Yes.
17      Q. For what purpose have you reviewed them
18  for?
19      A. I'm curious what other physicians think.
20  She's always been an enigma of sorts to me and so I
21  didn't request a second opinion, but it's always
22  interesting to see what other people think.
23       Now I have to say for a person like this
24  I honestly believe that a one-shot deal is
25  useless. This is not somebody that you can assess

1   Q. That she is otherwise qualified for?
2   A. I don't know about any job, but I think
3   she could perform jobs.
4   Q. Have you ever observed Ms. Darcangelo
5   other than in your clinical visits with her?
6   A. No.
7   Q. When you talk about her being impaired,
8   you are talking about even as medicated?
9   A. Yes.
10  Q. Do you have an opinion as to whether Bell
11  Atlantic violated the Americans with Disabilities
12  Act in its treatment of Ms. Darcangelo?
13  A. Not really.
14  Q. Why are you saying not really?
15  A. I don't have enough of the facts. I've
16  really tried to stay out of that issue. I didn't
17  feel it was my issue, she would have her day in
18  court and wasn't going to get caught up in it.
19  Q. What do you know about the medical
20  examination she was sent for while she was working
21  at Bell Atlantic?
22  A. You know, these just occurred. Nobody
23  ever asked me for my input on these and I always
24  was curious how these came about. I got the
25  impression that her employer was requesting them

1    MR. BURKHARDT: Same objection. He can't
2 be expected to understand legal significance. The
3 term, however, if you understand it, you know what
4 she's asking you in a regular sense, go ahead and
5 answer it.
6    THE WITNESS: Sure. Her social
7 interactions are severely limited. She does not
8 know how to relate consistently to others and
9 because of that has become increasingly isolated,
10 particularly after the death of her parents.
11    This has rolled over into her work
12 environment where despite the fact that she could
13 perform essential tasks, she gets into personality
14 clashes or conflicts with colleagues and
15 supervisors and just doesn't seem to recognize how
16 to work through, how to walk away from it or work
17 it through, so it just creates problems for her.
18    Q. But it's your view that there are jobs
19 she could perform?
20    A. Yes.
21    Q. Any job really where she could work
22 independently?
23    MR. BURKHARDT: Object to that
24 characterization.
25 BY MS. DYE:

```
 1   and she would just tell me I was sent to see Dr. X
 2   or Dr. Y or Dr. Z.
 3           I know one of them was specifically
 4   related to a VA claim for a service-related
 5   disability, so I was more aware of that one. But
 6   two others that occurred in Lancaster she just
 7   announced to me after the fact they occurred and I
 8   eventually got copies of the reports.
 9       Q.  So you don't know what prompted them?
10       A.  Only after the fact. Well, I really
11   don't. I got the impression that there was concern
12   that she was or was not able to return to work from
13   a cognitive or intellectual standpoint. And then
14   there was concern about her being violent in the
15   work place, but that one didn't seem very plausible
16   to me because she had never demonstrated anything
17   like that at all and reports didn't suggest that at
18   all. It was just her report, but I didn't put a
19   whole lot of credence in it.
20       Q.  You don't know what the events that
21   occurred in the work place that caused --
22       A.  After the fact she described some
23   altercation with other people where she says that
24   she was accused of yelling at somebody, somebody
25   yelled at her, somebody was harassing her, throwing
```

1   things at her and so forth. These were just her
2   accounts, hearsay. I have no knowledge whether
3   they were true or not.
4       Q. So do you have any opinion on the
5   propriety of them wanting to send her for these
6   medical evaluations?
7       A. No, I assume they acted in good faith.
8   They probably thought there was some reason for
9   concern. More than typically usually you are going
10  to get one IME is a big event, but to send somebody
11  for two psychiatric IMEs is unusual, that struck me
12  as unusual, but otherwise, no.
13      Q. What extent do you think Ms. Darcangelo's
14  behavior I guess particularly associated with her
15  personality disorder is volitional? For example,
16  if she gets in an altercation with somebody or has
17  a personality conflict with somebody, is it
18  something that she can turn on and off?
19      A. Volitional as in willful?
20      Q. Yeah.
21      A. No. It may appear to a layperson that
22  she has control over it, but like many other
23  psychiatric or psychological conditions, there is
24  no fun, it doesn't produce any benefit for her. If
25  it was willful, she wouldn't choose to embroil

1  Q. Or whether an accommodation would have
2  helped her in performing that job?
3  A. Well, in retrospect had it been asked I
4  think I probably would have recommended some
5  accommodations to her, for her, but I don't recall
6  being asked.
7  Q. Okay. You might have recommended
8  accommodations, but would you now or then have any
9  basis on which to opine as to whether those
10 accommodations would render her qualified?
11     MR. BURKHARDT: Same objection. He
12 doesn't know about the job qualifications or legal
13 significance of these terms. Go ahead and answer
14 if you can.
15     THE WITNESS: I agree with him.
16 BY MS. DYE:
17 Q. So no?
18 A. No, I don't know what the job was.
19 Q. Right, okay. So what accommodations
20 might you have recommended?
21 A. This person works better alone. I think
22 she is very bright and I think she's probably very
23 efficient alone. With supervision by a single
24 person who isn't likely to, a single, mature person
25 not likely to get caught up in personality

```
 1      A.  I'm not sure what you mean by my expert
 2  report.
 3      Q.  Well, you are here as an expert, right?
 4      A.  Yes.
 5      Q.  Is this your report?
 6      A.  These are letters. I wouldn't call them
 7  a report, but you can. These are letters and if
 8  this fits the definition of report, sure.
 9      Q.  Are these the letters --
10      A.  I wouldn't call this a report, I would
11  call this a letter.
12      Q.  Are these the documents that contain your
13  opinions that you are presenting here as an expert
14  in the lawsuit?
15      A.  Some of my opinions. These are, I
16  believe these are answers to specific questions
17  raised by Mr. Burkhardt.
18      Q.  Okay. Is there something else that has
19  your opinions in it that are being presented as an
20  expert in the lawsuit as far as you know?
21      A.  Only the content of our conversations,
22  nothing else written, no.
23      Q.  Let's take a look at the second page of
24  the January 17 letter from you to Mr. Burkhardt.
25  In it you express certain opinions about Ms.
```

```
 1            I have made it clear that I did not want
 2    to be the expert and after consultation with
 3    numerous legal counsel, it was felt that would be
 4    the way to proceed.  I think I'm acting as a
 5    reasonable psychiatrist would and trying to protect
 6    my patient's interest.
 7         Q.  Are you a member at all of the American
 8    Academy of Psychiatry?
 9         A.  No.
10         Q.  Do you plan to testify at trial as an
11
12    expert on Ms. Darcangelo's behalf?
13         A.  If called.
14         Q.  Do you have any personal ties to Ms.
15    Darcangelo other than seeing her in your capacity
16    as a psychiatrist?
17         A.  No.
18         Q.  Do you have any personal ties to Verizon,
19    Bell Atlantic other than they provide your phone
20    service?
21         A.  No.
22         Q.  You have never worked there, you don't
23    have friends or family that have ever worked there?
24         A.  No.
25         Q.  Do you personally suffer from mental
```

1  things at her and so forth. These were just her
2  accounts, hearsay. I have no knowledge whether
3  they were true or not.
4      Q. So do you have any opinion on the
5  propriety of them wanting to send her for these
6  medical evaluations?
7      A. No, I assume they acted in good faith.
8  They probably thought there was some reason for
9  concern. More than typically usually you are going
10 to get one IME is a big event, but to send somebody
11 for two psychiatric IMEs is unusual, that struck me
12 as unusual, but otherwise, no.
13     Q. What extent do you think Ms. Darcangelo's
14 behavior I guess particularly associated with her
15 personality disorder is volitional? For example,
16 if she gets in an altercation with somebody or has
17 a personality conflict with somebody, is it
18 something that she can turn on and off?
19     A. Volitional as in willful?
20     Q. Yeah.
21     A. No. It may appear to a layperson that
22 she has control over it, but like many other
23 psychiatric or psychological conditions, there is
24 no fun, it doesn't produce any benefit for her. If
25 it was willful, she wouldn't choose to embroil

1  what accommodations would fit and if they're harmed
2  or not. Just purely subjective in my opinion.
3      Q. So you don't go out and do any kind of
4  investigation?
5      A. No.
6      Q. This is based solely on your clinical
7  experiences with the patient?
8      A. Uh-huh, yep.
9      Q. And you don't know in any of those
10 situations either whether your testimony was
11 accepted or relied upon by the court in any way or
12 rejected for that matter?
13     A. I don't know.
14     Q. What would you say qualifies you to
15 comment on those kinds of issues?
16     A. If I'm the treating physician, I guess
17 the parties involved feel that I have some opinion
18 that might have bearing on the case. In other
19 words, I don't ask to be put in that position, they
20 feel I have something to say.
21     Q. Yeah, but I mean as a clinician, I mean
22 normally your function is to treat the patient,
23 right?
24     A. Right.
25     Q. Rather than to express opinions on what

```
 1   they should be doing at work?
 2        A.  Right.
 3        Q.  Which goes outside.
 4        A.  Right.
 5        Q.  So what would you say qualifies you to
 6   make comments on those subjects?
 7        A.  Well, the diagnosis and the prognosis are
 8   well within my purview.  Reasonable accommodation,
 9   I typically ask the patient what they think would
10   be an accommodation.  More often than not they will
11   give me a release to talk to a supervisor.  And in
12   some cases a supervisor or a company may have a
13   vested interest in the patient and they'll call me
14   and tell me what they think and I will try and work
15   that out with them.
16             Sometimes companies have even gone so far
17   as to send a description of the patient's work
18   environment or work conditions and ask me to do
19   that.  At that point I will try and bow out if I
20   can because I just don't want to be bothered with
21   it.
22             But a typical scenario is the patient
23   tells me what they think, a supervisor tells me
24   what they think and I will try to come up with
25   something reasonable that they can do.  In those
```

1  cases the employer and employee usually want to
2  work it out.
3      Q.  Were you doing any of that in this
4  situation?
5      A.  No.
6      Q.  Do you have any sort of training or
7  educational background or, you know, professional
8  experience working on work place type issues rather
9  than just these ad hoc conversations that qualified
10 you to testify to these kinds of issues or speak to
11 them in any manner?
12     A.  Well, again on the diagnosis and
13 prognosis, just being a physician. With regards to
14 work environment, I probably have more experience
15 than most because the practice at this point is
16 something I do part-time. I'm more of an
17 administrator and I have a master's degree in
18 health care administration and a master's degree in
19 health policy and my primary job for WellSpan is
20 director, executive director of the division. So
21 I'm responsible for hundreds of employees and have
22 to deal with Human Resources issues every day. So
23 in this particular case I have more background
24 knowledge than the average person would just
25 because of that experience.