```
                                                              1

 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF MARYLAND

 3    ------------------------------------------- x

 4    FRANCES DARCANGELO,

 5                        Plaintiff,
                                             Case No.

 6         -against-                         502816

 7    VERIZON MARYLAND, INC.,

 8                        Defendant.

 9    ------------------------------------------- x

10

11

12         DEPOSITION of DOUGLAS ANDERSON, taken

13    pursuant to Subpoena, held at the offices of

14    O'Melveny & Myers, LLP, 7 Times Square, New York,

15    New York, on April 18, 2005, at 10:13 a.m.,

16    before a Notary Public of the State of New York.

17

18

19

20

21    **********************************************
              BARRISTER REPORTING SERVICE, INC.
22                    120 Broadway
                   New York, N.Y. 10271
23                   212-732-8066

24

25
```

```
 1
 2     A P P E A R A N C E S:
 3
 4            SNIDER & FISCHER, LLC
                   Attorneys for Plaintiffs
 5                 104 Church Lane
                   Baltimore, Maryland   21208
 6
              BY:  MORRIS E. FISCHER, ESQ.
 7
 8
 9
10
11            O'MELVENY & MYERS, LLP
                   Attorneys for Defendant
12                 1625 Eye Street, N.W.
                   Washington, D.C.   20006
13
              BY:  IRA H. RAPHAELSON, ESQ.
14                      -and-
                   SHANNON M. BARRETT, ESQ.
15
16
17
              VERIZON
18                 185 Franklin Street
                   Boston, Massachusetts   02110
19
              BY:  LISA BIRKDALE, ESQ.
20
21                         xxxxx
22
23
24
25
```

1           Anderson
2   Q    "Social or occupational functioning,
3   hard to say because, you see, her social
4   occupational functioning is so much more
5   affected by her schizoid personality that
6   bipolar is a side show there."
7        Do you agree with that?
8   A    I don't think she has a schizoid
9   personality disorder.
10  Q    He goes on to say, "An occupational
11  functioning, again, the schizoid
12  personality, poor judgment, there's such
13  overwhelming factors it's hard to say what
14  the bipolar effects have."
15       Do you recall reading that?
16  A    Yes.
17  Q    Do you agree with him?
18  A    No.
19            MR. FISCHER: Just for the
20       record, I am objecting to this whole
21       line of questioning.
22  Q    So if a person has chronic hypomania
23  they cannot prevent themselves from calling
24  other people names; is that your view?
25  A    I'm not saying that anyone that has

197

1          Anderson
2  one can. I'm saying in her case that is the
3  case, yes.
4  Q     How about making threats on the
5  telephone?
6  A     It's quite consistent.
7  Q     If using the telephone is part of the
8  job, she can't perform that part of the job,
9  can she?
10 A     Occasional. Sometimes that would be
11 true.
12 Q     There are times when she cannot
13 perform that job if she is going to curse on
14 the phone?
15 A     I agree.
16 Q     If she is going to use racial
17 invectives on the phone?
18 A     Those would be times when she
19 should --
20            MR. FISCHER: I'm going to
21       object, because there has been no
22       evidence in this case that she used
23       racial invectives on the phone.
24            MR. RAPHAELSON: That would
25       also be a non sequitur since the

221

1          Anderson
2  there?
3  A      It's possible that there is no
4  reasonable accommodation.  I don't know
5  that.
6  Q      Now, her job, as it turns out,
7  includes contact with other employees; you
8  understand that, don't you?
9  A      Yes.
10 Q      As you sit there now?
11 A      Well, I already knew that.
12 Q      You knew that we couldn't wave a
13 magic wand and stop her from having
14 hand-offs to other employees, right?
15 A      Some amount of contact had to be
16 necessary.
17 Q      You knew that she had to talk to
18 internal customers on the phone, right?
19 A      No.
20 Q      You know that now, don't you?
21 A      Yes.
22 Q      Is she fit for that job, sir?
23 A      I believe so.
24 Q      How is she fit for that job if she
25 can't control herself?

222

1               Anderson
2   A      Well, most of the time she can.
3   Q      It only takes one customer hearing
4   the "N" word on the other side for an
5   incident?
6   A      Correct.
7   Q      How is she fit for her job, sir?
8   A      In other ways.
9   Q      That part of her job, sir, can she do
10  it?
11  A      Most of the time.
12  Q      All the time?
13  A      No.
14  Q      In fact, you conclude in your report
15  she cannot have customer contact?
16  A      It would be advisable that it would
17  be minimized.
18  Q      That's what you say?
19  A      That's what I mean.
20  Q      That's not what you say, sir, is it?
21  A      To the extent that it could be
22  eliminated would be advisable.
23  Q      That's not what you said, is it?
24  A      That's what I meant.
25  Q      That's not what you said, though, is