IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FRANCES DARCANGELO,<br><br>        Plaintiff,<br><br>   v.<br><br>VERIZON MARYLAND INC.,<br><br>        Defendant. | No. WDQ-02-816 (Civ.) |

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF DOUGLAS ANDERSON

Defendant Verizon Maryland, Inc. ("Verizon"), by and through its undersigned counsel respectfully submits this Memorandum in Support of its Motion in Limine to Exclude Expert Testimony of Douglas Anderson and states as follows.

## INTRODUCTION

The Court allowed plaintiff to engage a new expert in this case based on her specific representations that the new expert would act solely as a replacement for plaintiff's previous psychiatric expert and would not rebut the expert opinions of Verizon's psychiatric expert, Dr. Jeffrey S. Janofsky. By proffering an expert whose report and deposition greatly exceed the opinions her previous expert put forth and who was specifically told to address the opinions in Dr. Janofsky's report, plaintiff has abused the limited relief this Court granted her. Moreover, Dr. Anderson admits that he applied no recognized scientific principles and methodology in his analysis, despite the fact that the United States Court of Appeals for the Second Circuit has previously affirmed the exclusion of his testimony for similarly failing to use scientifically reliable methodology in another case. Finally, Dr. Anderson's core opinion is inadmissible under Federal Rule of Evidence 403 in that it suggests a theory of relief that the Fourth Circuit

has squarely disallowed and the prejudicial effect of his opinions therefore outweighs any probative value. For all of these reasons, Dr. Anderson should be precluded from testifying as an expert witness at trial.

## ARGUMENT

**I.   ANDERSON'S OPINIONS EXCEED THE SCOPE OF THE OPINIONS EXPRESSED BY PLAINTIFF'S ORIGINAL EXPERT AND IMPERMISSABLY REBUT THE OPINIONS EXPRESSED BY VERIZON'S EXPERT.**

On March 7, 2005, plaintiff filed an amended motion with the Court to designate a new psychiatric expert on the grounds that her initial expert, Dr. Gary Zimberg, refused to testify on her behalf. (Pl.'s Am. Mot. to Name New Expert (Dkt. #111).) In response to Verizon's argument that allowing a new expert so close to the beginning of trial would unfairly prejudice Verizon, plaintiff acknowledged that it would be prejudicial to allow a new expert to rebut the opinions expressed in Dr. Janofsky's report. (Pl.'s Reply to Def.'s Opp. (Dkt. #120), at 5 ("The fact is that Plaintiff's prior counsel failed to issue a report rebutting Defendant's Independent Medical Examiner, Dr. Jeffrey Janofsky in accordance with the scheduling order. As such, to permit Plaintiff an expert who would now perform that function would cause unfair prejudice to the defendant.").) However, plaintiff represented to the Court that she was not seeking to have the new expert challenge Dr. Janofsky's opinions, but was instead only seeking a "replacement" for Dr. Zimberg who would not exceed the scope of Dr. Zimberg's opinions. (*Id.* ("Plaintiff does not seek that remedy, but instead seeks a replacement for Dr. Zimberg and the scope of his opinion, whether produced in his report or in deposition.").) This Court granted plaintiff the leave to appoint a substitute expert to replace Dr. Zimberg's testimony. (Order Mar. 23, 2005 (Dkt. #123).)

Despite plaintiff's express representation to the Court that she would not have her new expert rebut Dr. Janofsky's report and her admission that any such use of a new expert would be

2

unfairly prejudicial, it is clear that plaintiff directed Dr. Anderson to do precisely that. Dr. Anderson's report indicates that plaintiff's counsel provided him a copy of Dr. Janofsky's report and expressly states that Dr. Anderson relied on Dr. Janofsky's report to form his own opinions. (Ex. 1, April 4, 2005 report of Dr. Anderson ("Anderson Rep."), at 1.) More importantly, Dr. Anderson admitted in his deposition that plaintiff's counsel, Morris Fischer, specifically asked him to address Dr. Janofsky's opinion in his report. (Ex. 2, Deposition of Douglas Anderson ("Anderson Dep."), at 55 ("Q: Were you asked to address his [Dr. Janofsky's] opinion in any way? A: Yes. Q: Who asked you to address his opinion? A: Mr. Fischer.").) As further evidence of the rebuttal nature of Dr. Anderson's opinions, Dr. Anderson went out of his way in his report to assert that plaintiff's inappropriate behaviors are not "an aspect of or consistent with a personality disorder." (Anderson Rep., at 4.) As Dr. Anderson indicated in his deposition, this opinion was in direct response to Dr. Janofsky's diagnosis that plaintiff has a personality disorder. (Anderson Dep., at 56 ("Q: What view or views do you have with regards to Mr. Janofsky's report? A: My view is that the diagnosis of personality disorder NOS is not supported, not justified and confuses the issue.").)

This Court has previously recognized that allowing an expert to provide what is essentially rebuttal opinion on the verge of trial is unfairly prejudicial and should be prohibited. In *Congressional Air v. Beech Aircraft Corp.*, 176 F.R.D. 513 (D. Md. 1997), this Court chose to exclude a supplemental expert opinion that raised new issues shortly before trial and was written only after reviewing the opposing side's expert report and adjusting the report accordingly. *Id.* at 515. In so doing, the Court explained that allowing such a report at such a late stage in the litigation would amount to permitting the plaintiff "trial by ambush." *Id.* at 516. Here, the prejudicial effect of Dr. Anderson's rebuttal of Dr. Janofsky's report is not even in dispute;

3

plaintiff herself admitted the prejudicial effect of such testimony when she misrepresented to the Court that she would not use Dr. Anderson for that purpose. Plaintiff's acts of providing Dr. Anderson with a copy of Dr. Janofsky's report and expressly asking him to address Dr. Janofsky's opinions are a blatant violation of the grounds on which the Court allowed plaintiff to designate a new expert. Dr. Anderson should be barred from testifying on that basis alone.

Meanwhile, while Dr. Anderson's report clearly serves as an attempted rebuttal of Dr. Janofsky's opinions, it cannot be characterized as the report of an expert who is merely acting as a "replacement" for Dr. Zimberg. An even cursory comparison of Dr. Anderson's report and the one-page letter which was plaintiff previously submitted as Dr. Zimberg's report reveals that Dr. Anderson opined on numerous issues which Dr. Zimberg's letter does not even tangentially address. (*Compare* Anderson's Rep., *with* Ex. 3, Letter from Dr. Zimberg to E. Burkhardt of January 17, 2003.) Federal Rule of Civil Procedure 26(a)(2)(B) requires a party to provide, for each testifying expert, a report containing, *inter alia*, "a complete statement of all opinions to be expressed and the basis and reasons therefor." Accordingly, the scope of Dr. Anderson's opinions should have been limited to the same scope as Dr. Zimberg's proffered report. However, even considering Dr. Zimberg's deposition testimony, Dr. Anderson's opinions still far exceed the scope of any opinions *ever* expressed by Dr. Zimberg. For example, as part of his report, Dr. Anderson opined as to numerous "accommodations" which he believes should have been provided to plaintiff. (Anderson Rep. at 3) In contrast, when asked about possible job accommodations, Dr. Zimberg replied that "had it been asked I think I probably would have recommended some accommodations to her, for her, but I don't recall being asked." (Ex. 4, Deposition of Gary Zimberg ("Zimberg Dep."), at 97.) Dr. Zimberg went on to say that he would have no basis on which to opine as to whether any accommodations would be adequate,

4

however, because, as he put it, "I don't know what the job was." (*Id.*)

Indeed, Dr. Anderson's opinions not only exceed the scope of Dr. Zimberg's report, but indeed flatly contradict Dr. Zimberg in several respects. For example, Dr. Zimberg specifically testified that plaintiff suffers from a "mixed personality disorder," and attributed her inappropriate conduct primarily to that personality disorder and simple poor judgment. (*Id.* at 39-40, 62 ("Social or occupational functioning hard to say because you see her social occupational functioning is so much more affected by her schizoid personality, the bipolar is a sideshow there. And occupational functioning, again, the schizoid personality, poor judgment, they're such overwhelming factors it's hard to say what the bipolar effect is.").) Dr. Anderson contradicts Dr. Zimberg's opinions in this regard, opining that plaintiff's symptoms were inconsistent with personality disorder and stating that her behavior was instead caused by a condition which Dr. Anderson describes as "chronic hypomania." (Anderson Dep., at 150, 195.) In other words, Dr. Anderson has offered a supposed explanation for plaintiff's behavior which is entirely inconsistent with Dr. Zimberg's earlier diagnosis. This introduction of a new medical theory cannot be credibly characterized as a "replacement" for the opinions for Dr. Zimberg. By proffering opinions by Dr. Anderson that extend well beyond the scope of opinions previously provided by Dr. Zimberg, plaintiff has again violated her express representations to this Court to present only a replacement expert and should therefore be barred from presenting Dr. Anderson as a witness at trial.

## II. ANDERSON'S OPINIONS DO NOT MEET THE REQUIREMENTS FOR EXPERT OPINION UNDER FEDERAL RULE OF EVIDENCE 702.

Even if the Court were to excuse plaintiff's inexcusable violation of her own representations to this Court, Dr. Anderson should nonetheless be barred from testifying on the grounds that his opinions fail to meet the criteria of admissible expert opinion under Federal

5

Rule of Evidence 702. Federal Rule of Evidence 702 specifically states that proffered expert testimony may only be admitted if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. It is the duty of a district court to ensure that any and all expert testimony admitted is reliable, as required by Rule 702. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590-91 (1993); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 1999 (4th Cir. 2001). Furthermore, the proponent of the purported expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 (citing Fed. R. Evid. 104(a)). Dr. Anderson's testimony fails all three requirements of Rule 702.

### A. Anderson's Opinions Are Not Based on Sufficient Facts or Data.

As his report reflects, Dr. Anderson's entire investigation in this case consisted of a single 90 minute interview of plaintiff and a review of a small set of materials hand-selected by plaintiff's counsel, and consisting almost exclusively of past medical records. (Anderson Rep., at 1; Anderson Dep. at 15.) Based on this narrow range of information, Dr. Anderson expressed a wide range of opinions including opinions that plaintiff suffers from bipolar disorder; that her bipolar disorder caused her to exist in a persistent state of "chronic hypomania" for several years; that her chronic hypomania compelled her to engage in each and every inappropriate act that she has ever committed in the workplace; that Verizon failed to provide reasonable accommodations; that plaintiff's job was primarily technical in nature; and that her termination caused her to become disillusioned about ever being able to maintain employment.

As his deposition made abundantly clear, however, Dr. Anderson lacked even a minimally sufficient factual basis for any of these wide-ranging opinions. Although Dr.

6

Anderson opines that all of plaintiff's misconduct was compelled by her hypomania, he failed to take any steps to verify the full extent or nature of that misconduct by, for example, requesting plaintiff's personnel file or reviewing the depositions of plaintiff's former supervisors and coworkers. (Anderson Dep., at 209, 227.) Further, Dr. Anderson did not point to any evidence that plaintiff was experiencing any symptoms of hypomania at the time she engaged in the various acts of misconduct. To the contrary, when shown contemporaneous treatment notes by plaintiff's psychiatrist which repeatedly stated she was not displaying symptoms of hypomania during the time frame of several of plaintiff's inappropriate behaviors, Dr. Anderson claimed that those treatment notes were neither consistent nor inconsistent with his opinion. (*Id.* at 178-83.) Rather, Dr. Anderson accepted the very fact that plaintiff engaged in inappropriate acts as conclusive evidence that she was experiencing hypomania at the time the acts occurred despite contemporaneous medical evidence to the contrary. (*Id.* at 180-81 ("Q: Isn't it inconsistent that the days she engaged in those behaviors or within days of her engaging in those behaviors Dr. Zimberg sees a patient that displays no evidence of mania or hypomania? A: I disagree if she told him about those episodes as they occurred that that, in fact, would be such evidence. Q: So the mere act is evidence to you? A: In a patient with her condition, absolutely. Q: But he doesn't even agree with your assertion that she had the condition that day, sir. A: I don't care.").) In sum, rather than conducting any reasonable investigation into plaintiff's acts of misconduct, the circumstances surrounding them or plaintiff's symptoms at the time, Dr. Anderson merely assumed the conclusion that those acts, which occurred over a time span of over 15 years, were uniformly caused by hypomania and simply ignored the abundant contemporaneous evidence to the contrary.

In his report, Dr. Anderson also proposed several accommodations that Verizon could

provide plaintiff without first even investigating whether the proposed efforts had ever been in place previously. For example, Dr. Anderson suggests in his report that reasonable "[a]ccommodation would . . . include the granting of necessary paid or unpaid sick leave to keep medical appointments and/or take time off when her condition appeared to be more destabilized." (Anderson Rep., at 3.) Dr. Anderson, however, failed to check whether such accommodations had ever been made for plaintiff in the past and whether they had been effective. (Anderson Dep., at 219 ("Q: Dr. Anderson, during the fourteen year period . . . when you say she had a chronic hypomania episode . . . wasn't she given time off for medical treatment in that period? A: I don't know. Q: Wasn't she given paid time off in that period? A: I don't know. Q: Didn't find out, did you? A: No. Q: So how would you know whether that is an effective accommodation or not, sir? A: I can't answer that.").) In his report, Dr. Anderson further suggested that plaintiff be placed under supervisors who were sensitized to her condition (Anderson Rep. at 3); however, Dr. Anderson did not even check to see what efforts Verizon had already made to place her with an appropriate supervisor. (Anderson Dep., at 217 ("Q: Wasn't she placed with a variety of supervisors over fourteen-year period, Doctor? A: Yes. Q: Wasn't that an accommodation? A: I don't know.").)[1] When confronted with his complete lack of knowledge as to what steps Verizon had taken to deal with plaintiff's conduct, Dr. Anderson admitted that "It's possible that there is no reasonable accommodation." Dr. Anderson made no attempt to establish a factual foundation for any of his recommendations for accommodation and as a result was forced to abandon his entire position on the subject.

---

[1] When confronted with his lack of knowledge of the efforts that were made on behalf of plaintiff, Dr. Anderson attempted to distance himself from his own report by claiming he did not intend to say that these accommodations were not already in place. (Anderson Dep., at 93 ("Q: When you wrote the last sentence in that paragraph, did you intend to imply that accommodation was not in place? A: No.").) When pressed, Dr. Anderson, however, admitted that this was exactly his intention. (*Id.* at 103-04 ("Sir, when I asked you before lunch whether you intended to convey that that accommodation was not granted, you said no, didn't you? A: I did. Q: That's false, isn't it? A: Yes, it is.").)

In yet another example, Dr. Anderson opined in his report that plaintiff's job was "primarily technical in nature" based solely on a generalized "job description" given to him by plaintiff's counsel and plaintiff's own assertions. (*Id.* at 60-62 ("Q: Well, you conclude that her job is essentially technical in nature, don't you? A: Primarily. . . . Q: That is based on Exhibit 4 [Central Office Technician Job Brief]? A: And on my interview. Q: And on your interview. Did Ms. Darcangelo tell you that she had to do hand-offs to other employees of the workload? A: No. Q: Did Ms. Darcangelo tell you that she had to deal with internal customers at Verizon? A: No. Did she tell you that there were, on occasions, a teaching aspect to her job? A: No.").) Dr. Anderson did not inquire whether any other material was available to describe plaintiff's job before opining as to the nature of that job. (Anderson Dep., at 51.)

The inadequacy of this meager investigation was revealed at Dr. Anderson's deposition when he admitted that he had no knowledge of critical aspects of plaintiff's job which relate directly to her ability to reliably do that job. For example, Dr. Anderson had no idea that plaintiff's job involved extensive telephone interaction with other employees, known as internal customers:

> Q: Now, her job, as it turns out includes contact with other employees; you understand that don't know?
>
> Anderson: Yes.
>  . . .
>
> Q: You knew that we couldn't wave a magic wand and stop her from having hand-offs to other employees right?
>
> Anderson: Some amount of contact had to be necessary.
>
> Q: You knew she had to talk to internal customers on the phone, right?
>
> Anderson: No.
>
> Q: You know that now, don't you?

9

Anderson: Yes.

(Anderson Dep., at 221.)

Plaintiff herself has admitted that such telephone contact was not only an important part of her job but was indeed an "essential function" of her job within the meaning of ADA and that her inability to do that function would disqualify her from that job. (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 24 (Dkt. #38) ("Plaintiff was involved in basically two types of regular interactions in the COT position: 1) interacting with fellow Bell Atlantic employees in remote installations to execute the provisioning function, which was a central purpose of her job; and 2) interacting with her co-workers in the immediate workgroup. *Plaintiff recognizes the former as an essential function of her position . . .*") (emphasis added)).

Dr. Anderson's ignorance of the degree of telephone contact required in plaintiff's job was a critical omission of knowledge. Once informed of this aspect of plaintiff's job description, Dr. Anderson admitted that, under his diagnosis, plaintiff could not be relied upon to perform that essential function of her job:

> Q: So if a person has chronic hypomanic they cannot prevent themselves from calling other people names; is that your view?
>
> Anderson: I'm not saying that anyone that has one can. I'm saying in her case that is the case, yes.
>
> Q: How about making threats on the telephone?
>
> Anderson: It's quite consistent.
>
> Q: If using the telephone is part of the job, she can't perform that part of the job, can she?
>
> Anderson: Occasional. Sometimes that would be true.
>
> Q: There are times when she cannot perform that job is she is going to curse on the phone?

      Anderson: I agree.

*Id.* at 196:22-197:15. In sum, by failing to conduct any minimally reasonable inquiry in the nature of plaintiff's job, Dr. Anderson inexcusably missed an essential function of plaintiff's job that is critical to the present case.

      As these examples make clear, Dr. Anderson made no effort to ensure a sufficient factual basis for his opinions and no such basis actually exists. Rather, Dr. Anderson merely accepted, at face value, plaintiff's version of all disputed facts, declaring that he "didn't feel that it was [his] role to determine the accuracy of these things." (*Id.* at 87.) Because Dr. Anderson's opinions are not based on sufficient facts or data, this Court should exclude his testimony from trial.

      **B. Anderson's Opinions Are Not the Product of Reliable Principles and Methods.**

      In addition to failing to ground his opinions in sufficient data, Dr. Anderson also, by his own admission, failed to apply recognized scientific principles or methods in reaching his core opinions that plaintiff has for several years been in a state of "chronic hypomania" and that any and all acts of misconduct that she has ever committed during those years were irresistibly compelled by her hypomania. In *Daubert*, 509 U.S. 579, the landmark case on expert testimony, the Supreme Court enunciated several factors for trial courts to consider in determining the reliability of an expert's methodology, including (1) whether the expert's technique or theory can be objectively tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally recognized in the scientific community. *Id.* at 593-94.

      Dr. Anderson's methodology fails under each of these factors. During his deposition, Dr. Anderson demonstrated that he was not aware of *any* scholarly or peer-reviewed materials which

11

supported his diagnosis of chronic hypomania, much less his assertion that hypomania, chronic or otherwise, could compel an individual to engage in inappropriate conduct. At first, Dr. Anderson attempted to claim that in reaching his opinion that plaintiff suffers chronic hypomania, he relied on the *Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed. 2000) (DSM-IV).

If the condition of chronic hypomania actually appeared in the DSM-IV, that fact alone would provide some reliability to Dr. Anderson's opinions. The DSM-IV is an authoritative text not only regarded highly in the psychiatric community but also routinely relied upon by the courts. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 308 n.3 (2002) (citing the DSM-IV for the definition of "Mental Retardation"); *Pruett v. Thompson*, 996 F.2d 1560, 1572 n.11 (4th Cir. 1993) (citing the DSM for the definition of "post-traumatic stress syndrome"); *Price v. Nat'l Bd. of Med. Exam'rs*, 966 F. Supp. 419, 423 (S.D.W. Va. 1997) (referring to the DSM-IV as "authoritative in the diagnosis of ADHD"); *Kramer v. United States*, 579 F. Supp. 314, 316 (D. Md. 1984) (referring to the DSM as "the official psychiatric manual"). Indeed, Dr. Anderson admitted that in his role as medical director of a managed care company, he would not approve the reimbursement of treatment absent a DSM-IV diagnosis. (Anderson Dep., at 32-33.)

As Dr. Anderson ultimately admitted, however, the condition of "chronic hypomania" appears nowhere in the DSM-IV. (*Id.* at 141 ("Q: Where in this book [DSM-IV] is chronic hypomania? A: Specifically, it isn't.").) Indeed, under the DSM-IV's criteria, hypomania by definition *cannot* be chronic. The DSM-IV clearly provides, "[a] Hypomanic Episode is defined as a ***distinct period*** during which there is an abnormally and persistently elevated, expansive, or irritable mood that lasts at least 4 days." (DSM-IV, at 365 (emphasis added).) The manual further states that "[t]he mood during a Hypomanic Episode must be ***clearly different*** from the

12

individual's usual nondepressed mood, and there must be a clear change in functioning that is not characteristic of the individual's usual functioning." *Id.* (emphasis added). When confronted with this actual text of the DSM-IV, Dr. Anderson admitted that he not only did not rely on the DSM-IV, but that he disagreed with its definition of hypomania. (Anderson Dep., at 143.)

Moreover, even if hypomania could be chronic in nature, the DSM-IV criteria for hypomania do not support, and indeed contradict, Dr. Anderson's assertion that plaintiff's supposed chronic hypomania compelled her to engage in misconduct against her will or even that chronic hypomania could be a form of ADA disability. The DSM-IV plainly states that, "In contrast to a Manic Episode, a Hypomanic Episode is not severe enough to cause marked impairment in social or occupational functioning . . . ." (DSM-IV, at 365.)

Meanwhile, Anderson admits that he did not rely on any other scholarly text or peer-reviewed materials in reaching his diagnosis of "chronic hypomania." (Anderson Dep., at 142-43 ("Q: The question is what book of a similar stature lists chronic hypomania as a condition? A: Offhand, I can't answer that. Q: Did you rely on any scholarly text at all in arriving at that? A: No, I did not."), 146-47 ("Q: What peer review materials, if any, did you rely on in the diagnosis of chronic hypomania? A: None. Q: Are there any authoritative texts which describe that condition? A: I don't know.").) In short, Dr. Anderson could not cite any evidence that the concept of chronic hypomania or the idea that it could compel behavior beyond a person's control has ever been subjected to peer review or has been generally recognized in the scientific or medical community, and the overwhelming evidence is that it has not.

Further, Dr. Anderson's methodology is not susceptible to any objective testing or the application of any meaningful standards or controls. Dr. Anderson fails to identify any objective criteria for his diagnosis of chronic hypomania or for determining whether plaintiff was

13

experiencing chronic hypomania at any given time. Rather, as discussed above, he opines that the very act of engaging in misconduct is conclusive evidence of chronic hypomania, thus allowing him to excuse any incidents of misbehavior without subjecting his opinion to any standards such as the existence of objectively-determined symptoms. In other words, Dr. Anderon's diagnosis is no more than the creation of a circular logic—plaintiff's chronic hypomania establishes that her misconduct is beyond her control and the allegedly uncontrollable nature of her misconduct demonstrates that she is suffering chronic hypomania. The circular nature of this logic defies any objective testing of Dr. Anderson's diagnosis, since the conclusion in effect proves itself. Because Dr. Anderson's opinions, as presented, are not subject to any objective testing, they are unreliable as a matter of law, and he should therefore be prohibited from presenting them at trial.

The unreliability of Dr. Anderson's approach is underscored by the fact that Dr. Anderson has previously been barred from testifying in a case in New York, the state in which he practices, for using a similarly unreliable methodology. In *United States v. Mazzeo*, No. 99-1223, 2000 U.S. App. LEXIS 818 (2d Cir. January 21, 2000), the Second Circuit upheld the district court's exclusion of Dr. Anderson's testimony regarding "false confessions." *Id.* at *7. As in the present case, Dr. Anderson's testimony in *Mazzeo* involved an area of questionable scientific value and was based on nothing more than eighty minutes of interaction with the defendant and the review of case-related documents. *Id.* at *5. The Second Circuit explained that Dr. Anderson "did not administer to Mazzeo any of the available tests designed to measure the extent to which a person is likely to make false confessions" and instead "merely repeated the characteristics associated with the profile and referred in conclusory fashion to his own professional experience." *Id.* at *6. Accordingly, the Second Circuit held that the district court

was justified in "excluding his proffered testimony at trial because it was not scientifically reliable as applied to this case." *Id.*

Having had his opinions previously excluded for failing to apply recognized scientific methods and principles, Dr. Anderson has repeated that same failure in the present case with the result that his opinions are wholly unreliable. Accordingly, following the Second Circuit's clear approach as to this expert's methods, the Court should exclude Dr. Anderson from testifying at trial.

### III.  ANDERSON'S OPINIONS DO NOT HAVE ANY PROBATIVE VALUE.

Finally, Dr. Anderson's testimony should be excluded under Federal Rule of Evidence 403 as more prejudicial than probative because his core opinions propose a theory of recovery that the Fourth Circuit has expressly disallowed. As discussed above, the linchpin of Dr. Anderson's opinions is that plaintiff is not responsible for her actions because she suffers a condition which compels her to engage in repeated misconduct. The clear import of those opinions is that any discipline taken against plaintiff for her actions is necessarily based on her alleged disability and thus discriminatory.

The Fourth Circuit, however, has expressly held that it is not discriminatory for an employer to terminate an employee for misconduct, even if that misconduct is caused by the employee's disability. In *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999), the Fourth Circuit addressed a situation analogous to the present case in which an employer terminated an employee after the employee made a death threat against another employee and left a suicide letter with his supervisor, acts which the employee suggested were the result of his diagnosed schizophreniform and post-traumatic stress syndrome. *Id.* at 421. The Fourth Circuit responded to this scenario by asserting that it "is well settled that the [Americans with Disabilities Act] is not violated when an employer discharges an individual based on the

15

employee's misconduct, even if the misconduct is related to a disability." The Fourth Circuit then went further to specifically hold that, "Because the ADA does not require an employer to ignore such egregious misconduct by one of its employees, *even if the misconduct was caused by the employee's disability,* we remand this case to the district court for entry of judgment in favor of the Defendants." *Id.* at 429 (emphasis added.)

In light of binding Fourth Circuit precedent that an employer cannot be required to ignore misconduct, even if it is caused by a disability, Dr. Anderson's core opinion that plaintiff's chronic hypomania caused her impermissible behavior has no probative value. Moreover, the introduction of such testimony threatens to confuse the jury and prejudice Verizon by suggesting, contrary to Fourth Circuit law, that disciplining plaintiff on the basis of her conduct was in and of itself a discriminatory act under the ADA. Accordingly, Dr. Anderson's testimony at least in that regard should be excluded under Rule 403.

## **CONCLUSION**

For the foregoing reasons, Verizon respectfully requests that the Court enter an Order barring the testimony of Dr. Douglas Anderson.  In addition, if the Court decides that it wishes to hear oral argument on this motion, Verizon respectfully requests that such a hearing be held outside of the presence of a jury so as to avoid any potential prejudice that hearing Dr. Anderson's testimony might cause.

Dated:  April 27, 2005

_____/s/_____
Karen M. Wahle, Bar No. 013658
Ira H. Raphaelson, Bar No. 012849
Shannon M. Barrett No. 16410
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
(202) 383-5414 (facsimile)

Counsel for Defendant
Verizon Maryland Inc.