# ANDERSON & NASSAR
CLINICAL AND FORENSIC PSYCHIATRY

500 Fifth Avenue
Suite 923
New York, NY 10110

DOUGLAS ANDERSON, M.D., F.A.C.F.P.      (212) 764-9083    Fax: (212) 764-0306      PAUL NASSAR, M.D., F.A.P.A.

April 4, 2005

Morris E. Fischer, Esq.
Snider & Fischer, LLC
104 Church Lane
Baltimore, MD 21208

Re: <u>Darcangelo v. Verizon</u>

Dear Mr. Fischer:

At your request, I examined your client, Frances Darcangelo, who is the plaintiff in the above captioned action, at my office in Weston, CT, on March 31, 2005. The examination consisted of both unstructured and structured interview segments. In addition, I have reviewed the following records and documents:

    Complaint and Jury Trial Demand
    Transcript of Plaintiff's Deposition
    Transcript of Deposition of Dr. Gary Zimberg
    Transcript of Deposition of Julie Swope
    Plaintiff's job description
    Plaintiff's medical record from the Department of the Air
      Force (excerpts)
    Plaintiff's medical record from the Department of Veterans
      Affairs (excerpts)
    Plaintiff's medical record from Oil City Area Health Center
    Plaintiff's record from Yorktown Psychological Services
    Plaintiff's medical record from Delphic Mental Health
      Associates
    Plaintiff's medical record from York Guidance Center
    Plaintiff's medical record from Memorial Hospital, York, PA
    Plaintiff's medical record from Hanover Hospital
    Plaintiff's medical record from Dr. T. Alan Ramsey
    Plaintiff's medical record from Dr. John Mira
    Plaintiff's file from Bell Atlantic Medical Department
    Psychiatric Evaluation report by Dr. Anthony Russo
    Psychiatric Evaluation report by Dr. Stephen Siebert
    Psychiatric Examination report by Dr. Jerome Gottlieb
    Dr. Janofsky's report.

<u>Darcangelo</u>
Page 2

Based on my examination and review, I have formulated the opinion contained in this report within a reasonable degree of medical certainty.

Plaintiff Frances Darcangelo is a 49 year old single female with a long history of bipolar affective disorder. She told me that she first sought treatment at age 22 or 23 for depression and sexual dysfuncton. She consulted with Dr. Ramsey, who prescribed the antidepressant imipramine; and her condition improved. In 1989, she joined the US Air Force Reserve and entered on active duty for basic training. She decompensated under the stress of training and experienced what she described as several psychotic dissociative episodes in which time stood still for brief periods during which she was apparently catatonic. She was at the time erroneously diagnosed with an adjustment disorder and separated from the Air Force that same year.

Shortly after her separation, Frances suffered a manic psychotic episode resulting in a hospitalization and an erroneous diagnosis of schizoaffective schizophrenia. She was treated with several andtipsychotic and antimanic medications which caused untoward side effects, including extrapyramidal (parkinsonian) symptoms from the antipsychotics, and delirium from Depakote. She eventually responded reasonably well to lithium carbonate under the care of Dr. Zimberg, who correctly diagnosed her condition as bipolar or manic-depressive illness. However, she continued to function in a more or less chronic hypomanic state. It was in this condition that the episodes at issue with respect to her termination occurred. It is also noted that the Department of Veterans Affairs eventually concurred with the diagnosis of bipolar disporder, and ultimately granted Frances a service connected partial disability and pension, finding that her first psychotic episodes did occur while on active duty in the US Air Force.

In 2003, Dr. Zimberg referred Frances for a nephrology consult because of an elevated creatinine level. Lithium was causing apparent damage to Frances' kidneys and needed to be discontinued. Lithium was therefore replaced with Lamictal 300mg per day, which Frances is currently still taking as prescribed by nurse practitioners under the supervision of Dr. Jack McDonald at a Satellite Clinic of the Baltimore VA Medical Center. She also continues to see Julie Swope in York, PA for supportive psychotherapy approximately once a month.

Throughout the examination, Frances evinced an elevated mood, jovial affect, pressured speech, and tangential though process. She was, however, entirely rational and logical, as well as a good historian. Her presentation was entirely consistent with

Darcangelo
Page 3


the chronic hypomanic state first described by Dr. Zimberg and noted to be present by most evaluators over time.

It is not unusual for bipolar patients to respond to treatment in the way Frances has, that is maintaining a permanently hypomanic mental state while preventing further psychotic or full manic episodes. This appears to be of critical importance in this case, because the behaviors that have over time resulted in disciplinary measures against Frances, up to and including her termination of employment, are precisely the kinds of behaviors to be expected from a bipolar patient in a chronic hypomanic state. The exact disease process of bipolar disorder is not completely understood, but it is well known that the manic side of the disorder interferes with proper functioning of neurons (brain cells) and pathways in the frontal lobes of the brain. The frontal lobes are the sight of the brain's inhibitory mechanisms, which filter and regulate thought, speech, and behavior to allow a person to speak and behave in a socially appropriate manner. This ability is impeded in bipolar disorder to varying degrees, depending on the severity of the condition and response to treatment. The worst case is psychotic mania in which the patient can be delusional with grandiose belief in superhuman power, importance, influence, or wealth. Fortunately, many bipolar patients are indistinguishable from normal in response to treatment; but many other, including Frances, are only partially responsive and remain in a more or less permanent semi-manic or hypomanic state.

It is evident from the records that Frances' employers were aware of her condition, because she was referred for psychiatric evaluation on more than one occasion. It appears, however, that despite this awareness, Frances' behavior was dealt with as a disciplinary matter, rather than as a function of a mental disorder that could perhaps be managed with reasonable accommodation. Such accommodation might include limiting Frances' contact and interaction with coworkers as much as possible and having her report to and interact mainly with supervisors who were aware of and sensitized to Frances' condition and its possible and likely expressions, which would be understood to be beyond Frances' ability to prevent. Accommodation would also include the granting of necessary paid or unpaid sick leave to keep medical appointments and/or take time off when her condition appeared to be more destabilized, for example under periods of high personal or work related stress.

It is my opinion that Frances Darcangelo suffers from **Bipolar Disorder, Type I (DSM IV 296.40)**, that she has had this condition since her early twenties, and that she remains in a chronic

<u>Darcangelo</u>
Page 4

hypomanic state despite appropriate medical treatment. It is also my opinion that Frances' occasional periodic episodes of socially inappropriate behavior in the workplace are a direct function of her condition and as such are not under her volitional control, nor are they an aspect of or consistent with a personality disorder. Because of these periodic episodes, Frances has been and continues to be substantially limited in her ability to form and maintain social relationships, both personally and in the workplace. This limitation eliminates her ability to perform a broad range of occupations, including, for example, teaching, customer relations, sales, or healthcare provider. However, I reviewed Frances' job description and found it to be primarily technical in nature. I would therefore concur with the finding of the Department of Veterans Affairs that Frances' condition is substantially but only partially disabling, specifically to the extent that she is employable but that reasonable accommodiations in the workplace, such as I have outlined, are necessary. It is therefore also my opinion that had such accommodations been in place, Frances very possibly could have continued to perform her technical job responsibilities in a productive and satisfactory manner.

Unfortunately, Frances' termination has caused her to become disillusioned about ever again being able to maintain steady employment. This is analagous to the disillusionment she acquired with respect to personal relationships earlier in her adult life as a function of her poorly regulated inhibition. After a series of failed relationships, she eventually gave up on them and now lives a largely isolated lifestyle. She is now at risk for this same kind of disillusionment causing her to give up on ever maintaining a job. She will therefore, in my opinion, require ongoing psychotherapy for an indefinite period of time to support any further efforts at sustained employment even with reasonable accommodations in place.

Thank you for asking me to examine your client and consult with you on this very interesting case. Please let me know if you require anything further or wish to have me testify with refeence to my opinion and this report.

Sincerely yours,

Douglas Anderson, M.D., F.A.C.F.P.