1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MARYLAND

3   ---------------------------------------------- x

4   FRANCES DARCANGELO,

5                          Plaintiff,

                                   Case No.

6        -against-                 502816

7   VERIZON MARYLAND, INC.,

8                          Defendant.

9   ---------------------------------------------- x

10

11

12        DEPOSITION of DOUGLAS ANDERSON, taken

13   pursuant to Subpoena, held at the offices of

14   O'Melveny & Myers, LLP, 7 Times Square, New York,

15   New York, on April 18, 2005, at 10:13 a.m.,

16   before a Notary Public of the State of New York.

17

18

19

20

21   ************************************************

         BARRISTER REPORTING SERVICE, INC.

22              120 Broadway

            New York, N.Y. 10271

23              212-732-8066

24

25

2

```
 1
 2   A P P E A R A N C E S:
 3
 4        SNIDER & FISCHER, LLC
                Attorneys for Plaintiffs
 5              104 Church Lane
                Baltimore, Maryland  21208
 6
          BY:   MORRIS E. FISCHER, ESQ.
 7
 8
 9
10
11        O'MELVENY & MYERS, LLP
                Attorneys for Defendant
12              1625 Eye Street, N.W.
                Washington, D.C.  20006
13
          BY:   IRA H. RAPHAELSON, ESQ.
14                   -and-
                SHANNON M. BARRETT, ESQ.
15
16
17
          VERIZON
18              185 Franklin Street
                Boston, Massachusetts  02110
19
          BY:   LISA BIRKDALE, ESQ.
20
21
                     xxxxx
22
23
24
25
```

1                   Anderson

2    Q        How long did that examination last?

3    A        Ninety minutes.

4    Q        When did you render your opinions to

5    Mr. Fischer?

6    A        April 4th.

7    Q        Had you concluded on or about

8    March 27th that the plaintiff was not

9    responsible for her behavior?

10   A        No.

11   Q        When did you prepare your written

12   report?

13   A        April 4th.

14   Q        When did you provide your report to

15   Mr. Fischer?

16   A        April 4th.

17             MR. RAPHAELSON:  I'm going to

18             show you what we've marked

19             Defendant's Exhibit 2 for

20             identification.

21                  (Whereupon a curriculum vitae

22             of Dr. Anderson was marked as

23             Defendant's Exhibit 2 for

24             identification, as of this date.)

25   Q        I ask you if that is a true and

1                    Anderson

2    panel of psychiatrists.

3    Q      Did they have more or less criteria

4    than DSM-IV-TR?

5    A      I would say the diagnostics, they

6    were essentially similar, are for most

7    purposes the same, but medical necessity

8    criteria go beyond diagnostic criteria.

9    They really have more to do with what types

10   or intensities of services can treat a

11   condition which are appropriate under

12   different circumstances.

13   Q      At American Case Management do you

14   use DSM-IV-TR criteria?

15   A      Well, we use them in the sense that

16   the providers use them.  We're not in the

17   business of making or questioning diagnoses,

18   because we don't examine patients, so if a

19   provider tells us that they have done an

20   assessment and admitted diagnosis, we accept

21   that.

22   Q      Did you ever approve coverage for

23   treatment of a psychiatric condition while

24   at American Case Management that did not

25   meet DSM IV-TR criteria?

1                    Anderson

2   A        A DSM-IV diagnosis is a requirement

3   for reimbursement of treatment.

4   Q        Right.  So if you didn't get a DSM-IV

5   diagnosis that was going to be in that group

6   that you were going to say no reimbursement

7   to while at American Case Management, right?

8   A        We never get a request for treatment

9   or reimbursement without a DSM-IV diagnosis.

10  It simply doesn't occur.

11  Q        Let me put it another way:  You've

12  never then been asked to approve a request

13  for reimbursement at American Case

14  Management where there wasn't a DSM-IV

15  diagnosis; is that your testimony?

16  A        Yes.

17  Q        If you had been asked, would you have

18  approved it?

19                    MR. FISCHER:  Object.

20                    You can answer.

21  A        No.

22  Q        How many cases of chronic hypomania

23  did you approve for treatment as an employee

24  of American Case Management?

25  A        I don't know.

1       Anderson

2       Defendant's Exhibit 3.

3               (Whereupon a document bearing

4       production numbers V-DAR 01792 and 93

5       was marked as Defendant's Exhibit 3

6       for identification, as of this date.)

7               MR. RAPHAELSON:  This is Bates

8       stamped V-DAR 01792 and 93.

9   Q       I'm going to ask you, is this the

10  document that you reviewed as described on

11  the first page of your -- strike that.

12              Is this the document described on the

13  first page of your report?

14  A       No.

15  Q       You reviewed something else?

16  A       Yes.

17  Q       Have you ever reviewed Defendant's

18  Exhibit number 3 for identification?

19  A       No.

20  Q       Did you ask Mr. Fischer if the

21  information he was supplying you regarding

22  Ms. Darcangelo's alleged job description was

23  all of the material available to describe

24  her job?

25  A       No.

55

1                    Anderson

2    Q        Did you ask?

3    A        No.

4    Q        Did you review the appendix to Dr.

5    Janofsky's report, sir?

6    A        Yes.

7    Q        How much time did you spend on that?

8    A        Very little.

9    Q        How did his report impact your

10   opinion, sir?

11   A        That's very hard to answer.  I don't

12   know.

13   Q        Were you asked to rebut his opinion

14   in any way?

15   A        No.

16   Q        Were you asked to address his opinion

17   in any way?

18   A        Yes.

19   Q        Who asked you to address his opinion?

20   A        Mr. Fischer.

21   Q        Do you address his opinion in your

22   report?

23   A        Not directly.

24   Q        How do you do it indirectly in your

25   report?

60

1                    Anderson

2    Q      Well, why don't you explain what you

3    mean.

4    A        Partial remission is a continuum that

5    in the case of Ms. Darcangelo is relative,

6    and at times she is, although always in

7    partial remission, more stabilized than

8    others, and that there is a waxing and

9    waning of her clinical condition within the

10   confines of partial remission.

11   Q      Sir, looking at Exhibit 3 for a

12   moment, that's another part of Ms.

13   Darcangelo's job description that

14   Mr. Fischer didn't share with you.

15        Would the fact that she had other

16   parts of her job beyond technical affect

17   your conclusion that she "very possibly" was

18   very capable of performing her job?

19   A        I don't understand the question.

20   Q      Well, you conclude that her job is

21   essentially technical in nature, don't you?

22   A        Primarily.

23   Q      You find it to be primarily technical

24   in nature on page 4, correct?

25   A        Yes.

61

1                     Anderson

2    Q        That is based on Exhibit 4?

3    A        And on my interview.

4    Q        And on your interview.  Did Ms.

5    Darcangelo tell you that she had to do

6    hand-offs to other employees of the

7    workload?

8    A        No.

9    Q        Did Ms. Darcangelo tell you that she

10   had to deal with internal customers at

11   Verizon?

12   A        No.

13   Q        Did she tell you that there were, on

14   occasions, a teaching aspect to her job?

15   A        No.

16   Q        Would those three facts affect your

17   conclusion that her job was primarily

18   technical in nature?

19   A        No.

20   Q        So those facts don't get in the way

21   of your conclusion?

22   A        Correct.

23   Q        Now, in your expert report you write:

24   "In 2003 Dr. Zimberg referred Frances for a

25   nephrology consult because of an elevated

62

1                    Anderson

2    creatinine level.  Lithium was causing

3    apparent damage to Frances' kidneys and

4    needed to be discontinued.  Lithium was

5    therefore replaced with Lamictal, 300 mg per

6    day, which Frances is currently still taking

7    as prescribed by nurse-practitioners under

8    the supervision of Dr. Jack McDonald at a

9    satellite clinic of the Baltimore VA Medical

10   Center.  She also continues to see Julie

11   Swope, in your PA, for support of

12   psychotherapy for approximately once a

13   month."

14            Did you write that, sir?

15   A       I did.

16   Q       From what source or sources did you

17   learn those facts?

18   A       From the plaintiff herself.

19   Q       Did you look for any verification in

20   any documents?

21   A       No.

22   Q       Did you look to see any

23   contemporaneous clinical treatment notes?

24   A       No.

25   Q       Did the information in that paragraph

87

1                    Anderson

2    A      No.

3    Q      Anything to determine how much family

4    leave Ms. Darcangelo had been granted?

5    A      No.

6    Q      Whether family leave had anything to

7    do with her behavior in the workplace that

8    led to her discipline and firing?

9    A      No.  I was listening at this point.

10   It was her opportunity to tell me what her

11   side of things or story was.

12   Q      Did you do anything after hearing her

13   side of the story to check out its accuracy?

14   A      Not specifically.

15   Q      How about nonspecifically?

16   A      Well, I didn't feel that it was my

17   role to determine the accuracy of these

18   things.  That wasn't necessary for the

19   opinion that was my task to render.

20   Q      So if she was lying to you, that's

21   not relevant?

22   A      Well, she was giving me an opinion,

23   so an opinion doesn't really fall under the

24   heading of truthfulness or lying, in my

25   view.  She was telling me what she thought.

1           Anderson

2   provided.

3   Q     Sir, that's a free-standing sentence,

4   isn't it, "Accommodation would also include

5   granting of necessary leave"?

6   A     Yes.

7   Q     The phrase "total accommodation

8   package" doesn't exist here?

9   A     You asked me to explain what I meant,

10  so I did so.

11  Q     Does the phrase "total accommodation

12  package" appear in this paragraph?

13  A     No.

14  Q     The concept isn't even hinted at, is

15  it?

16  A     Oh, I believe it's very clear.

17  Q     You do?

18  A     I do.

19  Q     When you wrote the last sentence in

20  that paragraph, did you intend to imply that

21  that accommodation was not in place?

22  A     No.

23  Q     You didn't intend that?

24  A     No, I did not.

25  Q     Does it affect your opinion in any

103

1                        Anderson

2    Q       That wasn't my question, sir.

3    A       Well, that's my answer.

4    Q       Go ahead and explain it.

5    A       What I mean is that I'm referring to

6    the instances in which she was dealt with

7    disciplinarily and which I feel is not

8    appropriate.

9    Q       Where do those words show up in that

10   sentence and a half?

11   A       They show up in the transcript of

12   this deposition because I just said them.

13   Q       But they're not in here in your

14   report, are they?

15   A       No.  You gave me an opportunity to

16   explain what I meant by this, so that's what

17   I meant.

18   Q       Are you done with your sentence?

19   A       Yes.

20   Q       Sir, when I asked you before lunch

21   whether you intended to convey that that

22   accommodation was not granted, you said no,

23   didn't you?

24   A       I did.

25   Q       That's false, isn't it?

104

```
 1                  Anderson
 2   A      Yes, it is.
 3   Q      In fact, you did intend to convey
 4   that that accommodation was not given,
 5   correct?
 6   A      Well --
 7   Q      Sir, that is a yes or no.  You did
 8   intend to convey that?
 9   A      It's not an absolute.
10   Q      Sir, don't you say that these
11   accommodations which you outline in the
12   previous paragraph weren't present?
13   A      What I'm saying is --
14   Q      Sir, in your report, don't you say
15   that?
16   A      If you're not going to let me answer
17   the questions, then I won't.
18   Q      Sir, do you say that in your report?
19   A      The report speaks for itself.
20   Q      Sir, that's a legal answer.  You're
21   in a deposition.  You have to answer the
22   question.
23          Doesn't your report say had such
24   accommodations been in place, Frances very
25   possibly could have continued to perform her
```

1                    Anderson

2    situation that many people who suffer from

3    this illness find themselves in.

4    Q        Are you done with your description?

5    A        Yes.

6    Q        Do you remember the question?

7    A        No.

8    Q        Where in this book is chronic

9    hypomania?

10   A        Specifically, it isn't.

11   Q        It's not in the book, is it?

12   A        No, it isn't.

13   Q        This is the book that psychiatrists

14   recognize and use as a diagnostic

15   definitional tool, isn't it, sir?

16   A        It's a book.

17   Q        Tell me a book that is as recognized

18   as DSM-IV that lists chronic hypomania as a

19   diagnosis.

20   A        Hypomania is not a diagnosis --

21   Q        I didn't ask you about hypomania.   I

22   asked you about chronic hypomania.

23   A        Chronic hypomania is not a diagnosis.

24   It is a clinical condition.

25   Q        Sir, it's not a clinical condition

1               Anderson

2    recognized by the DSM, is it?

3    A       It may not be specifically mentioned,

4    but that doesn't mean that it isn't an

5    accepted aspect of bipolar affective

6    disorder which is part of that book.

7    Q       Bipolar affected disorder, plainly,

8    sir, my question is limited right now to

9    your diagnosis of chronic hypomania.

10   A       A neurology diagnosis book may list

11   brain tumor but not list headache, but a

12   headache is part of having a brain tumor.

13   That's analogous to this.

14          Ms. Darcangelo, in my opinion, has

15   bipolar affected disorder, and an aspect of

16   her bipolar affected disorder is chronic

17   hypomania.

18   Q       Do you remember the question?

19   A       No.

20   Q       The question is what book of a

21   similar stature lists chronic hypomania as a

22   condition?

23   A       Offhand, I can't answer that.

24   Q       Did you rely on any scholarly text at

25   all in arriving at that?

143

1               Anderson

2    A       No, I did not.

3    Q       Do you agree with the DSM that a

4    hypomanic episode is defined as a distinct

5    period during which there is an abnormally

6    and persistently elevated expansive or

7    irritable mood that lasts at least four

8    days?

9    A       Yes.

10   Q       Do you agree with the DSM that the

11   mood during a hypomania episode must be

12   clearly different from the individual's

13   usual nondepressed mood, and there must be a

14   clear change in functioning that is not

15   characteristic of the individual's usual

16   functioning?

17   A       No.

18   Q       So it's not just that you don't have

19   a scholarly text for chronic hypomania, you

20   disagree with the definition of a hypomania

21   episode in the DSM; is that correct?

22   A       Yes, keeping in mind that that is

23   edition 4, because the DSM keeps changing.

24   Things get added, things get deleted, things

25   get clarified, things get expanded.

146

1                        Anderson

2    Q        Hypomania does not prevent someone

3    from being able to do their job or interact

4    with other people, does it?

5    A        In most cases it does not.

6    Q        In any case other than Ms.

7    Darcangelo, does it?

8    A        Yes.

9    Q        Is that the usual?

10   A        No.

11   Q        You agree the definition says it

12   doesn't impair, correct?

13   A        Generally.

14   Q        It doesn't say generally; it says it

15   doesn't impair?

16   A        Well, it generally doesn't.

17   Q        The DSM says it does not create a

18   marked impairment in social or occupational

19   functioning?

20   A        Marked impairment.  That is different

21   from impairment, isn't it?

22   Q        In your view it is?

23   A        Marked impairment is different from

24   impairment.

25   Q        What peer review materials, if any,

147

1                    Anderson

2    did you rely on in the diagnosis of chronic

3    hypomania?

4    A       None.

5    Q       Are there any authoritative texts

6    which describe that condition?

7    A       I don't know.

8    Q       In your opinion you say, "It is also

9    my opinion that Frances' occasional periodic

10   episodes of socially inappropriate behavior

11   in the workplace are a direct function of

12   her condition and as such are not under her

13   volitional control, nor are they an aspect

14   or consistent with the personality

15   disorder."

16          Do you recall that part of your

17   report, sir?

18   A       Yes.

19   Q       Aren't they consistent with being a

20   bully?

21   A       Are what?

22   Q       Aren't her behaviors consistent with

23   simply being a bully?

24   A       No.

25   Q       Aren't her behaviors consistent with

150

1                       Anderson
2     that she, Ms. Darcangelo, was a chronic
3     hypomanic; do you recall that?
4     A      I do.
5     Q      Dr. Zimberg also diagnosed her as
6     having a personality disorder?
7     A      He did.
8     Q      He's wrong?
9     A      I don't know whether he is or not.
10    Q      You don't have anything about the
11    possibility of a personality disorder in
12    your report, do you?
13    A      My impression is that she does not
14    have one.
15    Q      The question was you don't have
16    anything in your report about a personality
17    disorder, do you?
18    A      Well, I believe I'd rule it out.  I
19    think you quoted that.
20    Q      You didn't diagnose her as having
21    one?
22    A      That's correct.
23    Q      Dr. Zimberg did?
24    A      That's correct.
25    Q      So you agreed with him in part and

1              Anderson

2              (Whereupon a document was

3        marked as Defendant's Exhibit 9 for

4        identification, as of this date.)

5    Q      Do you recognize this?

6    A      Yes.

7    Q      Now, isn't it a fact that his

8    concurrent treatment updates make numerous

9    references to Ms. Darcangelo not displaying

10   hypomania or only mild hypomanic symptoms?

11   A      Yes.

12   Q      That would be inconsistent with your

13   opinion, wouldn't it?

14   A      No.

15   Q      Look at his notes for November 5,

16   1997, sir.

17   A      November 5th, is that the cover?

18   Yes.   Okay.

19   Q      "The patient denies any symptoms

20   suggestive of recurrent depression mania or

21   hypomania."

22   A      Where are we looking at?

23              MR. FISCHER:  Do you have an

24        extra copy that I can have to look

25        on?

179

1         Anderson

2              MR. RAPHAELSON:  It's the

3         middle of the page.

4              MR. FISCHER:  Do you mind if I

5         show him the place?

6              MR. RAPHAELSON:  Yes, I do,

7         actually.

8              THE WITNESS:  I see it.

9    Q    On the right.

10   A    I see it.

11   Q    Isn't that inconsistent with your

12   diagnosis?

13   A    It's not inconsistent with my

14   diagnosis.  It is what it is.

15   Q    On February 12, 1998, third line down

16   on the right, "She denied consistent

17   vegetative symptoms of depression or

18   objective symptoms of mania or hypomania."

19        Do you see that?

20   A    I do.

21   Q    "We reviewed her work situation and

22   her discussions with Mr. Markowitz, a labor

23   lawyer."  Do you see that?

24   A    No.  I do yes.

25   Q    It states that, "She believes her

180

1               Anderson

2    supervisors are intent on seeing her leave

3    the job but does not appear to be convinced

4    of any type of conspiracy concerted effort,"

5    et cetera.  Do you see that?

6    A     Yes.

7    Q     Inconsistent with your diagnosis or

8    not, sir?

9    A     Neither consistent nor inconsistent.

10   Q     March 11, 1998.  "The patient

11   displays no evidence of depression mania or

12   hypomania in the office today.  Represents a

13   reasonable explanation of the events

14   occurring in the workplace."

15         Do you see that?

16   A     Yes.

17   Q     Do you know what events he's

18   referring to?

19   A     No.

20   Q     That was the day that Ms. Darcangelo

21   called her supervisor a "sack of shit" and

22   screamed at another supervisor by the name

23   of Moxey.

24               MR. FISCHER:  Object.

25               You can answer.

181

1                    Anderson

2   A      Do you have a question?

3   Q      Isn't it inconsistent that the days

4   she engaged in those behaviors or within

5   days of her engaging in those behaviors Dr.

6   Zimberg sees a patient that displays no

7   evidence of mania or hypomania?

8   A      I disagree if she told him about

9   those episodes as they occurred that that,

10  in fact, would be such evidence.

11  Q      So the mere act is evidence to you?

12  A      In a patient with her condition,

13  absolutely.

14  Q      But he doesn't even agree with your

15  assertion that she had the condition that

16  day, sir.

17  A      I don't care.

18  Q      On April 15, 1998, again, Dr. Zimberg

19  finds no evidence of psychosis, mania or

20  hypomania.

21         Consistent or inconsistent with your

22  diagnosis, sir?

23  A      Neither consistent nor inconsistent.

24  Q      These are visits that have now

25  occurred over a nearly six-month period of

182

1                       Anderson

2    time, and the consistent notation is no

3    evidence of depression, mania or hypomania.

4    That's not inconsistent in your view?

5    A       No.

6    Q       Was she faking normalcy for Dr.

7    Zimberg?

8    A       No.

9    Q       There's a medical term for that,

10   isn't there, faking a psychiatric condition?

11   What is that medical term?

12   A       Well, I think you're talking about

13   malingering, but that means faking an

14   illness, not faking an abnormality.

15   Q       That's right.  May 13, 1998, "She

16   does not appear manic nor hypomanic nor does

17   she appear psychotic."

18   A       Yes.

19   Q       That is the same month that she put

20   that target up.  Would that be inconsistent

21   with your view that she was compelled by the

22   disease that you say she had that Dr.

23   Zimberg doesn't observe to put up the

24   target?

25   A       It's neither consistent or

183

1                    Anderson

2    inconsistent.

3    Q       August 10, 1998, "She does not appear

4    depressed or manic today."  That's now nine

5    months, sir, of consistent observation by

6    Dr. Zimberg.  Is that consistent or

7    inconsistent?

8    A       Neither.

9    Q       On September 9, 1998, "She did not

10   appear manic or hypomanic or depressed today

11   and reported no change in her work

12   situation."  Do you see that?

13   A       I do.

14   Q       Up to ten months, that's the month

15   that she walked out on an internal customer

16   call, sir.  Is that consistent or

17   inconsistent with your diagnosis?

18   A       Consistent.

19   Q       Consistent that she is perfectly

20   normal, according to Dr. Zimberg?

21   A       Sure.

22   Q       December 23, 1998, "Ms. Darcangelo

23   was seen in the office on this date and

24   appeared anxious with some affective

25   liability."  Consistent or inconsistent?

1                    Anderson

2      that it really isn't, in the sense of it

3      isn't really hypomania."  That's his

4      conclusion?

5      A      Yes.

6      Q      Do you agree or disagree?

7      A      I obviously strongly disagree with

8      that.

9      Q      He goes on to say, "Although she has

10     episodes of hypomania, it's not severe

11     enough to change the medication treatment,

12     and it typically appears to be that it's

13     more her personality disorder and her poor

14     judgment that gets her into trouble.  That

15     seems to be more the issue."  That is Dr.

16     Zimberg's testimony.

17     A      Yes.

18     Q      You disagree with all that?

19     A      Absolutely.

20     Q      Dr. Zimberg says under oath, "Well, I

21     don't think Darcangelo's hypomania requires

22     hospitalization, and I don't think it's

23     psychotic."  Do you agree with those two

24     points of view?

25     A      Yes, I do.

1                    Anderson

2    Q       "Social or occupational functioning,

3    hard to say because, you see, her social

4    occupational functioning is so much more

5    affected by her schizoid personality that

6    bipolar is a side show there."

7             Do you agree with that?

8    A       I don't think she has a schizoid

9    personality disorder.

10   Q       He goes on to say, "An occupational

11   functioning, again, the schizoid

12   personality, poor judgment, there's such

13   overwhelming factors it's hard to say what

14   the bipolar effects have."

15            Do you recall reading that?

16   A       Yes.

17   Q       Do you agree with him?

18   A       No.

19                   MR. FISCHER:  Just for the

20                   record, I am objecting to this whole

21                   line of questioning.

22   Q       So if a person has chronic hypomania

23   they cannot prevent themselves from calling

24   other people names; is that your view?

25   A       I'm not saying that anyone that has

197

1                   Anderson

2   one can.  I'm saying in her case that is the

3   case, yes.

4   Q      How about making threats on the

5   telephone?

6   A      It's quite consistent.

7   Q      If using the telephone is part of the

8   job, she can't perform that part of the job,

9   can she?

10  A      Occasional.  Sometimes that would be

11  true.

12  Q      There are times when she cannot

13  perform that job if she is going to curse on

14  the phone?

15  A      I agree.

16  Q      If she is going to use racial

17  invectives on the phone?

18  A      Those would be times when she

19  should --

20              MR. FISCHER:  I'm going to

21          object, because there has been no

22          evidence in this case that she used

23          racial invectives on the phone.

24              MR. RAPHAELSON:  That would

25          also be a non sequitur since the

209

                        Anderson

1

2    condition?

3    A      I don't accept your term, "symbolic

4    violence."  But given what I take you to

5    mean by symbolic violence, the answer is

6    yes.

7    Q      I'll give you an example of symbolic

8    violence is what we've marked as Exhibit

9    2 -- I'm sorry, Exhibit 5.  Is that an act

10   of symbolic violence, sir?

11   A      Well, apparently you think it is.

12   Q      I'm asking you what you think.

13   A      I think it's inappropriate behavior

14   in the workplace.

15   Q      Because it contains a threat of

16   violence?

17   A      I think it could be taken that way,

18   but not necessarily.

19   Q      You did not review the depositions of

20   Miss Darcangelo's supervisors regarding the

21   reasons for the IME referrals, did you?

22   A      No.

23   Q      Do you know who first recommended the

24   examinations?

25   A      No.

1                    Anderson

2    Q       Dr. Anderson, during the

3    fourteen-year period in 1983 when you said

4    she had a chronic hypomania episode which

5    caused her to wear a "Hitler is right"

6    T-shirt until she was sat down in 1987 and

7    told, "You're going to be put on progressive

8    discipline," wasn't she given time off for

9    medical treatment in that period?

10   A       I don't know.

11   Q       Wasn't she given paid time off in

12   that period?

13   A       I don't know.

14   Q       Didn't find out, did you?

15   A       No.

16   Q       So how would you know whether that is

17   an effective accommodation or not, sir?

18   A       I can't answer that.

19   Q       You don't know, do you?

20   A       It doesn't appear that it would have

21   been effective.

22   Q       It didn't appear to be effective

23   because after 1987 she continued with her

24   behaviors, didn't she?

25   A       Yes.

221

1                    Anderson

2      there?

3      A      It's possible that there is no

4      reasonable accommodation.  I don't know

5      that.

6      Q      Now, her job, as it turns out,

7      includes contact with other employees; you

8      understand that, don't you?

9      A      Yes.

10     Q      As you sit there now?

11     A      Well, I already knew that.

12     Q      You knew that we couldn't wave a

13     magic wand and stop her from having

14     hand-offs to other employees, right?

15     A      Some amount of contact had to be

16     necessary.

17     Q      You knew that she had to talk to

18     internal customers on the phone, right?

19     A      No.

20     Q      You know that now, don't you?

21     A      Yes.

22     Q      Is she fit for that job, sir?

23     A      I believe so.

24     Q      How is she fit for that job if she

25     can't control herself?

227

1                    Anderson

2              a group of papers that we'll put a

3              paper clip on, Exhibit 11.

4    Q       When you say you misspoke, you mean

5    you miswrote; is that correct?

6    A       Yes.

7    Q       You also mistestified when you said

8    under oath that you had reviewed her

9    personnel file, correct?

10   A       Yes.

11   Q       Exhibit 11 is what you mistakenly

12   believe to be her personnel file?

13   A       That's what I mistakenly referred to

14   as her personnel file.

15   Q       That is not her personnel file; you

16   would agree with that?

17   A       I would.  That is a medical

18   department file.

19   Q       So you did not review her personnel

20   file to determine the Verizon or formerly

21   Bell Atlantic perspective on the incidents

22   which you conclude were all compelled by her

23   chronic hypomania?

24   A       Correct.

25   Q       Now, sir, you also opined on page 4