UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MARYLAND

| | |
|---|---|
| FRANCES DARCANGELO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. WDQ-02-816 (Civ.) |
| | ) |
| VERIZON MARYLAND, INC., | ) |
| | ) |
| | ) |
| | ) |
| Defendant, | ) |

**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE
TESTIMONY OF DOUGLAS ANDERSON, M.D.**

Plaintiff, through her counsel, Morris E. Fischer, Esq., hereby files this opposition to Defendant's Motion in Limine to exclude the expert testimony of Douglas Anderson and states as follows.

**Dr. Anderson's Report Does Not Rebut Defendant's Medical Expert**

Dr. Anderson testified as follows.

Q. Were you asked to rebut his (Dr. Janofsky's opinion) in any way?
A. No. (See exhibit "A" at 55)

Defense counsel's motion contends that Dr. Anderson ruled out personality disorder strictly to rebut Dr. Janofsky's report. However, Defense counsel in the deposition repeatedly asked Dr. Anderson about his opinion in light of four other doctors, Dr. Zimberg, Dr. Russo, Dr. Siebert, and Dr. Beshai, two who diagnosed her with personality disorder and two who diagnosed her with personality traits  (Id. at 150:5-

1

152:24).    One of the underlying issues in this case is whether the plaintiff has a personality disorder and it's level of severity.  To prohibit Dr. Anderson to opine on that issue, simply because Dr. Janofsky rendered an opinion on it, is totally different than prohibiting Dr. Anderson from rebutting Dr. Janofsky's opinion.  The Court order as reflected in its scheduling did not permit a rebuttal report from Dr. Anderson regarding Dr. Janofsky's report and none was issued.  A rebuttal of Dr. Janofsky's report would have attacked specifically the credibility of his diagnosis, the methodology employed and listed several medical texts rebutting him.  Dr. Anderson's report didn't contain this because as he testified, he was told by counsel not to perform that function.

Defense Counsel also misstates Dr. Anderson's testimony when he states that "Dr. Anderson went out of his way in his report to assert that Plaintiff's inappropriate behaviors are not "an aspect of or consistent with a personality disorder." (Defense motion at Page 3).  As Dr. Anderson indicated in his deposition, this opinion was in direct response to Dr. Janofsky's diagnosis that Plaintiff has a personality disorder. (Id.)"

A review of the exchange between Defense counsel and Dr. Anderson reveals that it was Defense Counsel who initiated the discussion regarding Dr. Janofsky.

> Q. What views do you have with regards to Mr. Janofsky's report?
> A. My view is that the diagnosis of personality disorder NOS is not supported not justified and confuses the issue (Ex. "A" at 56).

Also defense counsel failed to ask to what extent Dr. Anderson addressed the opinion of Dr. Zimberg, Dr. Russo and Dr. Seibert and Dr. Beshai (See exhibit "B", reports attached).  Common sense dictates that opining on a personality disorder is unavoidable for Dr. Anderson's testimony.  Dr. Janofsky's report was reviewed because it was a doctor that had evaluated the Plaintiff and was part of a comprehensive review of

2

the relevant clinical information regarding Ms. Darcangelo. However, it was not rebutted.

Defense Counsel himself berated Dr. Anderson for not reviewing even more materials that Dr. Zimberg never reviewed. For example, there was a seven hour video of Defendant's previous expert, Stuart Kleinman, M.D., that Dr. Anderson didn't watch. Defense counsel asked Dr. Anderson on three separate occasions during his depositions for his reasons for not watching the video tape of Dr. Kleinman. (Ex. "A" at pages 39:7-14, 48: 16-49:8, 65: 15-20). Prior to asking these questions, Defense counsel also asked for the expert's opinion as to whether he agreed that a forensic evaluation must be a comprehensive review of relevant clinical and legal information regarding the evaluee and the legal issue in question (Id. at 40: 6-10).

Rest assured, had Dr. Anderson not reviewed Dr. Janofsky's report his opinion, he would have been assailed on that basis. Thus, on one hand, defense counsel attacked Dr. Anderson *for not* reviewing a video tape of a medical examination Dr. Zimberg never saw and assailed Dr. Anderson *for* reviewing another medical examination report that Dr. Zimberg never saw. Consequently, given Defendant's expectation that Dr. Anderson review all medical evaluations prior to opining on her condition, its very logical that Dr. Janofsky's report was one that should have been reviewed.

Defense counsel also failed to ask Dr. Anderson whether he was told to address Dr. Russo's report or Dr. Gottlieb's report. He also didn't inquire as to the degree of reliance on Dr. Janofsky's report as compared to the degree of reliance on any other medical report. He further suggests that a cursory comparison between Dr. Zimberg's one page report and Dr. Anderson's highlights the prejudice. However, a more even

3

comparison would be to consider Dr. Janofsky's forty three page report. Undoubtedly, in light of that comparison, the report is some 90% more like Dr. Zimberg's than Dr. Janofsky's.

Finally, that Dr. Anderson renders a different opinion that Dr. Janofsky's should not be considered at all. It is a misreading of the order and an incredible expectation for Plaintiff's counsel to find a psychiatrist within 15 days who will review a plethora of materials, conduct an examination of Plaintiff and render the exact opinion of Dr. Zimberg. The Court never intended that result. Especially in this case in which a number of doctors have evaluated the Plaintiff and a number of opinions have been rendered regarding her diagnoses on the Axis I and Axis II scales (see exhibit "B").

As such, defendant's reliance on *Congressional Air v. Beech Aircraft Corp.* 176 F.R.D. 513 (D. Md. 1997) is misplaced. In that products liability case, the court reasoned that Defendant expert's adjusted his original report after reviewing Plaintiff's expert report by re-examining the effective nose gear end rod and then for the first time addressed the issue of negligent manufacturing, something which was originally raised by the Plaintiff's expert.

In this case, whether Plaintiff suffered from a personality disorder was not first raised by Defendant's Doctor. It was raised by numerous doctors, including Dr. Zimberg, Plaintif's own treating physician and has and continues to be a central issue. As such, the report does not serve to rebut Dr. Janofsky, but to address the personality issue in which even Dr. Zimberg gave an opinion.

There are further distinctions in the case. *Congressional Air* dealt with a situation in which one of the parties, Beech, contended that had it received the rebuttal report at an

earlier date, it would have secured an additional expert. In this case, there was no contention that the Defendant required another expert in light of Dr. Anderson. Defendant already possesses an impressive expert, Jeffrey Janofsky, M.D., who is quite capable of offering a rebuttal to Dr. Anderson's testimony. There is no need for Defendant to acquire a second expert. Defendant argues that "chronic hypomania" is a new theory to the case. However, as will be shown, both Dr. Zimberg and Julie Swope discussed it in their depositions.

With regard to the accommodations aspect of the report, there are several factors to consider. Primarily, while no formal opinion by him was given, Dr. Zimberg was asked at his deposition as to accommodations he would have recommended (Exhibit "C" at 97-98). It is entirely possible that his recommendations could have been introduced at trial. This is further confirmed in Plaintiff's original Summary Judgment Opposition at pages 33-34 in which it is stated: "Plaintiff's co-worker (Maria Bury), treating physician (Dr. Gary Zimberg Dep. At 97-98) and Vocational Expert (Martin Kranitz Dep. 32-33) have all noted that Ms. Darcangelo's best prospects for succeeding at her job are with limited social contacts. (see excerpts from Plaintiff's original Summary Judgment Opposition, exhibit "D" 33-34). The original decision denied Summary Judgment regarding reasonable accommodation, with little detail (Exhibit "D2", File #48). As such, Plaintiff's counsel had reason to rely on Dr. Zimberg's testimony as a basis for Dr. Anderson to comment on that issue.

Moreover, Plaintiff's counsel served a timely report. Defense counsel could have raised this concern, even sought judicial intervention, of the report's accommodations' aspect with Plaintiff's counsel prior to the deposition. Instead, it willingly deposed Dr.

5

Anderson, accepted his opinions on accommodation, then used them in a Summary Judgment Motion.  Accordingly, it effectively waived any argument that said portion of the opinion was improper.  Defense counsel at deposition demonstrates the very distinction between *Congressional Air* and the case at bar.  The former involved complex matters regarding manufacturing defects in a products liability case.  That involves a good deal of scientific and engineering review by an expert to rebut the new found information.  However, in the case at bar, defense counsel's deposition reveals that he had a fair opportunity to undermine Dr. Anderson's theory of accommodations enough to move for Summary Judgment immediately following the deposition.

### Dr. Anderson's Opinion

Dr. Anderson's diagnosis of plaintiff was Bipolar I Disorder, DSM IV 296.40.  Defense counsel mischaracterized that diagnosis to be chronic hypomania.  However, Dr. Anderson states unequivocally at his deposition that chronic hypomania is not a diagnosis, but rather a descriptive state that a person may or may not be in. (Exhibit "A" at 34).  As such, it will not be found in the DSV IV manual.

### Reliance on DSM IV

The DSM IV manual itself states:

> "DSMIV is a classification of mental disorders that was developed for use in clinical, educational and research settings.  The diagnostic categories, criteria and textual descriptions are meant to be employed by the individuals with appropriate clinical training and experience in diagnosis.  It is important that DSMN-IV not be applied mechanically by untrained individuals.  The specific diagnostic criteria included in DSM IV are meant to serve

6

>   as guidelines to be informed by clinical judgment and are
>   not meant to be used in a cookbook fashion."
>   (Exhibit "E", DSM IV at page XXXII ).

Dr. Anderson's testimony regarding the limitations of the use of the DSM IV as the final word on diagnostic criteria or a cookbook (Ex. "A" at 129) is supported on page XXXVII of DSM IV (see exhibit "E"). The DSM IV states under the heading "Cautionary Statement."

>   "The specified diagnostic criteria for each mental disorder are offered as guidelines for making diagnoses because it has been demonstrated that the use of such criteria enhances agreement among clinicians and investigators. The proper use of these criteria requires specialized clinical training that provides both a body of knowledge and clinical skills.
>
>   These diagnostic criteria and the DSV-IV Classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our filed. They do not encompass, however, all the conditions for which people may be treated or that may be appropriate topics for research efforts." (Exhibit "E" at XXXVII).

Dr. Anderson explained this at deposition.

>   Q   Where is chronic hypomania in the
>   DSM-IV, sir?
>
>   A   It's bipolar affective disorder.
>
>   Q   That wasn't my question, sir.
>
>   A   That was my answer.
>
>   Q   I heard your answer, but in this
>
>   forum, like in court, you need to answer the
>
>   question that is put to you.

7

> A   Well, as I mentioned, this is a book for doctors, not for lawyers. One uses the book as a helpful guideline in making the diagnosis.
>
> In order to understand what bipolar affective disorder is, a psychiatrist needs to know quite a bit more than is contained in this section in this book. One needs to know what the clinical ramifications and variations are, and the condition of chronic hypomania is not at all an unrare clinical situation that many people who suffer from this illness find themselves in.
>
> Q   Are you done with your description?
>
> A   Yes. (Exhibit "A" at 140-141).

Dr. Anderson attests in his affidavit (Ex. "F1") and presents to the court several sources that support his opinion. According to Comprehensive Textbook of Psychiatry, Vol. I. 6th Edition, by Kaplan & Sadock, editors P. 1142,

> "Chronic Mania, DSM-IV does not specifically address the diagnostic questions posed by the 5 percent to bipolar I patients characterized by a chronic manic course. That course most commonly represents deterioration of course dominated by recurrent manic episodes" (See exhibit "F").

8

Even the DSM IV alludes to mania being chronic.

> "although the majority of individuals with bipolar I disorder experience significant symptom reduction between episodes, some 20-30% continue to display mood lability and other residual mood symptoms. As many as 60% experience chronic interpersonal or occupational difficulties between acute episodes (Ex. "E" at 386).

According to Dr. Anderson, Plaintiff would suffer from chronic mania, but for the effects of her medication, which can only control the effects of the illness partially, the mania portion. However, because the medication cannot control her illness completely, she is left in a chronically hypomanic state. At his deposition, Dr. Anderson testified.

```
      Q    Is chronic hypomania related to her
           medication?
10    A    Yes.
11    Q    In what way?
12    A    In my view if she were not on
13         medication, she would very probably have
14         full-blown manic psychotic episodes.
15    Q    Can appropriate medication relieve
16         chronic hypomania?
17    A    In some cases.
18    Q    In her case?
19    A    No.
```

(Exhibit "A" at 154)

9

**The Marked Impairment Issue**

Defendant argues that Dr. Anderson's opinion that hypomania causes impairment is at odds with the DSM IV, since that book states under "Hypomanic Epiosde" (Ex. "E" at 365) "that in contrast to a Manic Episode, a Hypomanic Episode is not severe enough to cause marked impairment in social or occupational functioning. Defense counsel fails to point out that the final sentence of that paragraph on page 365 reads: "However, for others, hyopomania can cause some social or occupational impairment." (Id. at 365).

What defense counsel seeks to do is argue that the DSM IV's use of the word "marked" is equivalent to the Fourth Circuit Court of Appeals definition of "substantial limitation" regarding a major life activity. This is precisely that which the DSM IV warns against.

According to the DSM-IV,

**Use of DSM-IV in Forensic Settings**

> When the DSM-IV catergories, criteria, and textual descritpitions are employed for forensic purposes, there're are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-0IV mentaol idosrder is not sufficient to establish the existence for legal purposes of a mental disorder," "mental disability," "mental disease" or "mental defect." (Ex. "E" at XXXII and XXXIII).

In other words, the DSM IV instructs us that a term used in it does not necessarily equal its legal definition. Consequently, the term "marked" has no legal definition inherent in it and someone suffering from hypomania could very well fit into the Fourth Circuit's definition of substantially limited in a major life activity.

The textbook, Noys' Modern Clinical Psychiatry, 7th Edition, provides further support for Dr. Anderson's diagnosis.

> "In the MANIC PHASE. In his personality makeup the patient whose episodes are of a manic type has usually been a self- satisfied, confident, aggressive, effervescing extrovert, at ease with other people. He has been inclined to scatter his energy over a wide field of interests. His affective attitude has been one of emotional expression and responsiveness. The manic phase or reaction is usually preceded by a simple depression. This depression is of brief duration and mild in degree, often lasting for only a few days and either not noted by the patient's family or not considered significant. This brief period is followed by exhilaration or mild excitement.
>
> *Sometimes the attack remains in this attenuated form known as hypomania. In this hypomanic state there are increased assertiveness, an air of self-assurance, careless gaiety, breezy affability, self-satisfaction, buoyant self-confidence, and boundless energy. No matter how inhibited the patient may normally have been, he is now irrepressible, demanding, uninhibited, effusive, and often astonishingly unconventional in speech and manner, He is narcissistic, childishly proud, and quite intolerant of criticism. Glib of tongue and genial of hand, the patient is socially aggressive, witty, boastful, flippant, argumentative, spends his money extravagantly, pawns his belongings, is full of ambitious schemes, and starts enterprises that soon fail or that he soon abandons.*
>
> Often striking is the frequency of use of direct and indirect quotations, particularized references, and adverbs of degree ( "absolutely," "much," "never"). His conversation is directed principally to a recital of events, circumstances, and meetings with others, but it seldom contains statements as to their inner affective meaning to him or as to his personal evaluation of the interactions between himself and others. *Thus there is little evidence of introspection but more that of comparing, weighing, and evaluating the performances of others and himself. From this trend, coupled with the many indications of denial and overcompensatory self-references, there emerges a self-image toward which the patient appears to be striving.*
>
> His excuses and arguments contain a superficial but specious plausibility. His disregard for the truth may carry great conviction to those not previously acquainted with him. The patient is bored with routine, lacks a sustained

> interest in any activity, and is too busy to submit his impressions to critical examination. Attention is often easily distracted, thought processes are accelerated, and the stream of thought is prone to wander. His manner of speaking has an undertone of emphasis and exaggeration.
>
> *Many hypomanic patients are mischievous, boisterous, and full of pranks, indulge in risque remarks and coarse and unseemly jokes, and make facetious comments about some object, or especially some person, in the environment. They are superficial in their relationships with other persons and insensitive to the latters' needs and feelings. Some hypomanic individuals delight in joking efforts to tease the physician. Unbridled criticism and bluntness of speech, even to the point of impudence, are common. Without constraint, the manic patient blurts out what he has doubtless long wished to say but has previously been afraid to express. The usual good humor, which is often infectious in nature, frequently continues as long as every whim of the patient is gratified, but it tends to be replaced with anger, caustic speech, and verbal abuse if anyone questions his opinion or thwarts his wishes. In place of this good humor, one occasionally meets with a sustained anger, argumentativeness, irritability, haughtiness, arrogance, sarcasm, and querulousness.* Open hostility to members of the family is common. After her recovery, one woman whose hypomanic attacks were characterized by a great outburst of hostility described her psychotic episodes as seeming "like a prolonged spell of anger." In her normal periods, she was a friendly person, anxious to help others, and took great pride in her love for them. (One suspects that this desirable personality characteristic was a reaction formation that served as a defense against a deep-seated hostility.)" (Ex. "F2" at 337-339).

A jury could find that a number of the episodes by Ms. Darcangelo such as posting a supervisor's picture in a target; wearing a "Hitler was Right" T-Shirt to protest a memo; and the name calling are products of this illness.

It is also contended that Dr. Anderson didn't review enough materials to formulate his opinions. He reviewed the vast majority of the medical records in this case and the depositions of Dr. Zimberg and Plaintiff's psychologist Julie Swope. There were

12

certainly more than a "handful" of materials provided to him. The depositions of the two medical providers alone were approximately 380 pages. The CORE medical records, were several hundred pages. He also reviewed Dr. Zimberg's notes which were about 130 pages of materials. Consequently, there were ample materials to support Dr. Anderson's ability to testify with respect to the plaintiff's medical condition.

With regard to reasonable accommodations, it is conceded that Dr. Zimberg didn't review all of the defense witnesses depositions. However, there is no indication that Dr. Zimberg did either. Yet, it would appear from the first Summary Judgment motion that this was not a factor in the Court's consideration of Dr. Zimberg's opinion. At most, Dr. Anderson should be excluded only with regard to his testimony on reasonable accommodation issues.

### Dr. Anderson and Dr. Zimberg

Defendant's motion mischaracterizes Dr. Anderson's opinion in two major fashions: (1) that it is completely contradictory to Dr. Zimberg's opinion and therefore suspicious; and (2) that the mere inappropriate act was the only evidence Dr. Anderson utilized to conclude that they were the result of hypomania. Neither of these assertions are true.

Dr. Zimberg explained at deposition that "some people are main hypomanic all the time, you can't really control them adequately. They're always a little bit on the manic side." (Ex. "C" at 57) Zimberg's deposition. He further testified that Darcangelo was just mildly hypomanic the entire time he's seen her. "It's hard with her because she has more than one diagnosis, but she is hypomanic a lot of the time." (Id. at 58). Dr.

13

Zimberg was asked by defense counsel as to the reasons his notes didn't suggest that Plaintiff's hypomania was reflected on his notes, to which he responded:

> "With her it's always is there something to treat, something to do different. In my office what I try to figure out is this really hypomania or just her schizoid personality or poor judgment which has nothing to do with psychiatry.
>
> What I typically conclude with Frances is that it really isn't. Although she has episodes of hypomania, it's not severe enough to change the medication treatment and it typically appears to be that it's more her personality disorder and her poor judgment that get her into trouble. That seems to be more the issue.
>
> What I look at as the treating physician, is there something I would do different here, is there something mediation-wise that I would do, but after talking to her I don't come tot hat conclusion." (Id. at 58)

Meaning that Dr. Zimberg, although acknowledging symptoms of hypomania, was looking at Plaintiff's treatment from an angle as to whether the hypomania was severe enough to change her medication. He also explained that for example on October 15, 1997, even though his notes didn't say anything about hypomania, "she was probably mildly hypomanic even then (Id. at 58-59)."

Dr. Zimberg's deposition was a material reviewed by Dr. Anderson. Consequently, when asked as to whether Dr. Zimberg's notes were consistent or inconsistent with his opinion, the response of "neither" was appropriate response given by Dr. Anderson.

It should be further noted that Dr. Anderson's opinion was supported by Julie Swope, Plaintiff's psychologist, who testified at deposition that she diagnosed Ms. Darcangelo with bipolar I and that "I think she's pretty much hypomanic all the time…

14

just recognizing some of those manicy symptoms. (Exhibit "G" Swope deposition at 58-60)."

Unlike Defense counsel's contention that Dr. Anderson concluded that the mere inappropriate actions were the only evidence of the hypomania, Dr. Anderson correctly identified the DSM-IV criteria sustained in Ms. Darcangelo including pressured speech, elevated mood, jovial affect, flight of ideas, tangential thought process and poor judgment. (Ex. "A"157-158).

Dr. Anderson opinion of this entire case is crystallized on page 149 of his deposition.

> Q    In what ways were Ms. Darcangelo's inappropriate behaviors inconsistent with having a personality disorder?
>
> A    When a person has a major mental disorder as a primary diagnosis and they engage in questionable or aberrant or inappropriate behavior that is consistent with that mental disorder, then it is appropriate to attribute the behavior to that mental disorder.

Meaning, if there exists a medical diagnosis which accounts for this behavior already, then there is no reason to provide an alternative explanation, such as a personality disorder. In fact, this is supported by the DSM-IV, (Ex. "E" at 27). "When an

15

individual has both an Axis I and an Axis II disorder, the principal diagnosis or the reason for the visit will be assumed to be on Axis I, unless the Axis II diagnosis is followed by the qualifying phrase "principal diagnosis" or reason for visit.

Furthermore, it is mistaken to characterize Dr. Anderson's testimony as attesting that each and every behavior she engages in is beyond her control, due to the illness. Dr. Anderson stated that Plaintiff's hypomania waxes and wanes and "sometimes she is in greater control than others (Ex. "A" at 112)." This falls in line with Dr. Zimberg's testimony that some of her behavior is a result of poor judgment. (Ex. "C" at 58).

### United States v. Mazeo, No. 99-1223, 2000 U.S. App. LEXIS 818 (2d Cir. January 21, 2000)

The Court should put no weight on the one case out of hundreds that Dr. Anderson was excluded. That pertained to a criminal matter dealing with false confessions, not the topic here. The court made no mention as to the amount of time Dr. Anderson spent reviewing that individual's file. However in this case, Dr. Anderson testified that he spent 15 hours reviewing Plaintiff's materials (Ex "A". at 45-46). Moreover, in *Mazeo,* Dr. Anderson had a hearing and the Second Circuit stated that it didn't find the district court's exclusion a manifest error. Id. at 6.

### Conclusion

Dr. Anderson's opinions are sound and supported. At the very least, he's supported by Plaintiff's treating Psychiatrist and Psychologist. The DSM-IV does not contradict him and is authoritative to a point. The DSM-IV itself lists its limitations and

cannot replace 35 years of clinical experience (see Dr. Anderson's C.V., Ex. "H").  His C.V. speaks for itself and there's no point in counsel highlighting it.

His examination, review of materials, deposition and short affidavit all confirm that: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Consequently, in accordance with Federal Rule of Evidence 702, he should be admitted.

His medical report does not rebut Dr. Janofsky.  It's clear from the deposition record that had he not read it, his opinion would have been assailed on that basis.  With respect to the accommodation portion of his opinion, defense counsel argues inconsistent positions.  In this motion, it is argued that he didn't review enough materials to qualify him as an expert on that particular issue.  However in the second Summary Judgment motion, defense counsel argues apparently that Dr. Anderson was qualified to give those opinions, so much so that the court should rely on them and grant Summary Judgment to the Defendant.  For those reasons, this motion should be denied in its entirety.

                          Respectfully Submitted,

                          /s/
                        _____
                        Morris E. Fischer, Esq.
                        MD: Bar No. 26286
                        Snider & Fischer, LLC
                        104 Church Lane
                        Baltimore, Maryland 21208
                        410-653-9060 phone
                        410-653-9061 fax
                        Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MARYLAND

| | |
|---|---|
| FRANCES DARCANGELO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. WDQ-02-816 (Civ.) |
| ) | |
| VERIZON MARYLAND, INC., ) | |
| ) | |
| ) | |
| ) | |
| Defendant, ) | |

**<u>ORDER</u>**

Upon consideration of Defendant's Motion and Plaintiff's Opposition to Defendant's Motion for to exclude expert, on this _____ day of _____ 2005, that said motion is hereby DENIED.

_____
United States District Judge