1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MARYLAND

3    --------------------------------------------- x

4    FRANCES DARCANGELO,

5                          Plaintiff,

                                      Case No.

6        -against-                    502816

7    VERIZON MARYLAND, INC.,

8                          Defendant.

9    --------------------------------------------- x

10

11

12        DEPOSITION of DOUGLAS ANDERSON, taken

13    pursuant to Subpoena, held at the offices of

14    O'Melveny & Myers, LLP, 7 Times Square, New York,

15    New York, on April 18, 2005, at 10:13 a.m.,

16    before a Notary Public of the State of New York.

17

18

19

20

21    *************************************************

         BARRISTER REPORTING SERVICE, INC.

22              120 Broadway

            New York, N.Y. 10271

23              212-732-8066

24

25

2

```
 1
 2   A P P E A R A N C E S:
 3
 4        SNIDER & FISCHER, LLC
                  Attorneys for Plaintiffs
 5                104 Church Lane
                  Baltimore, Maryland  21208
 6
          BY:   MORRIS E. FISCHER, ESQ.
 7
 8
 9
10
11        O'MELVENY & MYERS, LLP
                  Attorneys for Defendant
12                1625 Eye Street, N.W.
                  Washington, D.C.  20006
13
          BY:   IRA H. RAPHAELSON, ESQ.
14                     -and-
                  SHANNON M. BARRETT, ESQ.
15
16
17
          VERIZON
18                185 Franklin Street
                  Boston, Massachusetts  02110
19
          BY:   LISA BIRKDALE, ESQ.
20
21
                     xxxxx
22
23
24
25
```

1                    Anderson

2    not abusive?

3    A        As a psychiatrist, when I'm dealing

4    with mentally ill people, I'm called names.

5    I don't take it personally, no.  If someone

6    has an understanding of it and is led to

7    expect it, it can be quite -- it can be not

8    problematic.

9    Q        Ms. Darcangelo applied for a job at

10   Crescent Industries.  Did you know that?

11   A        No.

12   Q        Do you know what job she applied for?

13   A        No.

14   Q        Doesn't the fact that she applied for

15   a job at Crescent Industries after her

16   termination, isn't that fact inconsistent

17   with your suggestion that she is so

18   disillusioned about ever being able to

19   maintain steady employment again?

20   A        I never heard of Crescent Industries.

21   Q        You've said that already, sir.  My

22   question to you, isn't the fact that of her

23   application for a job inconsistent with your

24   view that she is so disillusioned that she

25   doesn't think she can get one?

240

1                   Anderson

2    A       No.

3    Q       Do you know whether she got that job?

4    A       No.

5    Q       Do you know whether she was qualified

6    for that job?

7    A       No.

8    Q       Do you know whether she could have

9    done that job if she had gotten it?

10   A       No.

11   Q       Are you aware that Ms. Darcangelo

12   thought that she would have been successful

13   at that job?

14   A       No.

15   Q       I thought you said you read her

16   deposition, sir.

17   A       I did.

18   Q       In her deposition, page 445, she

19   says:

20           Question:  "How would you have done

21   on a job if you had gotten that job?"

22           Answer:  "I form the opinion that I

23   would have been successful on that job."

24           Do you remember that in her

25   deposition, sir?

241

1                    Anderson

2    A      Yes.

3    Q      Is that consistent or inconsistent

4    with your view that she is so disillusioned

5    about ever being able to maintain steady

6    employment?

7    A      Neither.

8    Q      Neither consistent nor inconsistent?

9    A      Well, that's right.

10   Q      Isn't it inconsistent, sir?

11   A      My statement was not based on that.

12   It was based on our conversation on

13   April 4th -- excuse me -- on March 31st.

14   Q      So on March 31st she told you she's

15   disillusioned and you believed her, right?

16   A      Yes.

17   Q      When she gave her deposition and said

18   she thought she could be successful, you

19   chose not to believe that?

20   A      I think she has compromised judgment.

21   She is not in a position to accurately

22   evaluate what she might be successful at or

23   not, so I wasn't in a position to evaluate

24   that, knowing what that job is.

25   Q      At the time of her deposition she was

242

1                        Anderson

2    under oath.  At the time of your interview I

3    assume she wasn't?

4    A       I don't make that distinction.   I'm a

5    psychiatrist.

6    Q       She wasn't under oath when she spoke

7    to you, correct?

8    A       That's correct.

9    Q       She was under oath when I read to you

10   the testimony she gave; you agree with that?

11   A       Yes.

12   Q       Do you think she was lying under

13   oath?

14   A       No, I think she was not a very good

15   judge of what is appropriate and not

16   appropriate for her.

17   Q       You don't know when she took the oath

18   to give her deposition that she would have

19   the ability to know whether she was telling

20   the truth or not?

21   A       She would know she was telling the

22   truth.  I believe she thought she was

23   telling the truth, but the truth -- that

24   doesn't mean that what she says is accurate

25   or predictable of reality.

243

1              Anderson

2    Q      So her truth is internal; it may not

3    be accurate?

4    A      Her belief that she may have been

5    successful in that job does not mean that

6    she would have been.

7    Q      But it does mean she believed it,

8    doesn't it?

9    A      Yes.

10   Q      So how is that consistent with her

11   assertion to you that she's disillusioned

12   about ever being able to maintain steady

13   employment?

14   A      She doesn't currently work for

15   Crescent Industries.

16   Q      It wasn't the question, was it, sir?

17   A      I guess in that sense it's

18   consistent.  If she applies for a job that

19   she thinks is good for her and she doesn't

20   sustain it, then that's disillusioning.

21   Q      On day one under oath she said, "I

22   would be successful on that job."

23          Can you infer disillusionment from

24   that statement, sir?

25   A      I cannot.  She was not deposed on the

244

1                     Anderson

2    date that I examined her.

3    Q       That is correct.  She wasn't.  That

4    statement is inconsistent with the statement

5    or statements that she made to you that led

6    you to conclude that termination caused her

7    to be so disillusioned about ever again

8    being able to maintain steady employment,

9    correct?

10   A       I see what you're driving at.  It's a

11   progression.

12   Q       Is the statement under oath

13   inconsistent with your conclusion or not,

14   sir?

15   A       Essentially.

16   Q       That's a yes?

17   A       Yes.

18   Q       Is it your belief that it's

19   inconsistent because she didn't appreciate

20   her condition at the time of her deposition

21   or because you didn't sufficiently give

22   deference to her statement at the

23   deposition?

24   A       I can't answer that.  I don't know.

25   Q       Even though her deposition was under

245

1                    Anderson

2    oath?

3    A      Yes.  I put great weight on my own

4    clinical examination of the examinee.

5    Q      You concluded that her testimony

6    under oath was less reliable than her

7    statements to you?

8    A      Yes.

9            MR. RAPHAELSON:  Let's take a

10           two-minute break.  We may be done.

11           (Brief recess was taken.)

12           MR. RAPHAELSON:  Back on the

13           record at 4:15.

14   Q      Dr. Anderson, does it take a forensic

15   psychiatrist to tell whether Ms. Darcangelo

16   can be relied upon to provide accurate

17   information under oath on a particular day?

18   A      No.

19   Q      What goes into that decision?

20   A      I'm not sure I follow you.

21   Q      To discount or not discount your

22   testimony under oath?

23   A      I don't agree that I discounted her

24   testimony under oath.

25   Q      You didn't discredit it as much as

246

1          Anderson

2     you credited what she told you face to face?

3     A       That's true.

4     Q       You gave it less weight?

5     A       Yes.

6     Q       Does it take a forensic psychiatrist

7     to determine whether to give more or less

8     weight to Ms. Darcangelo's testimony under

9     oath?

10    A       No.

11    Q       How does one do it, then?

12    A       One filters it through one's judgment

13    and experience with many patients over many

14    years and makes the best overall assessment

15    that one can.

16    Q       But if I have a jury or a judge

17    without the benefit of years of experience

18    with patients, how do I do it?

19    A       Well, I guess in that sense you do

20    IME expert.  But the expert doesn't have to

21    be a forensic psychiatrist; it can just be a

22    psychiatrist.

23    Q       Any kind of psychiatrist?

24    A       Well, I don't appreciate "any kind

25    of."  One doesn't have to identify oneself

247

1                    Anderson

2    as a forensic psychiatrist in order to do

3    this kind of thing.

4    Q      I'm not trying to quibble with you,

5    Dr. Anderson.  I want to understand this

6    point.

7           Are you saying that it requires a

8    psychiatrist with some specialized forensic

9    knowledge or training and experience in a

10   clinical practice to decide whether to

11   credit someone with Ms. Darcangelo's

12   condition under oath versus not under oath?

13   A      I think not.

14   Q      How would a lay person go about

15   deciding what to credit under oath and not

16   under oath?

17   A      I'm not suggesting a lay person do

18   that.  I'm suggesting it doesn't have to be

19   a forensic psychiatrist.

20   Q      Lay people are going to do that at

21   trial.  What I'm trying to find out is do

22   you recognize them as having the capacity to

23   do that, twelve people drawn at random from

24   the population, or does it require some

25   specialized training?

248

1                    Anderson

2    A       I have every confidence in the jury's

3    ability to do their job.

4    Q       Their job includes determining

5    whether to give more weight to her testimony

6    under oath or her statements to you?

7    A       Yes.

8    Q       And you believe they can do that

9    without specialized training?

10   A       Yes.

11   Q       So how is it your specialized

12   training assisted you in determining she was

13   telling you the truth when she was

14   interviewed by you but not telling the truth

15   when she was interviewed by my associate

16   under oath?

17   A       I did not suggest that she was not

18   telling the truth when she was interviewed

19   by your associate under oath.

20   Q       Accurate versus inaccurate.

21   Substitute the word.

22   A       I would say useful -- more useful

23   versus less useful in terms of an overall

24   understanding of her current clinical

25   status.

249

1                    Anderson

2    Q      Is useful versus less useful

3    something that a lay person can do just as

4    well as an expert in the circumstance that I

5    just described?

6    A       No.  Let me put it this way:  I think

7    that the ability to understand, appreciate

8    and then convey to others, including a jury,

9    what is really going on in terms of the

10   psychological makeup, psychiatric status,

11   and explaining the behavior and mental

12   functioning of a person is something that a

13   psychiatrist is particularly trained to do;

14   and that the psychiatrist's opinion because

15   of that training and experience is more

16   important than whether or not a piece of

17   information was obtained under oath or in a

18   clinical interview and, in fact, I would

19   give more weight to the clinical interview

20   because of the psychiatrist's special

21   ability to appreciate the importance of

22   different pieces of information in a case

23   like this where there's a small mountain of

24   information.

25   Q      On a case like this where you only