1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF MARYLAND
3  ------------------------------------------------ x
4  FRANCES DARCANGELO,
5                    Plaintiff,
                                        Case No.
6        -against-                      502816
7  VERIZON MARYLAND, INC.,
8                    Defendant.
9  ------------------------------------------------ x
10
11
12      DEPOSITION of DOUGLAS ANDERSON, taken
13  pursuant to Subpoena, held at the offices of
14  O'Melveny & Myers, LLP, 7 Times Square, New York,
15  New York, on April 18, 2005, at 10:13 a.m.,
16  before a Notary Public of the State of New York.
17
18
19
20
21  **************************************************
          BARRISTER REPORTING SERVICE, INC.
22                 120 Broadway
              New York, N.Y. 10271
23              212-732-8066
24
25

```
 1
 2     A P P E A R A N C E S:
 3
 4           SNIDER & FISCHER, LLC
                   Attorneys for Plaintiffs
 5                 104 Church Lane
                   Baltimore, Maryland  21208
 6
             BY:   MORRIS E. FISCHER, ESQ.
 7
 8
 9
10
11           O'MELVENY & MYERS, LLP
                   Attorneys for Defendant
12                 1625 Eye Street, N.W.
                   Washington, D.C.  20006
13
             BY:   IRA H. RAPHAELSON, ESQ.
14                      -and-
                   SHANNON M. BARRETT, ESQ.
15
16
17
             VERIZON
18                 185 Franklin Street
                   Boston, Massachusetts  02110
19
             BY:   LISA BIRKDALE, ESQ.
20
21                          xxxxx
22
23
24
25
```

1           Anderson
2   A    No.
3   Q    Schizoid personality?
4   A    That's a personality type.
5   Q    What is the basis for your conclusion
6   that her actions were the direct result of
7   her condition?
8   A    That they are entirely consistent
9   with a person with bipolar affective
10  disorder in partial remission and that they
11  are -- and that that is a sufficient and
12  adequate and likely explanation for the
13  behavior; that the behaviors in and of
14  themselves are so inappropriate that they
15  would not be consistent with a personality
16  disorder or any other rational explanation
17  being behaviors that in the absence of
18  mitigating -- of major mitigating medical
19  circumstances would lead to loss of one's
20  job which any rational person would not want
21  to do.
22  Q    Is that scaring's one's co-workers
23  and supervisors and to letting one do
24  whatever or as little as one wants a
25  rational justification for those same

|   |   |   |
|---|---|---|
| 1 |   | Anderson |
| 2 | Q | "Social or occupational functioning, hard to say because, you see, her social occupational functioning is so much more affected by her schizoid personality that bipolar is a side show there." |
| 7 |   | Do you agree with that? |
| 8 | A | I don't think she has a schizoid personality disorder. |
| 10 | Q | He goes on to say, "An occupational functioning, again, the schizoid personality, poor judgment, there's such overwhelming factors it's hard to say what the bipolar effects have." |
| 15 |   | Do you recall reading that? |
| 16 | A | Yes. |
| 17 | Q | Do you agree with him? |
| 18 | A | No. |
| 19 |   | MR. FISCHER: Just for the record, I am objecting to this whole line of questioning. |
| 22 | Q | So if a person has chronic hypomania they cannot prevent themselves from calling other people names; is that your view? |
| 25 | A | I'm not saying that anyone that has |

197

1           Anderson
2  one can. I'm saying in her case that is the
3  case, yes.
4  Q      How about making threats on the
5  telephone?
6  A      It's quite consistent.
7  Q      If using the telephone is part of the
8  job, she can't perform that part of the job,
9  can she?
10 A      Occasional. Sometimes that would be
11 true.
12 Q      There are times when she cannot
13 perform that job if she is going to curse on
14 the phone?
15 A      I agree.
16 Q      If she is going to use racial
17 invectives on the phone?
18 A      Those would be times when she
19 should --
20          MR. FISCHER: I'm going to
21      object, because there has been no
22      evidence in this case that she used
23      racial invectives on the phone.
24          MR. RAPHAELSON: That would
25      also be a non sequitur since the

1      Anderson
2  able to be steadily employed at a job for
3  which she is technically qualified, she is
4  going to need supportive psychotherapy to
5  counter the disillusionment so that she can
6  persist in it.
7  Q      She had psychotherapy from the time
8  she came back in Verizon in the 1990's until
9  the time she was terminated, didn't she?
10 A      Yes.
11 Q      You say, "Even with reasonable
12 accommodation."  This is your theory that
13 supervisors should volunteer for abuse; is
14 that the kind of accommodation?
15 A      No, I didn't say that supervisors
16 should volunteer for abuse.  You did.
17 Q      How would you characterize it, sir?
18 A      Supervisors should be trained in how
19 to deal with her.
20 Q      Meaning a supervisor should be
21 prepared to be called all of those names
22 that we've gone through that you say she is
23 uncontrollably compelled to call them?
24 A      No.
25 Q      How is a supervisor able to stop her?

1           Anderson

2   A      A supervisor should understand that
3   should such an event occur, why it occurs.
4   Q      That doesn't get the supervisor out
5   of having to go through the event, does it?
6   A      Well, it can't be ruled out that such
7   an event might occur, and the supervisor
8   would have to be a person that would
9   understand that and would agree with it.
10  Q      Do you remember the question?
11  A      Not in its entirety.
12  Q      It doesn't get the supervisor out of
13  the event, does it?
14  A      It doesn't guarantee that, no.
15  Q      It doesn't do it at all.  It's not a
16  matter of guarantee.
17  A      Supervisor would be taking that risk.
18  Q      Supervisor would be taking the risk
19  of being abused, right?
20  A      If the supervisor understood what it
21  was all about, supervisor could understand
22  that it's not intended to be abusive.
23  Q      But it wouldn't be any less abusive?
24  A      But it would.
25  Q      To be called all those names, sir, is