IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCES DARCANGELO,

       Plaintiff,

v.

VERIZON MARYLAND INC.,

       Defendant.

No. WDQ-02-816 (Civ.)

## DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF DOUGLAS ANDERSON

Defendant Verizon Maryland Inc. ("Verizon"), by and through its undersigned counsel respectfully submits this Reply Memorandum in Further Support of its Motion in Limine to Exclude Expert Testimony of Douglas Anderson and states as follows.

## INTRODUCTION

Long after the close of discovery and the briefing of dispositive motions, this Court granted plaintiff the chance to appoint a substitute expert based on plaintiff's express representations that her new expert would act only as a replacement for plaintiff's previous expert, Dr. Gary Zimberg, and would not act as a rebuttal to Verizon's own psychiatric expert, Dr. Jeffrey S. Janofsky.  As revealed by the "replacement" expert's report and subsequent deposition, plaintiff's express representations have not been fulfilled.  Indeed, in direct contradiction of those representations, the newly named expert, Dr. Douglas Anderson, has opined in a manner that exceeds and contradicts the opinions of Dr. Zimberg and is designed specifically to contradict (rebut) those of Dr. Janofsky.  While this would ordinarily be sufficient reason to exclude an expert's testimony, there are other, substantial reasons for doing so here.

The latest manifestation of plaintiff's calculated effort to deny Verizon its procedural rights can be found attached to her reply to the instant motion. Having already contradicted her previous representations to the Court, plaintiff compounds the prejudice to Verizon by attempting to submit an affidavit in which Dr. Anderson expresses additional opinions and cites to sources referenced nowhere in his original report or deposition. This latest effort ignores the Court's order regarding the pre-deposition scheduling of the new expert's report. Unable to confront him, Verizon respectfully requests that the Court strike the affidavit, give it no consideration and preclude any reference to its substance through the remainder of these proceedings. Even if the Court considers the affidavit in deciding this motion but otherwise precludes its use at trial, the new affidavit does not change the fact that Dr. Anderson did not apply reliable, scientific principles and methodologies in formulating his opinions. Nor does it change the fact that his core opinion is inadmissible under Federal Rule of Evidence 403 because it suggests a theory of relief that the Fourth Circuit has expressly disallowed. Despite plaintiff's attempts to cover the blemishes of Dr. Anderson's testimony with a new and improper affidavit, this Court should strike that affidavit and bar Dr. Anderson's expert testimony in its entirety.

## ARGUMENT

**I.   ANDERSON'S AFFIDAVIT AMOUNTS TO AN IMPROPER NEW EXPERT REPORT.**

As support for Plaintiff's Opposition to Defendant's Motion ("Plaintiff's Opposition") (Dkt. #151), plaintiff attaches an affidavit by Dr. Anderson in which Dr. Anderson attempts to remedy the weaknesses in his opinions and methodology that were exposed during his deposition. This after-the-fact attempt to bolster Dr. Anderson's opinions literally days before trial not only unfairly prejudices Verizon but violates the rules of discovery. Dr. Anderson not only attempts to explain away his damaging testimony but also attempts to identify two new

sources for his opinions in clear violation of Federal Rule of Civil Procedure 26(a)(2)(B), which required that his initial expert report "contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . ." As a result of plaintiff's complete disregard for those rules, Verizon will have no opportunity to depose Dr. Anderson on this new information or its influence on his opinions either for trial or for the purposes of the current motion. Accordingly, Verizon respectfully requests that the Court strike Dr. Anderson's affidavit, both for the purposes of trial and for the purposes of the motions currently before the Court.

II.     **ANDERSON'S OPINIONS EXCEED THE SCOPE OF THE OPINIONS EXPRESSED BY PLAINTIFF'S ORIGINAL EXPERT AND IMPERMISSIBLY REBUT THE OPINIONS EXPRESSED BY VERIZON'S EXPERT.**

The Court allowed plaintiff to designate Dr. Anderson as a last minute witness based, in part, on plaintiff's representations that she would only use this expert as a replacement for Dr. Zimberg and that she would not use him to rebut the opinions of Verizon's expert, Dr. Janofsky. (Pl.'s Reply to Def.'s Opp. (Dkt. #120), at 5 ("Plaintiff does not seek [to issue an expert report rebutting Dr. Janofsky], but instead seeks a replacement for Dr. Zimberg and the scope of his expert opinion, whether produced in his report or in deposition.").) Plaintiff has, however, abandoned both of those promises.

Despite Dr. Anderson's and plaintiff's self-serving claims that Dr. Anderson did not "rebut" Dr. Janofsky, plaintiff cannot escape the basic facts that plaintiff's counsel gave Anderson a copy of Dr. Janofsky's report and specifically told Anderson to address Dr. Janofsky's opinions. (*See* Ex. 1 to Def.'s Mem. in Supp. of Mot. in Limine to Exclude Expert Test. of Douglas Anderson ("Verizon's Memorandum") (Dkt. #144), April 4, 2005 report of Dr. Anderson ("Anderson Rep."), at 1; Ex. A, Deposition of Douglas Anderson ("Anderson Dep."), at 55 ("Q: Were you asked to address his [Dr. Janofsky's] opinion in any way? A: Yes. Q:

3

Who asked you to address his opinion? A: Mr. Fischer.").) A thorough review of Dr. Janofsky's and Dr. Anderson's respective reports reveals that, after receiving that instruction from plaintiff's counsel, Dr. Anderson proceeded to assert the negative of virtually every significant opinion expressed in Dr. Janofsky's report with the notable exceptions of Dr. Janofsky's commentary on Dr. Zimberg's weaknesses as an expert and Dr. Janofsky's opinion regarding the propriety of independent medical examinations, both of which are no longer relevant issues in the case.[1] (*Compare* Ex. B, Expert Report of Dr. Jeffrey Janofsky, at 36-43 *with* Anderson Rep.) Regardless of how plaintiff or Dr. Anderson choose to characterize it, this practice of reviewing and responding to the opposing party's expert is the very essence of rebuttal testimony. Plaintiff has herself admitted that such use of Dr. Anderson's testimony is unfairly prejudicial to Verizon, (Pl.'s Reply to Def.'s Opp. (Dkt. #120), at 5), and based on that admitted prejudice alone, Dr. Anderson should be excluded as a witness at trial.

At the same time, Dr. Anderson's report and deposition cannot be credibly characterized as a "replacement" expert for Dr. Zimberg. As more fully addressed in Verizon's Memorandum, Dr. Anderson expressed opinions on a number of issues that were not addressed in Dr. Zimberg's report, which under Federal Rule of Civil Procedure 26(a)(2)(B) established the permissible scope of Dr. Zimberg's opinions. For example, plaintiff admits that Dr. Zimberg gave no formal opinion on the issue of accommodations. (Plaintiff's Opposition, at 5.) Nevertheless, plaintiff contends, contrary to the limitations imposed by Federal Rules 26(a)(2)(B) and 37(c)(1) and without citation to any legal authority, that "[i]t is entirely possible that [Dr. Zimberg's] recommendations could have been introduced at trial." Dr. Zimberg, however, testified that he was not qualified to testify as to whether any accommodations would be adequate because he did

---

[1] As the Court is aware, plaintiff has withdrawn Dr. Zimberg as an expert in this case, and plaintiff has asserted to the Court that she will not pursue any claim regarding the propriety of her referral to an independent medical examinations. (Pl.'s Opp. to Def.'s Mot. in Limine to Restrict Argument Re: Indep. Med. Exams. (Dkt. #129), at 1.)

4

not know the functions of plaintiff's job.  (Ex. C, Deposition of Gary Zimberg ("Zimberg Dep."), at 96); *Bryant v. Better Business Bureau*, 923 F. Supp. 720, 736 (D. Md. 1996) (defining a reasonable accommodation as one which is "effective" in enabling an employee to perform the essential functions of her job).  Thus, Dr. Anderson's opinions as to accommodations clearly represent an unfair expansion beyond the scope of the opinions which Dr. Zimberg considered himself qualified to provide.  Further, Dr. Anderson recommended new accommodations that were not in any way mentioned by Dr. Zimberg in his deposition or otherwise and do not appear anywhere else in the case.  As a result of Dr. Anderson's failure to adhere to the scope of Dr. Zimberg's permissible testimony, Verizon must now respond to claims for accommodations that had never before been raised in this case.

      Additionally, Dr. Anderson presents an entirely new medical theory for plaintiff's behavior, rejecting Dr. Zimberg's opinion that plaintiff has a personality disorder and instead claiming that she is compelled to engage in misconduct as the result of a condition that he describes as "chronic hypomania."  (Anderson Rep., at 3-4.)  Plaintiff suggests that Dr. Zimberg also discussed "chronic hypomania" as a condition.  (Plaintiff's Opposition, at 13-14.)  Though Dr. Zimberg did testify in his deposition that plaintiff was "just mildly hypomanic," (Zimberg Dep. at 57), he quickly explained that he was not sure whether what he saw was indeed hypomania as opposed to her personality disorder or just poor judgment, and he usually concluded that it was not, (*id.* at 58 ("In my office what I try to figure out is this really hypomania or just her schizoid personality or poor judgment which has nothing to do with psychiatry.  What I typically conclude with Frances is that it really isn't.  Although she has episodes of hypomania, it's not severe enough to change the medication treatment and it typically appears to be that it's more her personality disorder and her poor judgment that get her

5

into trouble. That seems to be more the issue.")). Moreover, in direct contrast to Dr. Anderson's claim that plaintiff's chronic hypomania was the cause of plaintiff's misconduct, Dr. Zimberg testified that he considered plaintiff's bipolar disorder, and thus her alleged hypomania, to be a mere "sideshow" compared to plaintiff's personality disorder and simple poor judgment. (*Id.* at 62.) By failing to restrict Dr. Anderson's opinions to the permissible scope of those of Dr. Zimberg, plaintiff has unfairly forced Verizon to respond to claims and theories that not only do not appear in Dr. Zimberg's report or deposition, but which indeed contradict Dr. Zimberg's opinions. This is patently inconsistent with plaintiff's representation to the Court that Dr. Anderson would merely be a replacement expert, and his testimony should be stricken on that basis.

### III.  ANDERSON'S OPINIONS DO NOT MEET THE REQUIREMENTS FOR EXPERT OPINIONS UNDER RULE OF EVIDENCE 702.

Dr. Anderson should also be barred from testifying because his opinions fail to meet the criteria of admissible expert opinions under Federal Rule of Evidence 702. Federal Rule 702 explicitly requires that an expert must meet each of three requirements: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Because Dr. Anderson's testimony does not meet these requirements, this Court, as part of its gatekeeper function, should exclude Dr. Anderson's testimony.

#### A.  Anderson's Opinions Are Not Based on Sufficient Facts or Data.

Dr. Anderson's opinions do not meet the first requirement of Federal Rule 702 because his deposition and report make clear that his opinions lack any factual foundation. Plaintiff responds in her brief that Dr. Anderson reviewed "several hundred pages" of material. (Plaintiff's Opposition, at 13.) Sufficiency, however, is not simply a matter of how many pages

6

a purported expert reviews. Instead, logic dictates that sufficiency is at its core a matter of whether the expert reviews the information necessary to reach his or her conclusions and to rule out other possible explanations. *See Hardesty v. Am. Seating Co.*, 194 F. Supp. 2d 447, 451-52 (D. Md. 2002) (excluding expert testimony that was a "metaphysical extrapolation" not based on sufficient facts or data). Here, Dr. Anderson, while he may have reviewed hundreds of pages, did not review sufficient information or gather sufficient facts to support many, if not all, of his conclusions.

For example, as more fully described in Verizon's Memorandum, Dr. Anderson opined on several possible accommodations that he believed Verizon could provide for plaintiff, but his recommendations were made without checking to see if these efforts had indeed been made. (Verizon's Memorandum, at 7-8.) In his report, Dr. Anderson opined that one accommodation that Verizon should have provided was the granting of leave for medical appointments and during times of stress. (Anderson Rep., at 3.) Dr. Anderson admitted, however, that in expressing this opinion, he was wholly unaware of Verizon's actual leave policy or whether plaintiff had indeed been provided leave under the circumstances described. (Anderson Dep., at 219.) Dr. Anderson also opined that plaintiff should have been placed with supervisors who were sensitized to her condition; once again, his recommendation was made without bothering to examine Verizon's efforts in placing plaintiff with several different supervisors during the fourteen-year period before her termination. (Anderson Rep., at 3; Anderson Dep., at 217.) The critical nature of these omissions in Dr. Anderson's review was demonstrated during his deposition when he admitted that, depending on what efforts were actually made in those regards, "[i]t's possible that there is no reasonable accommodation." (Anderson Dep., at 221.)

Likewise, Dr. Anderson opined that plaintiff's job was primarily technical in nature; yet, he neglected to review any materials beyond a so-called "job description" provided by plaintiff's counsel, and even neglected to ask whether that description was complete. (*Id.* at 51, 60-62.) As a result of this failure to obtain and review sufficient information before drawing his conclusions, Dr. Anderson failed to discover that plaintiff's job involved extensive telephone interaction with other employees, known as internal customers, a task which plaintiff herself has admitted was an "essential function" of her job within the meaning of the Americans with Disabilities Act (the "ADA"). (*See* Anderson Dep., at 221 ("Q: You knew she had to talk to internal customers on the phone, right? A: No. Q: You know that now, don't you? A: Yes."); Pl.'s Opp. to Def.'s Mot. for Summ. J. (Dkt. #38), at 24 ("Plaintiff was involved in basically two types of regular interactions in the COT position: 1) interacting with fellow Bell Atlantic employees in remote installations to execute the provisioning function, which was a central purpose of her job; and 2) interacting with her co-workers in the immediate workgroup. *Plaintiff recognizes the former as an essential function of her position* . . . .") (emphasis added).)

These and other glaring omissions in Dr. Anderson's review simply cannot be excused by plaintiff's assertion that Dr. Anderson reviewed "several hundred pages" of documents. As his own testimony makes clear, however many documents or however much information Dr. Anderson reviewed, it was not sufficient to support the opinions expressed in his report. On this basis alone, his testimony fails under Federal Rule of Evidence 702 and should be excluded.

  **B. Anderson's Opinions Are Not the Product of Reliable Principles and Methods.**

In addition to failing to base his opinions on sufficient facts or data, Dr. Anderson failed to apply reliable principles and methods in reaching his conclusions. The Supreme Court laid out four factors for examining whether an expert's opinion applies recognized scientific

8

principles and methods in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). In order to determine the reliability of an expert's methodology, the Supreme Court examined (1) whether the expert's technique or theory can be objectively tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally recognized in the scientific community. *Id.* at 593-94.

As explained in Verizon's Memorandum, Dr. Anderson opined as to plaintiff's supposed condition of chronic hypomania, which allegedly compels her to repeatedly engage in inappropriate behavior. (Anderson Rep., at 3-4.) During deposition, Dr. Anderson initially claimed that he relied on the *Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed. 2000) ("DSM-IV") in reaching this opinion. (Anderson Dep., at 140.) He ultimately admitted, however, that not only is his description of chronic hypomania not contained in the DSM-IV, he actually disagrees with the criteria for hypomania that do appear in the DSM-IV. (*Id.* at 141, 143.) In fact, Dr. Anderson admitted that he did not rely on *any* peer reviewed or scholarly works in reaching his diagnosis and did not know if there were any authoritative texts which even describe the supposed condition of chronic hypomania. (*Id.* at 142-43, 147.)

Plaintiff attaches to her opposition brief an affidavit in which Dr. Anderson asserts that after his deposition, he managed to locate two books which he suggests describe chronic hypomania. (Affidavit of Douglas Anderson, Ex. F1 to Plaintiff's Opposition.) However, apart from Anderson's conclusory assertion that those books are both "authoritative and generally recognized," (*id.*), neither Anderson nor plaintiff offers any actual evidence that the conclusions in these books were objectively tested, peer reviewed, or otherwise subjected to the normal

9

safeguards of reliability.

More importantly, regardless of the weight of the books that Dr. Anderson now cites, the fact remains that he did not rely upon them or *even know that they existed* at the time he rendered his opinions. Further, Dr. Anderson did not purport, either in his report or his deposition, to apply the criteria or descriptions set forth in those books to plaintiff or her symptoms to determine whether she indeed qualified under those suggested standards. In short, Dr. Anderson's ability to track down two books that use similar terminology to his own *after* he has already formed his opinion and after his deposition does nothing to demonstrate that his conclusions are based upon reliable methods and principles, much less that he applied those principles reliably as required under Rule 702.

Furthermore, as described more fully in Verizon's Memorandum, Dr. Anderson failed to identify any objective criteria for his diagnosis of chronic hypomania or for determining whether plaintiff was actually experiencing chronic hypomania at any given time. (Verizon's Memorandum, at 13-14.) Rather, he opines that the very act of engaging in misconduct is conclusive evidence of chronic hypomania, thus allowing him to excuse any incidents of misbehavior without subjecting his opinion to any standards such as the existence of objectively-determined symptoms. (*Id.* at 14.)

Plaintiff attempts to challenge this by arguing that Dr. Anderson applied criteria from DSM-IV to plaintiff. (Plaintiff's Opposition, at 15.) While applying DSM-IV criteria to plaintiff could be characterized as applying objective criteria to determine that she had hypomania at the time he examined her, Dr. Anderson did not point, in his report or elsewhere, to any objective criteria for his conclusion that her hypomanic state was chronic or that it extended back to the time of her employment. He likewise did not point, for example, to any data from any source

10

that she displayed symptoms such as pressured speech, elevated mood, or jovial affect, (DSM-IV, at 365), at the time that she, for example, put up the rifle target with Charles English's picture on it, screamed at her supervisor, or made racial slurs. Thus, Dr. Anderson pointed to no objective criteria for determining that she was hypomanic at those times much less that it was her supposed hypomania which caused her to engage in those behaviors.[2]

In her opposition brief, plaintiff attempts to cure this problem by pointing to Dr. Anderson's claim that when a person has a major mental disorder it is appropriate to attribute their aberrant and inappropriate behavior to that disorder. (Plaintiff's Opposition, at 15.) Indeed, plaintiff labels this as the "crystalliz[ation]" of Dr. Anderson's opinion. (*Id.*) This explanation, however, merely exposes the utter lack of scientific rigor in Dr. Anderson's approach by revealing that, once he made his diagnosis, he failed to review the circumstances surrounding, or to consider alternative explanations for, plaintiff's behavior in each particular instance of misconduct. Instead, Dr. Anderson essentially adopted the position that an individual with plaintiff's supposed condition could *never* volitionally choose to act in an inappropriate manner.

Further, the fallacy of plaintiff's attempted explanation of Dr. Anderson's approach is revealed by Dr. Anderson's attempts to explain plaintiff's acts of misconduct which occurred *before* the time that Dr. Anderson opined plaintiff became chronically hypomanic. During his deposition, Dr. Anderson testified that during the period before plaintiff entered the Air Force, she was not in a chronic hypomanic state. (Anderson Dep., at 113-14.) It was then pointed out to Dr. Anderson that at least two incidents of misconduct – bringing rifle bullets to work and

---

[2] Significantly, when confronted with Dr. Zimberg's treatment notes, which are contemporaneous with each incident of plaintiff's misbehavior at the workplace, for which she was eventually discharged, and which all indicate that plaintiff was either not displaying hypomania or only mild hypomanic symptoms at the time of those incidents, Dr. Anderson could only reply that such notes are "neither consistent or inconsistent." (Anderson Dep., at 176-89.) Furthermore, Dr. Anderson admitted that he never bothered to line up these incidents of misbehavior with plaintiff's contemporaneous treatment notes. (*Id.* at 189.)

wearing a t-shirt with the phrase "Hitler was right" to work – took place well before plaintiff entered the Air Force. (*Id.* at 114-16.) Unable to attribute those actions to plaintiff's chronic hypomania, Dr. Anderson merely opined that the incidents occurred during periods of acute hypomania. (*Id.* at 153.) When asked what evidence there was that plaintiff suffered hypomania of any type before entering the Air Force, plaintiff pointed to the two incidents themselves. (*Id.* at 115-16.) In other words, Dr. Anderson used the mere fact that plaintiff engaged in misconduct to conclude, without reference to any other evidence, that she was hypomanic at the time and then used that diagnosis of hypomania to assert that the actions were beyond her control. This circular logic, under which the commission of an egregious act is itself conclusive evidence that the act was beyond plaintiff's control, is the very antithesis of a reliable and verifiable methodology. Dr. Anderson's resort to conclusory opinion in the absence of a reliable methodology is what led the Second Circuit to uphold his exclusion in the past, *United States v. Mazzeo*, No. 99-1223, 2000 U.S. App. LEXIS 818, at *7 (2d Cir. Jan. 21, 2000), and is yet another reason for excluding him as a witness in this case.

## IV.   ANDERSON'S OPINIONS DO NOT HAVE ANY PROBATIVE VALUE

Finally, this Court should exclude Dr. Anderson's testimony under Federal Rule of Evidence 403 as more prejudicial than probative because the core of his opinion proposes a theory of recovery that is barred by the Fourth Circuit. As more fully explained in Verizon's Memorandum, Dr. Anderson's key opinion that the behavior for which plaintiff was disciplined and eventually terminated was directly caused by her chronic hypomanic condition is legally irrelevant because the Fourth Circuit has held that the ADA does not prohibit an employer from terminating an employee for misconduct, even if that misconduct is caused by a disability. *See Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999). Meanwhile, the

introduction of such testimony threatens to confuse the jury and prejudice Verizon by suggesting, contrary to Fourth Circuit law, that disciplining plaintiff on the basis of her conduct was in and of itself a discriminatory act under the ADA.

Plaintiff presents no response to this argument in her opposition, and therefore, for this additional reason, Dr. Anderson's testimony should be excluded at trial.

## CONCLUSION

For the foregoing reasons, Verizon respectfully requests that the Court enter an Order barring the testimony of Dr. Douglas Anderson. In addition, if the Court decides that it wishes to hear oral argument on this motion, Verizon respectfully requests that such a hearing be held outside of the presence of a jury so as to avoid any potential prejudice that hearing Dr. Anderson's testimony might cause.

Dated:  May 10, 2005                                                           _____/s/_____

Ira H. Raphaelson, Bar No. 012849
Karen M. Wahle, Bar No. 013658
Shannon M. Barrett, Bar No. 16410
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
(202) 383-5414 (facsimile)

Counsel for Defendant
Verizon Maryland Inc.