### J. Ms. Darcangelo's Perception of Why She Has Pursued Litigation:

80. Ms. Darcangelo indicated that she filed the current lawsuit because she did not have "anything better to do." She indicated that you have to litigate the ADA but most people can't do it. "I wouldn't miss it for the world. I may end up with bupkiss but this has been a great experience. I at least have gotten this far. I'd rather be doing this than a lot of other things. If none of this had happened, I'd be waiting in the telephone company for my shift to end. This way, at least I'm not a time server in a mindless and faceless organization."

81. Ms. Darcangelo indicated that "I was fired. I filed the lawsuit because I was fired for misconduct. If I was still employed, I would not have filed the lawsuit."

82. Ms. Darcangelo felt that she was sent to her first IME (Independent Medical Evaluation) because "they knew about my pre-existing condition. If they weren't so stupid, they would have terminated me for poor job performance, but it didn't work out that way."

83. Ms. Darcangelo indicated that she was not generally in love with the telephone company but now she has true devotion to the phone company, "it goes beyond love." She indicated that she is now more dedicated to the phone company than "the lover in any soap opera. I'm willing to take as much time as possible. They attacked me on the basis of my disability. How can I repay them? It remains to be seen."

84. Ms. Darcangelo indicated that her wish is to pursue the litigation "to the ends of the earth. The goal is the best possible outcome."

85. Ms. Darcangelo felt that she had been damaged by the hostile work environment at Bell Atlantic "which is hostile as you could get."

### K. Ms. Darcangelo's Perception of Her Difficulties at Bell Atlantic:

86. During the initial part of my interview with Ms. Darcangelo, she held up a yellow sheet of paper with a list of names whom she described as "perpetrators." The list included "English, Kelly, Russo, Greenberg, Gottlieb, Wright, Pabst, Kleinman and today's perpetrator."

87. I asked Ms. Darcangelo about a situation in 1983 where she wore a tee shirt stating, "Hitler Was Right" and "Kick Ass." She was given the opportunity to cover up the tee shirt or be suspended. She chose suspension. Ms. Darcangelo indicated that she was making a political statement and "didn't have any fear of being obstinate with my lower management. A couple of months later, I was promoted. So being suspended had no fear for me." Ms. Darcangelo was asked why, if she was told the tee shirt was offensive, she did not cover it up or change it. She indicated, "I didn't care if I offended the lower management. I didn't feel any positive motivation to cooperate with them."

88. Ms. Darcangelo indicated that from the day she came back from her disability leave after she was psychiatrically hospitalized in March of 1990, she was discriminated

against. She indicated that she saw no reason why she should not inform her employer of her illness. "That was my mistake." She indicated that she revealed her disability and was told that she could not return because "people were afraid of me." She indicated that she was made to sit at the other end of the building and "two people who ostracized me felt more comfortable." "The first line of attack was to declare me a direct threat."

89. She subsequently, however, returned to her old job from 1992 to 1994. She described this job as maintenance work, waiting for things to break. In 1993, Ms. Darcangelo indicated that the manager, who eventually fired her, Mr. Conrad, became her manager. "He didn't like me." Ms. Darcangelo related this to a "little tiff" that occurred in 1993. She indicated that she had complained about being sexually harassed by a man and management responded by saying that she had had a knife in her boot. She recalled being sent off to the Medical Department for a urine test and was sent back to work.

90. Ms. Darcangelo indicated that if the telemetry signaled a hardware error, her job was to find someone to go out and fix it, but it was difficult to get people to do that. "It was a no win job. There was always uncertainty. I had to use judgment to decide whether the telemetry signal was signaling a real error or it was false. After experience, you could do that, but it remained a no win situation." Ms. Darcangelo stated that she could rely on others in her department for help in judgment but "usually they didn't know any more than you did, like the blind guy with the elephant."

91. Ms. Darcangelo was asked about a poster of the grim reaper that she had displayed in her cubicle. She described it as a New Yorker cartoon. Ms. Darcangelo was asked what she was trying to convey with the cartoon, which had the caption "There are a few key people I want to take along with me." She indicated that "this was the best way to confront the grim reaper. Face him head-on. Take charge. It was meant to be a positive way of dealing with death. It has been ten years since I put it up. I don't see any hostility in it. I knew Conrad didn't like it. It's too sophisticated for some people. If people were offended, they were too unsophisticated to appreciate this."

92. Ms. Darcangelo was asked about another poster, that referred to psycho killers and kleptomaniacs. Ms. Darcangelo indicated that she put the poster up in 1993. "Shirley had stolen things out of my desk. I was accusing her of being a kleptomaniac. I think I wanted to say, 'If I was a real psycho killer, I'd be driving a cab or looking for cab driver victims'."

93. In 1994, Ms. Darcangelo indicated that she was "poisoned by Depakote." She became confused and lost control of her bowels at work. I asked Ms. Darcangelo to describe the Depakote incident in more detail. She stated that she had gone home and gone to sleep. The next thing she remembered is waking up at 1:00 a.m. for her 12:00 midnight shift. She went to work but on the way to work had a "narrow field of vision." On arriving at the job, she lost control of her bowels and flushed her underwear down the toilet. She remembers part of that evening. "My supervisor asked me to go home. I said no." I asked Ms. Darcangelo why she said no. She stated, "Saying yes would not have been the correct response." She stayed at work for the whole shift and when she left, work was undone but "I don't remember that."

94. I asked Ms. Darcangelo if she recalled taking Mellaril at that time as well. She stated that she did not remember. She stated that at the time of the Depakote incident, she had been on Depakote for seven or eight days and was on lithium as well. She recalled ending up being suspended and placed on family medical leave. From Ms. Darcangelo's perspective, her suspension after the Depakote incident "had me convinced they wanted to fire me." She "didn't know" if they threatened to fire her at that time but she recalls being accused of dereliction of duty. "They were acting like even though nothing bad happened, that it was the end of the earth." The suspension was removed from her records six months later. She indicated that part of her agreement on returning to work was that she would work day shifts. However, in 1997, according to Ms. Darcangelo, Mr. Conrad "rescinded that agreement." Ms. Darcangelo refused to sign a release for her medical records and she was suspended and sent to Anthony Russo, M.D. for an independent medical evaluation. According to Ms. Darcangelo, Dr. Russo "sent me back to work and gave me herpes."

95. Ms. Darcangelo was asked about her negative comments about Dr. Mira being an idiot and poisoning her with Depakote. She indicated that she felt that what Dr. Mira had done was not intentional but was due to "incompetence." She indicated that he gave her 750 mg. of Depakote but should have started her on a lower dose. "I think he didn't care. I don't think he thought about anything. He gave me the Depakote. I had a problem. He wasn't going to take responsibility for it."

96. Ms. Darcangelo recalled that she asked her treating physician for a letter after the Depakote incident and "he wrote one of his incoherent letters. They were not convinced the incident was drug-induced. They thought it was misconduct. I wasn't capable of staying home. If I had been drunk, it would have been different. They would have accepted that [laughing]." Ms. Darcangelo indicated that being drunk on the job was tolerated by Bell Atlantic.

97. Ms. Darcangelo stated that she reported her difficulties to her physician but "he was a jerk. He was not interested. He thought Depakote was a miracle drug. I think he was more worried that people would say he malpracticed. He did write a letter."

98. Ms. Darcangelo was switched to provisioning after the 1994 Depakote incident. "At the time, I considered it an insult and moving to provisioning was all for the best but knowing him he [Jim Conrad] meant it as an insult. I left maintenance and didn't miss it." "I don't know whether it wasn't a combination. I attribute bad motives to him. I was already in a discriminatory environment. I had already been ostracized. I didn't care if a new manager came in, it was the same shit, a different day. If a new manager came in, it didn't matter. He was there to make my life hard. Jim Conrad liked me so much, he fired me."

99. Ms. Darcangelo described her job in provisioning initially as "paper handling. There would be a six foot high stack of orders to make sure were done correctly." Provisioning was first a record keeping function but the job later evolved into actually offering services.

100. Ms. Darcangelo stated that 1995 and 1996, after the Depakote incident, were good years, without disciplinary infractions. She did not enjoy the job, however. "I thought the other workers felt they did not have to cooperate with me." However, Ms. Darcangelo got a commendation during this period for doing a great job. She indicated that she did well in provisioning until "the reign of the perpetrators in the Fall of 1997."

101. In 1997, Bell Atlantic merged with Nynex. After the merger, personnel actions were treated differently. For example, Ms. Darcangelo indicated that there was never a compliance office before the merger.

102. Ms. Darcangelo's first IME came after the merger but from Ms. Darcangelo's perspective it came out of the "clear blue sky. I was not aware of a complaint. I was not aware that people thought I was threatening them and people were writing letters. It was totally unexpected." From Ms. Darcangelo's perspective, after the Nynex merger there was a change in the human relations philosophy. It was only after the merger that she began being forced to have IME's and go on involuntary family medical leave.

103. Ms. Darcangelo was asked about the May 1998 poster incident. She indicated that the poster was originally put up in 1996. Ms. Darcangelo indicated that the original poster hung for six months in 1996 and then was placed in a file cabinet. Ms. Darcangelo indicated that in 1996 below the poster was a 44 ounce cup with a caption, "Put Butch on the bus one way to Pocomoke." She indicated that she kept the cup in several locations until she started getting worried about people putting money in the cup. She stated that her fellow employees knew that she was the one who had put the cup there and that she actually took the cup around on several occasions to collect money. "I didn't want people to put money in it. I thought it might be controversial." "It was in high demand. It was displayed on the fourth floor in Bullington's cubicle. I gave it to him."

104. Ms. Darcangelo took the poster out of the file cabinet in 1998 and posted it in her cubicle. It was confiscated the next day. Ms. Darcangelo described the background of the poster as "an abstract design with a picture, a target and a sign, 'Put Butch on the bus to Pocomoke'."

105. At this point in the interview, I showed Ms. Darcangelo the poster I had been provided by counsel for Bell Atlantic. The poster shows a crosshair sighting target with a photograph of Butch English superimposed on the bull's eye and the words, "brain dead 9 a.m. to 5 p.m. Monday through Friday" directly over the photograph. Ms. Darcangelo indicated that the poster she posted in 1998 was the same picture but with a different caption on top.

106. I pointed out to Ms. Darcangelo that the poster had her boss in the center of a sighting target. Ms. Darcangelo responded, "Then the Target Store sign must terrify people. It's not necessarily violent. There is nothing inherently violent about a target."

107. I asked Ms. Darcangelo why she had removed the old poster from the filing cabinet and changed it and posted it. She indicated that her new supervisor, Gottlieb Fleig, was a new hire with whom she had had a problem over his request that she work

-16-

night shift at Christmas. According to Ms. Darcangelo, Fleig "refused to recognize that we were a union shop and we had work rules. He came in and instead of offering us a shift selection, he put our names down. In December of 1998, Ms. Darcangelo recalls being forced to work night shift involuntarily, filing a grievance and winning. Ms. Darcangelo indicated that her supervisors wanted someone to fill in on the night shift. "At various times in my career I would have done it but in December 1997 I worked night shift under protest and filed a grievance. It was against the seniority rules. I won the grievance." Ms. Darcangelo indicated that she was then put back on day shift but then Bell Atlantic "started the nitpicking campaign. I wasn't bothering anyone." She indicated, however, "the whole thing got short-circuited with the poster."

108.  Ms. Darcangelo indicated that putting the poster up in 1998 "couldn't hurt" in facilitating her supervisor's transfer. She "intended support" of his transfer. She indicated that Gottlieb Fleig had been in the company for less than a year and that the poster "could have made him more popular." She indicated that the poster was to make people want to pitch in and ship him out. "I was acting in his best interest."

109.  After putting up the poster in 1998, Ms. Darcangelo was suspended for ten days and then underwent a second IME. Ms. Darcangelo indicated that subsequently her supervisor "suborned my best friend as an ideal candidate to pick a fight with me, to create violence in the workplace in order to terminate me."

110.  Ms. Darcangelo was asked to expand on her perception of her damages. She indicated that during the first IME, "I had been given genital herpes." She did not see the IME report until March 1998. When she saw the report which indicated that she had a past history of type 2 genital herpes, "I said to myself, I didn't know I had genital herpes. It made me doubt the discretion or the competence of the examiner." Ms. Darcangelo indicated that she has never, in fact, had genital herpes and therefore the report was not factually correct. She further indicated that when Dr. Russo subsequently corrected the report. "He said I told him that I had genital herpes. That's a lie. I'm sure that I never said that." Ms. Darcangelo believes that Dr. Russo's statement that she had genital herpes "may very well be malicious."

111.  I asked Ms. Darcangelo why Dr. Russo was on her list of perpetrators. She responded, "He gave me genital herpes. In my medical records it said I had oral herpes. He said I told him I had genital herpes. He needed a symptom to go along with his diagnosis of Borderline Personality Disorder. I think he meant to say I am promiscuous. He did give me genital herpes. He said so in his deposition."

112.  Ms. Darcangelo indicated that to a lay person, genital herpes indicated venereal disease. Ms. Darcangelo indicated, "how Dr. Russo could diagnose genital herpes is beyond me. The records he got it from were the company doctors."

113.  I asked Ms. Darcangelo why Dr. Greenberg was on her list of perpetrators. She indicated that Dr. Greenberg was "some old codger in Boston who never saw me. He signed off on the report that was sent to him in Boston. He said it was a great report and

returned me to work. As a result of the report, I got genital herpes three times. He said an untruth about me. It's libel and slander."

114.   I asked Ms. Darcangelo if she thought the report that she had genital herpes was deliberate. She indicated, "I do believe it was deliberate. I think he gave me genital herpes to give me the diagnosis of Borderline Personality Disorder. He couldn't declare me a threat of violence but he wanted to characterize me as someone who could go wild at any moment." Ms. Darcangelo indicated that "Dr. Russo was trying to do his job and his job was to say something bad about me. His report said this person was on the edge of having a breakdown."

115.   Ms. Darcangelo describes Dr. Russo's subsequent conclusions (except for the diagnosis of genital herpes) as "not incorrect. Dr. Greenberg said Dr. Russo's report was reasonable. I think he was diagnosing for dollars."

116.   Both Dr. Kleinman and I pointed out to Ms. Darcangelo that although she indicated that she felt the purpose of the IME's were to use her illness to get her out of the company because of dangerousness, she was not found dangerous. Ms. Darcangelo indicated that her anger towards the physicians who performed the IME's was a product of her "paranoid thinking. He did what he could do. To use nickel and dime stuff to degrade me." The recommendations of the report were for her to return to work with restrictions for appropriate behavior and to handle herself in an appropriate manner. Ms. Darcangelo felt that was degrading. "He could have just said I was stable and could return to work."

117.   I again asked Ms. Darcangelo why she thought Drs. Russo and Gottlieb were perpetrators when they found she was not dangerous and could go back to work. Ms. Darcangelo indicated, "They didn't send me for IME's, they sent me to get rid of me." She did not perceive the purpose of the IME's to help her in any way or to help her receive accommodations at the workplace.

118.   Ms. Darcangelo indicated that she has been trying to determine for years whether Dr. Russo's report was done intentionally to harm her. "It wouldn't surprise me if CORE sent him false information intentionally." When asked about the likelihood of Dr. Russo intentionally misdiagnosing genital herpes, Ms. Darcangelo indicated that there was a 60-40 split with 60% being the probability of him doing it maliciously. Ms. Darcangelo indicated that she would not have been offended by anything in the report if genital herpes had not been in there. "I suspect the herpes was passed on in a gossip basis." Ms. Darcangelo indicated that Barbara Kelly of CORE was "happy to placate them. She took pleasure in passing on negative information about me."

119.   Ms. Darcangelo indicated that to the best of her knowledge, she was sent for the first IME on the basis of no bad action on her part. She did state that she was sent for the second IME over the poster. Ms. Darcangelo indicated that the poster was first displayed in 1996 and "they should have sent me for the IME then."

120. When asked about the psychological effects of the IME's, she indicated that she had difficulty sleeping in 1998 and had to take Ativan every day. She also reported increased anxiety and increased paranoia and "nihilism, believing in the meaninglessness of existence. I was forced to stay in the company even though I knew every day was my last." Ms. Darcangelo indicated that her anxiety and restlessness ended after she left the company.

121. I again asked why Dr. Jerome Gottlieb was on the list of perpetrators. She indicated that Dr. Gottlieb came up with "completely different results. Seven months later, all of a sudden, things are different." I pointed out to Ms. Darcangelo that Dr. Gottlieb diagnosed her with Bipolar Disorder Type I, Slight Hypomanic and made no Personality Disorder diagnoses. She indicated that Dr. Gottlieb was on the list because "they went out and hired them to do me no good. The perpetrators got cold feet and chickened out. Their guns jammed. We are dealing with a relatively short period of time. He was hired to be a perpetrator but didn't do his job."

122. I asked Ms. Darcangelo if Dr. Gottlieb had hurt her in any way. She indicated that "he was a lot fairer than Dr. Russo. Since Dr. Russo invented a new diagnosis, Russo was despicable. He decided on the additional diagnosis of Borderline Personality Disorder since he didn't have any facts."

123. Ms. Darcangelo was asked about the diagnoses of paranoia. She "didn't know" if she really had paranoia. "I wouldn't deny it but I can't quantify it." She believes there is about a seventy percent probability that she has paranoia.

124. She stated, "provisioning went from something where you never worked on the equipment to where you did." Ms. Darcangelo indicated that on October 23, 1998, she took a call where "the caller said the equipment was not working in a particular way and I knew it could not be as they described." Ms. Darcangelo stated that she asked for help from another team member but "she refused to help me. According to Ms. Darcangelo, "I was supposed to get violent. That plan was conceived by Ms. Moxey. That was her brief." Ms. Moxey leaned her gigantic hooters over my head to try to get me to smack her. She was standing behind my chair. She did the same violation of personal space standing behind me over my head. She was trying to physically provoke me. I suspected she was trying to provoke me, so I left the room. I left the room so as not to be provoked into physical violence. Given my knowledge of them, they collaborated against me. Ms. Moxey tried in October and failed to provoke me. Now the scheme was to work with Ms. Lee in a more indirect way. I was off work until 11/16/98. Over the course of six weeks, they had plenty of time to hatch it out."

125. Ms. Darcangelo was next asked about the December 17, 1998 confrontation with Barbara Lee that led to her termination. She indicated that she felt that Barbara Lee was "put up to it to provoke me so they could fire me." On her last day of work, Ms. Darcangelo indicated that Ms. Moxey's best friend, Barbara Lee, who was black, "attacked me. I got a phone call about an order. She decided this was a thing to pick a fight over. She had no authority to tell me what to do. I told her I was not going to do it. I said, 'I ain't going to do it, old massa'. Everybody decided it was a racial incident. I

-19-

knew I was offending her. I wanted to." Ms. Darcangelo stated, "When I look back on it, I think they intended me to act that way. There must have been a discussion about it."

126. Ms. Darcangelo told Barbara Lee, "I don't work for you massa. You're not my boss, massa." Ms. Darcangelo indicated that she was very angry because Barbara Lee's best friend had "put her up to it. She was not going to leave me alone. She was going to harass me for the rest of the day. I was angry enough that I was not going to let her continue to harass me. She came in my cubicle and stood in front of me and I put both hands in my pocket. I knew I was going to be accused. Barbara Lee started yelling. I could have left the room but I would have been suspended. I could have gotten someone else involved or I could do what I did and handle it myself without leaving the room." According to Ms. Darcangelo, Ms. Lee "knew not to hit me because of my reputation. I'd fight her."

127. When asked what she meant by "old massa", Ms. Darcangelo indicated that she was speaking in Ebonics. "Some people think it's a separate language. I think it's a dialect of English." When asked why she used Ebonics at that particular time, Ms. Darcangelo indicated that Barbara Lee was "behaving like an overseer, telling me to pick up the bale and take it, to demonstrate that I was a defiant fieldhand. I was going to defy her, no matter what she did to me." Ms. Darcangelo indicated that she used Ebonics to Barbara Lee [who was African-American] because "anything else I would have said would not have gotten her attention." She indicated that if she had just stood there and said, "You must desist, Ms. Lee", would not have worked. Ms. Darcangelo then indicated that in the past a supervisor had accused her of calling Dwight Allen a nigger in front of Barbara Lee. "That was a lie. I thought she'd object if I used Ebonics. I didn't care if I offended her. I never called Dwight Allen a nigger."

128. Ms. Darcangelo was asked again why she chose to use Ebonics. She indicated, "it proved a lack of logic." Ms. Darcangelo indicated that that was part of her calculation. She was waiting for a reason to bring it up. "I knew it had been a lie. It proved the lie and stopped her from harassing me and got me fired."

129. Ms. Darcangelo indicated that she was angry at work. "I was angry enough. Thank God they fired me when they did. It would have kept on going."

130. Ms. Darcangelo indicated that Dr. Wright was on the list of perpetrators, because he is the head doctor at CORE, the medical vendor. "He's a lot more important than I thought. Although the nurse can call and smear your name, Dr. Wright makes the decisions to send you for the IME. He made the decisions to send me for the IME's and not to send me for the third one."

131. Ms. Darcangelo indicated that Linda Pabst was on her list of perpetrators, because of Bell Atlantic's attempt to send her for a third IME. Linda Pabst worked for security. Ms. Darcangelo indicated that Mr. English was told that Bell Atlantic wanted a security investigation of her. "Evidently Barbara Kelly got a phone call and a claim was made that Linda Pabst said I needed an IME. I don't believe it." According to Ms. Darcangelo, Bell

Atlantic opened up a security case against her but never investigated it. "It was fraudulent because I wasn't investigated. They had nothing. It's a lie."

132. Ms. Darcangelo indicated that she should have gone to a supervisor over the incident but chose not to. Ms. Darcangelo did not feel her language was provocative. "If the shoe fits, wear it. She started it."

133. Ms. Darcangelo did state that some of the other statements she had made to her co-employees and supervisors "were provocative." She stated that in her opinion the company did nothing to address the provocation of other employees. "They can tolerate anything they want to. There are people there that were crazier than I was. You can be crazy, you just can't be diagnosed."

134. Ms. Darcangelo indicated that she knew for sure that she was being singled out and that it was inevitable.

135. Ms. Darcangelo indicated that Dr. Kleinman was on her list of perpetrators because "I don't know why he didn't write a report. I didn't threaten to sue him for malpractice. If someone writes a report without a medical license, it's not malpractice, it's fraud. If you practice medicine without a license, it's fraud. Dr. Kleinman did not have a medical license in Maryland. He probably doesn't have a medical license. When I asked him about his medical license, he ran out of the room and hid. It's no shame not to have a medical license. I was curious about the license."

136. "Once Dr. Kleinman stopped hiding in the shithouse, he did okay."

137. I asked Ms. Darcangelo why she told Dr. Kleinman that he didn't have a medical license at the beginning of the interview. She indicated, "It seems to me to be perfectly factual to say you don't have a license, so you better not treat me. Anyone can be an expert."

L.   **Situation Since Termination From Bell Atlantic:**

138. Ms. Darcangelo currently lives in a rented home. She makes her rent payments "always on time." She owns a car outright. She has about $7,800.00 in credit card debts. She has no trouble paying off her credit card debts or paying her bills. She denied that she was in current financial distress.

139. Ms. Darcangelo has no health insurance but obtains her medications without cost from the Veterans Administration.

140. Ms. Darcangelo indicated that she has worked several jobs since her termination from Bell Atlantic.

141. In 1999, Ms. Darcangelo collected unemployment.

142. In 2000, Ms. Darcangelo worked both for H&R Block and the Census Bureau. Ms. Darcangelo has taken courses at H&R Block to be a tax preparer in the Fall of 1999.

-21-

The course had lots of homework and she spent six hours a week in class with eighteen to twenty hours of homework per week. She indicated that she did about half of the homework. She worked for 1½ months at H&R Block. "I did okay with taxes but I couldn't get along with my co-workers, as usual." She indicated that a co-worker was giving tax advice to a customer. The co-worker was offering to give tax forms for free but H&R Block charged $18.00. That co-worker wanted Ms. Darcangelo to "give away a product for free. I didn't want to. I could have fought with her and a customer about it. I wasn't going to do that."

143. At this point in the interview, Ms. Darcangelo indicated "low wage jobs are wonderful. I love them."

144. Ms. Darcangelo worked for the Census Bureau from April to July of 2000, going house to house doing surveys. The job ended when she had completed all of her assigned job responsibilities.

145. She worked for the Store Inventory Company from January 2002 to March 2002. "I was never fast enough for them." Her job was to actually go into the store and count inventory. "At some point, they would have fired me. I was too slow, so I quit after I got the offer from the school district."

146. Ms. Darcangelo indicated that she had six jobs in 2002. She worked at a WalMart for eleven days stocking shelves. "I was threatened with being fired." She indicated that she had committed a couple of faux pas and had "gotten on the list. People went behind my back to complain about me to management. They were tattletales. A lot of back biting."

147. Ms. Darcangelo worked at the Dollar General Store for fourteen days assembling a new store and putting it together from three semi-trucks. She indicated that she did not get along with the manager. "I wasn't pliant enough. If you were carrying two boxes, they wanted you to carry three."

148. Ms. Darcangelo worked at CDC Logistics for three days. She obtained this job through a temporary agency. It was not meant to be three days. Her job was labeling packages. They got big boxes from local companies. They'd send boxes by truck all over the country. Ms. Darcangelo indicated that she had to choose between this job and a Veterans Administration medical appointment. "The V.A. doesn't like you to reschedule appointments."

149. Ms. Darcangelo worked at Stouffer's Cookies for six hours putting animal crackers into teddy bear jars. Her job was to put the lids on the jars. "It was hot as hell and there were rats, so I quit."

150. Ms. Darcangelo's last job was working as a custodian at Southern York County Schools from March to September, 2002. She worked in an elementary school cleaning the second and third grade classrooms. While working there, she filed a sexual harassment complaint. "I considered going to the high school to work but didn't." Ms. Darcangelo indicated that she filed the sexual harassment complaint because there were

two custodians on the same floor, "I was one and a man was the other. He had driven two other women out. In one incident, he spilled chemicals on the floor and blamed it on me." Ms. Darcangelo indicated that she felt this was sexual harassment because all of the male custodian's targets were women. He was blaming me. He was sloppy. When he got caught, he blamed me. What's to stop him from deliberately doing it? But when you're dealing with a pervert, what's to stop him?" Ms. Darcangelo was asked why she indicated her fellow custodian was a pervert. She stated that he had "done it to two other women, blamed them for his accident and if he continues to only harass people of one gender, then it's sexual harassment." She left the job.

151.   Since her last employment, Ms. Darcangelo has submitted twelve to fourteen applications to various entities, including the Post Office and maintenance work. She recalled working for three days in October of 2002 for Keystone Electronics assembling wiring harnesses. She was "not asked to come back. The proprietor asked me to leave. He didn't tell me why."

152.   When asked about leisure time activities, Ms. Darcangelo indicated that she likes to read but "not as much as I used to." She stated that she reads the Bible "every chance I get." She has no problem concentrating and keeps up with the daily local news and news papers.

153.   When asked about hobbies, she indicated that her major hobby was "suing Bell Atlantic. I've given up everything else I used to do. Lately, I spend every waking minute on litigation activity."

154.   Prior to 1998, Ms. Darcangelo indicated that her major hobby was travel. She has been to various places in the Bahamas but has no time for travel now "because of the lawsuit." Before filing the lawsuit, she used to take two to three trips per year. She indicates that she tries to give competent advice to her attorney regarding the lawsuit.

VI.   DEPOSITION REVIEW:

A.   Gary Zimberg, M.D.:

155.   Dr. Zimberg sees Ms. Darcangelo for medication management sessions that last from 15 to 30 minutes (p. 70, Zimberg deposition). Dr. Zimberg does not perform psychotherapy, just supportive therapy (p. 74). Dr. Zimberg has talked to Ms. Swope, another of Ms. Darcangelo's mental health care providers, from time to time. He has not spoken to her much in later years and did not recall the content of those conversations (p. 37).

156.   Dr. Zimberg did not initially intend to be an expert witness in this case. His knowledge of Ms. Darcangelo was fairly limited because he functioned primarily to manage her medications. Dr. Zimberg subsequently consented to become an expert witness (p. 22). Dr. Zimberg felt he was at the deposition "under duress to some extent" (p. 27). He did not want to be an expert in this case (p. 31).

157. Dr. Zimberg stated that Ms. Darcangelo was in a mildly hypomanic state "pretty much the entire time I've seen her" (p. 57). However he also indicated that it was hard to differentiate schizoid personality disorder or poor judgment from hypomania and "although she has episodes of hypomania , it's not severe enough to change the medication treatment and it typically appears to be that it's more her personality disorder and poor judgment that get her into trouble."(p. 58). Dr. Zimberg did not apply DSM-IV-TR criteria for hypomania to Ms. Darcangelo's case (p. 60) and made the diagnosis of hypomania based on rapid and tangential but redirectable speech. (p. 59). Dr. Zimberg believes Ms. Darcangelo's hypomania is "really on the borderline and I think if left to her own devices really wouldn't be noticeable. The hypomania comes up when she is dealing with stressful, interpersonal issues" (p. 76).

158. Ms. Darcangelo does not fit neatly into any one diagnostic category. She does suffer from "some sort of personality disorder" (p. 43). Dr. Zimberg believes Ms. Darcangelo's difficulties with social and occupational functioning are overwhelmingly related to her schizoid personality disorder and poor judgment. The bipolar diagnosis is "a sideshow" (p. 62).

159. Dr. Zimberg was not aware that Ms. Darcangelo had displayed a photograph of her supervisor cut out and pasted in the center of a rifle target (p. 179). Dr. Zimberg relied exclusively on Ms. Darcangelo's descriptions of her difficulties at work. "I have no way of knowing what did or didn't happen" (p. 181).

160. Dr. Zimberg believes the GAF scale is "incredibly subjective (p. 65)." and "there has never been great reliability on that scale (p. 66)." Dr. Zimberg believes doctors reasonably differ on GAF scores all the time (p. 66) and that the GAF score cannot be used as a predictor of whether someone can perform a job (p. 69).

B.   Julie D. Swope:

161. Ms. Swope has been licensed psychologist in the State of Pennsylvania since 1983 (p. 27). She has only a Masters degree in Education, not a Doctoral degree (p. 28).

162. Ms. Darcangelo was initially referred to Ms. Swope in July 1984 by psychiatrist Dr. Mira (p. 14). Ms. Swope did not know Dr. Mira. Her name was picked off an insurance referral list (p. 100). Ms. Swope has never spoken to any of Ms. Darcangelo's health care providers (p. 132).

163. Ms. Darcangelo has been cooperative, on time and responsible during her appointments with Ms. Swope. Ms. Darcangelo was able to deal with the illness and subsequent death of her mother in a responsible fashion (p. 112 ).

164. Ms. Swope has not kept written treatment records for Ms. Darcangelo since 1995 (p. 33). Ms. Darcangelo saw Ms. Swope weekly in 1994 and then biweekly in 1995. Ms. Darcangelo chose the visit frequency. Ms. Darcangelo did not see Ms. Swope from October 1995 to 1997. Ms. Swope does not know why the two year interruption in treatment occurred (p. 116), nor does she know why Ms. Darcangelo returned to treatment in October 1997 for two visits only (p. 117). Ms. Darcangelo did not return to

treatment again until January 1998 (p. 117). Ms. Darcangelo saw Ms. Swope biweekly to monthly in 1998 (p. 118).

165.    Ms. Swope cannot testify as to the diagnosis of Bipolar Disorder as it is a medical diagnosis (p. 12). The diagnosis that is described in Ms. Swope's records, bipolar I disorder, is the psychiatrist's diagnosis, not Ms. Swope's (p. 58). Ms. Swope has never considered other diagnoses. (p. 104). Ms. Swope never saw Ms. Darcangelo as depressed (p. 13). Ms. Swope believes Ms. Darcangelo's behaviors of running on with words, rambling and non-focused speech are consistent with the diagnosis of Bipolar Disorder (p. 59). She has never seen Ms. Darcangelo as manic, but believes Ms. Darcangelo is hypomanic all the time based on sleep patterns and difficulty with social interaction (p. 60).

166.    Ms. Swope initially focused on Ms. Darcangelo's inappropriate behavior in the workplace (p. 16). Ms Swope's knowledge of the poster incident, which involved Ms. Darcangelo's supervisor Butch, came exclusively from Ms. Darcangelo (p. 17). Ms. Darcangelo showed Ms. Swope a photograph of the picture and target during a therapy session (p. 18). Ms. Swope saw the poster as "socially inappropriate" (p. 18). What usually got Ms. Darcangelo in difficulty were not her work habits but her raised voice and socially inappropriate speech content (p. 20). Ms. Swope believes Ms. Darcangelo has the capacity to control her responses (p. 156).

167.    Ms. Swope believed the final incident that resulted in Ms. Darcangelo's termination from Bell Atlantic involved a candy throwing incident with Barbara Lee. Ms. Swope was not aware of racial comments Ms. Darcangelo made during the actual incident (which did not in fact involve candy throwing) (p. 26).

168.    Ms. Darcangelo has not made progress on any of the things in her treatment plan (p. 113). Treatment is directed by Ms. Darcangelo, not by Ms. Swope. Ms. Swope initially tried cognitive therapy, but it did not work (p. 114). Ms. Darcangelo's presentation to Ms. Swope has been very consistent without change in symptoms (p. 115). In November 1998 Ms. Swope recorded that Ms. Darcangelo's symptoms were improved (p. 126).

169.    Although Ms. Swope continues to see Ms. Darcangelo, she has no current treatment plan for Ms. Darcangelo (p. 119). Ms. Swope sees Ms. Darcangelo as stable and does not see her termination from Bell Atlantic as having had an effect on her (p. 119).

C.    **Gottlieb Fleig**:

170.    Mr. Fleig worked for Bell Atlantic August 1997 to the first quarter of 2000 (p. 5) as a supervisor of transport support. Transport support monitored the software that hooks up new fiber optic service. The transport support group took care of service problems in the software (p. 6).

-25-

171. Ms. Darcangelo told Mr. Fleig that she was not supposed to work second shift or night shift. Mr. Fleig conferred with his manager Jim Conrad, and he did not recall ever saying that to her (p. 17).

172. Mr. Fleig felt it was "hard to get Fran to work" (p. 36). Fran would go in a direction that wasn't work related or conducive to get work done and continue in that direction until Mr. Fleig would tell her to stop (p. 57).

173. Several employees expressed their concerns about Ms. Darcangelo's potential to harm others (p. 42-44). Mr. Fleig discussed the issue with Mr. Conrad and "decided having the fiduciary responsibility for the safety of the employees there that maybe we ought to have a professional, a doctor, look into this and make a determination whether there was a real safety concern there" (p. 45).

174. Ms. Darcangelo made comments that were inappropriate to other members in her work group that didn't endear her to the other people (p. 49). As an example she used the N word in a group where there were people of African-American ancestry (p. 50).

175. Ms. Darcangelo had difficulty dealing with other people, which affected her job performance (p. 58). Mr. Fleig was "not so sure" that Ms. Darcangelo's difficulty in dealing with other people "wasn't by design" (p. 61). Ms. Darcangelo had a greater problem in dealing with people than any other employee (p. 66). She could do her job "but quite often didn't want to" (p. 67).

176. Ms. Darcangelo had a habit of taking off and walking around and doing things that had nothing, you know, just walking around the plant chitchatting with people and one occasion I came back and in the middle of the work day, her with lots of work to do, she had her feet up on the desk, was eating a plate full of chipped beef and reading the Wall Street Journal that was on her lap. When, like the other employees, she was expected to be doing what her work assignments were, which were obviously not what I observed. Once again, she had to get up from her work area, not say anything to me, go down to the cafeteria, stand in line, purchase this and come back (p. 70).

177. Mr. Fleig further indicated that Ms. Darcangelo told him that she did not intend to work for 20 to 25 years for Bell Atlantic, that her game plan was to do something to get fired, and then to sue the company and take the money to supplement her job as a refrigeration repair person (p. 115-116).

178. Ms. Darcangelo was eventually reassigned from Mr. Fleig's group to another group at the suggestion of Jim Conrad (p. 38).

D.   **Marianne Moxey**:

179. Ms. Moxey was a supervisor in provisioning (p. 6) and supervised Ms. Darcangelo through January 1999 (p. 42). Ms. Darcangelo could disrupt the work group by making a scene (p. 16). She would raise her voice and use inappropriate language including racial words like nigger (p. 17). Ms. Darcangelo referred to Ms. Moxey as a

slut and Ms. Menopause (p. 25). Ms. Darcangelo made personal phone calls every day to her stock broker and lawyer that took her out of the flow of work (p. 33).

180. Ms. Darcangelo did "little work" (p. 14) which was objectively measured on the crew report which Ms. Moxey received once per week or month (p. 53).

181. Ms. Darcangelo's job involved facilitating order provisioning for other phone company employees, not outside customers (p. 55).

182. Ms. Darcangelo did not interact well with other people (p. 62).

183. Ms. Darcangelo never asked for accommodation or special treatment as a result of her medical condition (p. 130).

184. In November 1998, Ms. Darcangelo complained that John Russo had tossed a tootsie roll to Billie Jo and that the candy had fallen in Ms. Darcangelo's cubicle (p. 178). As a result of the incident John Russo was moved (p. 182) and the candy was never thrown again (p. 183).

185. Ms. Moxey walked in on an incident between Barbara Lee and Ms. Darcangelo. Ms. Darcangelo repeatedly said to Ms. Lee "masta, I don't work for you" and this made Barbara Lee agitated. Barbara Lee stated "I'm going to fuck you up" to Ms. Darcangelo (p. 192). Ms. Moxey could not control the incident. Ms. Darcangelo kept repeating the "masta" line and Ms. Lee kept responding (p. 194). Other supervisors intervened and both women were removed from the area (p. 195).

E.  **James Conrad**:

186. Mr. Conrad described the job of central office technician as a generic term for top craft jobs in the telephone company (p. 8). Some of the major job responsibilities were coordinating activity with outside work groups, work on telephones for appointments, interaction with people, and the field, which was in the actual central office locations to get work scheduled and completed, and also to test work (p. 9). There was also a supplemental list of job responsibilities that went outside of the technical arena which were related to what were called interfacing skills. There was also the "Bell Atlantic Way", which talked about, how to work and deal with the team, to be team players and solve problems (p. 18).

187. Ms. Darcangelo was terminated for multiple violations of the code of conduct (p. 45).

Those included:

a.  called her supervisor a lying sack of shit;

b.  posting a poster with a target with the supervisor's picture in the middle and her work in her work area;