c.    walking away from the supervisor, Butch English, when he told her it would be insubordination if she did so; and

    d.    walking away from a customer contact and leaving him hanging on the phone;

    e.    an incident where she taunted a person in the center using racial type words (p. 46).

188. There were periods of time when Ms. Darcangelo did well and then there were periods of time when she just didn't want to cooperate in the workplace (p. 122).

189. On October 17, 1997, Mr. Conrad wrote Ms. Darcangelo a memo indicating that he had gone too far in trying to create a workplace where she could be productive including allowing incidents to go on in the hopes that they were not going to continue (p. 151). These included allowing her to disrupt the work force, use offensive language, and hang all manner of material in her cube (p. 151).

## VII. MENTAL STATUS EXAMINATION:

190. Ms. Darcangelo entered the interview room on time. She had a wheeled briefcase with yellow warning tape with black letters "Hazardous Material" about three inches in height on the tape. Although I offered to shake her hand at the beginning of the interview, she refused to shake mine. At the beginning of the interview, she took out a large bag of nuts and a bottle of ginger ale and slapped them very loudly on the table. At various points at the beginning of the interview, she slapped the table loudly with her hands but this behavior extinguished about an hour into the interview.

191. Her speech was of normal rate and was at times loud, but the volume of her voice tended to be more normal as the interview progressed. Ms. Darcangelo's affect was euthymic during the interview. She tended to giggle and laugh at points in the interview that appeared to me to be related to black or ironic humor. She described her mood as "always the best, not sad, but pessimistic. Maybe Martha has the judge in her pocket. I feel I need to punish some people [at this point she held up another list of people on the same yellow paper as her previous list. That list included Sullivan, Joyce Harris, Rukowicz, Ports, Conrad, Libertini, Broyles, Gottlieb Fleig, Marianne Moxey, Barbara Lee, Chantel Sakay.] She had a normal self-attitude and normal vital sense. She denied current suicidal ideations, intent or plan and made no threats toward others. She denied any trouble with sleep and described no change in appetite. There was no subjective or objective evidence of hallucinations in any sensory modality. There were no delusions.

192. She reported that she was "compulsive about mechanical things. I always wonder if the door is locked or the circuit breaker is on. I resist the urge to check." She also indicated that she is phobic of water but does not remember a drowning incident. She denied any current symptoms of free-floating anxiety. Ms. Darcangelo denied any history of nightmares, flashbacks or increased physiological reactions. I did not perform a formal cognitive examination but she appeared alert.

## VIII. PSYCHOLOGICAL TESTING:

193. The MMPI-2 was administered by me and scored by Alex Caldwell, Ph.D. Validity scales indicated that Ms. Darcangelo's MMPI-2 profile was within acceptable validity limits for Scales L, F and K. The extended validity scales suggest a person who is cautiously self-favorable in some areas but willing to report atypical attitudes and unusual experiences in other areas.

194. According to Dr. Caldwell:

> Ms. Darcangelo's MMPI-2 pattern strongly suggests a currently psychotic breakdown or a marked vulnerability to such decompensation. The profile indicates at least moderately severe distrust, emotional distancing and estrangement. Hostile, resentful and irritable, others are apt to see her as unpredictable and changeable and as difficult and hard to understand. Projecting and rationalizing of her own behavior when acutely upset, her empathy and emotional understanding of others and her awareness of how she hurts and alienates them appear distorted. The pattern is strongly predictive of chronic difficulties in getting along with men and what is apt to be a lifelong impairment in maintaining emotionally close relationships. Some similar patients have shown an instability of goals, along with a shallow and hedonistic morality. Nevertheless, her quite good level of ego-strength predicts organized functioning and immediate practical self-sufficiency in many areas.
>
> . . . The pattern suggests a mildly to moderate depressed emotional tone with moodiness, nervousness, tension and self-criticisms. However, in many similar cases, the guilt was displaced and focused on particular events rather than reflecting the many ways in which they had hurt the most important others in their lives. Also, the pattern suggests that her guilt would be "after the act" and would not effectively inhibit future acting-out. She tests as mildly shy socially. Her shyness would tend to keep her at the periphery of her social group and thus likely reduce the likelihood of getting into repeat difficulties of a public nature.
>
> The pattern suggests a "black sheep" lifestyle both by the standards of society and those of her family.

## IX. SUMMARY:

195. Ms. Darcangelo is a forty-seven-year-old woman plaintiff, who has sued Bell Atlantic claiming she was fired illegally because of discrimination related to a psychiatric disability. Ms. Darcangelo's family history is significant in that she had a difficult relationship with her family members. According to Ms. Darcangelo, neither parent felt that she was competent to do anything and both were extremely critical of her while she was growing up. Ms. Darcangelo indicated that she was continuously verbally demeaned by her parents, especially her mother. She also indicated that she was physically disciplined by her father with a strap on her back. She denied that she was a "bad kid." Ms. Darcangelo indicated that she has a brother who is a "family disappointment." She also indicated that her father's older sister had two sons, both diagnosed with Schizophrenia. The older son committed suicide. A paternal second cousin also suffers

from Schizophrenia. Ms. Darcangelo described "everyone" on her father's side as "eccentric."

196. As a child, Ms. Darcangelo indicated that she was touched in a sexually inappropriate way by a male cousin while she was in preschool. The cousin was six or seven years her senior. Ms. Darcangelo indicated that she had had "classic symptoms of Posttraumatic Stress Disorder" but that the symptoms had ended about fifteen years ago. She denied any current symptoms consistent with Posttraumatic Stress Disorder.

197. Ms. Darcangelo indicated that while in school, she was "bullied the entire time, all day and every day." She also indicated that she was sexually harassed in school, in that when she was touched by people in school, she over-reacted. After leaving high school, Ms. Darcangelo attended several colleges, subsequently graduating from the University of Maryland with a Bachelor's Degree. She has since taken technical courses.

198. Ms. Darcangelo has never married and has no children. She currently lives alone. She indicated lifelong difficulties in getting along with others; "People don't care about me and I don't care about them." She indicated that since she was young, she had no affinity for groups; "No one could put up with me or like me." She never identified with any group, including her family. She had no close friends, either outside or inside of her family. She denied ever having had a meaningful, caring relationship in her lifetime. She indicated, instead, that she "hated all my enemies." Ms. Darcangelo indicated that she would not give away her list of enemies but "I have plenty of enemies here."

199. When asked about prior intimate relationships, Ms. Darcangelo admitted to several prior relationships because "I needed someone to pay rent. One person seemed as good as anyone else." She expressed feeling hurt by, and angry towards, the men in her prior relationships. She described all of her prior relationships as bad; "I never had a good relationship. I didn't plan it that way."

200. Ms. Darcangelo stated that she suffered from chronic "walking depression" as a child and could not remember, as a child, when she was not depressed. She described symptoms of crying most of the day, having difficulty getting out of bed and having a disturbed appetite. Contemporaneous medical records confirm Ms. Darcangelo's description of chronic depression, diagnosis of Major Depression and treatment with antidepressant medications. Records also describe Ms Darcangelo as having significant conflicts in interpersonal relationships.

201. Ms. Darcangelo began working for C&P Telephone on November 6, 1977. Ms. Darcangelo left her employment at the telephone company and entered Air Force basic training at Lackland Air Force Base in October 1989. She had serious behavioral difficulties as a recruit. She was evaluated by Air Force mental health professionals and was found to be insubordinate, inappropriately cheerful and silly. No psychotic symptoms were documented and she was administratively separated from the Air Force for a character and behavior disorder. Ms. Darcangelo was subsequently hospitalized three times in Pennsylvania and Maryland and diagnosed with Schizophrenia and Schizoaffective Disorder. She was treated with antipsychotic medications after it was

noted that she was delusional and grandiose. She requested to be reinstated to her job at the telephone company and began treatment again with her prior outpatient psychiatrist, Dr. Ramsey, who reformulated her diagnosis as manic psychosis and adjusted her antipsychotic medications. She subsequently returned to work full-time at the telephone company on unrestricted basis on March 7, 1990.

202.    Ms. Darcangelo indicated that since her psychotic episode, she has been hypomanic but not "full-blown." She denied racing thoughts or thinking distortions but believed that she had "behavioral things consistent with hypomania." Ms. Darcangelo denied, and her medical treatment records confirm, that she had ever experienced manic symptoms before 1989. There were also no documented episodes of mania or psychotic symptoms subsequent to March 1990.

203.    From Ms. Darcangelo's perspective, after her psychotic episode in 1989, "I went through a door and came back in a different existence." Her chronic depression ended.

204.    Ms. Darcangelo was subsequently treated by a variety of mental health professionals. In June 1994, Dr. John Mira, Ms. Darcangelo's psychiatrist at that time, attempted to add Depakote, a mood-stabilizing medication, to her treatment regime. Ms. Darcangelo was also taking Mellaril, an antipsychotic medication, and occasional benzodiazepine anti-anxiety medications at the same time. On June 24, 1994, she arrived at work in a very confused state and was unable to perform her job duties. Ms. Darcangelo's Depakote was subsequently stopped and she has been maintained on lithium, a mood-stabilizing medication, with the occasional addition of BuSpar, an anti-anxiety medication.

205.    Ms. Darcangelo has had no subsequent psychiatric hospitalizations. Her current psychiatrist, Dr. Gary Zimberg, has never documented any signs or symptoms which would allow the diagnosis of either hypomanic or manic episodes.

206.    Ms. Darcangelo was employed in various jobs by the telephone company. She was a central office technician in provisioning at the time of her termination January 1999.

207.    Ms. Darcangelo engaged in a series of disruptive and provocative behaviors at Bell Atlantic, both before and after her 1989 psychotic episode. In January 1983, Ms. Darcangelo was disciplined when she brought two bullets to work and, when questioned about their purpose, stated, "They are bullets and I have your name on them" to a fellow worker. In March of 1983, she came to work with shirts with words on them such as "Hitler was right" and "Kick ass." She was given the alternative of covering the shirt or going home on company time to change. She refused both and was disciplined for insubordination.

208.    In October 1989, Ms. Darcangelo took a leave from Bell Atlantic and attempted to enter active military duty with the Air Force. She was administratively discharged from the Air Force, had her psychotic episode and subsequently returned to Bell Atlantic in March 1990. Her treatment records with Dr. Ramsey in 1990 indicate no evidence of

Mood Disorder, either mania, hypomania or depression but for a single record of being "somewhat hypomanic" on December 2, 1991.

209.   In June 1991, Ms. Darcangelo was complimented by her supervisor for doing a good job.

210.   In March 1992, Ms. Darcangelo was counseled for using inappropriate language, "shit pot" or "shit load", in the presence of visitors to Bell Atlantic. Later in the month, she was counseled for using "fuck and fucking" and stating, "Talk to my ugly face or don't talk to me at all, Mr. Nutless Wonder", in a company memo. Because of these behaviors and behavioral observations that she had a short temper and was argumentative, using profanity and raising her voice at co-workers and supervisors, she was sent for medical-legal urinalysis which was negative for screened drugs.

211.   In June 1993, John Mira, M.D., her treating psychiatrist, wrote to Bell Atlantic's medical director, indicating that Ms. Darcangelo had been treated by Dr. Mira for a year with medications for psychological difficulties and "has done well. Her current level of functioning does not preclude her from performing her work duties or impair productivity. She is not affected by her condition in such a way that her judgment or thought processes are affected." In a progress note in November 1993, Dr. Mira indicated that Ms. Darcangelo was "doing well on lithium."

212.   In an appraisal rating in March 1994, multiple positive comments regarding Ms. Darcangelo's technical knowledge were made. The rating, however, went on to note that Ms. Darcangelo was "very critical of some of her co-workers and tends to be very vocal about other actions. She was requested not to use arrogant comments when referring to co-workers and supervisors. She was also asked to consider how she might feel if the same comments and nicknames were directed at her. She needs to improve in this area."

213.   On June 1, 1994, Ms. Darcangelo had a blow-up with co-worker Dennis Bronis. This was precipitated by a call-out by Ms. Darcangelo one evening. Ms. Darcangelo stated that Mr. Bronis' wife spoke with her and that Ms. Darcangelo told the wife that Mr. Bronis was at a bar. Mr. Bronis then called Ms. Darcangelo a "Goddamn lunatic" in front of co-workers. Subsequently, Ms. Darcangelo returned a quality improvement award she had been awarded in March 1993. In the letter returning the award, she signed herself "Your Goddamned Lunatic." She further indicated in the letter, "If Nottingham presents me with the quality award, there will be blood on the floor."

214.   After the incident with Dennis Bronis, Shirley Scott contacted her supervisor and stated that she was fearful of what Ms. Darcangelo might do. Other staff members had overheard Ms. Darcangelo making the statement, "As long as Scotty is alive, no one has anything to worry about." In June of 1994, Ms. Darcangelo was given a formal warning that disciplinary action would take place if she did not change her behavior. The warning noted many unprofessional comments on Ms. Darcangelo's part, including calling the midnight supervisor a "fat bastard" and that she had caused fear in the workplace. In that letter, Ms. Darcangelo was informed that she had done a lot to create an image of herself that was threatening, such as placing name stickers on various documents identifying

herself as the Tasmanian devil, signing herself, Fran TT, for Fran The Terrible, and by signing many documents, including a recent work schedule as "The Goddamn Lunatic." Ms. Darcangelo was informed that this created the image of a person who could be violent in the workplace and that this was not acceptable. It was also pointed out that it was unacceptable to be disrespectful of her co-workers and to answer her phone with "Lunatic."

215.   Ms. Darcangelo responded to the June 16, 1994 formal warning by essentially taking no responsibility for her behavior and blaming others.

216.   On June 18, 1994, Dr. John Mira indicated that Ms. Darcangelo was having sleep difficulties in the last forty-eight hours and had called for an emergency appointment. Dr. Mira indicated that Ms. Darcangelo was "not manic now and is in control of her thoughts but is having difficulty with sleep, which is associated with problems at work." She was started on Depakote, Ativan and Mellaril. Subsequent notes by Dr. Mira indicated that Ms. Darcangelo complained of nausea. She was switched from Vistaril to Ativan for sleep. During that visit, Dr. Mira again indicated that Ms. Darcangelo had no manic symptoms.

217.   On June 24, 1994, Ms. Darcangelo had the previously mentioned episode of confusion and G.I. symptoms on the night shift. Her confused behaviors at work were attributed by Dr. Mira as intolerance of Depakote and it was stopped. In a July 14, 1994 note, Dr. Mira noted that Ms. Darcangelo continued to be not manic. He wrote a note to Bell Atlantic that her confused behaviors on June 24, 1994 were due to medication effects.

218.   In an August 23, 1994 letter, Dr. Mira indicated that from June 25, 1994, Ms. Darcangelo's medication had been adjusted and that she had done well.

219.   Dr. John Mira's progress notes through 1994 indicate that Ms. Darcangelo was doing well without any evidence of manic, hypomanic or depressed episodes.

220.   On March 2, 1995, on a medical appointment form, mental status is "hypomanic" without any other data noted. On April 11, 1995, mental status is noted to be "talkative. Voice normal tone. Diagnosis: Anxiety increased somewhat."

221.   In December of 1995, Ms. Darcangelo received a performance appraisal indicating that she "consistently produces quality product. Timeliness improving steadily. Needs to improve interfacing skills with other workers. Must be able to control temper in work environment and remain professional. Problem-solving skills improving steadily." She was complimented on the numerous positive contributions that she made in 1995. There were no subsequent descriptions of manic, hypomanic or depressed mental status symptoms in Ms. Darcangelo's contemporaneous treatment records.

222.   On August 14, 1997, Ms. Darcangelo was observed by her supervisor, Gottlieb Fleig, eating a plate of food and reading the *Wall Street Journal* instead of working. She was counseled on these actions. She then indicated that her reprimand was a form of discrimination because a Black co-worker, Dwight Allen, reads the newspaper and had

-33-

not been counseled by management. She referred to Black people as the "n word." During the conversation, she continued to read the newspaper.

223. On October 13, 1997, Ms. Darcangelo was counseled by management for making off-color remarks about people, i.e., "idiot and ass kisser", using offensive language, the f word and the n word and using offensive material in the working area, keeping her work area taped off like a police crime area and using comments, such as "dog piss." In a pre-disciplinary warning, her supervisor indicated that because of her unique problems, management had gone overboard and allowed Ms. Darcangelo to do things that they would not have allowed other employees to do. Management indicated that they would no longer overlook Ms. Darcangelo's disruptive behavior and she was to be held accountable for her behaviors.

224. In an evaluation by Gary Zimberg, M.D. on October 15, 1997, Ms. Darcangelo had no symptoms suggestive of mania, hypomania or depression.

225. On November 4, 1997, Ms. Darcangelo underwent an independent medical evaluation by Anthony Russo, M.D. at the request of her employer. She was referred because co-workers had expressed fear of Ms. Darcangelo's behavior. On mental status examination, Dr. Russo indicated that Ms. Darcangelo was stabilized on medication and could return to work in her full capacity. He further noted, "In the event that the patient demonstrates mania, hypomania and symptoms thereof, she should be considered for additional mood stabilization." Dr. Russo diagnosed Bipolar Disorder, Type I, Posttraumatic Stress Disorder, Sexual Dysfunction, Schizoid Personality Disorder and Borderline Personality Disorder.

226. Ms. Darcangelo returned to her treating psychiatrist, Dr. Gary Zimberg, on November 5, 1997. He again documented no symptoms suggestive of recurrent mania, depression or hypomania.

227. In December 1997, in a treatment session with Dr. Zimberg, Ms. Darcangelo again exhibited no symptoms consistent with mania, hypomania or depression. She indicated that she had been out of work on disability but had returned. She told Dr. Zimberg that she was not certain why she was out on disability and adamantly denied that she was ever inappropriate in her dealings with co-workers. In a January 1998 treatment record, Dr. Zimberg indicated that Ms. Darcangelo felt she was being harassed by her employer. Dr. Zimberg indicated that Ms. Darcangelo was euthymic and denied periods of agitation.

228. In a February 1998 letter from Dr. Zimberg to Robert Altland, M.D., Dr. Zimberg indicated that Ms. Darcangelo did not display any evidence of recent mania or hypomania.

229. In a treatment record dated February 18, 1998, there were again no documented symptoms of mania, hypomania or depression. She told Dr. Zimberg not to pursue the matter of reasonable accommodation as she was uncertain exactly what a reasonable accommodation might be considering her circumstances.

230. On March 6, 1998, Ms. Darcangelo referred to her supervisor, Butch English, as a "lying sack of shit."

231. On April 15, 1998, Dr. Zimberg again indicated that Ms. Darcangelo displayed no evidence of psychosis, mania or hypomania.

232. On May 8, 1998, Ms. Darcangelo's supervisor, Marianne Moxey, found a commercial rifle target with a supervisor's photo attached to the middle of the target. Ms. Darcangelo was immediately sent home as a possible violence in the workplace threat. She was suspended for ten days and referred to CORE and subsequently underwent an independent medical evaluation by Jerome Gottlieb, M.D.

233. In a May 13, 1998 progress note, Dr. Zimberg indicated that Ms. Darcangelo was on suspension again but "cannot explain why. She displayed a poster at work as a prank of sorts, which was apparently considered to be a threat. She is not surprised by her employer's response and feels all the more strongly that she is a victim of discrimination." Dr. Zimberg indicated again that Ms. Darcangelo did not appear manic, hypomanic nor psychotic at the time of that interview.

234. On May 29, 1998, Ms. Darcangelo underwent a second IME by Jerome Gottlieb, M.D. On mental status examination, Dr. Gottlieb described Ms. Darcangelo as having no psychotic symptoms with affect "appropriate for the most part. There were a couple of instances where she seemed to laugh at inappropriate times. Her mood was very slightly elevated." Dr. Gottlieb diagnosed Bipolar Disorder, Currently Slightly Hypomanic and deferred diagnosis on Axis II. Dr. Gottlieb felt Ms. Darcangelo could return to work.

235. On July 2, 1998, Dr. Zimberg indicated that Ms. Darcangelo was "a bit more labile than previously noted." He increased her lithium dose.

236. On August 10, 1998, Dr. Zimberg indicated that Ms. Darcangelo did not appear depressed or manic.

237. On August 28, 1998, Ms. Darcangelo referred to her supervisor as "a slut, PMS lady, and Ms. Menopause."

238. On September 9, 1998, Dr. Zimberg indicated that Ms. Darcangelo did not appear manic, hypomanic or depressed.

239. On September 23, 1998, Ms. Darcangelo was suspended for three days for insubordination when she did not follow the instructions of her supervisor. Marianne Moxey, her direct supervisor, indicated that Ms. Darcangelo was loud and disruptive and had used inappropriate language when talking about her supervisors, including referring to Marianne Moxey as a slut.

240. On October 14, 1998, Dr. Zimberg indicated that Ms. Darcangelo appeared "a bit labile." There were no further notations on her mental state during that visit.

241. On October 23, 1998, Ms. Darcangelo was given a fifteen day suspension for misconduct and insubordination when she refused to follow the instructions of her supervisor.

242. On November 17, 1998, in a session with Gary Zimberg, M.D., Ms. Darcangelo presented with increased anxiety and indicated that she had been out of work for the past few weeks due to "earlier alleged infractions on the job." She slept poorly. There is no description of her mood state in the note.

243. On December 17, 1998, Fran Darcangelo's co-worker, Barbara Lee, asked Ms. Darcangelo about a ticket order. Ms. Darcangelo replied, "I don't work for you, massa", and repeated the statement multiple times. Ms. Darcangelo was noted to be antagonizing Barbara Lee, making the statement like a slave talking to her master. Barbara Lee then came over to Ms. Darcangelo's cubicle, stating that she had had enough, that she was going to take care of this. Barbara Lee said that Ms. Darcangelo had been allowed to do or say things and she was tired of it. Barbara then told Ms. Darcangelo to go outside and said, "I'm going to fuck you up." Other employees intervened.

244. On December 23, 1998, Ms. Darcangelo saw Dr. Zimberg. She appeared anxious with affective lability. She felt she would likely be terminated from her job because of alleged assault of a co-worker. She stated that the co-worker actually assaulted her. Ms. Darcangelo appeared more labile. There is no further notation of Ms. Darcangelo's affective state in that note. Dr. Zimberg, however, suggested that Ms. Darcangelo pursue short-term disability to remove her from job-related stressors.

245. Ms. Darcangelo was subsequently terminated from her employment at Bell Atlantic on January 6, 1999.

X.  **OPINIONS:**

   A.  **Diagnosis:**

246. Diagnostically, it is my opinion that Ms. Darcangelo has suffered from the following psychiatric conditions during her lifetime:

   Axis I -      Bipolar Disorder
                 Delirium

   Axis II -     Personality Disorder Not Otherwise Specified

247. I have made the diagnosis of Bipolar Disorder because Ms. Darcangelo has had, during her lifetime, one manic episode and several major depressive episodes. Review of available psychiatric records indicate that Ms. Darcangelo had experienced depressive episodes before 1989, including periods of sustained depressed mood, diminished interest in usual activities, significant weight loss, fatigue, feelings of worthlessness and decreased ability to concentrate.

248.   Ms. Darcangelo's single manic episode in her lifetime occurred in late 1989 and early 1990, when she experienced a distinct period of abnormally and persistently elevated and irritable mood which lasted for more than one week. That episode was associated with grandiosity, decreased sleep, flight of ideas, agitation and was further associated with psychotic symptoms (hallucinations and delusions). By March of 1990, Ms. Darcangelo's manic episode had resolved with appropriate psychopharmacologic intervention. Ms. Darcangelo has had no manic episodes since that time.

249.   Bipolar Disorder by its very nature is an episodic condition with patients experiencing depressive episodes, manic episodes, hypomanic episodes, or mixed episodes at intervals throughout their lifetime. These episodes typically resolve and, between episodes, patients with Bipolar Disorder commonly return to their premorbid level of personality functioning. Based on my interview with Ms. Darcangelo and my review of her existing treatment records, there is no evidence that Ms. Darcangelo has suffered from either a depressive or manic episode after March 1990.

250.   It is also my opinion that Ms. Darcangelo either never experienced a hypomanic episode in her lifetime, or if she did, the intensity of her hypomanic symptoms were essentially insignificant. The DSM-IV-TR, psychiatry's current diagnostic manual, defines a hypomanic episode as a distinct period of persistently elevated, expansive or irritable mood lasting at least four days, that is clearly different from the usual non-depressed mood. Furthermore, during the period of mood disturbance, three or more of the following symptoms (four if the mood is only irritable) have persisted and have been present to a significant degree: (1) inflated self-esteem or grandiosity, (2) decreased need for sleep, (3) more talkative than usual or pressure to keep talking, (4) flight of ideas or subjective experience that thoughts are racing, (5) distractibility, (6) increase in goal-directed activity or psychomotor agitation, and (7) excessive involvement in pleasurable activities.

251.   Dr. Zimberg in his deposition indicated that he thought Ms. Darcangelo was in a mildly hypomanic state "pretty much the entire time I've seen her." However he also indicated that it was hard to differentiate schizoid personality disorder or poor judgment from hypomania and "it typically appears to be that it's more her personality disorder and poor judgment that get her into trouble." Dr. Zimberg did not apply DSM-IV-TR criteria for hypomania to Ms. Darcangelo's case.

252.   Although some of Ms. Darcangelo's medical records have alluded to hypomania, there is not a single documented instance in Ms. Darcangelo's contemporaneous medical or psychiatric treatment records that she ever met DSM-IV criteria for hypomania. Furthermore, Ms. Darcangelo did not meet the criteria for hypomania around the time of Dr. Kleinman's or my examinations. Ms. Darcangelo's Bipolar Disorder has been appropriately treated with lithium and other psychotropic medications since her diagnosis of Bipolar Disorder in 1990. As a result of medication management, it is my opinion that her Bipolar Disorder has essentially been in remission since that time.

253.   There is no data to suggest that any of Ms. Darcangelo's inappropriate behaviors at Bell Atlantic were related to her Bipolar Disorder, as there is no evidence that she was

-37-

in the midst of either a manic, hypomanic, mixed or depressive episode during the time of any of those behaviors.

254.   I have diagnosed Ms. Darcangelo as suffering from Delirium because Ms. Darcangelo's description of confusion and G.I. symptoms during the night shift of June 24, 1994 is consistent with a Delirium Syndrome secondary to medication effects. The combination of Depakote, Lithium, Mellaril, and benzodiazepines caused a temporary confusional state (Delirium) that resolved after a change in medications. Ms. Darcangelo was not capable of performing her job functions that night shift, but her symptoms were temporary and resolved completely after her medications were changed.

255.   I have also diagnosed that Ms. Darcangelo suffers from a personality disorder. A person's character is shown through their personality traits. Personality traits are ways of describing enduring patterns of the way an individual typically thinks, behaves and feels. When personality traits become inflexible and maladaptive the diagnosis of personality disorder is made.

256.   I have made the diagnosis of Personality Disorder in Ms. Darcangelo because throughout her adult lifetime, she has had an enduring pattern of inner experiences and behaviors that are inflexible and maladaptive and deviate markedly from the expectations of her culture. Her difficulties are inflexible and pervasive across a broad range of personal and social situations.

257.   Personality Disorders are not psychiatric illnesses, like Bipolar Disorder, or other major psychiatric illnesses. Personality Disorders do not impair intellectual or perceptual functioning. Personality Disorders also do not impair a person's ability to control their behaviors. Patients with personality disorders are fully capable of making appropriate choices in social and occupational functioning. Patients with personality disorders may make bad choices and may engage in inappropriate behaviors, but they chose to do so. They are perfectly capable of making good choices and engaging in appropriate behaviors.

258.   I have made the diagnosis of Personality Disorder Not Otherwise Specified as Ms. Darcangelo suffers from a disorder of personality functioning that does not meet criteria for any one specific Personality Disorder. Ms. Darcangelo's predominant personality vulnerabilities include aspects of both Paranoid and Schizoid Personality Disorder, including her fear that others are exploiting or deceiving her, her persistent bearing of grudges, her perception that others are attacking her character or reputation, her failure to maintain close relationships inside or outside her family, her lack of close friends or confidantes and her indifference to the criticism of others.

259.   My diagnoses are essentially consistent with the diagnoses of other psychiatrists who have treated Ms. Darcangelo since 1991. All treating psychiatrists have diagnosed Bipolar Disorder. No treating psychiatrist has noted any episodes of mania or depression. All treating psychiatrists have either documented no symptoms or very mild symptoms of hypomania. Ms. Darcangelo's treating psychiatrists have either not diagnosed personality disorder or have diagnosed schizoid personality and/or avoidant personality disorder.

B. <u>Impairment and Disability Assessment</u>:

260. Ms. Darcangelo's inappropriate behaviors at Bell Atlantic were volitional and under her control. She used intimidation to achieve her primary goal of distancing herself from others, and achieving revenge on those who she perceives as her enemies and "perpetrators." Her anger towards her perceived enemies is great, as is her instrumental use of fear-inducing behaviors towards others. She has consistently chosen speech and written means to express her anger, rather than physical violence. She also uses sarcasm and dark humor to express her anger. Her capacity to only intimidate when she perceives it is in her best interests, and to competently perform her job at other times, also indicates that Ms. Darcangelo's problematic work behaviors were under her direct control. She deliberately created an image of herself that is threatening, such as placing name stickers on various documents which identify her as the Tasmanian Devil, signing herself as Fran TT for Fran the Terrible, and by signing multiple documents with "the goddamn lunatic." The volitional nature of Ms. Darcangelo's problematic behaviors is perhaps best expressed in her own words, "I didn't care if I offended the lower management. I didn't feel any positive motivation to cooperate." Additionally, she informed one of her supervisors, Gottlieb Fleig, that her game plan was to do something to get fired, then sue the company and take the money to supplement her job as a refrigeration repair person.

261. The *Guides to the Evaluation of Permanent Impairment*[2] is the standard guide used throughout medicine to evaluate medical impairment. According to the *Guides*, impairment is defined as "a loss, loss of use or derangement of any body part, organ system or organ function." Impairments are assessed using medical means. Disability is most generally defined as an alteration of an individual's capacity to meet personal, social or occupations demands because of an impairment. Physicians have the education and training to evaluate a person's health status and determine the extent or absence of an impairment. If the physician has also been educated about a person's activities and needs, the physician may also be able to render an opinion about disability.

262. I have been instructed to assume that under the Americans with Disabilities Act ("ADA"), an individual is disabled if he or she has a physical or mental impairment that substantially limits major life activities.

263. According to the *AMA Guides*, Impairment due to Mental and Behavioral Disorders is assessed in four domains:

    a. Activities of daily living (self care, personal hygiene, communication);

    b. Concentration, persistence, and pace (ability to carry out instructions and complete tasks);

    c. Adaptation (ability to adapt to changes in work-like settings);

    d. Social Functioning (capacity to interact appropriately with others).

---

[2] AMA. *Guides to the Evaluation of Permanent Impairment.* 5th edition. AMA Press, 2001.

264. It is my opinion that Ms. Darcangelo has no impairment under the *AMA Guides* criteria in activities of daily living, concentration, persistence and pace, adaptation or social functioning.

265. During the relevant time period, Ms. Darcangelo's Bipolar Disorder was in remission and did not cause any impairments. I disagree with Dr. Zimberg's statement in his January 17, 2003 report that Ms. Darcangelo's difficulty in maintaining relationships is a result of hypomania. Dr. Zimberg's own treatment notes and his testimony at his deposition consistently reflect that Ms. Darcangelo had either no or minimal hypomanic symptoms.

266. Ms. Darcangelo's Personality Disorder has affected her throughout her adult lifetime. However, Ms. Darcangelo's Personality Disorder does not prevent her or significantly restrict her ability to appropriately interact with others if she so desires. Instead, Ms. Darcangelo, by reason of her Personality Disorder, chooses to keep others at a distance through sarcasm and verbally inappropriate behavior. Ms. Darcangelo uses fear and intimidation to separate herself from others. She is capable of controlling her behavior but at times chooses not to in order to distance herself from others. At other times, when she chooses to, Ms. Darcangelo functions appropriately with others. Ms. Darcangelo's style was perhaps best described by her prior treating psychiatrist, Dr. Ramsey: "Always angry underneath and projecting blame onto others."

267. Ms. Darcangelo has the capacity to function socially in an appropriate manner when she chooses to do so. She has shown on numerous occasions that she can maintain normal social behavior including her normal, non-disruptive behavior during the depositions of the witnesses in this matter and her appropriate behavior towards her mother when she was seriously ill. She has also shown that she understands when her behavior is not appropriate, as she showed during the December 17, 1998 incident with Barbara Lee that led to her termination. Ms. Darcangelo repeated "old massa" over and over again to Barbara Lee. During my interview, Ms Darcangelo told me, "I knew I was offending her. I wanted to." It is therefore my opinion that Ms. Darcangelo does not have an impairment in social functioning as defined in the *Guides*.

268. Based on Ms. Darcangelo's own description, depositions, and company documents regarding Ms. Darcangelo's job as central office technician in provisioning, it is my opinion that Ms. Darcangelo's mental disorders did not cause her to be disabled from being able to perform her essential job functions. Ms. Darcangelo had the technical capacity to perform her job functions and to interact appropriately with others, as she showed on numerous occasions and during numerous periods during her employment with Bell Atlantic. At other times Ms. Darcangelo, however, made the choice not to follow company behavioral rules, and to act in a provocative and disruptive manner. These disruptive behaviors were her choice and were volitional. Her behaviors were an attempt to intimidate and threaten those around her, and were under her direct control. She had the capacity to control her behaviors, but chose not to do so.

269. It is my understanding that the plaintiff intends to present Ms. Darcangelo's treating psychiatrist Dr. Zimberg to act as an expert to opine that she is disabled under the

-40-

ADA. Dr. Zimberg's opinion in this area is not reliable. As Ms. Darcangelo's treating psychiatrist, Dr, Zimberg was reluctant to act as an expert witness in this case. This was in my opinion prudent, given the inherent role conflicts between acting as treating psychiatrist and expert witness. Psychiatric treatment is a search for meaning (narrative truth), rather than a search for facts (objective truth). Treating psychiatrists accept the patient's statements in treatment as representing internal, personal reality from the patient's perspective. Forensic examiners, on the other hand, question the factual underpinnings of the data collected in a forensic interview by reviewing records, deposition testimony and other outside objective data.[3] As is usual in clinical practice, Dr. Zimberg relied on what he was told by Ms. Darcangelo and only read a few other reports. Although perfectly appropriate in the clinical treatment setting, this is a major error in the forensic setting, where it is imperative that all available data be reviewed in order to answer the questions posed by the litigation.

270.    Several examples of this error can be seen when Dr. Zimberg's treatment notes are compared with data available outside the treatment setting. During her 12/3/1997 session with Dr. Zimberg, Ms. Darcangelo informed Dr. Zimberg that she had been out of work on disability for several weeks and was not altogether certain why she was out on disability. She adamantly denied to Dr. Zimberg that she was ever inappropriate in her dealings with any co-workers. A review of available data showed in fact that Ms. Darcangelo had been disruptive at work by screaming in the work area, making derogatory comments such as, "you can write your name, can't you?" and making off-color remarks about people, i.e., "idiot and ass-kisser", using offensive language, such as the F word and the N word and placing offensive material in the work area by keeping it taped off like a police crime area.

271.    In another example, during a 5/13/1998 treatment session Dr. Zimberg indicated that Ms. Darcangelo told him that she was on suspension again but could not readily explain why. "She displayed a poster at work as a prank of sorts which was apparently considered to be a threat. She is not surprised by her employer's response and feels all the more strongly that she is a victim of discrimination." A review of available data, however, shows that Ms. Darcangelo had in fact posted a commercial rifle target with a picture of her supervisor in the bulls eye position. In his deposition Dr. Zimberg indicated that he had never even seen the poster. Failure to review such outside information may, as it has in this case, cause serious errors in answering the forensic questions posed by the litigation.

C.    <u>Accommodations</u>:

272.    Even if plaintiff proves impairment and an assessment for reasonable accommodations is therefore required, I disagree with plaintiff's expert, Mr. Kranitz's analysis. Mr. Kranitz opined that if Bell Atlantic had accommodated Ms. Darcangelo by allowing her more space and a place to work away from other people, or if more education or sensitivity training had been done with coworkers and supervisors to

---

[3]    Strasburger LH, Gutheil TG, Brodsky A: On wearing two hats: Conflicts in serving as both psychotherapist and expert witness. *American Journal of Psychiatry*. 154: 448, 1997.

understand her condition, Ms. Darcangelo would have been more successful at her job. In my opinion, even assuming that Ms. Darcangelo had requested these accommodations, they would not have been successful. Ms. Darcangelo's primary job responsibilities in provisioning required her to help internal company customers. Her job also required her to obtain assistance from co-workers, and to be able to hand off problems to co-workers on the next shift. Like almost all other jobs in the national economy, Ms. Darcangelo was also responsible for following the instructions of her supervisors. None of these basic job requirements would have been affected by more space and a place to work away from others. Instead Mr. Darcangelo's problematic behaviors were under her volitional control. She had the capacity to work well with others, but chose not to do so. Furthermore, educating co-workers and supervisors that Ms. Darcangelo was choosing to behave in an inappropriate fashion on the job would not have improved Ms. Darcangelo's job success.

273. Following Mr. Kranitz's recommended accommodations would not have prevented Ms. Darcangelo, for example from:

    a. placing a picture of her supervisor in the center of a rifle target and hanging it in the workplace,

    b. repeatedly calling an African-American co-worker "massa" in the workplace,

    c. not following the instructions of her supervisors, or

    d. repeatedly using offensive and provocative language.

274. In these examples, Ms. Darcangelo was actively seeking out attention and confrontation by choice, and the proposed accommodations therefore could not have any remedial effect.

D. **Psychic Injury**:

275. Dr. Zimberg and Mr. Kranitz both opine that Ms. Darcangelo's mental health has been adversely impacted by Bell Atlantic's actions. Mr. Kranitz seems to base his opinion on Ms. Darcangelo's GAF (Global Assessment of Functioning) score trends. I agree with Dr. Zimberg that the GAF Scale is subjective and has poor inter-rater reliability. I also agree that the GAF scale should not be used to measure how well a person can perform a job. (p. 68) For these same reasons I disagree with Mr. Kranitz's attempt to use GAF scores as a measure of capacity to maintain employment. There is also no scientific data to support Mr. Kranitz's statement that an individual with a GAF score of 50 would be unable to maintain employment.

276. I also disagree with Dr. Zimberg's statements that Ms. Darcangelo deteriorated in 1997, 1998 and 1999. Ms. Darcangelo has consistently engaged in disruptive behaviors throughout her employment at Bell Atlantic. What did change was Bell Atlantic's response to Ms. Darcangelo's disruptive behaviors. On 10/13/1997 Bell Atlantic management, after noting that Ms. Darcangelo's disruptive behaviors had a long history and were unacceptable, indicated a new approach would be taken. Her disruptive

behaviors would no longer be overlooked. She would be held accountable for her behaviors and would be expected to follow the rules. If Ms. Darcangelo did not follow the rules, progressive discipline would be initiated. In response to this appropriate limit setting Ms. Darcangelo escalated her problematic behaviors. It was Ms. Darcangelo's own disruptive, inappropriate behaviors which caused the company to follow its progressive discipline policy. Any distress felt by Ms. Darcangelo was therefore a direct result of her own problematic behaviors. Furthermore, Ms. Swope, Ms. Darcangelo's current therapist, indicated that Ms. Darcangelo's was stable and does not see her termination from Bell Atlantic as having had an effect on her mental state.

E.   **Reasonableness of IME Referrals**:

277.   It is my further opinion that Bell Atlantic appropriately referred Ms. Darcangelo for two separate independent medical evaluations. Supervisory staff were legitimately concerned about Ms. Darcangelo's disruptive behaviors, which were perceived by staff as intimidating and threatening. It would have been appropriate to refer Ms. Darcangelo for both independent medical evaluations even if she had not had a pre-existing diagnosis of Bipolar Disorder. Both independent evaluators found that Ms. Darcangelo was not impaired by a medical or psychiatric disorder and could return to work. Unfortunately, Ms. Darcangelo chose to continue her disruptive behaviors on the job, finally leading to her termination.

278.   All of my opinions are to a reasonable degree of medical certainty or probability.

279.   My fee for this matter is $400.00/hour. I have attached my curriculum vitae and a list of trial and deposition testimony.

Dated: June 9, 2003

_____
Jeffrey S. Janofsky, M.D.

-43-